## CIVIL COVER SHEET

JS-44
(Rev.1/05 DC)

| I (a) PLAINTIFFS | DEFENDANTS |
|---|---|
| MAJID KHAN, RABIA KHAN, as Next Friend of Majid Khan | GEORGE W. BUSH, President of the United States, DONALD RUMSFELD, Secretary, United States Department of Defense, REAR ADM. HARRY B. HARRIS, JR., Commander, Joint Task Force-GTMO, ARMY COL. WADE F. DAVIS, Commander, Joint Detention Operations Group-JTF-GTMO |

(b) COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF    99999
(EXCEPT IN U.S. PLAINTIFF CASES)

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT    11001
(IN U.S. PLAINTIFF CASES ONLY)
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED

(c) ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)

William Goodman
CENTER FOR CONSTITUTIONAL RIGHTS
666 Broadway
New York, NY 10012
Tel: (212) 614-6464
Fax: (212) 614-6499

ATTORNEYS (IF KNOWN)

Terry Marcus Henry
U.S. DEPARTMENT OF JUSTICE, CIVIL DIVISION - Room 7144
20 Massachusetts Avenue, NW
Washington, DC 20530
Tel: (202) 514-4107
Fax: (202) 616-8470

---

### II. BASIS OF JURISDICTION
(PLACE AN x IN ONE BOX ONLY)

O 1 U.S. Government Plaintiff

O 3 Federal Question (U.S. Government Not a Party)

⊙ 2 U.S. Government Defendant

O 4 Diversity (Indicate Citizenship of Parties in item III)

### III CITIZENSHIP OF PRINCIPAL PARTIES (PLACE AN x IN ONE BOX FOR PLAINTIFF AND ONE BOX FOR DEFENDANT) FOR DIVERSITY CASES ONLY!

|  | PTF | DFT |  | PTF | DFT |
|---|---|---|---|---|---|
| Citizen of this State | O 1 | O 1 | Incorporated or Principal Place of Business in This State | O 4 | O 4 |
| Citizen of Another State | O 2 | O 2 | Incorporated and Principal Place of Business in Another State | O 5 | O 5 |
| Citizen or Subject of a Foreign Country | O 3 | O 3 | Foreign Nation | O 6 | O 6 |

---

### IV.  CASE ASSIGNMENT AND NATURE OF SUIT
(Place a X in one category, A-N, that best represents your cause of action and one in a corresponding Nature of Suit)

**O A. Antitrust**

☐ 410 Antitrust

**O B. Personal Injury/ Malpractice**

☐ 310 Airplane
☐ 315 Airplane Product Liability
☐ 320 Assault, Libel & Slander
☐ 330 Federal Employers Liability
☐ 340 Marine
☐ 345 Marine Product Liability
☐ 350 Motor Vehicle
☐ 355 Motor Vehicle Product Liability
☐ 360 Other Personal Injury
☐ 362 Medical Malpractice
☐ 365 Product Liability
☐ 368 Asbestos Product Liability

**O C. Administrative Agency Review**

☐ 151 Medicare Act

Social Security:
☐ 861 HIA ((1395ff))
☐ 862 Black Lung (923)
☐ 863 DIWC/DIWW (405(g))
☐ 864 SSID Title XVI
☐ 865 RSI (405(g))
Other Statutes
☐ 891 Agricultural Acts
☐ 892 Economic Stabilization Act
☐ 893 Environmental Matters
☐ 894 Energy Allocation Act
☐ 890 Other Statutory Actions (If Administrative Agency is Involved)

**O D. Temporary Restraining Order/Preliminary Injunction**

Any nature of suit from any category may be selected for this category of case assignment.

*(If Antitrust, then A governs)*

---

**O  E. General Civil (Other)**    OR    **O  F. Pro Se General Civil**

Real Property
☐ 210 Land Condemnation
☐ 220 Foreclosure
☐ 230 Rent, Lease & Ejectment
☐ 240 Torts to Land
☐ 245 Tort Product Liability
☐ 290 All Other Real Property

Personal Property
☐ 370 Other Fraud
☐ 371 Truth in Lending
☐ 380 Other Personal Property Damage
☐ 385 Property Damage Product Liability

Bankruptcy
☐ 422 Appeal 28 USC 158
☐ 423 Withdrawal 28 USC 157

Prisoner Petitions
☐ 535 Death Penalty
☐ 540 Mandamus & Other
☐ 550 Civil Rights
☐ 555 Prison Condition

Property Rights
☐ 820 Copyrights
☐ 830 Patent
☐ 840 Trademark

Federal Tax Suits
☐ 870 Taxes (US plaintiff or defendant
☐ 871 IRS-Third Party 26 USC 7609

Forfeiture/Penalty
☐ 610 Agriculture
☐ 620 Other Food & Drug
☐ 625 Drug Related Seizure of Property 21 USC 881
☐ 630 Liquor Laws
☐ 640 RR & Truck
☐ 650 Airline Regs
☐ 660 Occupational Safety/Health
☐ 690 Other

Other Statutes
☐ 400 State Reapportionment
☐ 430 Banks & Banking
☐ 450 Commerce/ICC Rates/etc.
☐ 460 Deportation

☐ 470 Racketeer Influenced & Corrupt Organizations
☐ 480 Consumer Credit
☐ 490 Cable/Satellite TV
☐ 810 Selective Service
☐ 850 Securities/Commodities/ Exchange
☐ 875 Customer Challenge 12 USC 3410
☐ 900 Appeal of fee determination under equal access to Justice
☐ 950 Constitutionality of State Statutes
☐ 890 Other Statutory Actions (if not administrative agency review or Privacy Act

| ○ **G. Habeas Corpus/ 2255** | ○ **H. Employment Discrimination** | ○ **I. FOIA/PRIVACY ACT** | ○ **J. Student Loan** |
|---|---|---|---|
| [X] 530 Habeas Corpus-General<br>[ ] 510 Motion/Vacate Sentence | [ ] 442 Civil Rights-Employment<br>(criteria: race, gender/sex,<br>national origin,<br>discrimination, disability<br>age, religion, retaliation)<br><br>*(If pro se, select this deck)* | [ ] 895 Freedom of Information Act<br>[ ] 890 Other Statutory Actions<br>(if Privacy Act)<br><br><br><br>*(If pro se, select this deck)* | [ ] 152 Recovery of Defaulted<br>Student Loans<br>(excluding veterans) |

| ○ **K. Labor/ERISA (non-employment)** | ○ **L. Other Civil Rights (non-employment)** | ○ **M. Contract** | ○ **N. Three-Judge Court** |
|---|---|---|---|
| [ ] 710 Fair Labor Standards Act<br>[ ] 720 Labor/Mgmt. Relations<br>[ ] 730 Labor/Mgmt. Reporting &<br>Disclosure Act<br>[ ] 740 Labor Railway Act<br>[ ] 790 Other Labor Litigation<br>[ ] 791 Empl. Ret. Inc. Security Act | [ ] 441 Voting (if not Voting Rights<br>Act)<br>[ ] 443 Housing/Accommodations<br>[ ] 444 Welfare<br>[ ] 440 Other Civil Rights<br>[ ] 445 American w/Disabilities-<br>Employment<br>[ ] 446 Americans w/Disabilities-<br>Other | [ ] 110 Insurance<br>[ ] 120 Marine<br>[ ] 130 Miller Act<br>[ ] 140 Negotiable Instrument<br>[ ] 150 Recovery of Overpayment &<br>Enforcement of Judgment<br>[ ] 153 Recovery of Overpayment of<br>Veteran's Benefits<br>[ ] 160 Stockholder's Suits<br>[ ] 190 Other Contracts<br>[ ] 195 Contract Product Liability<br>[ ] 196 Franchise | [ ] 441 Civil Rights-Voting<br>(if Voting Rights Act) |

**V. ORIGIN**

⊙ 1 Original Proceeding ○ 2 Removed from State Court ○ 3 Remanded from Appellate Court ○ 4 Reinstated or Reopened ○ 5 Transferred from another district (specify) ○ 6 Multi district Litigation ○ 7 Appeal to District Judge from Mag. Judge

**VI. CAUSE OF ACTION** (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE.)
28 U.S.C. § 2241: Petition for Writ of Habeas Corpus.

| **VII. REQUESTED IN COMPLAINT** | CHECK IF THIS IS A CLASS [ ] ACTION UNDER F.R.C.P. 23 | DEMAND $ [           ]<br>JURY DEMAND: | Check YES only if demanded in complaint<br>YES [ ]   NO [ ] |
|---|---|---|---|

| **VIII. RELATED CASE(S) IF ANY** | (See instruction) | YES [X]   NO [ ] | If yes, please complete related case form. |
|---|---|---|---|

DATE  September 28, 2006    SIGNATURE OF ATTORNEY OF RECORD  _____

---

## INSTRUCTIONS FOR COMPLETING CIVIL COVER SHEET JS-44
### Authority for Civil Cover Sheet

The JS-44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. Listed below are tips for completing the civil cover sheet. These tips coincide with the Roman Numerals on the Cover Sheet.

I.    COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF/DEFENDANT (b) County of residence: Use 11001 to indicate plaintiff is resident of Washington, D.C.; 88888 if plaintiff is resident of the United States but not of Washington, D.C., and 99999 if plaintiff is outside the United States.

III.   CITIZENSHIP OF PRINCIPAL PARTIES: This section is completed only if diversity of citizenship was selected as the Basis of Jurisdiction under Section II.

IV.   CASE ASSIGNMENT AND NATURE OF SUIT: The assignment of a judge to your case will depend on the category you select that best represents the primary cause of action found in your complaint. You may select only one category. You must also select one corresponding nature of suit found under the category of case.

VI.   CAUSE OF ACTION: Cite the US Civil Statute under which you are filing and write a brief statement of the primary cause.

VIII.  RELATED CASES, IF ANY: If you indicated that there is a related case, you must complete a related case form, which may be obtained from the Clerk's Office.

Because of the need for accurate and complete information, you should ensure the accuracy of the information provided prior to signing the form.

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| Majid Khan<br>Detainee,<br>Guantánamo Bay Naval Station;<br>Guantánamo Bay, Cuba<br><br>Rabia Khan,<br>as Next Friend of Majid Khan;<br><br>*Petitioners/Plaintiffs,*<br><br><br><br>v.<br><br><br><br>GEORGE W. BUSH,<br>President of the United States<br>The White House<br>1600 Pennsylvania Ave., N.W.<br>Washington, D.C. 20500;<br><br>DONALD RUMSFELD,<br>Secretary, United States<br>Department of Defense<br>1000 Defense Pentagon<br>Washington, D.C. 20301-1000;<br><br>REAR ADMIRAL HARRY B. HARRIS, JR.,<br>Commander, Joint Task Force - GTMO<br>JTF-GTMO<br>APO AE 09360; and<br><br>ARMY COL. WADE F. DAVIS,<br>Commander, Joint Detention<br>   Operations Group - JTF-GTMO,<br>JTF-GTMO<br>APO AE 09360, | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

**PETITION FOR WRIT<br>OF HABEAS CORPUS**

**No.** _____

## PETITION FOR WRIT OF HABEAS CORPUS

Petitioner Majid Khan seeks the Great Writ. A citizen of Pakistan and long term resident

of the United States, Petitioner Khan acts on his own behalf and through his Next Friend, Rabia

Khan, his wife. He is a civilian wrongly treated as an "enemy combatant" by the President of the United States, and is being held *incommunicado* in military custody at Guantánamo Bay Naval Station, Guantánamo Bay, Cuba, after being held secretly by the United States Central Intelligence Agency for three and a half years. Petitioner Khan is and has been imprisoned without basis, without charge, without access to counsel and without being afforded any fair process by which he might challenge his detention. Petitioner is being held by color and authority of the Executive, and in violation of the Constitution, laws and treaties of the United States as well as customary international law. Accordingly, this Court should issue a Writ of Habeas Corpus compelling Respondents either to release Petitioner Khan or to establish in this Court the lawful basis for Petitioner Khan's detention. This Court should also order injunctive and declaratory relief.

Pursuant to the President's authority as Commander-in-Chief, his authority under the laws and usages of war, under the November 13 Executive Order, or under the reported September 17 Presidential Directive, Respondents George W. Bush, President of the United States; Donald H. Rumsfeld, U.S. Secretary of Defense; Rear Admiral Harry B. Harris, Jr., Commander of Joint Task Force-GTMO; and Army Colonel Wade F. Davis, Commander, Joint Detention Operations Group, Joint Task Force-GTMO are either ultimately responsible for or have been charged with the responsibility of maintaining the custody and control of the detained Petitioner Khan at Guantánamo.

## I.
## JURISDICTION

1.      This action arises under the Constitution, laws and treaties of the United States, including Articles I and II of, and the Fifth and Sixth Amendments to the United States Constitution, 28 U.S.C. §§ 1331, 1651, 2201, 2202, 2241(c)(1) & (c)(3), 2242 and 5

2

U.S.C. § 702, Geneva Convention (Third) Relative to the Treatment of Prisoners of War, Aug. 12, 1949, 6 U.S.T. 3316, 75 U.N.T.S. 135; Geneva Convention (Fourth) Relative to the Protection of Civilian Persons in Time of War, Aug. 12, 1949, 6 U.S.T. 3516, 75 U.N.T.S. 287, the International Covenant on Civil and Political Rights, Dec. 19, 1966, S. Exec. Doc. E (1978), 999 U.N.T.S. 1975, the Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, Dec. 10, 1984, S. Treaty Doc. No. 100-20, 1465 U.N.T.S. 112, and customary international law. Because they seek declaratory relief, Petitioners also rely on Fed. R. Civ. P. 57.

2.      This Court has subject-matter jurisdiction under 28 U.S.C. §2241, and may grant relief pursuant to this statute as well as 28 U.S.C. §1331, 5 U.S.C. § 702 and 28 U.S.C. §1651. Furthermore, Paragraph (a)12 of Article 2 of the UCMJ, 10 U.S.C. §802(a)(12), grants jurisdiction over a petition for judicial review filed by or on behalf of parties incarcerated at Guantánamo.

3.      This Court is empowered under 28 U.S.C. § 2241 to grant this Writ of Habeas Corpus, and to entertain the Petition filed by Rabia Khan, the Next Friend of Petitioner Majid Khan, under 28 U.S.C. § 2242. This Court is further empowered to declare the rights and other legal relations of the parties herein by 28 U.S.C. § 2201, and to effectuate and enforce declaratory relief by all necessary and proper means by 28 U.S.C. § 2202, as this case involves an actual controversy within the Court's jurisdiction. Finally, this Court is authorized to issue all writs necessary or appropriate in aid of its jurisdiction by 28 U.S.C. § 1651.

## II.

### DETAINEE TREATMENT ACT OF 2005

4.  On December 30, 2005, Respondent President Bush signed into law the Detainee Treatment Act of 2005, Pub. L. No. 109-148, §§ 1001-1006, 119 Stat. 2680, 2739-45 (2005) ("DTA"). Section 1005(e)(1) of the DTA amended 28 U.S.C. § 2241 to eliminate the jurisdiction of the federal courts to hear or consider petitions for Writs of Habeas Corpus and other actions brought by or on behalf of detainees held in Guantánamo filed after the date of its enactment.

5.  Section 1005(e)(2)(A) of the DTA granted the United States Court of Appeals for the District of Columbia Circuit "exclusive jurisdiction" to determine the validity of any final decision of a Combatant Status Review Tribunal ("CSRT") that a noncitizen is properly detained as an "enemy combatant." Section 1005(e)(2)(C) also provided that the applicable "scope of review" by the Court of Appeals is limited to determining whether a final CSRT decision "was consistent with the standards and procedures specified by the Secretary of Defense," and "to the extent the Constitution and laws of the United States are applicable, whether the use of such standards and procedures to make the determination is consistent with the Constitution and laws of the United States."

6.  Section 1005(e)(3)(A) of the DTA granted the United States Court of Appeals for the District of Columbia Circuit "exclusive jurisdiction" to determine the validity of any final decision rendered by a military commission. Section 1005(e)(3)(D) specified a "scope of review" analogous to that provided for the CSRT determinations.

7.  The Respondents have not conducted a CSRT for Petitioner Khan, nor do they purport to justify his detention based upon the findings of a previous CSRT.

4

8.    Petitioner Khan's challenge to his detention includes, *inter alia*, that the Executive is acting *ultra vires* in imprisoning Petitioner, a civilian seized in a zone of peace far from any battlefield and who has not engaged in hostilities against the United States. Petitioner contends that the military lacks any jurisdiction or authority to detain him or to subject him to any military proceedings whatsoever.

9.    Section 1005(e) of the DTA is unconstitutional on its face and as applied to Petitioner Khan because it violates the Suspension Clause of the United States Constitution, Art. I, § 9, cl. 2, and therefore does not deprive this Court of jurisdiction to hear or consider this Petition, and grant the relief that Petitioner Khan seeks herein.

## III.
## PARTIES

10.    Petitioner Majid Khan is a twenty-six-year-old long-term resident of the United States and a citizen of a U.S. ally, Pakistan. The United States detained Petitioner Khan in a secret location or locations operated by the Central Intelligence Agency ("C.I.A.") from on or about March 5, 2003 until on or about September 4, 2006. On or about September 4, 2006, Petitioner Khan was reportedly hooded, shackled, sedated and transferred by the Respondents to the U.S. Department of Defense ("D.O.D."). Dafna Linzer & Glenn Kessler, *Decision to Move Detainees Resolved Two-Year Debate Among Bush Advisers*, Wash. Post, Sept. 8 2006, at A1.    Petitioner Khan is presently incarcerated at Guantánamo Bay Naval Station, Guantánamo Bay, Cuba, ("Guantánamo") and held in Respondents' unlawful custody and control.    *See* Press Release, Office of the Press Secretary, President Discusses Creation of Military Tribunals to Try Suspected Terrorists (Sept. 6, 2006), *available at*    http://www.whitehouse.gov/news/releases/2006/09/20060906-3.html ("*President Bush's Speech*").

5

11.     Petitioner Rabia Khan is Petitioner Khan's wife. She is a Pakistani citizen. Because her
        husband has been and continues to be denied access to legal counsel and to the courts of
        the United States, Mrs. Khan acts as his Next Friend.

12.     Respondent President Bush is the President of the United States and Commander-in-
        Chief of the United States Military. Petitioner Khan is being detained purportedly
        pursuant to Respondent President Bush's authority as Commander-in-Chief, under the
        laws and usages of war or, alternatively, pursuant to either the Executive Order of
        November 13, 2001, Detention, Treatment, and Trial of Certain Non-Citizens in the War
        Against Terrorism, 66 Fed. Reg. 57,833 (November 13, 2001) ("November 13, 2001
        Executive Order") or the reported September 17 Presidential Directive, or both.
        Respondent President Bush is responsible for Petitioner Khan's unlawful detention and is
        sued in his official capacity.

13.     Respondent Donald Rumsfeld is the Secretary of the United States Department of
        Defense. Pursuant to the President's authority as Commander-in-Chief, under the laws
        and usages of war or, alternatively pursuant to the November 13, 2001 Executive Order,
        Respondent Rumsfeld has been charged with the responsibility of maintaining the
        custody and control of Petitioner Khan. He is sued in his official capacity.

14.     Respondent Rear Admiral Harry B. Harris, Jr. is the Commander of Joint Task Force-
        GTMO, the task force running the detention operation at Guantánamo Bay. He has
        supervisory responsibility for Petitioner Khan and is sued in his official capacity.

15.     Respondent Army Col. Wade F. Davis is the Commander of the Joint Detention
        Operations Group and the JTF-GTMO detention camps, including the U.S. facility where
        Petitioner Khan is presently held. He is the immediate custodian responsible for
        Petitioner Khan's detention and is sued in his official capacity.

6

16.     Respondents are directly responsible for any activities undertaken by or under the supervision of any agents or employees acting on their behalf, or of agents or employees of private contractors ("contractor employees") with whom any agency under Respondents' authority or supervision has contracted for the provision of services. All references to Respondents' actions in this Petition include activities performed by Respondents' agents or employees, other government agents or employees or contractor employees.

## IV.
## STATEMENT OF FACTS

17.     Petitioner Khan has not, nor has he ever been, an enemy alien, a lawful or unlawful belligerent, or a combatant of any kind under any definition adopted by the government in any civil or military proceeding.

18.     Petitioner Khan is not, nor has he ever been an "enemy combatant" who was "part of or supporting forces hostile to the United States or coalition partners in Afghanistan and who [was] engaged in an armed conflict against the United States there." *Hamdi v. Rumsfeld*, 542 U.S. 507, 516 (2004) (internal quotation marks omitted).

19.     Petitioner seeks to enforce his right to a judicial determination by an appropriate and lawful authority as to whether there is a lawful and factual basis for Respondents' determination that he is an "enemy combatant" either as defined by the United States Supreme Court in *Hamdi* or an "enemy combatant" as that term is defined and used by the Executive in the Combatant Status Review Tribunals ("CSRTs") conducted at Guantánamo, *see* Deputy Secretary of Defense Paul Wolfowitz's July 7, 2004 Order Establishing Combatant Status Review Tribunal ("July 7, 2004 Wolfowitz Order").

20.     In 1996, when Petitioner Khan was sixteen years old, he moved to the United States from Pakistan with his parents and siblings. On July 14, 1998, Petitioner's application for

asylum in the United States was granted. Throughout high school, Petitioner Khan was a good, quiet student and graduated from Owings Mills High School in 1999. In July 1999, Petitioner applied for Permanent Resident Status in the United States.

21.    After graduation, Petitioner Khan worked for the Maryland Office of Planning as a certified Oracle Database Administrator and for a computer training center as an Oracle Database Administration Instructor.

22.    Petitioner Khan also volunteered at the Islamic Society of Baltimore ("ISB") as an Oracle Database Administration teacher in the center's youth enrichment program. Technology training has provided Petitioner Khan with valuable job skills and he desired to help other young people improve their job skills.

23.    The Islamic Society of Baltimore is the only Islamic organization with which Petitioner Khan has been involved in the United States. A well-established, mainstream community organization, ISB began as a small group at Johns Hopkins University in 1969 and now resides at an 8-acre site in a Baltimore suburb with a membership of more than 3,000 Muslim families from the region. ISB provides a wide array of services to local Muslim families, including prayer services, daycare, education and recreational classes, and community programs, including meet-the-candidate forums during state and national elections.

24.    ISB encourages interfaith activities, promotes allegiance to democracy in America and hails its members as proud, outstanding citizens. The organization and its members condemned the attacks on September 11, 2001. After September 11th, the leadership of ISB reached out to the local community to show sympathy with the victims of the attack, including Muslim victims, and to promote interfaith dialogue about the role of Muslims in the United States.

8

25.  After completing working at the Maryland Department of Public Works and volunteering as a computer instructor at ISB, Petitioner Khan began working at Electronic Data Systems Technology & Engineering as an Infrastructure Specialist in March 2001. As part of the hiring process, Petitioner Khan was subject to and successfully passed a background investigation and drug screening.

26.  In 2002, Majid Khan and one of his older brothers went to Pakistan both to get married. After his wedding on February 26, 2002, Majid returned to the United States in early March 2002 to continue working and to provide financial support for his new wife, as well as to comply with the terms of his Immigration and Naturalization Services travel document.

27.  After working in the United States, he returned to Pakistan at the end of the year to be with his wife again.

28.  In the middle of the night, on March 5, 2003, individuals identified as Pakistani security officials pounded on the door of the home of Petitioner Khan's brother, Mohammed, in Gulistan-e-Jauhar, Karachi, and rushed into the flat. The family members at home included Petitioner Khan, his brother Mohammed, his brother's wife and their one-month-old daughter. As the family was trying to wake up, the officials hooded and bound all of them before placing them in a vehicle. Petitioner Khan, his brother, sister-in-law and infant niece were taken to an unknown location.

29.  Petitioner Khan's sister-in-law and infant niece were imprisoned for a week. Pakistan officials imprisoned his brother for approximately one month. Upon Mohammed Khan's release, officials threatened him not to make any public statements or inquire as to Petitioner Khan.

9

30.     As a result of the threats, the family waited anxiously and fearfully for Petitioner Khan's
        return. He was not released. Instead, officials refused to give the family official
        notification about where Petitioner Khan was imprisoned or the basis for his detention.
        Occasionally, Majid's brother in Pakistan received periodic phone calls from an unknown
        individual stating that Majid was alive and would return soon.

31.     Similarly, Petitioner Khan's family residing in the United States had no further
        information about Majid's welfare or location, despite diligent efforts to learn any
        information about him. After scores of meetings with members of the Khan family,
        officials from the Federal Bureau of Investigation and other government offices refused
        to provide the family with any information about Majid. His family had no means to
        confirm whether Majid was living or dead.

32.     Finally, on September 6, 2006, Respondent President Bush announced that Majid Khan
        had been secretly imprisoned by the C.I.A. and had been transferred into military custody
        at Guantánamo. Respondent President Bush also confirmed that U.S. officials had used
        "an alternative set of procedures" designed for use against individuals like Petitioner
        Khan who were held secretly by the C.I.A. As described in detail below, during
        interrogations involving torture; cruel, inhuman or degrading treatment; and/or outrages
        upon his personal dignity, Petitioner Khan was coerced into making false and unreliable
        statements. Respondent President Bush also stated on September 6, 2006 that Petitioner
        Khan, and the other detainees transferred from C.I.A detention to Guantánamo, would
        now be questioned subject to the new U.S. Army Field Manual. *See President Bush's
        Speech.*

33.     At the time of his arrest at his brother's home in Karachi, Pakistan, Petitioner Khan was
        not a member of the Taliban government's armed forces or Al Qaeda. Prior to his

                                              10

detention, he did not engage in any hostilities against the United States or against any American person or property. Petitioner Khan had no involvement, direct or indirect, in the terrorist attacks on the United States on September 11, 2001; the subsequent armed conflict in Afghanistan; or any act of terrorism attributed by the United States to Al Qaeda. After being held *incommunicado* in secret C.I.A. detention for three and a half years and subjected to torture; cruel, inhuman and degrading treatment; and outrages upon his personal dignity, Petitioner Khan was transferred to the custody of D.O.D. and remains incarcerated at Guantánamo, a territory over which the United States exercises exclusive jurisdiction and control. This transfer into military custody occurred despite the fact that Petitioner Khan is a civilian who has never engaged in any hostilities against the United States and who was seized in a zone of peace far from any battlefield.

34.    Petitioner Khan has not been afforded any procedures that would satisfy his rights under the most fundamental common law notions of due process, the U.S. Constitution, the laws and treaties of the United States, or customary international law.

35.    Petitioner Khan desires to pursue in the courts of the United States every available legal challenge to the lawfulness of his detention.

### A. The Authorization for the Use of Military Force

36.    In the wake of the September 11, 2001 attacks, the United States, at the direction of Respondent President Bush, began a massive military campaign against the Taliban government, then in power in Afghanistan. On September 18, 2001, a Joint Resolution of Congress authorized Respondent President Bush "to use all necessary and appropriate force against those nations, organizations, or persons he determined planned, authorized, committed, or aided the terrorist attacks that occurred on September 11, 2001, or harbored such organizations or persons, in order to prevent any future acts of

11

international terrorism against the United States by such nations, organizations or persons." Joint Resolution 23, Authorization for Use of Military Force, Public Law 107-40, 115 Stat. 224 (Jan. 18, 2001) ("AUMF"). The AUMF was limited to the parties involved in the attack on September 11, 2001.

37.    Because Petitioner Khan is a civilian seized away from any battlefield and who did not at any time plan, authorize, commit, or aid the attacks of September 11, 2001 or the armed conflict against the Taliban government in Afghanistan, and who did not participate in or harbor individuals who participated in, those attacks, he is not properly detained pursuant to Respondent President Bush's military authority as Commander-in-Chief, under the laws and usages of war, or under the AUMF.

### B. The Central Intelligence Agency's
### Secret Detention and Enhanced Interrogation Program

38.    On or about September 17, 2001, Respondent President Bush initiated a secret program to transfer suspected terrorists to the custody of the C.I.A. for imprisonment and interrogation outside the usual regulations and laws.    Respondent President Bush authorized the C.I.A. to administer the program in a still-classified presidential directive or finding signed on or about September 17, 2001 ("Presidential Finding"). Dana Priest, *CIA Holds Terror Suspects in Secret Prisons*, Wash. Post, Nov. 2, 2005, at 1; Douglas Jehl & David Johnston, *CIA Now Acting Independently to Move Prisoners*, NY Times, Mar. 7 2005, at 4.

39.    According to published reports, in the Presidential Finding, Respondent President Bush gave the C.I.A. covert action authority to operate independently and without case-by-case approval from the President or other Departments. The President also delegated day-to-day decision making to the C.I.A. Director, including the ability to decide to kill individuals if necessary.    Under the Presidential Finding, the C.I.A. has virtually

unfettered power to use interrogation techniques against suspected terrorists that violate domestic and international prohibitions against torture; cruel, inhuman and degrading treatment; and outrages upon personal dignity. Dana Priest, *Covert CIA Program Withstands New Furor – Anti-Terror Efforts Continue to Grow*, Wash. Post, Dec. 30, 2005, at A1; Priest, *CIA Holds Terror Suspects*; Jehl & Johnston, *CIA Now Acting Independently*.

40.     The Presidential Finding was broad and sweeping in its nature, granting the C.I.A. powers unprecedented since World War II. In response to the Finding, the C.I.A. established a covert action program which has been labeled GST, an abbreviation of a classified code name. Priest, *Covert CIA Program Withstands New Furor*.

41.     The GST program apparently consists of several components, which: arrest suspects with the assistance of foreign security services, secretly detain them overseas, employ enhanced interrogation techniques, transfer detainees between countries and even use paramilitary teams to find and kill suspects anywhere in the world. Priest, *Covert CIA Program Withstand New Furor*.     The Council of Europe has recently described the system of "targeting, apprehending and detaining terrorist suspects" as a "global spider's web" of which the United States is "chief architect." Committee on Legal Affairs and Human Rights, Council of Europe, *Alleged secret detentions and unlawful inter-state transfers of detainees involving Council of Europe member states* (June 12 2006) paras. 24-26 (Rapporteur: Dick Marty), *available at* http://assembly.coe.int/Documents/ WorkingDocs/doc06/edoc10957.pdf).

42.     On September 6, 2006, the Respondent acknowledged that Petitioner Khan and others had been held in a secret C.I.A. detention program ("secret C.I.A. Program") designed for interrogations of terrorism suspects, including citizens of U.S. allies using "alternative

13

procedures." Purportedly established pursuant to the Presidential Finding, the Commander-in-Chief power, and/or the laws of war, the secret C.I.A. Program has concealed at least 100 individuals. Dafna Linzer & Glenn Kessler, *Decision to Move Detainees Resolved Two-Year Debate Among Bush Advisers*, Wash. Post, Sept. 8 2006, at A1; Dana Priest, *CIA Holds Terror Suspects in Secret Prisons*, Wash. Post, Nov. 2, 2005, at A1.

43. According to documents released by the Office of the Director of National Intelligence following Respondent President Bush's announcement on September 6, 2006, Petitioner Khan had been imprisoned approximately three and a half years in (an) undisclosed location(s) by the C.I.A. prior to his transfer to the custody of the U.S. military at Guantánamo. *See* Announcement, Office of the Director of National Intelligence, Biographies of High Value Terrorist Detainees Transferred to the US Naval Base at Guantanamo Bay (Sept. 6, 2006), *available at* http://www.dni.gov/announcements/content/DetaineeBiographies.pdf.

44. On information and belief, in order to establish the secret C.I.A. Program, the United States government negotiated agreements with foreign governments to set up secret detention facilities ("black sites"). These agreements included immunity clauses for United States personnel from both the government and private companies. John Barry, Michael Hirsh, Michael Isikoff, *The Roots of Torture*, Newsweek, May 24, 2005. As at November 2005, these black sites were believed to be located, at various times, in eight countries including possibly Romania, Poland, Thailand, Afghanistan (including the "Salt Pit"); and at Guantánamo Bay. *Human Rights Watch Statement on U.S. Secret Detention Facilities in Europe*, Nov. 7, 2005, *available at* http://hrw.org/english/docs/2005/11/07/usint11995.htm; Dana Priest, *CIA Holds Terror Suspects in Secret Prisons*, Wash. Post,

Nov. 2, 2005, at A1; Daniel McGrory *CIA Accused of Running Secret Jails in Europe for Terrorists*, Times Online, Nov. 3, 2005, *available at* http://www.timesonline.co.uk/ article/0,,11069-1855381,00.html. Reports later indicated the existence of a C.I.A. facility in North Africa. Stephen Grey & Sarah Baxter, *CIA still hiding 'ghost' captives*, The Sunday Times, Sept. 10, 2006, *available at* http://www.timesonline.co.uk/ article/0,,2089-2350485,00.html; Brian Ross & Richard Esposito, *Sources Tell ABC News Top Al Qaeda Figures Held in Secret CIA Prisons*, ABC News, Dec. 5, 2005. In February 2006, it was reported that the United States was assisting Morocco to build a facility for interrogation and detention of Al-Qaeda suspects. Tom Walker Rabat & Sarah Baxter, *Revealed: the terror prison US is helping build in Morocco*, The Sunday Times, Feb. 12, 2006, *available at* http://www.timesonline.co.uk/article/0,,2089-2036 185,00.html.

45.    Respondent President Bush has announced that the secret C.I.A. Program will remain operational, though as of the date of the speech, "there are now no terrorists in the CIA program." Press Release, Office of the Press Secretary, President Discusses Creation of Military Tribunals to Try Suspected Terrorists (Sept. 6, 2006), *available at* http://www.whitehouse.gov/news/releases/2006/09/20060906-3.html. The Respondents have not disclosed at any time the locations where C.I.A. detainees were held, including the locations where Petitioner Khan was previously detained and interrogated. The President has signaled his intention not to disclose this information. Press Release, Office of the Press Secretary, President Discusses Creation of Military Tribunals to Try Suspected Terrorists (Sept. 6, 2006), *available at* http://www.whitehouse.gov/news/ releases/2006/09/20060906-3.html

46.    Detainees such as Petitioner Khan are typically picked up by local security forces, often
       with the assistance of U.S. agents. *See, e.g.* Center for Human Rights & Global Justice,
       *Fate and Whereabouts Unknown: Detainees in the "War on Terror,"* (2005) (describing
       several cases in which U.S. agents worked with local agencies to effect apprehensions of
       suspected terrorists). After initial interrogation by local and/or U.S. agents, "Members of
       the Rendition Group follow a simple but standard procedure: Dressed head to toe in
       black, including masks, they blindfold and cut the clothes off their new captive, then
       administer an enema and sleeping drugs. They outfit detainees in a diaper and jumpsuit
       for what can be a day-long trip." Dana Priest, *Wrongful Imprisonment: Anatomy of a CIA
       Mistake German Citizen Released after months in 'Rendition'*, Wash. Post, Dec. 4, 2005
       at A1; Committee on Legal Affairs and Human Rights, Council of Europe, *Alleged secret
       detentions and unlawful inter-state transfers of detainees involving Council of Europe
       member states* (June 12 2006) para. 85 (Rapporteur: Dick Marty), *available at*
       http://assembly.coe.int/Documents/WorkingDocs/doc06/edoc10957.pdf)

47.    Detainees such as Petitioner Khan are then handcuffed, blindfolded and bundled onto a
       plane. The C.I.A. uses a small fleet of private jets to transfer detainees into secret C.I.A.
       detention. These covert airplanes are often leased by fictional front companies. James
       Risen, State of War: The Secret History of the CIA and the Bush Administration (2006);
       Adrian Levy & Cathy Scott-Clark, *'One huge US jail'*, Guardian Unlimited, Mar. 19,
       2005, *available at* http://www.guardian.co.uk/afghanistan/story/0,1284,1440836,00.html;
       Dana Priest & Joe Stephens, *Secret World of U.S. Interrogation: Long History of Tactics
       in Overseas Prison is Coming to Light*, Wash. Post, May 11, 2004 at A1. There are also
       reports of the D.O.D. contracting planes used by the C.I.A. and of military aircraft being
       used in flight operations.    Committee on Legal Affairs and Human Rights, Council of

16

Europe, *Alleged secret detentions and unlawful inter-state transfers of detainees involving Council of Europe member states* (June 12 2006) paras. 40 (Rapporteur: Dick Marty), *available at* http://assembly.coe.int/Documents/WorkingDocs/doc06/doc10957. pdf); Amnesty International, *Below the radar: Secret flights to torture and 'disappearance'* (April 5 2006, AMR 51/051/2006); Seth Hettena, *Navy Secretly Contracted Jets Used by CIA*, Associated Press, September 24, 2005.

48.  The details of Petitioner Khan's detention are unknown to Petitioner, but known to Respondents.  Detainees who have been released from secret U.S. detention have described the types and conditions of facilities in which they were detained. Three Yemeni detainees describe two different types of U.S. detention centers. The first detention center they were held in was "an old style underground facility with high walls. The cells were approximately 1.5m x 2m with buckets instead of toilets." They were held in solitary confinement for six to eight months with Western music played 24 hours a day into the cell. Amnesty International, *USA/Jordan/Yemen: Torture and Secret Detention: Testimony of the 'Disappeared' in the 'War on Terror'* (August 4, 2005, AMR 41/108/2005).

49.  The second detention center they were transferred to was a modern purpose-built detention facility run by U.S. officials. It was underground, with modern facilities and surveillance cameras. The men were held in this facility for over 18 months in solitary confinement, mostly shackled and in handcuffs. The facility was designed to make it look as anonymous as possible. There were no pictures, ornaments, floor coverings, windows or natural light. Guards never spoke, instead communicating by hand gestures and were completely clothed in black. The facility was designed to induce maximum disorientation and sensory deprivation in the detainees. Amnesty International, *USA/Jordan/Yemen:*

17

*Torture and Secret Detention: Testimony of the 'Disappeared' in the 'War on Terror'*
(August 4, 2005, AMR 41/108/2005); Amnesty International, *United States of America/Yemen: Secret Detention in CIA "Black Sites",* (November 2005, AMR 51/177/2005).

50. In addition, both Laid Saidi, an Algerian citizen, and Khaled el-Masri, a Gerrman citizen, describe being held in secret detention in Afghanistan in the same facility. El-Masri describes being held in a "small, filthy, concrete cell...In place of a bed there was one dirty, military-style blanket and some old, torn clothes bundled into a thin pillow. It was cold and dark," Opening Br. for Pl.-Appellant at 6-7, *El-Masri v. Tenet*, (4th Cir. 2006) (No. 06-1667), *available at* http://www.aclu.org/pdfs/safefree/20060724elmasripls openingbrief.pdf; Decl. of Khaled El-Masri in Support of Pl.'s Op. to the United States' Mot. to Dismiss or, in the Alternative, for Summ. J. at ¶ 36, No. 1:05-cv-1417, *El-Masri v. Tenet*, 437 F. Supp. 2d 530 (E.D.Va. 2006) *available at* http://www.aclu.or g/pdfs/safefree/elmasri_decl_exh.pdf, and Saidi refers to the two rows of six cells in the basement as "filthy, not even suitable for animals." Craig S. Smith & Souad Mekhennet, *Algerian Tells of Dark Odessey in U.S. Hands*, N.Y. Times, July 7, 2006, at A1.

51. It has been widely recognized that "disappearances" are conducive to torture and other forms of human rights violations, and can itself constitute torture or ill-treatment of the "disappeared" person and in certain circumstances, ill-treatment of their families. *See, e.g.* Louise Arbour, *In our Name and on our Behalf*, 55 INT'L & COMP. L.Q 511, 520 (2006). *See also Kurt v Turkey*, Eur Ct Hum Rts Case No 15/1997/799/1002, 25 May 1998, para 134; The Inter-American Court of Human Rights, *Velásquez Rodríguez Case*, Judgment of 29 July 1988. Series C No 4, para 187; *Quinteros v Uruguay* (107/1981, para 14); Mojica v Dominican Republic (449/1991, para 5.7).

18

52.     The United States designed the C.I.A.'s secret detention system to facilitate the gathering
        of intelligence unhindered by the very factors that normally guard against this abuse, *e.g.*
        due process. Human Rights Watch, The United States' Disappeared: The CIA's Long-
        Term "Ghost Detainees" 5-15 (2004), *available at* http://www.hrw.org/backgrounder/
        usa/us1004/us1004.pdf. In the last several months, United Nations human rights bodies
        have called on the Unites States to close its secret detention facilities and bring their
        systems of detention in line with human rights standards binding on the U.S. *See*
        Concluding Observations of the U.N. Human Rights Committee, United States of
        America, U.N. Doc. CCPR/C/SR.2395 at ¶ 12 (July 27, 2006) *and* Conclusions and
        Recommendations of the Committee Against Torture, United States of America, U.N.
        Doc. CAT/C/USA/C/2 at ¶ 17 (May 18, 2006) (characterizing secret detention as a "per
        se" violation of the Torture Convention).

53.     In his speech of September 6, 2006, Respondent President Bush stated that detainees in
        the secret C.I.A. Program were subjected to an "alternative set of procedures," which
        appears to be a reference to the set of techniques known as "enhanced interrogation
        techniques." Press Release, Office of the Press Secretary, President Discusses Creation of
        Military Tribunals to Try Suspected Terrorists (Sept. 6, 2006), *available at*
        http://www.whitehouse.gov/news/releases/2006/09/20060906-3.html;          *see          also*
        Announcement, Office of the Director of National Intelligence, Summary of the High
        Value      Terrorist      Detainee      Program      (Sept.     6,     2006),     *available     at*
        http://www.dni.gov/announcements/content/TheHighValueDetaineeProgram.pdf.

54.     These "enhanced Interrogation Techniques" were reportedly approved by the C.I.A. in
        March 2002. These techniques include:

19

a. Water Boarding: A form of mock execution, the detainee is strapped to a board inclined so that the detainee's head is below his feet. Cellophane is wrapped over the detainee's face and water is poured over the detainee. The detainee experiences the terrifying fear of drowning which can leave permanent psychological scarring.

b. Cold cell: The detainee is stripped naked and doused with cold water in a cell with a temperature of approximately 50 degree Fahrenheit. Cold cell can lead to life-threatening hypothermia and resulting psychological trauma.

c. Long Time Standing: The detainee is handcuffed and shackled to the floor and forced to stand for more than 40 hours causing extreme exhaustion, sleep deprivation, and emotional distress.

d. The Attention Grab: The interrogator forcefully grabs the shirt of the detainee and shakes him violently.

e. Attention Slap: An open-handed slap inflicting pain and causing fear.

f. Belly Slap: An open-handed slap to the stomach which causes pain but causes no lasting internal damage.

*See*: Dana Priest, *CIA Holds Terror Suspects in Secret Prisons*, Wash. Post, Nov. 2, 2005, 1 (water boarding); *Vice President for Torture*, Wash. Post, Oct. 26, 2005, A18 (water boarding); Brian Ross & Richard Esposito, *Sources Tell ABC News Top Al Qaeda Figures Held in Secret CIA Prisons*, ABC News, Dec. 5, 2005, http://abcnews.go.com/WNT?Invesigtation/story?id=1375123 (water boarding, cold cell, attention slap); Brian Ross & Richard Esposito, CIA's Harsh Interrogation Techniques Described, ABC News, Nov. 18, 2005, http://abcnews.go.com/WNT/print?id=1322866 (all six techniques); Jane Mayer, *A Deadly Interrogation: Can the CIA Legally Kill a*

*Prisoner?*, The New Yorker, 14 Nov. 2005 (water boarding); Evan Thomas and Michael Hirsh, *The Debate over Torture*, Newsweek, Nov. 21, 2005 (water boarding).

55.    Prisoners in the secret C.I.A. Program have also been subject to other forms of cruel, inhuman and degrading treatment such as being beaten, shackled and subject to electric shocks.    Douglas Jehl and David Johnston, *CIA Now Acting Independently to Move Prisoners*, N.Y. Times, Mar. 7 2005, 4.

56.    These detainees are not allowed any contact with the outside world.    They do not have access to their families, legal counsel, or independent human rights or humanitarian agencies.    Even those treated as combatants by the United States are not registered anywhere, including, where appropriate, with the International Committee of the Red Cross, a failure that is in violation of the Geneva Conventions in situations of armed conflict.    International Committee of the Red Cross, *US Detention Related to the Events of 11 September 2001 and its Aftermath – the Role of the ICRC*, Mar. 29 2005, *available at* http://www.icrc.org/Web/Eng/siteeng0.nsf/html/66FGEL.

57.    A number of persons held secretly by the C.I.A. have reported that they were subjected to torture while in C.I.A. custody.    *See* Decl. of Khaled El-Masri in Support of Pl.'s Op. to the United States' Mot. to Dismiss or, in the Alternative, for Summ. J. at ¶ 36, No. 1:05cv1417, *El-Masri v. Tenet*, 437 F. Supp. 2d 530 (E.D.Va. 2006), *available at* http://www.aclu.org/pdfs/safefree/elmasri_decl_exh.pdf; Craig S. Smith and Souad Mekhennet, *Algerian Tells of Dark Odyssey in U.S. Hands*, N.Y. Times, July 7, 2006, A1; Michael Isikoff & Mark Hosenball, *"Don't Ask, Don't Tell"*, Newsweek, Dec. 8, 2005, *available at* http://msnbc.msn.com/id/10385133/site/newsweek/; Dana Priest, *CIA Holds Terror Suspects in Secret Prisons*, Wash. Post, Nov. 2, 2005, at A1; Human Rights

First, *Behind the Wire: An Update to Ending Secret Detentions* 2 (2005), *available at* http://www.humanrightsfirst.org/us_law/PDF/behind-the-wire-033005.pdf;

58.    Many of the documents released by the Department of Defense pursuant to the FOIA lawsuit brought by the Center for Constitutional Rights, ACLU and other human rights organizations, *available at* http://www.aclu.org/torturefoia/released/030905/, describe torture and mistreatment of individuals held secretly by the C.I.A. in military facilities. *See, e.g.*, Sworn Statement of SGT, Member of GTMO team, "Shut Up Group," Annex to Fay/Jones/Kern Report (June 4, 2004); Sworn Statement of SGT, 372nd MP, Annex to Fay/Jones/Kern Report (May 7, 2004); Sworn statement of CW2, A/519th MI Bn, Annex to Fay/Jones/Kern Report (May 19, 2004); Statement of B/Co, 470th MI Grp. SGT, Annex to Fay/Jones/Kern Report (May 18, 2004); *see also* Douglas Jehl & Tim Golden, *C.I.A. is Likely to Avoid Charges in Most Prisoner Deaths*, N.Y. Times, Oct. 23, 2005, at 6; Jane Mayer, *A Deadly Interrogation: Can the C.I.A. legally kill a prisoner?*, New Yorker, Nov. 14, 2005, at 44.

59.    Petitioner Khan has been interrogated repeatedly by agents of the C.I.A. and possibly other U.S. and foreign agencies and was subjected to one or more forms of coercion. These sessions may have yielded involuntary statements. Involuntary statements such as these, obtained through torture; cruel, inhuman or degrading treatment; or outrages upon personal dignity, frequently contain false or flawed information. Douglas Jehl, *Qaeda-Iraq Link U.S. Cited is Tied to Coercion Claim*, N.Y. Times, Dec. 9. 2005.

60.    On June 29, 2006, the United States Supreme Court handed down its decision in *Hamdan v. Rumsfeld*, No. 05-184, __U.S.__, 126 S.Ct. 2749 (June 29, 2006). It is reported that in the aftermath of this decision, government lawyers debated its implications for the secret C.I.A. Program, with the "most senior Justice Department lawyers believ[ing] the ruling

22

would force the government to close the CIA's 'black sites'" before a "compromise" was reached that the decision did not require closure, but "that the CIA could no longer handle suspects outside the boundaries of the Geneva Conventions." Dafna Linzer & Glenn Kessler, *Decision to Move Detainees Resolved Two-Year Debate Among Bush Advisers*, Wash. Post, Sept. 8 2006, at A1. An earlier report also refers to a decision to apply Geneva Conventions' Common Article 3 protections to detainees in secret C.I.A. detention. Charles Babington and Michael Abramowitz, *U.S. Shifts Policy on Geneva Conventions*, Wash. Post, July 12, 2006, at A1. Several reports refer to growing unease and dissent within the C.I.A. about its counter-terrorism activities, and particularly concern among C.I.A. officers about their vulnerability to legal action for their role in these activities. R. Jeffrey Smith, *Worried CIA Officers Buy Legal Insurance*, Wash. Post, Sept. 11, 2006, at A1; Ken Silverstein, *The CIA "Wehrmacht*," Harper's Magazine, April 19, 2006, *available at* http://www.harpers.org/sb-cia-wehrmacht.html.

61.    Despite Respondent President's Bush's statement on September 6 that the secret C.I.A. Program had been determined by Department of Justice and C.I.A. lawyers to be legal, in his Press Conference of September 15, 2006, the President repeatedly argued that the standards of Common Article 3 of the Geneva Conventions are "so vague that our professionals won't be able to carry forward the program, because they don't want to be tried as war criminals"; stated that unless there are "clear standards in the law" the "program is not going to go forward"; and emphasized that the military commissions bill must "...allow this vital program to continue." Press Conference of the President, Office of the Press Secretary, (Sept. 15, 2006), *available at* http://www.whitehouse.gov/ news/releases/2006/09/print/20060915-2.html; Press Release, Office of the Press Secretary, President Discusses Creation of Military Tribunals to Try Suspected Terrorists

(Sept. 6, 2006), *available at*    http://www.whitehouse.gov/news/releases/2006/09/
20060906-3.html.

## C. The Executive Order

62.    After approximately three and a half years of interrogation in the secret C.I.A. program,

on or around September 6, 2006, Respondents transferred the custody of Petitioner Khan

to the military authorities at Guantánamo. In transferring Petitioner to military custody,

the President purportedly invoked his authority under the Executive Order of November

13, 2001, the Commander-in-Chief power, and/or the laws of war.

63.    On November 13, 2001, Respondent President Bush issued an Executive Order

authorizing Respondent Secretary of Defense Rumsfeld to detain indefinitely anyone

President Bush has "reason to believe":

i.      is or was a member of the organization known as al Qaeda;
ii.     has engaged in, aided or abetted, or conspired to commit, acts of international
        terrorism, or acts in preparation therefore, that have caused, threaten to cause, or
        have as their aim to cause, injury to or adverse effects on the United States, its
        citizens, national security, foreign policy, or economy; or
iii.    has knowingly harbored one or more individuals described in subparagraphs (i)
        and (ii).

*See* Executive Order, 66 Fed. Reg. 57,833, §2 (November 13, 2001).

64.    Respondent President Bush must make this determination in writing.

65.    The November 13, 2001 Executive Order purports to vest Respondent President Bush

with the sole discretion to identify individuals who fall within its purview. It establishes

no standards governing the exercise of his discretion. Once a person has been detained,

the November 13, 2001 Executive Order contains no provision for that person to be

notified of the charges he may face or the basis for his detention. The November 13,

2001 Executive Order authorizes detainees to be confined indefinitely without charges or

an opportunity to challenge the basis for their detention. It contains no provision for a

24

detainee to be notified of his rights under domestic and international law, and provides neither the means to contact and secure counsel, nor the rights to notice of consular protection or to consular access at the detainee's request. It provides no right to appear before a neutral tribunal to review the basis for or the legality of a detainee's continued detention and contains no provision for recourse to an Article III court. Indeed, the United States Supreme Court in *Rasul v. Bush*, 542 U.S. 466 (2004), invalidated the order's provision barring federal habeas review of the legality of the detainees' imprisonment. Respondents have also taken the position that Petitioner Khan should not be informed of his rights or have access to existing civil counsel. As a result, Petitioner Khan lacks any ability to protect or vindicate his right under domestic and international law.

66.     The Executive Order purports to authorize indefinite and unreviewable detention, based on nothing more than the President's written determination that an individual is subject to its terms.

67.     The Executive Order was promulgated in the United States and in this judicial district, the decision to incarcerate Petitioner Khan was made by Respondents in the United States and in this judicial district, the decision to detain Petitioner Khan was made in the United States and in this judicial district, and the decision to continue detaining Petitioner Khan, was, and is, being made by Respondents in the United States and in this judicial district.

68.     Respondent President Bush has never formally certified or determined in any manner that Petitioner Khan is subject to the Executive Order.

69.     The November 13, 2001 Executive Order was neither authorized nor directed by Congress, and is *ultra vires*, and violates the Constitution, laws, and treaties of the United States.

25

V.
**CAUSES OF ACTION**

FIRST CLAIM FOR RELIEF
(ARTICLES I AND II OF THE CONSTITUTION –
UNLAWFUL DETENTION)

70.   Petitioners incorporate by reference all preceding paragraphs as if set forth fully herein.

71.   Petitioner Majid Khan is not, nor has he ever been, an enemy alien, lawful or unlawful belligerent, or combatant of any kind. He is a permanent resident of the United States and citizen of an ally country, Pakistan. The Executive lacks the authority to order or direct military officials to accept custody of and detain civilians who are seized far from the theater of war or occupied territory or who were not "carrying a weapon against American troops on a foreign battlefield." *Hamdi v. Rumsfeld,* 542 U.S. 507, 522 n.1 (2004).

72.   By the actions described above, Respondent President Bush has exceeded and continues to exceed the Executive's authority under Article II of the United States Constitution by authorizing, ordering and directing that Petitioner Khan, a civilian, be seized; detained *immunicado* in the custody of the Central Intelligence Agency at an unknown location; interrogated using tactics amounting to torture and cruel, inhuman and degrading treatment, and outrages upon his personal dignity; transferred to the custody of the U.S. military; and imprisoned in military detention at Guantánamo. All of the Respondents acted and continue to act without lawful authority by directing, ordering, and/or supervising the seizure, transfer and detention of Petitioner Majid Khan.

73.   The seizure, transfer and detention of Petitioner Majid Khan by the Respondents is *ultra vires* and illegal because it violates Article II of the United States Constitution. To the extent that the Executive asserts that Petitioner's detention is authorized by the Executive

26

Order of November 13, 2001, that Order exceeds the Executive's authority under Article
II and is *ultra vires* and void on its face and as applied to Petitioner.

74.    To the extent that Respondents assert that their authority to detain Petitioner Majid Khan
       derives from a source other than the Executive Order of November 13, 2001, including
       without limitation the Executive's inherent authority to conduct foreign affairs or to serve
       as Commander-in-Chief of the U.S. Armed Forces, whether from Article II of the
       Constitution or otherwise, Respondents lack that authority as a matter of fact and law.

75.    Accordingly, Petitioner Majid Khan is entitled to habeas, declaratory, and injunctive
       relief, as well as any other relief the court may deem appropriate.

## SECOND CLAIM FOR RELIEF
### (COMMON LAW DUE PROCESS AND DUE PROCESS CLAUSE OF THE FIFTH AMENDMENT TO THE CONSTITUTION - DENIAL OF DUE PROCESS)

76.    Petitioners incorporate by reference all preceding paragraphs as if set forth fully herein.

77.    By the actions described above, Respondents, acting under color of law, have violated
       and continue to violate common law principles of due process as well the Due Process
       Clause of the Fifth Amendment to the Constitution of the United States.  Respondent
       President Bush has ordered the unlawful transfer of a civilian into the custody of the
       United States military and then ordered the prolonged, indefinite and arbitrary military
       detention of Petitioner Khan without due process of law and the remaining Respondents
       have implemented those orders.

78.    To the extent that Petitioner Majid Khan's detention is without basis in law or fact and
       violates common law principles of due process and the Due Process Clause of the Fifth
       Amendment to the Constitution, Petitioner's detention is unlawful.

79.    Accordingly, Petitioner Majid Khan is entitled to habeas, declaratory, and injunctive
       relief, as well as any other relief the court may deem appropriate.

### THIRD CLAIM FOR RELIEF
### (INTERNATIONAL HUMAN RIGHTS TREATIES AND CUSTOMARY LAW – ARBITRARY DETENTION AND DENIAL OF DUE PROCESS)

80.　Petitioners incorporate by reference all preceding paragraphs as if set forth fully herein.

81.　By the actions described above, Respondents have denied and continue to deny Petitioner Majid Khan the due process accorded to civilian persons seized and detained by United States' officials as established by the International Covenant on Civil and Political Rights, the Convention Against Torture, the American Declaration of the Rights and Duties of Man, and the Universal Declaration of Human Rights, as well as by customary international human rights law as reflected, expressed, and defined in multilateral treaties and other international instruments and domestic judicial decisions, and other authorities.

82.　Violations of the ICCPR and CAT are direct treaty violations under 28 U.S.C. §1331, are violations of customary international law under 28 U.S.C. §1331, and constitute enforceable claims under 28 U.S.C. §2241(c)(3).

83.　Respondents are liable for this conduct described above, insofar as they set the conditions, directly and/or indirectly facilitated, ordered, acquiesced, confirmed, ratified and/or conspired to violate these treaties and customary international humanitarian law.

84.　Accordingly, Petitioner Majid Khan is entitled to habeas, declaratory, and injunctive relief, as well as any other relief the court may deem appropriate.

### FOURTH CLAIM FOR RELIEF
### (COMMON LAW DUE PROCESS AND DUE PROCESS CLAUSE OF THE FIFTH AMENDMENT TO THE CONSTITUTION – DENIAL OF DUE PROCESS)

85.　Petitioners incorporate by reference all preceding paragraphs as if set forth fully herein.

86.　Alternatively, if the Respondents purport to reply upon the laws of war as the source of authority to detain Petitioner Khan without due process, by the actions described above, Respondents, acting under color of law, have violated and continue to violate common

law principles of due process as well the Due Process Clause of the Fifth Amendment to the Constitution of the United States.  Respondent President Bush has ordered the prolonged, indefinite, and arbitrary detention of individuals, without due process of law, and the remaining Respondents have implemented those orders. Respondents' actions deny Petitioner Majid Khan the process accorded to persons seized and detained by the United States military in times of both international and noninternational armed conflict as established by, *inter alia*, the Uniform Code of Military Justice,  Army Regulation 190-8, Articles 3 and 5 of the Third and Fourth Geneva Conventions, and customary international law as reflected, expressed, and defined in multilateral treaties and other international instruments, international and domestic judicial decisions, and other authorities.

87.    To the extent that Respondents purport to authorize Petitioner Khan's detention under the Executive Order, that Order violates the Fifth Amendment on its face and as applied to Petitioner.

88.    To the extent that Petitioner Khan's detention is without basis in law and violates common law principles of due process, Petitioner's detention is unlawful.

89.    Accordingly, Petitioner Khan is entitled to habeas, declaratory, and injunctive relief, as well as any other relief the court may deem appropriate.

### FIFTH CLAIM FOR RELIEF
### (GENEVA CONVENTIONS AND CUSTOMARY INTERNATIONAL LAW OF ARMED CONFLICT- ARBITRARY DENIAL OF DUE PROCESS)

90.    Alternatively, if the Respondents purport to reply upon the laws of war as the source of authority to detain Petitioner Khan without due process, by the actions described above, Respondents, acting under color of law, have denied and continue to deny Petitioner Majid Khan the process due to all persons seized and/or detained by the U.S. military in

29

times of both international and noninternational armed conflict as established by, *inter alia*, Articles 3 and 5 of the Third and Fourth Geneva Conventions as well as customary international humanitarian law as reflected, expressed, and defined in , *inter alia*, Article 75 of the Protocol Additional to the Geneva Conventions of 1949, and multilateral treaties and other international instruments and domestic judicial decisions, and other authorities.

91.    Violations of the Geneva Conventions are direct treaty violations under 28 U.S.C. §1331; are violations of customary international law under 28 U.S.C. §1331; and constitute enforceable claims under 28 U.S.C.§2241(c)(3).

92.    Accordingly, Petitioner Majid Khan is entitled to habeas, declaratory, and injunctive relief, as well as any other relief the court may deem appropriate.

## SIXTH CLAIM FOR RELIEF
## VIOLATION OF THE APA - ARBITRARY AND CAPRICIOUS DENIAL OF DUE PROCESS)

93.    Petitioners incorporate by reference all preceding paragraphs as if set forth fully herein.

94.    Alternatively, if the Respondents purport to reply upon the laws of war as the source of authority to detain Petitioner Khan without due process by the actions described above, Respondents, acting under color of law, have arbitrarily and capriciously denied and continue to deny Petitioner Majid Khan the process due to all persons seized and/or detained by the United States military in times of both international and noninternational armed conflict as established by Army Regulation 190-8 in violation of the Administrative Procedures Act, 5 U.S.C. § 706(2).

95.    Accordingly, Petitioner Majid Khan is entitled to habeas, declaratory, and injunctive relief as well as any other relief the court may deem appropriate.

SEVENTH CLAIM FOR RELIEF
(INTERNATIONAL HUMANITARIAN LAW AND COMMON LAW OF WAR-
UNLAWFUL DETENTION)

96.    Petitioners incorporate by reference all preceding paragraphs as if set forth fully herein.

97.    Alternatively, if the Respondents purport to reply upon the laws of international armed
       conflict as the source of authority to detain Petitioner Khan without due process and even
       assuming *arguendo* that the detention of Petitioner Majid Khan was lawful at the time of
       his transfer to military custody, the government has conceded that the Geneva
       Conventions entitle detainees held at Guantánamo to release at the cessation of active
       hostilities. Br. for the United States, *Al Odah, et al., v. United States*, Nos. 05-5064, 05-
       5095 through 05-5116, at 55 (filed June 17, 2005).

98.    Accordingly, because the international armed conflict against Afghanistan has ended, so
       too has the authority, if any, of the United States Executive under the international
       humanitarian law of international armed conflict to continue detaining individuals in
       military custody. If it is pursuant to these laws of international armed conflict that the
       United States seeks to hold Petitioner Majid Khan, Petitioner Khan therefore, by the
       admission of the United States, is entitled to release or, alternatively to additional legal
       process under Army Regulation 190-8 to justify his detention beyond the end of the
       international armed conflict.

EIGHTH CLAIM FOR RELIEF
(COMMON LAW DUE PROCESS AND DUE PROCESS CLAUSE OF THE FIFTH
AMENDMENT TO THE CONSTITUTION - UNLAWFUL CONDITIONS OF
CONFINEMENT)

99.    Petitioners incorporate by reference all preceding paragraphs as if set forth fully herein.

100.   By the actions described above, Respondents, acting under color of law, have violated
       and continue to violate the right of Petitioner Majid Khan to be free from unlawful

31

conditions of confinement, in violation of common law due process and the Due Process Clause of the Fifth Amendment to the Constitution of the United States.

101.    Accordingly, Petitioner Majid Khan is entitled to declaratory and injunctive relief as well as any other relief the court may deem appropriate.

NINTH CLAIM FOR RELIEF
(FIFTH AND SIXTH AMENDMENTS TO THE CONSTITUTION - VIOLATION OF THE RIGHT TO COUNSEL AND TO ACCESS TO THE COURTS)

102.    Petitioner incorporates by reference all preceding paragraphs as if set forth fully herein.

103.    Respondents, purportedly acting from a concern for national security, have violated Petitioner Majid Khan's right to consult with counsel by denying him any access to counsel or any means to obtain counsel during his detention by the C.I.A. and the D.O.D.

104.    Accordingly, Petitioner Majid Khan is entitled to habeas, declaratory, and injunctive relief, as well as any other relief the court may deem appropriate.

TENTH CLAIM FOR RELIEF
ARTICLE I – VIOLATION OF THE SUSPENSION CLAUSE)

105.    Petitioner incorporates by reference all preceding paragraphs as if set forth fully herein.

106.    To the extent that the Detainee Treatment Act purports to remove this court's jurisdiction over Petitioner Khan's habeas petition challenging the legality of his detention, Respondent's actions constitute an unlawful Suspension of the Writ of Habeas Corpus, in violation of Article I, §9, cl. 2 of the United States Constitution.

107.    Accordingly, Petitioner is entitled to habeas, declaratory, and injunctive relief, as well as any other relief the court may deem appropriate.

32

## VI.
## PRAYER FOR RELIEF

WHEREFORE, Petitioners pray for relief as follows:

1.    Designate Rabia Khan as Next Friend of Majid Khan;

2.    Order and declare that Section 1005(e) of the DTA violates the Suspension Clause of the
United States Constitution;

3.    Grant the Writ of Habeas Corpus and order Respondent to release Petitioner Khan from
his current unlawful detention, or alternatively, to show cause why the writ should not be
granted;

4.    Order that Petitioner Khan be brought before the Court or before a Magistrate Judge
assigned by the Court to conduct proceedings under the supervision of the Court to
vindicate his rights;

5.    Order Respondents to allow counsel immediately to meet and confer with Petitioner
Khan, in private and unmonitored attorney-client conversations;

6.    Order Respondents to cease all interrogations of Petitioner Khan, direct or indirect, while
this litigation is pending;

7.    Order Respondents to cease all acts of torture; cruel, inhuman and degrading treatment;
and outrages upon the personal dignity of Petitioner Khan;

8.    Order and declare the Executive Order of November 13, 2001 is *ultra vires* and unlawful
in violation of Article II of the United States Constitution, the Fifth Amendment to the
U.S. Constitution, the Uniform Code of Military Justice, the Administrative Procedures
Act, 5 U.S.C. § 702, federal common law, the treaties of the United States and customary
international law;

33

9.   Order Respondents to disclose the Presidential Finding and any related documents which purportedly authorize the GST program;

10.   Order and declare the Presidential Finding is *ultra vires* and unlawful in violation of Article II of the United States Constitution, the Fifth Amendment to the U.S. Constitution, the Uniform Code of Military Justice, the Administrative Procedures Act, 5 U.S.C. § 702, federal common law, the treaties of the United States and customary international law;

11.   Order and declare that the prolonged, indefinite, and restrictive detention of Petitioner Khan without due process is arbitrary and unlawful and a deprivation of liberty without due process in violation of the common law principles of due process, the Due Process Clause of the Fifth Amendment to the United States Constitution, international human rights treaties and customary law, the regulations of the United States military, the treaties of the United States, and customary international humanitarian law on international and non-international armed conflict; and

12.   Grant such other relief as the Court may deem necessary and appropriate to protect Petitioner's rights under the common law, the United States Constitution, federal statutory law, and international law.

34

Dated: September 28, 2006   Respectfully submitted,

Counsel for Petitioners:

William Goodman/ + a

Michael Ratner (pursuant to L.Cv.R. 83.2(g))
William Goodman (pursuant to L.Cv.R. 83.2(g))
Gitanjali S. Gutierrez (pursuant to L.Cv.R. 83.2(g))
CENTER FOR CONSTITUTIONAL RIGHTS
666 Broadway
New York, New York 10012
(212) 614-6485
(212) 614-6499

35

## CERTIFICATION OF REPRESENTATION WITHOUT COMPENSATION

Counsel for Petitioner certify, pursuant to L. Cv. R. 83.2(g), that they are representing

Petitioner without compensation.

Dated:    September 28, 2006        William Goodman/ta

Michael Ratner (pursuant to L.Cv.R. 83.2(g))
William Goodman (pursuant to L.Cv.R. 83.2(g))
Gitanjali S. Gutierrez (pursuant to L.Cv.R. 83.2(g))
CENTER FOR CONSTITUTIONAL RIGHTS
666 Broadway
New York, New York 10012
(212) 614-6485
(212) 614-6499

36