**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |  |
|---|---|---|
| _____ | ) | |
| **MAJID KHAN,** *et al.*, | ) | |
| *Petitioners*, | ) | |
| | ) | |
| **v.** | ) | Civil Action No. 06-cv-1690 (RBW) |
| | ) | |
| | ) | |
| **GEORGE W. BUSH, et al.,** | ) | |
| *Respondents.* | ) | |
| _____ | ) | |

**REPLY MEMORANDUM IN SUPPORT OF EXPEDITED MOTION FOR
EMERGENCY ACCESS TO COUNSEL AND
ENTRY OF AMENDED PROTECTIVE ORDER**

Petitioner Maijd Khan (Petitioner Khan) respectfully submits this reply memorandum in support of his Expedited Motion for Emergency Access to Counsel and Entry of the Amended Protective Order.[1] The Respondents have imprisoned Petitioner Khan for over three years in secret CIA detention and subjected him to "alternative interrogation methods" that constitute torture and cruel, inhuman and degrading treatment. Respondents now argue that the Court lacks the authority to issue an order compelling the Executive to afford Petitioner Khan access to counsel in light of the Detainee Treatment Act of 2005[2] ("DTA") and Military Commission Act of 2006[3] ("MCA"). In so doing, the Respondents minimize the substantial doubts concerning the lawfulness of jurisdiction-stripping provisions of the DTA and MCA, seeking instead to reduce the Court's judicial power to an announcement of its lack of authority. The Respondents also characterize Petitioner Khan's secret CIA detention and interrogation as involving highly-sensitive classified information and then invoke the fact of his unlawful

---

[1] Amended Protective Order and Procedures for Counsel Access to Detainees at the United States Naval Base in Guantánamo Bay, Cuba, ("Amended Protective Order") (attached as Exhibit A).

[2] Detainee Treatment Act of 2005, Pub. L. No. 109-148, tit. X, 119 Stat. 2680 (10 U.S.C. §801 note).

[3] Military Commission Act of 2006, Pub. L. No. 109-___.

imprisonment and interrogation as justification for indefinitely delaying his access to counsel. Such efforts are a further attempt to shield Executive conduct from the constraints of judicial review.

The Court should reject Respondents' unfounded speculations concerning classified information, misrepresentations about the scope of and safeguards contained within the Amended Protective Order, and improper attempts to conceal illegal and embarrassing conduct through Executive classification authority. Moreover, any further delay of Petitioner Khan's access to counsel is likely to cause irreparable harm to his ability to pursue his challenge to the legality of his ongoing detention. As each day passes, the likelihood increases that Petitioner Khan will suffer from memory loss and other psychological injuries that will impede his capacity to assist in his representation and that the barriers to building a trusting attorney-client relationship will increase. In light of the urgency of Petitioner Khan's access to counsel and the Amended Protective Order's safeguards to protect national security and classified information —explicitly including "TOP SECRET//SENSITIVE COMPARTMENTED INFORMATION ("SCI') materials — no rational justifies denying Petitioner Khan prompt access to counsel.

Accordingly, the Court should exercise its existing jurisdiction to afford Petitioner Khan, at a minimum, prompt access to counsel and an opportunity to make informed decisions and to direct his litigation challenging his detention – including defending this Court's jurisdiction over his petition.[4]

I.    **THE COURT HAS EXISTING JURISDICTION TO GRANT PETITIONER'S MOTION FOR EMERGENCY ACCESS TO COUNSEL PURSUANT TO THE AMENDED PROTECTIVE ORDER.**

The Respondents do not dispute that Petitioner Majid Khan should have access to counsel in order to pursue his challenge to the legality of his detention. See Respondent's

---

[4] Respondents also objected that the Petition for Writ of Habeas Corpus (dkt. 1) was not verified as required pursuant to 28 U.S.C. § 2242. Petitioners have remedied the filing in compliance with § 2242. See Petrs' Additional Attach., Nov. 3, 2006 (dkt. no. 9).

Memorandum in Opposition at 12 ("Resp'ts Opp'n").  Rather, after imprisoning Petitioner in secret detention for over three years, the Respondents effectively seek to continue Petitioners' incommunicado detention by delaying further his right to consult with counsel concerning litigation decisions and the enforcement of his legal rights. They base this unlawful action upon a bold assertion of overreaching Executive Power and a denial of Petitioner's right to direct his representation and make litigation decisions.  In light of this Court's existing jurisdiction over this petition and Petitioner Khan's immediate need to consult with counsel, no reason warrants further hindrance of the Court's authority to order that the Respondent provide Petitioner Khan prompt access to legal counsel.

A.    **The Court Should Exercise Its Existing Jurisdiction over the Petition.**

The government argues that the withdrawal of jurisdiction under the Detainee Treatment Act, and Military Commission Act, is "unambiguous[]" and that this Court's only role is to announce its lack of jurisdiction.  See Resp'ts Opp'n at 9.  This contention ignores the Court's historical function under Article III of the Constitution to exercise its independent judgment on all issues rather than defer without inquiry to the unilateral assertions of the Executive.[5]  See, e.g., Hamdi v. Rumsfeld, 542 U.S. 507, 516 (2004) (rejecting the use of an Executive officials' untested declaration to justify the detention of an "enemy combatant" and reaffirming the Court's mandate to exercise independent review of Executive conduct).  Unless and until the matter is dismissed, this Court is entitled to exercise its authority over Petitioner Khan's case, including its authority to determine its jurisdiction and to afford Petitioner Khan access to counsel.

---

[5] Moreover, the only two courts to consider this question have concluded that the court's jurisdiction is a litigable issue because the government's interpretation of the DTA and MCA, even if correct, raises substantial questions concerning the lawfulness of the amendments withdrawing the Court's jurisdiction.  Indeed, the Court of Appeals and District Court have ordered briefing regarding the legality of the abrogation of the writ under the MCA and DTA in Al Odah v. United States, Nos. 05-5064, 05-5095 through 05-5116 (D.C. Cir.), & Boumediene v. Bush, Nos. 05-5062 & 05-5063 (D.C. Cir.), Order dated July 26, 2006, and in Hamdan v. Rumsfeld, Civil Action No. 04-cv-1519 (JR), Order dated Oct.. 27, 2006 (dkt. 77).

3

The undersigned counsel is obligated to pursue vigorously everything required to represent fully Petitioner Khan in litigating the disputed issues in the present petition, and potentially in the military commission proceedings that Respondents announced their intention to bring.  Further, Petitioner Khan is entitled to consult with counsel to litigate the issue of the Court's jurisdiction.  Any delay is an unwarranted obstruction of justice.

The Court has the authority to enter the Amended Protective Order and order prompt access to counsel because, contrary to Respondents' claims, see Resp'ts Opp at 8-10, the DTA and MCA do not deprive the Court of jurisdiction over Petitioner Khan's  habeas petition for the reasons set forth by the petitioners in Boumediene and Al Odah, in their supplemental briefs addressing the MCA (attached as Exs. B & C), whose arguments are adopted herein.  The DTA and MCA constitute an unlawful abrogation of the writ of habeas corpus and a denial of fundamental due process in violation of the Constitution, federal common law, and international law.  The DTA and MCA also violate, inter alia, separation of powers and constitute an unlawful delegation of Article III authority to the Executive.

Moreover, these arguments are even more compelling in the present case because, despite Respondents' assertions to the contrary, see Resp'ts Opp'n at 11-13, Petitioner Khan lacks any other available forum in which to challenge the legality of his detention or seek access to his counsel.  Even if the DTA and MCA applied to Petitioner Khan, he has not received any CSRT nor have military commission proceedings begun. [6]  Indeed, despite over three years of secret detention and interrogation, and nearly sixty days of detention at Guantánamo,[7] the military has

---

[6] Thus, unlike Petitioner Khan, the Petitioner in Bismullah v. Rumsfeld, No. 06-1197 (D.C.Cir.), had received a Combatant Status Review Tribunal decisions from which to appeal.

[7] Such lengthy delays are inconsistent with the speedy trial provisions of the Uniform Code of Military Justice, 10 U.S.C. § 810.

yet to even issue charges against Petitioner Khan and the military has announced that individuals such as Petitioner Khan may not even be charged until well into 2008.[8]

Under the regime envisioned by the Respondents, the Executive could seek to exercise unilateral and unreviewable authority over Petitioner – imprisoning him indefinitely without any judicial oversight. For example, because the DTA and MCA lack any express time restrictions for Executive conduct, the Executive might indefinitely delay initiating any military commission charges or a CSRT for years, thus impeding even the limited review provided for under the DTA to challenge the verdict of a military commission or the finding of a CSRT.[9] For the foreseeable future, Petitioner Khan has no available forum apart from his habeas petition in this Court to seek access to counsel in order to assist in his challenge to his detention.

Accordingly, this Court should defend its continuing habeas jurisdiction over Petitioner Khan's challenge to his detention and, thereby, order Petitioner Khan's immediate access to counsel.

**B.    Petitioner is Entitled to Access to Counsel to Defend the Court's Jurisdiction Over His Habeas Petition.**

The Respondents disingenuously state that while they are not trying to thwart Petitioner Khan's access to counsel entirely, numerous reasons justify further delay of Petitioner's access to counsel and, alternatively, that if the Court considers the jurisdictional issues, Petitioner's Next Friend may pursue the litigation on his behalf without Petitioner's consultation with his counsel. Contrary to the Respondents' claims, Petitioner Khan's access to counsel is essential to his ability to pursue his challenge to his detention, including defending the Court's

---

[8] Neil A. Lewis, Officials See Qaeda Trials Using New Law in 2007, NY Times, Nov. 3, 2006 (noting that the military commissions anticipated to begin in the summer of 2007 will "not involve any of the 14 senior Qaeda operatives recently sent to Guantánamo from secret C.I.A. custody" and that "Pentagon and Justice Department officials said it could be well into 2008, at the earliest, before the men believed to have been the high command structure of Al Qaeda sat in the dock at Guantánamo, where they will certainly face the death penalty").

[9] In fact, in Hamdan, the government argued repeatedly that Petitioner Hamdan held no speedy trial rights under the Uniform Code of Military Justice and then-existing military commission regulations. The timing of his prosecution was subject only to Executive whim. Similarly, the MCA contains no speedy trial right provision.

jurisdiction over his petitions and making informed litigation decisions. No rationale exists to compel Petitioner to defend the Court's jurisdiction over his case via his Next Friend rather than through his direct access to counsel.

Denial of Petitioner Khan's access to the undersigned counsel when she is at the prison meeting with other clients would be the epitome of arbitrariness that the rule of law seeks to prevent. Fundamentally, the Respondents' contention that Petitioner Khan's access to counsel is unnecessary while this Court considers either jurisdictional or merits issues undermines the Great Writ, as well as the ruling of the United States Supreme Court in <u>Rasul v. Bush</u>, 542 U.S. 466 (2004) (holding that the prisoners in Guantánamo may challenge the legality of their detention in federal court). Although prisoners in Guantánamo were previously able to overcome the jurisdictional challenges to their habeas petitions through their next friends, <u>see, e.g.</u>, <u>Rasul</u>, this mechanism and the denial of direct access to counsel is unwarranted in this case and unjustly restricts Petitioner Khan's access to the courts.

Accordingly, the Court should order the Respondents to afford Petitioner Khan immediate access to his counsel pursuant to the Amended Protective Order and counsel access procedures.

## II.    IMMEDIATE ACCESS TO COUNSEL PURSUANT TO THE AMENDED PROTECTED ORDER IS WARRANTED BECAUSE RESPONDENTS' OBJECTIONS ARE BASED UPON UNFOUNDED SPECULATION, MISUSE OF CLASSIFICATION AUTHORITY, AND MISREPRESENTATION OF THE AMENDED PROTECTIVE ORDER AND COUNSEL ACCESS PROCEDURES.

Respondents cannot establish any proper objection to Petitioner's immediate access to counsel pursuant to the Amended Protective Order. No information in the record establishes that Petitioner Khan possesses properly classified TOP SECRET or TOP SECRET//SCI information. Rather, the Executive is attempting to misuse its classification authority with respect to Petitioner Khan to conceal illegal or embarrassing Executive conduct. Moreover,

even if TOP SECRET or TOP SECRET//SCI information was involved in this case, the Amended Protective Order and existing counsel access regime expressly set forth provisions to govern habeas counsel's access to such information. The definition of "classified information" governed by the Protective Order, and thus the attached counsel access procedures, refers to "any classified document or information" that has been classified as "'CONFIDENTIAL,' 'SECRET,' or 'TOP SECRET,' or additionally controlled as 'SENSITIVE COMPARTMENTED INFORMATION (SCI)'." Amended Protective Order, ¶ 9. This Court should reject the Respondents' attempt to further delay Petitioner's access to counsel based upon the Respondents' unfounded speculation, effort to abuse the Executive's classification authority to conceal illegal or embarrassing Executive conduct, and flagrant misrepresentation of the Amended Protective Order. Any further delay of Petitioner Khan's access to counsel is wholly unwarranted and will irreparably injure his ability to vindicate his legal rights and establish an effective attorney-client relationship.

Accordingly, this Court should order that Petitioner Khan be afforded immediate access to counsel pursuant to the Amended Protective Order and counsel access procedures.

A.    **Respondents' Concerns That Petitioner's Access to Counsel Will Threaten National Security Are Speculative and Unfounded.**

The Respondents engage in speculation that Petitioner Khan may possess properly classified TOP SECRET or TOP SECRET//SCI information, which would have necessarily been provided or disclosed to him by U.S. government personnel while Petitioner Khan was imprisoned in secret CIA detention.[10] See Resp'ts Opp'n at 15. This speculation is unfounded and cannot justify any delay in Petitioner Khan's access to counsel.

---

[10] The information the Respondent seeks to conceal is Petitioner's personal experience of torture, disappearance, and indefinite detention by U.S. personnel. He can, at last, now seek some measure of justice. It is intolerable for the government to assert its own unacceptable and notorious treatment of this man as the very foil that is used to

In order to assert that "it is likely that [Petitioner Khan] will possess, and may be able to transmit to counsel, information that would be classified at the TOP SECRET//SCI level," see Resp'ts Opp'n at 15, the Respondents rely upon the Declaration of Marilyn S. Dorn ("Dorn Declaration"). While Dorn contends she is "generally familiar with this case," she does not assert any personal knowledge of the scope of Majid Khan's knowledge of information properly classified as TOP SECRET or TOP SECRET//SCI. Therefore, with respect to Petitioner Khan's possession of TOP SECRET or TOP SECRET//SCI information, this Court should not afford the Dorn Declaration any weight because of her lack of personal knowledge of Petitioner Khan's awareness. Moreover, the information she describes as TOP SECRET or TOP SECRET//SCI is already in the public realm, often as a result of the Respondents' action.

In addition the Dorn Declaration misstates the plain language of the Amended Protective Order. The Dorn Declaration indicates that the Information Review Officer of the National Clandestine Service had no personal knowledge of the Amended Protective Order and counsel access procedures. The Dorn Declaration states, for example, that the "protective order that petitioner requests the Court to adopt contemplates that the national security information at issue would be classified at the SECRET level, rather than at the TOP SECRET//SCI level as it is here." See Dorn Decl. ¶ 14; see also id. at ¶ 15. Yet, the plain language of the Protective Order explicitly states that it governs classified information that is CONFIDENTIAL, SECRET, TOP SECRET, as well as TOP SECRET information additionally controlled as SCI. For this additional reason, the Court should not give the Dorn Declaration any weight.

Finally, the Respondents should not be permitted to continue a pattern of erecting barriers to counsel access based on unfounded and blatantly inaccurate assertions. Since 2004, Respondents have invoked similar theoretical national security concerns based upon

---

perpetuate his isolation. To do so will only make it more difficult for him to partake of that justice he so desperately seeks.

declarations from individuals lacking personal knowledge to hinder and delay Guantánamo petitioners' access to counsel. See, e.g., Defs. Resp. to Compl., Al Odah v. United States, Civ. Action No. 02-cv-828 (D.D.C.), at 7, (attempting to justify impermissible monitoring of attorney-client conversations because of "the extraordinary nature of these cases involving Guantanamo Bay detainees, including that the detainees may possess sensitive information, for example, information regarding the Guantanamo base or concerning agents, units, or methods involved in the detainee's capture.")   The courts have soundly rejected these speculative barriers to counsel access and interferences with the attorney-client relationship. See, e.g., Al Odah v. United States, 346 F.Supp.2d 1 (2004).   The Court should do the same here.

Accordingly, the Court should order Petitioner Khan immediate access to counsel.

**B.    Information Concerning the Location of CIA Secret Detention and "Alternative Interrogation Methods" Is Currently in the Public Realm and Does Not Pose a Threat to National Security.**

Even if this Court affords the Dorn Declaration any weight, the information described as TOP SECRET and TOP SECRET//SCI is already in the public domain. Respondents express particular concerns about the potential disclosure of the location of the secret CIA detention sites and the interrogation techniques used against prisoners in these facilities.   Such information is known as a result of investigative news reporting, human rights investigations, accounts from released detainees, and accounts from individuals still detained in Guantánamo. The public information concerning the location of CIA secret detention, for example, includes descriptions of the facilities, the identification of host countries, photographs of the prisons, and flight records of prisoner transfers..   See, e.g., Amnesty International, USA/Jordan/Yemen: Torture and Secret Detention: Testimony of the 'Disappeared' in the 'War on Terror' (August 4, 2005, AMR 41/108/2005) (discussing Yemeni detainees released from CIA secret detention

describing the types and conditions of facilities in which they were detained, including sizes of cells, building structure and facilities, physical characteristics and behavior of guards, and sensory disorientation and deprivation techniques used on prisoners); Amnesty International, USA/Jordan/Yemen: Secret Detention in CIA "Black Sites", (November 2005, AMR 51/177/2005) (describing additional details of CIA detentions centers where Yemeni prisoners held and the interrogation tactics used); Dana Priest, CIA Holds Terror Suspects in Secret Prisons, Wash. Post, Nov. 2, 2005, at A1 (reporting that U.S. has secret detention centers in Eastern Europe); Daniel McGrory CIA Accused of Running Secret Jails in Europe for Terrorists, Times Online, Nov. 3, 2005, available at http://www.timesonline.co.uk/article/ 0,,11069-1855381,00.html (National Security Adviser, Stephen Hadley refusing to deny that "black sites" are located in "Jordan, Egypt, Morocco and Afghanistan, and at least one Eastern European nation"); Tom Walker Rabat & Sarah Baxter, Revealed: The Terror Prison U.S. is helping build in Morocco, The Sunday Times, Feb. 12, 2006, available at http://www. timesonline.co.uk/article/0,,2089-2036185,00.html (revealing that United States is helping to build interrogation and detention facility in Morocco); BELLWETHER Gallery, Press Release, available at http://www.bellwethergallery.com/upcoming_01.cfm?fid=305 (exhibiting Trevor Paglen's "Black World" November 16-December 23, 2006, featuring photographs of several of the CIA's "black sites", patches and symbols worn by personnel, and other documentation of the CIA secret detention program) (attached as Exhibit D) ; Human Rights Watch Statement on U.S. Secret Detention Facilities in Europe, Nov. 7, 2005, available at http://hrw.org/english/docs/ 2005/11/07/usint11995.htm (reporting that flight records showing CIA airplanes known to be used to transport prisoners landed repeatedly in Poland, Jordan, Morocco, Egypt, Libya, Germany, the United Kingdom, Switzerland, Spain, Portugal,

Macedonia, Cyprus, the Czech Republic, and Greece); see generally, Stephen Grey, Ghost Plane: The True Story of the CIA Torture Program (2006).

Similar extensive details are known about the methods used by CIA and other U.S. interrogators, including descriptions of these methods by former prisoners and former interrogators.[11] Amnesty International, USA/Jordan/Yemen: Torture and Secret Detention: Testimony of the 'Disappeared' in the 'War on Terror' (August 4, 2005, AMR 41/108/2005) (Yemeni detainees reporting the use of sensory disorientation and deprivation including solitary confinement for six to eighteen months, western music playing twenty-four hours a day, and elimination of natural light); Amnesty International, USA/Jordan/Yemen: Secret Detention in CIA "Black Sites" (November 2005, AMR 51/177/2005) (describing additional details of interrogation tactics used); Declaration of Khaled El-Masri ("el_Marsi Decl.") (attached as Exhibit E) (former secret CIA detainee, Khaled El-Masri reporting he was subject to torture while in CIA custody); Sworn Statements of Deparment of Defense personnel available at http://www.aclu.org/torturefoia/released/030905/ (describing the torture and mistreatment of individuals held secretly by the CIA); Press Release, Office of the Press Secretary, President Discusses Creation of Military Tribunals to Try Suspected Terrorists (Sept. 6, 2006), available at http://www.whitehouse.gov/news/releases/2006/09/20060906-3.html (President Bush admitting the use of "alternative set of procedures" implying the set of techniques known as "enhanced interrogation techniques" were used on secret CIA detainees); Brian Ross & Richard Esposito, CIA's Harsh Interrogation Techniques Described, ABC News, Nov. 18, 2005, http://abcnews.go.com/WNT/print?id=1322866 (reporting use of and describing waterboarding,

---

[11] Indeed, Vice President Dick Cheney recently provoked a controversy when, during a discussion of interrogation methods, he stated that it was a "no-brainer" that interrogators could use a "dunk in water" to extract information from prisoners. Transcript, Interview of the Vice President by Scott Hennen, WDAY at Radio Day at the White House, The Vice President's Office, available at http://www.whitehouse.gov/news/releases/2006/10/20061024-7.html. Despite the denials of the White House Press Spokesman, many observers considered the Vice President to be referring to the use of waterboarding during interrogations of individuals in secret CIA detention. Dan Eggen, Cheney Defends 'Dunk in the Water' Remark, Wash. Post, Oct. 28, 2006 available at http://www.washingtonpost.com/wp-dyn/content/article/2006/10/27/AR2006102700560.html.

cold cell, long-time standing, the attention grab, the attention slap, and the belly slap techniques) Douglas Jehl and David Johnston, CIA now Acting Independently to Move Prisoners, N.Y. Times, Mar. 7 2005, 4. (reporting that prisoners in secret detention have been subject to cruel, inhuman and degrading treatment such as beatings, shackling, and electric shocks); see also Brian Ross & Richard Esposito, Sources Tell ABC News Top Al Qaeda Figures Held in Secret CIA Prisons, ABC News, Dec. 5, 2005, http://abcnews.go.com/ WNT?Investigation/story?id=1375123; Jane Mayer, A Deadly Interrogation: Can the CIA Legally Kill a Prisoner?, The New Yorker, 14 Nov. 2005; Evan Thomas and Michael Hirsh, The Debate over Torture, Newsweek, Nov. 21, 2005.

Moreover, contrary to the Respondents' claims, see Resp'ts Opp'n at 3, Petitioner Khan's imprisonment in secret CIA detention is not unique to him.  Other prisoners held in Guantánamo prior to September 2006 had previously been held in secret CIA detention prior to their transfer to Guantánamo.  Some of those who have been held in secret CIA detention have had the opportunity to consult with lawyers.  See, e.g., Robert Barr, Group: U.S. Had Secret Prison in Germany, Forbes, Oct. 6, 2006, available at http://www.forbes.com/entrepreneurs /feeds/ap/2006/10/06/ap3072831.html.  The details of these Guantánamo detainees' secret CIA detention have been widely publicized in the context of European Union investigations into member countries' complicity in the U.S. secret detention program.

Not only is a great deal of general information known about the secret CIA detention program, specific details concerning some of the locations in which Petitioner Khan was held and his conditions of confinement are known to released prisoners, such as Mr. Khaled el-Masri.  See el-Masri Decl; see also Craig S. Smith, Algerian Tells of Dark Odyssey in U.S. Hands, NY Times, July 7, 2006, at A1 (attached as Exhibit F) (describing the imprisonment of Khaled el-Masri, Laid Saidi, Abdul al-Rahim Ghulam and Mohammed Ahmad Ghulam

Rabbani, all of whom were imprisoned with Petitioner Khan in secret CIA detention in Afghanistan)..

Upon his release, Mr. el-Masri filed an action seeking to hold U.S. government officials and private contractors accountable for his extraordinary rendition and wrongful imprisonment. His detailed disclosures about the facility in which he, and Petitioner Khan, were held did not result in further terrorists attacks. Rather, Mr. el-Masri and other released prisoners are able to speak openly about their experiences. Respondents continue to maintain illogically, however, that because they continue to imprison Petitioner Khan in incommunicado detention, he cannot be permitted timely access to couns

The government characterizes Petitioner Khan's three year imprisonment in secret detention -- isolated from the outside world, his family, legal counsel, the International Committee of the Red Cross, and others, while subjected to "aggressive" CIA interrogation methods -- as a "unique circumstance" justifying his further incommunicado detention at Guantánamo. Yet, the Respondents released four men detained with Petitioner Khan in at least one of the CIA secret detention locations and those men are able to speak openly about their experiences. Respondents maintain, however, that because they continue to imprison Petitioner Khan in incommunicado detention, he cannot be permitted timely access to counsel. The Respondents cannot invoke their patently illegal disappearance and aggressive interrogations of Petitioner Khan to justify more restrictive counsel access procedures or any further delay in his access to counsel. Rather, these "unique circumstances" support his urgent need to consult with his counsel.

Finally, implied in Respondents' concerns about security-cleared counsel meeting with Petition Khan is the belief that such communications will result in the illegal public disclosure of classified information. Respondents mistakenly equate access to counsel with unfettered

public disclosure of classified information. The counsel access regime and Amended Protective Order envision no such illegal conduct. Regardless of the classification level of any information that counsel learns from his or her client, that information cannot be disclosed absent a classification review by the military's Privilege Review Team, which the Respondents established and supervise. Counsel Access Procedures VII, IX. When necessary, the habeas litigation has proceeded under seal and filings are initially submitted to the CSO for proper redactions prior to any public filing to safeguard classified information and national security. Amended Protected Order ¶¶ 46-48. These are examples of the appropriate mechanisms incorporated into the existing Amended Protective Order that adequately address the national security concerns invoked by Respondents to hinder Petitioner Khan's access to counsel. As the court has stated, when the government grants security clearance to attorneys, such as the undersigned counsel, it is a determination that the individual can be trusted with the information classified at that level. Al Odah v. United States, 346 F.Supp.2d 1 (2004). As with any information covered by the Protective Order, safeguards exist to prevent the unauthorized disclosure of classified information.

Accordingly, the Court should order Petitioner Khan's immediate access to counsel.

**C.    The Executive's Classification Authority Cannot Be Used to Conceal Illegal or Embarrassing Conduct Concerning Petitioner's Secret Detention and Torture.**

Fundamentally, the Executive cannot use its classification authority to conceal illegal conduct or embarrassing activities. The Respondents cannot rely upon the system of classification established by Executive Order 12958, as amended by Executive Order 13292, to conceal violations of the law or to prevent embarrassment to the government. Exec. Order No. 12,958, 60 Fed. Reg. 19,825 (April 20, 1995), *amended by* Exec. Order No. 13,292, 68 Fed. Reg. 15,315 (March 28, 2003). Section 1.7(a) of Executive Order 12958 states that "[i]n no case

14

shall information be classified in order to: (1) conceal violations of law . . . [or] (2) prevent embarrassment to a person, organization, or agency." The classification limitations under Section 1.7(a)(1)-(2) of the Executive Order expressly prohibit the government from treating the details of Petitioner Khan's detention and interrogation as classified in order to conceal their illegal and embarrassing nature.

The Respondents argue that because the CIA chose to secretly detain Petitioner Khan, he might possess classified information "such as the locations of the C.I.A. detention centers." Respondents' Memorandum in Opposition, at 15. Under § 17(a)(1) of Executive Order 12958, the Respondents cannot declare the locations of the secret CIA detention classified to conceal the fact that the CIA operates a secret prison system in contravention of the United States' domestic and international legal obligations.[12] The illicit and illegal nature of the CIA secret detention program is well-known. Two human rights bodies of the United Nations have pointed out, for example, that the CIA's secret detention program violate the United States' obligations under the International Covenant on Civil and Political Rights ("ICCPR") and the U.N. Convention Against Torture ("CAT"). See Office of the U.N. High Comm'r for Human Rights, Working Group on Arbitrary Detention, Opinion No. 29/2006 (United States of America), ¶¶ 3, 15, 21–23 (Sept. 1, 2006) (observing the United States' obligations under the ICCPR and finding the CIA's detention of Petitioner Khan and other disappeared prisoners "manifestly cannot be justified on any legal basis"); Office of the U.N. High Comm'r for Human Rights, Committee Against Torture, Conclusions and Recommendations of the Committee Against Torture, United States of America, ¶ 17, U.N. Doc. CAT/C/USA/CO/2 (May 18, 2006) (characterizing secret detention as a "per se" violation of the CAT). Moreover, the CIA denied Petitioner Khan access to the International Committee of the Red Cross during his secret detention, thereby violating the

---

[12] As explained above, however, if such information was properly classified, regardless of the classification-level, and Petitioner Khan provided such information to his counsel, these details would remain safeguarded from public disclosure pursuant to the Amended Protective Order and counsel access procedures.

Geneva Conventions in situations of armed conflict.  International Committee of the Red Cross, US Detention Related to the Events of 11 September 2001 and its Aftermath—the Role of the ICRC, Mar. 29 2005, available at http://www.icrc.org/Web/Eng/siteeng0.nsf/html/66FGEL. Executive Order 12958 § 17(a)(1) bars the government from concealing the patent illegality of the CIA's secret detention program under the guise of "classified" information.  Accordingly, the Respondent cannot rely upon the classified nature concerning details about the locations of Petitioner Khan's secret detention to justify their denial of his immediate access to counsel.

The Respondents also argue that Petitioner Khan may know, due to his first-hand experience, "operational details, such as interrogation methods." Respondents' Memorandum in Opposition, at 15.  As with the location of the secret CIA detention, § 17(a)(1) prohibits the government from relying on the system of classification to conceal the illegality of alternative interrogation procedures that are tantamount to torture.  A number of individuals held secretly by the CIA have reported that they were subjected to torture while in CIA custody.   See Decl. of Khaled El-Masri; Craig S. Smith, Algerian Tells of Dark Odyssey in U.S. Hands, N.Y. Times, July 7, 2006, A1 (attached as Ex. D).

Among the "enhanced interrogation techniques" reportedly approved by the CIA in March 2002,[13] six techniques are known to inflict serious and potentially permanent pain and suffering on detainees.  Brian Ross & Richard Esposito, CIA's Harsh Interrogation Techniques Described, ABC News, Nov. 18, 2005, http://abcnews.go.com/WNT/print?id=1322866.  First, "water boarding" replicates the experience of execution by drowning.  The detainee is restrained on an incline with his head below his feet, and cellophane or a rag is wrapped over the detainee's face; when water is poured over the detainee's face and into his mouth, he experiences discomfort and fear calculated to cease just short of drowning. See Dana Priest, Terrorism

---

[13] See, Dana Priest, CIA Puts Harsh Tactics on Hold—Memo on Methods of Interrogation Had Wide Review, Wash. Post, June 27, 2004, at A1.

Suspects Held in . . ., Wash. Post, Nov. 6, 2005, at A1; Dana Priest, <u>Vice President for Torture</u>, Wash. Post, Oct. 26, 2005, at A18; Brian Ross & Richard Esposito, <u>Sources Tell ABC News Top Al Qaeda Figures Held in Secret CIA Prisons</u>, ABC News, Dec. 5, 2005, http://abcnews.go.com/WNT?Invesigtation/story?id=1375123.    Second, detainees are also commonly stripped naked and doused in water, and then restrained in cells kept at temperatures as low as fifty degrees Fahrenheit.  Not surprisingly, detainees subjected to this technique risk life-threatening hypothermia.  Ross & Esposito, <u>Sources Tell ABC News Top Al Qaeda Figures Held in Secret CIA Prisons</u>.  This technique of leaving a detainee in a "cold cell" is often accompanied the third technique of forced and prolonged standing.  Suspended by handcuffs attached to the ceiling and immobilized by shackles bolted to the floor, detainees are sometimes left standing for multiple days at a time; as a result, their legs and feet become painfully swollen while the handcuffs cut into their wrists, leaving permanent scars.  Smith & Mekhennet, <u>Algerian Tells of Dark Odyssey in U.S. Hands</u>.  The final three techniques all involve assaulting detainees, either by grabbing them and shaking them violently, or by slapping them in the face or midsection with an open hand—in the case of the "belly slap," repeated blows can cause serious harm to the detainees' internal organs.  Declaration of Khaled El-Masri, at ¶ 52; Ross & Esposito, <u>CIA's Harsh Interrogation Techniques Described</u>.

Reports have also revealed equally—if not more—alarming trends of abuse in CIA detention.  Both Khaled El-Masri and Laid Saidi, who were detained at the "Salt Pit" in Afghanistan with Majid Khan,[14] describe being kicked, beaten, and forcefully restrained. Declaration of Khaled El-Masri, at ¶ 40; Smith & Mekhennet, <u>Algerian Tells of Dark Odyssey in U.S. Hands</u>.  Most alarmingly, although El-Masri and Saidi were transported from significantly

---

[14] <u>See</u> Declaration of Khaled El-Masri, at ¶¶ 4, 42–43, 54–55, 57, 66 (explaining his knowledge that Majid Khan was at the Salt Pit); Craig S. Smith & Souad Mekhennet, <u>Algerian Tells of Dark Odyssey in U.S. Hands</u>, N.Y. Times, July 7, 2006, A1 (describing Laid Saidi's seizure, transport, and detention at the Salt Pit, where he met Mr. El-Masri).

different locations[15] to the Salt Pit, both were sodomized[16] and outfitted with diapers and jumpsuits before transport to Afghanistan. Declaration of Khaled El-Masri, at ¶¶ 33–35; Smith & Mekhennet, Algerian Tells of Dark Odyssey in U.S. Hands.

Indeed, reported conduct of CIA interrogators indicates that the interrogators themselves actually recognized the illegality of their alternative procedures and resisted the continued operation of the secret detention program. See Stephen Rickard, Interrogators Beware, Wash. Post, Oct. 17, 2006, at A21 (reporting that CIA interrogators stopped their work and "demanded 'clarity'" from Congress regarding liability for certain interrogation techniques); R. Jeffrey Smith, Worried CIA Officers Buy Legal Insurance, Wash. Post, Sept. 11, 2006, at A1; Ken Silverstein, The CIA "Wehrmacht," Harper's Magazine, April 19, 2006, available at http://www.harpers.org/sb-cia-wehrmacht.html (detailing efforts of some CIA employees to avoid any involvement in the Agency's "rendition" program). Per the limitations of Executive Order 12958 § 17(a)(1), the government may not classify the details of the CIA's interrogation techniques in order to conceal those techniques illegality, much less use the unilateral assertion of such classification to deny Petitioner Khan immediate access to counsel.

Similarly, the Executive's classification authority cannot be used to conceal information that would embarrass the United States. Executive Order 12958 § 17(a)(2). From the first news reports about its existence, the CIA secret detention program has been a source of embarrassment for the United States in the international community. United Nations human rights bodies have admonished the United States to close its secret detention facilities and to bring its systems of detention in line with human rights standards binding on the U.S. U.N. High Comm'r for

---

[15] Mr. El-Masri was transported from Skopje, Macedonia while Mr. Saidi was transported from Malawi. Declaration of Khaled El-Masri, at 39; Smith & Mekhennet, Algerian Tells of Dark Odyssey in U.S. Hands.
[16] More alarming still, Mr. El-Masri's and Mr. Saidi's experiences share a stunning similarity. Both were held to the ground while their clothes were cut away before having some sort of plug inserted in their anuses, and in both cases they were photographed throughout the process. Declaration of Khaled El-Masri, at ¶ 33; Smith & Mekhennet, Algerian Tells of Dark Odyssey in U.S. Hands.

Human Rights, Human Rights Committee, <u>Concluding Observations of the U.N. Human Rights Committee, United States of America,</u> ¶ 12, U.N. Doc. CCPR/C/SR.2395 (Sept. 15, 2006). Similarly, the Council of Europe has criticized the system of "targeting, apprehending and detaining terrorist suspects" as a "global spider's web" of which the United States is "chief architect." Committee on Legal Affairs and Human Rights, Council of Europe, <u>Alleged secret detentions and unlawful inter-state transfers of detainees involving Council of Europe member states</u> (June 12 2006) paras. 24-26 (Rapporteur: Dick Marty), <u>available at</u> http://assembly.coe.int/Documents/WorkingDocs/doc06/edoc10957.pdf).    Finally, since President Bush confirmed the existence of the CIA secret detention program on September 6, 2006, European leaders have begun to openly criticize the Executive's conduct as patently illegal. <u>See</u>, <u>e.g.</u> <u>Merkel Criticizes U.S.; Says CIA Prisons Not Compatible with "Rule of Law</u>," Int'l Herald Trib., Sept. 9, 2006 (quoting German Chancellor Angela Merkel). The government may not exercise its classification authority under Executive Order 12958 to conceal information about the CIA secret detention program that might further embarrass the United States on the world stage. Nor can this serve as a basis to deny Petitioner Khan access to counsel to challenge his ongoing detention by U.S. authorities.

**D.      Even If Petitioner Possesses TOP SECRET or TOP SECRET//SCI Information, the Amended Protective Order Explicitly Governs Habeas Counsel Access to Such Information and Detainees and Safeguards National Security.**

The Amended Protective Order and counsel access provisions were vigorously negotiated, fully briefed and extensively litigated. The Order and access procedures expressly reference habeas counsel's access to TOP SECRET and TOP SECRET//SCI information. The government inexplicably misleads the Court in this regard.

The government states repeatedly that the Amended Protective Order, and counsel access regime, "contemplates issues associated with the handling of information classified no higher than SECRET." See Resp'ts Opp'n at 14-15; see also id. at 16 ("[T]he current protective order and counsel access regime applicable in various other cases filed at a time when the District Court had *habeas* jurisdiction, contemplates that counsel representing a detainee hold or obtain only a SECRET-level clearance, and, in fact, petitioners' counsel in this case holds only a SECRET-level clearance."). In support of this assertion, Respondents reference Section III.A.1 of the Access Procedures. That provision, however, explicitly states that counsel must hold clearance at the Secret level or higher and it accounts for access to high-level classified information:

A.    Security Clearance:

1.    Counsel must hold a valid current United States security clearance at the Secret level or higher, or its equivalent (as determined by appropriate DoD intelligence personnel).

Moreover, the Amended Protective Order, to which the counsel access procedures are attached, states:

9.    The terms "classified national security information and/or documents," "classified information" and "classified documents" refer to:

a.    any classified document or information that has been classified by any Executive Branch agency in the interests of national security or pursuant to Executive Order, including Executive Order 12958, as amended, or its predecessor Orders as "CONFIDENTIAL," "SECRET," or "TOP SECRET," or additionally controlled as "SENSITIVE COMPARTMENTED INFORMATION (SCI)," or any classified information contained in such document

The entire Amended Protective Order and counsel access regime reflects habeas counsel's access to varying levels of classified information designated as SECRET and higher-level

information.[17]  Even the version of the counsel access procedures originally drafted and proposed by Respondents and later rejected, in part, by the court in Al Odah, acknowledged and contemplated that habeas counsel could hold varying levels of security clearance.

Respondents also fail to properly explain the regulations concerning classification-levels and the SCI designation. Pursuant to Executive Order 12958, only three classification levels exist: confidential, secret, and top secret.  Materials classified as TOP SECRET//SCI are "top secret" classification level materials that have additional access measures applicable to them which restrict the "need-to-know" basis for access to the information.  But no further "security clearance" is required to determine whether an individual can be trusted with SCI information: if an individual possesses "top secret" security clearance, he or she is eligible for access to TOP SECRET//SCI materials and the authorizing authority must then determine if the individuals falls within the group permitted access to the sensitive information pursuant to Executive Order 12958.[18]

The Respondents cite numerous examples of logistical matters that they argue will jeopardize national security. For example, they contend that the counsel access regime "contemplates mailing of communications to counsel from a detainee or of notes of a counsel's meeting with a detainee from Guantanamo to the secure workspace facility for habeas counsel called for under the protective order," referring Access Procedures §§ IV.B.3; VI.B; Amended Protective Order ¶ 20, and that materials classified at the TOP SECRET//SCI cannot "be sent through the mail, via certified mail."  See Respondents' Brief at 16.  The Access Procedures and

---

[17] In addition, when the undersigned counsel received security clearance in August 2004, it was her understanding from the Department of Justice Court Security Office that an adequate background investigation had been conducted to raise her clearance level to "top secret" should the need arise. See Declaration of Gitanjali S. Gutierrez, attached as Exhibit G.  If the Respondents conclude that Petitioner Khan cannot obtain access to counsel until counsel obtains top secret security clearance, the Court should direct that Respondents request that the Court Security Office complete any additional background investigation, if needed, immediately.

[18] If the Respondents conclude that access to top secret//SCI information is involved in this access, the Court should order the Respondents to seek access authorization for the undersigned counsel from the appropriate authorities. See Executive Order 12859.

Amended Protective Order require no such thing.  Section IV.B.3 of the Access Procedures require materials sent from a detainee to his lawyer to be handled in a manner appropriate for the material's level of classification, thus contemplating varying degrees of classification:

> 3.     After the outgoing legal mail is collected from the detainee, the envelop will be sealed into a larger envelop by military personnel at Guantanamo which will be marked as "Attorney-Detainee Materials-For Mail Delivery to Counsel" and will be annotated with the name of the detainee and the counsel.  The envelope will be sealed and mailed <u>in the manner required for classified materials</u>.  Within two (2) business days of receipt from the detainee, the communications will be mailed to the appropriate address as provided by government counsel.

<u>See</u> Access Procedures § IV.B.3 (emphasis added); <u>see also</u> Access Procedures § VI.B (similarly requiring that attorney-client meeting notes must be "mailed in the manner required for classified materials" without limiting the nature of the classified materials as defined in the Amended Protective Order ¶ 9, cited above).  Nothing in § IV.B.3 precludes the Respondents from compling with C.R.F. § 2001.45(c), (d), which requires that top secret information shall only "be transmitted by direct contact between authorized persons; the Defense Courier Service or an authorized government agency courier service; a designated courier or escort with Top Secret clearance; electronic means over approved communications systems."  Nothing under the counsel access regime requires the Respondents to transmit TOP SECRET information via the U.S. Postal Service.  In fact, the Access Procedures state that the privilege team shall "forward" the mail to Guantanamo, presumably in a manner that complies with Executive Order 12958, DoD Regulations 5200.1-R and AI 26, OSD Information and Security Supplement to DoD Regulations 5200.1-R, and C.F.R. § 2001.45.

The Amended Protective Order and counsel access procedures also do not limit the capacity of the secure workspace facility or the composition of the privilege review team to handle only SECRET information.  <u>See</u>, <u>e.g.</u>, Amended Protective Order ¶¶ 20 ("The

government shall arrange for one appropriately approved secure area for the use of petitioners' counsel. The secure area shall contain a working area that will be supplied with secure office equipment reasonable and necessary to the preparation of the petitioners' case."); 21 ("The Court Security Office shall establish procedures to ensure that the secure area may be maintained and operated in the most efficient manner consistent with the protection of classified information" as defined in the Amended Protective Order ¶9, cited above); and Access Procedures II.D (defining the "privilege team" without limiting its ability to review SECRET or higher-level classified information). The Respondents have had over three years to address the logistical arrangements necessary to afford Petitioner Khan access to counsel, and they have now imprisoned him in Guantánamo for nearly two months. The Respondents need to complete their preparations and cannot justify any further delay of Petitioner Khan's access to counsel.

Finally, the Respondents' concerns that the undersigned counsel will disclose TOP SECRET or TOP SECRET//SCI information to unauthorized recipients pursuant to the Amended Protective Order is absurd. See Respondents' Brief at 17-18; Dorn Decl. ¶ 15. First, security-cleared counsel have been entrusted with access to classified information. Second, the "need-to-know" provision of the Amended Protective Order prohibits disclosure except to persons "authorized pursuant to this Protective Order, the Court, and counsel for the government with the appropriate clearances and the need to know that information." Under these requirements, a habeas attorney cannot disclose TOP SECRET or TOP SECRET//SCI materials to another attorney who only held SECRET clearance, even if a "need-to-know" existed.

The Respondents urge this Court to defer to the Executive's responsibility to safeguard national security information and caution that the Court "should not proceed with entry of a protective order regime that fails to address classification-level concerns in this case such as those raised above." See Resp'ts Opp'n at 18. In fact, even if such classification-level concerns

actually existed in this case, the Amended Protective Order and counsel access regime, reviewed and considered by numerous judges of this Court, govern precisely these concerns.   More fundamentally, the Executive cannot misuse its classification authority under Executive Order 12958 to conceal illegal conduct or activity whose disclosure would be embarrassing to government officials.

Accordingly, the Respondents have offered no grounds for delaying Petitioner Khan's access to counsel and the Court should order Respondents to permit Petitioner Khan immediate access to counsel pursuant to the Amended Protective Order and counsel access procedures.

## III.    ANY DELAY OF PETITIONER'S ACCESS TO COUNSEL WOULD RESULT IN A UNJUSTIFIED AND GROSS MISCARRIAGE OF JUSTICE.

As set forth above, Respondents justifications for obstructing Petitioner's Khan access to counsel are based upon unfounded speculation, misleading assertions, and efforts to conceal illegal and embarrassing Executive wrongdoing.   Immediate access to counsel is not only warranted, but is essential to safeguard Petitioner Khan's legal rights.   Any delay of his right to meet and consult with legal counsel is likely to irreparably harm Petitioner Khan's ability to pursue his challenge to his detention.

By the Respondents' own admission, Petitioner Khan has been detained in secret CIA detention and subjected to the euphemistically named "alternative interrogation methods."  The psychological stress from incommunicado detention and torture or cruel, inhuman and degrading treatment, in general, has a deteriorating impact upon individual psychological and psychological health.   The longer Petitioner Khan remains without access to counsel, the greater the risk that his ability to assist in his representation will decline, and the difficulties of establishing a trusting attorney-client relationship will increase.

Torture and other forms of abusive interrogation can have devastating health consequences on the victim's physical, mental and social well-being. See Declaration of Allen Keller, attached as Exhibit D. These health consequences can include confusion, dissociation, and fear in the victims. See Keller Decl. In addition, the psychological dissociation that may result from torture occurs when processes which are normally integrated – such as memory, identity, emotions, and thoughts – are separated. See Keller Decl. Torture and abusive interrogation may also result in particular difficulties with memory. See Keller Decl. Petitioner Khan continues to suffer from the ongoing impact of torture resulting from indefinite secret detention and aggressive interrogation methods. When this is combined with a continuing denial of access to counsel, it undermines Petitioner Khan's ability to intelligently disclose facts and information to his counsel.

Further, the delay of access to counsel is likely to create substantial damage to Petitioner Khan's ability to establish a trusting and effective attorney-client relationship. As a result of his abuse, the ability of a victim of torture or abusive interrogation to recall information and develop a trusting professional relationship may deteriorate over time. See Keller Decl. Petitioner Khan is now in a new environment and may be disorientated and confused as to what is happening to him. He may be wary of new interrogation "tricks" or methods. Any continuing delay of his access to counsel only decreases his already compromised ability to develop a trusting and functional attorney-client relationship.

## CONCLUSION

The Executive consistently seeks to evade the rule of law with respect to individuals detained in secret CIA detention and at Guantánamo, characterizing any compliance with judicial review as a matter of favor rather than of constitutional mandate. This is simply not the

law.  Our Constitution requires that the Courts exercise their existing jurisdiction to impose independent review of Executive abuses.

This Court should not defer to the Respondents' unfounded assertions, misleading characteristics, and improper attempts to conceal illegal and embarrassing conduct.  Petitioner Khan, like all other individuals detained in Guantanamo, has a right to prompt access to his counsel while his habeas petition is pending before this Court.  He is entitled to consult with legal counsel and make informed litigation decisions to defend the Court's jurisdiction over his case.  The Respondents cannot imprison an individual wholly outside the law and subject him to torture or cruel, inhuman and degrading treatment only to invoke the same lawlessness as "unique circumstances" that compel the judiciary to decline to safeguard his liberty.  Accordingly, this Court should order Respondents to promptly afford Petitioner Khan access to counsel pursuant to the Amended Protective Order.

Dated:  November 3, 2006

Respectfully submitted,

Counsel for Petitioners:

  /s/ _____
Gitanjali S. Gutierrez

Michael Ratner
William Goodman
CENTER FOR CONSTITUTIONAL RIGHTS
666 Broadway
New York, New York 10012

Exhibit A

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| _____ )<br><br>*In re* **Guantanamo Detainee Cases**    · )<br><br>_____ ) | **Civil Action Nos.**<br>**02-CV-0299 (CKK), 02-CV-0828 (CKK),**<br>**02-CV-1130 (CKK), 04-CV-1135 (ESH),**<br>**04-CV-1136 (JDB), 04-CV-1137 (RMC),**<br>**04-CV-1142 (RJL), 04-CV-1144 (RWR),**<br>**04-CV-1164 (RBW), 04-CV-1166 (RJL),**<br>**04-CV-1194 (HHK), 04-CV-1227 (RBW),**<br>**04-CV-1254 (HHK), 04-CV-1519 (JR)** |

**AMENDED PROTECTIVE ORDER AND PROCEDURES FOR COUNSEL ACCESS**
**TO DETAINEES AT THE UNITED STATES NAVAL BASE**
**IN GUANTANAMO BAY, CUBA**

This matter comes before the Court upon Respondents' Motion for Protective Order to prevent the unauthorized disclosure or dissemination of classified national security information and other protected information that may be reviewed by, made available to, or are otherwise in the possession of, the petitioners and/or petitioners' counsel in these coordinated cases. Pursuant to the general supervisory authority of the Court, in order to protect the national security, and for good cause shown,

IT IS ORDERED:

1.    The Court finds that these cases involve classified national security information or documents, the storage, handling and control of which require special security precautions, and access to which requires a security clearance and a "need to know." These cases may also involve other protected information or documents, the storage, handling and control of which may require special precautions in order to protect the security of United States government personnel and facilities, and other significant government interests.

2.    The purpose of this Protective Order is to establish the procedures that must be followed by all petitioners' counsel, their respective petitioner(s), all other counsel involved in

these cases, translators for the parties, and all other individuals who receive access to classified national security information or documents, or other protected information or documents, in connection with these cases, including the privilege team as defined in Exhibit A.

3.    The procedures set forth in this Protective Order will apply to all aspects of these cases, and may be modified by further order of the Court *sua sponte* or upon application by any party. The Court will retain continuing jurisdiction to enforce or modify the terms of this Order.

4.    Nothing in this Order is intended to or does preclude the use of classified information by the government as otherwise authorized by law outside of these actions.

5.    Petitioners' counsel shall be responsible for advising their employees, the petitioners, and others of the contents of this Protective Order, as appropriate or needed.

6.    Petitioners' counsel are bound by the terms and conditions set forth in the "Revised Procedures For Counsel Access To Detainees At the U.S. Naval Base In Guantanamo Bay, Cuba," and the procedures for handling mail and documents brought into and out of counsel meetings, attached hereto as Exhibit A. This Protective Order specifically incorporates by reference all terms and conditions established in the procedures contained in Exhibit A to the extent they place limitations on petitioners' counsel in their access to and interaction with petitioners or handling of information. Any violation of the terms and conditions of those procedures will also be deemed a violation of this Protective Order. This paragraph does not apply with respect to provisions in the procedures contained in Exhibit A that are or have been overridden by the Court.

7.    The privilege team shall not disclose to any person any information provided by counsel for a petitioner or by a petitioner, other than information provided in a filing with the Court, unless such information, if it were monitored information, could be disclosed under Section X of Exhibit A. Such disclosure shall be consistent with the provisions of Section X of Exhibit A.

2

## Definitions

8.      As used herein, the words "documents" or "information" shall include, but are not limited to, all written or printed matter of any kind, formal or informal, including originals, conforming copies and non-conforming copies (whether different from the original by reason of notation made on such copies or otherwise), and further include, but are not limited to:

      a.      papers, correspondence, memoranda, notes, letters, reports, summaries, photographs, maps, charts, graphs, interoffice and intra-office communications, notations of any sort concerning conversations, meetings, or other communications, bulletins, teletypes, telegrams, telefacsimiles, invoices, worksheets, and drafts, alterations, modifications, changes and amendments of any kind to the foregoing;

      b.      graphic or oral records or representations of any kind, including, but not limited to, photographs, charts, graphs, microfiche, microfilm, videotapes, sound recordings of any kind, and motion pictures;

      c.      electronic, mechanical or electric records of any kind, including, but not limited to, tapes, cassettes, disks, recordings, electronic mail, films, typewriter ribbons, word processing or other computer tapes or disks, and all manner of electronic data processing storage; and

      d.      information acquired orally.

9.      The terms "classified national security information and/or documents," "classified information" and "classified documents" refer to:

      a.      any classified document or information that has been classified by any Executive Branch agency in the interests of national security or pursuant to Executive Order, including Executive Order 12958, as amended, or its predecessor Orders as "CONFIDENTIAL," "SECRET," or "TOP SECRET," or additionally controlled as "SENSITIVE

COMPARTMENTED INFORMATION (SCI)," or any classified information contained in such document;

        b.    any document or information, regardless of its physical form or characteristics, now or formerly in the possession of a private party that has been derived from United States government information that was classified, regardless of whether such document or information has subsequently been classified by the government pursuant to Executive Order, including Executive Order 12958, as amended, or its predecessor Orders as "CONFIDENTIAL," "SECRET," or "TOP SECRET," or additionally controlled as "SENSITIVE COMPARTMENTED INFORMATION (SCI)";

        c.    verbal or non-documentary classified information known to the petitioner or petitioners' counsel; or

        d.    any document and information as to which the petitioner or petitioners' counsel have been notified orally or in writing that such documents or information contains classified information.

    10.    All classified documents, and information contained therein, shall remain classified unless the documents bear a clear indication that they have been declassified by the agency or department that is the original classification authority of the document or the information contained therein (hereinafter, the "original classification authority").

    11.    The terms "protected information and/or documents," "protected information" and "protected documents" refer to any document or information deemed by the Court, either upon application by counsel or *sua sponte*, as worthy of special treatment as if the document or information were classified, even if the document or information has not been formally deemed to be classified.

    12.    For purposes of this Protective Order, "petitioners' counsel" shall be defined to include an attorney who is employed or retained by or on behalf of a petitioner for purposes of

4

representing the petitioner in habeas corpus or other litigation in federal court in the United

States, as well as co-counsel, interpreters, translators, paralegals, investigators and all other

personnel or support staff employed or engaged to assist in the litigation.

13.    "Access to classified information" or "access to protected information" shall mean

having access to, reviewing, reading, learning, or otherwise coming to know in any manner any

classified information or protected information.

14.    "Secure area" shall mean a physical facility accredited or approved for the storage,

handling, and control of classified information.

15.    "Unauthorized disclosure of classified information" shall mean any knowing,

willful or negligent action that could reasonably be expected to result in a communication or

physical transfer of classified information to an unauthorized recipient.

Designation of Court Security Officer

16.    The Court designates Christine E. Gunning as Court Security Officer for these

cases, and Joan B. Kendrall, Michael P. Macisso, James P. Londergan, Mary M. Cradlin,

Daniel O. Hartenstine, John P. Molinard, Jennifer Campbell, and Barbara J. Russell as Alternate

Court Security Officers, for the purpose of providing security arrangements necessary to protect

from unauthorized disclosure of any classified documents or information, or protected documents

or information, to be made available in connection with these cases. Petitioners' counsel shall

seek guidance from the Court Security Officer with regard to appropriate storage, handling,

transmittal, and use of classified documents or information.

<u>Access to Classified Information and Documents</u>

17.    Without authorization from the government, no petitioner or petitioners' counsel shall have access to any classified information involved in these cases unless that person shall first have:

a.    made a written submission to the Court Security Officer precisely stating the reasons why counsel has a need to know the classified information requested; and

b.    received the necessary security clearance as determined by the Department of Justice Security Officer; and

c.    signed the Memorandum of Understanding ("MOU"), attached hereto as Exhibit B, agreeing to comply with the terms of this Protective Order.

The written submissions that are made by counsel to the Court Security Officer stating the reasons why counsel has a need to know the classified information requested shall be kept confidential by the Court Security Officer and shall not be disclosed to any other counsel or party to these cases unless the Court specifically orders such disclosure.

18.    Petitioners' counsel to be provided access to classified information shall execute the MOU appended to this Protective Order, and shall file executed originals with the Court and submit copies to the Court Security Officer and counsel for the government. The execution and submission of the MOU is a condition precedent for petitioners' counsel to have access to, or continued access to, classified information for the purposes of this proceeding.

19.    The substitution, departure, or removal of petitioners' counsel from these cases for any reason shall not release that person from the provisions of this Protective Order or the MOU executed in connection with this Order.

6

20.    The government shall arrange for one appropriately approved secure area for the use of petitioners' counsel. The secure area shall contain a working area that will be supplied with secure office equipment reasonable and necessary to the preparation of the petitioners' case. Expenses for the secure area and its equipment shall be borne by the government.

21.    The Court Security Officer shall establish procedures to ensure that the secure area is accessible to the petitioners' counsel during normal business hours and at other times on reasonable request as approved by the Court Security Officer. The Court Security Officer shall establish procedures to ensure that the secure area may be maintained and operated in the most efficient manner consistent with the protection of classified information. The Court Security Officer or Court Security Officer designee may place reasonable and necessary restrictions on the schedule of use of the secure area in order to accommodate appropriate access to all petitioners' counsel in this and other proceedings.

22.    All classified information provided by the government to counsel for petitioners, and all classified information otherwise possessed or maintained by petitioners' counsel, shall be stored, maintained, and used only in the secure area.

23.    No documents containing classified information may be removed from the secure area unless authorized by the Court Security Officer or Court Security Officer designee supervising the area.

24.    Consistent with other provisions of this Protective Order, petitioners' counsel shall have access to the classified information made available to them in the secure area, and shall be allowed to take notes and prepare documents with respect to those materials.

25.    Petitioners' counsel shall not copy or reproduce any classified information in any form, except with the approval of the Court Security Officer or in accordance with the procedures established by the Court Security Officer for the operation of the secure area.

7

26.     All documents prepared by petitioners or petitioners' counsel that do or may contain classified information (including without limitation, notes taken or memoranda prepared by counsel and pleadings or other documents intended for filing with the Court) shall be transcribed, recorded, typed, duplicated, copied, or otherwise prepared only by persons who have received an appropriate approval for access to classified information.  Such activities shall take place in the secure area on approved word processing equipment and in accordance with the procedures approved by the Court Security Officer.  All such documents and any associated materials containing classified information (such as notes, memoranda, drafts, copies, typewriter ribbons, magnetic recordings, exhibits) shall be maintained in the secure area unless and until the Court Security Officer advises that those documents or associated materials are unclassified in their entirety.  None of these materials shall be disclosed to counsel for the government unless authorized by the Court, by petitioners' counsel or as otherwise provided in this Protective Order.

27.     Petitioners' counsel shall discuss classified information only within the secure area or in another area authorized by the Court Security Officer, shall not discuss classified information over any standard commercial telephone instrument or office intercommunication system, and shall not transmit or discuss classified information in electronic mail communications of any kind.

28.     The Court Security Officer or Court Security Officer designee shall not reveal to any person the content of any conversations she or he may hear by or among petitioners' counsel, nor reveal the nature of documents being reviewed by them, or the work generated by them, except as necessary to report violations of this Protective Order to the Court or to carry out their duties pursuant to this Order.  In addition, the presence of the Court Security Officer or Court Security Officer designee shall not operate as a waiver of, limit, or otherwise render inapplicable, the attorney-client privilege or work product protections.

8

29.    Petitioners' counsel shall not disclose the contents of any classified documents or information to any person, including counsel in related cases brought by Guantanamo Bay detainees in this or other courts, except those authorized pursuant to this Protective Order, the Court, and counsel for the government with the appropriate clearances and the need to know that information. Except as otherwise specifically provided by Judge Colleen Kollar-Kotelly in her well-reasoned opinion addressing counsel access procedures regarding petitioners Mohammed Ahmed al Kandari, Fawzi Khalid Abdullah Fahad al Odah, and Khalid Abdullah Mishal al Mutairi in Al Odah v. United States, 02-CV-0828 (CKK), counsel for petitioners in these cases are presumed to have a "need to know" information both in their own cases and in related cases pending before this Court. Therefore, and except as provided with respect to the three petitioners in Al Odah mentioned above, counsel for all petitioners in these cases who have satisfied all necessary prerequisites and follow all procedures set forth herein may share and discuss among themselves classified information to the extent necessary for the effective representation of their clients. Counsel for respondents may challenge the "need to know" presumption on a case-by-case basis for good cause shown.

30.    Petitioners' counsel shall not disclose classified information not provided by petitioner-detainee to that petitioner-detainee. Should petitioners' counsel desire to disclose classified information not provided by petitioner-detainee to that petitioner-detainee, petitioners' counsel will provide in writing to the privilege review team (See Exhibit A) a request for release clearly stating the classified information they seek to release. The privilege review team will forward the petitioner counsel's request to the appropriate government agency authorized to declassify the classified information for a determination. The privilege review team will inform petitioners' counsel of the determination once it is made.

31.    No petitioner or counsel for petitioner shall disclose or cause to be disclosed any information known or believed to be classified in connection with any hearing or proceeding in these cases except as otherwise provided herein.

32.    Except as otherwise stated in this paragraph and to ensure the security of the United States of America, at no time, including any period subsequent to the conclusion of the proceedings, shall petitioners' counsel make any public or private statements disclosing any classified information or documents accessed pursuant to this Protective Order, including the fact that any such information or documents are classified. In the event that classified information enters the public domain, however, counsel is not precluded from making private or public statements about the information already in the public domain, but only to the extent that the information is in fact in the public domain. Counsel may not make any public or private statements revealing personal knowledge from non-public sources regarding the classified or protected status of the information or disclosing that counsel had personal access to classified or protected information confirming, contradicting, or otherwise relating to the information already in the public domain. In an abundance of caution and to help ensure clarity on this matter, the Court emphasizes that counsel shall not be the source of any classified or protected information entering the public domain.

As stated in more detail in paragraph 49 below, failure to comply with these rules may result in the revocation of counsel's security clearance as well as civil and/or criminal liability.

33.    The foregoing shall not prohibit petitioners' counsel from citing or repeating information in the public domain that petitioners' counsel does not know to be classified information or a classified document, or derived from classified information or a classified document.

34.    All documents containing classified information prepared, possessed or maintained by, or provided to, petitioners' counsel (except filings submitted to the Court and

served on counsel for the government), shall remain at all times in the control of the Court Security Officer for the duration of these cases. Upon final resolution of these cases, including all appeals, all such documents shall be destroyed by the Court Security Officer.

<u>Access to Protected Information and Documents</u>

35.     Without authorization from the government or the Court, protected information shall not be disclosed or distributed to any person or entity other than the following:

a.     petitioners' counsel, provided such individuals have signed the Acknowledgment, attached hereto as Exhibit C, attesting to the fact that they have read this Protective Order and agree to be bound by its terms; and

b.     the Court and its support personnel.

36.     The execution of the Acknowledgment is a condition precedent for petitioners' counsel to have access to, or continued access to, protected information for the purposes of this proceeding. A copy of each executed Acknowledgment shall be kept by counsel making the disclosure until thirty (30) days after the termination of this action, including appeals.

37.     The substitution, departure, or removal of petitioners' counsel from these cases for any reason shall not release that person from the provisions of this Protective Order or the Acknowledgment executed in connection with this Protective Order.

38.     Petitioners' counsel shall not disclose the contents of any protected documents or information to any person, to include counsel in related cases brought by Guantanamo Bay detainees in this or other courts, except those authorized pursuant to this Protective Order, the Court, or counsel for the government. Except as otherwise specifically provided by Judge Colleen Kollar-Kotelly with respect to counsel for petitioners Mohammed Ahmed al Kandari, Fawzi Khalid Abdullah Fahad al Odah, and Khalid Abdullah Mishal al Mutairi in <u>Al Odah v. United States</u>, 02-CV-0828 (CKK), counsel for petitioners in these coordinated cases may share protected information with each other but only to the extent that counsel have appropriate

11

security clearances and that all other procedures set forth in this Protective Order are complied with. Petitioners' counsel shall maintain all protected information and documents received through this proceeding in a confidential manner.

39. Petitioners' counsel shall not disclose protected information not provided by petitioner-detainee to that petitioner-detainee without prior concurrence of counsel for the government or express permission of the Court.

40. No petitioner or counsel for petitioner shall disclose or cause to be disclosed any information known or believed to be protected in connection with any hearing or proceeding in these cases except as otherwise provided herein.

41. At no time, including any period subsequent to the conclusion of the proceedings, will petitioners' counsel make any public or private statements disclosing any protected information or documents accessed pursuant to this Protective Order, including the fact that any such information or documents are protected.

42. Protected information shall be used only for purposes directly related to these cases and not for any other litigation or proceeding, except by leave of the Court. Photocopies of documents containing such information shall be made only to the extent necessary to facilitate the permitted use hereunder.

43. Nothing in this Protective Order shall prevent the government from using for any purpose protected information it provides a party. Nothing in this Protective Order shall entitle another party to protected information.

44. Supplying protected information to another party does not waive privilege with respect to any person or use outside that permitted by this Protective Order.

45. Within sixty (60) days of the resolution of these actions, and the termination of any appeals therefrom, all protected documents or information, and any copies thereof, shall be promptly destroyed, provided that the party to whom protected information is disclosed certifies

in writing that all designated documents and materials have been destroyed, and further provided that counsel for the government may retain one complete set of any such materials that were presented in any form to the Court. Any such retained materials shall be placed in an envelope or envelopes marked "Protected Information Subject to Protective Order." In any subsequent or collateral proceeding, a party may seek discovery of such materials from the government, without prejudice to the government's right to oppose such discovery or its ability to dispose of the materials pursuant to its general document retention policies.

Procedures for Filing Documents

46.    Until further order of this Court, any pleadings or other document filed by a petitioner shall be filed under seal with the Court through the Court Security Officer unless the petitioner has obtained from the Court Security Officer permission, specific to a particular, non-substantive pleading or document (e.g., motions for extensions of time, continuances, scheduling matters, etc.) not containing information that is or may be classified or protected, to file the pleading or document not under seal. The date and time of physical submission to the Court Security Officer shall be considered the date and time of filing with the Court. The Court Security Officer shall promptly examine the pleading or document and forward it to the appropriate agencies for their determination whether the pleading or document contains classified information. If it is determined that the pleading or document contains classified information, the Court Security Officer shall ensure that portion of the document, and only that portion, is marked with the appropriate classification marking and that the document remains under seal. If it is determined that the pleading or document contains protected information, the Court Security Officer shall ensure that portion of the document, and only that portion, remains under seal. Any document filed by petitioner that is determined not to contain classified information or protected information, and is not subject to any other restrictions on disclosure, shall immediately be unsealed by the Court Security Officer and placed in the public record. The Court Security

13

Officer shall immediately deliver under seal to the Court and counsel for the government any pleading or document to be filed by petitioners that contains classified information or protected information. The Court shall then direct the clerk to enter on the docket sheet the title of the pleading or document, the date it was filed, and the fact that it has been filed under seal with the Court Security Officer.

47.    Any pleading or other document filed by the government containing classified information shall be filed under seal with the Court through the Court Security Officer. The date and time of physical submission to the Court Security Officer shall be considered the date and time of filing with the Court. The Court Security Officer shall serve a copy of any classified pleadings by the government upon the Petitioner at the secure facility.

48.    Nothing herein shall require the government to disclose classified or protected information. Nor shall anything herein prohibit the government from submitting classified information or protected information to the Court *in camera* or *ex parte* in these proceedings, or entitle petitioners or petitioners' counsel access to such submissions or information. Except for good cause shown in the filing, the government shall provide counsel for the petitioner or petitioners with notice served on such counsel on the date of the filing.

<u>Penalties for Unauthorized Disclosure</u>

49.    Any unauthorized disclosure of classified information may constitute violations of United States criminal laws. In addition, any violation of the terms of this Protective Order shall be immediately brought to the attention of the Court and may result in a charge of contempt of Court and possible referral for criminal prosecution. <u>See e.g.</u>, Executive Order 12958, as amended. Any breach of this Protective Order may also result in the termination of access to classified information and protected information. Persons subject to this Protective Order are advised that direct or indirect unauthorized disclosure, retention, or negligent handling of classified documents or information could cause damage to the national security of the United

14

States or may be used to the advantage of an adversary of the United States or against the interests of the United States. Persons subject to this Protective Order are also advised that direct or indirect unauthorized disclosure, retention, or negligent handling of protected documents or information could risk the security of United States government personnel and facilities, and other significant government interests. This Protective Order is to ensure that those authorized to receive classified information and protected information will not divulge this information to anyone who is not authorized to receive it, without prior written authorization from the original classification authority and in conformity with this Protective Order.

50.    The termination of these proceedings shall not relieve any person or party provided classified information or protected information of his, her, or its obligations under this Protective Order.


IT IS SO ORDERED.

November 8, 2004                                         /s/
                                                    JOYCE HENS GREEN
                                                    United States District Judge

15

# Exhibit A

EXHIBIT A

**REVISED PROCEDURES FOR COUNSEL ACCESS TO DETAINEES
AT THE U.S. NAVAL BASE IN GUANTANAMO BAY, CUBA**

## I. Applicability

Except as otherwise stated herein or by other Order issued in the United States District Court for the District of Columbia, the following procedures shall govern counsel access to all detainees in the control of the Department of Defense ("DoD") at the U.S. Naval Base in Guantanamo Bay, Cuba ("GTMO") by counsel for purposes of litigating the cases in which this Order is issued.

These procedures do not apply to counsel who are retained solely to assist in the defense of a detainee in a trial by military commission. Access by that counsel is covered by the Procedures for Monitoring Communications Between Detainees Subject to Trial by Military Commission and their Defense Counsel Pursuant to Military Commission Order No. 3.

## II. Definitions

A. <u>Communications</u>: All forms of communication between counsel and a detainee, including oral, written, electronic, or by any other means.

B. <u>Counsel</u>: An attorney who is employed or retained by or on behalf of a detainee for purposes of representing the detainee in the United States District Court for the District of Columbia and who is admitted, either generally or pro hac vice, in this Court. Unless otherwise stated, "counsel" also includes co-counsel, interpreters, translators, paralegals, investigators and all other personnel or support staff employed or engaged to assist in the litigation.

C. <u>Detainee</u>: An individual detained by DoD as an alleged enemy combatant at the U.S. Naval Base in Guantanamo Bay, Cuba.

D. <u>Privilege Team</u>: A team comprised of one or more DoD attorneys and one or more intelligence or law enforcement personnel who have not taken part in, and, in the future, will not take part in, any domestic or foreign court, military commission or combatant status tribunal proceedings involving the detainee. If required, the privilege team may include interpreters/translators, provided that such personnel meet these same criteria.

E. <u>Legal Mail</u>: Letters written between counsel and a detainee that are related to the counsel's representation of the detainee, as well as privileged documents and publicly-filed legal documents relating to that representation.

1

EXHIBIT A

**III. Requirements for Access to and Communication with Detainees**

A. Security Clearance:

    1.    Counsel must hold a valid current United States security clearance at the Secret level or higher, or its equivalent (as determined by appropriate DoD intelligence personnel).

    2.    Counsel who possess a valid security clearance shall provide, in writing, the date of their background investigation, the date such clearance was granted, the level of the clearance, and the agency who granted the clearance. Access will be granted only after DoD verification of the security clearance.

    3.    Counsel who does not currently possess a Secret clearance will be required to submit to an application for clearance to the Department of Justice, Litigation Security Division.

B. Acknowledgment of and Compliance with Access Procedures

    1.    Before being granted access to the detainee, counsel will receive a copy of these procedures. To have access to the detainee, counsel must agree to comply fully with these procedures and must sign an affirmation acknowledging his/her agreement to comply with them.

    2.    This affirmation will not be considered an acknowledgment by counsel that the procedures are legally permissible. Even if counsel elects to challenge these procedures, counsel may not knowingly disobey an obligation imposed by these procedures.

    3.    The DoD expects that counsel, counsel's staff, and anyone acting on the behalf of the attorney will fully abide by the requirements of this document. Counsel is required to provide the DoD with signed affirmations from interpreters, translators, paralegals, investigators and all other personnel or support staff employed or engaged to assist in the litigation, upon utilization of those individuals by counsel in a manner that implicates these procedures.

    4.    Should counsel fail to comply with the procedures set forth in this document, access to or communication with the detainee will not be permitted.

C. Verification of Representation

    1.    Prior to being permitted access to the detainee, counsel must provide DoD with a *Notification of Representation*. This Notification must include the counsel's licensing information, business and email addresses and phone number, as well as

EXHIBIT A

the name of the detainee being represented by the counsel. Additionally, counsel shall provide evidence of his or her authority to represent the detainee.

2.    Counsel shall provide evidence of his or her authority to represent the detainee as soon as practicable and in any event no later than ten (10) days after the conclusion of a second visit with the detainee. The Court recognizes that counsel may not be in a position to present such evidence after the initial meeting with a detainee. Counsel for detainees and counsel for respondents shall cooperate to the fullest extent possible to reach a reasonable agreement on the number of counsel visits allowed. Should counsel for a detainee believe that the government is unreasonably limiting the number of visits with a detainee, counsel may petition the Court at the appropriate time for relief.

3.    If the counsel withdraws from representation of the detainee or if the representation is otherwise terminated, counsel is required to inform DoD immediately of that change in circumstances.

4.    Counsel must provide DoD with a signed representation stating that to the best of counsel's knowledge after reasonable inquiry, the source of funds to pay counsel any fees or reimbursement of expenses are not funded directly or indirectly by persons or entities the counsel believes are connected to terrorism or the product of terrorist activities, including "Specially Designated Global Terrorists," identified pursuant to Exec. Order No. 13,224, 66 Fed. Reg. 49,079 (Sept. 23, 2001) or Exec. Order No. 12,947, 60 Fed. Reg. 5079 (Jan. 23, 1995), and (b) counsel has complied with ABA Model Rule 1.8(f).

D. Logistics of Counsel Visits

1.    Counsel shall submit to the Department of Justice (DoJ) any request to meet with a detainee. This request shall specify date(s) of availability for the meeting, the desired duration of the meeting and the language that will be utilized during the meeting with the detainee. Reasonable efforts will be made to accommodate the counsel's request regarding the scheduling of a meeting. Once the request has been approved, DoJ will contact counsel with the date and duration of the meeting.

2.    Legal visits shall take place in a room designated by JTF-Guantanamo. No more than two attorneys (or one attorney and one assistant) plus one interpreter/translator shall visit with a detainee at one time, unless approved in advance by the Commander, JTF-Guantanamo. Such approval shall not be unreasonably withheld.

3.    Due to the mission and location of the US Naval Base at Guantanamo Bay, Cuba, certain logistical details will need to be coordinated by counsel prior to arrival. This includes arrangements for travel and lodging. Specific information regarding these issues will be provided by DoJ.

3

EXHIBIT A

4.      In order to travel to GTMO, all counsel must have a country and theater clearance for that specific visit. In order to begin processing country and theater clearances, counsel must have confirmed flight information for travel to GTMO and a valid current United States security clearance at the Secret level or higher, or its equivalent (as determined by appropriate DoD intelligence personnel). Country and theater clearances require twenty (20) days to process. Accordingly, counsel shall provide DoD, through DoJ, with the required information no later than 20 days prior to the GTMO visit date, or as soon as a visit is scheduled. Requests for visits made inside of 20 days will not normally be granted.

## IV.  Procedures for Correspondence Between Counsel and Detainee

A.  <u>Mail Sent by Counsel to Detainee ("Incoming Mail")</u>

1.      Counsel shall send incoming legal mail for a detainee to the privilege team at the appropriate address provided by government counsel. Each envelope or mailer shall be labeled with the name of the detainee and shall include a return address for counsel sending the materials. The outside of the envelope or mailer for incoming legal mail shall be labeled clearly with the following annotation: "Attorney-Detainee Materials-For Mail Delivery to Detainee."

2.      Each page of legal mail shall be labeled "Attorney-Detainee Materials." No staples, paper clips or any non-paper items shall be included with the documents.

3.      Upon receiving legal mail from counsel for delivery to the detainee, the privilege team shall open the envelope or mailer to search the contents for prohibited physical contraband. Within two (2) business days of receipt of legal mail, and assuming no physical contraband is present, the privilege team shall forward the mail to military personnel at GTMO in a sealed envelope marked "Legal Mail Approved by Privilege Team" and clearly indicating the identity of the detainee to which the legal mail is to be delivered. The privilege team shall return to the sender any incoming mail that does not comply with the terms of paragraphs IV.A.1., 2.

4.      Within two (2) business days of receipt of legal mail from the privilege team, personnel at GTMO shall deliver the envelope or mailer marked by the privilege team as "Legal Mail Approved by the Privilege Team" to the detainee without opening the envelope or mailer. If counsel desires confirmation that the documents were delivered to the detainee, counsel is responsible for providing a stamped, self-addressed envelope for that purpose. The detainee shall be responsible for mailing any confirmation of delivery to counsel as outgoing legal mail. This method shall be the sole and exclusive means by which confirmation of delivery is provided to counsel.

EXHIBIT A

5.    Written correspondence to a detainee not falling within the definition of legal mail shall be sent through the United States Postal Service to the appropriate address provided by government counsel. Non-legal mail includes, but is not limited to, letters from persons other than counsel, including family and friends of the detainee. These non-privileged communications will be reviewed by military personnel at GTMO under the standard operating procedures for detainee non-legal mail.

6.    Counsel is required to treat all information learned from a detainee, including any oral and written communications with a detainee, as classified information, unless and until the information is submitted to the privilege team and determined to be otherwise by the privilege team or by this Court or another court. Accordingly, if a counsel's correspondence contains any summary or recitation of or reference to a communication with a detainee that has not been previously determined to be unclassified, the correspondence shall be prepared, marked, transported and handled as classified material as required by Executive Order 12958, DOD Regulation 5200.1-R and AI 26, OSD Information and Security Supplement to DOD Regulation 5200.1R.

7.    Written and oral communications with a detainee, including all incoming legal mail, shall not include information relating to any ongoing or completed military, intelligence, security, or law enforcement operations, investigations, or arrests, by any nation or agency or current political events in any country that are not directly related to counsel's representation of that detainee; or security procedures at GTMO (including names of U.S. Government personnel and the layout of camp facilities) or the status of other detainees, not directly related to counsel's representation.

B.  <u>Mail Sent by Detainee to Counsel ("Outgoing Mail")</u>

1.    Detainees will be provided with paper to prepare communications to counsel. In the presence of military personnel, the detainee will seal the written communication into an envelope and it will be annotated as "Attorney-Detainee Materials-For Mail Delivery To Counsel." Each envelope shall be labeled with the name of the detainee and the counsel. Envelopes annotated with the name of persons other the detainee's counsel (including family/friends or other attorneys) shall be processed according to the standard operating procedures for detainee non-legal mail.

2.    Military personnel will collect the outgoing legal mail within one (1) business day of being notified by the detainee that the communication is prepared for sealing and mailing.

3.    After the outgoing legal mail is collected from the detainee, the envelope will be sealed into a larger envelope by military personnel at Guantanamo which will be marked as "Attorney-Detainee Materials-For Mail Delivery To Counsel" and will

EXHIBIT A

be annotated with the name of the detainee and the counsel. The envelope will be sealed and mailed in the manner required for classified materials. Within two (2) business days of receipt from the detainee, the communication will be mailed to the appropriate address as provided by government counsel.

4.  Detainees also are permitted to send non-legal mail, including written communications to persons other than counsel, through the United States Postal Service. These communications shall be reviewed by military personnel at Guantanamo under the standard operating procedures for detainee non-legal mail.

5.  In the event any non-legal correspondence or messages from a detainee to individuals other than his counsel (including family/friends or other attorneys) are sent to counsel as, or included with, legal mail, counsel shall return the documents to military personnel at GTMO for processing according to the standard operating procedures for detainee non-legal mail.

## V. Materials Brought Into A Meeting With Detainee And Counsel

A.  Counsel shall bring only legal mail, writing utensils and paper into any meeting with a detainee unless counsel has received prior approval from the Commander, JTF-GTMO. The Commander shall not unreasonably withhold approval for counsel to bring into a meeting with a detainee letters, tapes, or other communications introducing counsel to the detainee, if the government has first reviewed the communication and determined that sharing the communication with the detainee would not threaten the security of the United States.

B.  Written and oral communications with a detainee, including all documents brought into a meeting with a detainee, shall not include information relating to any ongoing or completed military, intelligence, security, or law enforcement operations, investigations, or arrests, or the results of such activities, by any nation or agency or current political events in any country that are not directly related to counsel's representation of that detainee; or security procedures at GTMO (including names of U.S. Government personnel and the layout of camp facilities) or the status of other detainees, not directly related to counsel's representation.

## VI. Materials Brought Out Of A Meeting With Detainee and Counsel

A.  Upon the completion of each meeting with a detainee or during any break in a meeting session, counsel will give the notes or documents used or produced during the meeting to a designated individual at Guantanamo. These materials will be sealed in the presence of counsel and will be handled as classified material as required by Executive Order 12958, DOD Regulation 5200.1-R and AI 26, OSD Information Security Supplement to DOD Regulation 5200.1R.

B.  Upon the completion of the counsel's visit to Guantanamo, the notes or documents used or produced during the visit shall be sealed in the presence of

EXHIBIT A

counsel and placed in an envelope labeled as "Attorney-Detainee Meeting Documents–For Delivery to Counsel." The envelope shall be sealed into a larger envelope by military personnel at Guantanamo which shall be marked as "Attorney-Detainee Meeting Documents-For Mail Delivery To Counsel" and shall be annotated with the name of the detainee and the counsel. The envelope shall be sealed and mailed in the manner required for classified materials. Within two (2) business days following the completion of the counsel's visit to Guantanamo, the package shall be mailed to the appropriate address provided by government counsel.

C.    Correspondence or messages from a detainee to individuals other than his counsel (including family/friends or other attorneys) shall not be handled through this process. If a detainee provides these communications to his counsel during a visit, counsel shall give those communications to military personnel at Guantanamo so they can be processed under the standard operating procedures for detainee non-legal mail.

## VII. Classification Determination of Detainee Communications

A.    Counsel may submit information learned from a detainee to the privilege team for a determination of its appropriate security classification. Counsel shall memorialize the information submitted for classification review into a written memorandum outlining as specifically as possible the information for which counsel requests a classification determination. All documents submitted for classification review shall be prepared, handled and treated in the manner required for classified materials, as provided by as required by Executive Order 12958, DOD Regulation 5200.1-R and AI 26, OSD Information Security Supplement to DOD Regulation 5200.1R. No information derived from these submissions shall be disclosed outside the privilege team pursuant to these procedures until after the privilege team has reviewed it for security and intelligence purposes. Absent express consent given by the Court, or except as otherwise provided in this document, the submissions shall not be disclosed to any person involved in the interrogation of a detainee, and no such individual may make any use of those communications whatsoever, nor shall the submissions be disclosed to any Government personnel involved in any domestic or foreign court, military commission or combatant status tribunal proceedings involving the detainee.

B.    Counsel shall send all materials submitted for classification review to the appropriate address to be provided by government counsel. The outside of the envelope or mailer shall be clearly labeled "Attorney-Detainee Meeting Documents-For Classification Review By Privilege Team." Each envelope or mailer shall be annotated with the name of the detainee and the counsel. Each page of the document submitted for classification review shall be marked "Attorney-Detainee Materials" and "Classified." The envelope or mailer will be sealed and mailed in the manner required for classified materials.

EXHIBIT A

C.     As soon as possible after conducting the classification review, the privilege team shall advise counsel of the classification levels of the information contained in the materials submitted for review. The privilege team shall forward its classification determination directly to counsel after a review and analysis period not to exceed, from the time of receipt by the privilege team:

1. Seven (7) business days for information that is written in the English language;

2. Fourteen (14) business days for any information that includes writing in any language other than English, to allow for translations by the privilege team;

3. Twenty (20) business days for any information where the privilege team has reason to believe that a code was used, to allow for further analysis.

D.     While conducting classification review, the privilege team shall promptly report any information that reasonably could be expected to result in immediate and substantial harm to the national security to the Commander, JTF-Guantanamo. In his discretion, the Commander, JTF-Guantanamo may disseminate the relevant portions of the information to law enforcement, military and intelligence officials as appropriate.

E.     If, at any time, the privilege team determines that information in the documents submitted for classification review relate to imminent acts of violence, the privilege team shall report the contents of those documents to Commander, JTF-Guantanamo. In his discretion, the Commander, JTF-Guantanamo may disseminate the relevant portions of the information to law enforcement, military and intelligence officials.

F.     The privilege team shall not disclose any information submitted by counsel for classification review outside the privilege team, except as provided by these procedures or as permitted by counsel submitting the information.

## VIII. Telephonic Access to Detainee

A.     Requests for telephonic access to the detainee by counsel or other persons will not normally be approved. Such requests may be considered on a case-by-case basis due to special circumstances and must be submitted to Commander, JTF-Guantanamo.

B.     Any telephonic access by counsel will be subject to appropriate security procedures, but shall not include contemporaneous monitoring or recording.

C.     Any telephonic access by persons other than counsel will be subject to appropriate security procedures, including contemporaneous monitoring and recording.

8

EXHIBIT A

### IX. Counsel's Handling And Dissemination Of Information From Detainee

A.   Subject to the terms of any applicable protective order, counsel may disseminate the unclassified contents of the detainee's communications for purposes reasonably related to their representation of that detainee.

B.   Counsel is required to treat all information learned from a detainee, including any oral and written communications with a detainee, as classified information, unless and until the information is submitted to the privilege team and determined to be otherwise. All classified material must be handled, transported and stored in a secure manner, as provided by Executive Order 12958, DOD Regulation 5200.1-R and AI 26, OSD Information Security Supplement to DOD Regulation 5200.1R.

C.   Counsel shall disclose to DoJ or Commander, JTF-Guantanamo any information learned from a detainee involving future events that threaten national security or involve imminent violence.

D.   Counsel may not divulge classified information not learned from the detainee to the detainee. Counsel may not otherwise divulge classified information related to a detainee's case to anyone except those with the requisite security clearance and need to know using a secure means of communication. Counsel for detainees in the coordinated cases pending in the United States District Court for the District of Columbia are presumed to have a "need to know" information in related cases pending before this Court. Counsel for respondents in those cases may challenge this presumption on a case-by-case basis for good cause shown.

### X. JTF-Guantanamo Security Procedures

A.   Counsel and translators/interpreters shall comply with the following security procedures and force protection safeguards applicable to the US Naval Base in Guantanamo Bay, Cuba, JTF-Guantanamo and the personnel assigned to or visiting these locations, as well as any supplemental procedures implemented by JTF-Guantanamo personnel.

B.   Contraband is not permitted in JTF-Guantanamo and all visitors are subject to search upon arrival and departure. Examples of contraband include, but are not limited to, weapons, chemicals, drugs, and materials that may be used in an escape attempt. Contraband also includes money, stamps, cigarettes, writing instruments, etc. No items of any kind may be provided to the detainee without the advance approval of the Commander, JTF-Guantanamo.

C.   Photography or recording of any type is prohibited without the prior approval of the Commander, JTF-Guantanamo. No electronic communication devices are permitted. All recording devices, cameras, pagers, cellular phones, PDAs, laptops, portable electronic devices and related equipment are prohibited in or near JTF-Guantanamo. Should any of these devices be inadvertently taken into a

9

EXHIBIT A

prohibited area, the device must be surrendered to JTF-Guantanamo staff and purged of all information.

D.    Upon arrival at JTF-Guantanamo, security personnel will perform a contraband inspection of counsel and translators/interpreters using metal detectors as well as a physical inspection of counsel's bags and briefcases and, if determined necessary, a physical inspection of his/her person.

E.    Counsel shall not be permitted to interview or question members of the Joint Task Force about their duties or interactions with detainees without first obtaining permission from the Commander, Joint Task Force Guantanamo.  Should permission be unreasonably denied, counsel may seek an Order from this Court granting permission for good cause shown.

F.    Counsel will meet with a detainee in conference facilities provided by GTMO. These facilities are subject to visual monitoring by closed circuit TV for safety and security reasons.  (The only other method of visual observation available is for the door to remain open with military police sitting outside the door.).  No oral communications between counsel and detainee will be heard.

G.    At the conclusion of a meeting with a detainee, counsel and translators/interpreters will again be inspected using a metal detector and, if deemed necessary, by physical inspection of their persons.

10

# Exhibit B

EXHIBIT B

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

```
                              )
, et al.                      )
                              )
        Petitioners,          )
                              )
    v.                        )  Civil Action No.
                              )
GEORGE W. BUSH,               )
    President of the United   )
    States, et al.,           )
                              )
        Respondents.          )
```

## MEMORANDUM OF UNDERSTANDING REGARDING ACCESS TO CLASSIFIED NATIONAL SECURITY INFORMATION

Having familiarized myself with the applicable statutes, regulations, and orders related to, but not limited to, unauthorized disclosure of classified information, espionage and related offenses; The Intelligence Identities Protection Act, 50 U.S.C. § 421; 18 U.S.C. § 641; 50 U.S.C. § 783; 28 C.F.R. § 17 et seq.; and Executive Order 12958; I understand that I may be the recipient of information and documents that belong to the United States and concern the present and future security of the United States, and that such documents and information together with the methods and sources of collecting it are classified by the United States government. In consideration for the disclosure of classified information and documents:

(1) I agree that I shall never divulge, publish, or reveal either by word, conduct or any other means, such classified

EXHIBIT B

documents and information unless specifically authorized in writing to do so by an authorized representative of the United States government, or as expressly authorized by the Protective Order entered in the United States District Court for the District of Columbia in the case captioned _____ v. George W. Bush, No. _____.

(2)  I agree that this Memorandum of Understanding and any other non-disclosure agreement signed by me will remain forever binding on me.

(3) I have received, read, and understand the Protective Order entered by the United States District Court for the District of Columbia in the case captioned _____ v. George W. Bush, No. _____, and I agree to comply with the provisions thereof.

_____        _____
                                      Date

_____        _____
                                      Date

2

Exhibit C

EXHIBIT C

**ACKNOWLEDGMENT**

The undersigned hereby acknowledges that he/she has read the Protective Order entered in the United States District Court for the District of Columbia in the case captioned _____ v. George W. Bush, No. _____, understands its terms, and agrees to be bound by each of those terms.  Specifically, and without limitation, the undersigned agrees not to use or disclose any protected information or documents made available to him/her other than as provided by the Protective Order.  The undersigned acknowledges that his/her duties under the Protective Order shall survive the termination of this case and are permanently binding, and that failure to comply with the terms of the Protective Order may result in the imposition of sanctions by the Court.

DATED: _____      BY: _____
                                (type or print name)

                          SIGNED: _____

# Exhibit B

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| | )    **Civil Action Nos.** |
| | )    **02-CV-0299 (CKK), 02-CV-0828 (CKK),** |
| | )    **02-CV-1130 (CKK), 04-CV-1135 (ESH),** |
| | )    **04-CV-1136 (JDB), 04-CV-1137 (RMC),** |
| *In re* **Guantanamo Detainee Cases** | )    **04-CV-1142 (RJL), 04-CV-1144 (RWR),** |
| | )    **04-CV-1164 (RBW), 04-CV-1166 (RJL),** |
| | )    **04-CV-1194 (HHK), 04-CV-1227 (RBW),** |
| | )    **04-CV-1254 (HHK), 04-CV-1519 (JR)** |
| | ) |

ORDER ADDRESSING DESIGNATION PROCEDURES
FOR "PROTECTED INFORMATION"

On November 8, 2004, counsel for respondents in these coordinated cases filed a motion

requesting the Court to designate as "protected information" the unclassified information

contained in the respondents' factual returns to the petitions for writs of habeas corpus that is not

filed on the public record. Counsel for certain petitioners filed responses stating that they could

not take a position on the respondents' motion until they or a designated representative had an

opportunity to review the material that the respondents seek to have declared "protected."

In the interest of the efficient administration of these proceedings, it is hereby

ORDERED that should counsel for respondents in these consolidated cases wish to have

the Court deem any information "protected" pursuant to the Court's November 8, 2004 Amended

Protective Order and Procedures for Counsel Access to Detainees at the United States Naval

Base in Guantanamo Bay, Cuba, counsel for respondents shall disclose the information to

qualified counsel for petitioners and attempt to reach an agreement regarding the designation of

the information prior to filing a motion with the Court. "Qualified counsel" for petitioners

means those counsel who have satisfied the necessary prerequisites set forth in the Amended

Protective Order for the viewing of protected information.

It is FURTHER ORDERED that counsel for petitioners shall treat such disclosed information as "protected" unless and until the Court rules that the information should not be designated as "protected."

It is FURTHER ORDERED that counsel for petitioners shall make their best efforts to designate one attorney as a representative to review the information on their behalf and to negotiate with counsel for respondents prior to the filing of any motions to deem information "protected."

With respect to the November 8, 2004 Motion to Designate as "Protected Information" Unclassified Information in Factual Returns to Petitions for Writ of Habeas Corpus That is Not Filed on the Public Record, it is hereby

ORDERED that counsel for respondents shall deliver the information they seek to be deemed "protected" to the Court Security Officer at the designated secured facility on or before November 17, 2004.

It is FURTHER ORDERED that the Court Security Officer shall notify counsel for the petitioners of the location of the secured facility on or before November 12, 2004.

It is FURTHER ORDERED that petitioners' counsel shall review at the secured facility the information at issue and shall notify the Court of their position with respect to the designation of the information on or before November 19, 2004.

IT IS SO ORDERED.
November 10, 2004                    _____/s/_____
                                     JOYCE HENS GREEN
                                     United States District Judge

2

# Exhibit C

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
|  | ) | **Civil Action Nos.** |
|  | ) | **02-CV-0299 (CKK), 02-CV-0828 (CKK),** |
|  | ) | **02-CV-1130 (CKK), 04-CV-1135 (ESH),** |
|  | ) | **04-CV-1136 (JDB), 04-CV-1137 (RMC),** |
| *In re* **Guantanamo Detainee Cases** | ) | **04-CV-1144 (RWR), 04-CV-1164 (RBW),** |
|  | ) | **04-CV-1194 (HHK), 04-CV-1227 (RBW),** |
|  | ) | **04-CV-1254 (HHK), 04-CV-1897 (RMC)** |
|  | ) |  |
|  | ) |  |
|  | ) |  |
|  | ) |  |

**ORDER SUPPLEMENTING AND AMENDING FILING PROCEDURES
CONTAINED IN NOVEMBER 8, 2004 AMENDED PROTECTIVE ORDER**

In its November 8, 2004 Amended Protective Order, the Court set forth procedures for
the filing of documents by counsel in these coordinated cases. Paragraph 46 governs the filing of
documents by counsel for the petitioners and requires that all filings be first submitted under seal
to the Court Security Officer ("CSO") to determine whether they contain classified or protected
information. If the CSO, in consultation with the appropriate agency, concludes that a particular
filing does not contain any classified or protected information, ¶ 46 requires the unsealing of the
document by the CSO and the filing of the document in the public record. If the CSO, in
consultation with the appropriate agency, concludes that a particular filing does contain classified
or protected information, that information is to remain under seal and the unclassified and
unprotected portions of the filing, if any, are to be placed in the public record. Paragraph 47
governs the filing of classified materials by counsel for the respondents and requires counsel to
submit classified filings under seal to the Court through the CSO.

It has recently come to the Court's attention that some confusion and certain difficulties have arisen with respect to the filing of documents containing classified or protected information. Most of the difficulties have arisen as a result of the nature of the Court's CM/ECF electronic filing system. To clarify and, hopefully, to improve the filing system, it is hereby

ORDERED that the "Procedures For Filing Documents" contained on pages 13 through 14 of the November 8, 2004 Amended Protective Order are modified and supplemented as follows:

All documents filed by a petitioner shall be filed under seal with the Court through the Court Security Officer for determination by the appropriate agency as to whether the documents contain classified or protected information. At the time of making a submission to the CSO, the attorney shall file on the public record in the CM/ECF system a "Notice of Filing" notifying the Court that a submission has been made to the CSO and specifying in general terms the nature of the filing without disclosing any potentially classified or protected information. It is the Court's understanding that the CM/ECF system requires counsel to attach a document to any entry made by them on the system. Accordingly, the document to be attached to the Notice of Filing in the CM/ECF system shall be a one page submission repeating in general terms the nature of the filing without disclosing any potentially classified or protected information and disclosing the date and time the document was delivered to the CSO for her review.

In the event that the CSO informs counsel for a petitioner that a proposed filing does not contain any classified or protected information, counsel shall then promptly file the full submission in the CM/ECF system and counsel shall make specific reference to the earlier docket

2

entry notifying the Court that the document had been submitted to the CSO for review. The docket entry description shall also state that the CSO has approved of the public filing of the document. The underlying document filed in the CM/ECF system shall contain a notation in the upper right hand corner of the first page stating "PREVIOUSLY FILED WITH CSO AND CLEARED FOR PUBLIC FILING."

In the event that the CSO informs counsel for a petitioner that a proposed filing does in fact contain some or all classified or protected information, counsel shall then promptly file in the CM/ECF system a version of the document suitable for public viewing. Unless an entire document is deemed classified or protected, a "version of the document suitable for public viewing" shall mean a document in which the portions of the document containing classified or protected information are redacted. Such document shall contain a notification in the upper right hand corner of the first page stating "REDACTED VERSION FOR PUBLIC FILING CLEARED BY CSO." In the event an entire document is deemed classified or protected, a "version of the document suitable for public viewing" shall mean a one page "half sheet" containing the caption of the case, a version of the title of the document that does not disclose classified or protected information, and a brief statement that the CSO has informed counsel that the entire document is classified or protected. The docket entry description in the CM/ECF system for the document suitable for public viewing shall make specific reference to the earlier docket entry notifying the Court that the document had been submitted to the CSO for review.

Any pleading or other document filed by counsel for the respondents containing classified or protected information shall be filed under seal with the Court through the CSO. In addition,

3

counsel for respondents shall file in the CM/ECF system a version of the document suitable for

public viewing as that phrase is defined in the preceding paragraph.

IT IS SO ORDERED.

December 13, 2004                              _____/s/_____

                                                    JOYCE HENS GREEN
                                                 United States District Judge

4

# Exhibit B

[ORAL ARGUMENT HELD SEPTEMBER 8, 2005 AND MARCH 22, 2006]

Nos. 05-5062 & 05-5063

IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

---

LAKHDAR BOUMEDIENE, ET AL.,
APPELLANTS,
V.
GEORGE W. BUSH, ET AL.,
APPELLEES.

---

RIDOUANE KHALID,
APPELLANT,
V.
GEORGE W. BUSH, ET AL.,
APPELLEES.

---

ON APPEAL FROM A DECISION OF THE
UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA

---

**SUPPLEMENTAL BRIEF OF PETITIONERS BOUMEDIENE, ET AL., AND KHALID
REGARDING THE MILITARY COMMISSIONS ACT OF 2006**

---

**Attorneys for Lakhdar Boumediene, et al.**
Stephen H. Oleskey
Robert C. Kirsch
Melissa A. Hoffer
Mark C. Fleming
Wilmer Cutler Pickering Hale and Dorr LLP
60 State Street
Boston, MA  02109
(617) 526-6000

**Attorneys for Ridouane Khalid**
Wesley Powell
Hunton & Williams
200 Park Avenue
New York, NY  10166
(212) 309-1013

Julia Symon
James Hosking
Clifford Chance US LLP
31 W. 52nd Street
New York, NY  10019
(212) 878-8000

November 1, 2006

## <u>CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES</u>

### <u>Parties and Amici</u>

Except for the following, all parties, intervenors, and amici appearing before

this Court are listed in the Corrected Joint Brief of Appellants, dated May 3, 2005.

1. Supplemental Amicus Curiae Brief Of The Oregon Federal Public Defender Habeas Corpus Counsel In Support Of Petitioners'/Appellants' Position On The  Significance Of The Military Commissions Act Of 2006; and

2. Brief Of Amici Curiae Retired Federal Judges In Support Of Petitioners' Supplemental Brief Regarding The Military Commissions Act Of 2006.

US1DOCS 5912932v1

# TABLE OF CONTENTS

Page

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES ................................................................................ i

TABLE OF AUTHORITIES ................................................................ iv

GLOSSARY ..................................................................................... vii

STATUTES AND REGULATIONS ...................................................... 1

SUMMARY OF ARGUMENT ............................................................ 1

ARGUMENT ..................................................................................... 2

I.  THE MCA DOES NOT REPEAL HABEAS JURISDICTION IN PENDING CASES ...................................................................... 3

II.  THE MCA VIOLATES THE SUSPENSION CLAUSE ................................ 6

    A.  The MCA Does Not Provide An Adequate Substitute For Habeas ......................................................................... 7

        1.  *A Habeas Petitioner May Offer Evidence Outside The Return, Which The Government Asserts Is Forbidden By The DTA* .................................................. 8

        2.  *According To The Government, The DTA Requires This Court To Defer To The CSRT Decision, Again Contrary To The Writ As Of 1789* ............................. 17

        3.  *The Suspension Clause Does Not Permit Cancellation Of The Writ's Core Protections* ...................... 19

    B.  Habeas Procedures In Cases Of Military Commissions, Collateral Attacks On Prior Judgments, And Pre-Trial Detention Are Inapposite ............................................. 22

III.   THE MCA DOES NOT AUTHORIZE PETITIONERS'
       INDEFINITE DETENTION ........................................................................ 25

CONCLUSION .................................................................................................... 30

CERTIFICATE OF COMPLIANCE PURSUANT TO FED. R. APP.
       P. 32(A)(7)(C) ......................................................................................... 31

CERTIFICATE OF SERVICE ............................................................................. 32

ADDENDUM:  RELEVANT STATUTORY PROVISIONS ................................ 33

ANNEX 1:  Excerpts of Response in Opposition to Motion to
       Compel, *Bismullah v. Rumsfeld* (No. 06-1197) (Aug. 2006)

US1DOCS 5912932v1

# TABLE OF AUTHORITIES

## CASES

Page(s)

*Bushell's Case*, (1670) 124 Eng. Rep. 1006 (C.P.)............................................ 17, 23

*Case of the Hottentot Venus*, (1810) 104 Eng. Rep. 344 (K.B.)................................8

*Case of Three Spanish Sailors*, (1779) 96 Eng. Rep. 775 (C.P.).......................... 8, 9

*Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402 (1971) ................ 19

*Ex Parte Watkins*, 28 U.S. (3 Pet.) 193 (1830) ........................................................ 21

*Goldswain's Case*, (1778) 96 Eng. Rep. 711 (C.P.) .......................................... 8, 17

* *Hamdan v. Rumsfeld*, 126 S. Ct. 2749 (2006) .................................................... 3, 5

* *Hamdi v. Rumsfeld*, 542 U.S. 507 (2004) ...................................... 8, 18, 27, 28, 29

*Harris v. Nelson*, 394 U.S. 286 (1969) ....................................................................8

* *INS v. St. Cyr*, 533 U.S. 289 (2001).................................................. 3, 4, 5, 6, 7, 23

*Johnson v. Eisentrager*, 339 U.S. 763 (1950)......................................................... 27

*Landgraf v. USI Film Products*, 511 U.S. 244 (1994).......................................... 3, 4

*McCleskey v. Zant*, 499 U.S. 467 (1991) ................................................................. 21

* *Murray v. Schooner Charming Betsy*, 6 U.S. (2 Cranch) 64 (1804) .................. 27

*National Organization for Women v. Social Security Administration*,
    736 F.2d 727 (D.C. Cir. 1984).................................................................. 19

*R. v. Schiever*, (1759) 97 Eng. Rep. 551 (K.B.)........................................................9

* *Rasul v. Bush*, 542 U.S. 466 (2004)................................................................ 7, 21

\* Authorities upon which we chiefly rely are marked with an asterisk.

*Rumsfeld v. Padilla*, 542 U.S. 426 (2004) ............................................................. 21

*State v. Clark*, 2 Del. Cas. 578, 1820 WL 245 (Del. Ch. Aug. 6, 1820) ..................8

* *Swain v. Pressley*, 430 U.S. 372 (1977)................................................................7

*The Paquete Habana*, 175 U.S. 677 (1900)............................................................ 27

*Twenty Per Cent. Cases*, 87 U.S. (20 Wall.) 179 (1873)..........................................6

*United States ex rel. Kassin v. Mulligan*, 295 U.S. 396 (1935)........................ 24, 25

*United States v. Braxtonbrown-Smith*, 278 F.3d 1348 (D.C. Cir. 2002)................ 26

*United States v. Robel*, 389 U.S. 258 (1967) .................................................... 28, 29

*Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579 (1952) ............................ 28

## CONSTITUTIONAL AND STATUTORY PROVISIONS

* U.S. Const. art. I................................................................................................ 6, 28

5 U.S.C. § 555 ....................................................................................................... 19

5 U.S.C. § 556 ....................................................................................................... 19

5 U.S.C. § 706 .................................................................................................. 18, 19

10 U.S.C. § 948d ................................................................................................... 26

10 U.S.C. § 948q ................................................................................................... 26

10 U.S.C. § 950j.......................................................................................................5

28 U.S.C. § 2241 ......................................................................................... 3, 4, 7, 20

Authorization for Use of Military Force, Pub. L. No. 107-40, 115 Stat.
    224 (2001)..................................................................................... 25, 27, 28

Detainee Treatment Act of 2005, Pub. L. No. 109-148, 119 Stat. 2680 ..................1

Military Commissions Act of 2006, Pub. L. No. 109-366, 120 Stat.
    2600..................................................................................... 1, 4, 5, 7, 20, 26

US1DOCS 5912932v1

## INTERNATIONAL AUTHORITIES

International Convenant on Civil and Political Rights, Dec. 16, 1966,
art. 9, 999 U.N.T.S. 171, 6 I.L.M. 368 ........................................................ 27

## OTHER AUTHORITIES

Duker, William F., *A Constitutional History of Habeas Corpus* (1980) ................ 20

Heuston, R.F.V., *Habeas Corpus Procedure*, 66 L.Q. Rev. 79 (1957) .................. 21

Mian, Badshah K., *English Habeas Corpus:  Law, History, and
Politics* (1984) ............................................................................................. 20

Raack, David W., *A History of Injunctions in England Before 1700*,
61 Ind. L.J. 539 (1985-1986) ........................................................................ 21

Sharpe, R.J., *The Law of Habeas Corpus* (2d ed. 1989) ......................................... 20

Turner, Alexander Kingcome, *The Doctrine of Res Judicata* (2d ed.
1969) .............................................................................................................. 21

Whitlock, Craig, *U.S. Faces Obstacles to Freeing Detainees From
Guantanamo*, Wash. Post, Oct. 17, 2006, at A1 ........................................... 22

US1DOCS 5912932v1

## GLOSSARY

AUMF ....................................... Authorization for Use of Military Force, Pub. L. No. 107-40, 115 Stat. 224 (2001)

Boumediene Merits Br. ............. Corrected Joint Brief of Appellants (May 3, 2005)

Boumediene DTA Br ................ Corrected Supplemental Brief of Petitioners Boumediene, et al., and Khalid Regarding Section 1005 of the Detainee Treatment Act of 2005 (Mar. 15, 2006)

CSRT ........................................ Combatant Status Review Tribunal

DTA........................................... Detainee Treatment Act of 2005, Pub. L. No. 109-148, 119 Stat. 2680

Gov't DTA Br. .......................... Supplemental Brief of the Federal Parties Addressing the Detainee Treatment Act of 2005 (Feb. 17, 2006)

Habeas Scholars' Br. ................. Supplemental Brief Amici Curiae of British and American Habeas Scholars in Support of Petitioners Addressing Section 1005 of the Detainee Treatment Act of 2005 (Mar. 10, 2006)

MCA......................................... Military Commissions Act of 2006, Pub. L. No. 109-366, 120 Stat. 2600

3/22/06 Tr. [page]:[line]............ Transcript of Oral Argument (Mar. 22, 2006)

US1DOCS 5912932v1

Petitioners Boumediene, Nechla, Boudella, Bensayah, Ait Idir, Lahmar (the Boumediene Petitioners) and Khalid (together Petitioners) submit this brief pursuant to this Court's October 18, 2006 order.

## STATUTES AND REGULATIONS

The relevant provisions of the Military Commissions Act of 2006, Pub. L. No. 109-366, 120 Stat. 2600 (MCA), are set forth in the addendum to this brief. Other relevant statutory provisions are set forth in the addenda to the Boumediene Petitioners' corrected brief on the merits and the Government's supplemental brief regarding the DTA.

## SUMMARY OF ARGUMENT

The MCA does not affect Petitioners' appeal with respect to either jurisdiction or merits. MCA section 7(b) lacks the requisite "clear statement" to repeal jurisdiction in pending *habeas* cases. *See infra* Part I.

If the MCA repealed habeas, it would violate the Suspension Clause because its only substitute for habeas is review of CSRT decisions in this Court under section 1005(e)(2) of the Detainee Treatment Act of 2005 (DTA), a procedure that (as construed by the Government) is manifestly inadequate when compared to the core protections that habeas corpus provided in 1789. *See infra* Part II.

The Government lacks statutory authority to imprison the Boumediene Petitioners indefinitely. They have not been charged with any offense triable by

- 1 -

any military commission, court martial, or court. The MCA does not grant authority to detain persons indefinitely without charge. *See infra* Part III.[1]

## ARGUMENT

Although this brief discusses the "Military Commissions Act," this case does *not* involve military commissions. The Government claims the right to imprison the Boumediene Petitioners indefinitely *without ever charging or trying them*. For centuries, the writ of habeas corpus has shielded individuals against such arbitrary detention by requiring the Government to establish the legal and factual basis for confinement before a neutral judicial decision-maker.

The Framers were only too familiar with government attempts to hide unjust imprisonment and mistreatment from public view. They therefore directed that, except in circumstances not present here, persons imprisoned without charge must retain the right to obtain a court inquiry into the factual and legal bases for their imprisonment. The Government seeks nothing less than to replace habeas with a review process that places the Court wholly at the mercy of a "record" constructed by the Government and precludes the Boumediene Petitioners from presenting evidence demonstrating the unlawfulness of their imprisonment. No common law court before 1789, and certainly not the Framers, would have countenanced such a procedure in the case of a person imprisoned by the King without charge. And

---

[1] Petitioners incorporate by reference the arguments made in the brief of Petitioner-Appellees Al Odah, *et al.*, in Nos. 05-5064, 05-5095 through 05-5116.

neither the MCA nor the Suspension Clause permits this Court to ignore the merits

of Petitioners' appeal.

## I.    THE MCA DOES NOT REPEAL HABEAS JURISDICTION IN PENDING CASES

Longstanding rules of construction dictate that the MCA does not repeal

habeas jurisdiction in pending cases. First, "Congress must articulate specific and

unambiguous statutory directives to effect a repeal" of habeas jurisdiction. *INS v.*

*St. Cyr*, 533 U.S. 289, 299 (2001); *cf. Hamdan v. Rumsfeld*, 126 S. Ct. 2749, 2764

(2006) (stating that a statute will not be held to revoke the Supreme Court's habeas

jurisdiction "absent *an unmistakably clear statement* to the contrary" (emphasis

added)). Second, "a negative inference may be drawn from the exclusion of

language from one statutory provision that is included in other provisions of the

same statute." *Hamdan*, 126 S. Ct. at 2765. Third, a statute that would

retroactively alter a party's rights in a pending case "does not govern absent clear

congressional intent favoring such a result." *Id.* (quoting *Landgraf v. USI Film*

*Prods.*, 511 U.S. 244, 280 (1994)). And fourth, the Court should avoid construing

the MCA in a manner that would give rise to "substantial constitutional questions."

*St. Cyr*, 533 U.S. at 300, *see also id.* at 326.

Section 7(a) purports to strip jurisdiction over two distinct categories of

cases: (1) "an application for a writ of habeas corpus" filed by or on behalf of

certain aliens, 28 U.S.C. § 2241(e)(1); and (2) "any other action against the United

- 3 -

States or its agents *relating to any aspect of the detention, transfer, treatment, trial, or conditions of confinement*" of such an alien, *id.* § 2241(e)(2) (emphasis added).

Section 7(b), which sets out the "effective date" of section 7(a), provides only that section 7(a) applies to pending cases that are in the *second* category—cases "which *relate to any aspect of the detention, transfer, treatment, trial, or conditions of detention* of an alien detained by the United States since September 11, 2001." MCA § 7(b) (emphasis added). The MCA does not provide—much less contain an "unmistakably clear statement"—that section 7(a) repeals jurisdiction in *habeas* cases pending on the date of enactment.[2]

*St. Cyr* disposes of any argument that the MCA repealed jurisdiction over pending habeas cases. *St. Cyr* confirmed that Congress must express itself with clarity and precision to repeal habeas jurisdiction, and that habeas jurisdiction must remain in "'any cases not *plainly* excepted by law.'" *St. Cyr*, 533 U.S. at 298 (quoting *Ex parte Yerger*, 75 U.S. (8 Wall.) 85, 102 (1869)) (emphasis added). There, a section entitled "Elimination of Custody Review by Habeas Corpus" did not repeal habeas jurisdiction because the operative text of the statute did not specifically mention habeas. *Id.* at 308-310. Section 7(b), which likewise does not

---

[2] The fact that section 7(b) states that section 7(a) "shall take effect on the date of the enactment of this Act" has no bearing on whether the MCA applies retroactively. *See Landgraf*, 511 U.S. at 257 ("A statement that a statute will become effective on a certain date does not even arguably suggest that it has any application to conduct that occurred at an earlier date.").

- 4 -

reference habeas and addresses only the category of "other action[s]" included in new 28 U.S.C. § 2241(e)(2), does not satisfy *St. Cyr*.

Section 7(b) contrasts with section 3(a) of the MCA, which addresses habeas petitions brought by persons convicted by military commission. Section 3(a) added 10 U.S.C. § 950j, which provides that "notwithstanding any other provision of law (*including section 2241 of title 28 or any other habeas corpus provision*), no court, justice, or judge shall have jurisdiction to hear or consider *any claim or cause of action whatsoever . . . pending on . . . the date of the enactment of the [MCA]*, relating to the prosecution, trial, or judgment of a military commission under this chapter . . . ." 10 U.S.C. § 950j(b) (emphasis added). That section explicitly states that the jurisdiction-stripping provision applies to *habeas* cases pending on the date of enactment. Section 7(b) lacks similar language, and *St. Cyr* forecloses extending it to pending habeas cases by implication. *See St. Cyr*, 533 U.S. at 299 ("Implications from statutory text . . . are not sufficient to repeal habeas jurisdiction . . . ."). "[A] negative inference may be drawn from the exclusion of language from one statutory provision that is included in other provisions of the same statute." *Hamdan*, 126 S. Ct. at 2765. This Court must give effect to the difference between MCA §§ 3(a) and 7.

The MCA additionally fails to overcome the presumption against retroactive statutes. *See Hamdan*, 126 S. Ct. at 2764-2765. Because section 7(b) does *not*

- 5 -

purport to reach the habeas applications described in § 2241(e)(1) and makes no specific mention of habeas at all, the MCA does not contain the "unequivocal terms" required to affect habeas cases that arose prior to the MCA's enactment. *Twenty Per Cent. Cases*, 87 U.S. (20 Wall.) 179, 187 (1873).

A conclusion that the MCA does not affect jurisdiction in Petitioners' cases avoids substantial constitutional questions. *See St. Cyr*, 533 U.S. at 300; *see also id.* at 326 (rejecting habeas stripping where such a construction "would give rise to substantial constitutional questions"); *see infra* Part II.  Indeed, the mere need to determine the extent of the Suspension Clause guarantee is "in and of itself a reason to avoid answering the constitutional questions that would be raised by concluding that [habeas] review was barred entirely." *Id.* at 301 n.13.  When "an alternative interpretation of the statute is 'fairly possible,'" the Court is "obligated to construe the statute to avoid such problems." *Id.* at 300 (quoting *Crowell v. Benson*, 285 U.S. 22, 62 (1932)).

## II.   THE MCA VIOLATES THE SUSPENSION CLAUSE

Construing the MCA to remove habeas jurisdiction here would violate the Suspension Clause.[3]  "[A]t the absolute minimum, the Suspension Clause protects the writ 'as it existed in 1789.'" *St. Cyr*, 533 U.S. at 301 (quoting *Felker v. Turpin*,

---

[3] "The Privilege of the Writ of Habeas Corpus shall not be suspended, unless when in Cases of Rebellion or Invasion the public Safety may require it." U.S. Const. art. I, § 9, cl. 2.

- 6 -

518 U.S. 651, 663-664 (1996)). Because the United States holds absolute control over Guantanamo, persons imprisoned in 1789 under like circumstances would have been able to invoke the common law writ. *See Rasul v. Bush*, 542 U.S. 466, 481-482 (2004); Boumediene DTA Br. 35-38; Habeas Scholars' Br. 4-7.

### A.    The MCA Does Not Provide An Adequate Substitute For Habeas

Absent a valid suspension, limits on the availability of the writ are valid only if a substitute remedy is both adequate and effective to "test the legality of a person's detention." *Swain v. Pressley*, 430 U.S. 372, 381 (1977) (quotation omitted); *see also St. Cyr*, 533 U.S. at 305 ("a serious Suspension Clause issue would be presented" absent an adequate habeas substitute). If construed to repeal habeas in this case, the MCA would afford Petitioners only the procedure provided in "paragraph[ ] (2) . . . of section 1005(e) of the Detainee Treatment Act of 2005." MCA § 7(a) (adding 28 U.S.C. § 2241(e)(2)).

Review under DTA § 1005(e)(2) falls short of the core protections secured by the Suspension Clause. *See* Boumediene DTA Br. 41-55. Moreover, since the March 2006 argument regarding the DTA, the Government has consistently advanced constructions of § 1005(e)(2) review which confirm the inadequacy of that review as a habeas substitute.

US1DOCS 5912932v1

   *1. A Habeas Petitioner May Offer Evidence Outside The Return,*
    *Which The Government Asserts Is Forbidden By The DTA*

"Petitioners in habeas corpus proceedings ... are entitled to careful consideration and *plenary processing* of their claims including *full opportunity for the presentation of the relevant facts.*" *Harris v. Nelson*, 394 U.S. 286, 298 (1969) (emphases added); *see also Hamdi v. Rumsfeld*, 542 U.S. 507, 538 (2004) (plurality opinion) (habeas "permits the alleged combatant to present his own factual case to rebut the Government's return").

These holdings echo the common law, which likewise permitted habeas petitioners to offer evidence supporting release. For example, in *Goldswain's Case*, (1778) 96 Eng. Rep. 711 (C.P.), a habeas petitioner was pressed into Admiralty service. The Admiralty's return failed to mention an exemption issued by the Navy Board, which the petitioner's counsel substantiated through affidavits. *See id.* The court relied on the affidavits, noting that they included information omitted from the return. *See id.* at 712.[4] Early American courts adopted the same practice. *See, e.g., State v. Clark*, 2 Del. Cas. 578, 1820 WL 245, at *2 (Del. Ch. Aug. 6, 1820) (discharging a minor from the custody of the U.S. Army based on the minor's "suggestions . . . made against [the custodian's] return" and the

---

[4] *See also, e.g., Case of the Hottentot Venus*, (1810) 104 Eng. Rep. 344, 344 (K.B.) (ordering an examination of a "native of South Africa" to determine whether she was confined against her will); *Case of Three Spanish Sailors*, (1779) 96 Eng. Rep. 775, 775 (C.P.) (examining affidavits supporting petitioners' claim for release); *see generally* Habeas Scholars' Br. 8-9.

- 8 -

testimony of his father, who was "sworn as a witness for him"). Aliens accused of being enemy soldiers had the same right to judicial consideration of their own evidence. *See, e.g., R. v. Schiever*, (1750) 97 Eng. Rep. 551, 552 (K.B.) (considering affidavits submitted in support of an alien petitioner's habeas motion and concluding that "the Court thought this man, *upon his own showing*, clearly a prisoner of war" (emphasis added)); *Case of Three Spanish Sailors*, (1779) 96 Eng. Rep. 775, 776 (C.P.) (similar); Habeas Scholars' Br. 9.

Yet the Government contends that the DTA "limit[s] this Court's review to the record before the CSRT." Response in Opposition to Motion to Compel at 14, *Bismullah v. Rumsfeld* (No. 06-1197) (Aug. 2006) (attached as Annex 1) ("Gov't Response in *Bismullah*"). The Government similarly contends that this Court may not review CSRT decisions to exclude materials from the CSRT record. *See id.* at 18. On that interpretation, this Court would never hear evidence from petitioners that could mean the difference between freedom and lifelong imprisonment.

This is not a hypothetical concern. The Boumediene Petitioners sought to include in the CSRT record specific documents and testimony from specific witnesses, yet their CSRT records are devoid of both despite the ready availability of that evidence. *See* Boumediene Merits Br. 46. Petitioner Boudella asked his CSRT panel to consider the January 2002 order of the Supreme Court of the Federation of Bosnia and Herzegovina ordering him released due to lack of

- 9 -

evidence. J.A. 0576, 0582. That Tribunal concluded that the court decision was "not reasonably available" (J.A. 0582), even though the decision had been *filed in the district court and served on counsel for the Government* months before Mr. Boudella's CSRT convened.[5]

Mr. Boudella also requested as evidence a copy of the judgment of the Human Rights Chamber for Bosnia and Herzegovina, which confirmed that Mr. Boudella was ordered released by the Supreme Court and also held that Bosnia and Herzegovina had violated Bosnian law and the European Convention on Human Rights, which is binding on Bosnia and Herzegovina, by handing Mr. Boudella over to the United States. J.A. 0576, 0582.[6] His CSRT recited that this decision was "not reasonably available" (J.A. 0582), even though it was available on the Internet[7] and Mr. Boudella testified that he had actually seen the decision while at Guantanamo (J.A. 0582).

---

[5] *See* Pets.' Opp. to Resp. Motion for a Joint Case Management Conference, Entry of Coordination Order and Request for Expedition, Ex. B, *Boumediene v. Bush*, No. 1:04-cv-01166-RJL (D.D.C. Aug. 16, 2004) (Dkt. 13). Saber Lahmar also requested that the Bosnian Supreme Court's order be considered. J.A. 0401. His CSRT also deemed it "not reasonably available" on the ground that "[t]he Bosnian government was unable to provide any such document." *Id.*

[6] Mr. Boudella's request for the judgment of the Human Rights Chamber appears to have been mistranslated as a request for "a copy of 'Humanity of the People.'" J.A. 0576.

[7] *See* Memorandum in Support of Motion for Order Enjoining Appellees From Transferring Petitioners to Algeria Without Providing Counsel for Petitioners and the Court With 30 Days' Advance Notice, Ex. A2, p. 18 (Sept. 21, 2005).

US1DOCS 5912932v1

Petitioner Nechla sought the testimony of Mr. Mohmoud Sayed Yousef, his supervisor in the Bosnian office of the Red Crescent of the United Arab Emirates. J.A. 0520. His CSRT concluded that Mr. Yousef was not reasonably available. *See id.* Counsel easily located Mr. Yousef in January 2005 by calling the Red Crescent telephone number listed in the Sarajevo phone book.

Information that was potentially exculpatory was provided to Mr. Lahmar's Tribunal only *after* his CSRT hearing. *See* Boumediene Merits Br. 48-50. That information was *never* provided to any of the CSRTs of the other Boumediene Petitioners, even though their alleged "association" with Mr. Lahmar formed part of the basis for the CSRT decisions in their cases. *See id.* Under the Government's view of this Court's review procedure under the MCA and DTA, Petitioners would be forbidden from providing the Court with this crucial evidence.

[TEXT EXCERPTED HERE]

Bosnian authorities have since dropped the investigation into the alleged terrorist plot. J.A. 0704-0705. Yet under the Government's view of the DTA, this Court would be forbidden from considering any of this evidence.

These examples demonstrate why any alternative that does not permit this Court to review all evidence offered by a petitioner would not be an adequate substitute for habeas. The Government would prohibit this Court from considering

- 11 -

any of this evidence and limit this Court to only a meaningless review of a hastily assembled CSRT record. A statute requiring that this Court "wilfully shut [its] eyes" to important evidence is inconsistent with the common law writ, *Goldswain's Case*, 96 Eng. Rep. at 712, and violates the Suspension Clause.

> 2.   *According To The Government, The DTA Requires This Court To Defer To The CSRT Decision, Again Contrary To The Writ As Of 1789*

In stark contrast to habeas, the Government proposes a highly restrictive standard of review, essentially requiring affirmance unless there was *no* evidence supporting detention. *See* Gov't Response in *Bismullah* at 13 (arguing that the DTA limits this Court's role to "at most" a determination that the CSRT decision "is supported by substantial evidence"). Under that approach, the DTA would not permit the Court to assess the relative weight of the evidence; as long as some evidence supported detention, this Court would be constrained to uphold the imprisonment. Common law habeas rejected such deference to the Government's judgment; as one court put it, "our judgment ought to be grounded upon our own inferences and understandings, and not upon theirs." *Bushell's Case*, (1670) 124 Eng. Rep. 1006, 1007 (C.P.); *see generally* Boumediene DTA Br. 47.

The Government advocates a deferential standard of review by drawing an analogy between section 1005(e)(2) of the DTA and "substantial evidence" review of agency adjudications under the Administrative Procedure Act, 5 U.S.C.

- 12 -

§ 706(2)(E) (APA). *See* Gov't Response in *Bismullah* at 10-13 (citing *Florida Light & Power Co. v. Lorion*, 470 U.S. 729 (1985)).[8] The Suspension Clause's guarantee of habeas corpus is in no way affected by Congress's authorization of a more limited standard of review for agency decisions regarding the licensing of nuclear reactors. Except in cases of invasion or rebellion, the Suspension Clause prevents Congress from diminishing the core protections of the writ (including a full factual review) in cases of imprisonment without charge. *See, e.g.*, *Hamdi*, 542 U.S. at 575 (Scalia, J., dissenting) ("The Suspension Clause . . . would be a sham if it could be evaded by congressional prescription of requirements *other than the common-law requirement of committal for criminal prosecution* that render the writ, though available, unavailing." (emphasis in original)).

Even under the APA, a proceeding as defective as the CSRT would likely not be reviewable for substantial evidence, since that standard only applies to review of formal adjudications under sections 556 and 557 of the APA and to cases on the record of "an agency hearing provided by statute." 5 U.S.C. § 706(2)(E).

---

[8] The Court made a similar suggestion during oral argument. *See* 3/22/06 Tr. 27:13-16.

- 13 -

No statute provides for a CSRT hearing.[9]   And the CSRTs fail abysmally to meet the APA's criteria for a formal adjudication, because the prisoner has no meaningful opportunity to "submit rebuttal evidence" or "to conduct such cross-examination as may be required for a full and true disclosure of the facts."  *Id.* § 556(d).  Nor did the CSRT allow petitioners to be "accompanied, represented, and advised by counsel," an entitlement that the APA gives to every "person compelled to appear in person before an agency."  5 U.S.C. § 555(b).[10]

> 3.   *The Suspension Clause Does Not Permit Cancellation Of The Writ's Core Protections*

At oral argument regarding the DTA, this Court asked whether the restrictive review allowed under section 1005(e)(2) could be characterized as simply "modifying" habeas, similar to modern provisions eliminating the requirement to "produce the body" or limiting the filing of second or successive

---

[9] The CSRTs were established by order of the Deputy Secretary of Defense and do not find facts, but merely purport to confirm "enemy combatant" designations *already* reached "through multiple levels of review by officers of the Department of Defense." J.A. 1207. Nothing in the MCA (or in the DTA before it) remotely authorized such a procedure, particularly not against citizens of a friendly nation abducted from their home country in peacetime.

[10] Indeed, the only APA standard of review that arguably could apply to review of a CSRT would be a "trial de novo by the reviewing court," *id.* § 706(2)(F), which is the appropriate standard when "the agency factfinding procedures are inadequate." *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 415 (1971); *see also National Org. for Women v. Social Sec. Admin.*, 736 F.2d 727, 746 (D.C. Cir. 1984) (indicating that procedures that are "closed, unfair, or otherwise inadequate to the task of developing a factual record" would warrant *de novo* review under the APA).

petitions.    3/22/06 Tr. 46:6-7, 46:17-22, 47:16-23.[11]    The MCA's serious

limitations on this Court's review of the CSRT process are in no way comparable

to these minor alterations that leave the core protections of habeas undiminished.

The requirement that a custodian "produce the body" was—even in 1789—a

vestigial procedural relic rather than a central substantive concern of the Great

Writ.[12]    By the time of the Founding, the production of the body was merely a

means by which common law courts could "extend their jurisdiction by bringing

the body of the petitioner . . . before them."    William F. Duker, *A Constitutional*

*History of Habeas Corpus* 29-30 (1980); *see also* R.J. Sharpe, *The Law of Habeas*

---

[11] The Court's suggestion that the DTA modified, rather than abolished, habeas corpus had an arguable textual basis due to the particular phrasing of 28 U.S.C. § 2241(e)(1), as added by section 1005(e)(1) of the DTA. *See* 3/22/06 Tr. 57:23-58:9. Section 7(a) of the MCA repealed that language, however, and enacted a new section 2241(e). The new section makes a clear distinction between habeas corpus, which is treated in new section 2241(e)(1), and "other action[s]" including review under section 1005(e)(2) of the DTA, which are treated in new section 2241(e)(2). *See* MCA § 7(a).

[12] What we now refer to as habeas corpus was originally "an aggregation of two existing writs: habeas corpus, and a writ questioning the cause of a prisoner's custody." William F. Duker, *A Constitutional History of Habeas Corpus* 25 (1980). Habeas corpus proper was simply a writ that compelled the appearance of an individual before a court—typically, in its origins, to "secure the appearance of an unwilling defendant." *Id.* at 18; *see also* R.J. Sharpe, *The Law of Habeas Corpus* 1-4 (2d ed. 1989). The procedural writ of habeas corpus later became firmly attached to other substantive writs designed to test the judgment of another court—a practice that developed primarily because a court's jurisdiction frequently depended on the physical presence of the person who was the subject of the dispute. *See* Duker, *supra,* at 27-40; Badshah K. Mian, *English Habeas Corpus: Law, History, and Politics* 18-21 (1984).

- 15 -

*Corpus* 4 (2d ed. 1989) (habeas corpus "brought matter of the imprisonment fully before the court" since it was "important to be able to exert physical control over the parties in civil litigation").[13]  Similarly, the federal statute's modern restriction of second and successive petitions poses no Suspension Clause concerns because it simply codified and systematized the common law principle of "abuse of the writ," pursuant to which English courts have always had the power to deny dilatory or abusive habeas petitions. *See, e.g., McCleskey v. Zant*, 499 U.S. 467, 494 (1991).[14]

These modern variations in habeas procedure did not affect the courts' basic ability to "review[] the legality of Executive detention." *Rasul*, 542 U.S. at 474 (citation omitted); *see also Ex Parte Watkins*, 28 U.S. (3 Pet.) 193, 202 (1830) ("[T]he great object of [the writ of habeas corpus] is the *liberation* of those who

---

[13] The requirement of "producing the body"—formerly a technical prerequisite to the habeas court's ability to grant relief—has been replaced by an adequate substitute, namely, court jurisdiction over the *custodian* and power to order him to release the prisoner. *See, e.g., Rumsfeld v. Padilla*, 542 U.S. 426, 434-435 (2004).

[14] "Every English Court of Justice is, and from time immemorial has been, invested with inherent jurisdiction . . . to dismiss, or stay, or otherwise nullify all actions or proceedings which are shewn to its satisfaction to be vexatious or oppressive, or to constitute an abuse of its process." Alexander Kingcome Turner, *The Doctrine of Res Judicata* 407 (2d ed. 1969).  Thus, under English jurisprudence, "it never was [the case] that an applicant for habeas corpus may in term apply successively to every judge of the High Court." R.F.V. Heuston, *Habeas Corpus Procedure*, 66 L.Q. Rev. 79 (1950); *see also* David W. Raack, *A History of Injunctions in England Before 1700*, 61 Ind. L.J. 539, 568-570 (1985-1986) (noting the well-established "practice of enjoining [common law] proceedings where the legal process was being abused").

- 16 -

may be imprisoned without sufficient cause."). The MCA, through which the Government would replace habeas corpus with a deferential review of an incomplete "record," essentially eliminate that fundamental substantive attribute of habeas and therefore works an unlawful suspension.[15]

**B.    Habeas Procedures In Cases Of Military Commissions, Collateral Attacks On Prior Judgments, And Pre-Trial Detention Are Inapposite**

At prior oral argument, the Court suggested that the Boumediene Petitioners were being detained "preliminary to full trial before a Military Commission." 3/22/06 Tr. 42:6-7. With respect, the Court was mistaken. It must be emphasized that *none of the Boumediene Petitioners have been charged with any crime triable by military commission.* The CSRTs are not preliminary to a further procedure; rather, the Government treats them as sufficient in themselves to justify indefinite detention. The Government has recently stated that, although approximately 435 men remain imprisoned indefinitely at Guantanamo, only 60 to 80 are expected to be tried by military commission. *See* Craig Whitlock, *U.S. Faces Obstacles to*

---

[15] Previously identified defects in the DTA review scheme, including apparently barring court review of detention decisions by bodies other than a CSRT, not authorizing release of a successful petitioner, and interfering with the right to counsel, are not cured in the MCA. *See* Boumediene DTA Br. 49-55.

*Freeing Detainees From Guantanamo*, Wash. Post, Oct. 17, 2006, at A1 (reporting statement of John B. Bellinger III, Legal Adviser, U.S. Department of State).[16]

The Government repeatedly has sought to confuse certain issues in this case by citing to the historical scope of habeas in *criminal* cases, specifically collateral attacks on prior convictions. *See, e.g.*, Gov't DTA Br. 51. Such sources are irrelevant, since the Boumediene Petitioners have been neither charged nor convicted of any crime. Their imprisonment without charge is precisely the circumstance in which the protections of habeas "have been strongest." *St. Cyr*, 533 U.S. at 301.

The common law accorded persons who—like Petitioners—had no reasonable prospect of a trial a significantly broader inquiry on habeas than was available to persons awaiting trial on a criminal charge. Of course, even persons in pretrial detention generally had the right to present their own evidence on habeas. *See, e.g.*, Habeas Scholars' Br. 10 n.5. Although some decisions suggest that persons in pretrial detention could not controvert the return, those statements are based on the common law right to a speedy trial, where the prisoner has a right to present his own evidence to a jury. *See, e.g.*, *Bushell's Case*, 124 Eng. Rep. at 1010 (noting that, while a person held "upon a general commitment" for a felony

---

[16] Moreover, even conceded enemy soldiers tried by military commission receive more procedural protections than the Boumediene Petitioners did before the CSRTs. *See* Boumediene Merits Br. 20 & n.19.

could not present his own evidence during a habeas proceeding, he "may press for his tryal, which ought not to be denied or delayed," whereas a person imprisoned without charge is permitted to traverse the return).

The decision in *United States ex rel. Kassin v. Mulligan*, 295 U.S. 396 (1935), which the Court cited during oral argument, is consistent with this common law tradition. *See* 3/22/06 Tr. 24-28. In *Kassin*, the petitioner was indicted in Florida but apprehended in New York. He filed a habeas petition challenging an order—issued after a further evidentiary hearing on probable cause—extraditing him so that he could be tried on the Florida indictment. *Kassin* is explicitly premised on the fact that an "order of removal adjudges nothing affecting the merits of the case and *amounts to no more than a finding that the accused may be brought to trial.*" 295 U.S. at 401 (emphasis added). Moreover, the habeas procedure observed in *Kassin* appears to have been more in the nature of a collateral attack on the post-indictment extradition hearing, during which the petitioner had introduced depositions of five persons in support of his release. *See id.* at 398-399; *see also id.* at 401-402 ("He was entitled to introduce evidence to prove the absence of probable cause and to have the Commissioner judicially consider it. We have held that exclusion of competent evidence is a denial of right . . . ."). The petitioner in *Kassin* did not seek to supplement the record on habeas, and the Supreme Court did not address whether he could have done so. *See id.* at

- 19 -

401.[17]  Moreover, the ultimate order was that the petitioner would have a full trial on the indictment, not indefinite detention without charge.  *See id.* at 402.

Unlike the petitioner in *Kassin*, the Boumediene Petitioners' detention—now approaching five years in duration—has never been in anticipation of any criminal proceeding.  Nor have Petitioners had the opportunity to present to *anyone* the evidence that they believe would compel their release.  *See supra* Part II.A.1.  Common law habeas has always required a searching judicial examination of the factual and legal bases for detention in cases such as this.

Because Congress has not purported to suspend the writ of habeas corpus, let alone validly done so,[18] a construction of the MCA that repealed habeas jurisdiction in this case would render the MCA unconstitutional.

## III.  THE MCA DOES NOT AUTHORIZE PETITIONERS' INDEFINITE DETENTION

Petitioners have previously shown that the Government has no authority, under the AUMF or otherwise, to kidnap citizens of friendly nations far from any

---

[17] Petitioners respectfully submit that this Court was mistaken in suggesting at oral argument that *Kassin* held that that a petitioner could not submit evidence during a habeas proceeding.  3/22/06 Tr. 25:24 to 26:6, 28:6-7.  The question did not arise in *Kassin*—probably because the Petitioner previously had a full opportunity to submit his evidence—and the opinion does not suggest that the petitioner sought to submit anything further.  Importantly, the Supreme Court approvingly noted that the district court "considered the evidence in detail" and admonished the court of appeals for "declin[ing] to examine the evidence" itself.  295 U.S. at 402.

[18] The MCA, like the DTA before it, does not meet the Constitution's requirements for a valid suspension of the writ.  *See* Boumediene DTA Br. 55-56.

battlefield, especially after the investigative authorities of that country concluded that there was no evidence to hold them. *See* Boumediene Merits Br. 20-27. The MCA does not alter this analysis. Accordingly, the Court should reverse the judgment of the district court.

*First*, the MCA nowhere authorizes the Executive to jail persons situated similarly to the Boumediene Petitioners. The MCA creates a bipartite system for trying purported "combatants": "lawful enemy combatants" may be tried through traditional courts martial, and "unlawful enemy combatants" may be tried through the MCA's military commissions upon the filing of charges and specifications. *See* 10 U.S.C. §§ 948d, 948q (added by MCA § 3(a)). The MCA does not create or sanction a detention system for persons such as Petitioners, who have not been charged with any offense, let alone designated for trial by court martial or military commission. *See United States v. Braxtonbrown-Smith*, 278 F.3d 1348, 1352 (D.C. Cir. 2002) ("In construing a statute, the court begins with the plain language of the statute. Where the language is clear, that is the end of judicial inquiry in all but the most extraordinary circumstances." (internal citations and quotation omitted)).

*Second*, construing the MCA to authorize detention of uncharged persons such as Petitioners would violate the law of nations (including the laws of war) and is therefore a construction that must be avoided "if any other possible construction

- 21 -

remains." *Murray v. Schooner Charming Betsy*, 6 U.S. (2 Cranch) 64, 118 (1804);

*cf. Hamdi*, 542 U.S. at 521 (construing the AUMF "based on longstanding law-of-

war principles"); *The Paquete Habana*, 175 U.S. 677, 700 (1900) (holding that

international law "is part of our law").

The laws of war do not authorize imprisonment of citizens of a friendly

nation, captured far from any battlefield, and taken into custody by the U.S.

Government despite a court order mandating their release. *See* Boumediene Merits

Br. 24; *see also Johnson v. Eisentrager*, 339 U.S. 763, 769 & n.2 (1950)

("[T]hroughout the civilized world . . . an alien friend is the subject of a foreign

state at peace with the United States; an alien enemy is the subject of a foreign

state at war with the United States." (internal quotation and citations omitted)).

Construing the MCA to authorize indefinite detention—without trial or court

martial—would also violate other U.S. treaty and customary international law

obligations. *See, e.g.*, International Covenant on Civil and Political Rights, Dec.

16, 1966, (entered into force for United States on Sept. 8, 1992), 58 Fed. Reg. 45,

934 (Aug. 31, 1993), 999 U.N.T.S. 171, arts. 9.1, 9.2, 9.4 (mandating that "[n]o

one shall be subjected to arbitrary arrest or detention," "[a]nyone who is arrested

shall be informed, at the time of arrest, of the reasons for his arrest and shall be

promptly informed of any charges against him," and "[a]nyone who is deprived of

his liberty by arrest or detention shall be entitled to take proceedings before a

court, in order that that court may decide without delay on the lawfulness of his detention and order his release if the detention is not lawful") (full text of ICCPR in addendum to Boumediene Merits Br. at 11a-15a); *see also* Boumediene Merits Br. 34-39.

*Third*, if the MCA authorized the detention of the Boumediene Petitioners, it would exceed the power of Congress under Article I and constitute an improper open-ended grant of detention power to the President. Congress's war power[19] is not unlimited: "the phrase 'war power' cannot be invoked as a talismanic incantation to support any exercise of congressional power which can be brought within its ambit." *United States v. Robel*, 389 U.S. 258, 263 (1967) (holding statute prohibiting members of certain "Communist-action organizations" from working at defense facilities exceeded congressional war power and impermissibly infringed associational rights); *cf. Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579 (1952) (President exceeded executive war power in seizure of steel mills). Although Congress authorized the Executive to detain persons in a manner consistent with the laws of war by passing the AUMF, *see Hamdi*, 542 U.S. at 518-519 (plurality opinion), the situation of the Boumediene Petitioners falls outside the rationale for detention "based on longstanding law-of-war principles," because

---

[19] Congress holds the power "[t]o declare War, grant letters of Marque and Reprisal, and make Rules concerning Captures on Land and Water." U.S. Const. art. I, § 8, cl. 11.

- 23 -

they have neither "tak[en] up arms" nor been captured on a "field of battle." *See id.* at 518, 521. Congress's war power cannot authorize the kidnapping and indefinite detention of civilian citizens of an allied country at peace with the United States. *See Robel*, 389 U.S. at 264 ("[T]his concept of 'national defense' cannot be deemed an end in itself, justifying any exercise of legislative power designed to promote such a goal. Implicit in the term 'national defense' is the notion of defending those values and ideals which set this Nation apart.").

Even if Congress's powers theoretically allowed it to legislate such seizures and detentions, such powers could not be transferred to the Executive without effective standards or limits. Empowering the President to detain indefinitely any person he deems supports "hostilities" against the United States, anywhere in the world, would constitute an extraordinary delegation, unimaginable to the Framers.

Accordingly, this Court should hold that the imprisonment of the Boumediene Petitioners is unlawful.

- 24 -

## CONCLUSION

For the foregoing reasons, the MCA does not affect this Court's jurisdiction over Petitioners' appeal or the district court's jurisdiction over their habeas petitions. To the extent the Court interprets the statute otherwise, the MCA is unconstitutional. The judgment of the district court dismissing Petitioners' habeas petitions should be reversed.


Respectfully submitted,


_____          _____
Stephen H. Oleskey                       Wesley R. Powell
Robert C. Kirsch                         Hunton & Williams
Melissa A. Hoffer                        200 Park Avenue
Mark C. Fleming                          New York, NY  10166
Wilmer Cutler Pickering Hale and Dorr LLP   Phone:  (212) 309-1000
60 State Street                          Fax:  (212) 309-1100
Boston, MA  02109
Phone:  (617) 526-6000                   Julia Symon
Fax:  (617) 526-5000                     James Hosking
                                         Clifford Chance US LLP
Attorneys for Appellants Lakhdar         31 W. 52nd Street
Boumediene, et al.                       New York, NY 10019
                                         (212) 878-8000

                                         Attorneys for Appellant Ridouane
                                         Khalid


Dated:  November 1, 2006

USIDOCS 5912932v1

## CERTIFICATE OF COMPLIANCE
## <u>PURSUANT TO FED. R. APP. P. 32(A)(7)(C)</u>

I hereby certify, pursuant to Fed. R. App. P. 32(a)(7)(C) and D.C. Circuit Rule 32(a), that the foregoing brief uses a proportionally spaced typeface of 11-point or larger.  The brief is 7,280 words in length, which is within the 10,000 word limit set out in this Court's order of October 18, 2006.

 

 

_____

Melissa A. Hoffer

- 26 -

## CERTIFICATE OF SERVICE

I, Dawn Canady, hereby certify that on November 1, 2006, I filed and served

the foregoing brief by causing an original and seventeen copies to be delivered by

hand to the Court Security Office for filing with the Court and service on the

following counsel:

> Douglas N. Letter, Esq.
> Robert M. Loeb, Esq.
> August E. Flentje, Esq.
> U.S. Department of Justice
>   (DOJ) Civil Division - Appellate Staff
> 950 Pennsylvania Avenue, NW
> Washington, DC  20530-0001
>         Robert.Loeb@usdoj.gov
>         Douglas.Letter@usdoj.gov
>         August.Flentje@usdoj.gov
>         *Counsel for Government*

_____

Dawn Canady

# RELEVANT STATUTORY PROVISIONS

**Military Commissions Act of 2006, Pub. L. No. 109-366, 120 Stat. 2600**

**SEC. 3  MILITARY COMMISSIONS.**

(a) MILITARY COMMISSIONS.—

(1) IN GENERAL.—Subtitle A of title 10, United States Code, is amended by inserting after chapter 47 the following new chapter:

...

**"§ 948d. Jurisdiction of military commissions**

"(a) JURISDICTION.—A military commission under this chapter shall have jurisdiction to try any offense made punishable by this chapter or the law of war when committed by an alien unlawful enemy combatant before, on, or after September 11, 2001.

"(b) LAWFUL ENEMY COMBATANTS.—Military commissions under this chapter shall not have jurisdiction over lawful enemy combatants. Lawful enemy combatants who violate the law of war are subject to chapter 47 of this title. Courts-martial established under that chapter shall have jurisdiction to try a lawful enemy combatant for any offense made punishable under this chapter.

...

**"§ 948q.  Charges and specifications**

"(a) CHARGES AND SPECIFICATIONS.—Charges and specifications against an accused in a military commission under this chapter shall be signed by a person subject to chapter 47 of this title under oath before a commissioned officer of the armed forces authorized to administer oaths and shall state--

"(1) that the signer has personal knowledge of, or reason to believe, the matters set forth therein;  and

"(2) that they are true in fact to the best of the signer's knowledge and belief.

"(b) NOTICE TO ACCUSED.—Upon the swearing of the charges and specifications in accordance with subsection (a), the accused shall be informed of the charges against him as soon as practicable.

...

**"§ 950j. Finality or [*sic*] proceedings, findings, and sentences**

...

"(b) PROVISIONS OF CHAPTER SOLE BASIS FOR REVIEW OF MILITARY COMMISSION PROCEDURES AND ACTIONS.—Except as otherwise provided in this chapter and notwithstanding any other provision of law (including section 2241 of title 28 or any other habeas corpus provision), no court, justice, or judge shall have jurisdiction to hear

- 28 -

or consider any claim or cause of action whatsoever, including any action pending on or filed after the date of the enactment of the Military Commissions Act of 2006, relating to the prosecution, trial, or judgment of a military commission under this chapter, including challenges to the lawfulness of procedures of military commissions under this chapter.
       …".".

## SEC. 7  HABEAS CORPUS MATTERS.

(a) IN GENERAL.—Section 2241 of title 28, United States Code, is amended by striking both the subsection (e) added by section 1005(e)(1) of Public Law 109-148 (119 Stat. 2742) and the subsection (e) added by added by [*sic*] section 1405(e)(1) of Public Law 109-163 (119 Stat. 3477) and inserting the following new subsection (e):

"(e)(1)  No court, justice, or judge shall have jurisdiction to hear or consider an application for a writ of habeas corpus filed by or on behalf of an alien detained by the United States who has been determined by the United States to have been properly detained as an enemy combatant or is awaiting such determination.

"(2)  Except as provided in paragraphs (2) and (3) of section 1005(e) of the Detainee Treatment Act of 2005 (10 U.S.C. 801 note), no court, justice, or judge shall have jurisdiction to hear or consider any other action against the United States or its agents relating to any aspect of the detention, transfer, treatment, trial, or conditions of confinement of an alien who is or was detained by the United States and has been determined by the United States to have been properly detained as an enemy combatant or is awaiting such determination.".

(b) EFFECTIVE DATE.—The amendment made by subsection (a) shall take effect on the date of the enactment of this Act, and shall apply to all cases, without exception, pending on or after the date of the enactment of this Act which relate to any aspect of the detention, transfer, treatment, trial, or conditions of detention of an alien detained by the United States since September 11, 2001.

Exhibit C

[ORAL ARGUMENTS HELD SEPTEMBER 8, 2005, AND MARCH 22, 2006]

Nos. 05-5064, 05-5095 through 05-5116

---

IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

---

KHALED A.F. AL ODAH, et al.,

Plaintiffs-Petitioners-Appellees/Cross-Appellants,

v.

UNITED STATES OF AMERICA, et al.,

Defendants-Respondents-Appellants/Cross-Appellees.

---

ON CONSOLIDATED APPEALS FROM THE UNITED STATES
DISTRICT COURT FOR THE DISTRICT OF COLUMBIA

---

THE GUANTANAMO DETAINEES' SUPPLEMENTAL BRIEF
ADDRESSING THE MILITARY COMMISSIONS ACT OF 2006

---

DAVID J. CYNAMON
MATTHEW J. MACLEAN
OSMAN HANDOO

PILLSBURY WINTHROP
 SHAW PITTMAN LLP
2300 N STREET, NW
WASHINGTON, DC 20037
TELEPHONE: 202-663-8000

THOMAS B. WILNER
NEIL H. KOSLOWE
AMANDA E. SHAFER

SHEARMAN & STERLING LLP
801 PENNSYLVANIA AVE., N.W.
WASHINGTON, DC 20004
TELEPHONE: 202-508-8000

GEORGE BRENT MICKUM IV

SPRIGGS & HOLLINGSWORTH
1350 I ST., N.W.
WASHINGTON, DC 20005
TELEPHONE: 202-898-5866

JOSEPH MARGULIES
MACARTHUR JUSTICE CENTER
NORTHWESTERN UNIVERSITY
LAW SCHOOL
357 EAST CHICAGO AVENUE
CHICAGO, IL 60611
TELEPHONE: 312-503-0890

BAHER AZMY
CENTER FOR SOCIAL JUSTICE
SETON HALL LAW SCHOOL
833 MCCARTER HIGHWAY
NEWARK, NJ 07102
TELEPHONE: 973-642-8700

DAVID H. REMES
COVINGTON & BURLING
1201 PENNSYLVANIA AVENUE, NW
WASHINGTON, DC 20004
TELEPHONE: 202-662-5212

PROF. ERIC M. FREEDMAN
HOFSTRA LAW SCHOOL
HEMPSTEAD, NY 11550
TELEPHONE: 516-463-5167

JOHN J. GIBBONS
LAWRENCE S. LUSTBERG
GIBBONS, DEL DEO, DOLAN,
  GRIFFINGER & VECCHIONE
ONE RIVERFRONT PLAZA
NEWARK, NJ 07102
TELEPHONE: 973-596-4493

DOUGLAS J. BEHR
KELLER AND HECKMAN LLP
1001 G STREET, NW, SUITE 500W
WASHINGTON, DC 20001
TELEPHONE: 202-434-4100

BARBARA J. OLSHANSKY
GITANJALI GUTIERREZ
CENTER FOR CONSTITUTIONAL
  RIGHTS
666 BROADWAY, 7th FLOOR
NEW YORK, NY 10012
TELEPHONE: 212-614-6439

SCOTT SULLIVAN
DEREK JINKS
UNIVERSITY OF TEXAS
SCHOOL OF LAW
727 E. DEAN KEETON STREET
AUSTIN, TX 78705
TELEPHONE: 512-471-5151

RICHARD J. WILSON
MUNEER I. AHMAD
KRISTINE HUSKEY
INTERNATIONAL HUMAN RIGHTS
  LAW CLINIC
AMERICAN UNIVERSITY
  WASHINGTON COLLEGE OF LAW
4801 MASSACHUSETTS AVENUE, NW
WASHINGTON, DC 20016
TELEPHONE: 202-274-4147

PAMELA CHEPIGA
ANDREW MATHESON
KAREN LEE
SARAH HAVENS
ALLEN & OVERY LLP
1221 AVENUE OF THE AMERICAS
NEW YORK, NY 10020
TELEPHONE: 212-610-6300

MARK S. SULLIVAN
CHRISTOPHER G. KARAGHEUZOFF
JOSHUA COLANGELO-BRYAN
DORSEY & WHITNEY LLP
250 PARK AVENUE
NEW YORK, NY 10177
TELEPHONE: 212-415-920

MARC D. FALKOFF
NORTHERN ILLINOIS UNIVERSITY
   COLLEGE OF LAW
2166 BROADWAY #12A
NEW YORK, NY  10024
TELEPHONE: 347-564-5043

ERWIN CHEMERINSKY
DUKE LAW SCHOOL
SCIENCE DRIVE & TOWERVIEW RD.
DURHAM, NC 27708
TELEPHONE: 919-613-7173

CLIVE STAFFORD SMITH
JUSTICE IN EXILE
636 BARONNE STREET
NEW ORLEANS, LA 70113
TELEPHONE: 504-558-9867

BARRY J. POLLACK
COLLIER SHANNON SCOTT, PLLC
3050 K STREET, NW, SUITE 400
WASHINGTON, DC  20007
TELEPHONE:  202-342-8472

JON W. NORRIS
641 INDIANA AVENUE, NW
WASHINGTON, DC  20004
TELEPHONE:  202-842-2695

L. BARRETT BOSS
COZEN O'CONNOR, P.C.
1667 K STREET, NW, SUITE 500
WASHINGTON, DC  20006-1605
TELEPHONE:  202-912-4800

MARC A. GOLDMAN
JENNER & BLOCK LLP
601 13TH ST. N.W., SUITE 1200 SOUTH
WASHINGTON, D.C. 20005-3823
(202) 639-6087

ANDREW A. JACOBSON
JENNER & BLOCK LLP
330 N. WABASH AVENUE
CHICAGO, IL 60611-7603
(312) 923-2923

MICHAEL D. MORI
MAJOR, U.S. MARINE CORPS
OFFICE OF MILITARY COMMISSIONS
OFFICE OF THE CHIEF DEFENSE
   COUNSEL
1099 14TH STREET, NW, STE 2000E
WASHINGTON, DC 20005
TELEPHONE: (202) 761-0133, EXT. 116

**CERTIFICATE AS TO PARTIES, AMICI, RULINGS, AND RELATED CASES**

Petitioners do not have a list of the *amici* appearing on behalf of the Federal Parties in this Court, and the previous supplemental briefs of the Federal Parties did not contain such a list.

Otherwise, all parties and *amici* who previously appeared in the district court and in this Court are listed in the Opening Brief for the United States *et al* as well as the Guantanamo Detainees' Corrected Second Supplemental Brief Addressing the Effect of the Detainee Treatment Act of 2005 on this Court's Jurisdiction Over the Pending Appeals (March 10, 2006), except:

- Brief of *Amici Curiae* Retired Federal Jurists in Support of Petitioners' Supplemental Brief Regarding the Military Commissions Act of 2006.

- Supplemental Amicus Curiae Brief of the Oregon Federal Public Defender Habeas Corpus Counsel in Support of Petitioners'/Appellants' Position on the Significance of the Military Commission Act of 2006.

References to the rulings at issue appear in the Opening Brief for the United States *et al.* A statement indicating which of the cases on review were previously before this Court and the names and numbers of related cases currently pending in this Court or the district court appears in the Opening Brief for the United States *et al.*

# TABLE OF CONTENTS

Page

INTRODUCTION AND SUMMARY ........................................................................................ 1

ARGUMENT ........................................................................................................................... 3

I.    THE MCA DOES NOT STRIP JURISDICTION OVER PETITIONERS' PENDING
      HABEAS CASES ............................................................................................................ 3

II.   IF READ TO STRIP THE COURTS OF JURISDICTION OVER PENDING
      HABEAS CASES, THE MCA VIOLATES THE SUSPENSION CLAUSE ...................... 6

      A.    Petitioners' Right to Habeas Is Protected by the Suspension Clause. ........................... 6

      B.    Congress May Not Substitute Another Remedy for Habeas Unless the Substitute
            Remedy is Adequate and Effective to Test the Lawfulness of a Prisoner's
            Detention. ....................................................................................................................... 7

      C.    The Review Allowed Under the MCA is Not Commensurate With Habeas .............. 10

      D.    In Cases of Executive Detention, Common Law Habeas Demands a Far More
            Searching and Extensive Review Than the Limited DTA Review Espoused by
            the Government. ............................................................................................................ 12

      E.    As Congress Provided, the Court Must, at a Minimum, Examine the Fairness of
            the CSRT Procedures Under the Due Process Clause .................................................. 19

III.  ELIMINATION OF HABEAS CHALLENGES TO PETITIONERS' ALLEGED
      STATUS AS ENEMY COMBATANTS DEPRIVES THEM OF A CRITICAL
      JURISDICTIONAL CHALLENGE TO MILITARY COMMISSIONS. ........................... 20

IV.   THE MCA DOES NOT PRECLUDE HABEAS RELIEF FOR PETITIONERS'
      CLAIMS UNDER THE GENEVA CONVENTIONS ...................................................... 22

      A.    Section 5(a) Does Not Apply To Pending Claims ....................................................... 23

      B.    Section 5(a) Unconstitutionally Bars The Assertion Of Otherwise Valid Habeas
            Claims. ........................................................................................................................... 23

CONCLUSION ..................................................................................................................... 26

## TABLE OF AUTHORITIES

### FEDERAL CASES

*Ex parte Bennett*, 3 F. Cas. 204 (C.C.D.D.C. 1825) (No. 1,311) ................................................. 16

*Ex parte Bollman*, 8 U.S. (4 Cranch) 75 (1807) .......................................................... 16

*Brownell v. We Shung*, 352 U.S. 180 (1956) .............................................................. 25

*Chae Chan Ping v. United States*, 130 U.S. 581 (1889) ............................................... 24

*Cook v. United States*, 288 U.S. 102 (1933) ................................................................ 24

*In re Davenport*, 147 F.3d 605 (7th Cir. 1998) ........................................................... 9

*In re Dorsainvil*, 119 F.3d 245 (3d Cir. 1997) ........................................................... 9

*Felker v. Turpin*, 518 U.S. 651 (1996) ........................................................................ 7

*Frank v. Mangum*, 237 U.S. 309 (1915) .................................................................. 2, 17

*In re Guantanamo Detainee Cases*, 355 F. Supp. 2d 443 (D.D.C. 2005) ................................... 20

*Hamdan v. Rumsfeld*, 415 F.3d 33 (D.C. Cir. 2005) ............................................... 21, 24

*Hamdan v. Rumsfeld*, 126 S. Ct. 2749 (2006) ........................................................ *passim*

*Hamdi v. Rumsfeld*, 542 U.S. 507 (2004) .................................................................. 18

*Heikkila v. Barber*, 345 U.S. 229 (1953) ................................................................... 25

*Henderson v. INS*, 157 F.3d 106 (2d Cir. 1998) ........................................................ 24

*Hibbs v. Winn*, 542 U.S. 88 (2004) ............................................................................. 5

*Hicks v. Bush*, 397 F. Supp. 2d 36 (D.D.C. 2005) ...................................................... 22

*Hill v. United States*, 368 U.S. 424 (1962) ................................................................ 24

*Hughes Aircraft Co. v. United States ex rel. Schumer*, 520 U.S. 939 (1997) ................................... 6

*INS v. St. Cyr*, 533 U.S. 289 (2001) ............................................................... 6, 7, 13, 24

*In re Jones*, 226 F.3d 328 (4th Cir. 2000) .................................................................. 9

*Landgraf v. USI Film Prods.*, 511 U.S. 244 (1994) ................................................................5, 23

*Marbury v. Madison*, 5 U.S. (1 Cranch) 137 (1803) ...................................................................7

*Ex parte Milligan*, 71 U.S. (4 Wall.) 2 (1866)..........................................................................14

*Moore v. Dempsey*, 261 U.S. 86 (1923) ................................................................................2, 17

*Preiser v. Rodriguez*, 411 U.S. 475 (1973) ..............................................................................18

*Rasul v. Bush*, 542 U.S. 466 (2004)...............................................................................*passim*

*Reyes-Requena v. United States*, 243 F.3d 893 (5th Cir. 2001) ....................................................9

*In re Smith*, 285 F.3d 6 (D.C. Cir. 2002).....................................................................................9

*Sosa v. Alvarez-Machain*, 542 U.S. 692 (2004) ........................................................................25

*St. Fort v. Ashcroft*, 329 F.3d 191 (1st Cir. 2003) ....................................................................24

*Swain v. Pressley*, 430 U.S. 372 (1977) ..........................................................................*passim*

*Trans World Airlines v. Franklin Mint Corp.*, 466 U.S. 243 (1984).............................................24

*Triestman v. United States*, 124 F.2d 361 (2d Cir. 1997)..............................................................9

*United States ex rel. Wheeler v. Williamson*, 28 F. Cas. 682 (E.D. Pa. 1855) (No. 16, 725)........15

*United States v. Barrett*, 178 F.3d 34 (1st Cir. 1999)...................................................................9

*United States v. Hamilton*, 3 U.S. 17 (1795) ..............................................................................16

*United States v. Hayman*, 342 U.S. 205 (1952)............................................................................9

*United States v. Johns,* 4 Dall. 412 (Cir. Ct. 1806) ....................................................................16

*United States v. Klein*, 80 U.S. 128 (1872)..................................................................................7

*United States v. Paquete Habana*, 175 U.S. 677 (1900) .............................................................25

*Ex parte Watkins*, 28 U.S. (3 Pet.) 193 (1830) ..........................................................................13

*Weinberger v. Rossi*, 456 U.S. 25 (1982) ..................................................................................24

*Wofford v. Scott*, 177 F.3d 1236 (11th Cir. 1999) ........................................................................9

*Ex parte Yerger*, 75 U.S. 85 (1868).................................................................................6

## STATE CASES

*Arabas v. Ivers*, 1 Conn. 92 (1784)..............................................................................16

*Matter of Carleton*, 7 Cow. 471 (N.Y. Sup. Ct. 1827) ..................................................15

*Commonwealth v. Cushing*, 11 Mass. 67 (1814)...........................................................15

*Commonwealth v. Gamble*, 11 S. & R. 93 (Pa. 1824) ...................................................15

*Commonwealth v. Holloway*, 6 Binn. 213 (Pa. 1814) ...................................................16

*Lockington's Case*, Bright (N.P. 269) (Pa. 1813)..........................................................15

*Mann v. Parke*, 57 Va. 443 (1864) ..............................................................................15

*Matter of Oakes*, 8 Monthly L. Rep. 122 (Sup. Jud. Ct. Mass. 1845)...........................15

*State v. Joseph Clark*, 2 Del. Cas. 578 (Del. Chancery 1820).......................................15

*State v. Raborg*, 5 N.J.L. 642 (1819)............................................................................16

*Ex parte Toney*, 11 Mo. 661 (1842)..............................................................................13

## FOREIGN CASES

*A. v. Secretary of State*, [2005] UKHL 71 ....................................................................17

*Barney's Case,* 87 Eng. Rep. 683 (K.B. 1701) ..............................................................16

*Brenan's Case*, 116 Eng. Rep. 188 (1847) ....................................................................13

*Bushell's Case*, 124 Eng. Rep. 1006 (C.P. 1670).................................................13, 14, 17

*Carus Wilson's Case*, 7 Q.B. 984, 115 Engl. Rep. 759 (1845)........................................13

*Case of the Three Spanish Sailors,* 96 Eng. Rep. 775 (C.P. 1779) .................................15

*Goldswain's Case*, 96 Eng. Rep. 711 (C.P. 1778) .........................................................14

*Good's Case*, 96 Eng. Rep. 137 (K.B. 1760)..................................................................14

*King v. Lee*, 83 Eng. Rep. 482 (K.B. 1676) ....................................................................15

*Lord Mohun's Case,* 91 Eng. Rep. 96 (1692) ................................................................16

*R. v. Greenwood,* 93 Eng. Rep. 1086 (K.B. 1739) ........................................................16

*R. v. Schiever*, 97 Eng. Rep. 551 (K.B. 1759) ..............................................................15

*R. v. Turlington*, 97 Eng. Rep. 741 (K.B. 1761) ...........................................................15

*R. v. Whistler*, K.B. 215 (1702) ..................................................................................17

*Rex v. Dalton,* 93 Eng. Rep. 936 (K.B. 1731) ..............................................................16

*Sommersett's Case*, 20 Howell's State Trials 1 (K.B. 1772) ........................................16

## FEDERAL STATUTES

Military Commissions Act of 2006, Pub. L. No. 109-366, 120 Stat. 2600 (2006) ................*passim*

Detainee Treatment Act of 2005, § 1105(e) ..................................................................25

U.S. Const. art. I, § 9, cl. 2 ...........................................................................................1

10 U.S.C. § 950j(b)........................................................................................................4

## FOREIGN STATUTES

Habeas Corpus Act of 1640, 16 Car. 1 (1640) ..............................................................16

## MISCELLANEOUS

Craig Whitlock, U.S. Faces Obstacles to Freeing Detainees, Wash. Post at A1 (Oct. 17,
    2006)........................................................................................................................20

ERIC M. FREEDMAN, HABEAS CORPUS: RETHINKING THE GREAT WRIT OF LIBERTY (2001).........15

4 Int'l Comm. of Red Cross, *Commentary: Geneva Convention Relative to the Protection of
    Civilian Persons in Time of War* 21 (1958)...............................................................24

Paul Halliday, *Suspending and Using Habeas Corpus: The View from 1689*, Jurist Legal
    News & Research, at http://jurist.law.pitt.edu/forumy/2006/10/suspending-and-
    using-habeas-corpus.php ..........................................................................................18

v

R.J. SHARPE, THE LAW OF HABEAS CORPUS (1989) ................................................................ 13, 16

THE FEDERALIST NO. 78 .................................................................................................................... 7

1 W. BLACKSTONE, COMMENTARIES ON THE LAWS OF ENGLAND (1765) ...................................... 17

## INTRODUCTION AND SUMMARY

On October 17, 2006, the President signed into law the Military Commissions Act of 2006, Pub. L. No. 109-366, 120 Stat. 2600 (the "MCA"). The government contends that the MCA strips this Court and the district court of jurisdiction over petitioners' pending habeas cases.[1] This Court, however, need not decide the profound constitutional questions that would arise if the government were correct because the MCA, by its terms, does not revoke jurisdiction over applications for habeas corpus that were pending in court when the statute was enacted.

As the government has pointed out,[2] the MCA distinguishes between two categories of cases: (1) "application[s] for a writ of habeas corpus" and (2) "other action[s]" that relate "to any aspect of the detention, transfer, treatment, trial, or conditions of confinement" of aliens determined by the United States to have been properly detained as enemy combatants. The MCA applies its jurisdiction-stripping provision only to pending cases in the latter category. Accordingly, the MCA does not affect the Court's jurisdiction to hear and decide the present habeas cases, all of which were pending when the MCA was enacted. The Court should promptly affirm Judge Green's denial of the government's motion to dismiss these cases and, at long last, allow the district court to decide "the merits of petitioners' claims" as mandated by the Supreme Court. *Rasul v. Bush*, 542 U.S. 466, 485 (2004).

A contrary reading of the MCA would render the statute unconstitutional. Congress may suspend the privilege of the writ of habeas corpus only in cases of "rebellion" or "invasion." U.S. Const. art. I, § 9, cl. 2. Congress is otherwise simply without power to do so. Congress may substitute another remedy for habeas but only if that substitute is "commensurate" in scope

---

[1] *See* Letter from Counsel for Respondents to the Court, dated October 17, 2006, submitted pursuant to Fed. R. App. P. 28(j).

[2] *Id.*

1

with habeas and "is neither inadequate nor ineffective to test the legality of a person's detention." *Swain v. Pressley*, 430 U.S. 372, 381, 384 (1977).

In these circumstances of pure executive detention – where petitioners are not attacking a prior conviction pursuant to judicial process and have no prospect of a prompt trial – common law habeas required a searching judicial inquiry into the factual and legal bases for the detention.[3] If the government had conducted some prior process to justify the detentions, the court would not defer to that process but would first determine whether it was fair and adequate and "more than an empty shell."[4] The court would conduct its own inquiry into the legality of the detention; it would allow the petitioner to traverse the government's return and to present exculpatory evidence, and it would resolve disputed facts. It would not limit itself to reviewing only evidence presented by the government but would consider all the facts, including whether any of the evidence was obtained through torture or coercion. Following such an inquiry, a common law habeas court would order the petitioners' release if it found inadequate justification for the detention.

The substitute remedy for habeas allowed by the MCA – namely, review in this Court under the Detainee Treatment Act of 2005 ("DTA") of determinations by the Combatant Status Review Tribunals ("CSRTs") that petitioners have been properly detained as enemy combatants – does not come close to being the equivalent of this searching habeas inquiry. As construed by the government, the DTA limits this Court to determining whether the CSRTs followed their

---

[3] *See* Guantanamo Detainees' Corrected Second Supplemental Brief Addressing the Effect of the Detainee Treatment Act of 2005 on this Court's Jurisdiction Over the Pending Appeals (March 10, 2006) ("Mar. 10, 2006 Br.") at 37-38; Supplemental Brief Amici Curiae of British and American Habeas Scholars in Support of Petitioners Addressing Section 1005 of the Detainee Treatment Act ("Br. of British and American Habeas Scholars") at 12.

[4] *Frank v. Mangum*, 237 U.S. 309, 346 (1915) (Holmes, J. dissenting). Justice Holmes' opinion became the law of the land in *Moore v. Dempsey*, 261 U.S. 86, 92 (1923), where the Supreme Court emphasized that the independent judicial review that is the essence of habeas corpus does not "allow a Judge of the United States to escape the duty of examining the facts for himself."

own standards and procedures. The Court would be precluded from examining whether the procedures themselves were a sham. It would also be restricted to reviewing only evidence presented to the CSRTs by the government, and precluded from examining all the evidence, including exculpatory evidence presented by petitioners. The Court would have no authority to order a petitioner's release, even if it found that his detention was unjustified. Thus, the MCA clearly does not provide an adequate or effective substitute for habeas, and it therefore violates the Suspension Clause.

**ARGUMENT**

## I.    THE MCA DOES NOT STRIP JURISDICTION OVER PETITIONERS' PENDING HABEAS CASES.

Beginning with its plain text, and applying "[o]rdinary principles of statutory construction," the Supreme Court in *Hamdan* concluded that the DTA did not divest federal courts of jurisdiction over cases pending on the date of its enactment. *Hamdan v. Rumsfeld*, 126 S. Ct. 2749, 2765-69 (2006). The same analysis compels the conclusion that the MCA also does not, by its terms, divest federal courts of jurisdiction over pending habeas cases.

Section 7(a) of the MCA amends 28 U.S.C. § 2241 (as amended by the DTA) by adding a new subsection (e), which provides:

> (e)(1) No court, justice, or judge shall have jurisdiction to hear or consider an application for a writ of habeas corpus filed by or on behalf of an alien detained by the United States who has been determined by the United States to have been properly detained as an enemy combatant or is awaiting such determination.

> (2) Except as provided in paragraphs (2) and (3) of section 1005(e) of the Detainee Treatment Act of 2005 (10 U.S.C. 801 note), no court, justice, or judge shall have jurisdiction to hear or consider any other action against the United States or its agents **relating to any aspect of the detention, transfer, treatment, trial, or conditions of confinement of an alien who is or was detained by the United States** and has been determined by the United States to have been properly detained as an enemy combatant or is awaiting such determination.

3

MCA § 7(a) (emphasis added).  Section 7(b) provides:

> Effective Date. – The amendment made by subsection (a) shall take effect on the date of the enactment of this Act, and shall apply to all cases, without exception, pending on or after the date of the enactment of this Act **which relate to any aspect of the detention, transfer, treatment, trial, or conditions of detention of an alien detained by the United States** since September 11, 2001.

MCA § 7(b) (emphasis added).  Section 7(b) does not refer to habeas cases pending on the date of enactment.  The bolded phrase is virtually identical to the phrase used in new subsection (e)(2), which encompasses all cases "other" than the cases – habeas cases – described in new subsection (e)(1).  By its plain terms, therefore, § 7 does not strip courts of jurisdiction over pending habeas cases.

Section 7(b) also stands in stark contrast to section 3(a) of the MCA, adding 10 U.S.C. § 950j, where Congress explicitly refers to habeas corpus in purporting to eliminate jurisdiction over *pending* actions relating to the prosecution, trial, or judgment of a military commission:

> Except as otherwise provided in this chapter and notwithstanding any other provision of law **(including section 2241 of title 28 or any other habeas corpus provision)**, no court, justice, or judge shall have jurisdiction to hear or consider any claim or cause of action whatsoever, including any action **pending on or filed after the date of enactment** of the Military Commissions Act of 2006, relating to the prosecution, trial, or judgment of a military commission under this chapter . . . .

MCA § 3(a), 10 U.S.C. § 950j(b) (emphasis added).[5]  When Congress intended to strip habeas corpus jurisdiction in pending cases, it said so explicitly.  Because section 7(b) contains no such explicit provision, it cannot be construed to apply to pending habeas cases.

The "[o]rdinary principles" of construction that the Supreme Court applied in *Hamdan* confirm this reading of MCA § 7.  **First,** "[a] negative inference may be drawn from the exclusion of language from one statutory provision that is included in other provisions of the

---

[5] Petitioners do not concede that section 3(a) strips the courts of habeas jurisdiction in petitioners Hicks's and Khadr's actions relating to military commissions, and maintain that if so applied it would be unconstitutional.

same statute." *Hamdan*, 126 S. Ct. at 2765 (citations omitted). Section 3(a) states that its

jurisdiction-stripping provision applies to habeas cases pending on the date of enactment. A

"negative inference" may be drawn from the exclusion of similar language from section 7(b).

Moreover, because § 7(b) uses the language of (e)(2) and not the language of (e)(1), a "negative

inference" may be drawn that § 7(b) does not apply to pending habeas cases.

**Second**, § 7(b) can be read to apply to pending habeas cases only if habeas cases are

included within the category of cases "which relate to any aspect of the detention, transfer,

treatment, trial or conditions of detention." But if habeas cases are already included within that

category, there would have been no reason for Congress to add a new subsection (e)(1) dealing

separately with habeas cases. Such a reading of § 7(b) would render new subsection (e)(1)

superfluous and would violate the principle that "[a] statute should be construed so that effect is

given to all its provisions, so that no part will be inoperative or superfluous, void or

insignificant." *Hibbs v. Winn*, 542 U.S. 88, 101 (2004) (citation omitted). Subsection (e)(1) can

have independent meaning only if § 7(b) does *not* encompass habeas cases; and if § 7(b) does not

encompass habeas cases, then (e)(1) does not apply to *pending* habeas cases. *Cf. Hamdan,* 126

S.Ct. at 2769 (finding "nothing absurd" about DTA scheme in which pending habeas actions, but

not other pending actions, are preserved).

**Third**, to read § 7 to apply to pending habeas cases would violate the presumption

against retroactive application of statutes. *See Landgraf v. USI Film Prods.*, 511 U.S. 244, 272

(1994) (statutes "will not be construed to have retroactive effect unless their language requires

this result") (citation omitted). As in *Hamdan*, the exception to that presumption for retroactive

application of jurisdiction-stripping statutes does not apply here because application of (e)(1) to

pending cases would deprive petitioners of substantive rights. *See Hamdan*, 126 S. Ct. at 2765.

5

"Such a statute, even though phrased in 'jurisdictional' terms, is as much subject to our presumption against retroactivity as any other." *Hughes Aircraft Co. v. United States ex rel. Schumer*, 520 U.S. 939, 950 (1997).

**Fourth**, to construe § 7 to strip jurisdiction over pending habeas cases would violate "the longstanding rule requiring a clear statement of congressional intent to repeal habeas jurisdiction." *INS v. St. Cyr*, 533 U.S. 289, 298 (2001). "Implications from statutory text or legislative history are not sufficient to repeal habeas jurisdiction; instead, Congress must articulate specific and unambiguous *statutory directives* to effect a repeal." *Id.* at 299 (emphasis added). *See Ex parte Yerger*, 75 U.S. 85, 102, 104 (1868) (the courts "are not at liberty to except from [habeas jurisdiction] any cases not plainly excepted by law" and may not read a statue repealing habeas jurisdiction "to have any further effect than that plainly apparent from its terms"). The MCA by its terms does not revoke jurisdiction over pending habeas actions, and this Court may not read language into the statute that Congress chose not to include.

**Finally**, to read § 7 to apply to pending habeas corpus cases would require this Court to decide whether the MCA violates the Suspension Clause. If at all possible, the Court should construe the statute to avoid such a substantial constitutional issue. *See St. Cyr*, 533 U.S. at 299-300.

## II.    IF READ TO STRIP THE COURTS OF JURISDICTION OVER PENDING HABEAS CASES, THE MCA VIOLATES THE SUSPENSION CLAUSE.

### A.    Petitioners' Right to Habeas Is Protected by the Suspension Clause.

The Supreme Court held in *Rasul* that these petitioners have the right to habeas corpus. *Rasul*, 542 U.S. at 466. Significantly, in addition to finding that they have that right under the statute, *Rasul* confirmed that they were entitled to the writ under the common law, and would have been entitled to the writ as of 1789 when the Constitution was adopted. *Id.* at 479-82.

6

Because "at an absolute minimum, the Suspension Clause protects the writ 'as it existed in 1789,'" *St. Cyr*, 533 U.S. at 301,[6] petitioners' right to the writ as of 1789 is protected by the Suspension Clause.[7]

This Court clearly has the judicial power to invalidate a statute that violates the Suspension Clause. The Suspension Clause is a plain, direct, and explicit limit imposed by Article I of the Constitution on the power of Congress. It does not give particular individuals a "right." It provides, rather, that Congress may not suspend access to the writ of habeas corpus except in cases of "rebellion" or "invasion." If those circumstances do not exist, Congress cannot suspend the writ, and the courts cannot allow the suspension to stand.[8] *See United States v. Klein*, 80 U.S. 128, 147 (1872) (invalidating a statute that unconstitutionally stripped the Supreme Court of jurisdiction in violation of separation of powers); *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 177 (1803) ("[A]n act of the legislature, repugnant to the constitution, is void").

**B.    Congress May Not Substitute Another Remedy for Habeas Unless the Substitute Remedy is Adequate and Effective to Test the Lawfulness of a Prisoner's Detention.**

In *Swain v. Pressley*, 430 U.S. 372 (1977), the Supreme Court set forth the test under which a court is to determine whether a statute that substitutes another remedy for habeas violates the Suspension Clause. In *Swain* the Court rejected a Suspension Clause challenge because the statute in question expressly authorized resort to habeas if the substitute remedy

---

[6]    The Suspension Clause may protect the substantive scope of the writ as it exists today, not merely as it existed in 1789. *See Felker v. Turpin*, 518 U.S. 651, 663-64 (1996).

[7]    *See* Mar. 10, 2006 Br. at 30-33; Br. of British and American Habeas at 3-6 (demonstrating that, historically, habeas was available anywhere the Crown exercised power and control, extending to both aliens and citizens alike in those territories).

[8]    As Alexander Hamilton explained: "[A] limited Constitution ...[is] one which contains certain specified exceptions to the Legislative authority; such, for instance, as that it shall pass no bills of attainder, no *ex post facto* laws, and the like. Limitations of this kind can be preserved in practice no other way than through the medium of the courts of justice; whose duty it must be to declare all acts contrary to the manifest tenor of the Constitution void. Without this, all the reservations of particular rights or privileges would amount to nothing." THE FEDERALIST NO. 78, at 426 (Alexander Hamilton).

proved inadequate or ineffective to test the legality of the prisoner's detention, and because the Court found that the substitute was "commensurate" in scope with habeas and was "neither inadequate nor ineffective to test the legality" of the detention. *Id.* at 381, 384.

The statute in *Swain*, which is modeled on 28 U.S.C. § 2255, provides a collateral remedy for prisoners in custody under sentence of the Superior Court of the District of Columbia. The statute allows such prisoners to move in the Superior Court for release on the ground that the sentence is unconstitutional or unlawful. Unless it appears that the prisoner is entitled to *no* relief, the Superior Court is required to serve notice of the motion on the government, grant a prompt hearing, determine the issues, make findings of fact and conclusions of law, and, if the prisoner's claims are sustained, vacate the sentence and order the prisoner's release or other appropriate relief. The D.C. statute provides that no court may entertain an application for habeas by a prisoner who could have moved for relief under the law but did not do so, or whose motion for relief under the D.C. statute was denied.

The Supreme Court cited three factors in upholding the statute against Suspension Clause challenge. *First*, the Court cited the statute's "savings clause" allowing a federal district court to entertain an application for habeas if it appears that the statute's remedy is "inadequate or ineffective" to test the legality of the prisoner's detention. 430 U.S. at 381. The Court said this clause "avoids any serious question about the constitutionality of the statute." *Id. Second*, as construed by the Court, the statute's remedy is the same as that provided to federal prisoners by 28 U.S.C. § 2255, which contains a similar "savings clause." *Id. Third*, the because the Court had previously held that the remedy provided by § 2255 is the "exact equivalent of the pre-existing habeas corpus remedy," it found that the remedy provided by the D.C. statute "is also

8

commensurate with habeas corpus in all respects," except that it is administered by non-Article III judges, a factor the Court did not regard as consequential. *Id.* at 381-83.

The Supreme Court said in *Swain* that it had "no occasion to consider what kind of showing would be required to demonstrate that the . . . remedy [provided by the D.C. statute] is inadequate or ineffective in a particular case." 430 U.S. at 383 n.20. This Court and other courts of appeals, however, have held that §2255 is inadequate and ineffective to test the legality of a prisoner's detention when, for example, its prohibition against successive motions would bar claims of actual innocence or claims newly permitted under an intervening Supreme Court decision.[9] On the basis of the "savings clause" of §2255 – which is similar to the "savings clause" of the D.C. statute – courts have allowed prisoners to file applications for habeas corpus under 28 U.S.C. § 2241 to make such claims.[10] Without the "savings clause," §2255 would have been vulnerable to attack under the Suspension Clause. *See United States v. Hayman*, 342 U.S. 205, 223 (1952) ("In a case where the Section 2255 procedure is shown to be 'inadequate or ineffective,' the Section provides that the habeas corpus remedy shall remain open to afford the necessary hearing. Under such circumstances, we do not reach the constitutional question"); *In re Davenport*, 147 F.3d 605, 609 (7th Cir. 1998) (Posner, J.).

The MCA does not have a "savings clause" allowing resort to habeas if the remedy provided by the DTA is inadequate or ineffective to test the legality of petitioners' detentions. Under *Swain* and its progeny, the absence of such a "savings clause" in itself may render the MCA unconstitutional under the Suspension Clause. But even if it does not, the MCA cannot

---

[9] *See In re Smith*, 285 F.3d 6, 8 (D.C. Cir. 2002); *Reyes-Requena v. United States*, 243 F.3d 893, 900-06 (5th Cir. 2001); *In re Jones*, 226 F.3d 328, 333-34 (4th Cir. 2000); *Wofford v. Scott*, 177 F.3d 1236, 1244 & n.3 (11th Cir. 1999); *United States v. Barrett*, 178 F.3d 34, 49-53 (1st Cir. 1999); *In re Davenport*, 147 F.3d 605, 611 (7th Cir. 1998); *Triestman v. United States*, 124 F.2d 361, 377 (2d Cir. 1997); *In re Dorsainvil*, 119 F.3d 245, 248-52 (3rd Cir. 1997).

[10] *Id.*

survive Suspension Clause challenge because, as discussed below, the review it provides is not commensurate with habeas. *Swain*, 430 U.S. at 382.

## C.    The Review Allowed Under the MCA is Not Commensurate With Habeas

The government previously argued that the judicial review provided by the DTA, which is the only review allowed to petitioners by the MCA, is an adequate and effective substitute for habeas. *See* Supp'l Br. of Fed. Parties On Effect Of DTA (Feb. 17, 2006), at 50-53.[11]  However, in a recent filing in *Bismullah v. Rumsfeld*, D.C. Cir. No. 06-1197 – in which a Guantanamo prisoner seeks review in this Court under the DTA – the government set forth its view of the scope of the review this Court may conduct under the MCA and the DTA. *See* Response in Opp. to Mot. to Compel (Aug. 31, 2006) ("*Bismullah* Opp."). The government's submission makes crystal clear that review by this Court under the DTA plainly is not commensurate with the searching inquiry demanded by common law habeas.

**First**, according to the government, the DTA does not permit this Court to engage in a factual inquiry into the bases for petitioners' detentions or to engage in any fact-finding at all. *Bismullah* Opp. at 15.  Rather, according to the government, this Court is limited to reviewing the CSRT "record," *id.* at 14, which consists exclusively of the evidence that the government itself chose to put before the CSRT. The government says that a CSRT record "is entitled to the strongest sort of presumption of regularity." *Id.* at 19. In the government's view, the Court may examine the CSRT record only to determine "whether the CSRT followed appropriate procedures." *Id.* at 12-13. And although DTA § 1005(e)(2)(C)(i) instructs this Court to determine whether a CSRT's conclusion that a prisoner is "properly detained" as an enemy

---

[11] As petitioners have previously pointed out, the CSRTs to which they were subject were not conducted in accordance with the new safeguards the DTA requires. *See* Mar. 10, 2006 Br. at 16-22, 38-41. Petitioners take no position on whether DTA review would be an inadequate substitute for habeas, and therefore violate the Constitution, in future cases.

combatant is consistent with "the requirement that the conclusion of the Tribunal be supported by a preponderance of the evidence," the government claims "this provision limits review to the question of whether the CSRT followed appropriate procedures and rendered a decision supported by *sufficient* evidence." *Id.* at 12 (emphasis added). According to the government, "sufficient" evidence means, "at most," the same thing as "substantial" evidence, which is "simply such relevant evidence as a reasonable person might accept as proof of a conclusion." *Id.* at 13.

**Second**, the government contends that, under the DTA, petitioners may not introduce and this Court may not consider extrinsic evidence to controvert the government's evidence, including evidence of "actual innocence" or evidence that statements used against petitioners were obtained through torture. *Bismullah* Opp. at 16-17; Transcript of March 22, 2006 Oral Argument ("Mar. 22 Tr.") at 53.[12] According to the government, "the DTA does not authorize the submission of new evidence to this Court." *Bismullah* Opp. at 16. The government goes so far as to say that petitioners may not even introduce evidence showing that the military official (the "recorder") responsible for compiling the "record" considered by the CSRT failed to discharge his or her duties consistent with CSRT procedures. *Id.* at 17-20.

**Third**, the government maintains that, although the factual bases for petitioners' detentions may be classified, neither petitioners nor their counsel are entitled under the DTA to have access to such relevant but classified information. *Bismullah* Opp. at 7-10. Indeed, the government maintains that neither petitioners nor their counsel are entitled to *any* evidence

---

[12] The Court directly asked government counsel during the March 22 argument whether petitioner, or the moving party, would be able to produce factual evidence in a review under the DTA, to which the government responded "No." *Id.*

relevant to petitioners' detentions that is outside the "record" compiled by the government for petitioners' CSRTs. *Id.* at 10-12, 17-20.

**Fourth**, although DTA § 1005(e)(2)(C)(ii) authorizes this Court to consider "whether the use of [the CSRT] standards and procedures to make the determination [of enemy combatant status] is consistent with the Constitution and laws of the United States" – at least "to the extent the Constitution and laws of the United States are applicable" – the government continues to argue that there is not a single constitutional protection, including fundamental due process, that petitioners may invoke. *Bismullah* Opp. at 6 n.5 & 7. Thus, under the government's interpretation, § 1005(e)(2)(C)(ii) of the DTA is meaningless.

**Finally**, the government has made clear its view that the DTA gives the Court no authority to order petitioners' release if the Court determines that the CSRT procedures, and thus the determinations pursuant to those procedures, were unlawful or unfair.[13]  Rather, according to the government, the only remedy the Court may order in that event is a new CSRT.[14]

**D.     In Cases of Executive Detention, Common Law Habeas Demands a Far More Searching and Extensive Review Than the Limited DTA Review Espoused by the Government.**

Petitioners, facing the fifth anniversary of their incarceration at Guantanamo, are imprisoned not under sentence of any court, but by the sheer might of the Executive.  In these circumstances of pure executive detention, habeas at common law would require a searching judicial inquiry into the factual and legal basis for the detention, including the opportunity for the petitioner to traverse the government's return, to present exculpatory evidence, and to obtain a determination by the court of disputed issues of fact.

---

[13] Mar. 22 Tr. at 7.

[14] *Id.*

12

The common law drew a distinction between habeas petitions challenging a prior conviction pursuant to judicial process and those challenging executive detentions. Courts prohibited a petitioner from introducing extrinsic evidence and limited their review of the underlying facts in cases where the petitioner was challenging a criminal conviction by a duly constituted court of "competent jurisdiction."[15] That was never the case, however, with respect to executive detentions. As the Supreme Court has emphasized: "At its historical core, the writ of habeas corpus has served as a means of reviewing the legality of executive detention, and it is in that context that its protections have been strongest." *St. Cyr,* 533 U.S. at 301.

In such cases of non-judicial detention, where there had been no safeguard of trial by jury and there was no risk of offending a court of parallel competence and jurisdiction, the common law required a searching judicial examination into the bases for detention.[16] The government

---

[15] *See, e.g., Ex parte Watkins,* 28 U.S. (3 Pet.) 193, 207-09 (1830); *Carus Wilson's Case,* 7 Q.B. 984, 115 Engl. Rep. 759 (1845) ("our form of writ does not apply where a party is in execution under the judgment of a competent court"); *Brenan's Case,* 116 Eng. Rep. 188, 192 (1847) (habeas court will not review judgment of "court having competent jurisdiction to try and punish the offense . . . We are bound to assume prima facie, that the unreversed sentence of a Court of competent jurisdiction is correct, otherwise we should, in effect be constituting ourselves a Court of appeal without power to reverse the judgment"); *Ex parte Toney,* 11 Mo. 661, 661-62 (1842) ("this court nor no other court nor officer can investigate the legality of a judgment of a court of competent jurisdiction by writ of habeas corpus. . . . The party must resort to his writ of error or other direct remedy to reverse or set aside the judgment, for in all collateral proceedings it will be held to be conclusive"). *See generally* R.J. SHARPE, THE LAW OF HABEAS CORPUS 51 (1989) ("trial by common law was thought to provide the subject with adequate protection, and the possibility of allowing a convicted person some method of challenging the correctness of a conviction by habeas corpus was viewed with considerable misgiving").

[16] This distinction is reflected in *Bushell's Case,* which involved a habeas petition before the Court of Common Pleas brought by a juror imprisoned for contempt pursuant to a quasi-judicial determination of the London Court of Sessions, based on his alleged refusal to convict a criminal defendant against the asserted weight of the evidence. *Bushell's Case,* 124 Eng. Rep. 1006 (C.P. 1670). The habeas court, per Chief Justice Vaughan, undertook a very broad scope of factual and legal review of the quality of the evidence, concluding that the government's return itself failed to specify the evidence demonstrating the alleged contempt "whereby the [court] could judge, whether it were a cause for commitment or not." *Id.* at 1008. Chief Justice Vaughan recognized that review had to be more searching than in a petition challenging a conviction for "treason or felony," where a general return stating that there had been a valid conviction for those offenses by a court of competent jurisdiction would have been sufficient to end habeas review. "The cases are not alike," the court explained,

was required to file a return specifying its asserted legal and factual justifications for the detention. The court, however, would not simply accept the government's return and consider only the reasons and evidence presented by the government.[17] Rather, the petitioner was entitled to controvert the return and to present evidence, and the court would review all the evidence and order petitioner's release if it concluded that the evidence as a whole was insufficient to justify the detention.

In *Ex parte Milligan*, 71 U.S. (4 Wall.) 2 (1866), the Supreme Court, and the district court before it, reviewed the habeas petition of a citizen of Indiana and concluded that a military commission had no legal authority to try him. In answering this broad legal question, the court evaluated the evidence, including extrinsic "facts stated in Milligan's petition, and the exhibits [he] filed" in support of it, in order to decide the ultimate questions of lawful authority.

In *Goldswain's Case*, 96 Eng. Rep. 711, 712 (C.P. 1778), the court rejected the claim that "either the Court or the party are concluded by the [government's] return of a habeas corpus" petition, and affirmed that a petitioner may present evidence and "may plead to it any special matter necessary to regain his liberty." Goldswain submitted evidence controverting the return and explaining the circumstances surrounding his impressment as a sailor. The court agreed that the petitioner had raised facts to which the court "could not willfully shut its eyes," and on consideration of those facts, ordered his release. Similarly, in *Good's Case*, 96 Eng. Rep. 137 (K.B. 1760), the court examined and accepted petitioner's affidavit testimony that he was a ship-

---

because in the case of a criminal conviction a prisoner would have had an "indictment and trial" which would reveal the particulars justifying the commitment, while in the case at hand there was no full factual and legal record established by jury trial and the prisoner was subject to detention indefinitely without trial. *Id.* at 1010.

[17] *See* Br. of British and American Habeas Scholars at 8 ("Common law courts did not simply accept the government's return to a prisoner's habeas petition; instead, they routinely probed the return and examined additional evidence submitted by both sides . . .").

carpenter and thus entitled to an exemption from service to the Admiralty, and ordered him released on that basis.

In *State v. Joseph Clark*, 2 Del. Cas. 578 (Del. Chancery 1820), the court discharged Jacob Calloway from his obligation of enlistment. It did so after reviewing an affidavit he submitted in contravention of the government's return, which stated that he had been intoxicated and under 21 when he enlisted, and after hearing live testimony from Calloway's father stating that he never consented to his son's enlistment.[18]

Habeas review, including the opportunity to present evidence, was also available at common law to allow aliens detained during wartime to challenge whether they were properly detained by the executive as enemy aliens. *See, e.g., Lockington's Case,* Bright (N.P. 269, 298-99) (Pa. 1813); *Case of the Three Spanish Sailors,* 96 Eng. Rep. 775, 776 (C.P. 1779); *R. v. Schiever,* 97 Eng. Rep. 551 (K.B. 1759).

Moreover, the courts' thorough review of the evidence was not restricted only to cases of executive detention.[19] The courts regularly went beyond the government's return to examine

---

[18] *See also Commonwealth v. Cushing,* 11 Mass. 67 (1814) (successfully challenging restraint of liberty imposed by military enlistment contract); *Matter of Carleton,* 7 Cow. 471 (N.Y. Sup. Ct. 1827) (same); *Commonwealth v. Gamble,* 11 S. & R. 93 (Pa. 1824) (same); *Mann v. Parke,* 57 Va. 443 (1864) (same). *See also* ERIC M. FREEDMAN, HABEAS CORPUS: RETHINKING THE GREAT WRIT OF LIBERTY 27-28 & nn. 55-56 (2001) (discussing a number of similar evidentiary hearings held by federal district courts).

[19] Common law courts also admitted and considered extrinsic evidence in cases where the petitioner's liberty was restrained by a third party, often conducting in-court factual inquiries on their own initiative. For example, in *R. v. Turlington,* 97 Eng. Rep. 741 (K.B. 1761), the court discharged a woman from the custody of an asylum after examining doctors' affidavits and then conducting its own examination of the petitioner's mental condition. *See also Matter of Oakes,* 8 Monthly L. Rep. 122 (Sup. Jud. Ct. Mass. 1845) (court denied a habeas petition brought by a "lunatic" seeking release from an insane asylum after conducting a two-day evidentiary hearing which convinced the court that the restraint of her liberty was proper as a matter of law); *King v. Lee,* 83 Eng. Rep. 482 (K.B. 1676) (conducting factual hearing on petitioner's claim that she should not be subject to her husband's custody on the grounds of "ill usage, imprisonment and danger of [the wife's] life"). Habeas was also used as a means to review claims of unlawful enslavement. The writ would be issued and a full factual hearing held, and the court would then either order the petitioner discharged as a free man or remanded to his custodian. *See United States ex rel. Wheeler v. Williamson,* 28 F. Cas. 682, 685 (E.D. Pa. 1855) (No. 16, 725) (finding after hearing that return to writ, which denied custody over claimed slaves, was

extrinsic evidence even in cases where petitioners were detained pending a forthcoming trial, normally pursuant to orders by magistrates or justices of the peace.[20]

It is also clear that, if the Executive had undertaken some prior process of its own to justify the detention, a habeas court would not be bound by that process, or restricted simply to reviewing whether the Executive had abided by its own rules in conducting that process. Indeed, the Habeas Corpus Act of 1640 was passed by Parliament largely to prevent judicial deference to such internal processes employed by the King and his Proxy Council – including the infamous Star Chamber – and to require independent judicial review of the bases for the detention so that the court can "examine and determine whether the cause of commitment . . . be just and legal or not." 16 Car. 1 (1640). *See* R.J. SHARPE, THE LAW OF HABEAS CORPUS 7-16 (2d ed. 1989).

In *Bushell's Case,* the court emphasized, in an opinion by Chief Justice Vaughan, that it was a habeas court's obligation to look behind the proffered conclusion even of the London Court of Sessions and to evaluate the underlying evidence and the legal rationale itself: "[Our] judgment ought to be grounded upon our own inferences and understandings, and not upon

---

"evasive, if not false"); *Arabas v. Ivers,* 1 Conn. 92 (1784); *State v. Raborg,* 5 N.J.L. 642 (1819); *Commonwealth v. Holloway,* 6 Binn. 213 (Pa. 1814); *see also Sommersett's Case,* 20 Howell's State Trials 1 (K.B. 1772) (Mansfield, C.J.).

[20] *See, e.g., Ex parte Bollman,* 8 U.S. (4 Cranch) 75, 125 (1807) (Supreme Court "fully examined and attentively considered" the evidence contained in written depositions, concluded that no crime of treason had been committed, and ordered petitioners released); *United States v. Hamilton,* 3 U.S. 17 (1795) (where prisoner was admitted to bail after court considered "affidavits of several of the most respected inhabitants of the western countries"); *Ex parte Bennett,* 3 F. Cas. 204 (C.C.D.D.C. 1825) (No. 1,311) (examining anew at habeas corpus hearing witnesses who had appeared before committing magistrate); *United States v. Johns,* 4 Dall. 412, 413 (Cir. Ct. 1806) (taking oral testimony to evaluate habeas petition alleging unlawful pre-trial detention); *R. v. Greenwood,* 93 Eng. Rep. 1086 (K.B. 1739) (accepting and considering affidavits of eight "credible persons" introduced after indictment but before trial of a man accused of highway robbery); *Barney's Case,* 87 Eng. Rep. 683 (K.B. 1701) (bailing woman indicted for killing her husband after allowing her to introduce affidavits of fact showing that it was a malicious prosecution); *Rex v. Dalton,* 93 Eng. Rep. 936 (K.B. 1731); *Lord Mohun's Case,* 91 Eng. Rep. 96 (1692) (bailing prisoners after examining deposition testimony).

theirs." 124 Eng. Rep. at 1007.[21]  That was essentially the point famously made by Justice

Holmes:

> [H]abeas corpus cuts through all forms and goes to the very tissue of the structure.
> It comes in from outside, not in subordination to the [prior] proceedings, and
> although every form may have been preserved, opens the inquiry whether they
> have been more than an empty shell.[22]

In addition, at any common law habeas hearing, a petitioner would be notified of the

accusations against him - not just those the government decided to reveal - and would have the

opportunity to determine whether any of those accusations were obtained through torture or

coercion.  There is no doubt under the common law that any coerced statements would have been

excluded as inherently unreliable.  *A. v. Secretary of State,* [2005] UKHL 71, ¶ 11, ¶ 51. (An

appeal taken from Eng.) ("[T]he common law has regarded torture and its fruits with abhorrence

for over 500 years").[23]

Finally, it is beyond dispute that habeas review, both at common law and under modern

practice, contemplates but one remedy should the court determine that the detention is unlawful:

release.  As this Court recognized at oral argument, release is "one of the two essential elements

with habeas corpus."[24]  Any alternate process that does not contemplate release falls far short of

the common law requirements.

---

[21] *See also R. v. Whistler,* K.B. 215 (1702) (Holt, C.J.) (justifying searching review by King's Bench of
prior summary judicial proceedings where "a penalty is inflicted, and a different manner of trial from
magna carta instituted, and the party offending, instead of being openly tried by his neighbors in a court
of justice, shall be convicted by a single justice of the peace in a private chamber").

[22] *Frank v. Mangum,* 237 U.S at 346. *See Moore v. Dempsey,* 261 U.S. at 92 (habeas corpus does not
"allow a Judge of the United States to escape the duty of examining the facts for himself").

[23] By contrast, according to the government, the coercive interrogation techniques it employed on
Mohammed al Qahtani at Guantanamo caused him to implicate not only himself, but 30 other detainees
at Guantanamo as well.  Under the government's CSRT procedures, none of those men would be
allowed to know the identity of their accuser, or that Mr. al Qahtani made those accusations under
coercion. *See* Mar. 10, 2006 Br. at 39-40.

[24] Mar. 22 Tr. at 5 ("the two essential elements with habeas corpus are number one, a judicial
determination of the legality of executive detention.  And number two, if upon a determination that the

*    *    *

Accordingly, it is plain that at common law, particularly in cases of executive detention such as these, courts undertook a searching factual and legal review into the causes of the detention, ordering release where detention was unjustified. To the extent the government had conducted some prior process to justify the detention, the courts could not be restricted to determining only whether the government had followed its own rules, but would have had the duty to determine whether the rules were fair and adequate, and to review the underlying facts themselves to determine whether there was a reasonable basis for detention. In doing so, the courts did not restrict themselves to the return submitted by the government, but considered all the evidence, including extrinsic evidence submitted by the petitioner.[25] They were not and could not be precluded from inquiring into whether any of the evidence was obtained through torture and coercion. Because the DTA, at least as construed by the government, fails to provide this kind of searching inquiry commensurate with the habeas review available at common law, it violates the Suspension Clause.

---

individual is being held illegally, to order the individual released"). *See also Preiser v. Rodriguez*, 411 U.S. 475, 484 (1973) ("[T]he essence of habeas corpus is an attack by a person in custody upon the legality of that custody, and . . . the traditional function of the writ is to secure release from illegal custody"); 1 W. BLACKSTONE, COMMENTARIES ON THE LAWS OF ENGLAND (1765) 132-133. Once a habeas court concluded that an executive detention was without sufficient cause, it would order release, not remand to the executive to try again. *See Hamdi v. Rumsfeld*, 542 U.S. 507, 576 (2004) (Scalia, J., dissenting) (explaining that at common law, "the role of habeas corpus is to determine the legality of the executive detention, not to supply the omitted process necessary to make it legal. . . . It is not the habeas court's function to make illegal detention legal by supplying a process that the government could have provided but chose not to").

[25] In a famous instance in English history, following the temporary suspension of the writ in 1689 in response to threats of rebellion, the English courts "held the applicable law up to every prisoner and asked whether law or fear had been the reason for imprisonment," and considered the "facts as well as law in habeas hearings, going well beyond the simple matter contained in the official return to the writ" and conducting a "searching inquiry." Paul Halliday, *Suspending and Using Habeas Corpus: The View from 1689*, Jurist Legal News & Research, at http://jurist.law.pitt.edu/forumy/2006/10/suspending-and-using-habeas-corpus.php. The English courts' commitment to a full and fair inquiry went beyond policy or rhetoric; of the nearly three hundred persons detained during the crisis, the courts ordered 82% released. *Id.*

18

E.    **As Congress Provided, the Court Must, at a Minimum, Examine the Fairness of the CSRT Procedures Under the Due Process Clause.**

During the second oral argument on March 22, 2006, the Court intimated that it might construe the DTA to provide a remedy equivalent to habeas and, therefore, avoid a violation of the Suspension Clause.[26] It is not evident to petitioners how that could be done, particularly in light of the government's construction of the DTA. As petitioners demonstrated above, it is absolutely clear, as a starting point, that no review can be commensurate with habeas that restricts the Court to considering whether the CSRTs followed their own procedures. The Court itself must determine whether the procedures were a sham.

The DTA does, in section 1005(e)(2)(C)(ii), authorize this Court to measure the fairness of the CSRTs against the standard of the Due Process Clause. That section authorizes the Court to consider "whether the use of [the CSRT] standards and procedures to make the determination [of enemy combatant status] is consistent with the Constitution and laws of the United States," at least "to the extent the Constitution and laws of the United States are applicable." In enacting this section, Congress expressed its apparent concern with the validity of those CSRT standards and procedures, although it recognized that the courts are the final arbiters of the application of the Constitution.

The Court should exercise its authority under section 1005(e)(2)(C)(ii) to examine the fairness of the CSRT procedures under the Due Process Clause, and it should affirm Judge Green's holding that those procedures violated the detainee petitioners' due process rights under the Fifth Amendment. In that event, the government's argument that the DTA and MCA somehow oust the federal courts of jurisdiction over the pending habeas cases would necessarily fail because there would be no CSRT status determinations left for this Court to review under

---

[26] Mar. 22 Tr. at 5.

19

section 1005(e)(2)(C)(i) of the DTA. The DTA and MCA could not be said, in these circumstances, to provide any substitute for habeas at all, much less the adequate and effective substitute required by *Swain* under the Suspension Clause. Of course, independent of the scope of the common law writ, if this Court holds that petitioners are entitled to due process protections under the Fifth Amendment,[27] the government's underlying motion to dismiss for failure to state a claim necessarily would fail as well.

### III.    ELIMINATION OF HABEAS CHALLENGES TO PETITIONERS' ALLEGED STATUS AS ENEMY COMBATANTS DEPRIVES THEM OF A CRITICAL JURISDICTIONAL CHALLENGE TO MILITARY COMMISSIONS.

Under the MCA, the CSRT findings do more than subject petitioners to indefinite detention. The Act specifically provides that a CSRT finding "that a person is an unlawful enemy combatant is dispositive for the purposes of jurisdiction for trial by military commission under this chapter." MCA §3(a)(1) (adding 10 U.S.C. § 948d(c)). Thus, although the MCA does not require that detainees be charged and subjected to trial by military commission, and in fact most detainees have not been charged and will not be charged,[28] it potentially subjects all detainees who have been through a CSRT to criminal convictions and sentences, including the death penalty. In the case of the detainees that have been charged, including two of these

---

[27] As petitioners have consistently argued, and as Judge Green expressly held, these petitioners – held in U.S. custody within the territorial jurisdiction of the United States – are entitled to fundamental constitutional protections of due process. *See In re Guantanamo Detainee Cases,* 355 F. Supp. 2d 443, 464 (D.D.C. 2005); Br. for the Guantanamo Detainees (May 27, 2005) at 22-28; Reply Br. for the Guantanamo Detainees (June 28, 2005) at 5-6.

[28] The government has recently stated that, it expects only, only 60 to 80 of the indefinitely detained prisoners ever to be tried by military commission. See Craig Whitlock, U.S. Faces Obstacles to Freeing Detainees, Wash. Post at A1 (Oct. 17, 2006) (reporting statement of John B. Bellinger III, Legal Adviser, U.S. Department of State). To date, only ten of the remaining 435 persons in detention have been charged.

petitioners – Hicks and Khadr[29] – the MCA presents immediate and potentially irremediable collateral consequences.

Under the MCA, the military commission itself is not permitted to consider whether it lacks jurisdiction over the detainee on the basis that the unlawful enemy combatant decision was erroneous. Even assuming that petitioners may challenge this aspect of the Act on review of a conviction by a military commission, that remedy would be far too little and too late. As this Court and the Supreme Court have made clear, petitioners have a right to challenge—in a fair proceeding—the jurisdiction of the military tribunal *before* trial. This Court explained in its decision in *Hamdan v. Rumsfeld*, 415 F.3d 33 (D.C. Cir. 2005), that an essential aspect of habeas corpus is the right of a civilian to challenge the military's basis for exercise of penal jurisdiction over him. The Court noted that historically, the writ of habeas corpus has been used to litigate jurisdictional challenges to military tribunals before being subject to trial by those tribunals. *See id.* at 36 ("*Ex Parte Quirin* . . . provides a compelling historical precedent for the power of civilian courts to entertain challenges that seek to interrupt the processes of military commissions"). The Supreme Court agreed. *Hamdan*, 126 S. Ct. at 2772 (2006). This Court also acknowledged in *Hamdan* that in order to be meaningful, such review must take place before trial. 415 F.3d at 36 ("[S]etting aside the judgment after trial and conviction insufficiently redresses the defendant's right not to be tried by a tribunal that has no jurisdiction"). Accordingly, in *Hamdan*, this Court reached the merits of Hamdan's jurisdictional challenge to his military commission, an approach that was ultimately validated by the Supreme Court. And

---

[29] The government has never moved to withdraw or dismiss the charges against Hicks or Khadr, or the Presidential "reason to believe" determination issued pursuant to the President's Military Order (PMO) of November 13, 2001. Indeed, Petitioners' charges remain posted on the Department of Defense (DoD) Military Commissions website at http://www.defenselink.mil/news/commissions.html. Lastly, the DoD apparatus for conducting military commissions (including the Offices of the Appointing Authority, Chief Prosecutor, and Chief Defense Counsel) has remained in place notwithstanding the Supreme Court's decision in *Hamdan*.

21

in the case of David Hicks, the District Court recognized the importance of a pre-commission

habeas challenge. *Hicks v. Bush*, 397 F. Supp. 2d 36, 41 (D.D.C. 2005) ("An injunction in this

case is necessary in order for this Court to maintain its jurisdiction over Petitioner's claim that a

military commission lacks jurisdiction to try him, a claim which Petitioner is *entitled to have*

*adjudicated by this Court prior to trial* before a military commission" (emphasis added)); *id.*

(noting "established right to pre-commission review of jurisdictional issues"); *id.* at 42 (noting

the irreparable injury caused by being "tried by a tribunal without any authority to adjudicate the

charges against him in the first place, potentially subjecting him to a second trial before a

different tribunal").

Thus, if the MCA were valid, it would strip two of these petitioners of the right to pursue

challenges that are now properly being asserted in their pending habeas petitions, and subject all

of these petitioners to the threat of designation for trial by military commission, and therefore

possible life imprisonment or death, without any opportunity to challenge that designation.

## IV. THE MCA DOES NOT PRECLUDE HABEAS RELIEF FOR PETITIONERS' CLAIMS UNDER THE GENEVA CONVENTIONS.

Section 5(a) of the MCA purports to preclude individuals from seeking judicial

enforcement of rights guaranteed by the Geneva Conventions:

> (a) IN GENERAL – No person may invoke the Geneva Conventions or any
> protocols thereto in any habeas corpus or other civil action or proceeding to which
> the United States, or a current or former officer, employee, member of the Armed
> Forces, or other agent of the United States is a party as a source of rights in any
> court of the United States or its States or territories.

This provision does not extinguish petitioners' claims under the Geneva Conventions or

its protocols. First, the provision does not by its terms apply retroactively. It also raises a

serious Suspension Clause issue to the extent that it applies to habeas. Second, MCA § 5(a)

unconstitutionally bars the assertion of otherwise valid habeas claims. It does not, however, bar

the assertion of claims under any other source of law.[30]

### A.    Section 5(a) Does Not Apply To Pending Claims.

The provision of the MCA prohibiting invocation of the Geneva Conventions possesses

no indicia of retroactive intent and thus cannot be given retroactive effect. On its face, MCA

§ 5(a) does not purport to apply to pending actions, and the presumption against retroactive

application applies. *See Landgraf*, 511 U.S. at 272.

### B.    Section 5(a) Unconstitutionally Bars The Assertion Of Otherwise Valid Habeas Claims.

Section 5 of the MCA unconstitutionally bars habeas review of otherwise valid

non-constitutional claims. Congress may not, without raising serious constitutional questions,

bar habeas review of Geneva Conventions-based claims that would otherwise support habeas

relief unless Congress abrogates or supersedes the Conventions so as to deprive them of their

status as U.S. law.

The Geneva Conventions have the status of supreme federal law as a "treat[y] of the

United States" within the meaning of Article VI of the Constitution and 28 U.S.C. § 2241(c)(3),

and therefore provide a substantive source of rights that may be vindicated on habeas. Although

Congress has the constitutional authority to abrogate or supersede treaties by later statute, the

courts have refused to construe statutes as doing so absent a clear statement from Congress of its

---

[30] The arguments applicable to Section 5(a) are also applicable to subsection (g) of new section 948, title 10 (added by MCA § 3), which provides:

> (g) GENEVA CONVENTIONS NOT ESTABLISHING SOURCE OF RIGHTS.—No alien unlawful enemy combatant subject to trial by military commission under this chapter may invoke the Geneva Conventions as a source of rights.

23

intent to abrogate or supersede. *Cook v. United States*, 288 U.S. 102, 120 (1933). *See also Trans World Airlines v. Franklin Mint Corp.*, 466 U.S. 243, 252 (1984); *Weinberger v. Rossi*, 456 U.S. 25, 32 (1982); *Chae Chan Ping v. United States*, 130 U.S. 581 (1889). There is no such clear statement in the MCA. Indeed, the statutory language indicates Congress's intention to implement U.S. obligations under the Conventions. MCA § 6 ("Implementation of Treaty Obligations").

Given the lack of a clear Congressional abrogation, the MCA does not alter the status of the Geneva Conventions in U.S. law, and petitioners may seek habeas relief for any treaty violations that result in a "miscarriage of justice" or constitute a departure from the "rudimentary demands of fair procedures." *Hill v. United States*, 368 U.S. 424, 428 (1962) (defining the appropriate scope of habeas review for non-constitutional claims). Any other reading would raise serious "due process," Suspension Clause, and Article III problems. *See, e.g., Henderson v. INS*, 157 F.3d 106, 119-22 (2d Cir. 1998); *Saint Fort v. Ashcroft*, 329 F.3d 191, 201-02 (1st Cir. 2002).[31]

MCA § 5(a), in any case, does not preclude the invocation of the rules embodied in the Conventions where the "source of right" is established by other laws. In *Hamdan*, the Supreme Court held that habeas relief was available under Common Article 3 of the Geneva Conventions, as incorporated by Article 21 of the Uniform Code of Military Justice (UCMJ), 10 U.S.C. § 821, *irrespective* of whether the Conventions constitute an "independent source of law . . . furnishing

---

[31] In *Hamdan*, the Supreme Court characterized as not "persuasive" this Court's holding that the Geneva Conventions are not judicially enforceable, 126 S. Ct. at 2793, and called into question, *id.* at 2794 n.58, this Court's statement in its previous opinion that "treaty-based individual rights" could not be enforced by habeas. *See Hamdan*, 415 F.3d at 40. The rights guaranteed by the Geneva Conventions are rights of individuals and *exist* to be enforced by individuals. *See Hamdan*, 126 S. Ct. at 2754 n.57 ("the 1949 Geneva Conventions were written 'first and foremost to protect individuals, and not to serve State interests'" (citing 4 Int'l Comm. of Red Cross, *Commentary: Geneva Convention Relative to the Protection of Civilian Persons in Time of War* 21 (1958)).

petitioner with any enforceable right," because the relevant statute conditions congressional

authorization on compliance with the laws of war, including the Conventions. *See Hamdan*, 126

S. Ct. at 2794. Thus, petitioners may use the habeas vehicle to invoke the protections of the

Conventions, notwithstanding Section 5(a), under the "consistency with U.S. law" review

preserved under the Detainee Treatment Act. DTA § 1005(e)(2)–(3); *see also Brownell v. We

Shung*, 352 U.S. 180, 182 n. 1 (1956).[32]

---

[32] Similarly, Petitioners may enforce rights guaranteed by the Geneva Conventions to the extent that those same rights are independently guaranteed by any other source of law – such as the Alien Tort Statute, 28 U.S.C. § 1350, the law of nations, and customary international law. *See Rasul*, 542 U.S. at 484-85; *Sosa v. Alvarez-Machain*, 542 U.S. 692, 732-33 (2004); see also *United States v. Paquete Habana*, 175 U.S. 677, 711 (1900).

CONCLUSION

For these reasons and the reasons given in petitioners' previous briefs, the Court should

affirm Judge Green's denial in part of the government's motion to dismiss and reverse Judge

Green's grant in part of the government's motion to dismiss.

Respectfully submitted,

_Thomas B. Wilner/snw_

Thomas B. Wilner
Neil H. Koslowe
Amanda E. Shafer
Shearman & Sterling LLP
801 Pennsylvania Avenue, N.W.
Washington, D.C. 20004
Telephone: (202) 508-8000
Facsimile:  (202) 508-8100

_David J. Cynamon/snw_

David J. Cynamon
Matthew J. MacLean
Osman Handoo
Pillsbury Winthrop Shaw Pittman LLP
2300 N Street, N.W.
Washington, D.C. 20037
Telephone: (202) 663-8000
Facsimile:  (202) 663-8007

_George Brent Mickum, IV/mw_

George Brent Mickum, IV
Spriggs & Hollingsworth
1350 I St., N.W.
Washington, DC 20005
Telephone: 202-898-5866

_Counsel for Al Odah Petitioners_

Dated: November 1st, 2006

## CERTIFICATE OF COMPLIANCE WITH RULE 32(a)(7)(C) OF THE FEDERAL RULES OF APPELLATE PROCEDURE AND CIRCUIT RULE 32(a)

I certify that, in accordance with Fed. R. App. P. 32(a)(7)(C) and D.C. Circuit Rule 32(a),

the foregoing Guantanamo Detainees' Supplemental Brief Addressing the Military Commissions

Act of 2006 is proportionately spaced with a font size of 11 point or greater, and contains 9,190

words, which is within the word count authorized by this Court in its Order of October 18, 2006.

Amanda E. Shafer
Attorney

## CERTIFICATE OF SERVICE

I certify that today, November 1st, 2006, I served the foregoing Guantanamo Detainees'

Supplemental Brief Addressing the Military Commissions Act of 2006 on the government by

causing copies to be sent, via the Court Security Officer, to the following counsel of record for

the government:

Robert M. Loeb
Attorney
Appellate Staff
Civil Division, Room 7268
Department of Justice
950 Pennsylvania Avenue, N.W.
Washington, D.C. 20530-0001

Amanda E. Shafer
Attorney

**Exhibit D**

# BELLWETHER

## BLACK WORLD
## Trevor Paglen

November 16 - December 23 2006

*OPENING RECEPTION*
Thursday, November 16, 2006
6:00 PM - 8:00 PM



checklist
press release

    

PRESS RELEASE:

Black World

November 16-December 23, 2006

BELLWETHER is pleased to announce Trevor Paglen's first solo show at the gallery. Entitled "Black World," the exhibition features a startling collection of photographs, videos, and images exploring the deepest recesses of the military industrial complex.

Over the last five years, Trevor Paglen has developing unique visual strategies to explore the "black world" of classified military and intelligence activities. To produce his photographs of secret military installations Paglen uses powerful telescopes and employs astronomical techniques to capture his subject from dozens of miles away - a proprietary technique he terms "Limit-Telephotography." The sheer distances, heat, and atmospheric distortions captured in his work result in photographs that often take on the qualities of impressionistic paintings.

Paglen is the first and only person to have photographed several of the CIA's "black sites" overseas - a collection of secret prisons whose existence (but not locations) the CIA has only recently acknowledged. These never-before-seen photographs will also be on display. Other works on view include a diverse collection of patches and symbols worn by people working on secret military programs - programs that do not officially "exist" - and forged signatures from the corporate documents of CIA front companies.

By confronting us with images of a world that cannot be seen with the naked eye, and that do not "officially" exist, Paglen asks the viewer to meditate on the limits of vision, abstraction and the nature of evidence as he performs a series of stunning interventions into the history of landscape photography.

*Trevor Paglen is a PHD candidate in the Department of Geography at the University of California at Berkeley. He holds an MFA from the School of the Art Institute of Chicago. His recent book, "Torture Taxi: On the Trail of the CIA's Rendition Flights" was released this fall. His work was recently exhibited in the show, "Ahistoric Occasion: Artists Making History" at Mass MoCA.*

*For more information please contact Bellwether at 212 929 5959 or by email:info@bellwethergallery.com.*

**Exhibit E**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

)
MAJID KHAN, *et al.*,                      )
                                           )
        Petitioners,          )    Civil Action No. 06-cv-1690 (RBW)
                                           )
    v.                                )
                                           )
GEORGE W. BUSH,                            )
    President of the United States,       )
    *et al.*                              )
                                           )
        Respondents.          )
                                           )

## DECLARATION OF KHALED EL-MASRI

I, Khaled El-Masri, of Senden, Germany under penalty of perjury under the laws of the

United States of America, declare as follows, pursuant to 28 U.S.C. § 1746:

    1.    I make this Declaration in support of Majid Khan's application to have access to

legal counsel.

    2.    I understand that Mr. Khan is presently detained at Guantánamo Bay naval

Station, Cuba (Guantánamo).

    3.    As more fully explained below, on January 23, 2004, I was unlawfully rendered

by the U.S. Central Intelligence Agency from Macedonia, where I was on holiday, to a secret

U.S. run detention facility in Afghanistan. I was detained at this facility from January 24, 2004

until my release without charge or trial on May 28, 2004.

4.    From my arrival, until approximately, March 28, 2004, I was detained in the same facility as Mr. Khan and I am therefore aware of some of the details of his detention in Afghanistan.

5.    I was born in Kuwait on June 29, 1963. Both of my parents are Lebanese. I fled Lebanon in 1985 during the civil war and sought asylum in Germany. Before my asylum application was processed I married my first wife, a German citizen. We lived together for ten years, and were married for seven.

6.    In 1995, I renounced my Lebanese citizenship, acquired by virtue of the nationality of my parents, and took up German citizenship. After my first marriage ended in divorce, I re-married in 1996. My second wife is Lebanese. Together we have five young children, aged one, three, five, seven, and eight years old.

7.    I trained as a carpenter when I first came to Germany. I then began working as a truck driver and subsequently as a car salesman. Around late 2003 and early 2004, I was made redundant from the car dealership. Since then I have been continuously unemployed and dependent on unemployment assistance.

8.    In the last few months of 2003, my wife and I had been experiencing marital problems. These problems were made worse by our living conditions. At this point I was unemployed and was living together with my wife and four young children in a one-room apartment. By December of that year, things had gotten so bad that I felt I just had to leave home for a while to get my head together.

9.    I decided to travel to Macedonia. ADAC (a German automobile club, similar to AAA in the United States, I understand) informed me that the cost of living there was

inexpensive and that hotel rooms were easy and cheap to come by. I made some initial inquiries with a bus company in Ulm that runs direct connections between Ulm and Skopje, Macedonia.

10.    On December 30, 2003, I purchased a round-trip bus ticket from Ulm to Skopje. When I purchased the ticket I had no set plans as to how long I was going to stay there, but I planned on remaining for at least a week before returning home again.

11.    The bus left Ulm as scheduled on December 30. We traveled without incident through Germany, Austria, Slovenia, Croatia, and Serbia.

12.    Around 3 p.m. on December 31, 2003, the bus arrived at the border between Serbia and Macedonia. As with all other border crossings we made during the trip, at the check point the bus driver collected all the passengers' passports, mine included, to take to the border police for examination. After our papers were checked, everyone, except me, had their passport returned to them. The bus driver approached me and asked me to get off the bus and meet with the border official. The official asked me a few routine questions. First, he asked where exactly I was going to stay in Macedonia. I replied that I intended to find a hotel once I arrived, and that I had no specific one in mind. He then asked me about the purpose of my stay in Macedonia. I said I was on a tourist trip and had planned to stay for about a week. He told me that as soon as I arrived in Skopje, I should go and see the local police. As I did not speak any Macedonian, a fellow traveler translated for me and for the border official. The translator was tall, slim, and appeared to me to me in his mid to late forties. After these few questions the official instructed me to return to the bus. The bus driver stayed with him for a brief moment before returning to the bus.

13.    The bus then drove on towards Skopje. After about 3 kilometers or so, I asked the bus driver if he could return my passport. He told me that he didn't have it and that he thought it

3

must still be with the border officials. The driver turned the bus around and drove back to the

border, where I got down off the bus and asked the border official for my passport. The official

said that there was a problem with my passport, and resolving it might take some time. He

suggested that I remain behind and let the bus continue on. He said that after we had resolved the

passport issue, he would drop me off at a hotel in Skopje. The bus drove on without me. I had to

then hang around waiting until about 6 p.m.

     14.     At this time I was taken to a narrow room, about eight meters from the border

station. The room had a door and a big glass window facing the street where cars drove by. In the

room there was a table, a desk, and a chair. I sat down on the chair with my back to the glass

window. The official did not allow me to turn around. He also told me to put every item I carried

with me on the table.

     15.     Afterwards he searched everything thoroughly. Once he had completed the

search, a young man appeared. He was about 1.75 m tall and looked to be in his early 30s.

     16.     After an hour-long interrogation, another man turned up. He was a little bigger

and also appeared to be around 30 years old. He started a second interrogation, mentioning

Islamic organizations and groups and asking whether I knew any of them. I said that I had heard

of most of them. He then asked if I had anything to do with any of them. I replied that I had no

involvement or even contact with any of them. He continued to question me about Ulm, asking

me if there were any mosques in the area near where I lived, how many people attended their

services, what nationalities they were, and if I had ever invited someone to Islamic activities at

the Mosque or if someone had ever invited me to them. I answered no to all these questions. I

was asked if there were any other activities in mosques apart from Friday services, and if I knew

of any non-Muslims that had converted to Islam. He offered me alcohol, presumably to test whether I drank alcohol. I declined. He asked me if I prayed or fasted. I replied, "sometimes."

17.    The interrogation ended around 10 p.m. By this stage, some of the officers had gotten drunk; in less than 2 hours, the New Year would begin.

18.    I was eventually taken out of the office and led on to the road leading towards Serbia. I saw three vehicles there, all without license plates. Two of them were VW Golfs: one red, one black. The third car was also black but I cannot remember the make. It was very dark and the fog was thick. The streets and the border station were deserted. My escorts were all dressed in plain clothes and were armed with guns. On our way, we saw a police barricade. We were allowed to pass quickly through it without stopping when my escort turned on a blue signal light.

19.    In Skopje I was taken to a hotel. I subsequently discovered the name of the hotel: The Skopski Merak. The hotel has a website: http://www.skopskimerak.com.mk/, which I have looked at.

20.    My escorts quickly walked me inside the hotel, and over to the elevator, situated a few meters away on the left side of the entrance. The elevator was very small. It could fit only two people at a time. One of my escorts and I took the elevator.  The rest of the men took the stairs.

21.    The hotel building had four or five floors. We exited on the top floor and walked into the room located opposite the elevator. Immediately on the left side of the entrance to the room was the bathroom. It had a window, approximately eighty by forty cm, and a Jacuzzi. Between the sink and the Jacuzzi was the toilet. On the right side of the room was a double bed next to a large window with a view toward the inside of the hotel. Opposite the entrance there

was a large table with a computer and an internet connection. To the left of it was a television mounted to the ceiling. There was a second window with a view onto the slightly damaged chimney of a tall building. Behind this building was another building and to the left, there was a view of a mountain with a cross visible on its summit. This window was always locked and covered by heavy blue curtains; between this window and the bed stood a small table with four chairs.

22.    From the hotel website photographs, I can identify the actual room where I was held. From another, I even recognize one of the waiters who served me food during my detention there.

23.    After entering the hotel room, three of my escorts remained with me. They locked the door. I asked them why they didn't leave. They said that they were going to be staying with me even when I was sleeping. I thought they just wanted to accompany me to my hotel and then leave me there as they said they would when I was detained at the border. I asked them if I was under arrest and they said that I wasn't, asking me if I saw any handcuffs on my wrists. They carried out another search of all my belongings. After this, three of them began interrogating me again. These interrogations were conducted in English despite the fact that I have only a very basic grasp of the language. The three men asked many questions all at once, speaking at me and firing questions from all sides of the room. The interrogation lasted until at least 3 a.m. the next morning.

24.    The men conducted similar such interrogations for the next three days. They observed my every move at all times. Even when I went to the toilet they asked me to leave the door open, although it was located in the same room where I was staying. When I was exhausted and tired of answering their questions and after having been locked in this hotel room all this

6

time, I demanded a translator, as I hardly spoke any English. Then I asked to call the German Embassy, a lawyer, and my family. All my requests were refused. At one point I became so angry that I demanded to be released and attempted to leave the room by force. During this particular incident, we all raised our voices, each of us speaking in our own language. Communication was clearly impossible. One of the men pulled out his firearm and held it level with my head; the other two placed their hands on their holsters in a threatening manner.

25.     The watch was divided between nine men; they changed shift every six hours. On the fifth day, a man with a bag appeared. He had sheets of paper and finger-print ink. He also had a camera and took a few photographs of me: right profile, left profile, and then frontal.

26.     After about seven days, another official turned up. He appeared to be of a much higher rank than any of my guards. He looked to be around fifty-five years old. He had a large build and brought an assistant with him. He was very respectful. He asked me about my condition and how the food was. He told me that I could order food from any restaurant if I didn't like the food that was being served. He also asked if the guards had treated me well. I thanked him and said that so far I was fine. He then told me that he wanted to and could end my current situation, and that he had a deal to offer me. I asked him what kind of a deal. He replied that if I admitted that I belonged to the Al-Qaeda organization they would send me back to Germany with a police escort. I refused and he subsequently left.

27.     Two or three days later, his assistant showed up again and presented me with a list of allegations. He told me that he was certain that these allegations were true. He added that based on these allegations the case against me was no longer within their control, and that it had been referred to the Macedonian president. He said that the president had made a decision regarding my continued detention.

28.    I was surprised by this turn of events and asked again to meet with the German ambassador or any other German authority. He told me that the German government did not want anything to do with me, and that I was wanted by them as well. One of the specific allegations against me was that my passport did not belong to me, and that I was wanted by both the Egyptian and German governments because I had been seen in Jalalabad, Afghanistan. After presenting me with these allegations, he left.

29.    On the thirteenth day after my seizure, I began a hunger strike to protest my situation. A week later, I was told they would soon send me to the airport to fly me back to Germany. I did not eat again for the remaining ten days of detention in Macedonia.

30.    At around 8 p.m. on the twenty-third day of my captivity, January 23, 2004, a video recoding was taken of me. I was instructed to state my full name, that I had been treated well, and that I would shortly be flown back to Germany. I was then accompanied out of the hotel. Once outside, two men approached me. They grabbed hold of my arms and a third man then handcuffed and blindfolded me.

31.    Before being blindfolded, I saw a white minivan, and in front of it, a black jeep. I also saw many people in plain clothes waiting around. I was placed in the jeep and it drove off. By the manner in which it was being driven, I think that it was following another car.

32.    After about half an hour, the vehicle came to a halt. I was taken out of the vehicle and made to sit down on a chair, where I sat for about another one and a half hours. At this point, I heard the voice of the assistant who had come to see me with the high-ranking official. I was told that I would soon be taken into a room for a medical examination before being returned to Germany.

8

33.    As I was led into this room, I felt two people violently grab my arms, one from the right side and the other from the left. They bent both my arms backwards. This violent motion caused me a lot of pain. I was beaten severely from all sides. I then felt someone else grab my head with both hands so I was unable to move. Others sliced my clothes off. I was left in my underwear. Even this they attempted to take off. I tried to resist at first, shouting out loudly for them to stop, but my efforts were in vain. The pain from the beatings was severe. I was terrified and utterly humiliated. My assailants continued to beat me, and finally they stripped me completely naked and threw me to the ground. My assailants pulled my arms back and I felt a boot in the small of my back. I then felt a stick or some other hard object being forced in my anus. I realized I was being sodomized. Of all the acts these men perpetrated against me, this was the most degrading and shameful. I was then pulled to my feet and pushed into the corner of a room. My feet were tied together, and then, for the first time since the hotel, they took off my blindfold. As soon as it was removed, a very bright flashlight went off and I was temporarily blinded. I believe from the sounds that they had taken photographs of me throughout.

34.    When I regained my vision, I saw seven to eight men standing around me, all dressed in black, with hoods and black gloves.

35.    I was dressed in a diaper, over which they fitted a dark blue sports suit with short sleeves and legs. I was once again blindfolded, my ears were plugged with cotton, and headphones were placed over my ears. A bag was placed over my head and a belt around my waist. My hands were chained to the belt. They put something hard over my nose. Because of the bag, breathing was getting harder and harder for me. I struggled for breath and began to panic. I pictured myself like the images I had seen in the media of the Muslims that were brought to Guantánamo.

9

36.     They bent me over, forcing my head down, and then hurried with me to a waiting car and then on to a waiting aircraft. They walked so fast that the pain at my joints was getting worse, as the iron of my shackles chaffed against my ankles. When I tried to slow down they almost dislocated my shoulder. In the airplane, I was thrown down onto the floor and my arms and legs were spread-eagled and secured to the sides of the plane.

37.     During the flight I received two injections, one in the left arm and one in the right arm, at different times. They put something over my nose. I think it was some kind of anesthesia. It felt like the trip took about four hours, but I don't really remember. However, it appeared to be a much longer trip than one to Germany.

38.     I was mostly unconscious for the duration. I think the plane touched down once and took off again. When the plane landed for the final time I was fully conscious, although still a little light-headed. I was taken outside the aircraft. I could feel dry, warm air and knew immediately that the place where the plane had landed couldn't possibly be Europe.

39.     I later learned that aviation documents show that a Boeing business jet owned and operated by some of the defendants in this case, then registered by the FAA as N313P, took off from Palma, Majorca, Spain on January 23, 2004, and landed at the Skopje airport at 8:51 p.m. that evening. The jet left Skopje more than three hours later, flying to Baghdad and then on to Kabul, the Afghan capital. I believe I was on that plane. Attached hereto as Exhibit A are true and correct copies of the aircraft logs for January 23, 2004.

40.     After being removed from the aircraft, I was thrown down into what felt like the trunk of a vehicle. The vehicle drove for about ten minutes. I was then dragged out of the trunk and down a flight of stairs. My arms were raised high behind my back. I was marched so quickly that at times my feet hardly touched the ground. They pushed and shoved me against the walls

10

of the building. Finally I was thrown to the ground. They beat me and kicked my head. Someone stepped on my head and neck with his feet, then removed my chains and my blindfold. I heard them leave and the door being pulled hard and locked behind them.

41.    I was eventually left in a small, filthy, concrete cell. The walls were covered in crude Arabic, Urdu, and Farsi writing. In place of a bed there was one dirty, military-style blanket and some old, torn clothes bundled into a thin pillow. It was cold and dark. I came to find out that I was in a prison in Afghanistan known as the "Salt Pit."

42.    In the Salt Pit I was held in a cell next to two brothers from Pakistan, Abdul Al-Rahim Ghulam Rabbani and Mohammed Ahmad Ghulam Rabbani. On occasion we spoke with one another and sometimes we communicated by writing on bits of toilet paper which we hid, to be read by fellow inmates, in the communal toilet. Through them, I learned that I was detained near a young man named Majid. They told me that Majid had lived in the United States with his father and that he had been arrested by Pakistanis while visiting someone in Pakistan. The Pakistani officials had then handed him over to U.S. officials.

43.    At one time, Al-Rahim and Mohammed had been detained right next to Majid but before my arrival he was moved to a separate section of the prison approximately 10 meters away from where I was held. I understand, however, that the conditions of his detention were more or less identical to my own. Attached hereto as Exhibit B is a copy of a plan of the prison. I have shaded the section of the prison where I was held as well as the section where Majid was detained.

44.    When I first arrived in the Salt Pit, through a small grille on the metal door of the cell, I could see a man dressed in Afghan clothes standing in front of the cell. I was very thirsty at this point and called out to the man for some water. The man pointed to a small bottle in the

11

corner of my cell. It was a very old plastic bottle, dirty outside as well as in. The color of the water was greenish-brown. It stank. I could smell the water from the other side of the cell. After I held the bottle, the smell stayed on my hands for quite some time. I was extremely thirsty but when I tried to drink the water, it caused me to vomit. It was impossible for me to drink from this bottle.

45.     That first night, four masked men in black uniforms came to my cell, dragged me outside, and pushed me into a room close by. The room was bare apart from a table and some chairs. Three men in masks were sitting in the room when we arrived. Two wore the same uniform as my four escorts, the third was dressed in shirt and jeans.

46.     Speaking in Arabic with a Palestinian accent, one of them instructed me to strip naked as a doctor was going to examine me. I undressed, but left on the diaper. I was instructed to remove this as well and complied. I was left standing naked.

47.     I was then photographed, and blood and urine samples were taken by one of the masked men. I think he may have been a doctor.

48.     The "doctor" wore a tight-fitting mask covering his head and extending down his neck. From his eyes, the grey hair that was visible, and the tone of his voice, he appeared to me to be around 40 or 50 years of age. He was dressed casually in jeans and a blue checked shirt. I complained to him about the unhygienic cell and the filthy water. He told me that the Afghans were responsible for the conditions of my confinement. He then asked whether I preferred Islamic or non-Islamic food. I told him I wanted Islamic food. Later I found out that he had made fun of me for this request since the Afghan food was nothing more than the leftovers of the Afghan guards. All it consisted of was chicken bones and skin.

49.    After the examination, which lasted about ten minutes, I dressed and was accompanied back to my cell. I had to search for the bed because the cell was so dark. There was no lighting. I found it almost impossible to sleep because it was so cold and I was in so much pain from being strapped to the unpadded floor of the airplane. I could not sleep on my right or left sides. Only after ten days was I able to sleep on my front or back. My discomfort was made worse by the nighttime cold in Kabul at this time, and I only had one blanket.

50.    On the second night, four masked men came to my cell, bound my hands and feet, and dragged me into the interrogation room again. Seven other men were in the room. All of them were masked and wearing black matching uniforms. One of them yelled at me to come forward. He spoke Arabic with a South Lebanese accent. The man asked if I knew why I had been detained; I said that I did not. He then told me that I was in a land where there were no laws, and that nobody knew I was there.

51.    On the desk in front of him was a file. He said that the file contained information about me and was the reason I had been detained in Skopje and flown to Afghanistan. He said that the file contained evidence that I had attended a terrorist training camp here in Afghanistan, that my passport was forged. He interrogated me about these issues and my alleged association with important terrorists like Muhammed Atta, Ramzi Bin Al-Shibh and other alleged extremists based in Germany.

52.    I said that I had only heard of these individuals in the media, adding that if they wanted to determine whether I had ever trained in Afghanistan and whether my passport was a fake, all they had to do was speak with the German authorities who would prove that I was a German citizen and that I had never been to Afghanistan. I repeatedly asked him to contact the

13

German government. I also asked why I had been taken to Afghanistan, when I was a German citizen, and had no ties to this country. My interrogator did not answer.

53.    In total, I was interrogated on three or four occasions, each time by the same man, and each time at night. In one of these interrogations, I was asked about telephone calls to Sudan. My interrogations were always accompanied by threats, insults, pushing, and shoving. Two of the men who participated in these interrogations identified themselves as Americans. During each interrogation, I demanded that I meet with a representative of the German government. My demands, however, were ignored.

54.    In March, together with several other inmates with whom I had been communicating through the cell walls, I commenced a hunger strike. Numerous other prisoners participated in the hunger strike, including Majid. We refused to eat or drink and demanded to see an American commander or representative to complain and demand our basic human rights. Initially, there was no response to our demands. After six days, I became very weak and felt close to death. I started to drink again, but still refused to eat.

55.    On the 23 or 24 day, Al-Rahim, wrote a note detailing some of our demands, including that our captors respect our most basic human rights, afford us access to a court to challenge our continued detention, inform our relatives of our whereabouts, and give us reading materials. Either Al-Rahim or Majid then handed the note to one of the American officials.

56.    On March 13, I was interrogated by three unmasked American officials and a psychologist who also functioned as the prison's Arabic interpreter. This interpreter had a Syrian accent. The interrogation focused on my alleged associations with Dr. El-Attar, Dr. Yousif, his son Omar, and Mr. Reda Seyam. I was also asked about people associated with the multicultural center "Multi Kultur Haus" in Ulm and the Islamic Information Center (IIZ) in Ulm.

57.    Around March 28, twenty-three or twenty-four days into the hunger strike, I heard through my fellow inmates that Majid had been transferred by the Americans form the Salt Pit to another detention facility. We did not know where, however.

58.    On March 31, after twenty-seven days without food, I noticed people standing outside of the house and I shouted to them. I was taken to an interrogation room. After my hands and feet were shackled, I met with two unmasked Americans. One described himself as the prison director; the other was a more senior official whom some of the other inmates referred to as "the Boss." In addition, the Afghan prison director and the Arabic translator with a Palestinian accent were both present.

59.    I was asked why I was on hunger strike. I replied that I was protesting my abduction from Macedonia and my detention in Afghanistan. I said that I was also protesting against my continued detention without charge or trial, their refusal to allow me access to a lawyer or my family or government, and the inhumane conditions of my confinement.

60.    The American prison director demanded that I end my hunger strike. I responded that I would not unless I was released, brought before a court, or permitted immediate access to a German government official. The only other circumstance that would bring my hunger strike to an end was death. The American prison director said that I was innocent of any crime, and that he would take that matter up with his superiors in Washington, D.C., but that he could not release me without their authorization. After this conversation I was taken back to my cell, and continued my hunger strike. My health continued to deteriorate on a daily basis. I received no medical treatment despite my repeated requests.

61.    From media reports, I understand that shortly after I was abducted and transferred to detention in Afghanistan, senior personnel within the CIA as well as the State Department

knew that they had the wrong man and that I was being detained unlawfully. Attached hereto as Exhibit C are true and correct copies of media reports substantiating this fact.

62.    By April 8 I was so weak that I was unable to leave my bed, not even to use the toilet. On April 9 some Afghans came to see me and tried to convince me to end my hunger strike, as they had noticed how much my health had deteriorated. By April 10 I had been on hunger strike for exactly thirty-seven days.

63.    On the night of April 10, thirty-seven days into my hunger strike, hooded men entered my cell, dragged me from my bed, and bound my hands and feet. They dragged me into the interrogation room, sat me in a chair, and tied me to it. One of the men then grabbed my head. A tube was stuffed up my nose and some sort of liquid was forced directly into my stomach. After this procedure, I was given some canned food as well as some books to read. I noticed that the food boxes had blue and white labels, and listed sodium and potassium as part of their contents. I could also make out "USA" written on these boxes. I was also weighed at this time. The scale showed that since the time of my initial detention in December 2003, I had lost more than sixty pounds.

64.    Around April 8, 2004, I distinctly recall feeling an earth tremor. After my return to Germany, my lawyers obtained records online from the Geological Survey. These records show that on February 14 and April 15, 2004, there were indeed two tremors recorded in the vicinity of Kabul. Attached hereto as Exhibit D is a true and correct copy of these records.

65.    Thirty hours after this force-feeding, I became extremely ill and suffered excruciating pain in my stomach. A doctor visited me in my cell in the middle of the night and administered medication on which I could read the name "Cipro." I remained in bed thereafter for several days, during which time my health gradually improved.

66.    In mid-April 2004, Majid Khan was transferred. I do not know where Majid was transferred to, or even whether he was transferred to another section of the prison or to another prison entirely.

67.    Around the beginning of May, the Afghan prison director took me to the interrogation room where I met with an American who identified himself as a psychologist as well as a female interpreter. The psychologist told me he had come all the way from Washington, D.C. to check on me and ask me some questions. At the end of our conversation, he promised that I would be released from the facility very soon.

68.    Some days later, on May 16, the American prison director, together with a man in military uniform, arrived. The man in the military uniform spoke German and identified himself only as "Sam." "Sam" was about 180cm tall, slim, and had light brown hair. His skin was very tanned. He wore glasses and a cap. He told me that he wanted to talk honestly with me about everything I knew. I said that I was more than happy to share everything I knew with him, but before I did I wanted to know who from the German government had sent him. Before answering he turned to the two Americans beside him (one was the prison director) and spoke with them in English. I could not understand exactly what they were talking about, but after speaking with the director he told me in German that he could not respond to the specific questions I had raised. I then asked him if anyone in the German government knew I was here. Again he refused to respond. I then asked him if my wife knew where I was. To this, he replied no. I noticed that whenever he spoke he searched for his words. He seemed very nervous while the Americans stood beside him. After my questions, "Sam" began to interrogate me.

69.    He asked more or less the same questions that I had previously been asked, in Macedonia and by the Americans as well, regarding my alleged associations with extremists in

17

Neu-Ulm, Germany and people who attended or preached at the multicultural center in Neu-Ulm. In all, the conversation lasted for about two to three hours.

70.    From our very first meeting I was convinced "Sam" was a German citizen and from his accent, from the North of the country. At one point he told me that his wife used a "Metro-Card," a particular card for the "Metro" supermarket that is generally used only by self-employed people, and it was clear to me from this conversation that he knew Germany intimately. Following my return home, I identified "Sam" twice: once on January 1, 2006, from a photograph in the online newspaper "Saar-Echo" (after I was notified of the article by its author, Frank Kruger), and again on February 20, 2006 from a police line-up. His name is Gerhard Lehmann and he is an officer from the German BKA (Bundeskriminalamt). I am ninety percent certain that the "Sam" I met in Afghanistan and the man I identified in this line-up one and half years later are one and the same. Attached hereto as Exhibit E is a true and correct copy of a New York Times article reporting on my identification of "Sam."

71.    "Sam" met with me three more times. On May 20, he told me that it might take them another week to assess whether or not I could be released. Upon hearing this I became angry and told him that they kept promising my release and always postponed it. I said that I would begin my hunger strike again the next day.

72.    On May 21 I began my second hunger strike. In the evening that same day, the American prison director appeared together with "Sam" and an American doctor. "Sam" asked that I end my hunger strike and assured me that I would be on my way to Germany within the next eight days. He said that they were just clearing the security formalities for my transfer from Afghanistan to Germany. He explained that the flight would not go directly to Germany and that

it would take many hours. He asked that I remain calm, not worry, and that I would be home soon.

73.   I recall distinctly all of the dates mentioned in this declaration because I dutifully counted them from the first day of my detention. When I didn't have any paper or pencil to record the dates, I scratched the days off on the wall of my cell. Then, when I was issued paper and a pencil I wrote them down. When the other inmates warned me that the guards would keep any papers in my cell when I left, I committed the dates to memory.

74.   On the evening of May 27, the American doctor and the American prison director came to my cell. The doctor examined me. The director then said that I was to be flown back to Germany the next day. He went on to explain some of the details of the transfer from my cell to the airport. The doctor requested that I not eat or drink after that night, as I wasn't going to be permitted to use the bathroom during the flight.

75.   The next morning, May 28, the doctor and the American prison director arrived in my cell. I was handcuffed, shackled, and blindfolded before being led outside and put inside a jeep. I was driven for about ten minutes and then taken inside a large empty shipping container. They sat me down in a chair so that I was unable to see out and was forced to face the wall. From this position, I could hear the sound of an approaching aircraft.

76.   Shortly thereafter, my blindfold was removed and I was handed the suitcase that had been taken from me in Skopje. I was also given two t-shirts. I removed the clothes I had been wearing and changed into some of the clothes that I had in my suitcase and one of the t-shirts.

19

77.     My hands were cuffed again. My ears were plugged and headphones were placed over my ears. I was blindfolded again and led back to the jeep. We drove a short distance to the waiting airplane. Once inside I was chained to the seat.

78.     The plane was much smaller than the one that had flown me from Macedonia. It had leather seats. I wasn't administered any injections before taking off. "Sam" accompanied me. I could also hear American accents around me. Although they were muffled, it sounded to me like there were at least two or three different people.

79.     At one point during the flight, I asked if I could remove the headphones. "Sam" obliged and they remained off for the remainder of the flight.

80.     After telling me that there was a new President in Germany, "Sam" explained that we would eventually land in a European country but that it would not be Germany itself. When he told me this, it heightened my persistent fear that I was not going to be flown home, but rather taken to another country and executed. The flight took about six to seven hours.

81.     When the plane landed, "Sam" told me that we would part company there and some other people would make sure I got back to Germany safely. I was blindfolded and handcuffed the whole time. I was then bundled out of the plane and placed in the backseat of what I sensed to be a Japanese-made minivan-type vehicle. Specifically, I sensed that it was a Toyota F-model, by the sound it made when it drove over bumps. I had driven an identical model myself when I was back in Germany.

82.     I was driven in the car, up and down mountains, on paved and unpaved roads for more than three hours. The vehicle came to a halt and I was aware of the three men in the car getting out, closing the doors and then three men climbing in to the vehicle. All of them had South European/Slavic accents, but said very little.

20

83.    The vehicle proceeded to drive for another three hours, again up and down mountains and on paved and unpaved roads. Eventually, the vehicle was brought to a halt. I was taken out of the car and before my blindfold was removed, one of my captors turned me around. He then removed the blindfold, sliced the cuffs from my wrists, gave me my suitcase and passport, and directed me to walk down a path without turning back.

84.    I heard the car leave and began to walk as instructed. It was dark. No one was around. As I walked I feared that I was about to be shot in the back and left to die.

85.    As I came round a corner in the road, I came across three armed men. They immediately asked for my passport. When they saw that my German passport had no Albanian visa, they said I was illegal and asked me what I was doing in Albania without the necessary authorization. I had no idea I was even in Albania. We walked together a short distance until we came upon an old one storey building. The building had an Albanian flag on it.

86.    Some time later another man appeared. He seemed to be a superior officer. He went through my bags and asked me what I was doing in Albania. He said that from my appearance (I had grown long hair and a beard) I looked like a terrorist. When I told them the story of my arrest in Macedonia, transport to and imprisonment in Afghanistan, and eventual transport to Albania, they all laughed and said that no one would believe my story. The officer instructed me not to tell my story to anyone.

87.    I asked if they could take me to the German Embassy. The officer in charge said that was unnecessary; they would take me to the airport and put me on a flight to Germany.

88.    The whole time I was with them, I sensed that they had been expecting me; that our chance encounter on the road was not an accident at all but rather planned. One fact that seems to confirm this for me is that the bread, chips and cheese that I was given to eat during the

21

road trip through Albania were in the same plastic bag that I got when I ate these very snacks at the border station, and they tasted exactly the same.

89.     The three men drove me to the Mother Theresa Airport in Tirana. We arrived at around 6 a.m. One of the men took my passport and 320 Euros from my wallet and went in to the airport building. When he returned some fifteen minutes later, he instructed me to go through a door. On the other side, I was met by another man who accompanied me through customs and immigration controls and on to the airplane. Apart from an exit stamp in my passport, I went through these controls without further inspection. Only after the plane was airborne did I finally believe that I was going home.

90.     Attached hereto as Exhibit F is a true and correct copy of relevant pages of my passport showing Macedonian entry and exit stamps as well as an exit stamp from Albania.

91.     The plane landed at Frankfurt International Airport at 8.45 a.m. on May 29, 2004. I went through customs and immigration controls. By this time, I had lost a great deal of weight, something like sixty pounds, my hair was long and unkempt, and my beard had not been shaved since I arrived in Macedonia. Consequently, I looked nothing like the picture in my passport. The immigration officer questioned whether I was the same man, but after substantiating my identity with other documentation in my possession, he let me through.

92.     From Frankfurt I traveled to Neu-Ulm and from there to my home village, Senden. I knew before I entered my house that no one was there and that no one had been there for some time. I went from my home to the Cultural Center in Neu-Ulm where I asked after my wife and children. I was told that my wife and children were all safe and well and that they had all relocated to her family's place in Lebanon. I called my wife and she returned to Germany with our four children one week later. On July 31, 2005, our fifth child, Sirin was born.

03/11 '06 FR 19:56 FAX +43 3452 82788 400   VOLKSBILDUNGSH.RETZHOF                      ☒001
NOV-03-2006 15:10 FROM:ACLU                  12125492651          TO:+43 3452 02700 400   P.2/2

93.    On June 3, 2004, I met with my German lawyer Manfred Gnidjic. Initially

skeptical of my account of what had happened to me, he asked that I write down a complete

version of events and make drawings of the hotel in Macedonia where I had been detained for

twenty-three days and the prison in Afghanistan. A copy of the prison plan is attached as Exhibit

B and attached hereto as Exhibit G are true and correct copies of my statement together with a

plan of the hotel in Skopje.

94.    Mr. Gnidjic also requested that I hand over my passport, which was stamped with

entry and exit stamps for Macedonia and an exit stamp for Albania, my boarding pass for the

flight from Tirana to Frankfurt, and the two t-shirts which had been given to me in Afghanistan.

Mr. Gnidjic then handed over all these documents to the German Prosecutor in Munich so that he

could carry out an investigation into my allegations.

95.    On June 20, 2005, I met with Steven Watt of the American Civil Liberties Union

(ACLU) in Ulm. I retained the ACLU to represent me in legal proceedings in the United States.

My case is presently pending before the Fourth Circuit Court of Appeals.

*****

I hereby declare under penalty of perjury that the foregoing is true and correct. Executed this

3rd  day of November 2006.


_____
Khaled El-Masri


23

## DECLARATION OF KHALED EL-MASRI

### EXHIBITS

Aircraft logs of N313P ...................................................................................... A

Sketch Plan of Prison in Afghanistan ............................................................... B

Lisa Myers & Aram Roston, *CIA Accused of Detaining Innocent Man: If the agency knew he was the wrong man, why was he held?*, MSNBC, (April 21, 2005);
David Johnston, *Rice Ordered Release of German Sent to Afghan Prison in Error*, NEW YORK TIMES, (April 23, 2005) ........................................................................... C

United States Geological Survey, *Significant Earthquakes of the World*, (2004) ................................................................................................................ D

Don Van Natta Jr., *Germany Weighs if it Played Role in Seizure by U.S.*, NEW YORK TIMES, (February 21, 2006) ........................................................................... E

Khaled El-Masri's Passport ................................................................................ F

Khaled El-Masri's statement, with English translation;
Sketch Plan of Hotel in Skopje ......................................................................... G

# EL-MASRI DECLARATION
## EXHIBIT A

All AFTN messages concerning call sign N313P
between 22/01/04 and 24/01/04

Received from KSFOXLDI on date : 23/01/04 time : 0842
(FPL-N313P-IG
-B737/M-SDIGHURWY/S
-LEPA1745
-N0455F390 DCT MORSS UM603 KAS UW44 PEP
-LWSK0216 LGTS
-EET/LFFF0019 LIRR0040 LIBB0123 LAAA0143 DSGG0159 LWSS0203
REG/N313P SEL/AFRS
RMK/MACEDONIA LNDG PMT: 11/02
SKOPJE ARR SLOT: 2000Z
E/0516 P/13 R/UV S/M J/LF D/3 **** C YLT
A/WHT/BLU/RED
C/FAIRING)

Received from LFPYZMFP on date : 23/01/04 time : 1529
(FPL-N313P-IG
-B737/M-SDGHIRUWY/S
-LEPA1745
-N0455F390 MORSS UM603 KAS UW44 PEP
-LWSK0216 LGTS
-EET/LFFF0019 LIRR0040 LIBB0123 LAAA0143 LGGG0159 LWSS0203 REG/N313P
SEL/AFRS RMK/MACEDONIA LNDG PMT: 11/02  SKOPJE ARR SLOT: 2000Z
DOF/040123 ORGN/KSFOXLDI)

Received from LFPYZMFP on date : 23/01/04 time : 1749
(FPL-N313P-IG
-B737/M-SDGHIRUWY/S
-LWSK2130
-N0462F410 RUGAS UN126 PEREN UM603 EKI DCT GOTAN VA4 BKZ UVN702 INB
VN90 SIN UT711 SARPI/N0457F410 UG67 BARUS UN747 DUKAN/K0837S1210 B449
RJ A240 AFGAN L750 MARAD/K0835S0820 L750 RANAH/N0478F270 V838 VELDT
V338 KABUL DCT
-ZZZZ0458 OPRN
-EET/LGGG0012 LTEB0033 LTAA0100 UGGG0159 UBBB0221 UTAK0259 UTAA0324
OAKX0414 REG/N313P SEL/AFRS RMK/TURKEY O/F PMT / CAT 608
TURKMENISTAN O/F PMT / GC/94/145/18S010C  ABGHANISTAN LNDG PMT / TC
056/2004 DOF/040123 ORGN/KSFOXLDI)

Sended by LWSKZPZX on date : 23/01/04 time : 1951
(ARR-N313P-LEPA-LWSK1951)

Sended by LWSKZPZX on date : 23/01/04 time : 2158
(DLA-N313P-LWSK2220-ZZZZ)

Sended by LWSKZPZX on date : 23/01/04 time : 2219
(DLA-N313P-LWSK2330-ZZZZ)

Sended by LWSKZPZX on date : 23/01/04 time : 2300
(RQP-N313P-LWSK-ZZZZ)

Sended by LWSKZPZX on date : 23/01/04 time : 2307
(RQP-N313P-LWSK2130-OAKR)

```
Received from LFPYZMFP on date : 23/01/04 time : 2309
 (FPL-N313P-IG
 -B737/M-SDGHIRUWY/S
 -LWSK2130
 -N0462F410 RUGAS UN128 PERREN UM603 EKI DCT GOTAN VA4 BKZ UVW702 INB
  VW90 SIN UT711 SARPI/N0457F410 UG67 BARDS UM747 DUKAN/K0837S1210 B449
  RJ A240 AFGAN L750 MARAD/K0835S0820 L750 RANAH/N0478Z270 V838 VELDT
 -V338 KABUL DCT
 -OAKBD458 OPEN
 -EET/LGGG0012 LTBB0033 LTAA0100 UGGG0159 UBBB0221 UTAK0259 UTAA0323
  OAKX0414 REG/N313P SEL/AFRS RMK/TURKEY O/F PMT / CAT 508
  TURKMENISTAN O/F PMT / GC/94/145/180104  AFGHANISTAN LNDG PMT / YA
  056/2004 DOF/040123 SRC/RQP ORGN/KSFOXLDI)


Sended by LWSKZPEX on date : 23/01/04 time : 2311
 (DLA-N313P-LWSK2330-OAKB)


Received from LFPYZMFP on date : 23/01/04 time : 2312
 (DLA-N313P-LWSK2330-OAKB)


Received from LFPYZMFP on date : 24/01/04 time : 0016
 (CNL-N313P-LWSK2330-OAKB)


Received from LFPYZMFP on date : 24/01/04 time : 0018
 (FPL-N313P-IG
 -B737/M-SDGHIRUWY/S
 -LWSK0030
 -N0462F390 RUGAS UN128 PERREN/N0462F410 UM603 EKI VG12 YAA VG8 BAG
  UL614 GEM VG8 SRT VR21 KABAN/N0460F410 R784 RAMPI L417 BGD DCT
 -ORBI0253 ORMM
 -EET/LGGG0011 LTBB0033 LTAA0055 ORBB0210 REG/N313P SEL/AFRS
  RMK/TURKEY OVERFLT PMT CAT508 DOF/040124 ORGN/KSFOXLDI)


Received from LFPYZMFP on date : 24/01/04 time : 0018
 (CNL-N313P-LWSK0030-ORBI)


Sended by LWSKZPEX on date : 24/01/04 time : 0023
 (FPL-N313P-IG
 -B737/M-SDGHIRUWY/S
 -LWSK0125
 -N0462F390 RUGAS UN128 PERREN/N0462F410 UM603 EKI VG12 YAA VG8 BAG
  UL614 GEM VG8 SRT VR21 KABAN/N0460F390 R784 RAMPI L417 BGD DCT
 -ORBI0253 ORMM
 -EET/LGGG0011 LTBB0033 LTAA0059 ORBB0210 REG/N313P SEL/AFRS
  RMK/TURKEY OVERFLT PMT CAT508 DOF/040124)


Received from LFPYZMFP on date : 24/01/04 time : 0048
 (FPL-N313P-IG
 -B737/M-SDGHIRUWY/S
 -LWSK0045
 -N0462F370 RUGAS UN128 PERREN/N0462F390 UM603 EKI VG12 YAA VG8 BAG
  UL614 GEM.VG8 SRT VR21 KABAN/N0460F390 R784 RAMPI L417 BGD DCT
 -ORBI0423 ORMM
 -EET/LGGG0011 LTBB0033 LTAA0100 ORBB0210 REG/N313P SEL/AFRS
  DOF/040124 ORGN/KSFOXLDI)
```

Sended by LWSKZPZX on date : 24/01/04 time : 0050
(DLA-N313P-LWSK0125-ORBI)

Received from LFPYZMFP on date : 24/01/04 time : 0051
(DLA-N313P-LWSK0125-ORBI)

Sended by LWSKZPZX on date : 24/01/04 time : 0135
(DEP-N313P-LWSK0135-ORBI)

# EL-MASRI DECLARATION
## EXHIBIT B

When Khaled was
in the cell No. 4,
Majid was on the
site where the
cell No. 4 is situated

to make it clear:



# EL-MASRI DECLARATION
# EXHIBIT C

**NBC MSNBC.com**

# CIA accused of detaining innocent man
**If the agency knew he was the wrong man, why was he held?**

By Lisa Myers, Aram Roston & the NBC Investigative Unit
Updated: 7:48 p.m. ET April 21, 2005

Last year, the CIA thought it had an important al-Qaida terrorist in custody.  CIA agents secretly detained him in Europe and flew him to a secret CIA prison in Afghanistan, in a so-called "rendition."  But now senior U.S. officials tell NBC News that CIA realized early on, it had the wrong man — but kept him in prison anyway.  They say he was kept in the primitive prison for more than a month after CIA director George Tenet was informed of the case, while officials tried to figure out a way to fix their mistake.

On New Year's Eve 2003, German citizen Khaled El-Masri says he was kidnapped in Macedonia, and then flown by U.S. officials to Afghanistan where he was held in secret in harsh conditions until May. The mysterious events were seen as a case study in "renditions," or secret CIA operations to move terrorist suspects to third countries, outside U.S. legal authority.

Many of El-Masri's claims have been confirmed, but until now it was not known what had actually gone wrong. Now NBC News has learned key details of the CIA operation, how the mistake was discovered, and how top officials in the US government, including Tenet and Condoleezza Rice were briefed.

Among the details NBC News has learned:

• Macedonian officials arrested El Masri first and told the CIA that El-Masri's German passport was fake. His name set off bells because it matched someone who had trained in Osama bin Laden's camps.
• A CIA "black renditions" team swept into Macedonia and then flew El-Masri to a prison in Afghanistan nicknamed the "Salt Pit."
• In February, CIA officers in Kabul began to suspect he was the wrong man, and they raised the red flag. They sent his passport back to the agency's headquarters in Langley, Va. In March, sources say, the CIA finally finished checking his passport and found it was not a fake. The Macedonians had been wrong. The CIA realized it had the wrong man, a genuine German citizen, in custody.

El-Masri told NBC News that back in Afghanistan, in the prison, one American was frustrated over what was happening.

"He seemed to get mad about the situation and shouted, 'I don't think you belong here, I will once more call Washington,'" El-Masri says.

But in Washington, sources say, in mid April, officials called a special meeting at the CIA to brief director George Tenet. An officer quotes Tenet as saying, "You've got an innocent guy in the Salt Pit?" Tenet said El-Masri should be released.

By May, sources say National Security Council Director Condoleezza Rice learned of the mistake and ordered El-Masri's immediate release. She said as well that the German government should be told of the incident, for diplomatic reasons. But that didn't end the case.  About two weeks later, Rice learned El-Masri was still being held and ordered him released again.

In late May 2003, he finally was freed.

"It's very deeply troublesome," says former CIA general counsel Jeffrey Smith, when NBC News told him of the story. Smith says el-Masri should have been released as soon as the CIA learned he was the wrong man.

"It's wrong morally, it's wrong legally," he says. "And it violates the basic principles of the United States."

The American Civil Liberties Union has been investigating the CIA's use of "renditions" on suspected terrorists.

"Use of rendition," says Steven Watt, an ACLU lawyer, "puts America in a legal black hole. But when it's used to hold a man that the United States knows to be innocent, that puts us in a moral black hole as well."

Watt says this incident shows incompetence on the part of the CIA. "They denied a man his freedom, simply to avoid potential criticism or embarrassment," he adds.

The CIA, Tenet and Rice had no comment. Intelligence sources say the CIA inspector general is investigating, and the German government says prosecutors in Munich are also looking into El-Masri's charges.

© 2006 MSNBC.com

URL: http://www.msnbc.msn.com/id/7591918/

**The New York Times**
nytimes.com

PRINTER-FRIENDLY FORMAT
SPONSORED BY 

April 23, 2005

# Rice Ordered Release of German Sent to Afghan Prison in Error

### By DAVID JOHNSTON

WASHINGTON, April 22 - A German citizen detained for five months in an Afghan prison was released in May 2004 on direct orders from Condoleezza Rice, then the national security adviser, after she learned the man had been mistakenly identified as a terror suspect, government officials said Friday.

The officials, who confirmed an account of Ms. Rice's decision that was first reported by NBC News, said that when Khaled el-Masri was taken from a bus on the Serbian-Macedonian border on Dec. 31, 2003, the Macedonian and the American authorities believed he was a member of Al Qaeda who had trained at one of Osama bin Laden's camps in Afghanistan.

But within several months they concluded he was the victim of mistaken identity, the officials said. His name was similar to a Qaeda suspect on an international watch list of possible terrorist operatives, they said.

By then, Mr. Masri, 41, a car salesman who lives in Ulm, Germany, had been flown on a C.I.A.-chartered plane to the prison under a secret American program of transferring terror suspects from country to country for interrogation, officials said. At the prison in Kabul, Mr. Masri said, he was shackled, beaten, photographed nude and injected with drugs by interrogators who pressed him to reveal ties to Al Qaeda.

For reasons that are unclear, he remained for months at a prison known locally as the "Salt Pit." The case reached Ms. Rice in May 2004, officials said, and twice, over several weeks, she ordered him immediately freed. He was released in Albania on May 29, 2004.

The American officials acknowledged Friday that the detention had been a serious mistake and that he had been held too long after American officials realized their error.

In an interview on Friday, Mr. Masri said that he was gratified that "the truth has finally come out" and that he expected an apology. "I hope that America will in the future respect the rights of people," he said.

The disclosure of the decision to free Mr. Masri shed new light on the transfer of suspected Qaeda operatives around the world. Until now, it was believed that the transfers were carried out by the C.I.A. under presidential directives issued after the Sept. 11, 2001, attacks.

Ms. Rice's involvement suggests that the White House may have played a more hands-on role than was previously known. The officials who discussed the matter on Friday suggested that she had intervened as needed, but would not describe the extent to which national security officials at the White House were in charge.

In January, Mr. Masri's account of his ordeal was the subject of an article in The New York Times. At the time, officials at the C.I.A. and F.B.I. would not confirm or deny the details of his case, although they acknowledged that they had been contacted by the German authorities investigating his allegations of mistreatment.

*Don Van Natta contributed reporting from London for this article, and Souad Mekhennet from Frankfurt.*

Copyright 2005 The New York Times Company | Home | Privacy Policy | Search | Corrections | RSS | Help | Back to Top

# EL-MASRI DECLARATION
# EXHIBIT D

United States Geological Survey (USGS)

Page 1 of

# USGS

## Earthquake Hazards Program

October 6, 2005

## EQ Facts & Lists  Significant Earthquakes of the World for 2004

### Earthquake Lists

SIGNIFICANT EARTHQUAKES OF THE WORLD, 2004

Earthquakes of magnitude 6.5 or greater or ones that caused fatalities, injuries or substantial damage. BRK--Berkeley.  PAS--Pasadena.

| DATE UTC | ORIGIN TIME UTC HR MN SEC | GEOGRAPHIC COORDINATES LAT | LONG | DEPTH | MAG | SD | NO. STA USED | REGION, ADDITIONAL MAGNITUDES AND COMMENTS |
|---|---|---|---|---|---|---|---|---|
| JAN 01 | 20 59 31.9 | 8.310 S | 115.788 E | 45 | 5.8 | 1.0 | 119 | BALI REGION, INDONESIA. MW 5.8 (GS), 5.8 (HRV), mb 5.5 (GS), MS 5.4 (GS), Mo 6.6*10**17 Nm (HRV), 5.6*10**17 Nm (GS). At least one person killed, 22 injured and 2,000 buildings damaged on Lombok. At least seven people injured and 4,000 buildings damaged on Bali. Felt (VI) at Karangasem, Bali and (V) at Mataram, Lombok. |
| JAN 03 | 16 23 21.0 | 22.253 S | 169.683 E | 22 G | 7.1 | 1.1 | 597 | SOUTHEAST OF THE LOYALTY ISLANDS. MW 7.1 (HRV), 6.8 (GS), mb 6.4 (GS), MS 7.1 (GS), Mo 5.9*10**19 Nm (HRV), 1.6*10**19 Nm (GS), 8.2*10**19 Nm (PPT). Es 8.7*10**14 Nm (GS). Felt on Mare and at Noumea, New Caledonia. |
| JAN 10 | 18 30 14.8 | 36.852 N | 3.418 E | 10 G | 4.5 | 1.0 | 190 | NORTHERN ALGERIA. mb 4.5 (GS), MS 4.4 (GS), ML 4.6 (LDG). Three hundred people injured and additional damage to buildings in the Algiers-Boumerdes area previously weakened by the event of May 21, 2003. |
| JAN 25 | 11 43 11.8 | 16.830 S | 174.196 W | 130 D | 6.7 | 0.8 | 732 | TONGA. MW 6.7 (GS), 6.7 (HRV), mb 6.4 (GS), MS 6.6 (GS), Mo 1.1*10**19 Nm (HRV), Es 1.6*10**14 Nm (GS). Felt in the Tava'u Group. |
| JAN 28 | 22 15 30.7 | 3.120 S | 127.400 E | 17 | 6.7 | 1.1 | 243 | SERAM, INDONESIA. MW 6.7 (GS), 6.7 (HRV), mb 6.0 (GS), MS 6.5 (GS), MS 7.0 (GS), ML 6.7 (DDA), Mo 1.2*10**19 Nm (GS), |

USGS Earthquake Hazards Program: Significant Earthquakes for 2004

FEB 04  11 59 47.6  8.358 N  82.877 W  29 D  6.1  0.9  465  1.1*10**19 Nm (HRV), 9.1*10**18 Nm (PPT). Es 6.4*10**14 Nm (GS). Felt (V) at Namlea, Buru and (II) on Ambon. A local tsunami was observed at Namlea.

PANAMA-COSTA RICA BORDER REGION. MW 6.1 (GS), 6.1 (HRV), mb 5.6 (GS), MS 5.9 (GS), ME 6.8 (GS). Mo 1.6*10**18 Nm (HRV), 1.5*10**18 Nm (GS). Es 3.1*10**14 Nm (GS). Four people injured, three houses damaged and a bridge collapsed in Chiriqui, Panama. Felt in Bocas del Toro, Panama. Felt strongly in southern Costa Rica, the Valle Central and at Limon.

FEB 05  21 05 02.8  3.615 S  135.538 E  17  7.0  1.0  367  PAPUA, INDONESIA. MW 7.0 (HRV), 7.1 (GS), mb 6.1 (GS), MS 7.1 (GS), ME 6.7 (GS). Mo 3.4*10**19 Nm (HRV), 1.8*10**19 Nm (GS), 7.2*10**19 Nm (PPT). Es 2.8*10**14 Nm (GS). At least 37 people killed, 682 injured, 2,678 buildings damaged or destroyed and nine bridges damaged in the epicentral area. The airport runway was damaged and power outages occurred in the Nabire area. Felt (VI) at Nabire, (V) at Enarotali and (IV) at Manokwari. Also felt at Tembagapura.

FEB 07  02 42 35.2  4.003 S  135.023 E  10 G  7.3  1.0  390  NEAR THE SOUTH COAST OF PAPUA, INDONESIA. MW 7.3 (GS), 7.3 (HRV), 7.1 (OBN), mb 6.2 (GS), MS 7.5 (GS), ME 7.5 (GS). Mo 9.7*10**19 Nm (HRV), 1.0*10**20 Nm (HRV), 7.2*10**20 Nm (PPT), 5.0*10**19 Nm (OBN). Es 4.0*10**15 Nm (GS). Additional damage in the Nabire area.

FEB 08  08 56 51.8  3.665 S  135.339 E  26  6.7  1.1  256  PAPUA, INDONESIA. MW 6.7 (HRV), 6.5 (GS), mb 5.7 (GS), MS 6.9 (GS). Mo 7.2*10**18 Nm (HRV), 1.2*10**19 Nm (HRV). Es 1.5*10**14 Nm (GS). Felt (VI) at Nabire.

FEB 11  08 15 03.8  31.675 N  35.551 E  27 D  5.3  0.9  386  DEAD SEA REGION. MW 5.3 (HRV), mb 5.1 (GS), MS 4.8 (GS), ME 5.2 (GS). Mo 1.1*10**17 Nm (HRV). Four people injured in western Jordan and a landslide occurred at Ma'in. Minor damage to buildings at Jerusalem, Petah-Tiqwa, Tel Aviv and in the Nablus area. Felt from Cairo, Egypt to Lebanon.

FEB 14  10 30 22.1  34.774 N  73.216 E  11 G  5.5  0.9  353  PAKISTAN. MW 5.5 (GS), 5.4 (HRV), mb 5.4 (GS), MS 5.2 (GS). Mo 1.9*10**17 Nm (GS), 1.5*10**17 Nm (HRV). At least 24 people killed, including 14 by landslides, and about 40 injured in the Balakot-Batgram-Mansehra area. More than 1,420 buildings collapsed, 5,379 damaged and roads cracked and blocked by landslides in the area. About 20 percent of water wells damaged in Mansehra. Felt throughout the North-West Frontier Province. Power and telephone cables damaged at Srinagar, Kashmir. Also felt at Gulmarg, Kashmir and Kabul, Afghanistan.

FEB 14  11 56 57.5  34.798 N  73.206 E  11 G  5.4  0.8  369  PAKISTAN. MW 5.4 (GS), 5.3 (HRV), mb 5.4 (GS), MS 5.1 (GS). Mo

USGS Earthquake Hazards Program: Significant Earthquakes for 2004

1.2*10**17 Nm (GS), 1.1*10**17 Nm (HRV). Casualties and damage included with the event at 10:30 UTC.

| Date | Time | Lat | | Long | | Depth | | Mag | | Deaths |
|---|---|---|---|---|---|---|---|---|---|---|
| FEB 16 | 14 44 39.9 | 0.466 | S | 100.655 | E | 56 | | 5.1 | 0.9 | 199 |
| FEB 21 | 02 34 42.7 | 59.425 | S | 14.963 | W | 10 | G | 6.6 | 1.3 | 102 |
| FEB 22 | 06 46 27.0 | 1.559 | S | 100.488 | E | 42 | G | 6.0 | 0.8 | 611 |
| FEB 24 | 02 14 34.0 | 3.393 | S | 29.558 | E | 10 | A | 4.7 | 1.0 | 71 |
| FEB 24 | 02 27 46.24 | 35.142 | N | 3.997 | W | 0 | G | 6.4 | | 786 |

SOUTHERN SUMATRA, INDONESIA. MW 5.1 (HRV), mb 5.2 (GS), MS 4.5 (GS). Mo 4.5*10**16 Nm (HRV). At least 5 people killed, 7 injured and more than 100 houses damaged in the Padangpanjang area. Felt (V) at Padangpanjang; (IV) at Batusangkar, Bukittinggi and Padang; (II) at Pekanbaru.

EAST OF THE SOUTH SANDWICH ISLANDS. MW 6.6 (GS), 6.6 (HRV), mb 6.0 (GS), MS 6.1 (GS). Mo 9.5*10**18 Nm (HRV), 8.4*10**18 Nm (GS), 1.5*10**19 Nm (PPT).

SOUTHERN SUMATRA, INDONESIA. MW 6.0 (GS), mb 6.3 (GS). MS 5.7 (GS). ME 6.3 (GS). Mo 1.3*10**18 Nm (GS), 1.2*10**18 Nm (HRV). Es 6.6*10**13 Nm (GS). One person injured, four houses badly damaged and many houses slightly damaged in Pesisir Selatan. Felt (V) at Padang and (III) at Bengkulu, Bukittinggi, Kepahiang and Padangpanjang. Felt on Singapore.

BURUNDI. mb 4.7 (GS). Three people killed and at least 24 houses destroyed at Ruyega. Felt strongly at Bujumbura. Also felt at Bukavu, Congo; Kigali, Rwanda; Kabanga, Tanzania.

STRAIT OF GIBRALTAR. , MW 6.4 (GS), 6.4 (HRV), mb 6.2 (GS), MS 6.4 (GS), ME 6.9 (GS). Mo 4.9*10**18 Nm (GS), 3.9*10**18 Nm (HRV). Es 5.9*10**14 Nm (GS). At least 628 people killed, 926 injured, 2,539 homes destroyed and more than 15,000 people homeless in the Al Hoceima-Imzouorene-Aït Kamra area, Morocco. Maximum intensity IX in the Imzouorene-Aït Kamra area. Ground cracks and landslides were observed between Ajdir and Beni Abdallah and maximum horizontal acceleration of 0.24g was recorded near Imzourene. Felt from Tetouan to Nador and as far south as Fes. Felt (V) at Melilla and (III) in many parts of southern Spain from Algeciras to Roquetas de Mar. Felt (II) at Cordoba, Granada, Huelva, Jaen and Madrid. Also felt in Gibraltar. Several aftershocks killed at least three people and destroyed previously weakened buildings. This earthquake occurred near the eastern end of the Rif mountain belt, which is part of the diffuse boundary between the African and Eurasian plates. The moment tensors and pattern of surface cracking indicate left-lateral strike-slip faulting on a buried NE-SW trending fault. This quake occurred near the epicenter of the magnitude 6.0 Al Hoceima earthquake of May 26, 1994, that injured one person and caused significant damage to adobe buildings. Special reports for this earthquake are available on the website http://www.emsc-csem.org.

U.S. Earthquake Hazards Program: Significant Earthquakes for 2004

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| FEB 25 | 12 44 57.4 | 35.278 N | 4.113 W | 10 D | 5.3 | 1.1 | 283 |

STRAIT OF GIBRALTAR. MW 5.3 (HRV), mb 4.9 (GS), MS 4.9 (GS). Mo 8.9*10**16 Nm (HRV). Casualties and damage are included with the event at 02:24 UTC. Felt (III) at Estepona, Spain.

| FEB 26 | 12 07 04.2 | 35.233 N | 4.192 W | 11 D | 5.0 | 1.1 | 272 |

STRAIT OF GIBRALTAR. MW 5.0 (HRV), mb 4.8 (GS), MS 4.5 (GS). Mo 3.1*10**16 Nm (HRV). Casualties and damage are included with the event at 02:24 UTC. Felt (III) at Melilla and (II) at Benalmedena, Spain.

| MAR 01 | 23 55 19.06 | 38.058 N | 38.277 E | 5 G | 3.8 | | 6 |

EASTERN TURKEY. MD 3.8 (ISK). At least six people killed and two injured at Celikhan.

| MAR 07 | 06 37 52.24 | 35.036 N | 4.022 W | 0 G | 5.1 | | 274 |

STRAIT OF GIBRALTAR. MW 5.1 (HRV), mb 4.7*10*16 Nm (HRV), MS 4.8 (GS), MS 4.7 (GS). Mo 4.7*10**16 Nm (HRV). Casualties and damage are included with the event of February 24, 2004 at 02:24 UTC. Felt (V) at Al Hoceima, Morocco. Felt (III) at Melilla and (II) at Malaga, Spain.

| MAR 24 | 01 53 49.4 | 45.392 N | 118.256 E | 19 D | 5.5 | 0.9 | 447 |

EASTERN NEI MONGOL, CHINA. MW 5.5 (GS), 5.4 (HRV), mb 5.6 (GS), MS 5.2 (GS). MS 5.5 (GS). Mo 1.9*10**17 Nm (GS), 1.3*10**17 Nm (HRV). Es 3.8*10**12 Nm (GS). At least 100 people injured and 38,000 buildings damaged in the Bayan Ul Uoc-Ulinatal area. Felt at Chaoyang, Chengde and Baicheng. Damage from this earthquake and the aftershocks estimated at 74 million U.S. dollars.

| MAR 25 | 19 30 45.0 | 39.930 N | 40.812 E | 10 G | 5.6 | 1.1 | 237 |

EASTERN TURKEY. MW 5.6 (GS), 5.6 (HRV), mb 5.0 (GS), MS 5.4 (GS). Mo 3.3*10**17 Nm (HRV), 2.4*10**17 Nm (GS). At least ten people killed, 46 injured and 45 buildings damaged or destroyed in Erzurum.

| MAR 28 | 03 51 10.06 | 39.847 N | 40.874 E | 5 | 5.6 | | 509 |

EASTERN TURKEY. MW 5.6 (HRV), 5.5 (GS), mb 5.3 (ISK). Mo 2.8*10**17 Nm (HRV), 2.1*10**17 Nm (GS). MS 5.3 (GS). At least 12 people injured, more than 50 buildings in 10 villages damaged or destroyed and many livestock killed in the Askale area.

| APR 03 | 23 02 00.8 | 36.428 N | 141.008 E | 31 G | 6.0 | 0.7 | 528 |

NEAR THE EAST COAST OF HONSHU, JAPAN. MW 6.0 (HRV), 5.9 (GS). mb 5.7 (GS), MS 5.6 (GS). MS 5.6 (GS). Mo 8.9*10**17 Nm (GS), 1.0*10**18 Nm (HRV). Es 5.5*10**12 Nm (HRV). 2.1*10**17 Nm (HRV). Felt strongly in Chiba, Fukushima, slightly at Nabe. Felt in much Ibaraki, Miyagi, Saitama and Tochigi Prefectures. Felt in much of east-central Honshu. Recorded (4 JMA) in Chiba and Tochigi; (3 JMA) in Chiba, Fukushima, Gunma, Ibaraki, Saitama and Tokyo; (2 JMA) in Iwate, Kanagawa, Nagano, Niigata, Shizuoka, Yamagata and Yamanashi; (1 JMA) in Akita and Aomori Prefectures.

APR 05 21 24 04.0 36.512 N 71.029 E 187 D 6.6 1.0 728 HINDU KUSH REGION, AFGHANISTAN. MW 6.6 (GS), 6.5 (HRV), mb 6.4 (GS), ME 6.4 (GS). Mo 7.5*10**18 Nm (GS), 6.3*10**18 Nm (HRV), Es 8.2*10**13 Nm (GS). At least one person killed in the Shahr-e Bozorg area and two people killed at Kabul. At least five people injured in Pakistan. Felt at Delhi and Gurgaon, India; Srinagar, Kashmir; Islamabad and Lahore, Pakistan. Felt (IV) at Tasmit and (III) at Andijon, Fargona, Namangan and Tashkent, Uzbekistan.

APR 09 15 23 35.0 13.174 S 167.198 E 228 D 6.5 1.1 424 VANUATU. MW 6.5 (GS), 6.4 (HRV), mb 5.8 (GS), ME 5.5 (GS). Mo 5.5*10**18 Nm (GS), 5.0*10**18 Nm (HRV). Es 3.4*10**12 Nm (GS). Four people injured jumping from buildings in the Bolu area.

APR 13 21 47 23.06 40.729 N 31.629 E 5 4.1 116 WESTERN TURKEY. mb 4.1 (GS), ML 4.6 (ISN). Four people injured jumping from buildings in the Bolu area.

APR 23 01 50 30.2 9.362 S 122.839 E 66 D 6.7 1.1 386 SAVU SEA. MW 6.7 (HRV), mb 6.5 (GS). Mo 1.1*10**19 Nm (GS), 1.1*10**19 Nm (HRV), 9.5*10**18 Nm (PPT). Es 1.4*10**14 Nm (GS). Minor damage at Kupang, Timor. Felt (IV) at Maumere and (III) at Kota, Flores; (III) at Sabu, Timor; (III) at Waingapu, Sumba. Felt in much of Timor. Also felt at Darwin, Kununurra and Wyndham, Australia.

MAY 01 07 56 13.6 24.081 N 121.611 E 45 5.2 -0.9 191 TAIWAN. MW 5.2 (HRV), mb 5.2 (GS). MS 5.1 (GS). Mo 7.3*10**16 Nm (HRV). At least 2 people killed and 1 injured by a rockslide in Hua-lien County. A bridge collapsed at Taroko Gorge National Park. Felt in most parts of the island. Recorded (7 TAP) in Hua-lien; (5 TAP) in I-lan; (3 TAP) in Nan-t'ou, T'ai-chung and Yun-lin; (2 TAP) in Chia-i, Hsin-chu, Miao-li, T'ai-pei, T'ai-tung and T'ao-yuan; (1 TAP) in Kao-hsiung and T'ai-nan.

MAY 03 04 36 50.0 37.695 S 73.406 W 21 G 6.6 1.3 282 BIO-BIO, CHILE. MW 6.6 (HRV), mb 5.9 (GS), MS 6.5 (GS), MW 6.3 (GS), ME 6.4 (GUC). Mo 8.4*10**18 Nm (GS), 1.0*10**19 Nm (HRV). Minor damage (HRV), 8.4*10**18 Nm (PPT). Es 5.9*10**13 Nm (GS). Minor damage (VI) and power outages occurred at Canete. Felt (VI) at Lebu, Concepcion, Los Angeles, Talcahuano and Victoria; (IV) at Cauquenes, Longuimay, Temuco, Valdivia and Villarica; (III) at Curico, Osorno, Rancagua, Chillan, Linares and Talca; (III) at Santiago. Also felt at Chiguayante and San Fernando.

MAY 08 20 11 44.2 30.126 N 67.121 E 10 G 4.5 1.4 58 PAKISTAN. mb 4.5 (GS). At least one person killed, about 30 injured and minor damage to some buildings in the Quetta area.

MAY 28 12 38 44.4 36.290 N 51.610 E 17 G 6.3 0.9 732 NORTHERN IRAN. MW 6.3 (HRV), mb 6.2 (GS), MS 6.3 (GS). Mo 6.2 (GS). Mo 3.7*10**18 Nm (HRV), 2.5*10**18 Nm (GS). At least 35 people killed, 400 injured and 3.8*10**18 Nm (GS). At least 35 people killed, 400 injured and many buildings damaged in Mazandaran and Qazvin provinces. Some of the deaths were caused by landslides on the Tehran-Chalus

| Date | Time | Lat | Lon | Depth | Mag | | Region |
|---|---|---|---|---|---|---|---|
| MAY 29 | 20 56 09.6 | 34.251 N | 141.406 E | 16 G | 6.5 | 1.0 | 352 | road. Minor damage reported in Tehran. Felt in much of central and northern Iran. Felt (IV) at Lankaran and (III) at Baku, Azerbaijan. Felt (III) at Makhachkala, Russia.

OFF THE EAST COAST OF HONSHU, JAPAN. MW 6.5 (GS), 6.3 (HRV), mb 5.6 (GS), MS 6.6 (GS), Mo 6.3 (GS), Mo 6.9*10**18 Nm (GS), 3.2*10**18 Nm (HRV), Es 7.4*10**13 Nm (GS). Felt along the coast of eastern Honshu. Recorded (1 JMA) in Chiba, Kanagawa, Miyagi, and Shizuoka Prefectures. |
| JUN 10 | 15 19 57.7 | 55.682 N | 160.003 E | 189 D | 6.9 | 0.8 | 798 | KAMCHATKA PENINSULA, RUSSIA. MW 6.9 (GS), 6.9 (HRV). mb 6.1 (GS). ME 6.5 (GS). Mo 2.9*10**19 Nm (GS), 2.3*10**19 Nm (HRV), 4.1*10**19 Nm (PPT). Es 1.4*10**14 Nm (GS). Felt (IV) at Petropavlovsk-Kamchatskiy. |
| JUN 28 | 09 49 47.04 | 54.800 N | 134.250 W | 20 G | 6.8 | | 772 | QUEEN CHARLOTTE ISLANDS REGION . MW 6.8 (GS), 6.8 (HRV), 6.7 (OBN), mb 5.9 (GS), MS 6.8 (GS). ME 6.8 (GS). Mo 1.9*10**19 Nm (GS), 1.9*10**19 Nm (HRV), 2.8*10**19 Nm (PPT), 1.2*10**19 Nm (OBN). Es 3.1*10**14 Nm (GS). Felt strongly on the northern Queen Charlotte Islands. Also felt throughout the rest of the Queen Charlotte Islands and along the northwest coast of British Columbia at Kitimat, Prince Rupert, Stewart and Terrace. Felt (VI) at Craig; (V) at Klawock, Metlakatla and Petersburg; (IV) at Hyder, Juneau and Ketchikan; (III) at Sitka and Wrangell, Alaska. |
| JUL 01 | 22 30 09.3 | 39.766 N | 43.979 E | 5 G | 5.1 | 1.1 | 422 | EASTERN TURKEY. MW 5.1 (HRV). mb 5.4 (GS). MS 4.8 (GS). Mo 5.6*10**16 Nm (HRV). At least 18 people killed and 21 injured in the Doğubeyazit area. |
| JUL 12 | 13 04 07.1 | 46.296 N | 13.641 E | 8 | 5.2 | 1.0 | 476 | SLOVENIA. MW 5.2 (HRV), mb 5.0 (GS), MS 4.9 (GS), ML 5.7 (STR), 5.6 (LDO), 5.6 (BRG), 5.5 (FBH), 5.5 (FUR), 5.4 (ZAMG), 5.4 (PDG), 4.9 (LJU), Mo 7.1*10**16 Nm (HRV). One person killed and 5 injured by a rockslide in the Bovec area. Some houses destroyed and others damaged at Kobarid. Felt in Ljubljana. Felt in northeastern Italy as far north as Venice and southern Austria as far northeast as Vienna. Also felt at Zagreb, Croatia; Munich, Germany; Prague, Czech Republic. |
| JUL 15 | 04 27 14.7 | 17.636 S | 178.760 W | 566 D | 7.1 | 0.9 | 208 | FIJI REGION. MW 7.1 (GS), 7.0 (GS). mb 6.4 (GS). ME 6.6 (GS). Mo 4.8*10**19 Nm (HRV), 4.1*10**19 Nm (GS). Es 2.1*10**14 Nm (GS). |
| JUL 18 | 04 22 22.56 | 38.000 S | 176.510 E | 5 | 5.6 | | 92 | NORTH ISLAND OF NEW ZEALAND. . MW 5.6 (GS), 5.4 (HRV). mb 5.1 (GS), MS 5.1 (GS). Mo 2.5*10**17 Nm (HRV), 1.5*10**17 Nm (HRV). One person killed and two injured in the Rotorua-Tauranga area. Five houses heavily damaged at Lake Roto Ma. Landslides occurred on the highway between Lake Rotoiti and Lake Roto Ma. |

USGS Earthquake Hazards Program: Significant Earthquakes for 2004

| Date | Time | Lat | Lon | Depth | Mag | | | Region |
|---|---|---|---|---|---|---|---|---|
| | | | | | | | | Felt from Taurangs to Whakatane. This is the largest of a series of earthquakes in the Lake Rotoiti area. |
| JUL 18 | 08 31 45.8 | 33.426 N | 69.324 E | 10 G | 5.2 | 0.4 | 216 | CENTRAL AFGHANISTAN. MW 5.2 (HRV), mb 5.1 (GS), MS 4.8 (GS). Mo 6.7*10**16 Nm (HRV). Two people killed, 40 injured and hundreds of houses destroyed in Paktia Province. |
| JUL 25 | 14 35 19.0 | 2.427 S | 103.981 E | 582 D | 7.3 | 0.9 | 641 | SOUTHERN SUMATRA, INDONESIA. MW 7.3 (GS), 7.3 (HRV), mb 6.8 (GS), MS 7.4 (GS), Mo 9.8*10**19 Nm (GS), 1.0*10**20 Nm (HRV). Es 3.1*10**15 Nm (GS). Felt (IV) at Bengkulu and (III) at Bandung, Bogor, Sawahan and Podangpanang. Felt (III) at Jakarta, Java. Also felt (III) at Mataram, Surabumi. (II) throughout Bali, Java, Lombok and Sumatra. Also felt in southern Johor, Malaysia and in Singapore. |
| JUL 28 | 03 56 28.6 | 0.443 S | 133.091 E | 13 D | 6.5 | 1.1 | 305 | NEAR THE NORTH COAST OF PAPUA, INDONESIA. MW 6.5 (HRV), 6.4 (HRV), mb 6.0 (GS), MS 6.4 (GS). Mo 6.3*10**18 Nm (HRV), 4.6*10**18 Nm (GS). Es 9.8*10**13 Nm (GS). Felt (IV) at Manokwari and Sorcong. |
| JUL 30 | 07 14 07.84 | 39.634 N | 43.966 E | 5 | 4.8 | | 132 | EASTERN TURKEY. mb 4.8 (GS), MS 4.0 (GS). At least one person killed, 5 injured and some houses damaged in the Dogubeyazit area. |
| AUG 04 | 03 01 07.5 | 36.833 N | 27.815 E | 10 G | 5.6 | 1.3 | 412 | DODECANESE ISLANDS, GREECE. MW 5.6 (HRV), 5.5 (GS), mb 5.1 (GS), MS 5.2 (GS). ML 5.4 (ATH). Mo 2.4*10**17 Nm (HRV), 1.9*10**17 Nm (GS). Eleven people injured at Bodrum, Turkey. Felt at Akyaka, Datca, Didim, Fethiye, Gocek, Marmaris and Mugla, Turkey. Also felt on Kos and Rhodes. |
| AUG 10 | 01 47 32.8 | 36.444 N | 70.796 E | 207 D | 6.0 | 0.9 | 492 | HINDU KUSH REGION, AFGHANISTAN. MW 6.0 (GS), 6.0 (HRV), mb 5.3 (GS). Mo 1.2*10**18 Nm (HRV), 1.1*10**18 Nm (GS). At least two people killed in Mansehra, Pakistan. Felt in Balkh, Kabul, Konduz and Takhar, Afghanistan. Also felt at Chitral, Islamabad, Lahore, Peshawar, Rawalpindi and Swat, Pakistan. Gurgaon, India. Also felt (IV) at Dushanbe, Tajikistan. Felt (II) at Shymkent, and Ashgabat, Turkmenistan. Felt (IV) at Tashkent, Uzbekistan. Kazakhstan. |
| AUG 10 | 10 26 14.7 | 27.266 N | 103.873 E | 6 * | 5.4 | 1.2 | 203 | SICHUAN-YUNNAN-GUIZHOU REGION, CHINA. MW 5.4 (HRV), mb 5.1 (GS), MS 5.1 (GS). Mo 1.2*10**17 Nm (HRV). At least 4 people killed, nearly 200 seriously injured, more than 400 slightly injured, 120,000 homeless, 18,556 houses destroyed and 65,601 damaged in Ludian County, Yunnan. Twenty-two reservoirs damaged in Yunnan Province. |
| AUG 11 | 15 48 26.9 | 38.377 N | 39.261 E | 7 | 5.7 | 1.1 | 487 | EASTERN TURKEY. MW 5.7 (HRV), 5.6 (GS), mb 5.3 (GS), MS 5.5 (GS). |

| Date | Time | Lat | Long | Depth | | Mag | | No |
|---|---|---|---|---|---|---|---|---|
| AUG 28 | 13 41 25.66 | 35.173 S | 70.525 W | 5 | | 6.5 | | 349 |
| SEP 05 | 10 07 07.8 | 33.070 N | 136.618 E | 14 G | 7.2 | 0.9 | | 643 |
| SEP 05 | 14 57 18.6 | 33.184 N | 137.071 B | 10 G | 7.4 | 0.9 | | 594 |

Mo 3.6*10**17 Nm (HRV), 2.8*10**17 Nm (GS). One person killed, 11 people injured and several houses damaged in the Biazig-Sivrice area.

349  MAULE, CHILE. . MW 6.5 (GS), 6.5 (HRV), mb 6.1 (GS). MS 6.3 (GS), MS 5.9 (GS). Mw 6.2 (GUC). MD 6.2 (SJA). Mo 7.2*10**18 Nm (HRV), 6.7*10**18 Nm (GS), 9.0*10**18 Nm (PPT). Es 1.8*10**13 Nm (GS). Power outages occurred at Cauquenes, Curico, San Javier and Talca. Felt (VI) at Curico, Romeral, Talca and Vichuquen; (V) at Cauquenes, Linares, Quilleo, Rancagua, Santiago, Valparaiso and Vina del Mar; (IV) at Chillan, Concepcion, Los Andes, Quilpue and San Felipe; (III) at Cabildo; (II) at Los Angeles. Also felt (IV) at General Alvear and San Rafael; (III) at Mendoza, Neuquen and Santa Rosa; (II) at Buenos Aires and Cordoba, Argentina.

643  NEAR S. COAST OF WESTERN HONSHU, JAPAN. MW 7.2 (HRV), 7.0 (GS), 7.3 (OBN), 7.2 (NIED). mb 6.7 (GS). MS 7.0 (GS), MS 7.5 (GS). Mo 7.8*10**19 Nm (HRV), 4.0*10**19 Nm (GS), 8.8*10**19 Nm (OBN), 7.5*10**19 Nm (NIED), 5.2*10**19 Nm (PPT). La 3.7*10**15 Nm (GS). At least four people injured in the Kyoto area. Felt in much of southwestern Japan and as far northeast as Tokyo. A local tsunami was generated with maximum recorded wave heights (peak-to-trough) of 63 cm on Kozu-shima and 34 cm at Kushimoto. Recorded (5L JMA) in Mie, Nara and Wakayama; (4 JMA) in Aichi, Gifu, Hyogo, Kyoto, Osaka and Shiga; (3 JMA) in Chiba, Fukui, Hiroshima, Kanagawa, Nagano, Okayama, Shimane, Shizuoka, Tokyo, Tottori and Yamanashi; (2 JMA) in Gumma, Ishikawa, Saitama, Tochigi, Toyama and Yamaguchi; (1 JMA) in Ibaraki, Miyagi and Niigata Prefectures. Recorded (3 JMA) in Kagawa, Kochi and Tokushima; (2 JMA) in Ehime Prefectures, Shikoku. Recorded (1 JMA) in Kagoshima, Kumamoto, Miyazaki and Oita Prefectures, Kyushu. Also recorded (3 JMA) on Kozu-shima, Nii-jima and O-shima; (2 JMA) on Hachijo-jima, Mikura-jima and Miyake-jima; (1 JMA) on Dogo and in the Dozen Islands.

594  NEAR THE SOUTH COAST OF HONSHU, JAPAN. MW 7.4 (GS), 7.4 (HRV), 7.5 (NIED). MS 7.1 (GS). ME 7.4 (GS). Mo 1.5*10**20 Nm (HRV), 1.2*10**20 Nm (GS), 1.7*10**20 Nm (NIED), 1.1*10**20 Nm (PPT). Es 3.3*10**15 Nm (GS). About forty people injured in the Kyoto area. Felt in much of southwestern Japan and as far northeast as Tokyo. A local tsunami was generated with maximum recorded wave heights (peak-to-trough) of 93 cm on Kozu-shima and 86 cm at Kushimoto. Power outages occurred at Wakayama and a fire occurred at Sakai. Recorded (5L JMA) in Wakayama and Mie; (4 JMA) in Aichi, Fukui, Gifu, Hyogo, Kyoto, Nara, Osaka, Shiga and Tottori; (3 JMA) in Chiba, Hiroshima, Ishikawa, Kanagawa,

USGS Earthquake Hazards Program: Significant Earthquakes for 2004

Nagano, Okayama, Shimane, Shizuoka, Tokyo and Yamanashi, (2 JMA) in Gunma, Ibaraki, Niigata, Saitama, Tochigi and Yamaguchi (1 JMA) in Miyagi Prefectures. Recorded (3 JMA) in Kagawa, Kochi and Tokushima; (2 JMA) in Ehime Prefectures, Shikoku. Recorded (1 JMA) in Fukuoka, Kumamoto, Miyazaki, Oita and Saga Prefectures, Kyushu. Also recorded (3 JMA) on Hachijo-jima, Kozu-shima, Miyake-jima, Nii-jima and O-shima; (2 JMA) on Dogo, Mikura-jima and in the Dozen Islands; (1 JMA) on Sadogo-shima.

| Date | Time | Lat | Lon | Depth | Mag | | | Region |
|---|---|---|---|---|---|---|---|---|
| SEP 06 | 12 42 59.3 | 55.372 S | 28.976 W | 10 G | 6.9 | 1.1 | 233 | SOUTH SANDWICH ISLANDS REGION. MW 6.9 (GS), 6.8 (HRV), mb 6.0 (GS), MS 6.5 (GS). Mo 2.5*10**19 Nm (GS), 1.7*10*19 Nm (HRV), 2.0*10**19 Nm (PPT). |
| SEP 06 | 23 29 35.0 | 33.205 N | 137.227 E | 10 G | 6.6 | 0.8 | 478 | NEAR THE SOUTH COAST OF HONSHU, JAPAN. MW 6.6 (HRV), 6.5 (GS), MW 6.3*10**18 Nm 6.5 (NIED), mb 6.4 (GS), MS 6.3 (GS), ME 6.5 (GS). Mo 6.3*10**18 Nm (PPT), 6.0*10**18 Nm (GS), 1.0*10**19 Nm (HRV), 6.4*10**18 Nm (NIED). Es 1.2*10**14 Nm (GS). Felt in southwestern Honshu from Kobe to Tokyo. Recorded (4 JMA) in Osaka, Mie, Shizuoka and Wakayama; (3 JMA) in Aichi, Fukui, Hyogo, Kanagawa, Kyoto, Nara, Shiga, Tottori and Yamanashi; (2 JMA) in Chiba, Hiroshima, Ishikawa, Nagano, Okayama, Saitama, Shimane, Tokyo and Toyama; (1 JMA) in Gunma, Miyagi, Niigata and Yamaguchi Prefectures. Recorded (3 JMA) in Tokushima and (2 JMA) in Ehime, Kagawa and Kochi Prefectures, Shikoku. Also recorded (3 JMA) on Kozu-shima, Nii-jima and O-shima; (2 JMA) on Aoga-shima, Hachijo-jima, Mikura-jima and Miyake-jima. |
| SEP 07 | 11 53 06.1 | 28.573 S | 65.840 W | 22 D | 6.4 | 0.8 | 360 | CATAMARCA, ARGENTINA. MW 6.4 (HRV), 6.1 (GS), MS 6.1 (GS), ME 6.3 (GS). Mo 4.2*10**18 Nm (GS), 1.7*10*18 Nm (HRV), 1.4*10**18 Nm (PPT). Es 5.8*10**13 Nm (GS). At least one person killed, several people injured and some buildings damaged (VI) at Catamarca. Felt (III) at San Juan. Felt as far east as Buenos Aires and in parts of Chile. |
| SEP 07 | 12 15 49.7 | 34.682 N | 103.781 E | 10 A | 5.2 | 0.8 | 108 | GANSU, CHINA. mb 5.2 (GS). At least nineteen people injured, 600 houses destroyed and more than 3,800 houses damaged in Gansu Province. |
| SEP 15 | 08 35 10.8 | 8.773 S | 115.357 E | 98 | 5.4 | 1.1 | 157 | BALI REGION, INDONESIA. MW 5.4 (HRV), mb 5.2 (GS). Mo 1.3*10**17 Nm (HRV). One person killed and two injured at Denpasar. Felt (V) at Mataram, Lombok and (II) at Banyuwangi, Java. |
| SEP 21 | 13 32 30.8 | 54.841 N | 19.912 E | 10 A | 4.8 | 1.2 | 224 | POLAND. MW 4.8 (HRV), mb 4.9 (GS), ML 4.8 (CLL), 4.7 (BRG). No 1.6*10**16 Nm (HRV). At least three people injured and seventeen houses damaged (VI) at Kaliningrad, Russia. Damage to railroad tracks near Svetlogorsk, Russia. Minor damage occurred at Suwalki, Poland. Felt (II) at Saint Petersburg, Russia. Felt |

USGS Earthquake Hazards Program: Significant Earthquakes for 2004

throughout Belarus, Estonia, Latvia, Lithuania and northern
Poland. Also felt in the areas of Copenhagen, Denmark; Helsinki,
Finland; Oslo, Norway and in southern Sweden.

OCT 06  14 40 39.9  35.950 N  139.919 E  64 D  5.8  0.8  405  NEAR THE SOUTH COAST OF HONSHU, JAPAN. MW 5.8 (HRV), 5.7 (GS),
5.7 (NIED), mb 5.5 (GS). Mo 4.8*10**17 Nm (HRV), 4.5*10**17 Nm
(GS), 4.5*10**17 Nm (NIED). One person injured and two houses
damaged at Tezuma. Felt in Chiba, Gumma, Ibaraki, Kanagawa,
Nagano, Shizuoka and Tokyo Prefectures. Recorded (5L JMA) in
Ibaraki, Saitama and Tochigi; (4 JMA) in Chiba, Gumma, Kanagawa
and Tokyo; (3 JMA) in Fukui, Nagano, Shizuoka and Yamanashi (2
JMA) in Miyagi, (1 JMA) in Aichi, Gifu, Iwate and Yamagata
Prefectures. Also recorded (2 JMA) on O-shima and (1 JMA) on
Hachijo-jima, Kozu-shima, Miyake-jima and Nii-jima.

OCT 07  21 46 20.3  37.125 N  54.477 E  35 D  5.6  0.8  526  NORTHERN IRAN. MW 5.6 (GS), 5.6 (HRV), mb 5.6 (GS). MS 5.4 (GS).
MS 6.0 (THR), Mo 3.2*10**17 Nm (HRV), 3.1*10**17 Nm (GS). At
least 60 people injured in Golestan. Felt as far west as Tehran.

OCT 08  08 27 53.5  10.951 S  162.161 E  36 G  6.8  0.9  545  SOLOMON ISLANDS. MW 6.8 (GS), 6.8 (HRV), mb 6.1 (GS). MS 6.9
(GS), ME 6.8 (GS). Mo 1.6*10**19 Nm (HRV), 1.5*10**19 Nm (GS).
Es 3.7*10**14 Nm (GS).

OCT 08  14 36 06.1  13.925 N  120.534 E  105 G  6.5  0.9  526  MINDORO, PHILIPPINES. MW 6.5 (GS), 6.4 (HRV), mb 6.3 (GS), ME 6.4
(GS). Mo 6.6*10**18 Nm (GS), 5.2*10**18 Nm (HRV). Es 1.0*10**18 Nm
(PFT). Es 7.6*10**13 Nm (GS). Power outages occurred in the
Manila area, Luzon. Felt (V PIVS) at Puerto Galera. Also felt (V
PIVS) at Los Banos, Makloss. San Fernando and Tagaytay; (IV
PIVS) at Buco and Talisay, Luzon. Felt on Mindoro and throughout
central and southern Luzon.

OCT 09  21 26 53.6  11.422 N  86.665 W  35 G  7.0  1.1  441  NEAR THE COAST OF NICARAGUA. MW 7.0 (HRV), 6.8 (GS), mb 6.0 (GS).
MS 7.0 (GS), ME 6.5 (GS), ML 6.8 (SNET). Mo 3.0*10**19 Nm (HRV),
2.0*10**19 Nm (GS), 3.2*10**19 Nm (PFT). Es 1.1*10**14 Nm (GS).
Felt at Managua and in much of Nicaragua. Felt (IV) at San
Salvador, El Salvador. Felt as far north as Tegucigalpa,
Honduras and as far south as San Jose, Costa Rica.

OCT 15  04 08 50.2  24.530 N  122.694 E  94  6.7  0.9  698  TAIWAN REGION. MW 6.7 (HRV), 6.6 (HRV), mb 6.4 (GS). ES 6.3 (GS).
Mo 6.7*10**18 Nm (HRV), 1.1*10**19 Nm (GS). Es 7.4*10**13 Nm
(GS). Several people injured and buildings damaged in I-lan
County. Felt throughout Taiwan. Also felt in much of the Ryukyu
Islands, Japan. Recorded (5 JMA) in Hua-lien and I-lan; (4 TAP)
in T'ai-chung, T'ai-pai, T'ai-tung, T'ao-yuan and Yun-lin; (3
TAP) in Chang-hua, Chia-i, Hsin-chu, Miao-li, Nan-t'ou and T'ai-
nan; (2 TAP) in Kao-hsiung and P'ing-tung Counties. Also
recorded (5L JMA) on Yonaguni-jima; (4 JMA) on Iriomote-jima and

...rthquake Hazards Program: Significant Earthquakes for 2004

| Date | Time | Lat | Lon | Depth | | Mag | Err | Deaths | Description |
|---|---|---|---|---|---|---|---|---|---|
| OCT 18 | 22 11 44.9 | 25.073 N | 99.169 E | 30 | | 4.8 | 0.6 | 87 | YUNNAN, CHINA. mb 4.8 (GS). MS 4.4 (GS). Twelve people injured and more than 20,000 houses damaged or destroyed in the Baoshan area. Felt strongly in Changning, Longling, Shidian and Tengchong Counties. |
| OCT 23 | 08 56 00.8 | 37.226 N | 138.779 E | 16 | G | 6.6 | 1.1 | 782 | NEAR THE WEST COAST OF HONSHU, JAPAN. MW 6.6 (HRV), 6.4 (GSI), 6.7 (OBN), 6.6 (NIED). mb 6.4 (GSI). MS 6.3 (GSI). ME 6.5 (GSI). Mo 8.6*10**18 Nm (HRV), 5.8*10**18 Nm (NIED), 2.4*10**19 Nm (PPT), 1.3*10**19 Nm (OBN). Es 1.4*10**14 Nm (GSI). At least 40 people killed, 3,183 injured and 6,000 buildings destroyed or damaged in Niigata Prefecture. A high-speed train derailed; several roads, bridges and rail lines damaged; at least 1,300 landslides and 11 fires occurred; several gas, water and power lines damaged in Niigata Prefecture. Felt in Chiba, Fukushima, Gumma, Kanagawa, Miyagi, Saitama and Tokyo Prefectures. |
| OCT 27 | 01 40 50.2 | 37.284 N | 138.885 E | 14 | D | 6.0 | 0.9 | 499 | NEAR THE WEST COAST OF HONSHU, JAPAN. MW 6.0 (GSI), 5.9 (HRV), 5.8 (NIED). mb 5.7 (GSI). MS 5.4 (GSI). ME 5.8 (GSI). Mo 8.6*10**17 Nm (HRV), 1.2*10**18 Nm (GSI), 6.3*10**17 Nm (NIED). Es 1.3*10**13 Nm (GSI). At least five people injured; one building destroyed and some others damaged; water and gas lines broke in Niigata Prefecture. Felt in Gumma, Kanagawa, Nagano, Saitama and Tokyo Prefectures. Recorded (6L JMA) in Niigata. Felt in Fukushima, Gunma and Saitama; (3 JMA) in Ibaraki, Ishikawa, Kanagawa, Nagano, Tochigi, Toyama, Yamagata and Yamanashi; (2 JMA) in Chiba, Gifu and Shizuoka; (1 JMA) in Aichi, Akita, Aomori, Osaka and Shiga Prefectures. Also recorded (4 JMA) on Sadoga-shima, (2 JMA) on Awa-shima and (1 JMA) on Hegura-jima and Tobi-shima. |
| NOV 02 | 10 02 12.8 | 49.277 N | 128.772 W | 10 | G | 6.7 | 1.2 | 459 | VANCOUVER ISLAND, CANADA REGION. MW 6.7 (GSI), 6.6 (HRV), 6.6 (PGC). mb 5.8 (GSI). MS 6.4 (GSI). ME 6.9 (GSI). Mo 8.6*10**18 Nm (HRV), 1.1*10**19 Nm (GSI), 1.0*10**19 Nm (PPT), 1.4*10**19 Nm (PGC). Es 5.9*10**14 Nm (GSI). Felt at Akert Bay, Bamfield, Port Alice, Vancouver and Victoria. |
| NOV 03 | 23 57 28.1 | 37.434 N | 138.752 E | 10 | G | 5.3 | 0.7 | 193 | NEAR THE WEST COAST OF HONSHU, JAPAN. MW 5.3 (HRV), 5.1 (NIED). mb 4.5 (GSI). MS 5.0 (GSI). Mo 8.7*10**16 Nm (HRV), 5.6*10**16 Nm (NIED). One person injured at Nagaoka in Niigata Prefecture. Recorded (5U JMA) in Niigata. Felt in Fukushima, Gumma, Ishikawa and Nagano; (2 JMA) in Ibaraki, Miyagi, Saitama, Tochigi, Toyama and Yamagata; (1 JMA) in Shizuoka and Tokyo Prefectures. Also recorded (3 JMA) on Sadoga-shima. |

US Earthquake Hazards Program: Significant Earthquakes for 2004

| Date | Time | Lat | Lon | Depth | | Mag | | Deaths | Description |
|------|------|-----|-----|-------|---|-----|---|--------|-------------|
| NOV 08 | 02 15 58.8 | 37.396 N | 138.862 E | 10 | G | 5.5 | 0.7 | 382 | NEAR THE WEST COAST OF HONSHU, JAPAN. MW 5.5 (GSI), 5.5 (HRV), 5.5 (NIED), mb 5.6 (GSI), MS 5.0 (GSI), Mo 2.3*10**17 Nm (HRV), 2.0*10**17 Nm (GSI), 2.2*10**17 Nm (NIED). At least eight people injured and a landslide occurred in Niigata Prefecture. Felt at Tokyo. Recorded (5V JMA) in Niigata; (4 JMA) in Fukushima; (3 JMA) in Gunma, Ibaraki, Ishikawa, Nagano, Saitama and Yamagata; (2 JMA) in Kanagawa, Miyagi, Tochigi, Tokyo, Toyama and Yamanashi; (1 JMA) in Akita, Chiba and Shizuoka Prefectures. Also recorded (2 JMA) on Sadoga-shima and (1 JMA) on Hegura-jima. |
| NOV 09 | 18 43 08.4 | 37.366 N | 138.825 E | 10 | | 5.1 | 0.8 | 211 | NEAR THE WEST COAST OF HONSHU, JAPAN. MW 5.1 (HRV), 5.1 (NIED), mb 5.2 (GSI), MS 4.6 (GSI), Mo 4.4*10**16 Nm (HRV), 4.4*10**16 Nm (NIED). One person injured at Niitsuke. Felt in northern Honshu. A minor landslide occurred near Tochio. Recorded (5) JMA) in Niigata; (3 JMA) in Fukushima; (2 JMA) in Gunma, Ibaraki, Niigata/ (3 JMA) in Fukushima and Yamagata; (1 JMA) in Miyagi, Tokyo Ishikawa, Nagano, Saitama and Yamagata. Also recorded (2 JMA) on Sadoga-shima and Tochigi Prefectures. |
| NOV 09 | 23 58 23.6 | 11.150 S | 163.706 E | 13 | G | 6.9 | 1.0 | 405 | SOLOMON ISLANDS. MW 6.9 (GSI), 6.9 (HRV), mb 6.6 (GSI), MS 6.7 (GSI). Mo 2.8*10**19 Nm (HRV), 2.2*10**19 Nm (GSI), 5.4*10**19 Nm (PPT). |
| NOV 11 | 17 34 52.0 | 11.128 S | 162.208 E | 10 | G | 6.7 | 1.1 | 233 | SOLOMON ISLANDS. MW 6.7 (GSI), 6.6 (HRV), mb 5.8 (GSI), MS 6.6 (GSI), ME 6.1 (GSI), Mo 1.2*10**19 Nm (GSI), 1.0*10**19 Nm (HRV), 7.6*10**18 Nm (PPT). Es 3.7*10**13 Nm (GSI). |
| NOV 11 | 21 26 41.1 | 8.152 S | 124.868 E | 10 | G | 7.5 | 1.1 | 301 | KEPULAUAN ALOR, INDONESIA. MW 7.5 (HRV), 7.4 (GSI). mb 6.5 (GSI) MW 7.3 (GSI). BE 7.4 (GSI). Mo 2.1*10**20 Nm (HRV), 1.6*10**20 Nm (GSI), 6.6*10**19 Nm (ORN), 1.7*10**20 Nm (PPT), 3.2*10**15 Nm (GSI). At least 34 people killed, 400 injured, 781 buildings destroyed and 16,712 damaged on Alor. Landslides blocked roads in some areas. Felt (VIII) at Kalabahi. Felt (V) as far away as Dili, East Timor. |
| NOV 15 | 09 06 56.5 | 4.695 N | 77.508 W | 15 | G | 7.2 | 0.9 | 708 | NEAR THE WEST COAST OF COLOMBIA. MW 7.2 (GSI), 7.2 (HRV), mb 6.6 (GSI), MS 7.1 (GSI), ME 7.4 (GSI), Mo 7.6*10**19 Nm (HRV), 6.6*10**19 Nm (GSI), 4.6*10**19 Nm (PPT). Es 2.8*10**15 Nm (GSI). Two people seriously injured, four others slightly injured, at least 154 buildings destroyed and 290 damaged in Bajo Baudo. Seven people injured and at least 67 houses destroyed or damaged at Buenaventura. One person injured and some buildings damaged at El Cairo, Jamundi and Restrepo. Buildings damaged at El Cerrito, at Cali. Power and telephone service interrupted at Cali. Some damage and power interrupted at Bogota. Felt at Armenia, Quindio and in much of western and central Colombia. Felt lightly by people in tall buildings at Quito, Ecuador. Earthquake lights observed in the |

Earthquake Hazards Program: Significant Earthquakes for 2004

| Date | Time | Lat | | Long | | Depth | | Mag | | N | Description |
|---|---|---|---|---|---|---|---|---|---|---|---|
| NOV 17 | 21 09 13.1 | 20.068 S | 178.710 W | 623 | D | 6.6 | 1.0 | 510 | | | FIJI REGION. MW 6.6 (GS), 6.5 (HRV). mb 5.9 (GS). ME 5.7 (GS). Mo 8.4*10**18 Nm (GS), 7.2*10**18 Nm (HRV), 5.5*10**18 Nm (PPT). Es 6.8*10**12 Nm (GS). |
| NOV 20 | 08 07 22.0 | 9.602 N | 84.172 W | 16 | G | 6.4 | 0.9 | 530 | | | COSTA RICA. MW 6.4 (GS), 6.4 (HRV). mb 6.2 (GS). MS 6.3 (GS). ME 6.4 (GS). Mo 4.8*10**18 Nm (GS), 4.6*10**18 Nm (HRV), 5.5*10**18 Nm (PPT). Es 9.2*10**13 Nm (GS). Eight people killed and several injured; 526 buildings damaged or destroyed; many roads and bridges damaged; some landslides occurred in the San Jose area. Water lines broke at Parrita and Quepos (VI) at Damas, Failsa Quepos. Felt (VIII) at Parrita and Quepos; (VI) at Damas, Failsa Quepos and Jaco. (V) at Alajuela, Monterrey, Naranjo, Puntarenas, San Isidro, Turrialba and Zapote; (IV) at Batan, Bribri, Limon, Los Chiles, Nicoya, Palmar Sur and Upala. Felt in much of Costa Rica. |
| NOV 21 | 11 41 07.7 | 15.679 N | 61.706 W | 14 | G | 6.3 | 1.0 | 672 | | | LEEWARD ISLANDS. MW 6.3 (GS), 6.3 (HRV). mb 6.3 (GS). MS 6.1 (GS). ME 6.4 (GS). Mo 3.4*10**18 Nm (HRV), 3.2*10**18 Nm (GS), 7.1*10**18 Nm (PPT). Es 7.6*10**13 Nm (GS). One person killed, at least two injured and several houses destroyed or damaged at Trois-Rivieres; one person injured at Capesterre-Belle-Eau; ten people slightly injured on Les Saintes; at least eight houses destroyed and twenty-five others damaged on Torre-de-Bas, Gundeloupe. At least twenty houses damaged and power outages occurred in northern Dominica. Felt in Antigua and Barbuda, Saint Kitts and Nevis and as far as Saint Lucia. |
| NOV 22 | 04 01 30.4 | 33.297 N | 47.977 E | 36 | D | 5.0 | 1.1 | 268 | | | WESTERN IRAN. MW 5.0 (HRV). mb 5.0 (GS). MS 4.0 (GS). Mo 3.7*10**16 Nm (HRV). Several people slightly injured and several vehicles damaged by rockslides on the road between Khorramabad and Pol-e Dokhtar. Some houses slightly damaged in the Pol-e Dokhtar area. |
| NOV 22 | 20 26 23.9 | 46.676 S | 164.721 E | 10 | G | 7.1 | 1.1 | 585 | | | OFF WEST COAST OF THE SOUTH ISLAND, N.Z. MW 7.1 (HRV), 7.0 (GS). mb 6.4 (GS). MS 7.1 (GS). MS 6.9 (GS). Mo 5.6*10**19 Nm (HRV), 7.0 (GS). 3.4*10**19 Nm (GS), 5.5*10**19 Nm (PPT). Es in the Southland-Otago area. Minor damage at Invercargill and as far north as Hamilton on the North Island. Felt in much of the South Island and as far north as Hamilton on the North Island. |
| NOV 24 | 22 59 40.0 | 45.626 N | 10.559 E | 17 | | 5.1 | 1.1 | 529 | | | NORTHERN ITALY. MW 5.1 (HRV). mb 5.1 (GS). MS 4.6 (GS). ML 5.5 (FBB), 5.5 (LGG), 5.5 (GRF), 5.3 (STR), 5.1 (SUB), 5.0 (ZAMG). Mo 4.5*10**16 Nm (HRV). At least nine people injured and many buildings damaged in the Brescia area. Felt as far west as Torino; as far south as La Spezia and as far east as Venice. Also felt at Bern, Switzerland. |

USGS Earthquake Hazards Program: Significant Earthquakes for 2004

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| NOV 26 | 02 25 03.3 | 3.609 S | 135.404 E | 10 G | 7.1 | 1.2 | 439 | PAPUA, INDONESIA. MW 7.1 (HRV), 7.0 (GS). mb 6.2 (GS). MS 7.2 (GS). Me 6.8 (GS). Mo 5.5*10**19 Nm (HRV), 3.1*10**19 Nm (GS), 4.4*10**19 Nm (PPT). Es 3.5*10**14 Nm (GS). At least 32 people killed, 130 injured, 328 buildings destroyed (VIII), airport and seaport damaged and power outages occurred at Nabire. Damage estimated at 55 million U.S. dollars. Felt (IV) at Serui, Yapen; (III) at Biak, Biak and Timika, Papua. |
| NOV 28 | 02 35 13.4 | 26.525 S | 113.834 W | 10 G | 6.5 | 1.4 | 265 | EASTER ISLAND REGION. MW 6.6 (HRV), 6.5 (GS). mb 5.6 (GS). MS 6.1 (GS). Mo 9.0*10**18 Nm (HRV), 5.7*10**18 Nm (GS), 1.1*10**19 Nm (PPT). |
| NOV 28 | 18 32 14.1 | 43.006 N | 145.119 E | 39 G | 7.0 | 0.8 | 929 | HOKKAIDO, JAPAN REGION. MW 7.0 (GS), 7.0 (HRV), 7.4 (OBN), 7.0 (NIED). mb 6.4 (GS). MS 6.7 (GS). ME 7.0 (GS). Mo 3.7*10**19 Nm (GS), 3.7*10**19 Nm (HRV), 4.0*10**19 Nm (PPT), 3.4*10**19 Nm (NIED), 1.6*10**20 Nm (OBN). Es 6.9*10**14 Nm (GS). At least 24 people injured; road damage occurred, power, natural gas and railway service interrupted in the Nekkei-Kushiro-Nemuro area. Minor damage 3*10**13 Nm (NIED). At docks and buildings at Nemuro. A 10 cm tsunami was recorded at Nemuro. Felt (IV) at Misawa, Honshu. Felt (IV) at Yuzhno-Kuril'sk, Kunashir and (III) on Shikotan and at Kuril'sk, Iturup. Recorded (5U JMA) in eastern Hokkaido. (4 JMA) in southern Hokkaido, (3 JMA) in southwestern Hokkaido and (1 JMA) in northern Hokkaido. Also recorded (3 JMA) in Aomori, Iwate and Miyagi (2 JMA) in Akita, Ibaraki and Yamagata; (1 JMA) in Fukushima, Kanagawa, Saitama, Shizuoka, Tochigi and Tokyo Prefectures, Honshu. |
| DEC 01 | 17 42 24.7 | 36.848 N | 3.448 E | 10 G | 4.5 | 0.9 | 120 | NORTHERN ALGERIA. mb 4.5 (GS). At least 15 people injured, minor damage to some buildings and power outages occurred in the Boumerdas area. Felt at Algiers. |
| DEC 01 | 23 17 21.5 | 3.665 S | 135.528 E | 10 G | 5.5 | 1.0 | 96 | PAPUA, INDONESIA. MW 5.5 (GS), 5.5 (HRV). mb 5.3 (GS). MS 5.3 (GS). Mo 2.3*10**17 Nm (HRV), 2.0*10**17 Nm (GS). One person killed in the Nabire area. Felt at Jayapura. |
| DEC 05 | 08 30 59.5 | 36.865 N | 3.421 E | 10 G | 4.5 | 1.0 | 174 | NORTHERN ALGERIA. mb 4.5 (GS). ML 4.7 (ALG). Forty-six people injured in the Zemmouri area. Felt at Algiers. |
| DEC 06 | 14 15 11.8 | 42.900 N | 145.228 E | 35 G | 6.8 | 0.8 | 759 | HOKKAIDO, JAPAN REGION. MW 6.8 (HRV), 6.8 (NIED). mb 6.5 (GS). MS 6.5 (GS). ME 6.7 (GS). Mo 1.5*10**19 Nm (GS), 1.0*10**19 Nm (NIED), 1.8*10**19 Nm (PPT), 1.5*10**19 Nm (HRV), 1.6*10**19 Nm (NIED). Es 2.7*10**14 Nm (GS). At least 4 people injured and power outages occurred in the Kushiro area. Felt at Obihiro. Also felt at Misawa and Sendai, Honshu. Recorded (5U JMA) in the Kushiro area. (5L JMA) in the Obihiro area and in eastern Hokkaido; (4 |

12/13/2x

Earthquake Hazards Program: Significant Earthquakes for 2004

JMA) in the Chitose-Tomakomai area and in south-central Hokkaido? (3 JMA) in southwestern and central Hokkaido. Also in the Shibetsu area; (1 JMA) in northern Hokkaido. Also recorded (3 JMA) in Aomori and Miyagi; (2 JMA) in Akita, Iwate and Yamagati; (1 JMA) in Fukushima, Ibaraki, Niigata and Shizuoka Prefectures, Honshu.

DEC 09   08 49 00.2   24.757 N   92.539 E   35 D   5.4   0.7   236
INDIA-BANGLADESH BORDER REGION. MW 5.4 (GSI), 5.3 (HRV), mb 5.5 (GSI). MS 4.7 (GSI). Mo 1.6*10**17 Nm (GSI), 1.1*10**17 Nm (HRV). Several people slightly injured at Kailashondi, India. Minor damage in Cachar, India. Felt in much of central and southern Assam, India. Felt in eastern Meghalaya, India. Also felt at Chittagong and in parts of eastern Bangladesh.

DEC 14   05 56 10.0   94.119 N   141.793 E   10 G   5.8   0.9   494
HOKKAIDO, JAPAN REGION. MW 5.8 (GSI), 5.8 (HRV), mb 5.8 (GSI). MS 5.3 (GSI). Mo 6.2*10**17 Nm (GSI), 4.8*10**17 Nm (HRV). Two people injured and one at Haboro. Some buildings, roads and water lit? damaged at Tomamae. Felt in northern and western Hokkaido. Recorded (50 JMA) in the Haboro area; (4 JMA) in the Shibetsu-Numata area; (3 JMA) in the Otaru area; (2 JMA) in the Mombetsu area and much of western Hokkaido; (1 JMA) in the Obihiro, Shari-Tokestsu and Setana areas. Also recorded (2 JMA) on Rishiri-to.

DEC 14   20 13.3   18.988 N   81.409 W   10 G   6.8   1.0   639
CAYMAN ISLANDS REGION. MW 6.8 (GSI), 6.8 (HRV), mb 6.2 (GSI). MS 6.7 (GSI). Mo 2.1*10**19 Nm (GSI), 1.8*10**19 Nm (HRV), 1.2*10**19 Nm (PPT). Felt (VI) at Bodden Town and West Bay; (V) at George Town, Grand Cayman. Felt (III-IV) in many parts of Cuba. Also felt at Cancun, Mexico and Half Way Tree and New Kingston, Jamaica.

DEC 20   23 02 12.44   37.042 N   28.206 E   5   5.3   456
WESTERN TURKEY. MW 5.3 (HRV), mb 5.2 (GSI). MS 4.7 (GSI). No felt 1.1*10**17 Nm (HRV). Three people injured, some buildings damaged and rockslides blocked a highway at Marmaris. Felt at Bodrum, Datca and Izmir.

DEC 23   14 59 04.4   49.312 S   161.345 E   10 G   8.1   1.1   331
NORTH OF MACQUARIE ISLAND. MW 8.1 (GSI). 8.0 (HRV), mb 6.5 (GSI). MS 8.2 (GSI). Mo 1.6*10**21 Nm (HRV), 1.0*10**21 Nm (GSI), 5.4*10**20 Nm (PPT). Es 5.2*10**16 Nm (GSI). Felt throughout Tasmania, Australia and in much of the South Island, New Zealand.

DEC 26   00 58 53.4   3.295 N   95.982 E   30 G   9.0   1.2   601
OFF THE WEST COAST OF NORTHERN SUMATRA. MW 9.0 (HRV), 8.2 (GSI). 7.0 (GSI). MS 8.8 (GSI). MS 8.5 (GS). Mo 4.0*10**22 Nm (HRV), 2.6*10**22 Nm (GSI), 2.1*10**22 Nm (PPT). Es 1.1*10**17 Nm (GSI). This is the fourth largest earthquake in the world since 1900 and is the largest since the 1964 Prince William Sound, Alaska

~? Earthquake Hazards Program: Significant Earthquakes for 2004

| DEC 26 | 04 21 29.8 | 6.910 N | 92.958 E | 39 | 7.1 | 1.0 | 385 | earthquake. In total, more than 283,100 people were killed, 14,100 are still listed as missing and 1,126,900 were displaced by the earthquake and subsequent tsunami in 10 countries in South Asia and East Africa. The earthquake was felt (IX) at Banda Aceh, (VIII) at Meulaboh and (IV) at Medan, Sumatra and (III-V) in parts of Bangladesh, India, Malaysia, Maldives, Myanmar, Singapore, Sri Lanka and Thailand. The tsunami caused more casualties than any other in recorded history and was recorded nearly world-wide on tide gauges in the Indian, Pacific and Atlantic Oceans. Seiches were observed in India and the United States. Subsidence and landslides were observed in Sumatra. A mud volcano near Baratang, Andaman Islands became active on December 28 and gas emissions were reported in Arakan, Myanmar. A detailed summary of this event is given at the end of this publication. |
| DEC 26 | 09 20 01.6 | 8.879 N | 92.375 E | 16 * | 6.6 | 1.1 | 353 | NICOBAR ISLANDS, INDIA REGION. MN 7.1 (HRV). mb 6.1 (GS). MS 7.5 (GS). Mo 5.8*10**19 Nm (HRV).  NICOBAR ISLANDS, INDIA REGION. MF 6.6 (HRV). mb 6.0 (GS). MS 6.6 (GS). Mo 1.0*10**19 Nm (HRV). |

**NOTABLE NORTH AMERICAN EARTHQUAKES**

| SEP 28 | 17 15 24.24 | 35.819 N | 120.364 W | 9 | 6.0 | | 363 | CENTRAL CALIFORNIA.. MW 6.0 (HRV), 6.0 (BRK). mb 5.4 (GS). MS 5.8 (GS). Mo 1.1*10**18 Nm (HRV), 9.8*10**17 Nm (BRK). Minor damage at Parkfield, San Miguel and Shandon. Felt (V) at Avenal, Bradley, Coalinga, King City, Lockwood, Paso Robles and Templeton. Felt in much of California from Sacramento, Santa Rosa and San Francisco south as far as Los Angeles and Orange County. Also felt at Las Vegas and Reno, Nevada. |

Compiled by Waverly J. Person and Pamela J. Benfield.

Hypocenters will be recomputed for December 2004.

THE SUMATRA-ANDAMAN ISLANDS EARTHQUAKE AND TSUNAMI OF 26 DEC 2004

This is the fourth largest earthquake in the world since 1900 and is the largest since the 1964 Prince William Sound, Alaska earthquake. The earthquake itself caused severe damage and casualties in northern Sumatra, Indonesia and in the Nicobar Islands, India. The earthquake casualties are included with the tsunami statistics below.

The earthquake was felt at the following selected localities:

USGS Earthquake Hazards Program: Significant Earthquakes for 2004

| | | |
|---|---|---|
| Indonesia: | IX | at Banda Aceh |
| | VIII | at Meulaboh |
| | IV | at Medan and Sampali |
| | III | at Bukittinggi, Parapat and Payakumbuh |
| | Felt | at Jakarta |
| | | |
| India: | VII | at Port Blair, Andaman Islands |
| | IV | at Madras |
| | III | at Bengaluru and Vishakhapatnam |
| | Felt | at Bangalore, Bhubaneshwar, Calcutta and Kochi |
| | | |
| Malaysia: | V | at Gelugor Estate |
| | IV | at Sungai Ara |
| | III | at Alor Setar, George Town, Kampong Tanjong Bunga, Kuala Lumpur and Kulim |
| | | |
| Thailand: | V | at Hat Yai |
| | IV | at Bangkok |
| | III | at Chiang Mai and Phuket |
| | | |
| Myanmar: | IV | at Mandalay |
| | III | at Rangoon |
| | | |
| Singapore: | II | on Singapore |
| | | |
| Bangladesh: | III | at Dhaka |
| | Felt | at Chittagong |
| | | |
| Sri Lanka: | II | at Kandy and in other parts of Sri Lanka |
| | | |
| Maldives: | IV | at Male (nearly 2500 km from the epicenter) |
| | | |
| Guam: | Felt | by people in a high rise building at Hagatna (more than 5400 km from the epicenter) |

The tsunami from this earthquake caused extreme destruction in South Asia, was recorded nearly world-wide and killed more people than any tsunami in recorded history. In total, at least 283,100 people were killed, 14,100 are missing and 1,126,900 were displaced by the earthquake and tsunami.

At least 108,100 people were killed, 127,700 are missing and presumed dead and 426,800 were displaced by the earthquake and tsunami in Aceh and Sumatera Utara Provinces. Indonesia. About 70 percent of the small-scale fishing fleet was destroyed. Tsunami runup heights of more than 30 meters were observed along the west coast of Sumatra.

uS Earthquake Hazards Program: Significant Earthquakes for 2004

At least 30,900 people were killed, 5,400 missing and 552,600 displaced by the tsunami in Sri Lanka, where wave heights were estimated to be 5-10 meters. About 66 percent of the fishing fleet was destroyed and 10 of 12 major fishing harbors in the country had some damage.

At least 10,700 people were killed, 5,600 missing and 112,500 displaced in Andhra Pradesh, Kerala, Pondicherry, Tamil Nadu and Andaman and Nicobar Islands, India. Wave heights were estimated to be more than 20 meters in the Andaman Islands and 10 meters on the east coast of India.

At least 5,300 people were killed, 8,400 injured and 3,100 missing along the west coast of Thailand, where wave heights were estimated to be as high as 3-5 meters in the Phuket area.

The tsunami also caused casualties and/or damage in the following countries:
Somalia:      at least 150 people killed and about 5,000 displaced.
Maldives:     82 people killed, 26 missing and more than 21,600 displaced.
Malaysia:     68 people killed, 6 missing and about 4,200 displaced.
Myanmar:      90 people killed, 10 missing and 3,200 displaced.
Tanzania:     10 people killed.
Seychelles:   3 people killed.
Bangladesh:   2 people killed.
Kenya:        1 person killed.
Madagascar:   about 1,000 people displaced.
Mauritius:    some damage.
Mozambique:   tsunami was observed, but no damage reported.

In Australia, the tsunami caused minor damage at Geraldton and Mangles Bay. A 30 centimeter wave was observed at Penguin Island. People were swept into the ocean at Delambre Island and Geographe Bay, but all survived. The tsunami was observed at Busselton.

Maximum tsunami heights, peak-to-trough in centimeters, were recorded at the following selected tide stations:

Indian Ocean:

Kochi, India                          130
Tuticorin, India                      210
Vishakhapatnam, India                 240

Diego Garcia, Chagos Archipelago       80

Colombo, Sri Lanka                    260

Salalah, Oman                         250

Page 18 o

10/18/

Earthquake Hazards Program: Significant Earthquakes for 2004

| | |
|---|---|
| Lamu, Kenya | 120 |
| Zanzibar, Tanzania | 80 |
| Male, Maldives | 210 |
| Port Louis, Mauritius | 210 |
| Port Elizabeth, South Africa | 273 |
| Richards Bay, South Africa | 165 |
| East Ongul Island, Antarctica | 75 |
| Cocos Island, Australia | 42 |
| Esperance, Western Australia, Australia | 60 |
| Billanya, Western Australia, Australia | 90 |
| Portland, Victoria, Australia | 85 |
| Mid-ocean, about 5 S, SSE of Sri Lanka (from Jason 1 satellite altimeter) | 100 approximate |

Pacific Ocean:

| | |
|---|---|
| Rosslyn Bay, Queensland, Australia | 25 |
| Spring Bay, Tasmania, Australia | 60 |
| Chatham Island, New Zealand | 35 |
| Jackson Bay, South Island, New Zealand | 65 |
| Napier, North Island, New Zealand | 30 |
| Timaru, South Island, New Zealand | 80 |
| Port Vila, Vanuatu | 15 |
| Nukualofa, Tonga | 10 |
| Suva, Fiji | 11 |
| Pago Pago, American Samoa | 10 |
| Nuku Hiva, French Polynesia | 5 |
| Noumea, New Caledonia | 10 |
| Severo-Kurilsk, Russia | 29 |

USGS Earthquake Hazards Program: Significant Earthquakes for 2004

K. Abe has computed a tsunami magnitude (Mt) of 9.1 for this event.

Landslides and approximately 2 meters of subsidence were observed in Sumatra. A mud volcano became active near Baratang, Andaman Islands on December 28. Gas emissions were reported in Arakan, Myanmar. Seiches occurred in Jharkhand, Maharashtra, Orissa and West Bengal, India and as far away as Tulsa County, Oklahoma, United States. Water level fluctuations occurred in wells as far away as Florida, Nebraska and Virginia, United States.

Principal sources:
U.N. Office for Coordination of Humanitarian Affairs, Situation Reports and
  ReliefWeb website as of 2 Feb 2005. For updates, see
  http://www.reliefweb.int/rw/dbc.nsf/doc100?OpenForm.
A. Rabinovich and J. Gower, Institute of Ocean Sciences, Canada, website
  http://www-sci.pac.dfo-mpo.gc.ca/osap/projects/tsunami/default_e.htm.
NOAA, West Coast and Alaska Tsunami Warning Center, webpage on the Indian
  Ocean tsunami, http://wcatwc.arh.noaa.gov/IndianSite/Indian012-26-04.htm.
K. Abe and Y. Tsuji, et al., Earthquake Research Institute, University
  of Tokyo, Special Event Page, at
  http://www.eri.u-tokyo.ac.jp/topics/SUMATRA2004/index-e.html
S. Martin, Rustrel Seismic Centre, Pune, India, Special Event page, at
  http://asc-india.org/events/041226_bob.htm.
V. Dent, University of Western Australia, Asian Tsunami effects in Western
  Australia, at
  http://www.seismicity.segs.uwa.edu.au/welcome/asian_tsunami_in_wa
CNN website, at http://www.cnn.com/.
BBC World Service website, at http://www.bbc.co.uk/worldservice/index.shtml.
Felt reports contributed to USGS "Did you feel it?" webpages, at:
  http://pasadena.wr.usgs.gov/shake/ous/index.html.

Tectonic Summary:

The devastating earthquake of 26 December 2004 occurred as thrust-faulting on
the interface of the India plate and the Burma plate. In a period of minutes,
the faulting released elastic strains that had accumulated for centuries from
ongoing subduction of the India plate beneath the overriding Burma plate.

In a broad sense, the India and Australian plates move toward the north-
northeast with respect to the interior of the Eurasia plate with velocities of
about 60 mm/y in the region of the earthquake. In the region of northern
Sumatra and the Nicobar Islands, most of the relative motion of India/Australia
and the Eurasia plate is accommodated at the Sunda trench and within several
hundred kilometers to the east of the Sunda trench on the boundaries of the
Burma plate. The direction in which India/Australia converges toward Eurasia
is oblique to the trend of the Sunda trench. The oblique motion is partitioned

USGS Earthquake Hazards Program: Significant Earthquakes for 2004

into thrust-faulting and strike-slip faulting. The thrust faulting occurs on the interface between the India plate and the western margin of the Burma plate and involves slip directed at a large angle to the orientation of the trench. The strike-slip faulting occurs on the eastern boundary of the Burma plate and involves slip directed approximately parallel to the trench. The 26 December main shock occurred as the result of thrust faulting on the western Burma-plate boundary, but many strike-slip faulting aftershocks occurred on the eastern plate boundary.

Currently available models of the 26 December main-shock fault displacement differ in many interesting details, but are consistent in implying that fault-rupture propagated to the northwest from the epicenter and that substantial fault-rupture occurred hundreds of kilometers northwest of the epicenter. The data upon which the modeling is based do not permit confident resolution of the extent of rupture beyond about 500 km northwest of the main-shock epicenter. The width of the earthquake rupture, measured perpendicular to the Sunda trench, is estimated to have been about 150 kilometers and is the maximum displacement on the fault plane about 20 meters. The sea floor overlying the thrust fault would have been uplifted by several meters as a result of the earthquake.

The zone of aftershocks to the 26 December earthquake is over 1300 km long. Because aftershocks occur on and very near the fault-planes of main shocks, the length of the aftershock zone suggests that main-shock fault-rupture may have extended north of the epicenter by an amount significantly larger than 500 km. However, a great earthquake may also trigger earthquake activity on faults that are distinct from the main-shock fault plane and aftershock zone by tens or even hundreds of kilometers. We will not know until further analysis is how much of the 26 December aftershock zone may correspond to activity in the immediate vicinity of the main-shock rupture, and how much may correspond to activity remote from the main-shock rupture.

Since 1900, earthquakes similarly sized or larger than the 26 December earthquake have been the magnitude 9.0 1952 Kamchatka earthquake, the magnitude 9.1 1957 Andreanof Islands, Alaska, earthquake, the magnitude 9.5 1960 Chile earthquake, and the magnitude 9.2 1964 Prince William Sound, Alaska, earthquake. All of these earthquakes, like the one on 26 December, were mega-thrust events, occurring where one tectonic plate subducts beneath another. All produced destructive tsunamis, although deaths and damage from the 26 December tsunami far exceed those caused by tsunamis associated with the earlier earthquakes.

U.S. Department of the Interior: U.S. Geological Survey
USGS Privacy Statement || Disclaimer || Accessibility
This page is brought to you by the Earthquake Hazards Program

FIRSTGOV

Page 23 of

,,US Earthquake Hazards Program: Significant Earthquakes for 2004

URL: http://neic.usgs.gov/neis/eqlists/sig_2004.html
Contact: NEIC Web Team
Last modification: Tuesday, 6-Jan-2004 08:48

# EL-MASRI DECLARATION
# EXHIBIT E

The New York Times
nytimes.com

PRINTER-FRIENDLY FORMAT
SPONSORED BY

February 21, 2006

# Germany Weighs if It Played Role in Seizure by U.S.

By DON VAN NATTA Jr.

*This article was reported by Don Van Natta Jr., Souad Mekhennet, and Nicholas Wood, and was written by Mr. Van Natta.*

MUNICH, Feb. 20 — For more than a year, the German government has criticized the United States for its role in the abduction of a German man who was taken to an American prison in Kabul, Afghanistan, where he said he was held and tortured for five months after being mistaken for a terrorism suspect.

German officials said they knew nothing about the man's abduction and have repeatedly pressed Washington for information about the case, which has set off outrage here. At a meeting in Berlin last December, Chancellor Angela Merkel demanded an explanation from Secretary of State Condoleezza Rice over the incident.

But on Monday in Neu-Ulm near Munich, the police and prosecutors opened an investigation into whether Germany served as a silent partner of the United States in the abduction of the man, Khaled el-Masri, a German citizen of Arab descent who was arrested Dec. 31, 2003, in Macedonia before being flown to the Kabul prison.

The action came after a two-and-a-half-hour meeting at police headquarters in which Mr. Masri told the police that he was "90 percent" certain that a senior German police official was the interrogator who had visited him three times inside the prison in Kabul but had identified himself only as "Sam." The German prosecutors said Monday that they were also investigating whether the German Embassy in Skopje, Macedonia, had been notified about Mr. Masri's kidnapping within days of his capture there, but then had done nothing to try to help him.

Mr. Masri's case has come to symbolize the C.I.A. practice known as extraordinary rendition, in which terror suspects are sent to be interrogated in other countries where torture is commonly used. In broadening its criminal inquiry into the abduction of Mr. Masri to the activities of its own government, German prosecutors are trying to determine whether the German government worked secretly with the United States in the practice.

"I feel deceived and betrayed by my own country," Mr. Masri, a 42-year-old unemployed car salesman from Neu-Ulm, said in an interview.

The German police official identified as "Sam" denied that he had visited Mr. Masri in Afghanistan and said he was "on holiday" at the time in Germany, but that he could not remember exactly where. The man was present on Monday at the police station, where Mr. Masri picked him out of a 10-person lineup. After speaking with him, Mr. Masri said that his voice was similar but that his hair style was different.

Martin Hofmann, a prosecutor in Munich, said Monday that his office would not "assume that this man is Sam" but would "go forward with our investigation."

A senior German official familiar with the case said that Mr. Masri was "at best mistaken" and that the police official "cannot be Sam."

The New York Times is withholding the official's name at the request of Germany's intelligence services because he often does undercover intelligence work. He frequently gets "sensitive" assignments and helps clean up "dirty work" for the German foreign intelligence service, said one of his longtime colleagues, who spoke on condition of anonymity.

A senior Macedonian government official who was directly involved in Mr. Masri's detention told The Times that not long after Mr. Masri's capture, Macedonian officials notified the German Embassy in Skopje. C.I.A. officers in Macedonia conducted the interrogation of Mr. Masri, according to Macedonian officials.

August Stern, the Munich-based federal prosecutor who is leading Germany's criminal investigation of Mr. Masri's kidnapping, said his investigators were trying to determine whether the German Embassy had been told about Mr. Masri's capture, and then sent a German agent to the American prison in Kabul to talk with him. Mr. Stern and other senior police officers and prosecutors said they would try to interview the officials in the embassy in Skopje in coming weeks.

August Hanning, secretary of state for the Ministry of the Interior, denied in an interview that any member of Germany's secret services had visited Mr. Masri while he was held captive. "He has never been to Afghanistan," Mr. Hanning said of the German police official.

Two senior German officials, who spoke on condition of anonymity because of the case's sensitive nature, denied that Germany's Embassy had been told about Mr. Masri's capture. "The German Embassy in Skopje was not informed by Macedonian authorities while German citizen el-Masri was in custody in Macedonia," a Foreign Office spokesman said. Another official said Germany did not learn about Mr. Masri's detention until May 31, 2004, when the American ambassador to Germany at the time, Daniel Coats, informed German officials about Mr. Masri's capture and eventual release.

"According to our investigation, I am convinced that German officials did not have any knowledge before his release," the official said.

Later this week, the German government is expected to turn over a report to Parliament about Mr. Masri's case.

Meanwhile, investigators at the Council of Europe, led by Dick Marty, a Swiss lawmaker, are looking into whether there was quiet cooperation between the C.I.A. and its counterparts in European countries, including Germany, Italy and Sweden, where suspected terrorists were kidnapped and sent to third countries for interrogation.

In Italy, the authorities in June charged 23 C.I.A. agents with the abduction of a terrorism suspect from the streets of Milan. Italian officials insist that they did not know about the procedure, but some elected officials in Italy said the Americans must have tipped off their counterparts in the Italian intelligence agency.

European officials have been sharply critical of the C.I.A.'s rendition program. In particular, German officials have rebuked the United States for playing a role in the abduction of one of their citizens and then transporting him to Afghanistan on a chartered C.I.A. plane.

"I have no explanation for the whole case," a senior German official said. "To bring such a man like el-Masri from Europe to Afghanistan and to ask him some questions and six months later, the explanation is that it's a terrible error is not very convincing. To me there are still a lot of questions."

Manfred R. Gnjidic, Mr. Masri's lawyer, said he is convinced that Germany "stood by like a little school boy, watching what was going on with my client and doing nothing."

After more than five months in captivity, the United States released Mr. Masri without filing charges. His case was first disclosed in The Times in January 2005.

At the meeting last December in Berlin between the German chancellor and Ms. Rice, the kidnapping of Mr. Masri was discussed privately, but the two leaders seemed to disagree about the substance of that conversation afterward.

Ms. Merkel said the Bush administration had admitted that it had mistakenly abducted Mr. Masri. But Ms. Rice declined to discuss with reporters anything about the case. She said only that she had pledged to Ms. Merkel, "When and if mistakes are made, we work very hard and as quickly as possible to rectify them."

In Washington, a senior State Department official said Monday that the department would not comment on Mr. Masri's

case, noting that it was a matter of litigation in both Germany and the United States. In late 2003, Mr. Masri left his family in Ulm for a trip to Macedonia. Macedonian and German officials said he was arrested at a border checkpoint on Dec. 31, 2003, because his name was on an Interpol terror watch list. But they said the name referred to another Khaled el-Masri.

Mr. Masri was then held in a hotel in Macedonia for several weeks, where he was questioned by the C.I.A., according to senior Macedonian and American officials. A senior Macedonian official said the German Embassy was notified about Mr. Masri within days of his capture. "Unofficially, they knew," the official said of the Germans.

A C.I.A. spokesman declined to comment.

Two senior Macedonian officials said the Americans had asked to have Mr. Masri detained in Macedonia for 23 days. "We consider the Americans as our partners," a senior Macedonian official said. "We cannot refuse them."

Mr. Masri said he had pleaded with his captors to let him go. "Call the German Embassy," Mr. Masri said he had repeatedly told them. "I'm a German citizen. Please tell them I am here!"

"They don't want to talk to you," he said one of his captors had replied.

In a recent interview, Mr. Masri said: "I thought it was strange that they kept telling me the Germans didn't care about me. Now I know why they said that — because it was true."

At the hotel, Mr. Masri said he had been asked whether he was a member of Al Qaeda. But he was struck by the many questions he was asked about his time in Germany. He said the questions had led him to suspect that the Germans were cooperating with the Macedonians.

A German official disputed that assertion, saying Germany often shared information with their American counterparts about suspected terrorists. But the official acknowledged that the German police had not considered Mr. Masri to be an "important" suspect.

Publicly, Macedonia has denied that Mr. Masri was held illegally. "There is nothing the ministry has done illegally," Hari Kostiv, the minister of interior at the time and later the prime minister, said in an interview. "The man is alive and back home with his family. Somebody made a mistake. That somebody is not Macedonia."

By late January 2004, Mr. Masri was sent to Afghanistan, where he said he was held and beaten over the next five months.

For Mr. Masri, one of the biggest mysteries was the identity of the interrogator who identified himself as Sam, and who spoke fluent German. He visited three times during Mr. Masri's final month at the Kabul jail.

During the first meeting, Mr. Masri said he had asked the man if he was from Germany, but the man declined to answer. Mr. Masri said he had asked him, "Do the Germans know I'm here?"

"He said he did not want to answer," Mr. Masri said. "I asked him if my wife knew I was there. Sam said she doesn't know. He then said, I shouldn't ask questions, I should only answer them."

During their second meeting, the man was no longer belligerent, Mr. Masri said, bringing him cookies, chocolates and a copy of the German newsmagazine Focus. The man also asked if Mr. Masri wanted "anything from Germany."

"I said, 'Nothing, thank you,' " Mr. Masri said.

In their last meeting, a week before Mr. Masri's release, the man told him that he would be returning home soon. The last time Mr. Masri saw Sam, the interrogator was speaking with a man who he believed was an American. Soon afterward, Mr. Masri was released.

On Dec. 12, 2005, Mr. Gnjidic, the lawyer for Mr. Masri, received an e-mail message from a German journalist named Frank Kruger, who suggested that Sam might be a German police official. Earlier this month, Mr. Gnjidic said he had obtained a videotape of the police official that convinced Mr. Masri that he was Sam. On Monday, after meeting the man at police headquarters, Mr. Masri said he was 90 percent certain that the police official was Sam.

"The man was very nervous, and he could not look at me into my eyes," Mr. Masri said. "The hair is different, but the voice sounded very similar."

"For me, it is very important that we know who this man was," he said.

Mr. Gnjidic said he found it hard to believe that other than the prosecutors in Munich, no one in the German government has sought Mr. Masri's testimony about his ordeal. "The scandal for me is that the Germans did nothing when they heard a German had been captured," he said. "They should have protested very hard and tried to stop this."

Don Van Natta reported from Munich for this article, Souad Mekhennet from Neu-Ulm and Munich, and Nicholas Wood from Skopje.

---

Copyright 2006The New York Times Company  | Home  | Privacy Policy | Search  | Corrections  | , XML  | Help  | Contact Us  | Work for

# EL-MASRI DECLARATION
# EXHIBIT F







# EL-MASRI DECLARATION
# EXHIBIT G

Am 31.12.03 kam ich an der Makedonischen Grenze um ca. 15 Uhr an. Der Busfahrer nahm die Reisepässe der Reisenden unter anderem meins zum Grenzposten, um sie checken zu lassen. Wir waren 15 Personen. Nachdem sie unsere Papiere gecheckt haben, bekam jeder seinen Pass zurück. Der Busfahrer bat mich, auszusteigen und den Grenzbeamten aufzusuchen. Der Grenzbeamte fragte mich nach der Adresse, zu der in ich Makedonien gehen werde. Ich sagte, dass ich ein Hotel suchen würde. Es gibt keine feste Adresse, zu der ich gehen will. Er fragte mich dann über den Zweck des Aufenthalts in Makedonien. Ich sagte, dass ich auf einer Touristischen Reise bin und dass ich ca. eine Woche bleiben möchte. Er sagte mir, dass wenn ich in Skopje ankomme, die dortige Polizei aufsuchen soll. Zwischen mir und dem Beamten hat ein Mitreisender übersetzt. Er war groß, schlank und ca. 45 Jahre alt. Dann sagte er ich soll zum Bus zurückkehren. Der Busfahrer blieb bei ihm und kam kurze Zeit später zum Bus zurück. Wir fuhren los in Richtung Skopje. Nach ca. drei km fragte ich den Busfahrer, ob ich meinen Pass zurückbekommen könne. Er sagte mir, dass er es nicht habe. So fuhren wir zurück zur Grenze und erkundigten uns beim Grenzbeamten. Der Beamte sagte mir, dass ich bleiben solle, da sich das Problem in die Länge zieht. Der Bus soll jetzt wegfahren und mich würde dann ein Auto zum Hotel bringen. Also blieb ich und wartete bis um 18 Uhr. Dann brachten sie mich in ein enges Zimmer, welches ca. 8 Meter vom Grenzposten entfernt lag. Das Zimmer hatte eine Tür und ein großes Glasfenster, welches an der Seite der Straße lag, wo die Pkws fuhren. Im Zimmer standen ein Tisch, ein Schreibtisch und ein Stuhl. Ich setzte mich auf den Stuhl mit dem Rücken zum Glasfenster. Der Beamte erlaubte mir nicht, mich umzudrehen. Er verlangte von mir auch, alle Gegenstände, die ich bei mir hatte, auf den Tisch zu legen. Daraufhin durchsuchte er alles sorgfältig. Als er fertig war kam ein junger Mann, etwa 33 Jahre alt und ca. 175 cm groß.

Nach dem einstündigen Verhör kam ein anderer, etwas kräftig und ebenfalls ca. 30 Jahre alt. Er fing ein zweites Verhör an und nannte mir islamische Organisationen, Hilfsorganisationen und Gruppierungen. Er fragte mich dann, ob ich diese Gruppierungen kenne. Ich sagte, dass es sich um allgemein bekannte Gruppen handelt und dass ich von den meisten von ihnen gehört habe. Er fragte mich auch, ob ich irgendetwas mit einen oder mehreren dieser Organisationen zu tun hätte. Ich antwortete ihm, dass ich keinerlei Kontakte mit irgendwelchen Gruppierungen hätte. Er fragte mich weiter, ob es Moscheen gäbe in der Region, wo ich lebe und wie viele Personen besuchen diese Moscheen und welchen Nationalitäten gehören sie an? Und ob ich jemals jemanden zum Islam eingeladen habe oder ob mich jemals jemand zu einer islamischen Aktivität eingeladen hat. Meine Antworten bestanden immer aus Verneinungen und ich fragte ihn, ob es Aktivitäten in den Moscheen gäbe außer der Freitagspredigt? Und ob es Nicht-Muslime gäbe, die zum Islam konvertiert sind? Dann bot er mir Alkohol an um zu testen, ob ich trinke oder nicht. Ich lehnte ab. Er fragte mich, ob ich bete und faste. Ich antwortete: manchmal. Er stoppte das Verhör gegen 22 Uhr. Einige der Beamten betranken sich. In weniger als zwei Stunden fängt das neue Jahr an. Sie nahmen mich dann hinter dem Häuschen auf der Straße in Richtung Serbien. Ich sah drei Fahrzeuge, die keine Kennzeichnung hatten. Zwei von ihnen waren VW Golf. Eine rot, das andere schwarz. Das dritte Auto war ebenfalls schwarz aber ich kann mich nicht mehr erinnern, welches Fabrikat es war. Es war sehr dunkel und der Nebel war dicht. Die Straßen und der Grenzposten waren menschenleer. Meine Begleiter waren alle zivil bekleidet und mit Pistolen bewaffnet. Auf dem Weg sahen wir eine Polizeisperre. Wir aber durften zügig passieren, da meine Begleiter ein blaues Leuchtsignal abgaben. In Skopje brachten sie mich in ein Hotel. Gleich auf der rechten Seite befand sich die Informationstheke. Sie gingen mit mir schnell ein paar Meter vor bis zum Aufzug, welcher auf der linken Seite lag. Der Aufzug war sehr eng und es passten nur zwei Personen rein. Ich und einer meiner Begleiter bestiegen den Aufzug, der Rest stieg die Treppen hinauf. Das Gebäude des Hotels hatte vier oder fünf Stockwerke. Wir stiegen im obersten Stockwerk aus und gingen ins Zimmer, welches direkt

1

gegenüber vom Aufzug war. Gleich links im Zimmer lag der Waschraum welches ein Fenster hatte ca. 80 cm breit und 40 cm hoch. Im Waschraum war noch ein Massage Whirlpool. Zwischen dem Wasserbecken und dem Pool lag das WC. Im Zimmer auf der rechten Seite stand ein großes Bett und neben dran ein großes Fenster, welches auf das Hotelinnere blickte. Gegenüber dem Eingang stand ein großer Tisch mit PC und Internetanschluss. Links daneben ein Fernseher, welcher an der Decke befestigt war. Im Zimmer gab es auch ein Fenster, welches auf einem beschädigten Schornstein eines hohen Gebäudes blickte. Hinter diesem Gebäude stand ein weiteres Gebäude. Wenn man von diesem Fenster links rausschaut sieht man einen hohen Berg. Dieses Fenster war die ganze Zeit über geschlossen und mit einer blauen Gardine verdeckt. Zwischen diesem Fenster und dem Bett standen ein kleiner Tisch und vier Stühle.

Nachdem wir eingetreten waren, blieben drei Mann von meinen Begleitern bei mir stehend im Zimmer und schlossen die Tür ab. Ich fragte sie, warum sie nicht gegangen sind? Sie sagten wir bleiben hier bei dir. Ich sagte, dass ich gerne schlafen würde. Sie sagten, dass ich auch in ihrer Anwesenheit schlafen könne. Ich dachte, dass sie mich einfach nur zum Hotel begleiten und dass sie wieder gehen würden wie sie mir an der Grenze gesagt haben. Ich fragte sie, ob ich verhaftet bin. Sie antworteten mit nein, siehst du denn irgendwelche Handschellen an deinen Händen? Dann wiederholten sie die genaue Durchsuchung all meiner Sachen. Danach begannen drei Männer von ihnen, mich abermals zu verhören. Diese drei Männer stellten mir so viele Fragen auf einmal und von allen Richtungen bis drei Uhr morgens. Diese Verhöre dauerten vier Tage an. Die Bewachung war lückenlos und sehr streng. Sogar wenn ich ins Bad wollte verlangten sie von mir, dass ich die Türe offen lasse, obwohl sich die Toilette im selben Hotelzimmer befand, in der ich untergebracht war.

Nachdem ich erschöpft und keine Lust auf ihre Fragerei hatte, und nach all dieser Zeit, in der ich in diesem Hotelzimmer gefangen war verlangte ich von ihnen, dass sie mir einen Dolmetscher holen sollen, da ich nur fast kein Englisch sprechen konnte. Dann wollte ich die Deutsche Botschaft, irgendeine andere behördliche Einrichtung, einen Rechtsanwalt und meine Familie anrufen. All das wurde mir untersagt! Ich wurde wütend und ich wollte mit Gewalt aus dem Zimmer rausgehen. Unsere Stimmen wurden lauter, jeder sprach auf seiner Sprache. Eine Verständigung war unmöglich. Daraus entwickelte sich eine handgreifliche Auseinandersetzung und wir schlugen auf uns ein bis einer von ihnen seine Schusswaffe zog, der zweite hatte seine Hand auf dem Halfter.

Die Wache war auf 9 Männern aufgeteilt; alle sechs Stunden wechselten sie die Schichten. Am fünften Tag kam ein Mann mit einer Tasche. Er hatte Blätter und Tinte für die Hände und Finger, um Fingerabdrücke zu machen. Dann schoss er mehrere Bilder von mir: rechtes Profil, linkes Profil und frontal.

Nach ungefähr sieben Tagen kam ein Beamter, der offensichtlich hoch angesiedelt war. Er war etwa 55 Jahre alt. Er war etwas kräftig gebaut und brachte einen Assistenten mit sich. Er fragte mich mit allem Respekt nach meinem Befinden und wie das Essen ist. Er sagte mir, dass ich von jedem beliebigen Restaurant Essen bestellen könne falls mir das Essen hier nicht gefallen sollte. Er fragte mich auch, ob die Wächter gut mit mir umgegangen sind.

Ich dankte ihm und sagte ihm, dass es mir soweit gut ginge. Dann sagte er mir, dass er dieses Problem jetzt beenden möchte und dass er mir ein Deal vorschlagen wolle. Ich fragte, was es für ein Deal sei. Er antwortete: das wenn ich angebe, dass ich der Al-Qaida Organisation angehöre und dass sie mich dafür mit polizeilicher Begleitung nach Deutschland zurückbringen. Ich lehnte dies ab. Darauf ging er wieder weg.

Zwei oder drei Tage später kam sein Assistent zu mir und präsentierte mir eine Liste voller Anschuldigungen. Er teilte mir mit, dass er sich hinsichtlich dieser Anschuldigungen sicher sei und dass die Sache aus ihren Händen ist und dass sie mein Problem an den Präsidenten weitergeleitet hätten und dass er diesbezüglich einen Beschluss gefasst hat. Ich wunderte mich und verlangte den deutschen Botschafter oder einen Kontakt mit irgendeiner deutschen

Behörde. Er sagte mir, dass die deutsche Regierung nichts mit mir zu tun haben möchte und dass ich mittlerweile ebenfalls von den deutschen Behörden gesucht sei.
Die Anschuldigungen, welche er mir präsentierte waren, dass mein Reisepass nicht mein eigener wäre und dass die Ägyptische Regierung mich suche, da ich in Jalalabad / Afghanistan gesehen wurde. Dann ging er.

Am 13. Tag meiner Festnahme startete ich einen ersten Hungerstreik. AM 20. Tag sagten sie mir, dass sie mich zum Flughafen schicken würden und dass ich von dort aus nach Deutschland geflogen werde.

Am 23. Tag um ungefähr 20 Uhr verlangten sie von mir, dass ich vor einer Videokamera spreche und meinen vollen Namen erwähne und dass es mir gesundheitlich gut geht und das wir jetzt zum Flughafen gehen und von dort aus nach Deutschland reisen werden.
Danach gingen wir aus dem Hotel heraus auf die Straße. Dann kamen zwei Personen von rechts und von links und nahmen meine Hand. Dann kam ein dritter hinzu und legte mir Handschellen an. Dann verbanden sie meine Augen. Davor sah ich auf der Straße einen weißen Kleinbus, vor ihm einen schwarzen Jeep und viele Personen, die in zivil gekleidet waren. Sie setzten mich in den Jeep und führen los. Ich glaube der Jeep folgte ein anderes Fahrzeug, das bemerkte ich an der Fahrweise des Fahrers. Nach ungefähr einer halben Stunde kamen wir beim Flughafen an. Sie setzten mich auf einen Stuhl. Ich wartete dort anderthalb Stunden etwa. Dann hörte ich die Stimme des Assistenten welcher mit dem hohen Beamten zu mir kam. Er sagte mir, dass ich gleich in ein Zimmer kommen werde, in der mich ein Arzt untersuchen wird, bevor ich die Reise nach Deutschland antrete.
Als sie mich in dieses Zimmer führten griffen zwei Personen gewaltvoll nach meinen armen, einer von rechts und der andere von links und bogen beide Arme nach hinten. Diese gewaltvolle Bewegung bereitete mir sehr starke Schmerzen. Währenddessen schlugen sie von allen Seiten auf mich ein. Ein anderer griff mit beiden Händen nach meinem Kopf, damit ich mich nicht bewegen kann. Andere begannen, meine Kleidung ebenfalls unter Gewaltanwendung mit Scheren und Messer zu zerschneiden. Schließlich wollten sie mir sogar meine Unterwäsche von mir nehmen. Ich wehrte mich vergebens. Sie schlugen auf mich ein bis sie mich völlig auszogen. Sie fesselten meine Füße und nahmen mir den Augenverband weg, um Fotos von mir zu schießen. Ich sah sieben bis acht Mann um mich stehen, welche in schwarz, mit Sturmhauben und schwarzen Handschuhen bekleidet waren. Sie zogen mir Windeln, einen dunklen Sportanzug und Augenband, stopften meine Ohren mit Watte und setzten mir eine Art Kopfhörer auf. Sie stülpten mir eine Tüte über den Kopf und banden um meine Hüfte einen Gürtel, an den sie meine Hände nach hinten fesselten. Ich bekam immer schlechter Luft wegen dieser Tüte. Ich stellte mich so vor wie die Medien über die Muslime, welche nach Guantanamo gebracht wurden berichteten. Sie beugten mich nach vorne und mein Kopf nach unten dann gingen sie mit mir im Laufschritt zum Auto dann zum Flugzeug. Sie gingen so schnell mit mir, sodass die Schmerzen an meinen Gelenken schlimmer wurden da das Eisen meiner Fesseln in die Knochen stieß. Wenn ich langsamer laufen wollte, haben die fast meine Schultern ausgekugelt. Als wir im Flugzeug waren warfen sie mich auf den Boden und befestigten meine Hüfte, Arme und Beine am Boden und an den Seiten des Flugzeugs. Es schien mir als wäre dies ein militärisches Transportflugzeug, in der es keine Sitze gab. Die Geräusche der Triebwerke hörten sich nicht normal an. Während des Fluges spritzte man mir zwei Spritzen. Eine am rechten Arm und die andere am linken zu verschiedenen Zeiten. Sie setzten mir etwas auf die Nase, was ich für eine Art Narkose halte. Ich schätzte, dass die Reise etwa vier Stunden dauerte. Diese Zeit ist sehr viel, wenn die Reise nach Deutschland gehen sollte!

3

Ich war nicht bei Bewusstsein. Ich glaube, dass das Flugzeug eine Zwischenlandung hatte und dass wir dann weiterflogen. Dann landete das Flugzeug und sie brachten mich aus dem Flugzeug heraus. Als wir draußen gingen spürte ich, dass die Luft trocken und warm war. Es ist unmöglich, dass wir uns in Europa befanden. Sie warfen mich auf eine Laderampe eines Fahrzeugs und fuhren etwa zehn Minuten. Dann zerrten sie mich gewaltvoll von der Laderampe herunter und gingen mit mir wieder im Laufschritt eine Treppe herunter. Sie gingen so schnell, dass ich nicht mithalten konnte und fast gefallen war. Sie hielten meine Arme hintenrum nach oben. Dies bereitete mir sehr starke Schmerzen. Meine Füße berührten den Boden kaum. Sie schoben mich vor ihnen her und manchmal stießen sie mich an die Wand. Schließlich warfen sie mich auf den Boden, stiegen mit ihren Füßen auf mein Kopf und auf mein Hals, nahmen mir die Fesseln ab und das, womit meine Augen verbunden waren, gingen und verschlossen die Tür hinter sich. Nach kurzer Zeit konnte ich meine Augen öffnen und ich konnte was um mich war wahrnehmen. Ich schaute nach oben als ich auf den Boden lag und sah ein kleines Fenster oben in der Zelle. Ich sah die rote Sonne und dachte, dass es vielleicht früh morgens wäre. Später aber wurde es dunkel und es war der Sonnenuntergang, den ich beobachtet hatte. Die Reise dauerte 20 Stunden also! Schon elf Tage vergingen im Hungerstreik.

Auf den Wänden hatten andere Häftlinge in verschiedenen Sprachen geschrieben, welche vor mir in dieser Zelle waren. Es waren Dinge auf Arabisch, Urdu und Farsi geschrieben. Ich konnte Quranversen, Zitate und Daten erkennen.

Auf dem Boden lag ein alter dreckiger Plastikteppich, dessen Farbe man fast gar nicht erkennen konnte da es so dreckig und alt war. Die Farbe und der Putz der Wände schälten ab und lagen ebenfalls auf diesen Teppich rum. Das Bett war alt und bestand aus alten, zerrissenen Kleidungsstücken und war nur ein Zentimeter hoch. Auf dem Bett lag eine dreckige, dünne Militärdecke. Auf dem Bett lagen weitere zerrissene Kleidungsstücke, die vielleicht die Bettlaken darstellen sollten. Ich war sehr müde. Die Tür der Zelle bestand aus gewelltem Eisen und einer 10cm² kleinen Luke. Ich konnte von dieser Luke sehen, dass draußen ein Mann mit afghanischen Kleidern stand, der mich anstarrte.

Ich war sehr überrascht und gleichzeitig enttäuscht. Ich konnte glauben, dass ich mich gerade in Afghanistan befand!

Ich war sehr durstig. Ich war noch nie so durstig in meinem ganzen Leben. Ich deutete dem Afghanen draußen, dass ich etwas zu trinken will. Er zeigte mit seiner Hand auf einer kleinen Flasche in einer Ecke der Zelle. Ich dachte er versteht mich nicht und gab ihm abermals zu verstehen, dass ich Trinkwasser möchte. Er deutete wieder auf die Flasche in der Ecke. Er wollte mir sagen, dass es nur dieses Wasser zu trinken gab, entweder ich trinke davon oder gar nicht.

Es war eine uralte Plastikflasche die von Außen und Innen stark verschmutzt war. Die Farbe des Wassers war grünbraun. Das Wasser stank fürchterlich! Der Gestank des Wassers konnte man auf drei Metern von der Ecke riechen. Als ich die Flasche in meiner Hand hielt blieb der Geruch an meiner Hand für eine längere Zeit. Trotz meines starken Durstes konnte ich nicht aus dieser Flasche trinken.

Am Anfang der Nacht kamen vier vermummte Männer zu mir mit einer einheitlichen schwarzen Uniform, zerrten mich aus der Zelle und stießen mich vor sich hin bis zu einem Zimmer, dass etwa 15 Meter von meiner Zelle entfernt lag. In diesem Zimmer standen ein Tisch und ein paar Stühle. Drei vermummte Männer saßen in einer einheitlichen schwarzen Uniform ein weiterer war mit Hemd und Jeanshose gekleidet. Sie stießen mich in den Raum und meine Begleiter kamen ebenfalls mit rein. Wir waren zu Acht im Raum. Einer von ihnen sagte mir auf arabisch und mit palästinensischem Dialekt ich solle mich ganz ausziehen, denn dies ist ein Arzt, der mich untersuchen wird. Ich zog mich aus, behielt aber die Windeln an, die sie mir zuvor angezogen hatten. Die anderen kamen dann zu mir und wollten Gewalt

4

anwenden, um mir das letzte, was ich noch anhatte auszuziehen. Sie schossen nochmals Fotos von mir, nahmen Blut ab und entnahm mir eine Urin Probe. Ich beschwerte mich beim Arzt, wegen dem Dreck und das dreckige Wasser. Er sagte mir, dass dies nicht ihr Problem sei und dass sich die Afghanen darum kümmern. Dann fragte er mich, ob ich islamisches Essen oder nicht-islamisches Essen haben möchte. Ich sagte, dass ich islamisches Essen wünsche. Später habe ich erfahren, dass er sich nur lustig machte und dass das islamische Essen aus den Resten von dem, was die Afghanischen Wächter verspeisten. Es bestand aus Knochen und Haut …

Dann brachten sie mich zu meiner Zelle zurück. Ich suchte nach dem Bett weil es in der Zelle dunkel war. Es gab auch kein Licht. Ich konnte weder auf der rechten noch auf der linken Seite vor den Schmerzen schlafen, da ich so lange auf dem Boden des Transportflugzeugs ohne Unterlage gelegen war. Erst nach zehn Tagen konnte ich auf dem Bauch oder auf den Rücken schlafen. Es war damals kalt in Kabul und ich hatte nur eine Decke.

In der Nacht des zweiten Tages kamen vier vermummte Männer zu mir in die Zelle und fesselten mir Hände und Füße dann stießen sie mich in ein Verhörzimmer, in dem weitere sieben Mann saßen, die ebenfalls vermummt waren und eine einheitliche schwarze Uniform trugen. Einer von ihnen schrie mich an und sagte mir, ich soll vorkommen und sagte weiter, dass ich hier in Afghanistan wäre, in der es keine Gesetze gäbe und dass niemand weiß, wo ich mich befinde. Weißt du was ich meine? Wir können hier mit dir alles machen. Er sprach arabisch mit einem südlibanesischen Akzent. Weißt du, warum du hier bist? Schrie er. Ich antwortete: Das ist meine Frage, die ich euch stellen wollte. Vor ihm auf dem Tisch lag eine Akte. Er sagte: All das sind Informationen über dich, wenn die Beschuldigungen, die da drin aufgeführt sind nicht richtig wären, hätte man dich nicht aus Skopje mit einem extra Flugzeug hergeholt. Ich sagte: Ist das ein Beweis gegen mich, wenn mich ein Flugzeug aus Skopje herbringt? Er sagte: Was glaubst du, warum du hier bist? Ich sagte: weil ich ursprünglich Araber bin und Muslim zugleich. Dann wurde er wütend und schrie noch lauter: Alle hier behaupten das wenn wir anfangen, sie zu verhören aber sie sind keine Muslime. Sie sind Terroristen! Ich sagte ihm: Was sind denn die terroristischen Aktivitäten, die ich begangen habe und die mich hergebracht haben? Er sagte: Du hast hier in Afghanistan eine terroristische Ausbildung durchgemacht, dein Reisepass ist gefälscht und du hast Kontakte mit großen Terroristen in Deutschland gehabt wie Muhammed Atta, Ramzi Bin Al-Shibh und anderen, die ich in Wahrheit gar nicht kannte außer von den Medien. Bezüglich der Ausbildung in Afghanistan und meinem angeblich gefälschten Pass könnt ihr mit den deutschen Behörden sprechen. Die werden euch bestätigen, dass ich deutscher Staatsbürger bin und nicht in Afghanistan war in einer sehr kurzen Zeit. Ich bat ihn sich mit den deutschen Behörden in Kontakt zu setzen. Er lehnte ab. Dann fragte ich ihn, warum sie mich nach Afghanistan gebracht haben, obwohl ich Deutscher bin und meine Eltern keine Afghanen sind. Er wollte nicht antworten. Dieser Beamte führte vier Verhöre binnen vier Tage in einer Woche mit mir durch.

Als ich spürte, wie die Amerikaner mit den Menschen auf eine arrogante Art und Weise umgingen und ohne Beachtung der Gesetze und Menschenrechte und wie sie die Würde der Menschen verachten und ihren Willen brechen; und nachdem die Zeit der Inhaftierung (der Entführung eher gesagt) unter unmenschlichen Bedingungen länger wurde, wurde ich depressiv und ich verlor die Hoffnung. Ich wünschte mir das Rauskommen aus dieser Inhaftierung nur um mich an jedem Amerikaner zu rechen, den ich sehe auch wenn er ein Arzt wäre, der den Menschen hilft, da ich so viel Ungerechtigkeit und Härte erlebt habe. Mein Zellennachbar wurde sogar schwer krank und ich konnte ihn nachts stöhnen hören vor Schmerzen. Er bat immer um eine Arztvisite oder Medikamente, aber er bekam nichts. Ich war sehr wütend und ich verlor die Hoffnung und ich wollte diese Ungerechtigkeit mit allen

5

mir zur Verfügung stehenden Möglichkeiten zu beseitigen, auch wenn ich dafür mein Leben geben würde.

Am 05.03.04 begannen wir alle auf diesem Flur untergebrachten Häftlinge (9 Personen) einen Hungerstreik vom Essen und Trinken und wir forderten ein Gespräch mit einem Amerikanischen Kommandanten oder Beauftragten, um uns zu beschweren und die Behandlung nach den einfachsten Menschenrechten zu verlangen. Aber ohne Ergebnis! Nach sechs Tagen Hungerstreik wurde ich zu schwach und kam dem Tode nahe. Deshalb fing ich wieder an zu trinken, aß aber nichts. Ich bekam heftige Schmerzen im Kopf. Mehrere Male versuchte ich, im Stehen zu beten und fiel vor Schwäche um. Der siebte Tag seit dem Beginn des Hungerstreiks: Ich fühlte, als ob ich gelegentlich bewusstlos werde. Mir ging es mit jeder Minute schlechter. Ich fragte mich, ob dieser Hungerstreik islamisch gesehen legitim wäre. Wir diskutierten darüber und unsere Meinungen waren verschieden: die einen sagen es wäre erlaubt und die anderen sagen es wäre verboten. Also haben wir nur getrunken und den Hungerstreik aufrechterhalten. Am achten Tag bekam einer der Häftlinge die Chance einen Amerikanischen Beamten zu treffen und übergab ihm ein Zettel, auf dem einige unserer Forderungen aufgeführt waren, auf die wir uns gemeinsam einigten wie die einfachsten Menschenrechte und dass wir vor ein Gericht gestellt sollen, dass unsere Angehörigen benachrichtigt werden und dass wir Bücher bekommen sollen. Keine unserer Forderungen wurde nachgegangen. Die anderen Häftlinge konnten den Hungerstreik nicht mehr aufrechterhalten und haben aufgehört da sie schon länger nichts Richtiges gegessen haben. Einige von ihnen saßen schon ein oder zwei Jahre! Ich und ein anderer Häftling, der halb Pakistanisch halb Amerikanisch war und in Pakistan festgenommen wurde und Anfang 2003 an den Amerikanern ausgeliefert. Er hielt bis zum 24. Tag durch dann bekam er von den Amerikanern Bücher und sie versprachen ihm, in ein anderes, besseres Gefängnis untergebracht zu werden. Später wurde er auch tatsächlich verlegt.

Am 13.03. Wurde ich von Amerikanischen Beamten verhört und es wurde hauptsächlich über folgende Personen gefragt: ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

Am 28.03 wurden die Schmerzen unerträglich und meine Wut brach aus. Ich begann am kleinen Fenster so laut ich konnte „Allahu Akbar" (Allah ist am Größten) zu schreien und bat die Afghanen, falls einer von ihnen Muslim ist und mich hört, dass er sich für uns einsetzen soll und diese Ungerechtigkeit bekämpfen soll. In den oberen Stockwerken des Gefängnisgebäudes lagen Büroräume, in denen Afghanische Angestellte arbeiten. Das Gebäude bestand aus vier Stockwerken.
Einige der Vorbeigehenden vor meinem Fenster stehen und hörten sich an, was ich sagte aber sie verstanden nicht alles. Sie verstanden aber, dass ich hier leide und meine Rechte fordere. Einer der Afghanischen Angestellten ging ins Gefängnis um von mir mehr zu verstehen. Ich bat ihn, die Afghanischen Behörden über uns und über die Ungerechtigkeit zu informieren und dass ich unbedingt mit einem Amerikanischen und einen Afghanischen Beamten reden möchte.

Nachdem 27 Tage des Hungerstreiks vorüber waren (am 31.03) wurde ich zum Verhörraum mit gefesselten Händen und Füßen gebracht. Im Verhörraum saßen der Afghanische Gefängnisdirektor und zwei Amerikanische Beamten, welche ich zum ersten mal sah und ein palästinensischer Dolmetscher. Den Dolmetscher sah ich damals bei der ärztlichen Untersuchung zum ersten Mal. Sie fragten mich, warum ich im Hungerstreik bin? Ich sagte: Ich bin Deutscher, weder meine Mutter noch mein Vater kommen aus Afghanistan und ich befand mich noch nie zuvor in Afghanistan. Und ihr seid Amerikaner und das ist nicht euer

Land. Warum bringt ihr mich hierher zum Verhör? Dies muss in Deutschland geschehen oder Amerika. Die Aktion mit meiner Entführung aus Mazedonien verstößt gegen jegliche Gesetze und Menschenrechte! Und nun befinde ich mich schon seit drei Monaten unter den schlimmsten Bedingungen in Haft. Zudem kommt, dass mir bisher keine konkrete Beschuldigung vorgetragen wurde. Wir dürfen unsere Familien nicht benachrichtigen und ihnen unsere Situation erklären; wir wissen nicht, wie es ihnen geht. Es gibt keine Anwälte, keine Richter …

Weiter sagte ich ihnen, dass das Essen aus: Morgens Tee ohne Zucker und ein Stück Brot. Mittags Reis mit Insekten, Sand und kleine Steinchen bestand. Diese Dinge, die nicht ins Essen reingehören wurden absichtlich rein getan. Zusätzlich bekamen wir halbvergammelte Orange, dessen Farbe man nicht klar erkennen konnte ob blau oder grün? Ein Hähnchenknochen und Haut, die die Gefängnisaufseher übrig gelassen haben; ein halbes Liter warmes Wasser, dessen aussehen und Geruch den Magen umkippt. Die anderen Häftlinge berichteten mir, dass das Essen zehnfach verbessert wurde, seitdem ich hier bin. Alle Häftlinge litten und leiden immer noch unter schwerem Durchfall und starke Magenschmerzen. Kamen wohl diese Schmerzen vom verdorbenen Essen und der Verschmutzung? Oder wurden irgendwelche Mittel dem Essen beigefügt, die uns diese Schmerzen zugefügt haben, um uns auf diese Art zu foltern?

Über der gesamten Zeit der Inhaftierung waren ich sowie alle anderen Häftlinge in Einzelhaft untergebracht. Das Sprechen war uns strengstens untersagt. Wir bekamen keine Stifte, Papier oder Bücher, um damit die Zeit zu verbringen. Die Minuten vergingen dort wie Stunden und die Stunden wie Tage. Wenn ein Tier auf diese Weise in Europa von seinem Besitzer so behandelt würde, hätte sein Besitzer ein Prozess und Haftstrafen am Hals hängen. Aber bei der Behandlung der Muslime vergessen die Amerikaner die Gesetze, die Moral und die Menschenwürde. Vor Wut begann ich einige male zu Zittern und ich konnte nicht gegen meine Tränen ankämpfen. Ich fragte den Amerikanischen Beamten: „Habt ihr die christlichen Amerikaner, diese Verbrecher, die die Terroranschläge von Oklahoma City auf bestialische Art und Weise durchgeführt haben auch so behandelt?" Niemand wollte mir diese Frage beantworten. Ist diese Umgangsweise, mit der ihr mit den Muslimen umgeht Terror an sich? Ist das nicht der wahre Extremismus? Die Nichtbeachtung der Gesetze, die Rechte anderer und Menschenrechte ist doch das wahre Verbrechen? Das Zerreißen der Kleider der muslimischen Häftlinge. Ist das die Art, mit der man Menschen behandelt? Ist das der Frieden und die zivilisierte Umgangsweise, die ihr verbreiten und den Afghanen und Irakern beibringen wollt?

Nach meiner Rede fragte mich der Gefängnisdirektor, was ich fordere, um mit dem Hungerstreik aufzuhören. Ich sagte: Sie haben vier Möglichkeiten: 1. Ich halte an mein Hungerstreik bis zum Tod, 2. mich freilassen, 3. mich in die USA fliegen und mich vor ein Gericht stellen, 4. einen hohen deutschen Beauftragten oder Beamten treffen, dem ich meine Situation erklären kann und über eine freie Entscheidungsgewalt verfügt. Der Direktor sagte: „Du hast deine Freilassung schon mal verlangt. Ich werde den Verantwortlichen und Vorgesetzten in Washington einen detaillierten Bericht über unser Gespräch verfassen und ihnen sagen, dass dies hier nicht der geeignete Platz ist für dich und wir alle bezeugen dies." Ich wurde zu meiner Zelle wütend und übermüdet zurückgebracht. Ich dachte meine Nerven würden gleich zusammenbrechen.

Am 07.04. kam ein anderer Afghanischer Beamter zu mir und ich beschwerte mich abermals bei ihm und erwähnte, dass die Amerikaner behaupten, dass ihr für die schlechte Behandlung

und das schlechte Essen verantwortlich seid. Die Amerikaner haben immer für die gespannte Lage zwischen uns Häftlingen und den Afghanischen Wächtern und Angestellten gesorgt. Ein Beispiel: Wenn sich die Häftlinge über die Afghanischen Wächter bei den Amerikanern beschweren, tadeln die Amerikaner die Afghanen vor den Häftlingen; darauf werden die Afghanen auf die Häftlinge wütend und geben ihnen ihre Rechte nicht. Z.B. bei der Verteilung des Essens oder der Medikamente. Sie nehmen diese dann einfach für sich und geben sie nicht an die Häftlinge weiter. Die Dummheit der Afghanischen Wächter, die Wut und psychische Belastung der Häftlinge füllen die Herzen mit Hass.

Mein Gesundheitszustand verschlechterte sich von Tag zu Tag. Ich war sehr schwach und übermüdet. Ich bekam auch immer öfter starke Schmerzen im Magen. Ich legte immer meine Hand auf den Bauch und stützte es mit dem Fuß ab. Ab dem 08.04 konnte ich nicht mehr vom Bett aufstehen, nicht mal um die Notdurft zu verrichten. Ich tat es immer im Bett in einer leeren Flasche. Am 09.04 kamen ein paar Afghanen zu mir und versuchten mich zu überzeugen, dass ich mit dem Hungerstreik aufhören soll nachdem sie gesehen haben, wie sich mein Gesundheitszustand verschlimmert hat. In der Nacht des 10.04 vergingen exakt 37 Tage, die ich im Hungerstreik verbracht habe. In dieser Nacht kam der Gefängnisdirektor mit dem Arzt. Sie sagten mir, dass ich in drei Wochen freigelassen werde und ich muss deswegen mit dem Hungerstreik aufhören. Ich verlangte eine Absicherung, die sie mir aber nicht gewährleisten konnten. Ich weigerte mich den Streik abzubrechen. Daraufhin kamen die vermummten Männer in die Zelle, zerrten mich vom Bett und fesselten meine Hände und Füße. Sie schliffen mich in den Verhörraum und setzten mich auf einen Stuhl, fesselten mich darauf und einer hielt mein Kopf fest. Dann schoben sie mir ein Schlauch in die Nase bis in den Magen und kippten eine Flüssigkeit direkt in mein Magen ein. Sie gaben mir auch ein paar Nahrungskonserven und Bücher. An dem Tag brachten sie mich auf die Waage. Es zeigte 94,5kg an. Vor meiner Entführung im Dezember wog ich 123 kg!

30 Stunden später wurde mir noch schlechter als zuvor. Ich bekam starken Durchfall und Schmerzen im Bauch. Die Schmerzen waren so stark, dass ich mir sogar den Tod wünschte. Mitten in der Nacht kam der Arzt und zog mir binnen einer Stunde zwei Beutel Ringerlösung auf, in denen auch Schlafmittel war und vier gelbe Tabletten, die er mir auf einmal verabreichte. In mein Wasser rührte er ein Pulver und gab es mir zum Trinken. Ich blieb für ein paar weitere Tage im Bett. Danach verbesserte sich mein Gesundheitszustand.

Die drei Wochen vergingen, nach denen mir die Freilassung versprochen wurde. Sie sagten, dass die Freilassung weitere zwei bis drei Wochen dauern würde, da mein Transport nach Deutschland noch besprochen würde. Am 07.05 brachten sie acht weitere Gefangene in unser Gefängnis und am 13.05 wurden elf Häftlinge in ein Container geschliffen und weggebracht. Ich weiß nicht wohin. Nur noch ich, Sulayman und Ali blieben in diesem Gefängnis, nachdem wir 14 Häftlinge waren.

Am 16.05 kam ein Deutscher begleitet vom Direktor und einen anderen Amerikaner der arabisch sprechen konnte. Der Deutsche war etwa 180 cm groß, schlank, seine Haare waren ca. acht cm lang und hellbraun. Seine Hautfarbe war braungebrannt. Er trug eine Brille und eine Mütze. Er sagte mir, dass er mit mir ehrlich und über alles sprechen möchte. Ich willigte ein und sagte ihm, dass er mich kennt aber ich ihn nicht und bat ihn, sich mir vorzustellen und mir zu sagen, welcher deutschen Behörde er angehört. Er sprach mit dem Amerikaner kurz bezüglich der Antwort. Ich verstand nicht, was sie beredeten und wandte sich wieder zu mir und sagte: Ich kann nicht auf diese Frage antworten. Ich fragte weiter: Wissen die deutschen Behörden wo ich mich befinde? Er lehnte die Antwort auf diese Frage ebenfalls ab. Weiß denn meine Frau wo ich bin? Er antwortete: Nein das weiß sie nicht. (Als er anfing zu sprechen versuchte er seine Worte sorgfältig auszusuchen und hatte angst, mehr Informationen als nötig zu geben. Er versuchte auch, alle Informationen über seine

8

Identität zu verbergen). Dann begann er sein Verhör. Seine Fragen konzentrierten sich auf ▓▓▓ ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ Das Gespräch dauerte etwa zwei bis drei Stunden. Am 17.05 ebenfalls zwei Stunden und am 18.05 ebenfalls.

Am 19.05 kam er nicht, obwohl er ein Tag davor gesagt hatte, dass er kommen wird. Er kam aber am 20.05 und sagte mir, dass sie vielleicht noch eine Woche brauchen werden. Ich wurde wütend und sagte ihm, dass ihr mir immer die Freilassung verspricht und immer verschiebt. Ich kündigte auch an, dass ich ab morgen meinen Hungerstreik wieder aufnehmen werde und dass ich etwas unternehmen werde, dass mir und allen anderen hier einen immensen Schaden zufügen würde und sehr schlechte Folgen für alle haben würde falls die deutschen Behörden sich nicht bewegen und mich hier rausholen. Ich habe vier Kinder und sie würden erfahren, was mir passiert ist und von meiner Familie wird schon jemand Rache von den Amerikanern nehmen! Er sagte, was willst du denn machen? Ich antwortete: Das wirst du schon zu gegebener Zeit sehen. Er sagte: ich bitte dich fang nicht mit dem Hungerstreik nochmals an und gib mir zwei Tage. Ich werde in diesen zwei Tagen mit den Vorgesetzten in Deutschland sprechen und ich verspreche dir die schnelle Antwort. Dann ging ich wütend in die Zelle zurück. Er war von meinen Reaktionen überrascht.

Etwa zwei Wochen, bevor der deutsche Beamte namens "Sam" zu mir kam, brachten mich die Aufseher in den Verhörraum, wo ein Amerikanischer Psychologe und eine Dolmetscherin saßen. Der Psychologe sagte mir, dass er extra wegen mir aus Washington gekommen sei, um nach mir zu schauen und um mir einige Fragen zu stellen. Am ende unseres Gesprächs versprach er mir, hier bald raus zu kommen.

Am 21.05 begann ich meinen zweiten Hungerstreik. Am Abend desselben Tages kam der Arzt mit dem Direktor und dem Deutschen und baten mich, meinen Streik zu beenden und versicherten mir, dass ich spätestens am 28.05 auf dem Weg nach Deutschland sein werde. Sie befänden sich auf die Klärung der Sicherheitsformalitäten des Transfers von Afghanistan nach Deutschland. Die Reise würde nicht direkt nach Deutschland sein und würde eine Zeit lang in Anspruch nehmen. Daher soll ich mich ruhig verhalten und keine Sorgen haben, ich würde schon mit Sicherheit bald zu Hause sein.

Am Abend des 27.05 kam der Arzt und führte einige Untersuchungen durch. Ich wog nun 105 kg. Dann erklärte mir der Direktor einige Details und die Weise, auf der ich von der Zelle am nächsten Tag zu einem nicht bekannten Flughafen gebracht werde. Der Arzt bat mich, ab dieser Nacht nichts mehr zu trinken oder zu essen, da es mir nicht erlaubt sein wird während der Reise auf die Toilette zu gehen.

Am Morgen des 28.05 kam der Direktor mit dem Arzt und fesselten meine Hände und Füße und legten mir eine Augenbinde an. Dann gingen sie mit mir raus und wir stiegen in einen Jeep ein. Nach etwa zehn Minuten Fahrt stiegen wir aus und sie brachten mich in ein Container, der zum Transport von Waren gebraucht wird. Sie setzten mich auf einen Stuhl im inneren des Containers mit dem Gesicht nach innen. Sie baten mich, nicht nach hinten zu schauen, wenn sie die Augenbinde losmachen. Dann übergaben sie mir all meine Sachen, die ich in Skopje hatte und ich wechselte die Gefängniskleider in zivile Kleidung, welche bei mir in meiner Tasche waren. Ich hörte hinter uns ein Flugzeug, welches sich wie ein kleiner Jet anhörte, der etwa 200 Meter hinter unserem Container zum Stehen kam. Dann fesselten sie wieder meine Hände, banden diese um meinen Gürtel nach vorne, setzten mir Ohrenstöpsel und setzten mir Kopfhörer auf. Dann banden sie meine Augen wieder zu. Dann stiegen wir wieder in den Jeep und führen diese 200 Meter zum bereitstehenden Flugzeug. Im Flugzeug banden sie meine Füße und meine Hüfte an den Sitz. Es war etwa acht Uhr morgens.

Während des Fluges sprach der Deutsche Beamte zu mir. Mittlerweile nannte es sich „Sam". Am Handgelenk trug er eine große schwarze Uhr mit einem Kompass [ wie die Amrikaner hatten ). Ich hörte gelegentlich Leute hinter uns, die Englisch sprachen. Ich verstand aber nichts. Der Flug dauerte 6 bis 7 Stunden. Dann landeten wir. Sam sagte mir, dass wir uns ab dann trennen werden und es werden mich andere Leute übernehmen. Nachdem ich ca. eine Stunde im Flugzeug wartete stiegen wir aus und stiegen in einen Kleinbus ein. Ich konnte hören, dass wenn eines der Türen offen war, dass es dann einen Alarm gab, was bei Japanischen Fahrzeugen üblich ist. Wir fuhren etwa weitere sieben Stunden mit dem Kleinbus auf unwegsamen Landstraßen wie es mir vorkam. Es ging auf und ab und in scharfe Kurven. Während der Fahrt stoppte der Kleinbus zweimal und die Personen, die bei mir waren stiegen aus und stiegen kurz darauf wieder ein. Ich glaube, die Besatzung wurde gewechselt. Später stoppte der Bus und wir stiegen alle aus. Sie brachten mich zu einer Stelle, banden mir die Augen wieder los und verlangten von mir, dass ich mich nicht umdrehe. Die Person hinter mir zeigte mir mit der Hand zu der Richtung, in der ich laufen soll. Es kam mir vor, als würden sie mich einige Schritte laufen lassen und mir dann in den Rücken zu schießen. Zu der Zeit war es schon Nacht geworden. Der Platz, wo sie mich laufen ließen war menschenleer irgendwo im bewaldeten Gebirge. Die Wege waren sehr eng und unbefahrbar. Als ich ca. 400 Meter in die zugewiesene Richtung ging traf ich nach einer Kurve auf drei uniformierte, mit Kalaschnikow bewaffnete Soldaten, die meinen Reisepass zu sich nahmen und mich zu einem alten Gebäude brachten. Am Eingang wehte die Albanische Flagge. Der dienst habende Offizier bat mich alle Gegenstände, die ich bei mir trug auf dem Tisch zu legen und die um mich stehenden Soldaten durchsuchten mich gründlich. Dann sagte der Offizier, dass ich nach Albanien illegal eingereist wäre und fragte mich, was ich hier mache. Ich erzählte ihm meine Geschichte aber er glaubte mir nicht fragte mich, ob ich ihn für dumm halte. Niemand würde mir meine Geschichte glauben. Dann sagte er mir, dass sie mich jetzt zum Flughafen fahren würden, damit ich das Land verlasse und nach Deutschland fliege. Ich sagte, dass ich das auch gerne möchte. Ich spürte von seiner Redeweise, dass er über mein Kommen bescheid wusste. Auf der Seite hatte er sogar eine Tüte, in der etwas zu Essen und Trinken bereitstand. Ich fragte ihn, wie weit der Flughafen sei. Er antwortete: genauso lang und von derselben Stelle, von der du gekommen bist. (An dieser Stelle dachte ich mir, dass wir vorhin in Tirana landeten). Dann fuhren sie mit mir Richtung Flughafen Tirana. Wir befanden uns im Drei Länder Eck Mazedonien, Serbien und Albanien. Er schickte mit mir drei Polizisten in einem Jeep. Als wir von der Polizeistation losfuhren war es bereits 22 Uhr. Auf dem Weg baten sie mir Chips und Brot an. Es waren die gleichen Chips und das gleiche Brot, welches mir im Kleinbus vor meiner Freilassung gegeben wurde! Um fünf Uhr morgens kamen wir am Flughafen Mutter Teresa an. Dort erwartete mich ein Mann in zivil, kaufte mir von meinem Geld ein Flugticket nach Frankfurt am Main und begleitete mich bis zum Flugzeug. Das Flugzeug startete um 6:30 Uhr morgens und kam um 8:45 Uhr in Frankfurt an. Zu Hause kam ich um 13:30 Uhr am 29.05 an. Ich fand niemand zu Hause. All unsere Sachen waren in Umzugskartons gepackt. Ich nahm ein Taxi und fuhr nach Neu-Ulm, um nach meiner Familie zu fragen und wo sie verblieben sind. Meine Freunde teilten mir mit, dass meine Familie nach Libanon geflogen ist, nachdem ich so lange weggeblieben war.

**English Translation**

On December 31st 2003, I arrived at the Macedonian border around 3pm. The bus driver collected the passengers' passports, mine included, to take them to the border police to have them checked. After they had checked our papers everyone had their passport returned to them. The bus driver asked me to get off the bus and see the border official. The border official asked me what address I was planning to go to in Macedonia. I replied that I intended to find a hotel, that there was no fixed address that I was going to. He then asked me about the purpose of my stay in Macedonia. I said I was on a tourist trip and had planned to stay for about a week. He told me that as soon as I arrived in Skopje, I should go and see the local police. A fellow traveler translated for me and the border official. He was tall, slim, and about 45 years old. He then told me to return to the bus. The bus driver stayed with him for a brief moment before returning to the bus. We drove towards Skopje. After about 3 km, I asked the bus driver if I could have my passport back. He told me he didn't have it. So we drove back to the border and asked the border official. The official asked me to stay as the problem seemed to be more time-consuming. He said that the bus should leave now, and a car would bring me to the hotel later. So I stayed and waited until 6 pm. Then they took me to a narrow room that was about 8 meters away from the border station. The room had a door and a big glass window facing the side of the street where the passenger cars drove by. In the room there was a table, a desk, and a chair. I sat down on the chair with my back to the glass window. The official did not allow me to turn around. He also told me to put every item I carried with me on the table. Afterwards he searched everything thoroughly. Once he was done a young man appeared, around 33 years old and 175 cm tall.

After an hour-long interrogation, another man arrived, a little bigger and also about 30 years old. He started a second interrogation and mentioned Islamic organizations, suborganizations, and groups. He then asked me whether I knew any of those organizations. I said that those groups are well-known, and that I had heard of most of

them. He also asked me if I had anything to do with one or several of these organizations. I replied that I had no contact with any organization. He continued asking me if there were any mosques in the area I lived, and how many people attended their services, and what nationalities they were, and if I had ever invited someone to Islam or if someone had ever invited me to any Islamic activities. My replies were always negative, and I asked him if there were any other activities in mosques apart from Friday services? And if there weren't also non-Muslims that have converted to Islam? He then offered me alcohol to test whether I drink. I declined. He asked me if I pray or fast. I replied, "sometimes." He ended the interrogation around 10 pm. Some of the officers got drunk. In less than 2 hours, the new year began. They then took me behind the lodge on the road to Serbia. I saw three vehicles without license plates. Two of them were VW Golf. One red, one black. The third car was also black but I cannot remember the make. It was very dark and the fog was thick. The streets and the border station were deserted. My escorts were all dressed in plain clothes and were armed with guns. On our way, we saw a police barricade. But we were allowed to pass quickly when my escort used a blue light signal. In Skopje they took me to a hotel.

Directly on the right side was the information desk. They quickly walked with me over to the elevator, situated a few meters away on the left side. The elevator was very small and fit only two people. I and one of my escorts took the elevator, the rest took the stairs up. The hotel building had four or five floors. We got off at the top floor and walked into the room located opposite the elevator. Just on the left side of the room was the lavatory with a window approximately 80x40 cm (h x w) and a massage whirlpool. Between the sink and the pool was the toilet. On the right side of the room was a big bed next to a big window with a view toward the inside of the hotel. Opposite the entrance there was a big table with a PC and internet connection. Left of it was a TV mounted to the ceiling. There was also a window in this room with a view onto a slightly damaged chimney of a tall building. Behind this building was another building. When one looks out of this window

2

to the left, one sees a high mountain. This window was always locked and covered by blue curtains. Between this window and the bed stood a little table with four chairs. After we had entered, three of my escorts stayed with me in the room and locked the door. I asked them why they didn't leave? They said, "We stay here with you." I said that I would like to sleep. They replied that I could sleep in their presence. I thought they just wanted to accompany me to my hotel and then leave as they had told me at the border. I asked them if I was under arrest. Their reply was "no, do you see any handcuffs on your hands?" Then they repeated a thorough search of all my belongings. Afterwards three of the man began interrogating me again. These three men asked so many questions at once and from all sides until three in the morning. These interrogations lasted four days. The observation was very strict and consistent. Even when I went to the toilet they asked me to leave the door open, although it was located in the same hotel room where I was situated.

When I was exhausted and tired of answering their questions and after having been locked in this hotel room all this time, I demanded a translator, as I hardly spoke any English. Then I wanted to call the German Embassy, another official institution, a lawyer, and my family. All this was refused! I got angry and wanted to leave my room with force. Our voices rose, each one speaking their own language. Communication was impossible. As a result the argument became physical, and we hit each other until one of them pulled his firearm, another one placing his hand on the holster.

The watch was divided between nine men; they changed shift every six hours. On the fifth day, a man with a bag appeared. He had sheets and ink for the hands and fingers to take fingerprints. Then he took a few photos of me: right profile, left profile, and frontal. After about seven days, an official showed up who was obviously of a high rank. He was around 55 years old. He had a large build and brought an assistant with him. With respect, he asked me about my condition and how the food was. He told me that I could order food from any restaurant if I didn't like the food here. He also asked if the guards had treated me well. I thanked him and said that so far I was fine. He then told me he

3

wanted to end this problem, and that he had a deal to offer. I asked him what kind of deal. He replied, if I declared that I belong to the Al-Qaeda organization they would in turn bring me back to Germany with police escort. I refused. Hereupon he left again.

Two or three days later, his assistant showed up and presented me a list of accusations. He told me that he was certain about these accusations, and that this case had left their hands, and they had referred it to the president who had made a decision regarding this matter. I was surprised and asked for the German ambassador or to contact any German authority. He told me that the German government doesn't want to have anything to do with me, and that meanwhile I was also wanted by them. The accusations he presented me with was that my passport wasn't mine, and I was wanted by the Egyptian government because I had been seen in Jalalabad, Afghanistan. Then he left.

On the 13th day after my seizure, I began my first hunger strike. On the 20th day, I was told they would send me to the airport to fly me to Germany.

On the 23rd day, at about 8pm they asked me to speak in front of a videocamera, state my full name and claim I was healthy, and that we would leave for the airport now to travel to Germany. Afterwards we exited the hotel onto the streets. Here two people approached me from left and from right and took my hands. A third one joined and handcuffed me. They blindfolded me. I had seen a white minivan before, in front of it a black Jeep and many people in plain clothes. They put me in the Jeep and started driving. The driving style led me to believe that the Jeep followed another car. After about an hour, we arrived at the airport. They sat me on a chair, where I waited for about another one and a half hours. Then I heard the voice of the assistant who had come to see me with the high-ranking official. I was told that I would soon be brought into a room for medical examination before returning to Germany.

When they led me into this room two people violently grabbed my arms, one from the right side and the other from the left, and bent both arms backwards. This violent motion

4

caused me a lot of pain. Meanwhile they were beating me from all sides. Someone else grabbed my head with both hands so I was unable to move. Others forcefully began to take away my clothes with scissors and knives. Finally they even wanted to take off my underwear. I tried to resist but unsuccessfully. They hit me until they had completely stripped me naked. They tied my feet and took off my blindfold to take photos of me. I saw seven to eight men standing around me, dressed in black, with hoods and black gloves. They dressed me in a diaper, a dark sports suit, and blindfolded me, plugged my ears with cotton, and placed some kind of headphones over my ears. They put a plastic bag over my head and a belt around my waist, to which they chained my hands. Because of the plastic bag breathing was getting harder and harder for me. I pictured myself like the images I had seen in the media of the Muslims that were brought to Guantanamo. They bent me over forwards with my head facing down and then hurried with me to the car and then the airplane. They walked so fast that the pain at my joints was getting worse, as the iron of my shackles hit my bones. When I tried to slow down they almost dislocated my shoulder. In the airplane, they threw me down onto the floor and tied my hips, arms, and legs to the floor and the sides of the plane. It appeared to me to be a military carrier plane without seats. The sound of the engines did not sound standard. During the flight I received two injections. One in the left and one in the right arm at different times. They put something over my nose that I believe was some kind of anasthesia. I guess the trip took about four hours. A long time for a trip to Germany! I was unconscious. I think the plane made a stopover, and then we continued the flight. Then the plane landed and they brought me outside. Walking outside I could feel dry and warm air. This couldn't possibly be Europe. They threw me onto the loading platform of a vehicle and drove for about ten minutes. Then they violently dragged me from the platform and took me down some stairs, again walking very fast. I almost fell, as they walked so fast I was unable to keep up with the pace. They raised my arms high behind my back which hurt badly. My feet almost did not touch the ground. They pushed me forward and sometimes pushed me against the wall. Finally they threw me to the ground,

5

stepped on my head and neck with their feet, removed my chains and what had covered my eyes, left, and locked the door behind them. After a brief moment, I was able to open my eyes and observe my surroundings. Lying on the floor, I looked towards the ceiling and noticed a little window in the ceiling of the cell. I saw the red sun and thought it might be early morning. But later it turned dark, so it had been sunset I had seen. That means the trip had taken 20 hours! Already 11 days had passed on hunger strike.

Former inmates had written on the wall in different languages, Arabic, Urdu, and Farsi. I recognized Quranic verses, quotations, and dates.

An old dirty plastic carpet lay on the floor, so old and dirty there was almost no color left. Plaster pieces and color from the crumbling wall lay on the carpet. The bed was old and made from old, torn clothes and was just 1 cm thick. On top of the bed was a dirty, thin military blanket. There were other pieces of torn clothes on the bed that maybe were supposed to function as something like a bed sheet. I was very tired. The cell door was made of undulating iron and had a hatch of about 10cm2. Through this opening I could see a man dressed in Afghan clothes standing in front of the cell who stared at me.

I was very surprised and disappointed at the same time. I had to realize that I was in Afghanistan right now!

I was very thirsty. I had never been that thirsty before in my life. I signaled the Afghan outside that I wanted something to drink. He pointed to a little bottle in the corner of my cell. I thought he had misunderstood me and I tried to tell him again that I wanted water to drink. He pointed to the bottle in the corner again. He meant to tell me that either I drink this water or nothing, that there was only this water here for me to drink.

It was a very old plastic bottle, dirty outside as well as inside. The color of the water was greenish-brownish. The water stank! One could smell the water from three meters away. After holding the bottle in my hand, the bad smell stayed on my hands for quite some time. Although I was really thirsty it was impossible for me to drink from this bottle.

6

At the beginning of the night, four masked men in matching black uniforms came to see me, dragged me out of the cell, and pushed me into a room that was about 15 meters away from my cell. There was a table and some chairs in this room. Three masked men sat there in matching uniforms, another one was dressed in shirt and jeans. They pushed me into the room, and my escort entered the room with me. We were eight in the room. One of them told me in Arabic with a Palestinian accent that I should completely undress myself, as a doctor was going to examine me. I undressed but left the diaper on that they had dressed me in earlier. The others came towards me and wanted to take off this last piece of cloth I was wearing with force. They photographed me again, took a blood sample and a urine sample. I complained to the doctor about the dirt and the filthy water. He told me that this wasn't their problem, but it was the Afghans' responsibility. He then asked me whether I wanted Islamic or non-Islamic food. I told him I wanted Islamic food. Later I found out that he had made fun of me and that the Afghan food consisted of the leftovers of what the Afghan guards ate. It consisted of bones and skin.

They then took me back to my cell. I had to search for the bed because the cell was dark. There was no lighting. I was in so much pain from lying on the floor of the air carrier without padding that I could neither sleep on my right nor on my left side. Only after ten days could I sleep on my front or back. It was cold in Kabul at this time, and I only had one blanket.

During the night of the second day, four masked men came to my cell and bound my hands and feet and pushed me into an interrogation room with seven more men, also masked and wearing black matching uniforms. One of them yelled at me and told me to come forward and that I was in Afghanistan, where there are no laws, and that nobody knew I was here. "You know what I mean? We can do with you whatever we want." He spoke Arabic with a south Lebanese accent. "Do you know why you are here?" he shouted. I replied, "This is my question I wanted to ask you." In front of him on the desk was a file. He said, "This is information about you. If the charges mentioned here weren't correct they wouldn't have flown you here from Skopje." I said, "Is this evidence against

7

me that a plane from Skopje brought me here?" He said, "Why do you believe you are here?" I said, "Because I am of Arab origin and also Muslim." He got angry and yelled even louder: "Everyone claims this when we start interrogating them, but they are not Muslims. They are terrorists!" I asked him what terrorist activities I was supposed to have committed and that had brought me here? He said, "You attended terrorist training here in Afghanistan, your passport is forged, and you had contact with important terrorists like Muhammed Atta, Ramzi Bin Al-Shibh and others in Germany." – None of them I really knew, I only knew them through the media. Regarding my training in Afghanistan and my supposedly fake passport you can talk to the German authorities. They will prove that I am a German citizen and haven't been to Afghanistan in a very short time." [this is like this in German, guess it should be: only for a very short time or lately? ] I asked them to contact the German officials. He refused. Then I asked him why they had taken me to Afghanistan, although I was German, and my parents weren't Afghan. He didn't reply. This official carried out four interrogations with me on four days within a week.

When I sensed how arrogant the Americans treat human beings, without respecting law and human rights, and how they disrespect human dignity and break their will; and after the time of imprisonment (or rather abduction) under inhuman conditions I became depressed and lost all hope. I wished to escape this imprisonment just to be able to take revenge on any American I saw, even if it was a doctor helping people, as I had experienced so much injustice and severity. My cell neighbor even became very sick, and I could hear him moan in pain at night. He kept asking for a doctor or medicine, but did not get anything. I was very angry and lost all hope and wanted to abolish this injustice with all my options at hand, even if this would cost my life.

On March 5th 2004, all the inmates from my corridor (9 people) began a hunger strike, no food or drink, and we demanded to see an American commander or representative to

8

complain and demand the basic human rights. But without any result! After six days of hunger strike, I started getting very weak and was close to death. Therefore I started to drink again, but not to eat. My head started to ache badly. A few times, I tried to pray standing, and collapsed with weakness. The seventh day of my hunger strike, I sometimes felt as if I was getting unconscious. I felt worse with each minute. I asked myself if this hunger strike was legitimate from an Islamic point of view. We discussed this with different opinions: some said it was legitimate, others said it was forbidden. So we just drank but continued not to eat. On the eighth day, one of the inmates had the opportunity to meet an American official and handed him a note with some of the demands we had agreed on, such as the most basic human rights, and that we should be taken to court, our relatives should be informed, and that we should get some books. None of our demands were fulfilled. The other inmates had to end the hunger strike, as they hadn't had anything proper to eat for some time. Some of them had been kept prisoner already for one or two years! Just me and another inmate—who was half-American and half-Pakistani had been seized in early 2003 and turned over to the Americans—continued. After the 24th day of hunger strike, he received books from the Americans and was promised to be transferred to a different, better prison. And he actually was transferred.

On March 13th I was interrogated by American officials and was questioned mainly about the following people: Dr. El-Attar, Dr. Yousif, his son Omar, Mr. Reda Seyam, the multicultural center "Multi Kultur Haus" in Ulm and the Islamic Information Center (IIZ) in Ulm.

On March 28th my pain became unbearable and my anger erupted. I started screaming "Allahu akbar" (Allah is the greatest) out of the window as loud as I could and asked the Afghans, in case they were Muslim and heard me, to stand up for us and fight this injustice. Offices were located in the upper floors of the building, where Afghan employees worked. It was a four-story building. Some of the people passing my window

9

stopped and listened to what I said, but could not understand everything. But they did understand that I suffered here and tried to fight for my rights. One of the Afghan employees walked into the prison building to be able to understand better what I was saying. I asked him to inform the Afghan officials about us and the injustice happening here and that I wanted to talk to an American and an Afghan official.

After 27 days of hunger strike had passed (on March 31st), I was taken into an interrogation room with bound hands and feet. In the room there were the Afghan prison director and two American officials that I saw for the first time and a Palestinian translator that I had met at my medical examination for the first time. They asked me why I was on hunger strike? I replied, "I am German, neither my mother nor my father are from Afghanistan and I have never been to Afghanistan before." [contradicts the above?] And you are Americans and this is not your country. Why do you bring me here for interrogation? This has to take place in Germany or in America. My abduction in Macedonia is against all law and human rights! And now I have already spent three months in prison under the worst conditions. I also haven't been told any specific accusations. We are not allowed to inform our families and explain our situation; we have no idea how they are. There are no lawyers, no judges…"

I also told them that the food consisted of a tea in the morning without sugar and a piece of bread. For lunch, rice with insects, sand, and little stones. They purposefully added these ingredients that don't belong in food. In addition, we got half moldy oranges, and it was hard to tell whether they were of green or blue color. A chicken bone and skin, leftovers from the prison guards, half a liter of warm water that looked and smelled so that it turned your stomach. The other inmates reported that the food had improved ten times since I was here. All inmates suffered very bad diarrhea and bad stomachache. Were these pains resulting from the rotten food and the dirt? Or did they add anything to the food that made us suffer these pains, to torture us?

During my whole imprisonment, the other inmates and I were in solitary confinement. It was strictly forbidden to talk. We did not receive any pieces of paper, pens, or books to pass our time with. If an animal was treated like this in Europe, its owner would be taken to court and convicted. But with Muslims the Americans forget law, morality, and human dignity. Sometimes I started shaking with rage and could not help crying. I asked the American official: "Did you treat the Christian Americans responsible for the terrible terror attacks in Oklahoma the same way?" Nobody would reply to my question. Is the way you treat Muslims also a kind of terror? Is this not true extremism? Isn't ignoring the law, the rights of others, and human rights the true crime? The tearing of the Muslim inmates' clothes – is this how you should treat human beings? Is this the peace and civilized manners that you want to spread and teach Afghans and Iraqis?

After my speech the head of the prison director demanded that I end my hunger strike. I said, "You have four options: 1. I stay on hunger strike till I die. 2. You release me. 3. You fly me to the U.S. and take me to court there. 4. I meet a senior German representative or official to whom I can explain my situation and who has absolute jurisdiction." The director said: "You have asked for your release before. I will send the people in charge and the superiors in Washington a detailed report about our conversation and let them know that this is not the appropriate place for you here, and we all testify to this." Angry and exhausted, I was taken back to my cell. I thought my nerves would collapse soon.

On April 7th another Afghan official came to see me and again I complained and mentioned that the Americans claimed that they were the ones responsible for the bad treatment and bad food. The Americans always made sure that there was a strained situation between detainees and the Afghan guards and employees. One example: when the detainees complain about the Afghan guards to the Americans, they blame them in

11

front of us; hereupon the Afghans get angry with the detainees and deny them their rights, for example with supply of food or medicine. They just take these for themselves and don't pass it on to the inmates. The stupidity of the Afghan guards, the inmates' anger, and psychological pressure fill the hearts with hatred.

My state of health got worse from day to day. I was very weak and exhausted. My stomach ached increasingly. I put my hand on my belly and supported it with my foot. Since April 8th I was unable to leave my bed, not even to use the toilet. I used an empty bottle in bed. On April 9th some Afghans came to see me and tried to convince me to end the hunger strike, as they had noticed how much my health had declined. It had been exactly 37 days on April 10th since I had begun the hunger strike. This night the prison warden showed up with a doctor. They told me that I would be released in three weeks and therefore should end the hunger strike. I asked them for some kind of proof, but they couldn't give me any. I refused to end the strike. Hereupon the hooded men entered my cell, dragged me from my bed and bound my hand and feet. They dragged me into the interrogation room and sat me on a chair, tied me to it, and one of them held my head. Then they stuffed a tube up my nose all the way down to my stomach and poured liquid directly into my stomach. They gave me canned food and books as well. That day they put me on a scale. It showed 94.3 kg. Before my kidnapping in December I had 123kg! Thirty hours later I got even more nauseous than before. I had very bad diarrhea and stomach pain. The pain was so bad that I even wished to die. In the middle of the night, the doctor came and within one hour infused me two bags of Ringer's solution, to which barbiturate had been added, and gave me four yellow pills all at once. He stirred some powder into the water he gave me to drink. I stayed in bed for some more days. Then my health improved.

Three weeks passed, when they had promised to release me. They said that the release will take another two or three weeks, as my transportation to Germany was still being discussed. On May 7th they brought eight more prisoners into our prison and on May 13th

11 inmates were dragged into a container and removed. I have no idea where to. Just me, Sulayman and Ali stayed in this prison, and we had been 14 inmates before.

On May 16th a German arrived accompanied by the director and another American who knew Arabic. The German was about 180cm tall, slim, and his hair was c. 8cm long and light brown. His skin was very tanned. He wore glasses and a cap. He told me that he wanted to talk honestly with me and about everything. I agreed and told him that he knew me, but I did not know him and asked him to introduce himself and tell me which German authority he belonged to. He briefly talked to the American about his reply. I could not understand what they were talking about. He turned to me and said, "I cannot reply to these questions." I continued to ask, "Do the German officials know where I am?" He again refused to reply. "Does my wife know where I am?" He replied, "No, she does not know." (When he spoke he tried to choose his words carefully and was afraid to give away more information than necessary. He also tried to conceal any information about himself.) Then the questioning started. His questions focused on Dr. El-Attar, Dr. Yousif, his son Omar, Mr. Reda Seyam, and the multicultural center in Ulm. The conversation lasted for about two to three hours. On May 17th another two hours, and on May 18th also.

On May 19th he did not show up, although a day earlier he had announced he would come. But he appeared on May 20th and told me that it might take them another week. I got angry and told him that they kept promising my release and always postponed it. I announced that I would begin my hunger strike again tomorrow, and that I was going to take steps that would result in severe damage to myself and everyone else here and would have bad consequences for everyone in case the German officials would not start moving and get me out of here. I have four children, and they would find out what has happened to me, and someone from my family would take revenge on Americans! He said, "What are you going to do?" I replied, "You will find out in due time." He said, "Please don't begin the hunger strike again and give me two days. I will talk to my German superior

13

and promise you a quick response." Then I angrily returned to my cell. He was surprised by my behavior.

About two weeks before the German official referred to as "Sam" came to see me, the wardens took me to the interrogation room where an American psychologist and a woman interpreter sat. The psychologist told me he had come all the way from Washington to check on me and ask me some questions. At the end of our conversation, he promised me that I would get out of here soon.

On May 21st I began my second hunger strike. In the evening that same day, the director appeared with the German and asked me to end my strike and reassured me that I would be on my way to Germany on May 28th the latest. He said they were just clearing the security formalities for the transfer from Afghanistan to Germany. The trip would not go directly to Germany and would take a while. So I should stay calm and not worry, I would be home soon.

On the eve of May 27th the doctor came and carried out some examinations. I weighed 105 kg now. Then the director explained some details and how I was going to be transferred from the cell to some unknown airport the next day. The doctor asked me not to drink or eat anything after tonight, as I wasn't going to be allowed to use the toilet during the journey.

In the morning of May 28th the director appeared with the doctor and tied my hands and feet and blindfolded me. Then they took me outside and we got in a Jeep. After about ten minutes drive, we got out of the car and they took me to a container, one of those used for transportation of goods. They sat me on a chair inside the container with my face towards the interior. They asked me not to turn around once they had taken off the blindfold. Then they handed me all my belongings I had had in Skopje and changed my prison clothes to

14

plain clothes that I had in my bag. Behind us I heard a plane, which sounded like a little jet, which came to a stop about 200 meters behind our container. Then they tied my hands again, tied them to my belt in the front, plugged my ears and put headphones on me. Then they blindfolded my eyes again. We went back to the Jeep and drove the 200m to the waiting airplane. On the plane they tied my feet and hips to the seat. It was eight o'clock in the morning.

During the flight, the German official talked to me. Meanwhile he called himself "Sam." On his wrist, he carried a big black watch with a compass (like the Americans had). Once in a while I heard people behind us, speaking English. But I could not understand anything. The flight took six to seven hours. Then we landed. Sam told me that he would depart now and other people would take over. After I had waited on the plane for about an hour, we got off and entered a minivan. I could hear that when one of the car doors was open an alarm went off, as is common in Japanese cars. It seemed to me that we drove another seven hours with the minivan on impracticable country roads. It went up and down and in steep curves. During the drive the car stopped twice and the people escorting me got off and on again after a short moment. I believe the crew was replaced. Later the van stopped and we all got out. They took me to some location, where they took off the blindfold and told me not to turn around. The person behind me pointed in the direction I was supposed to walk. It seemed to me that they were going to let me walk a few steps and then shoot me in the back. Meanwhile it was night. The location where they released me was deserted and in some forested mountain area. The paths were very narrow and unnavigable. After walking for about 400m in the assigned direction, after a bend I met three soldiers in uniform armed with Kalashnikovs who took my passport and brought me to an old building with an Albanian flag at the entrance. The officer in charge asked me to put all my luggage on the table, and the soldiers searched me thoroughly. Then the officer told me that I had illegally entered Albania and asked me what I was doing here. I told him my story, but he did not believe me and asked me if I thought he was stupid. Nobody would believe my story. Then he told me that they would bring me to

15

the airport now to fly me out of the country back to Germany. I told him that I, too, very much wanted this. I could tell by the way he talked that he knew about my coming here. He even had a bag with food and drinks ready on the side. I asked him how far it was to the airport. He answered, "As far and from the same place that you came from." (At this point I figured that we had landed in Tirana before). Then they drove me towards the Tirana airport. We were on the border of Macedonia, Serbia, and Albania. He sent me to a Jeep with three policemen. When we left the police station it was already 10pm. On the way, they offered me chips and bread. It was the same kind of chips and bread I had been given in the minivan on the day before my release! At five in the morning, we arrived at the airport Mother Teresa. A man in plain clothes waited for me there, bought me a plane ticket to Frankfurt a.M. with my money and accompanied me to the airplane. The plane took off at 6.30 in the morning and arrived in Frankfurt at 8.45. I arrived home at 1.30 pm on May 29th. I found noone home. All our belongings were packed in removal boxes. I took a cab and drove to Neu-Ulm to find out where my family had gone. My friends told me my family had flown to Lebanon, since I had been gone for such a long time.



**Exhibit F**



**Common Dreams**
**NEWS CENTER**
Breaking News & Views for the Progressive Community
www.commondreams.org

*Published on Friday, July 7, 2006 by the New York Times*

# Algerian Tells of Dark Odyssey in U.S. Hands

**by Craig S. Smith**

ALGIERS - Two years ago, a motley collection of prisoners spent night after night repeating their telephone numbers to one another from within the dark and dirty cells where they were being held in Afghanistan. Anyone who got out, they said they agreed, would use the numbers to contact the families of the others to let them know that they were still alive.

At least two of those men are now free and, thanks to the memorization exercise, are back in touch with each other.

The case of one of them, Khaled el-Masri, a German citizen who was held as part of the United States' antiterrorism rendition program, was revealed last year, and German and American officials have acknowledged that he was erroneously detained by the United States. But the tale of the other, an Algerian named Laid Saidi, has never been told before, and it carries a new set of allegations against America's secret detention program.

In May 2003, Mr. Saidi was expelled from Tanzania, where he ran a branch of Al Haramain Islamic Foundation, an international charity based in Saudi Arabia that promoted the fundamentalist Wahhabi strain of Islam and has since been shut down after being accused of financing terrorist groups. Tanzanian newspapers reported on Mr. Saidi's expulsion at the time, but nothing was known about where he went.

In a recent interview, Mr. Saidi, 43, said that after he was expelled he was handed over to American agents and flown to Afghanistan, where he was held for 16 months before being delivered to Algeria and freed without ever being charged or told why he had been imprisoned. He acknowledged that he was carrying a fake passport when he was detained, but he said he had no connection to terrorism.

Wearing a white robe and a white skullcap in his lawyer's office here, he held up two white shoes he said his captors gave him before setting him free in August 2004. The only other physical evidence he offered of his imprisonment were fading scars on his wrists that he said were from having been chained to the ceiling of a cell for five days.

"Sometimes I cry and shake when I think about this," he said in his first interview about his imprisonment. "I didn't think I would see my family again."

While Mr. Saidi's allegations of torture cannot be corroborated, other elements of his story can be.

American, Tanzanian and Algerian officials have declined to comment on Mr. Saidi's allegations, but Mr. Masri said he saw Mr. Saidi in the Afghan prison where he was held. German prosecutors investigating Mr. Masri's detention now want to interview Mr. Saidi, said Martin Hofmann, a prosecutor in Munich.

In addition, a criminal investigation of the deaths in 2002 of two Afghan detainees at the American military detention center in Bagram, north of Kabul, found that prisoners were often shackled to the ceiling by their wrists for punishment, as Mr. Saidi said he had been. Military officials, though, said the practice was stopped after the deaths.

A spokesman for the Central Intelligence Agency declined to discuss Mr. Saidi's claims. "While the C.I.A. does not as a rule comment publicly on these kinds of allegations, the agency has said repeatedly that it does not condone torture," said the spokesman, Paul Gimigliano. He added that renditions, the process of moving captured terrorism suspects to third countries for interrogation, "are an antiterror tool that the United States has used for

years in accordance with its laws and treaty obligations."

A Shadowy Program

Mr. Saidi is one of a handful of men to publicly claim they were seized in the rendition program and then mistreated or tortured, before being released without charge or explanation. Like prisoners released from the American military detention center at Guantánamo Bay, Cuba, they represent not only a mounting political problem, but a potential legal problem for the United States and its allies that have participated in the extrajudicial abductions.

International fallout from renditions continued Wednesday when prosecutors in Milan arrested two Italian intelligence officers on allegations that they aided the C.I.A. in the 2003 kidnapping of a radical Egyptian cleric in Italy. The cleric was then sent to Egypt, where he has been imprisoned.

Mr. Saidi was seized as the United States and Saudi Arabia were cracking down on Al Haramain, which the United States subsequently declared had provided "financial and other operational support" for the 1998 embassy bombings in Kenya and Tanzania. But it is not known what, if any, specific suspicions the authorities had about Mr. Saidi.

A July 2004 German intelligence report on Al Haramain made note of Mr. Saidi's expulsion but said, "It is not yet clear whether there existed concrete assessments that this person had links to terrorism." It added that "the Tanzanian government justified their procedure with the not very credible argument that he had broken legal regulations for foreigners."

In addition to the German prosecutors, the Council of Europe, a multinational human rights watchdog, wants to interview Mr. Saidi as part of its investigation into whether any European countries have breached the European Convention on Human Rights by participating in renditions.

Mr. Saidi said he believed that his captors were Americans because they spoke English and appeared in charge at the Afghanistan prison. He said he hoped to file a lawsuit against the government later this year. "We don't know who to sue yet," said Mostefa Bouchachi, Mr. Saidi's lawyer. "We don't know who is responsible, the C.I.A. or F.B.I."

Mr. Saidi said he left Algeria in 1991 to escape the violence then engulfing the country. He studied in Yemen before moving to Kenya and then Tanzania in early 1997. He began working for Al Haramain and became director of its branch in the costal city of Tanga, a job that gave him a public profile.

He said that during that time he was using a fraudulent Tunisian passport and living under the name Ramzi ben Mizauni ben Fraj. He said he had lost his passport and bought a fake one because he was afraid of going to the Algerian Embassy while Algeria was fighting a civil war with Islamists. He denied that he had any reason to hide his identity or that Al Haramain's activities were anything but charitable.

United States intelligence officials have long suspected that Al Haramain was involved in financing terrorism, according to the report of the 9/11 Commission. Suspicion rose after the August 1998 bombings of the United States Embassies in Kenya and Tanzania. After the Sept. 11 attacks, American and Saudi authorities alleged that some Haramain money was being diverted to terrorist groups and that the organization was infiltrated by people with links to those groups.

By 2003, several Haramain branches were shut down, and the following year the Saudi authorities dissolved the charity.

It is not clear if the crackdown on Al Haramain led to Mr. Saidi's detention, but on Saturday, May 10, 2003, Tanzanian police officers surrounded his car as he left home for work, according to Mr. Saidi, his wife and press reports at the time. That night the police drove him to Dar es Salaam and put him in jail.

"I thought I might have been arrested for holding a false passport, but I didn't tell them it was fake," he said.

Three days later, he said, he was bundled into a white Land Rover and driven to the Malawi border, where he was turned over to Malawians in plain clothes who were accompanied by two middle-aged Caucasian men wearing jeans and T-shirts. They spoke English with the Malawians, Mr. Saidi said. That is when he realized that something more ominous was going on.

A Place 'Out of the World'

Shortly after the expulsion, a lawyer representing Mr. Saidi's wife filed an affidavit in the Tanzanian court saying that immigration documents showed Mr. Saidi was deported through the border between Kasumulu, Tanzania, and Malawi.

After being held for a week in a prison in the mountains of Malawi, Mr. Saidi said, a group of people arrived in a sport utility vehicle: a gray-haired Caucasian woman and five men dressed in black wearing black masks revealing only their eyes.

The Malawians blindfolded him, and his clothes were cut away, he said. He heard someone taking photographs. Then, he said, the blindfold was removed and the agents covered his eyes with cotton and tape, inserted a plug in his anus and put a disposable diaper on him before dressing him. He said they covered his ears, shackled his hands and feet and drove him to an airplane where they put him on the floor.

"It was a long trip, from Saturday night to Sunday morning, " Mr. Saidi recalled. When the plane landed, he said, he was taken to what he described as a "dark prison" filled with deafening Western music. The lights were rarely turned on.

Men in black arrived, he said, and he remembers one shouting at him through an interpreter: "You are in a place that is out of the world. No one knows where you are, no one is going to defend you."

He was chained by one hand to the wall in a windowless cell and left with a bucket and a bottle in lieu of a latrine. He remained there for nearly a week, he said, and then was blindfolded and bound again and taken to another prison. "There, they put me in a room, suspended me by my arms and attached my feet to the floor," he recalled. "They cut off my clothes very fast and took off my blindfold." An older man, graying at the temples, entered the room with a young woman with shoulder-length blond hair, he said. They spoke English, which Mr. Saidi understands a little, and they interrogated him for two hours through a Moroccan translator. At last, he said, he thought he would learn why he was there, but the questioning only confounded him.

He said the interrogators focused on a telephone conversation they said he had had with his wife's family in Kenya about airplanes. But Mr. Saidi said he told them that he could not recall talking to anyone about planes.

He said the interrogators left him chained for five days without clothes or food. "They beat me and threw cold water on me, spat at me and sometimes gave me dirty water to drink," he said. "The American man told me I would die there."

He said his legs and feet became painfully swollen because he was forced to stand for so long with his wrists chained to the ceiling. After they removed him from the chains, he said, he was moved back to the "dark" prison and a doctor gave him an injection for his legs.

After one night there, he was moved to a third prison. He said the guards in this prison were Afghans, and one told him that he was outside Kabul.

There were two rows of six cells in the basement, which he described as "filthy, not even suitable for animals." Each cell had a small opening in the zinc-clad door through which the prisoners could glimpse one another as they were taken in and out of their cells. At night, they would talk.

"This is where I met Khaled el-Masri," Mr. Saidi said. A layout of the prison he sketched closely matched one drawn by Mr. Masri.

Mr. Masri had been seized in Macedonia in December 2003, and it was later revealed that he had apparently

been mistaken for a terrorism suspect with a similar name. He said he was able only to glimpse Mr. Saidi a few times in Afghanistan. But he said their cells were close enough for them to talk at night.

"At the beginning of our prison time together, I was in the last cell and he was two cells away from me," Mr. Masri said by telephone from Germany. "Whenever I wanted to go to the toilet or was taken for questioning, I had to pass his door."

Mr. Masri and Mr. Saidi said they got to know other prisoners, including two Pakistani brothers from Saudi Arabia, whose phone number Mr. Masri also memorized. Using that number, The New York Times reached relatives of the brothers, Abdul al-Rahim Ghulam Rabbani and Mohammed Ahmad Ghulam Rabbani, who said they had heard from the Red Cross two years ago that the brothers were being held in Afghanistan. Pentagon documents show that two men with those names are now detainees at Guantánamo Bay.

A Dire Misunderstanding

In prison, Mr. Saidi said, he was interrogated daily, sometimes twice a day, for weeks. Eventually, he said, his interrogators produced an audiotape of the conversation in which he had allegedly talked about planes.

But Mr. Saidi said he was talking about tires, not planes, that his brother-in-law planned to sell from Kenya to Tanzania. He said he was mixing English and Arabic and used the word "tirat," making "tire" plural by adding an Arabic "at" sound. Whoever was monitoring the conversation apparently understood the word as "tayarat," Arabic for planes, Mr. Saidi said.

"When I heard it, I asked the Moroccan translator if he understood what we were saying in the recording," Mr. Saidi said. After the Moroccan explained it to the interrogators, Mr. Saidi said, he was never asked about it again.

"Why did they bring me to Afghanistan to ask such questions?" he said in the interview. "Why didn't they ask me in Tanzania? Why did they have to take me away from my family? Torture me?"

Mr. Saidi said the interrogators also accused him of hiding rockets in his house and of funneling money to Al Qaeda, allegations that he strongly denies and for which he said evidence was never produced.

While he was in prison, however, the United States Treasury Department asked the United Nations to add Al Haramain's Tanzanian branch to the list of charities alleged to have financed terrorist organizations.

In its January 2004 announcement, the department said an unnamed former director of Al Haramain in Tanzania was responsible for making preparations for the advance party that planned the 1998 embassy bombings. But the department declined to identify the former director or to comment on Mr. Saidi's case.

Mr. Saidi said interrogators asked repeatedly about the Haramain director who preceded him, a Saudi named Muammar al-Turki. But he said he was no longer in touch with him.

Mr. Saidi said the interrogations eventually stopped. In the late spring or early summer of 2004, he said, he was flown to Tunisia, apparently because his captors thought he was Tunisian. But when Arabic-speaking men boarded the plane, he said he told them he was from Algeria and that his Tunisian passport was fake.

"I didn't want to get into more trouble," he explained.

He spent 75 more days in jail, he said. In late August 2004, he again prepared to travel. His captors gave him the pair of white shoes he still has. The flight took about 10 or 12 hours, and when the plane landed, he said, he was turned over to Algerian intelligence officials. They held him for a few days, then bought him some clothes, gave him a small sum of money and drove him to a bus stop in the Algiers neighborhood of Bir Khadem.

After 16 months, Mr. Saidi was free. He was reunited with his wife and children. Mr. Masri had been released a few months before. He tried to contact Mr. Saidi at the Tanzanian phone number he had memorized, but the number was disconnected. Eventually, Mr. Saidi sent him a text message with a new number in Algeria, which Mr. Masri called.

"I know him from his voice," Mr. Masri said, "and I recognized his voice from the first phone call that we had after his release."

Copyright 2006 New York Times Company

###

**Exhibit G**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| **MAJID KHAN, et al.,**<br>     *Petitioners,*<br><br>v.<br><br>**GEORGE W. BUSH, et al.,**<br>     *Respondents.* | )<br>)<br>)<br>)<br>)  Civil Action No. 06-1690 (RBW)<br>)<br>)<br>)<br>)<br>) |

## DECLARATION OF GITANJALI S. GUTIERREZ

I, Gitanjali S. Gutierrez, declare that the following statements are true to the best of my knowledge, information, and belief:

1. I am an attorney with the Center for Constitutional Rights (CCR), and counsel for Majid Khan, Petitioner in the above-captioned matter, and for Rabia Khan, the wife and Next Friend for Petitioner Majid Khan.  I offer this Declaration in support of Petitioner Khan's Expedited Motion for Emergency Access to Counsel and Entry of Amended Protected Order.

2. Pursuant to United States Department of Justice authorization, I applied for security clearance on July 19, 2004 in the course of my representation of two former prisoners in Guantánamo in <u>Begg v. Bush</u>, 04-cv-1137 (RMC).

3. I received interim security clearance at the "SECRET" level in August 2004 and have maintain this security clearance for the purposes of representing individuals imprisoned in Guantánamo Bay Naval Station, Guantánamo Bay, Cuba in their habeas petitions challenging the legality of their detention.

4. My understanding during my orientation session with the U.S. Department of Justice Court Security Office in August 2004 is that the Department of Justice conducted a sufficient background investigation to determine whether I can be granted TOP SECRET security clearance. I was granted security clearance at the SECRET level because it was the minimum level of clearance required for my client representation at that time.

5. I declare, under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed this 3rd day of November, 2006 in New York, New York.

_____
Gitanjali S. Gutierrez

**Exhibit H**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| MAJID KHAN, *et al.*, | ) | |
| | ) | |
| Petitioners, | ) | Civil Action No. 06-CV-1690 (RBW) |
| | ) | |
| v. | ) | |
| | ) | |
| GEORGE W. BUSH, | ) | |
| President of the United States, | ) | |
| *et al.* | ) | |
| | ) | |
| Respondents. | ) | |

## DECLARATION OF ALLEN S. KELLER

I, Allen S. Keller, under penalty of perjury under the laws of the United States of America,

declare as follows, pursuant to 28 U.S.C. § 1746:

1.  I am an American physician licensed to practice medicine in the State of New York.  I am

a graduate of New York University School of Medicine and completed my residency in Primary

Care Internal Medicine at NYU/Bellevue Medical Center.  The residency program provided me

intensive training on the psychosocial aspects of care including effective doctor-patient

communications and the evaluation and treatment of common psychiatric problems including

depression, anxiety, and somatization.  I am board certified in Internal Medicine and am an

Associate Professor of Clinical Medicine at NYU School of Medicine, and an Attending

Physician at Bellevue Hospital in New York City.

2.  I have received specialized post-graduate training from Physicians for Human Rights in

the use of medical skills for the documentation and treatment of torture victims.  I have been

conducting medical evaluations of survivors of torture since 1990.  In 1993, I worked in

Cambodia where I helped develop a program to train Cambodian health professionals in the

evaluation and treatment of survivors of torture. In November and December of 1996, I led a fact-finding mission to Dharamsala, India on behalf of Physicians for Human Rights to examine Tibetan refugee survivors of torture and to evaluate and document the continued use of torture of Tibetans by Chinese officials. I am the author or coauthor of multiple publications on the evaluation and treatment of survivors of torture.

3. I have also trained health professionals in the United States in the evaluation of torture survivors. I have participated in training U.S. Government CIS Asylum Officers concerning the health consequences of torture and effective interviewing skills when interviewing traumatized individuals. In June of 2001, at the invitation of the Office of Chief Immigration Judge, I was invited to make a presentation concerning the evaluation of torture survivors at the annual conference of immigration judges. I have been previously qualified in Federal Immigration Court as an expert witness in evaluating and treating survivors of torture. I am on the International Advisory Board of Physicians for Human Rights.

4. I developed and now direct the Bellevue/NYU Program for Survivors of Torture, a program at Bellevue Hospital and NYU Medical Center in New York City which provides medical, psychological, and rehabilitative services to survivors of torture and refugee trauma. Since 1995, the Bellevue Program has cared for more than 2,000 men, women, and children from more than seventy countries.

<u>Purpose of this Declaration</u>

5. I have been advised that a habeas petition has been filed on behalf of Majid Khan, one of the fourteen men previously held in secret CIA detention facilities, and recently transferred to Guantánamo Bay.

6.  I have also been advised that he has filed legal papers for emergency access to his lawyer.

7.  This declaration aims to briefly describe the likely impact of the torture and abusive interrogation methods that the CIA interrogators are known to have used on men detained within their custody in the "war on terror."

Knowledge of Torture and Abusive Interrogation in the CIA "Ghost Detention" Program

8.  I am familiar with the "enhanced interrogation techniques" that the Central Intelligence Agency is most likely to have used against "high-value detainees."  I have read the publicly available literature and was invited to inform the U.S. Congress about these issues during a September 25, 2006 legislative briefing session related to proposed military commissions legislation.

9.  According to published reports from CIA sources, the "enhanced interrogation techniques" authorized for use by CIA officers include:

   a.  The "Attention Grab":  The interrogator forcefully grabs the prisoner and shakes him.

   b.  The "Attention Slap":  The interrogator slaps the prisoner with an open hand, causing pain and fear.

   c.  The "Belly Slap":  The interrogator gives the prisoner a hard open-handed slap to the stomach, causing pain.

   d.  "Long Time Standing":  The interrogator forces the prisoner to stand, handcuffed and with his feet shackled to an eyebolt in the floor for upwards of forty hours.

   e.  "Cold Cell":  The interrogator makes the prisoner stand naked in a cell kept near fifty degrees.  The prisoner is periodically doused with cold water.

f.  "Water Boarding":  The prisoner is bound to an inclined board, with his feet raised and
his head slightly below his feet.  Cellophane is wrapped over the prisoner's face and
water is poured over him.  This is a mock execution which provokes feelings of
drowning.

10. I am also aware of the effects of these "enhanced interrogation techniques" because of
my direct clinical experience working with individuals who have been tortured.  For instance, I
have evaluated and/or treated torture survivors who have been slapped and hit all over the body,
subjected to long-time standing, exposed to cold, or subjected to asphyxiation, including under
vats of water.


Psychological and Physical Impact of Torture and Abusive Interrogation

11. Torture and other forms of abusive interrogation can have devastating health
consequences on the victim's physical, mental and social well-being.

12. Torture can result in confusion, dissociation, and fear in its victims.  Psychological
dissociation is when processes which are normally integrated – such as memory, identity,
emotions, and thoughts – are separated.

13. Torture and abusive interrogation may also result in difficulties with memory.  The
ability of a victim of torture or abusive interrogation to recall information and develop a trusting
professional relationship may deteriorate over time.

14. Torture survivors often have difficulty developing trusting relationships. Creating a safe
environment by ensuring that mistreatment will not occur, and allowing proper access to
appropriate professional relationships including legal counsel, is important in facilitating a
trusting relationship.

I hereby declare under penalty of perjury that the foregoing is true and correct. Executed this 2nd day of November 2006.

Allen S. Keller, M.D.