**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

_____
                                                    )
**MAJID KHAN, *et al.*,**                          )
        *Petitioners,*                              )
**v.**                                              )        Civil Action No. 06-cv-1690 (RBW)
                                                    )
**GEORGE W. BUSH, et al.,**                        )
        *Respondents.*                              )
_____)


**<u>NOTICE OF CORRECTION</u>**

Petitioners are hereby filing a corrected version of Petitioners' **Reply Memorandum In Support of Expedited Motion for Emergency Access to Counsel and Entry of Amended Protective Order** (dkt. 9).  The correction to this document consists of corrected typographical and citation errors.


Dated:  November 4, 2006

                                        Respectfully submitted,

                                        Counsel for Petitioners:

                                        __/s/ _____

                                        Gitanjali S. Gutierrez

                                        Michael Ratner
                                        William Goodman
                                        CENTER FOR CONSTITUTIONAL RIGHTS
                                        666 Broadway
                                        New York, New York 10012
                                        (212) 614-6485

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

_____
                        )
**MAJID KHAN,** *et al.***,**         )
      *Petitioners,*        )
**v.**                       )     Civil Action No. 06-cv-1690 (RBW)
                       )
**GEORGE W. BUSH, et al.,**    )
      *Respondents.*      )
_____)

**REPLY MEMORANDUM IN SUPPORT OF EXPEDITED MOTION FOR
EMERGENCY ACCESS TO COUNSEL
AND ENTRY OF AMENDED PROTECTIVE ORDER**

Petitioner Maijd Khan (Petitioner Khan) respectfully submits this reply memorandum in support of his Expedited Motion for Emergency Access to Counsel and Entry of the Amended Protective Order.[1]  The Respondents have imprisoned Petitioner Khan for over three years in secret CIA detention and subjected him to "alternative interrogation methods" that constitute torture and cruel, inhuman and degrading treatment.  Respondents now argue that the Court lacks the authority to issue an order compelling the Executive to afford Petitioner Khan access to counsel in light of the Detainee Treatment Act of 2005[2] ("DTA") and Military Commission Act of 2006[3] ("MCA").  In so doing, the Respondents minimize the substantial doubts concerning the lawfulness of jurisdiction-stripping provisions of the DTA and MCA, seeking instead to reduce the Court's judicial power to an announcement of its lack of authority.  The Respondents also characterize Petitioner Khan's secret CIA detention and interrogation as involving highly-sensitive classified information and then invoke the fact of his unlawful imprisonment and interrogation as justification for indefinitely delaying his access to counsel.

---

[1] Amended Protective Order and Procedures for Counsel Access to Detainees at the United States Naval Base in Guantánamo Bay, Cuba, ("Amended Protective Order") (attached as Exhibit A).
[2] Detainee Treatment Act of 2005, Pub. L. No. 109-148, tit. X, 119 Stat. 2680 (10 U.S.C. §801 note).
[3] Military Commission Act of 2006, Pub. L. No. 109-___.

Such efforts are a further attempt to shield Executive conduct from the constraints of judicial review.

The Court should reject Respondents' unfounded speculations concerning classified information, misrepresentations about the scope of and safeguards contained within the Amended Protective Order, and improper attempts to conceal illegal and embarrassing conduct through Executive classification authority. Moreover, any further delay of Petitioner Khan's access to counsel is likely to cause irreparable harm to his ability to pursue his challenge to the legality of his ongoing detention. As each day passes, the likelihood increases that Petitioner Khan will suffer from memory loss and other psychological injuries that will impede his capacity to assist in his representation and that the barriers to building a trusting attorney-client relationship will increase. In light of the urgency of Petitioner Khan's access to counsel and the Amended Protective Order's safeguards to protect national security and classified information —explicitly including "TOP SECRET//SENSITIVE COMPARTMENTED INFORMATION ("SCI") materials — no rational justifies denying Petitioner Khan prompt access to counsel.

Accordingly, the Court should exercise its existing jurisdiction to afford Petitioner Khan, at a minimum, prompt access to counsel and an opportunity to make informed decisions and to direct his litigation challenging his detention – including defending this Court's jurisdiction over his petition.[4]

## I.    THE COURT HAS EXISTING JURISDICTION TO GRANT PETITIONER'S MOTION FOR EMERGENCY ACCESS TO COUNSEL PURSUANT TO THE AMENDED PROTECTIVE ORDER.

The Respondents do not dispute that Petitioner Majid Khan should have access to counsel in order to pursue his challenge to the legality of his detention. See Respondent's Memorandum in Opposition at 12 ("Resp'ts Opp'n"). Rather, after imprisoning Petitioner in

---

[4] Respondents also objected that the Petition for Writ of Habeas Corpus (dkt. 1) was not verified as required pursuant to 28 U.S.C. § 2242. Petitioners have remedied the filing in compliance with § 2242. See Petrs' Additional Attach., Nov. 3, 2006 (dkt. no. 8).

secret detention for over three years, the Respondents effectively seek to continue Petitioners' incommunicado detention by delaying further his right to consult with counsel concerning litigation decisions and the enforcement of his legal rights. They base this unlawful action upon a bold assertion of overreaching Executive Power and a denial of Petitioner's right to direct his representation and make litigation decisions. In light of this Court's existing jurisdiction over this petition and Petitioner Khan's immediate need to consult with counsel, no reason warrants further hindrance of the Court's authority to order that the Respondent provide Petitioner Khan prompt access to legal counsel.

**A.     The Court Should Exercise Its Existing Jurisdiction over the Petition.**

The government argues that the withdrawal of jurisdiction under the Detainee Treatment Act, and Military Commission Act, is "unambiguous[]" and that this Court's only role is to announce its lack of jurisdiction. See Resp'ts Opp'n at 9. This contention ignores the Court's historical function under Article III of the Constitution to exercise its independent judgment on all issues rather than defer without inquiry to the unilateral assertions of the Executive.[5] See, e.g., Hamdi v. Rumsfeld, 542 U.S. 507 (2004) (rejecting the use of an Executive officials' untested declaration to justify the detention of an "enemy combatant" and reaffirming the Court's mandate to exercise independent review of Executive conduct). Unless and until the matter is dismissed, this Court is entitled to exercise its authority over Petitioner Khan's case, including its authority to determine its jurisdiction and to afford Petitioner Khan access to counsel.

---

[5] Moreover, the only two courts to consider this question have concluded that the court's jurisdiction is a litigable issue because the government's interpretation of the DTA and MCA, even if correct, raises substantial questions concerning the lawfulness of the amendments withdrawing the Court's jurisdiction. Indeed, the Court of Appeals and District Court have ordered briefing regarding the legality of the abrogation of the writ under the MCA and DTA in Al Odah v. United States, Nos. 05-5064, 05-5095 through 05-5116 (D.C. Cir.), & Boumediene v. Bush, Nos. 05-5062 & 05-5063 (D.C. Cir.), Order dated July 26, 2006, and in Hamdan v. Rumsfeld, Civil Action No. 04-cv-1519 (JR) (D.D.C.), Order dated Oct. 27, 2006 (dkt. 77).

The undersigned counsel is obligated to pursue vigorously everything required to represent fully Petitioner Khan in litigating the disputed issues in the present petition, and potentially in the military commission proceedings that Respondents announced their intention to bring. Further, Petitioner Khan is entitled to consult with counsel to litigate the issue of the Court's jurisdiction. Any delay is an unwarranted obstruction of justice.

The Court has the authority to enter the Amended Protective Order and order prompt access to counsel because, contrary to Respondents' claims, see Resp'ts Opp'n at 8-10, the DTA and MCA do not deprive the Court of jurisdiction over Petitioner Khan's habeas petition for the reasons set forth by the petitioners in Boumediene and Al Odah, in their supplemental briefs addressing the MCA (attached as Exhibits B & C), whose arguments are adopted herein. The DTA and MCA constitute an unlawful abrogation of the writ of habeas corpus and a denial of fundamental due process in violation of the Constitution, federal common law, and international law. The DTA and MCA also violate, inter alia, separation of powers and constitute an unlawful delegation of Article III authority to the Executive.

Moreover, these arguments are even more compelling in the present case because, despite Respondents' assertions to the contrary, see Resp'ts Opp'n at 11-13, Petitioner Khan lacks any other available forum in which to challenge the legality of his detention or seek access to his counsel. Even if the DTA and MCA applied to Petitioner Khan, he has not received any CSRT nor have military commission proceedings begun.[6] Indeed, despite over three years of secret detention and interrogation, and nearly sixty days of detention at Guantánamo,[7] the military has

---

[6] Thus, unlike Petitioner Khan, the Petitioner in Bismullah v. Rumsfeld, No. 06-1197 (D.C.Cir.), had received a Combatant Status Review Tribunal decision from which to appeal. See Resp'ts Opp'n at 20.

[7] Such lengthy delays are inconsistent with the speedy trial provisions of the Uniform Code of Military Justice, 10 U.S.C. § 810.

yet to even issue charges against Petitioner Khan and the military has announced that individuals such as Petitioner Khan may not even be charged until well into 2008.[8]

Under the regime envisioned by the Respondents, the Executive could seek to exercise unilateral and unreviewable authority over Petitioner – imprisoning him indefinitely without any judicial oversight.  For example, because the DTA and MCA lack any express time restrictions for Executive conduct, the Executive might indefinitely delay initiating any military commission charges or a CSRT for years, thus impeding even the limited review provided for under the DTA to challenge the verdict of a military commission or the finding of a CSRT.[9] For the foreseeable future, Petitioner Khan has no available forum apart from his habeas petition in this Court to seek access to counsel in order to assist in his challenge to his detention.

Accordingly, this Court should defend its continuing habeas jurisdiction over Petitioner Khan's challenge to his detention and, thereby, order Petitioner Khan's immediate access to counsel.

**B.    Petitioner is Entitled to Access to Counsel to Defend the Court's Jurisdiction Over His Habeas Petition.**

The Respondents disingenuously state that while they are not trying to thwart Petitioner Khan's access to counsel entirely, numerous reasons justify further delay of Petitioner's access to counsel and, alternatively, that if the Court considers the jurisdictional issues, Petitioner's Next Friend may pursue the litigation on his behalf without Petitioner's consultation with his counsel.  Contrary to the Respondents' claims, Petitioner Khan's access to counsel is essential to his ability to pursue his challenge to his detention, including defending the Court's

---

[8] Neil A. Lewis, <u>Officials See Qaeda Trials Using New Law in 2007</u>, NY Times, Nov. 3, 2006 (noting that the military commissions anticipated to begin in the summer of 2007 will "not involve any of the 14 senior Qaeda operatives recently sent to Guantánamo from secret C.I.A. custody" and that "Pentagon and Justice Department officials said it could be well into 2008, at the earliest, before the men believed to have been the high command structure of Al Qaeda sat in the dock at Guantánamo, where they will certainly face the death penalty").

[9] In fact, in <u>Hamdan</u>, the government argued repeatedly that Petitioner Hamdan held no speedy trial rights under the Uniform Code of Military Justice and then-existing military commission regulations.  The timing of his prosecution was subject only to Executive whim.  Similarly, the MCA contains no speedy trial right provision.

jurisdiction over his petition and making informed litigation decisions.  No rationale exists to compel Petitioner to defend the Court's jurisdiction over his case via his Next Friend rather than through his direct access to counsel.

Denial of Petitioner Khan's access to the undersigned counsel when she is at the prison meeting with other clients would be the epitome of arbitrariness that the rule of law seeks to prevent.  Fundamentally, the Respondents' contention that Petitioner Khan's access to counsel is unnecessary while this Court considers either jurisdictional or merits issues undermines the Great Writ, as well as the ruling of the United States Supreme Court in <u>Rasul v. Bush</u>, 542 U.S. 466 (2004) (holding that the prisoners in Guantánamo may challenge the legality of their detention in federal court).  Although prisoners in Guantánamo were previously able to overcome the jurisdictional challenges to their habeas petitions through their next friends, <u>see</u>, <u>e.g.</u>, <u>Rasul</u>, 542 U.S. at 471, this mechanism and the denial of direct access to counsel is unwarranted in this case and unjustly restricts Petitioner Khan's access to the courts.

Accordingly, the Court should order the Respondents to afford Petitioner Khan immediate access to his counsel pursuant to the Amended Protective Order and counsel access procedures.

## II.    IMMEDIATE ACCESS TO COUNSEL PURSUANT TO THE AMENDED PROTECTIVE ORDER IS WARRANTED BECAUSE RESPONDENTS' OBJECTIONS ARE BASED UPON UNFOUNDED SPECULATION, MISUSE OF CLASSIFICATION AUTHORITY, AND MISREPRESENTATION OF THE AMENDED PROTECTIVE ORDER AND COUNSEL ACCESS PROCEDURES.

Respondents cannot establish any proper objection to Petitioner's immediate access to counsel pursuant to the Amended Protective Order.  No information in the record establishes that Petitioner Khan possesses properly classified TOP SECRET or TOP SECRET//SCI information.  Rather, the Executive is attempting to misuse its classification authority with respect to Petitioner Khan to conceal illegal or embarrassing Executive conduct.  Moreover,

even if TOP SECRET or TOP SECRET//SCI information was involved in this case, the Amended Protective Order and existing counsel access regime expressly set forth provisions to govern habeas counsel's access to such information. The definition of "classified information" governed by the Protective Order, and thus the attached counsel access procedures, refers to "any classified document or information" that has been classified as "'CONFIDENTIAL,' 'SECRET,' or 'TOP SECRET,' or additionally controlled as 'SENSITIVE COMPARTMENTED INFORMATION (SCI)'." Amended Protective Order, ¶ 9. This Court should reject the Respondents' attempt to further delay Petitioner's access to counsel based upon the Respondents' unfounded speculation, effort to abuse the Executive's classification authority to conceal illegal or embarrassing Executive conduct, and flagrant misrepresentation of the Amended Protective Order. Any further delay of Petitioner Khan's access to counsel is wholly unwarranted and will irreparably injure his ability to vindicate his legal rights and establish an effective attorney-client relationship.

Accordingly, this Court should order that Petitioner Khan be afforded immediate access to counsel pursuant to the Amended Protective Order and counsel access procedures.

**A.    Respondents' Concerns That Petitioner's Access to Counsel Will Threaten National Security Are Speculative and Unfounded.**

The Respondents engage in speculation that Petitioner Khan may possess properly classified TOP SECRET or TOP SECRET//SCI information, which would have necessarily been provided or disclosed to him by U.S. government personnel while Petitioner Khan was imprisoned in secret CIA detention.[10] See Resp'ts Opp'n at 15. This speculation is unfounded and cannot justify any delay in Petitioner Khan's access to counsel.

---

[10] The information the Respondent seeks to conceal is Petitioner's personal experience of torture, disappearance, and indefinite detention by U.S. personnel. He can, at last, now seek some measure of justice. It is intolerable for the government to assert its own unacceptable and notorious treatment of this man as the very foil that is used to perpetuate his isolation. To do so will only make it more difficult for him to partake of that justice he so desperately seeks.

In order to assert that "it is likely that [Petitioner Khan] will possess, and may be able to transmit to counsel, information that would be classified at the TOP SECRET//SCI level," see Resp'ts Opp'n at 15, the Respondents rely upon the Declaration of Marilyn S. Dorn ("Dorn Declaration"). While Dorn contends she is "generally familiar with this case," she does not assert any personal knowledge of the scope of Majid Khan's knowledge of information properly classified as TOP SECRET or TOP SECRET//SCI. Therefore, with respect to Petitioner Khan's possession of TOP SECRET or TOP SECRET//SCI information, this Court should not afford the Dorn Declaration any weight because of her lack of personal knowledge of Petitioner Khan's awareness. Moreover, the information she describes as TOP SECRET or TOP SECRET//SCI is already in the public realm, often as a result of the Respondents' action.

In addition the Dorn Declaration misstates the plain language of the Amended Protective Order. The Dorn Declaration indicates that the Information Review Officer of the National Clandestine Service had no personal knowledge of the Amended Protective Order and counsel access procedures. The Dorn Declaration states, for example, that the "protective order that petitioner requests the Court to adopt contemplates that the national security information at issue would be classified at the SECRET level, rather than at the TOP SECRET//SCI level as it is here." See Dorn Decl. ¶ 14; see also id. at ¶ 15. Yet, the plain language of the Protective Order explicitly states that it governs classified information that is CONFIDENTIAL, SECRET, TOP SECRET, as well as TOP SECRET information additionally controlled as SCI. For this additional reason, the Court should not give the Dorn Declaration any weight.

Finally, the Respondents should not be permitted to continue a pattern of erecting barriers to counsel access based on unfounded and blatantly inaccurate assertions. Since 2004, Respondents have invoked similar theoretical national security concerns based upon declarations from individuals lacking personal knowledge to hinder and delay Guantánamo

petitioners' access to counsel.  See, e.g., Defs. Resp. to Compl., Al Odah v. United States, Civ. Action No. 02-cv-828 (D.D.C.), at 7, (attempting to justify impermissible monitoring of attorney-client conversations because of "the extraordinary nature of these cases involving Guantanamo Bay detainees, including that the detainees may possess sensitive information, for example, information regarding the Guantanamo base or concerning agents, units, or methods involved in the detainee's capture")  The courts have soundly rejected these speculative barriers to counsel access and interferences with the attorney-client relationship.  See, e.g., Al Odah v. United States, 346 F.Supp.2d 1 (2004).   The Court should do the same here.

Accordingly, the Court should order Petitioner Khan immediate access to counsel.

**B.    Information Concerning the Location of CIA Secret Detention and "Alternative Interrogation Methods" Is Currently in the Public Realm and Does Not Pose a Threat to National Security.**

Even if this Court affords the Dorn Declaration any weight, the information described as TOP SECRET and TOP SECRET//SCI is already in the public domain. Respondents express particular concerns about the potential disclosure of the location of the secret CIA detention sites and the interrogation techniques used against prisoners in these facilities.  Such information is known as a result of investigative news reporting, human rights investigations, accounts from released detainees, and accounts from individuals still detained in Guantánamo. The public information concerning the locations of CIA secret detention, for example, includes descriptions of the facilities, the identification of host countries, photographs of the prisons, and flight records of prisoner transfers..  See, e.g., Amnesty International, USA/Jordan/Yemen: Torture and Secret Detention: Testimony of the 'Disappeared' in the 'War on Terror' (August 4, 2005, AMR 41/108/2005) ("Testimony of the Disappeared") (discussing Yemeni detainees released from CIA secret detention describing the types and conditions of facilities in which they were detained, including sizes of cells, building structure and facilities, physical

characteristics and behavior of guards, and sensory disorientation and deprivation techniques used on prisoners); Amnesty International, <u>USA/Jordan/Yemen: Secret Detention in CIA "Black Sites"</u>, (November 2005, AMR 51/177/2005) ("<u>Secret Detention</u>") (describing additional details of CIA detentions centers where Yemeni prisoners held and the interrogation tactics used); Dana Priest, <u>CIA Holds Terror Suspects in Secret Prisons</u>, Wash. Post, Nov. 2, 2005, at A1 (reporting that U.S. has secret detention centers in Eastern Europe); Daniel McGrory <u>CIA Accused of Running Secret Jails in Europe for Terrorists</u>, Times Online, Nov. 3, 2005, <u>available at</u> http://www.timesonline.co.uk/article/ 0,,11069-1855381,00.html (National Security Adviser, Stephen Hadley refusing to deny that "black sites" are located in "Jordan, Egypt, Morocco and Afghanistan, and at least one Eastern European nation"); Tom Walker Rabat & Sarah Baxter, <u>Revealed: The Terror Prison U.S. is helping build in Morocco,</u> The Sunday Times, Feb. 12, 2006, <u>available at</u> http://www. timesonline.co.uk/article/0,,2089-2036185,00.html (revealing that United States is helping to build an interrogation and detention facility in Morocco); BELLWETHER Gallery, Press Release, <u>available at</u> http://www.bellwethergallery.com/upcoming_01.cfm?fid=305 (exhibiting Trevor Paglen's "Black World" November 16-December 23, 2006, featuring photographs of several of the CIA's "black sites," patches and symbols worn by personnel, and other documentation of the CIA secret detention program) (attached as Exhibit D) ; <u>Human Rights Watch Statement on U.S. Secret Detention Facilities in Europe</u>, Nov. 7, 2005, <u>available at</u> http://hrw.org/english/ docs/2005/11/07/usint11995.htm (reporting that flight records showing CIA airplanes known to be used to transport prisoners landed repeatedly in Poland, Jordan, Morocco, Egypt, Libya, Germany, the United Kingdom, Switzerland, Spain, Portugal, Macedonia, Cyprus, the Czech Republic, and Greece); <u>see generally</u>, Stephen Grey, <u>Ghost Plane: The True Story of the CIA Torture Program</u> (2006).

Similar extensive details are known about the methods used by CIA and other U.S. interrogators, including descriptions of these methods by former prisoners and former interrogators.[11] Amnesty International, Testimony of the 'Disappeared', supra (Yemeni detainees reporting the use of sensory disorientation and deprivation including solitary confinement for six to eighteen months, western music playing twenty-four hours a day, and elimination of natural light); Amnesty International, Secret Detention, supra (describing additional details of interrogation tactics used); Declaration of Khaled El-Masri ("El-Masri Decl.") (attached as Exhibit E) (former secret CIA detainee, Khaled El-Masri, reporting he was subject to torture while in CIA custody); Sworn Statements of Department of Defense personnel available at http://www.aclu.org/torturefoia/released/030905/ (describing the torture and mistreatment of individuals held secretly by the CIA); Press Release, Office of the Press Secretary, President Discusses Creation of Military Tribunals to Try Suspected Terrorists (Sept. 6, 2006), available at http://www.whitehouse.gov/news/releases/2006/09/20060906-3.html (President Bush admitting the use of "alternative set of procedures," implying the set of techniques known as "enhanced interrogation techniques" were used on secret CIA detainees); Brian Ross & Richard Esposito, CIA's Harsh Interrogation Techniques Described, ABC News, Nov. 18, 2005, http://abcnews.go.com/WNT/print?id=1322866 (reporting use of and describing waterboarding, cold cell, long-time standing, the attention grab, the attention slap, and the belly slap techniques); Douglas Jehl & David Johnston, CIA Now Acting Independently to Move Prisoners, N.Y. Times, Mar. 7 2005, at 4. (reporting that prisoners in secret detention have been subject to cruel, inhuman and degrading treatment such as beatings, shackling, and electric

---

[11]Indeed, Vice President Dick Cheney recently provoked a controversy when, during a discussion of interrogation methods, he stated that it was a "no-brainer" that interrogators could use a "dunk in water" to extract information from prisoners. Transcript, Interview of the Vice President by Scott Hennen, WDAY at Radio Day at the White House, The Vice President's Office, available at http://www.whitehouse.gov/news/releases/2006/10/20061024-7.html. Despite the denials of the White House Press Spokesman, many observers considered the Vice President to be referring to the use of waterboarding during interrogations of individuals in secret CIA detention. Dan Eggen, Cheney Defends 'Dunk in the Water' Remark, Wash. Post, Oct. 28, 2006 available at http://www.washingtonpost.com/wp-dyn/content/article/2006/10/27/AR2006102700560.html.

shocks); see also Brian Ross & Richard Esposito, Sources Tell ABC News Top Al Qaeda Figures Held in Secret CIA Prisons, ABC News, Dec. 5, 2005, http://abcnews.go.com/ WNT?Investigation/story?id=1375123; Jane Mayer, A Deadly Interrogation: Can the CIA Legally Kill a Prisoner?, The New Yorker, 14 Nov. 2005; Evan Thomas & Michael Hirsh, The Debate over Torture, Newsweek, Nov. 21, 2005.

Moreover, contrary to the Respondents' claims, see Resp'ts Opp'n at 3, Petitioner Khan's imprisonment in secret CIA detention is not unique to him. Other prisoners held in Guantánamo prior to September 2006 had previously been held in secret CIA detention prior to their transfer to Guantánamo. Some of those who have been held in secret CIA detention have had the opportunity to consult with lawyers. See, e.g., Robert Barr, Group: U.S. Had Secret Prison in Germany, Forbes, Oct. 6, 2006, available at http://www.forbes.com/entrepreneurs /feeds/ap/2006/10/06/ap3072831.html. The details of these Guantánamo detainees' secret CIA detention have been widely publicized in the context of European Union investigations into member countries' complicity in the U.S. secret detention program.

Not only is a great deal of general information known about the secret CIA detention program, specific details concerning some of the locations in which Petitioner Khan was held and his conditions of confinement are known to released prisoners, such as Mr. Khaled El-Masri. See El-Masri Decl.; see also Craig S. Smith, Algerian Tells of Dark Odyssey in U.S. Hands, NY Times, July 7, 2006, at A1 (attached as Exhibit F) (describing the imprisonment of Khaled el-Masri, Laid Saidi, Abdul al-Rahim Ghulam and Mohammed Ahmad Ghulam Rabbani, all of whom were imprisoned with Petitioner Khan in secret CIA detention in Afghanistan). Upon his release, Mr. el-Masri filed an action seeking to hold U.S. government officials and private contractors accountable for his extraordinary rendition and wrongful

imprisonment. His detailed disclosures about the facility in which he, and Petitioner Khan, were held did not result in further terrorists attacks.

The government characterizes Petitioner Khan's three year imprisonment in secret detention -- isolated from the outside world, his family, legal counsel, the International Committee of the Red Cross, and others, while subjected to "aggressive" CIA interrogation methods -- as a "unique circumstance" justifying his further <u>incommunicado</u> detention at Guantánamo. The Respondents cannot invoke their patently illegal disappearance and aggressive interrogations of Petitioner Khan to justify more restrictive counsel access procedures or any further delay in his access to counsel. Rather, these "unique circumstances" support his urgent need to consult with his counsel.

Finally, implied in Respondents' concerns about security-cleared counsel meeting with Petition Khan is the belief that such communications will result in the illegal public disclosure of classified information. Respondents mistakenly equate access to counsel with unfettered public disclosure of classified information. The counsel access regime and Amended Protective Order envision no such illegal conduct. Regardless of the classification level of any information that counsel learns from his or her client, that information cannot be disclosed absent a classification review by the military's Privilege Review Team, which the Respondents established and supervise. Counsel Access Procedures II.D; VII; IX. When necessary, the habeas litigation has proceeded under seal and filings are initially submitted to the CSO for proper redactions prior to any public filing to safeguard classified information and national security. Amended Protected Order ¶¶ 46-48. These are examples of the appropriate mechanisms incorporated into the existing Amended Protective Order that adequately address the national security concerns invoked by Respondents to hinder Petitioner Khan's access to counsel. As the court has stated, when the government grants security clearance to attorneys,

such as the undersigned counsel, it is a determination that the individual can be trusted with the information classified at that level. Al Odah, 346 F.Supp.2d at 14. As with any information covered by the Protective Order, safeguards exist to prevent the unauthorized disclosure of classified information.

Accordingly, the Court should order Petitioner Khan's immediate access to counsel.

**C.    The Executive's Classification Authority Cannot Be Used to Conceal Illegal or Embarrassing Conduct Concerning Petitioner's Secret Detention and Torture.**

Fundamentally, the Executive cannot use its classification authority to conceal illegal conduct or embarrassing activities. The Respondents cannot rely upon the system of classification established by Executive Order 12958, as amended by Executive Order 13292, to conceal violations of the law or to prevent embarrassment to the government. Exec. Order No. 12,958, 60 Fed. Reg. 19,825 (April 20, 1995), *amended by* Exec. Order No. 13,292, 68 Fed. Reg. 15,315 (March 28, 2003). Section 1.7(a) of Executive Order 12958 states that "[i]n no case shall information be classified in order to: (1) conceal violations of law . . . [or] (2) prevent embarrassment to a person, organization, or agency." The classification limitations under Section 1.7(a)(1)-(2) of the Executive Order expressly prohibit the government from treating the details of Petitioner Khan's detention and interrogation as classified in order to conceal their illegal and embarrassing nature.

The Respondents argue that because the CIA chose to secretly detain Petitioner Khan, he might possess classified information "such as the locations of the C.I.A. detention centers." Resp'ts Opp'n, at 15. Under § 1.7(a)(1) of Executive Order 12958, the Respondents cannot declare the locations of the secret CIA detention classified to conceal the fact that the CIA operates a secret prison system in contravention of the United States' domestic and international

legal obligations.[12]   The illicit and illegal nature of the CIA secret detention program is well-known.  Two human rights bodies of the United Nations have pointed out, for example, that the CIA's secret detention program violates the United States' obligations under the International Covenant on Civil and Political Rights ("ICCPR") and the U.N. Convention Against Torture ("CAT").  See Office of the U.N. High Comm'r for Human Rights, Working Group on Arbitrary Detention, Opinion No. 29/2006 (United States of America), ¶¶ 3, 15, 21–23 (Sept. 1, 2006) (observing the United States' obligations under the ICCPR and finding the CIA's detention of Petitioner Khan and other disappeared prisoners "manifestly cannot be justified on any legal basis"); Office of the U.N. High Comm'r for Human Rights, Committee Against Torture, Conclusions and Recommendations of the Committee Against Torture, United States of America, ¶ 17, U.N. Doc. CAT/C/USA/CO/2 (May 18, 2006) (characterizing secret detention as a "per se" violation of the CAT).   Moreover, the CIA denied Petitioner Khan access to the International Committee of the Red Cross during his secret detention, thereby violating the Geneva Conventions in situations of armed conflict.  International Committee of the Red Cross, US Detention Related to the Events of 11 September 2001 and its Aftermath—the Role of the ICRC, Mar. 29 2005, available at  http://www.icrc.org/Web/Eng/siteeng0.nsf/html/66FGEL. Executive Order 12958 § 1.7(a)(1) bars the government from concealing the patent illegality of the CIA's secret detention program under the guise of "classified" information.  Accordingly, the Respondent cannot rely upon the classified nature concerning details about the locations of Petitioner Khan's secret detention to justify their denial of his immediate access to counsel.

The Respondents also argue that Petitioner Khan may know, due to his first-hand experience, "operational details, such as interrogation methods." Resp'ts Opp'n at 15.  As with the location of the secret CIA detention, § 1.7(a)(1) prohibits the government from relying on the

---

[12] As explained above, however, if such information was properly classified, regardless of the classification-level, and Petitioner Khan provided such information to his counsel, these details would remain safeguarded from public disclosure pursuant to the Amended Protective Order and counsel access procedures.

system of classification to conceal the illegality of alternative interrogation procedures that are tantamount to torture. A number of individuals held secretly by the CIA have reported that they were subjected to torture while in CIA custody. <u>See</u> El-Masri Decl.; Smith, <u>Algerian Tells of Dark Odyssey in U.S. Hands</u>.

Among the "enhanced interrogation techniques" reportedly approved by the CIA in March 2002,[13] six techniques are known to inflict serious and potentially permanent pain and suffering on detainees. Ross & Esposito, <u>CIA's Harsh Interrogation Techniques</u> <u>supra</u>. First, "water boarding" replicates the experience of execution by drowning. The detainee is restrained on an incline with his head below his feet, and cellophane or a rag is wrapped over the detainee's face; when water is poured over the detainee's face and into his mouth, he experiences discomfort and fear calculated to cease just short of drowning. <u>See</u> Priest, <u>CIA Holds Terrorism Suspects</u>, <u>supra</u>; Dana Priest, <u>Vice President for Torture</u>, Wash. Post, Oct. 26, 2005, at A18; Ross & Esposito, <u>Sources Tell ABC News</u>, <u>supra</u>. Second, detainees are also commonly stripped naked and doused in water, and then restrained in cells kept at temperatures as low as fifty degrees Fahrenheit. Not surprisingly, detainees subjected to this technique risk life-threatening hypothermia. Ross & Esposito, <u>Sources Tell ABC News</u>, <u>supra</u>. This technique of leaving a detainee in a "cold cell" is often accompanied by the third technique of forced and prolonged standing. Suspended by handcuffs attached to the ceiling and immobilized by shackles bolted to the floor, detainees are sometimes left standing for multiple days at a time; as a result, their legs and feet become painfully swollen while the handcuffs cut into their wrists, leaving permanent scars. Smith & Mekhennet, <u>Algerian Tells of Dark Odyssey in U.S. Hands</u>, <u>supra</u>. The final three techniques all involve assaulting detainees, either by grabbing them and shaking them violently, or by slapping them in the face or midsection with an open hand—in the case of the

---

[13] <u>See</u>, Dana Priest, <u>CIA Puts Harsh Tactics on Hold—Memo on Methods of Interrogation Had Wide Review</u>, Wash. Post, June 27, 2004, at A1.

"belly slap," repeated blows can cause serious harm to the detainees' internal organs.  El-Masri Decl., at ¶ 52; Ross & Esposito, CIA's Harsh Interrogation Techniques Described, supra.

Reports have also revealed equally—if not more—alarming trends of abuse in CIA detention.  Both Khaled El-Masri and Laid Saidi, who were detained at the "Salt Pit" in Afghanistan with Majid Khan,[14] describe being kicked, beaten, and forcefully restrained.  El-Masri Decl., at ¶ 40; Smith & Mekhennet, Algerian Tells of Dark Odyssey in U.S. Hands.  Most alarmingly, although Mr. El-Masri and Mr. Saidi were transported from significantly different locations[15] to the Salt Pit, both were sodomized[16] and outfitted with diapers and jumpsuits before transport to Afghanistan.  El-Masri Decl., at ¶¶ 33–35; Smith & Mekhennet, Algerian Tells of Dark Odyssey in U.S. Hands.

Indeed, reported conduct of CIA interrogators indicates that the interrogators themselves actually recognized the illegality of their alternative procedures and resisted the continued operation of the secret detention program.  See Stephen Rickard, Interrogators Beware, Wash. Post, Oct. 17, 2006, at A21 (reporting that CIA interrogators stopped their work and "demanded 'clarity'" from Congress regarding liability for certain interrogation techniques); R. Jeffrey Smith, Worried CIA Officers Buy Legal Insurance, Wash. Post, Sept. 11, 2006, at A1; Ken Silverstein, The CIA "Wehrmacht," Harper's Mag., April 19, 2006, available at http://www. harpers.org/sb-cia-wehrmacht.html (detailing efforts of some CIA employees to avoid any involvement in the Agency's "rendition" program).  Per the limitations of Executive Order 12958 § 1.7(a)(1), the government may not classify the details of the CIA's interrogation

---

[14] See El-Masri Decl., at ¶¶ 4, 42–43, 54–55, 57, 66 (explaining his knowledge that Majid Khan was at the Salt Pit); Smith, Algerian Tells of Dark Odyssey in U.S. Hands, supra (describing Laid Saidi's seizure, transport, and detention at the Salt Pit, where he met Mr. El-Masri).

[15] Mr. El-Masri was transported from Skopje, Macedonia while Mr. Saidi was transported from Malawi.  El-Masri Decl., at 39; Smith & Mekhennet, Algerian Tells of Dark Odyssey in U.S. Hands.

[16] More alarming still, Mr. El-Masri's and Mr. Saidi's experiences share a stunning similarity.  Both were held to the ground while their clothes were cut away before having some sort of plug inserted in their anuses, and in both cases they were photographed throughout the process.  El-Masri Decl., at ¶ 33; Smith & Mekhennet, Algerian Tells of Dark Odyssey in U.S. Hands.

techniques in order to conceal those techniques' illegality, much less use the unilateral assertion of such classification to deny Petitioner Khan immediate access to counsel.

Similarly, the Executive's classification authority cannot be used to conceal information that would embarrass the United States. Executive Order 12958 § 1.7(a)(2). From the first news reports about its existence, the CIA secret detention program has been a source of embarrassment for the United States in the international community. United Nations human rights bodies have admonished the United States to close its secret detention facilities and to bring its systems of detention in line with human rights standards binding on the U.S. U.N. High Comm'r for Human Rights, Human Rights Committee, Concluding Observations of the U.N. Human Rights Committee, United States of America, ¶ 12, U.N. Doc. CCPR/C/SR.2395 (Sept. 15, 2006). Similarly, the Council of Europe has criticized the system of "targeting, apprehending and detaining terrorist suspects" as a "global spider's web" of which the United States is "chief architect." Committee on Legal Affairs and Human Rights, Council of Europe, Alleged secret detentions and unlawful inter-state transfers of detainees involving Council of Europe member states (June 12 2006) paras. 24-26 (Rapporteur: Dick Marty), available at http://assembly.coe.int/Documents/WorkingDocs/doc06/edoc10957.pdf).

Finally, since President Bush confirmed the existence of the CIA secret detention program on September 6, 2006, European leaders have begun to openly criticize the Executive's conduct as patently illegal. See, e.g., Merkel Criticizes U.S.; Says CIA Prisons Not Compatible with "Rule of Law," Int'l Herald Trib., Sept. 9, 2006 (quoting German Chancellor Angela Merkel). The government may not exercise its classification authority under Executive Order 12958 to conceal information about the CIA secret detention program that might further embarrass the United States on the world stage; nor can this serve as a basis to deny Petitioner Khan access to counsel to challenge his ongoing detention by U.S. authorities.

**D.    Even If Petitioner Possesses TOP SECRET or TOP SECRET//SCI Information, the Amended Protective Order Explicitly Governs Habeas Counsel Access to Such Information and Safeguards National Security.**

The Amended Protective Order and counsel access provisions were vigorously negotiated, fully briefed and extensively litigated. The Order and access procedures expressly reference habeas counsel's access to TOP SECRET and TOP SECRET//SCI information. The government inexplicably misleads the Court in this regard.

The government states repeatedly that the Amended Protective Order, and counsel access regime, "contemplates issues associated with the handling of information classified no higher than SECRET." See Resp'ts Opp'n at 14-15; see also id. at 16 ("[T]he current protective order and counsel access regime applicable in various other cases filed at a time when the District Court had *habeas* jurisdiction, contemplates that counsel representing a detainee hold or obtain only a SECRET-level clearance, and, in fact, petitioners' counsel in this case holds only a SECRET-level clearance."). In support of this assertion, Respondents reference Section III.A.1 of the Access Procedures. That provision, however, explicitly states that counsel must hold clearance at the Secret level <u>or higher</u> and it accounts for access to high-level classified information:

> A.    <u>Security Clearance</u>:
>
>    1.    Counsel must hold a valid current United States security clearance at the Secret level or higher, or its equivalent (as determined by appropriate DoD intelligence personnel).

Moreover, the Amended Protective Order, to which the counsel access procedures are attached, states:

> 9.    The terms "classified national security information and/or documents," "classified information" and "classified documents" refer to:
>
>    a.    any classified document or information that has been classified by any Executive Branch agency in the interests of national security or

pursuant to Executive Order, including Executive Order 12958, as amended, or its predecessor Orders as "CONFIDENTIAL," "SECRET," or "TOP SECRET," or additionally controlled as "SENSITIVE COMPARTMENTED INFORMATION (SCI)," or any classified information contained in such document.

The entire Amended Protective Order and counsel access regime reflects habeas counsel's access to varying levels of classified information designated as SECRET and higher-level information.[17]    Even the version of the counsel access procedures originally drafted and proposed by Respondents and later rejected, in part, by the court in Al Odah, acknowledged and contemplated that habeas counsel could hold varying levels of security clearance.

Respondents also fail to properly explain the regulations concerning classification-levels and the SCI designation. Pursuant to Executive Order 12958, only three classification levels exist: CONFIDENTIAL, SECRET, and TOP SECRET.    Materials classified as TOP SECRET//SCI are "TOP SECRET" classification level materials that have additional access measures applicable to them which restrict the "need-to-know" basis for access to the information.  But no further "security clearance" is required to determine whether an individual can be trusted with SCI information: if an individual possesses "TOP SECRET" security clearance, he or she is eligible for access to TOP SECRET//SCI materials and the authorizing authority must then determine if the individual falls within the group permitted access to the sensitive information pursuant to Executive Order 12958.[18]

The Respondents cite numerous examples of logistical matters that they argue will jeopardize national security. For example, they contend that the counsel access regime

---

[17] In addition, when the undersigned counsel received security clearance in August 2004, it was her understanding from the Department of Justice Court Security Office that an adequate background investigation had been conducted to raise her clearance level to "TOP SECRET" should the need arise. See Declaration of Gitanjali S. Gutierrez (attached as Exhibit G).  If the Respondents conclude that Petitioner Khan cannot obtain access to counsel until counsel obtains TOP SECRET security clearance, the Court should direct that Respondents request that the Court Security Office complete any additional background investigation, if needed, immediately.

[18] If the Respondents conclude that access to TOP SECRET//SCI information is involved in this case, the Court should order the Respondents to seek access authorization for the undersigned counsel from the appropriate authorities. See Executive Order 12859.

"contemplates mailing of communications to counsel from a detainee or of notes of a counsel's meeting with a detainee from Guantanamo to the secure workspace facility for *habeas* counsel called for under the protective order," referring to Access Procedures §§ IV.B.3; VI.B; Amended Protective Order ¶ 20, and that materials classified at the TOP SECRET//SCI cannot "be sent through the mail, via certified mail." See Resp'ts Opp'n at 16. The Access Procedures and Amended Protective Order require no such thing. Section IV.B.3 of the Access Procedures require materials sent from a detainee to his lawyer to be handled in a manner appropriate for the material's level of classification, thus contemplating varying degrees of classification:

> 3.    After the outgoing legal mail is collected from the detainee, the envelop will be sealed into a larger envelop by military personnel at Guantanamo which will be marked as "Attorney-Detainee Materials-For Mail Delivery to Counsel" and will be annotated with the name of the detainee and the counsel.  The envelope will be sealed and mailed in the manner required for classified materials.  Within two (2) business days of receipt from the detainee, the communications will be mailed to the appropriate address as provided by government counsel.

See Access Procedures § IV.B.3 (emphasis added); see also Access Procedures § VI.B (similarly requiring that attorney-client meeting notes must be "mailed in the manner required for classified materials" without limiting the nature of the classified materials as defined in the Amended Protective Order ¶ 9, cited above).  Nothing in § IV.B.3 precludes the Respondents from complying with C.R.F. § 2001.45(c), (d), which requires that top secret information shall only "be transmitted by direct contact between authorized persons; the Defense Courier Service or an authorized government agency courier service; a designated courier or escort with Top Secret clearance; electronic means over approved communications systems."  Nothing under the counsel access regime requires the Respondents to transmit TOP SECRET information via the U.S. Postal Service.  In fact, the Access Procedures state that the privilege team shall "forward" the mail to Guantanamo, presumably in a manner that complies with Executive Order 12958,

DoD Regulations 5200.1-R and AI 26, OSD Information and Security Supplement to DoD Regulations 5200.1-R, and C.F.R. § 2001.45.

The Amended Protective Order and counsel access procedures also do not limit the capacity of the secure workspace facility or the composition of the privilege review team to handle only SECRET information. See, e.g., Amended Protective Order ¶ 20 ("The government shall arrange for one appropriately approved secure area for the use of petitioners' counsel. The secure area shall contain a working area that will be supplied with secure office equipment reasonable and necessary to the preparation of the petitioners' case."); ¶ 21 ("The Court Security Office shall establish procedures to ensure that the secure area may be maintained and operated in the most efficient manner consistent with the protection of classified information" as defined in the Amended Protective Order ¶9, cited above); and Access Procedures II.D (defining the "privilege team" without limiting its ability to review SECRET or higher-level classified information). The Respondents have had over three years to address the logistical arrangements necessary to afford Petitioner Khan access to counsel, and they have now imprisoned him in Guantánamo for nearly two months. The Respondents need to complete their preparations and cannot justify any further delay of Petitioner Khan's access to counsel.

Finally, the Respondents' concerns that the undersigned counsel will disclose TOP SECRET or TOP SECRET//SCI information to unauthorized recipients pursuant to the Amended Protective Order is absurd. See Resp'ts Opp'n at 17-18; Dorn Decl. ¶ 15. First, security-cleared counsel have been entrusted with access to classified information. Second, the "need-to-know" provision of the Amended Protective Order prohibits disclosure except to persons "authorized pursuant to this Protective Order, the Court, and counsel for the government with the appropriate clearances and the need to know that information." Under these requirements, a habeas attorney

cannot disclose TOP SECRET or TOP SECRET//SCI materials to another attorney who only holds SECRET clearance, even if a "need-to-know" existed.

The Respondents urge this Court to defer to the Executive's responsibility to safeguard national security information and caution that the Court "should not proceed with entry of a protective order regime that fails to address classification-level concerns in this case such as those raised above." See Resp'ts Opp'n at 18. In fact, even if such classification-level concerns actually existed in this case, the Amended Protective Order and counsel access regime, reviewed and considered by numerous judges of this Court, govern precisely these concerns. More fundamentally, the Executive cannot misuse its classification authority under Executive Order 12958 to conceal illegal conduct or activity whose disclosure would be embarrassing to government officials.

Accordingly, the Respondents have offered no grounds for delaying Petitioner Khan's access to counsel and the Court should order Respondents to permit Petitioner Khan immediate access to counsel pursuant to the Amended Protective Order and counsel access procedures.

## III.  ANY DELAY OF PETITIONER'S ACCESS TO COUNSEL WOULD RESULT IN AN UNJUSTIFIED AND GROSS MISCARRIAGE OF JUSTICE.

As set forth above, Respondents justifications for obstructing Petitioner Khan's access to counsel are based upon unfounded speculation, misleading assertions, and efforts to conceal illegal and embarrassing Executive wrongdoing. Immediate access to counsel is not only warranted, but is essential to safeguard Petitioner Khan's legal rights. Any delay of his right to meet and consult with legal counsel is likely to irreparably harm Petitioner Khan's ability to pursue his challenge to his detention.

By the Respondents' own admission, Petitioner Khan has been detained in secret CIA detention and subjected to the euphemistically named "alternative interrogation methods." The psychological stress from incommunicado detention and torture or cruel, inhuman and

degrading treatment, in general, has a deteriorating impact upon an individual's psychological and physical health. The longer Petitioner Khan remains without access to counsel, the greater the risk that his ability to assist in his representation will decline, and the difficulties of establishing a trusting attorney-client relationship will increase.

Torture and other forms of abusive interrogation can have devastating health consequences on the victim's physical, mental and social well-being. See Declaration of Allen Keller ("Keller Decl.") ¶11 (attached as Exhibit H). These health consequences can include confusion, dissociation, and fear in the victims. See Keller Decl. ¶12. In addition, the psychological dissociation that may result from torture occurs when processes which are normally integrated – such as memory, identity, emotions, and thoughts – are separated. See Keller Decl. ¶12. Torture and abusive interrogation may also result in particular difficulties with memory. See Keller Decl. ¶13. Petitioner Khan continues to suffer from the ongoing impact of torture resulting from indefinite secret detention and aggressive interrogation methods. When this is combined with a continuing denial of access to counsel, it undermines Petitioner Khan's ability to intelligently disclose facts and information to his counsel.

Further, the delay of access to counsel is likely to create substantial damage to Petitioner Khan's ability to establish a trusting and effective attorney-client relationship. As a result of his abuse, the ability of a victim of torture or abusive interrogation to recall information and develop a trusting professional relationship may deteriorate over time. See Keller Decl. ¶13-14. Petitioner Khan is now in a new environment and may be disorientated and confused as to what is happening to him. He may be wary of new interrogation "tricks" or methods. Any continuing delay of his access to counsel only decreases his already compromised ability to develop a trusting and functional attorney-client relationship.

## CONCLUSION

The Executive consistently seeks to evade the rule of law with respect to individuals detained in secret CIA detention and at Guantánamo, characterizing any compliance with judicial review as a matter of favor rather than of constitutional mandate. This is simply not the law. Our Constitution requires that the Courts exercise their existing jurisdiction to impose independent review of Executive abuses.

This Court should not defer to the Respondents' unfounded assertions, misleading characteristics, and improper attempts to conceal illegal and embarrassing conduct. Petitioner Khan, like all other individuals detained in Guantanamo, has a right to prompt access to his counsel while his habeas petition is pending before this Court. He is entitled to consult with legal counsel and make informed litigation decisions to defend the Court's jurisdiction over his case. The Respondents cannot imprison an individual wholly outside the law and subject him to torture or cruel, inhuman and degrading treatment only to invoke the same lawlessness as "unique circumstances" that compel the judiciary to decline to safeguard his liberty.

Accordingly, this Court should order Respondents to promptly afford Petitioner Khan access to counsel pursuant to the Amended Protective Order.

Dated: November 3, 2006

Respectfully submitted,

Counsel for Petitioners:

/s/ _____

Gitanjali S. Gutierrez

Michael Ratner
William Goodman
CENTER FOR CONSTITUTIONAL RIGHTS
666 Broadway
New York, New York 10012
(212) 614-6485