**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| _____ ) | |
| **MAJID KHAN,** *et al.*, ) | |
| *Petitioners,* ) | |
| ) | |
| **v.** ) | Civil Action No. 06-cv-1690 (RBW) |
| ) | |
| ) | |
| **GEORGE W. BUSH, et al.,** ) | |
| *Respondents.* ) | |
| _____ ) | |

**PETITIONERS' EXPEDITED MOTION FOR RECONSIDERATION OF THE COURT'S
NOVEMBER 17, 2006 ORDER, OR IN THE ALTERNATIVE, RENEWED EXPEDITED
MOTION FOR EMERGENCY ACCESS TO COUNSEL AND ENTRY OF AMENDED
PROTECTIVE ORDER**

PLEASE TAKE NOTICE that on such date as the Court shall determine, Petitioner,

together with his Next Friend, by and through undersigned counsel, shall move on an expedited

basis for reconsideration of the Court's Order of November 17, 2006 (dkt. no. 11) as set forth in

the accompanying Memorandum in Support of Petitioners' Motion.

Dated:  New York, New York.
        December 7, 2006

Respectfully submitted,

Counsel for Petitioners:

By:

  /s/ _____
Gitanjali S. Gutierrez
CENTER FOR CONSTITUTIONAL RIGHTS
666 Broadway
New York, New York 10012
(212) 614-6485

*Counsel for Petitioner*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| **MAJID KHAN,** *et al.*, | ) | |
| *Petitioners,* | ) | |
| **v.** | ) | Civil Action No. 06-cv-1690 (RBW) |
| | ) | |
| **GEORGE W. BUSH, et al.,** | ) | |
| *Respondents.* | ) | |

## MEMORADNUM IN SUPPORT OF PETITIONERS' MOTION FOR RECONSIDERATION OF THE COURT'S NOVEMBER 17, 2006 ORDER, OR IN THE ALTERNATIVE, RENEWED EXPEDITED MOTION FOR EMERGENCY ACCESS TO COUNSEL AND ENTRY OF AMENDED PROTECTIVE ORDER

Petitioner Majid Khan ("Khan") respectfully submits this Motion for Reconsideration of the Court's Order of November 17, 2006 ("Order") (dkt. no. 11), or in the alternative a Renewed Expedited Motion for Emergency Access to Counsel and Entry of the Amended Protective Order.[1]  Prior to Petitioner's transfer on September 4, 2006 to the Guantánamo Naval Station, Guantánamo Bay, Cuba ("Guantánamo"), the Respondents imprisoned Petitioner Khan for over three years in secret Central Intelligence Agency (CIA) detention and have admitted they subjected him to "enhanced interrogation techniques,"[2] methods that amount to torture and cruel, inhuman and degrading treatment.  In opposing Khan's effort to meet with his counsel, the Respondents asserted that, in light of the Detainee Treatment Act of 2005[3] ("DTA") and Military Commission Act of 2006[4] ("MCA"), this Court should summarily announce its lack of

---

[1] Pursuant to Local Civil Rule 7(m), the undersigned counsel for Petitioners conferred with Respondents' counsel regarding the relief sought in this motion.  Respondents' counsel oppose the motion.

[2] See Press Release, Office of the Press Secretary, President Discusses Creation of Military Tribunals to Try Suspected Terrorists (Sept. 6, 2006), available at http://www.whitehouse.gov/news/releases/2006/09/ 20060906-3.html; see also Announcement, Office of the Director of National Intelligence, Summary of the High Value Terrorist Detainee Program (Sept. 6, 2006), available at http://www.dni.gov/announcements/content/TheHighValue DetaineeProgram.pdf.; Pet for Writ of Habeas Corpus (dkt. no. 1), at ¶ 54.

[3] Detainee Treatment Act of 2005, Pub. L. 109-148, tit. X, 119 Stat. 2680 (10 U.S.C. §801 note).

[4] Military Commission Act of 2006, Pub. L. No. 109-___.

authority over the case.  The Respondents also boldly claimed that because Khan was exposed to "top secret//sensitive compartmented information" vis-à-vis his secret detention and brutal interrogations, he cannot consult with his attorney at this time for fear he will reveal information about his secret detention and interrogations, including the methods used to torture him or information that the Respondents voluntarily provided to him.  Such circular and self-serving logic cannot justify any delay in Khan's fundamental right to consult with his counsel.

Although the Court issued an Order denying Khan's motion without prejudice November 17, 2006, because "the issue of whether this Court has jurisdiction to entertain the habeas petition filed by putative counsel is pending review by the District of Columbia Circuit," Order at 4, Khan seeks, at a minimum, that this Court exercise its jurisdiction to determine its jurisdiction while his petition is pending before it.  The Court continues to exercise jurisdiction over this petition because the matter has not been withdrawn, dismissed or appealed.  Upon review of this argument, reconsideration of Khan's motion is warranted.

By denying without prejudice Khan's Expedited Motion for Emergency Access to Counsel and Entry of the Protective Order, the Court was unable to consider Khan's additional arguments that Respondents misrepresented the scope and provisions of the Amended Protective Order; that Respondents cannot invoke their own torture and abuse of Khan as grounds to delay his access to counsel; that Respondents were attempting to improperly use Executive classification authority to conceal illegal or embarrassing conduct; and that any delay in consulting with his lawyer is likely to have an irreparable and detrimental impact upon Khan's ability to assist in his own defense and challenge to his detention.[5]

Khan now timely moves for reconsideration of the Court's Nov. 17, 2006 Order on the grounds that the Court has existing jurisdiction over this pending habeas petition and the

---

[5] The Order, for example, quotes Respondents' description of the Amended Protective Order, Order at 3, without any reference to the Respondents' significant misrepresentation of the document's scope and the safeguards it contains against disclosure of classified information.  See Pet'r Reply (dkt. no. 10), at 8.

authority to order relief sought by counsel on behalf of Khan.  See Fed. R. Civ. Pro. 6(e); 59(e); 60(b)(1) & (6).  Alternatively, Khan renews his Expedited Motion for Emergency Access to Counsel and Entry of the Amended Protective Order.

Accordingly, for the reasons set forth below, and for the reasons set forth in Khan's Expedited Motion for Emergency Access to Counsel and Entry of the Amended Protective Order and Reply Brief in support of that motion, (dkts. nos. 2 & 10), this Court should exercise its authority to vacate its Order of November 17, 2006 and order Respondents to afford Khan immediate access to counsel pursuant to the Amended Protective Order.

## ARGUMENT

The Court, like other district courts, continues to have jurisdiction over this Petition and has the authority to order the Respondents to provide Khan immediate access to counsel. Additionally, the Court misapprehended the concerns of Khan's counsel regarding his physical and mental health: in light of Respondents' admissions concerning Khan's treatment during his interrogation and imprisonment in secret CIA detention, counsel seek immediate access to Khan before further deterioration of his health precludes his ability to assist in his own defense and representation.  Time is of the essence if Khan is to have access to justice.

**I.     THE COURT HAS JURISDICTION OVER KHAN'S HABEAS PETITION BECAUSE THE PETITION HAS NOT BEEN DISMISSED AND THE COURT RETAINS JURISDICTION TO DETERMINE ITS JURISDICTION.**

This Court declined to permit Khan access to counsel on the grounds that "the issue of whether this Court has jurisdiction to entertain the habeas petition filed by putative counsel is pending review by the District Columbia Circuit."  The issues pending before the Court of Appeals in Boumediene v. Bush, No. 05-5062 (D.C. Cir.), and Al Odah v. United States, No. 05-5064 (D.C. Cir.), do not preclude this Court's exercise of jurisdiction to order Khan's

3

immediate access to counsel for three reasons. First, this Court has jurisdiction over cases currently pending before it. Second, it is improper to delay consideration of the present Petition pending the outcome of an appeal in a different habeas petition on behalf of other individuals. Third, even if this Court stays further consideration of this Petition pending the outcome of the Al Odah and Boumediene appeal, this Court retains jurisdiction over this case. Accordingly, the Court has the authority to order Respondents to provide Khan with immediate access to counsel pursuant to the Amended Protective Order, and should do so for the reasons Khan stated previously and herein.

A.    **This Court has jurisdiction over cases pending before it.**

Khan's habeas petition was properly filed and is currently pending before the district court. It has not been withdrawn or dismissed. The district court has not been deprived of jurisdiction as a result of any appeal of a final order or judgment. Moreover, Khan, unlike all other Guantánamo habeas petitioners, has no other available judicial forum in which to challenge the legality of his detention or seek any review whatsoever because he has not received a Combatant Status Review Tribunal (CSRT), and the timing of any future CSRT or military commission is subject purely to the whim of the Executive. As a result, despite nearly four years of secret detention and aggressive interrogations, Khan has not received any final decision from a proceeding at Guantánamo or any other U.S. facility that can be appealed pursuant to the DTA or MCA to the Circuit Court.

This Court currently has ongoing jurisdiction over Khan's case and the authority to order counsel access and entry of the Amended Protective Order. Indeed, this Court is the sole judicial authority which can do so. Accordingly, the Court should order Khan's prompt access to counsel.

B.    **It is improper to delay consideration of Khan's Petition pending the outcome of an appeal in another case on behalf of other individuals.**

4

Any pending jurisdictional challenges in this matter or in others do not deprive this Court of authority. The issues pending before the Court of Appeals concern whether the federal courts retain jurisdiction over the petitioners in the consolidated appeal of Al Odah and Boumediene, not over the present case and Khan. Any delay of consideration of Khan's case pending the outcome of a different petition on appeal is improper, particularly in light of the lengthy delay of any ruling in Al Odah and Boumediene. Habeas jurisprudence cautions against unnecessary delay of consideration of an individual's challenge to his detention. See, e.g., Yong v. INS, 208 F.3d 1116, 1120 ("[H]abeas proceedings implicate special considerations that place unique limits on a district court's authority to stay a case in the interests of judicial economy."); Johnson v. Rogers, 917 F.2d 1283, 1284 (10th Cir. 1990) (recognizing that if delay in deciding a habeas petition, absent good reason, were routinely permissible, "the function of the Great Writ would be eviscerated"); Jones v. Shell, 572 F.2d 1278, 1280 (8th Cir. 1978) ("The writ of habeas corpus, challenging the illegality of detention, is reduced to a sham if the trial courts do not act within a reasonable time."); Cross v. Harris, 418 F.2d 1095, 1105 n. 64 (D.C. Cir. 1969) ("This is a habeas proceeding, and thus particularly inappropriate for any delay."); see also Mohammon v. Bush, 05-2386 (RBW), Order (June 27, 2006) (dkt. no. 66) ("Absent contrary direction by the District of Columbia Circuit, this Court is unwilling to take action that might conceivably dilute the Great Writ or impair its exercise.").

Moreover, it is by no means clear that the resolution of the issues in Al Odah and Boumediene will even decide the jurisdictional questions in the present case. In those cases, the petitioners have undergone a Combatant Status Review Tribunal ("CSRT") as well as Annual Review Boards ("ARBs"); filed their habeas petitions prior to the passage of the DTA; and do not have asylum status in the United States. In contrast, Khan has been given absolutely no legal process at Guantánamo, as described above. It is entirely possible that the Executive

could delay indefinitely any CSRT or military commission proceeding against Khan, and thus prevent him from ever obtaining a decision eligible for review under the DTA. Further, if the Court of Appeals determines that, based upon a statutory interpretation analysis, the provisions of the MCA abrogating the writ of habeas corpus do not apply to pending cases, it could preclude any Suspension Clause analysis in that appeal. Because Khan's petition was filed after the passage of the DTA, this Court may still be required to address the Suspension Clause and other issues that the appellate court might avoid in Al Odah and Boumediene. These arguments illustrate the distinctions between the legal issues in the appellate cases and the potential that when the final resolution of that appellate proceeding is resolved, potentially by the United States Supreme Court in its 2007 Term, Khan may still be left facing additional legal challenges by the Respondents. These circumstances emphasize the need for prompt determination of Khan's motion for counsel access rather than delaying consideration of his case for months, and perhaps years.

Although another court, after ordering that the petitioner receive access to counsel, recently granted a stay pending the outcome of Al Odah and Boumediene, the court warned that:

> The longer those appellate proceedings drag on, the more problematic it becomes as to whether a stay serves the interest of justice. It is often said that "justice delayed is justice denied." Nothing could be closer to the truth with reference to the Guantanamo Bay cases.

Al Razak v. Bush, Civil Action No. 05-1601 (GK), Order (Dec. 1, 2006) (dkt. 41), at 3.

From the Respondents' own admissions, Khan has received even less legal process and has been subjected to even more severe conditions of confinement and aggressive interrogations than most other prisoners at Guantánamo. His unique circumstances, therefore, do not justify further delay of his access to the courts, as Respondents have argued. Rather, Khan's circumstances necessitate immediate access to counsel and weigh against the imposition of a

stay or any delay in his proceedings pending the outcome of an appeal in other Guantánamo habeas cases.  Thus, this Court should order Petitioner's prompt access to counsel pursuant to the Amended Protective Order.

> **C.    Even if further consideration of the present habeas petition is stayed pending the outcome of Al Odah and Boumediene, this Court retains jurisdiction and has the authority to order Khan's immediate access to counsel.**

Even if the Court defers further rulings pending the outcome of Al Odah and Boumediene, numerous courts in this district have recognized that the courts retain jurisdiction over the pending habeas petitions and may issue orders as needed.  Multiple courts in this district, for example, have properly exercised their existing jurisdiction over pending habeas petitions in a similar procedural posture as the present case: habeas petitions filed after the passage of the DTA and prior to the MCA.  The courts in these cases, while awaiting the decision in Al Odah and Boumediene, have issued orders to grant the petitioners immediate access to counsel, to require the respondents to file factual returns, or to require the respondents to declare why the writ should not be granted.[6]  See, e.g., Isamatullah v. Bush, Civil Action No. 06-1682 (RJL), minute order (Nov. 27, 2006) (ordering, in habeas petition on behalf of a Guantánamo detainee filed on September 29, 2006, that the respondents shall file "a statement showing why the writ of Habeas Corpus should not issue"); Mohammed, et al. v. Rumsfeld, Civil Action No. 06-1680 (RJL), Order (Nov. 27, 2006) (ordering, in habeas petition filed on September 29, 2006, on behalf of 25 detainees held in U.S. military custody at the U.S. Air Force Case, Bagram, Afghanistan, that respondents file "a statement showing why the Writ of Habeas Corpus should not issue"); Hamdullah v. Bush, Civil Action No. 06-1691 (GK), Order (Oct. 16, 2006) (ordering, in habeas petition filed on September 29, 2006, on behalf of a

---

[6] Additionally, in at least one habeas case that was filed prior to the DTA, the district court has ordered the parties to brief the jurisdictional issue rather than delay consideration until the outcome of Al Odah and Boumediene.  See Hamdan v. Rumsfeld, Civil Action. No. 04-1519 (JR), Order (Oct. 27, 2006) (dkt. no. 77).  As in the present case, the jurisdictional issues may overlap, but are not identical.

Guantánamo detainee, that the "Respondents show cause by November 6, 2006 why the Petition should not be granted"); <u>Taher v. Bush</u>, Civil Action No. 06-1684 (GK), Order (Oct. 16, 2006) (ordering, in habeas petition filed on September 29, 2006, on behalf of a Guantánamo detainee, that the "Respondents shall show cause by November 6, 2006 why the Petition should not be granted"); <u>Moosa v. Bush</u>, Civil Action No. 06-1686 (CKK), Order (Oct. 4, 2006) (ordering, in habeas petition filed on September 29, 2006, on behalf of a Guantánamo detainee, that the Amended Protective Order is entered and that the respondents shall file a factual return, and staying the remaining issues pending the resolution of <u>Al Odah</u> and <u>Boumediene</u>). Unless and until the case is formally dismissed, this Court retains jurisdiction and authority over the present habeas petition and, therefore, has the authority to order Khan's immediate access to his attorney and entry of the Amended Protective Order.

This Court should not defer to the Respondents' blunt assertion that the judiciary lacks authority to review Executive conduct in this case, nor should this Court decline to exercise jurisdiction pending the resolution of issues pending in another matter and further delay Petitioner's most basic access to the legal system – the ability to consult with his counsel.

Even assuming that the jurisdictional questions are novel and complex, if the Court has any hesitation in exercising its judicial authority, it should provide Khan the opportunity to defend his fundamental right to seek judicial review of his detention. This also necessarily includes his right to consult with his existing pro bono counsel about the jurisdictional significance of facts known only to Khan.

Finally, Khan has a fundamental right to direct his own representation to the best of his capacity. It is unconscionable to continue to deny Khan access to counsel while scores of similarly-situated prisoners are able to meet with their counsel at Guantánamo, including other

prisoners represented by the undersigned counsel.[7]  Indeed, even prisoners held with Khan in secret CIA detention in Afghanistan are currently able meet with their attorneys at Guantánamo.[8]  Such arbitrariness is an affront to the rule of law.  Like his fellow prisoners, Khan has a right to meet with his existing counsel for purposes of pursuing his habeas petition, including his defense of this court's jurisdiction over his petition.

Accordingly, for the reasons stated above and the reasons stated in Khan's prior briefs, this Court has the authority to afford Khan immediate access to his counsel pursuant to the Amended Protective Order.

## II.    IMMEDIATE ACCESS TO COUNSEL IS NECESSARY TO SAFEGUARD KHAN'S ABILITY TO PURSUE HIS LEGAL RIGHTS

Respectfully, the Court's Order of November 17, 2006 misapprehended the urgent nature of Khan's position after three and a half years of secret CIA detention.  Khan's counsel do not request that Respondents only "assess his mental and physical health or injuries" and report back the results.  Order at 4 n. 4.  Rather, counsel seek immediate access to Khan in order to establish a meaningful attorney-client relationship with him before Khan's condition further deteriorates as a result of his secret detention and admitted subjection to the government's enhanced interrogation techniques.  Immediate access to counsel is not only warranted, but is essential to safeguard Khan's legal rights.  Any delay of his right to meet and consult with legal counsel is likely to irreparably harm Khan's ability to pursue his challenge to his detention.  By the Respondents' own admission, Khan has been detained in secret CIA detention and subjected to the euphemistically named "alternative interrogation methods."  The psychological stress from incommunicado detention and torture or cruel, inhuman and degrading treatment, in

---

[7] Cf. Mohammon, Civ. Action No. 05-2386, Order (dkt. no. 66) (RBW) (noting the potential of "procedural morass fraught with significance administrative burdens" where protective order is applied to some but not all petitioners).
[8] See Rabbani v. Bush, Civ. Action No. 05-1607 (JJR) (habeas petition on behalf of Pakistani brothers Abdul al-Rahim Ghulam Rabbani and Mohammed Ahmad Ghulam Rabbani, who were held in secret detention with Khan); see also Pet'r Reply Br., Ex. F (dkt. no. 10) Craig S. Smith, Algerian Tells of Dark Odyssey in U.S. Hands, NY Times, July 7, 2006, at A1.

general, has a deteriorating impact upon an individual's psychological and physical health. The longer Khan remains without access to counsel, the greater the risk that his ability to assist in his representation will decline, and the difficulties of establishing a trusting attorney-client relationship will increase.

There is a substantial risk that, with each passing day, Khan's ability to participate in and contribute to his case and legal representation will become further, if not permanently, impaired due to his likely suffering from one or more of the following conditions: memory loss, "Stockholm Syndrome,"[9] concentration difficulties, disorientation, confused thinking, paranoia, and/or other symptoms of post-traumatic stress syndrome (PTSD).[10]  Particularly relevant to Petitioner Khan's case, a principle symptom of PTSD is "memory disturbances": "The individual may be unable to recall with precision specific details of the torture events but will be able to recall the major theme of the torture experiences."  Istanbul Protocol at ¶ 253; see also ¶ 241(b) (describing avoidance of recollection and inability to recollect aspects of the

---

[9] This syndrome is described infra at page 13.

[10]  In his Declaration of November 2, 2006, Allen S. Keller, M.D. stated that "abusive interrogation can have devastating health consequences on the victims' physical, mental and social well-being."  Pet's Reply Br., Ex. H (dkt. no. 10), Declaration of Allen S. Keller, M.D., at ¶ 11 ("Keller Decl.").  More specifically, victims of torture and abusive interrogation can suffer from psychological disassociation and memory loss.  Id. at ¶¶ 12-13.  Similarly, the Istanbul Protocol: Manual on the Effective Investigation and Documentation of Torture and Other Cruel, Inhuman or Degrading Treatment ("Istanbul Protocol") observes that "many victims experience profound emotional reactions and psychological symptoms." Office of the United Nations High Commissioner for Human Rights, Istanbul Protocol: Manual on the Effective Investigation and Documentation of Torture and Other Cruel, Inhuman or Degrading Treatment (2004), available at http://www.unhchr.ch/pdf/8istprot.pdf.  The main psychiatric disorders associated with torture are PTSD and major depression.  Istanbul Protocol at ¶ 236.  Although the Istanbul Protocol acknowledges that not all victims of torture develop diagnosable mental illness, it finds that the prevalence of PTSD and major depression "is much higher among traumatized populations."  Id.

Moreover, the Istanbul Protocol provides an inexhaustive list of torture methods that encompass many of the CIA's enhanced interrogation techniques.  See e.g., Istanbul Protocol at ¶ 145(a) ("Blunt trauma, such as a . . . slap"); ¶ 145(b) ("Positional torture, using . . . prolonged constraint of movement, forced positioning"); ¶ 145(e) ("Asphyxiation, such as wet and dry methods"); ¶ 145(m) ("Conditions of detention such as . . . irregular or contaminated water"); ¶ 145(n) ("Deprivation of normal sensory stimulation, such as . . . manipulation of brightness of the cell, . . . restriction of sleep, . . . [or] isolation within prison").  The Respondents have admitted using these methods against Khan.  See supra note 2; see also Brian Ross & Richard Esposito, CIA's Harsh Interrogation Techniques Described, ABC News, Nov. 18, 2005 (reporting use of and describing waterboarding, cold cell, long-time standing, the attention grab, the attention slap, and the belly slap techniques used by the CIA); Pet'r Reply Br., Ex. E (dkt. 10), Declaration of Khaled el-Masri, at ¶ 46 (describing the fetid drinking water at the "Salt Pit" – where Mr. el-Masri was detained with Petitioner Khan – that caused Mr. el-Masri to vomit).

trauma as common psychological responses to torture"); ¶ 244 (describing the effects of psychological dissociation on memory). Where, as here, the specific details of Khan's experience and treatment during his detention directly relate to the rights his habeas petition aims to protect and enforce, it is essential that counsel have access to Khan before his ability to recollect those specific details is further impaired.

Indeed, the precise concerns raised by counsel for Khan are currently being addressed in the criminal proceedings against a U.S. citizen, Mr. Jose Padilla, who was detained as an "enemy combatant" for three years in the Charleston Naval Consolidated Brig in South Carolina. During his detention within the domestic United States in military custody, Mr. Padilla suffered severe abuses and conditions of confinement to further his interrogations. In a court filing last month, Mr. Padilla stated that military interrogators engaged in torture, including administering the mind-altering drug LSD; physical assaults; threats of imminent death; stress positions; forced hypothermia; prolonged sleep deprivation; and extreme, prolonged isolation in a windowless 9-by-7 foot cell.[11] According to the Respondents' admissions, many of these tactics were authorized and used against Khan.

An expert declaration filed by counsel for Mr. Padilla on December 1, 2006 confirmed that Mr. Padilla is now unable to assist in his own defense. After spending approximately twenty hours during two multi-day meetings to evaluate Mr. Padilla, the expert psychiatrist reached the following conclusion:

> Within a reasonable degree of medical and psychiatric certainty, it is my opinion that as a result of his experiences during his detention and interrogation, Mr. Padilla does not appreciate the nature and consequences of the proceedings against him, is unable to render assistance to counsel, and has impairments in reasoning as the result of mental illness, i.e., post traumatic stress disorder, complicated by the neuropsychiatric effects of prolonged isolation and as such lacks the capacity to assist in his own defense.

---

[11] United States v. Hassoun, et al., Crim. Action No. 04-60001 Def's Mot. to Dismiss for Outrageous Gov't Conduct.

See Exhibit A, Declaration of Dr. Angela Hegarty ("Hegarty Decl."), United States v. Hassoun, et al., Crim. Action No. 04-60001, Def's Reply to Gov'ts Resp. to Mot. to Dismiss for Outrageous Gov't Conduct, Ex. B, filed Dec. 1, 1006, at ¶ 19.    More specifically, Dr. Hegarty found that as a result of PTSD and other neuropsychiatric effects from Mr. Padilla's treatment, the traumatic events from his detention and interrogation "are persistently re-experienced . . . by recurrent and intrusive distressing recollections of the events, including images, thoughts and/or perceptions that are necessary for his ability to assist his counsel with his defense."  Hegarty Decl. at ¶ 12.  Mr. Padilla has made "persistent efforts to avoid stimuli associated with the trauma of his detention and interrogation and demonstrates a general numbing of responsiveness, including efforts to avoid thoughts, feelings and conversations associated with the trauma."  Id. at ¶ 13.  This prevents his ability to answer his lawyers' questions about his case.  Id.  Dr. Hegarty also found that "[i]n addition to the symptoms of posttraumatic stress disorder, Mr. Padilla also demonstrates the kind of disorientation, confused thinking, paranoid ideation and inability to trust others outside the closed environment characteristic of individuals who have been isolated for a long time."  Id. at ¶ 14.  Despite the various approaches used by his lawyers, Mr. Padilla has been unable to assist his attorneys in reviewing evidence, answering their questions, or providing them information about his detention and interrogation. Id. at ¶¶ 16-18.

As a result of the trauma from his isolation, abuse and dependency upon his interrogators and custodians, Dr. Hegarty further found that Mr. Padilla was also experiencing symptoms of similar to that of the Stockholm Syndrome:

> Mr. Padilla tends to identify with the interests of the government more than his own interests at times.  For example, after defense counsel cross-examined FBI agents regarding their interrogation of the defendant in Chicago establishing inconsistencies and aggressive behavior, Mr. Padilla's reaction was concern that the agents could get in trouble.  Instead of being pleased with his

attorney's efforts to get out the truth, he was more concerned about the effect it could have upon the agents, or the possibility that these efforts on his behalf might result in his return to the brig. This is a common response in individuals who have been traumatized. One way of coping has been traditionally labeled as "identification with the aggressor." In its most extreme form identification with the aggressor leads to Stockholm Syndrome – a condition first described in hostages who identify completely with the aim, motives and perspective of the hostage takers to the point of joining their cause. Identification with the aggressor works for people in traumatic situations because it is the aggressor who has all the power and the more they meet the aggressor's needs and identify with the aggressor's cause, the safer they are. When such individuals orient themselves with the interests and perspectives of the aggressor, anxiety is alleviated. The relief from anxiety is re-enforcing and over time the identification will increase in intensity. Attempts to see things from other perspectives leads to increasing anxiety. Such identification also aids those seeking to elicit information from detainees: a detainee who is entirely identified with the aims of interrogators is going to try to please them in any way possible, up to and including providing information they know is false, in order to curry favor with the captors.

Id. at ¶ 17.

These are exactly the concerns raised by the undersigned counsel in seeking Khan's immediate access to counsel. As each day passes, the effects of Khan's prior secret detention and interrogation – as well as his ongoing incommunicado detention and isolation – are likely to result in greater deterioration of his ability to assist in defense and challenge to the legality of his detention as a result of memory loss and other cognitive impairments. Further, Khan is in a new environment, surrounded by military guards and interrogators that he presumably did not know before his transfer. It is critical that he have an opportunity to build a relationship with his counsel before he becomes dependent upon the new interrogators and guards. If counsel access continues to be denied for months, or even years, it will significantly compromise Khan's ability to act in his best interests with his lawyers and increase the likelihood of his increased dependency upon his captors, and even identification with them. And if the abuses,

13

and resulting harms, described above have occurred for a U.S. citizen detained in a domestic military brig, it creates even greater concern about the urgency for Khan to have access to counsel after nearly three years in secret CIA detention subject to enhanced interrogation techniques used by that agency.

Finally, in addition to the risk of further deterioration of his ability to assist in his defense, Khan's continued detention without access to counsel is likely to have a deleterious impact upon his ability to establish a trusting attorney-client relationship.  Dr. Keller observed that victims of torture and abusive interrogations suffer from an impaired ability to develop trusting relationships. Keller Decl. at ¶ 14. Similarly, the Istanbul Protocol lists psychosis resulting in "[p]aronia and delusions of persecution" among common psychological responses to torture.  Istanbul Protocol, at ¶ 247(v).  Any continuing delay of his access to counsel only decreases his already compromised ability to develop a trusting and functional attorney-client relationship.  Accordingly, in order to stem this risk of paranoia and to establish and develop the trust inherent to an attorney-client relationship, it is imperative that the Court grant counsel access to Khan immediately.

**III.    THE COURT SHOULD ORDER AN IMMEDIATE MENTAL AND PHYSICAL HEALTH EVALUATION OF KHAN BY INDEPENDENT HEALTH PROFESSIONALS**

The Court has encouraged the Respondents to provide an assessment of Khan's mental and physical health. Order at 4 n.4.   Yet, given the jurisdictional discussion above, this Court has the authority to order that Respondents conduct or permit an immediate mental and physical health evaluation of Khan by independent health professionals to determine whether he is receiving any necessary treatment and can assist in his representation.  Respondents, as Khan's jailors and interrogators, cannot assess his ability to assist his attorneys in his legal

14

representation, nor can they investigate their own potentially criminal conduct during his torture and abuse.

In conformity with internationally recognized standard practices, any report submitted by the Respondents to the Court concerning Khan's health, should comply with the guidelines outlined in the Istanbul Protocol, and in particular, with sections IV, V, VI, and Annex I ( 5(b) and 6(b)).  The World Medical Association, of which the American Medical Association is a member, has recommended that national medical associations "[d]isseminate to physicians the Istanbul Protocol" for purposes of evaluating the health of victims of torture or inhuman treatment and preserving evidence of their treatment and its impact.[12]  These provisions set forth the minimum standards for any evaluation of a victim of torture or abuse.

## CONCLUSION

As each day passes, the likelihood increases that Petitioner Khan will suffer from memory loss and other psychological injuries that will impede his capacity to assist in his representation and that the barriers to building a trusting attorney-client relationship will intensify, creating irreparable harm.  After three years of secret detention, torture and abuse, it is critical that Khan meet with his counsel immediately to preserve his legal rights and ability to pursue his challenge to his detention.

Accordingly, for the reasons stated above and set forth in Petitioner Khan's prior briefs, this Court should order Respondents to promptly afford him access to counsel pursuant to the Amended Protective Order.

---

[12] See World Medical Association, The World Medical Association Resolution on the Responsibility of Physicians in the Denunciation of Acts of Torture or Cruel or Inhuman or Degrading Treatment of Which They Are Aware, at ¶ 19 (Sept. 2002), available at http://www.wma.net/e/policy/t1.htm; see also UN General Assembly Resolution A/Res/55/89 (Dec. 4, 2000) (referencing Annex I of the Istanbul Protocol, "Principles on the Effective Investigation and Documentation of Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment").

Dated:  December 7, 2006

Respectfully submitted,

Counsel for Petitioners:

  /s/                     

Gitanjali S. Gutierrez

Michael Ratner
William Goodman
CENTER FOR CONSTITUTIONAL RIGHTS
666 Broadway
New York, New York 10012
(212) 614-6485

16

# Exhibit A

**Affidavit of Angela Hegarty, MD**

I, Angela Hegarty, MD hereby swear and affirm:

1.      I am licensed to practice medicine in New York State. I am a diplomate of the American Board of Psychiatry and Neurology in both Psychiatry and Forensic Psychiatry

2.      The following is a brief and abbreviated summary of my observations and opinions regarding the defendant, Mr. José Padilla:

3.      I met with Mr. Padilla on five consecutive days from June 26, 2006 through June 30, 2006, and again on September 11 and 12, 2006. To date, I have spent approximately twenty-two hours with the defendant. All the interviews were conducted in the conference room at the Special Housing Unit located at the Federal Detention Center in Miami, Florida. During the interviews the defendant was shackled and manacled, with a belly chain that restricted the movement of his arms.

4.      Mr. Padilla was willing to affirm or deny whether he had been subject to interrogation techniques that had been commonly reported in the media. He denied being sexually assaulted or humiliated. He denied being water-boarded with uncharacteristic intensity and insistence. He acknowledged being kept in the dark or with the lights on for very long periods of time, being shackled and left alone for long periods of time, of being kept in a cold environment for long periods of time, and above all, of being certain he would die in the brig.

5.      In particular, he described periods of sleep deprivation caused by the discomfort of lying on a steel bun without a mattress and with the lights on. Also, the slamming of adjacent cell doors at regular intervals prevented his sleep. Mr. Padilla recalled asking for medication for pain and being told by staff they were not authorized to give him anything for his pain. He also described an incident during which he felt intense pressure on his chest "like two hundred pounds" and was convinced he was going to die from that intense pressure.

6.      During my interview, Mr. Padilla briefly conveyed obviously painful recollections of being taken out of the cell to a "recreation" cage. Mr. Padilla recalled how he begged his guards not to take him out and put him in the cage. He would not say what went on in the cage or why it upset him so. Mr. Padilla also made it clear to me that he had not told me everything that had been done to him in the brig and that he was unwilling to do so.

7.      Mr. Padilla told me that he had no way of keeping track of time while in the brig. He was the sole occupant on the lower level of the brig. There were long periods of darkness and long periods of bright artificial light. There were no clocks or calendars. He had no access of any kind to the outside world. He was unable to put

# EXHIBIT B

Case 1:06-cv-01690-RBW    Document 12-2    Filed 12/07/2006    Page 3 of 6
                                                                                      003/006
11/Case 0:04-cr-60001-MGC    Document 695-3    Entered on FLSD Docket 12/01/2006    Page 4 of 5

events in chronological order for me. He was clear that early on, for what seemed like months, there was a "terrible time," although he could not be more specific as to what constituted that 'terrib e time."

8.      Though the importance of reviewing evidence has been explained to Mr. Padilla repeatedly by both his attorneys and myself, he has been unable to either read transcripts or listen to tapes of intercepted conversations that the government intends to use as evidence in his trial. When exhorted to do so, he pleads with his attorneys not to "make him" look at or listen to the material.

9.      Mr. Padilla makes a number of references to hallucinations and strange experiences during his detention. He is terrified of appearing or being seen as "crazy." He recalled being told by one of his interrogators that if he were to relate a particular experience to someone "on the outside," they would see him as "crazy." He was completely unable to describe those experiences to me. He also made a number of references to drugs or truth serums in the course of his interview and how it affected him. At times Mr. Padilla became intensely anxious and expressed fear of losing his mind on recalling his detention.

10.     Mr. Padilla meets full diagnostic criteria for a diagnosis of Post Traumatic Stress Disorder, according to the Diagnostic and Statistical Manual of the American Psychiatric Association Fourth Edition, Text Revision (DSM 4 TR).

11.     He has endured a traumatic event that involved actual or threatened death or serious injury, or a threat to the physical integrity of self or others and his response involved intense fear and helplessness. The use of prolonged isolation along with tactics designed to have an individual reveal facts they otherwise might not wish to reveal, as well as the fostering of dependence on interrogators not only creates the conditions in which individuals might reveal important information, but also the conditions that induce intense fear, feelings of helplessness and loss of control characteristic of the traumatic experience. Sleep deprivation, physiological stress, and repeated questioning only exacerbate the traumatic nature of the experience. Mr. Padilla believed he was going to die on a number of occasions during his detention. He believed his family would be harmed if he did not comply. He learned that no matter whether he was cooperative, or whether he pleaded with his captors, he was utterly helpless and absolutely dependent on them for everything. He believed and still believes they have the ultimate power to decide what happens in his life, his case, and whether he is released or ultimately is returned to the brig. These traumatic events were exacerbated by their duration. Additionally, Mr. Padilla's current environment wherein he is

still in an unhealthy degree of isolation remains psychologically unsafe for h m and only serves to compound the psychological damage that has already been done.

12.     These traumatic events are persistently re-experienced in b/ recurrent and intrusive distressing recollections of the events, including images, thoughts and or perceptions that are necessary for his ability to assist his counsel with his defense. When these intrusive recollections are triggered by turns of phrase or intonation during questioning, Mr. Padilla feels as though the traumatic event is recurring again. In other words, for Mr. Padilla the questioning necessary for the development of his defense dredges up the same emotions he experience during his interrogations at the Brig. Mr. Padilla has demonstrated intense physiological distress and evidenced physiological reactivity on exposure to cues that symbolized or resembled aspects of the traumatic events he has experienced. During questioning about his experiences, his facial tics became prominent and increased in frequency and intensity. He also became diaphoretic at times and appeared restless and anxious.

13.     Mr. Padilla makes persistent efforts to avoid stimuli associated with the trauma of his detention and interrogation and demonstrates a general numbing of responsiveness, including efforts to avoid thoughts, feelings and conversations associated with the trauma. For instance he refuses to watch the videos of his interrogation and he refuses to answer questions pertaining to aspects of the evidence in his case. He has large memory gaps related to his detention and he is unable to place events in chronological order or say how long different situations persisted. He also fails to recall important aspects of the trauma. There is evidence of markedly diminished interest in significant activities. He feels detached not only from the man he was and the life he had, but from others as well, and there is a restricted range of affect. Mr. Padilla periodically concludes that no matter what, win or loose, he will be going back to the brig, where he will die, and as such, has a sense of a foreshortened future.

14.     There is clear evidence of increased arousal as indicated by the defendant's exaggerated startle response, his periodic hypervigilance, and his difficulties concentrating. In addition to the symptoms of posttraumatic stress disorder, Mr. Padilla also demonstrates the kind of disorientation, confused thinking, paranoid ideation and inability to trust others outside the closed environment characteristic of individuals who have been isolated for a long time.

15.     The issue of malingering has to be considered in any evaluation involving legal proceedings. The definition of malingering is the deliberate feigning or exaggeration of psychiatric symptoms for a specific conscious purpose. Such individuals present themselves as more impaired than they actually are. In Mr. Padilla's case the

opposite is true: he strives to present himself as stress and symptom free both on interview and on testing. He was very reluctant to allow a psychiatric evaluation in the first place and is equally reluctant to allow evidence of psychiatric impairment to be brought forward. He is terrified that anyone will consider him mentally ill or crazy. A diagnosis of malingering is not appropriate in this case.

16.    Mr. Padilla has not been able to assist his attorneys in reviewing the evidence provided by the government in discovery. He is also unable to answer questions in sufficient detail so as to be of use to his attorneys in his defense. When asked for further information, beyond what has already been given he insists on some occasions that the issues in question "have been established" and no further information is required. On other occasions he insists he has already answered the questions. He is unable to watch video recordings of his interrogation. He is unable to view transcripts of taped phone conversations to be used against him at trial. When approached by his attorneys, he begs them, "Please, please, please" not to have to discuss his case. Efforts to desensitize him to the distress of confronting what happened to him – talking about the tasks at hand in a gradual way without threatening exposure, over time – have utterly failed. Even after sixteen hours of work with undersigned during which he revealed some details of what had happened to him, he was still unable even to consider watching the tapes or reviewing the evidence against him.

17.    Mr. Padilla tends to identify with the interests of the government more than his own interests at times. For example, after defense counsel cross-examined FBI agents regarding their interrogation of the defendant in Chicago establishing inconsistencies and aggressive behavior, Mr. Padilla's reaction was concern that the agents could get in trouble. Instead of being pleased with his attorney's efforts to get out the truth, he was more concerned about the effect it could have upon the agents, or the possibility that these efforts on his behalf might result in his return to the brig. This is a common response in individuals who have been traumatized. One way of coping has been traditionally labeled as "identification with the aggressor." In its most extreme form identification with the aggressor leads to Stockholm Syndrome – a condition first described in hostages who identify completely with the aims, motives and perspectives of the hostage takers to the point of joining their cause. Identification with the aggressor works for people in traumatic situations because it is the aggressor who has all the power and the more they meet the aggressor's needs and identify with the aggressor's cause, the safer they are. When such individuals orient themselves with the interests and perspective of the aggressor, anxiety is alleviated. The relief from anxiety is re-enforcing and over time the identification will increase in intensity. Attempts to see things from other

perspectives leads to increasing anxiety. Such identification also aids those seeking to elicit information from detainees: a detainee who is entirely identified with the aims of interrogators is going to try to please them any way possible, up to and including providing information they know is false, in order to curry favor with the captors.

18.    Victims of intense traumatic stress experience intense distress in recalling the triggers of the traumatic events. It is as though the recollection of the events made the trauma were recurring. This stimulus triggers a desire to avoid the pain, and hence an individual's inability to engage in discussions about the traumatic events or deal with anything that resurrects the trauma or triggers symptoms. Mr. Padilla's behavior is symptomatic of one who is experience such traumatic recall.

19.    Within a reasonable degree of medical and psychiatric certainty, it is my opinion that as the result of his experiences during his detention and interrogation, Mr. Padilla does not appreciate the nature and consequences of the proceedings against him, is unable to render assistance o counsel, and has impairments in reasoning as the result of a mental illness, i.e., post traumatic stress disorder, complicated by the neuropsychiatric effects of prolonged isolation and as such lacks the capacity to assist in his own defense

Further Affiant Sayth Naught

_Angela Hegarty_
Dr. Angela Hegarty

The foregoing instrument was sworn to and before me this 30th day of November, 2006 by Angela Hegarty

Personally known ( x )

Produced identification (x)  _Denis Langa_.

09|25|2010

My commission expires:

Notary Public
State of    New York
County of    SUFFOLK

Dennis Zampani
Notary Public, State of New York
No. 01ZA6153036
Qualified in Suffolk County
Commission Expires 09 / 25 / 2010

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____
                                      )
**MAJID KHAN,**                       )
    *Petitioner,*  )
                                      )
**v.**                                )    Civil Action No. 06-cv-1690 (RBW)
                                      )
                                      )
**GEORGE W. BUSH, et al.,**           )
    *Respondents.* )
_____)


## [PROPOSED] PROTECTIVE ORDER

Upon consideration of Petitioner's Motion for Reconsideration, it is

ORDERED that the Court's Order of November 17, 2006 is VACATED;

ORDERED that the Amended Protective Order and Procedures for Counsel Access to Detainees at the United States Naval Base in Guantanamo Bay, Cuba, first issued on November 8, 2004, (344 F. Supp. 2d 174 (D.D.C. 2004)), the Order Supplementing and Amending Filing Procedures Contained in November 8, 2004 Amended Protective Order, first issued on December 13, 2004, and the Order Addressing Designation Procedures for "Protected Information," first issued on November 10, 2004, in the *In re Guantanamo Bay Detainee Cases* shall be entered in this case; and further,

ORDERED that Respondents afford Petitioner access to counsel promptly.


DATED:_____          _____
                                Reggie B. Walton
                                United States District Judge