IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| MAJID KHAN, *et al.* | ) | |
| | ) | |
| Petitioners, | ) | |
| | ) | |
| v. | ) | Civil Action No. 06-CV-1690 (RBW) |
| | ) | |
| GEORGE W. BUSH, | ) | |
| President of the United States, | ) | |
| *et al.,* | ) | |
| | ) | |
| Respondents. | ) | |

**RESPONDENTS' REPLY IN SUPPORT OF THEIR MOTION TO DISMISS
AND IN OPPOSITION TO MOTION FOR A STAY-AND-ABEY ORDER**

Respondents submit this response to petitioner Majid Khan's Opposition to Respondents' Motion to Dismiss, or Alternatively, Motion for a Stay-And-Abey Order. As explained in Respondents' Motion to Dismiss, the law of this circuit, announced recently in *Boumediene v. Bush*, 476 F.3d 981 (D.C. Cir. 2007), *cert. denied*, 127 S. Ct. 1478, requires dismissal of this case because Section 7 of the Military Commissions Act of 2006 ("MCA"), Pub. L. No. 109-366, 120 Stat. 2600, specifically divests this Court of jurisdiction to review the present habeas petition[1] and because the MCA is consistent with the Suspension Clause of the Constitution.

In response, petitioner argues that *Boumediene* is inapplicable to him because at one time he was a legal resident of the United States with ties to this country, and thus, petitioner's

---

[1] As petitioner acknowledges, *see* Petitioner's Opposition to Respondents' Motion to Dismiss ("Pet. Opp.") at 13 n.7, he received his Combatant Status Review Tribunal ("CSRT") hearing on April 13-14, 2007, and thus, is currently awaiting his CSRT determination. *See* MCA § 7(a)(1) (limiting federal district court habeas jurisdiction over habeas petitions filed by or on behalf of an alien detained by the United States who has received or is awaiting his CSRT determination).

argument continues, the MCA's removal of jurisdiction over his habeas petition is an unconstitutional suspension of the writ.  Petitioner further argues that even if *Boumediene* is applicable here, under the Supreme Court case,  *Rhine v. Weber*, 544 U.S. 269, 274 (2005), which permits a federal court to stay a state prisoner's habeas petition pending exhaustion of state remedies in certain limited circumstances, this Court should stay and hold in abeyance his habeas petition pending his exhaustion of remedies provided in Section 1005(e) of the Detainee Treatment Act of 2005 ("DTA"), Pub. L. No. 109-148, 119 Stat. 2680.

As discussed below, the MCA does not contravene the Suspension Clause as applied to petitioner because like the Guantanamo detainees in *Boumediene*, petitioner has no constitutional right to habeas relief.  Despite once previously having been granted asylum by the United States, petitioner is an alien who is no longer present in the sovereign territory of the United States, having voluntarily left and remained outside the country.  As an asylee, once petitioner left the country, any constitutional protection that might have been implied by the United States' permission to allow his presence in this country ceased to exist.  *See Eisentrager v. Johnson,* 339 U.S. 763, 770-71 (1950); *Shaughnessy v. United States ex rel. Mezei*, 345 U.S. 206 (1953).  His status is no different from that of any other alien outside of the United States for purposes of invoking constitutional protections under the Suspension Clause.

Even if petitioner had a constitutional right to habeas relief, the MCA does not violate the Suspension Clause because the judicial review procedures available under the DTA provide petitioner with adequate alternative remedies.  Indeed, that judicial review, which permits the Court of Appeals for the District of Columbia Circuit to review final decisions of Combatant Status Review Tribunals ("CSRT"), *see* MCA § 7, provides petitioner with greater rights than

traditionally available through habeas in the military tribunal context, and is at least consistent

with that available in the non-military context.

As for petitioner's proposed course of action to have his habeas petition held in abeyance,

such relief is without basis in law.  Filing a DTA petition is not merely an exhaustion

requirement for petitioner's habeas case, and this case is therefore entirely different from what

was involved in *Rhine*.  Under the MCA, this Court simply has no jurisdiction to issue a stay,

whether or not petitioner pursues his DTA remedies.

## ARGUMENT

## I.    THE MCA DOES NOT VIOLATE THE SUSPENSION CLAUSE WHEN APPLIED TO PETITIONER

### A.    Petitioner Has No Constitutional Right to Habeas Relief Because He Voluntarily Left the Sovereign Territory of the United States And Has No Legal Right to Return to This Country

Petitioner argues that the MCA cannot constitutionally deprive this Court of jurisdiction

to review his habeas petition because his prior residence and voluntary ties to this country place

him in the category of noncitizens who have been vested with constitutional rights.  Petitioner is

wrong.  *Boumediene* controls here, and petitioner's attempt to distinguish it is unavailing.

By way of background, records of United States Citizenship and Immigration Services

("USCIS") reflect that petitioner is a Pakistani citizen who entered the United States illegally in

July 1996.[2]  *See* Declaration of Donald W. Neufeld (attached to this Reply) ¶¶ 5-6; *see also* Pet.

---

[2]  Contrary to petitioner's argument that this Court must accept as true all the factual allegations contained in the habeas petition in considering respondents' motion to dismiss for lack of subject matter jurisdiction, *see* Pet. Opp. at 3 n. 1, this Court may consider extra-pleading materials in reviewing respondents' jurisdictionally based motion, akin to a Fed. R. Civ. P. 12(b)(1) motion.  As the D.C. Circuit has explained, one of the "important distinctions between a dismissal pursuant to subdivision [Fed. R. Civ. P. 12] b(1) and one under b(6) . . . [is that under

¶ 20 (alleging that when petitioner was sixteen years old, he moved to the United States from Pakistan with his parents and siblings). He was granted asylum on July 14, 1998. *See* Neufeld Decl. ¶ 6. According to USCIS records, petitioner applied for refugee travel documents twice, once in October 2001 when he requested permission to travel to Dubai in the United Arab Emirates to get married and to Saudi Arabia for a pilgrimage, and another time in December 2002 when he requested that he be permitted to travel to Dubai to visit his wife. *Id.* ¶¶ 8-9. Petitioner's first application was granted, permitting the requested travel from December 22, 2001, to December 22, 2002, but his second application was not. *See id.*

---

b(1) ] the court is not restricted to the face of the pleadings, but may review any evidence, such as affidavits and testimony, to resolve factual disputes concerning the existence of jurisdiction to hear the action." *Wilderness Soc. v. Griles*, 824 F.2d 4, 16 n. 10 (D.C. Cir. 1987) (quoting 2A J. Moore & J. Lucas, Moore's Federal Practice, ¶ 12.07(2.-1), at 12-45-46 (1986)). In other words, "although a Rule 12(b)(1) motion cannot be converted into a motion for summary judgment as a Rule 12(b)(6) motion can, *see* Fed. R. Civ. P. 12(b), a district court can assure that appropriate extra-pleading materials are consulted in determining the threshold jurisdictional issue." *Id.* Thus, "'where necessary, the court may consider the complaint supplemented by undisputed facts evidenced in the record, or the complaint supplemented by undisputed facts plus the court's resolution of disputed facts.'" *Coalition for Underground Expansion v. Mineta*, 333 F.3d 193, 198 (D.C. Cir. 2003) (quoting *Herbert v. Nat'l Acad. of Scis.,* 974 F.2d 192, 197 (D.C. Cir.1992)).

In any event, the material facts supporting respondents' constitutional argument — *i.e.*, that petitioner is an alien who voluntarily left this country, that he was captured outside the sovereign territory of the United States, and that he was thereafter continuously detained abroad — are not in dispute. Indeed, even as to the issue of petitioner's refugee travel document, respondents' extra-pleading submission is consistent with petitioner's allegations. Petitioner alleges that he had a refugee travel document for his first trip, but gave no indication as to whether he had such document for his second trip. *See* Pet. ¶ 26 (alleging that petitioner returned to the United States in March 2002 to comply with the terms of his Immigration and Naturalization Services travel documents).

Petitioner alleges that he traveled to Pakistan in early 2002 to get married and that he returned in March that same year to comply with terms of his refugee travel document.[3]  *See* Pet. ¶ 26.  Petitioner further alleges that he returned to Pakistan "at the end" of 2002 to be with his wife, *id.* at ¶ 27, and that he was seized in Pakistan on March 5, 2003, by Pakistani authorities, *id.* at ¶ 28.  In other words, even assuming that petitioner had left the United States before the expiration of his refugee travel document on December 22, 2002, he nonetheless remained outside the country and indisputably did not have a valid refugee travel document that would have permitted his re-entry to the United States.[4]  And with respect to his ties to this country, petitioner maintains that his only residence is his family's home in a Baltimore suburb, and although he claims to have property in the United States, he does not say whether his property is real or personal.  *See* Pet. Opp. at 4 & n.2.

These facts do not help petitioner escape the ambit of *Boumediene*, which holds that the Suspension Clause does not apply to "aliens held at an overseas military base leased from a foreign government."  476 F.3d at 990-91.  Despite petitioner's one-time voluntary connections

---

[3]  Although USCIS generally does not maintain records of petitioner's travels, USCIS records in this instance do reflect that petitioner was admitted to the United States on March 21, 2002.  *See* Neufeld Decl. ¶ 8.

[4]  As reflected in a federal court proceeding in the Southern District of New York, there was even an effort to fraudulently obtain refugee travel document so as to allow petitioner to re-enter the United States.  Another individual, Uzair Paracha, was later convicted and sentenced to 30 years in prison for, *inter alia*, impersonating petitioner in an attempt to obtain the refugee travel document "that would have allowed [petitioner] to re-enter the United States to commit a terrorist act."  *See* Department of Justice, Press Release, dated November 25, 2005, *available at* http://newyork.fbi.gov/dojpressrel/pressrel05/parachaconvic. htm; *see also* The New York Times, *Pakistani Gets 30 Years for Aiding Qaeda operative*, July 21, 2006, *available at* http://www.nytimes.com/2006/07/21/nyregion/21sentence.html?ex= 1178856000&en =5b4d6a66dd5a9234&ei=5070.

to this country, he is not "vested with constitutional rights," Pet. Opp. at 4, because he voluntarily

left the country, did not reenter the United States during a period in which he would have been

permitted to do so, was captured in a foreign country, and never re-entered the United States,

having been detained entirely outside the sovereign territory of the United States.  As the

Supreme Court explained long ago in *Johnson v. Eisentrager*, an alien's physical presence in our

country is the predicate to constitutional protections:

> The alien, to whom the United States has been traditionally
> hospitable, has been accorded an ascending scale of rights as he
> increases his identity with our society.  Mere lawful presence in the
> country creates an implied assurance of safe conduct and gives him
> certain rights; they become more extensive and secure when he
> makes preliminary declaration of intention to become a citizen, and
> they expand to those of full citizenship upon naturalization
>                                      * * *
> But, in extending constitutional protections beyond the citizenry,
> the Court has been at pains to point out that *it was the alien's
> presence within its territorial jurisdiction that gave the Judiciary
> power to act.*

339 U.S. 763, 770-71 (1950) (emphasis added); *see also id* at 777-78 ("the privilege of litigation

has been extended to aliens, whether friendly or enemy, *only because permitting their presence

in the country implied protection*") (emphasis added).  As the Supreme Court also stated in

*Zadvydas v. Davis*, 533 U.S. 678, 693 (2001), "[i]t is well established that certain constitutional

protections available to persons inside the United States are unavailable to aliens outside of our

geographic borders.  *But once an alien enters the country, the legal circumstance changes . . .*"

(emphasis added; citations omitted).

    The Supreme Court's decision in *Shaughnessy v. United States ex rel. Mezei*, 345 U.S.

206 (1953), is also instructive.  In that case, Mezei, an alien who had lived in the United States

for some 25 years and was married to a United States citizen, sailed for Europe to visit his dying mother in Romania, but was unable to gain entry to that country. *Id.* at 208; *see also Mezei*, 101 F. Supp. 66, 67 (S.D.N.Y. 1951). He remained abroad for many months due to difficulty in obtaining a permit to exit Hungary. *Id.* at 208. Upon returning to the United States, he was denied entry for security reasons and was thereafter detained indefinitely at Ellis Island because the Government could not find another country to accept him. *Id.* at 208-209. Despite Mezei's prior 25-year residence in the United States, the Supreme Court held that he had no Fifth Amendment right to a hearing or to learn the evidence upon which the Government's exclusion determination was based. *Id.* at 214-15; *see also Zadvydas*, 533 U.S. at 692 ("the Court held that Mezei's detention did not violate the Constitution"). As the Court said, "[i]t is true that aliens who have once passed through our gates, even illegally, may be expelled only after proceedings conforming to traditional standards of fairness encompassed in due process of law. . . But an alien on the threshold of initial entry stands on a different footing." *Mezei*, 345 U.S. at 212. Drawing from immigration laws, the Court also noted that "the legal incidents of an alien's entry remain unaltered whether he has been here once before or not. He is an entering alien just the same, and may be excluded if unqualified for admission under existing immigration laws." *Id.* at 213.

Significantly, the Court distinguished Meizei's case from *Kwong Hai Chew v. Colding*, 344 U.S. 590, 601 (1953), in which the alien, Chew, was "admitted by an Act of Congress to permanent residence in the United States," and due to his employment on a vessel of American registry with home port in New York City, he left the United States for four months at sea. *See Mezei*, 345 U.S. at 213. Although cleared by the Coast Guard for his voyage, Chew, like Mezei,

- 7 -

was excluded on security grounds upon his return without a hearing.  As the Court explained in *Mezei*, on those facts, the Court "felt justified in 'assimilating' [Chew's] status for constitutional purposes to that of continuously present alien residents entitled to hearings at least before an executive or administrative tribunal."  *Id.* at 214.  The Court, however, found Mezei's situation "drastically differs from that disclosed in Chew's case," because "[u]nlike Chew who with full security clearance and documentation pursued his vocation aboard an American ship, [Mezei] apparently without authorization or reentry papers, simply left the United States."  *Id.*  Thus, whereas Chew was entitled to a hearing consistent with the Due Process Clause of the Fifth Amendment, Mezei was not.

Petitioner is not a permanent resident alien, *see* Pet. ¶ 20; Neufeld Decl. ¶¶ 6-7, and like Mezei, he once developed voluntary ties to this country, but thereafter simply left the country and remained outside the United States beyond the validity period of his refugee travel document.  Thus, under *Mezei*, petitioner has no constitutional rights.  Were it otherwise, any alien who has once lived in the United States for any period of time, would be able to claim constitutional protections even though no longer in the United States.  Such extraterritorial application of the Constitution would be entirely inconsistent with Supreme Court and Circuit precedent.

Indeed, in *Boumediene*, the D.C. Circuit explicitly held that the Suspension Clause does not extend to alien enemy combatants, such as petitioner, captured abroad and detained at the Guantanamo Bay Naval Base because "Cuba – not the United States – has sovereignty over Guantanamo Bay."  476 F.3d at 992.  And the Court of Appeals further explained, even under common law habeas protected by the Suspension Clause (at least as it existed in 1789), "the dispositive fact was not a petitioner's enemy alien status, but *his lack of presence within any*

*sovereign territory.*" *Id.* at 991 n.8.  In other words, once petitioner left the sovereign territory of the United States on his own volition, his legal circumstance changed and any constitutional rights that might have attached to his presence here were no longer available.

Nor does petitioner's status of previously having been granted asylum affect the constitutional analysis.  Unlike with respect to "permanent resident aliens[, who] are in so many respects situated similarly to citizens," *Toll v. Moreno*, 458 U.S. 1, 44 (1982); *cf. LeClerc v. Webb*, 419 F.3d 409, 415 (5th Cir. 2005) (in equal protection claim based on alienage, "[t]he Supreme Court has reviewed with strict scrutiny only state laws affecting permanent resident aliens"), a grant of asylum to an alien means only that the alien has a legal right to remain and work in the United States and may not be removed or returned to his country of nationality or last habitual residence.  *See* 8 U.S.C. § 1158(c)(1); *I.N.S. v. Aguirre-Aguirre*, 526 U.S. 415, 419-420 (1999).  Thus, to the extent an asylee is entitled to any constitutional protections while residing in this country, it is due to his physical presence here, not to his status as an asylee.  *See Eisentrager*, 399 U.S. at 771; *Mezei*, 345 U.S. at 212; *Zadvydas*, 533 U.S. at 693.

Even assuming *arguendo* that any constitutional right attaches to the asylee status, this right does not attach outside the United States; petitioner cannot claim any privilege associated with his asylee status, given that he voluntarily returned to Pakistan and remained outside the United States.  An asylee traveling abroad must obtain a valid refugee travel document to return to the United States, *see* 8 U.S.C. § 1158(c)(1)(C) ("In the case of an alien granted asylum . . . the Attorney General may allow the alien to travel abroad *with the prior consent* of the Attorney

General)[5]; 8 C.F.R. § 223.1(b), and "[b]y virtue of obtaining the refugee travel document, the

asylee retains his or her asylum status," Legal Op. No. 99-6, U.S. Department of Justice,

Immigration and Naturalization Service ("INS Legal Op. 99-6"), 2001 WL 1047688; *see also* 8

C.F.R. § 223.3(d)(2) ("an alien shall be accorded the immigration status endorsed in his or her

refugee travel document" when he presents "a valid unexpired refugee travel document" upon

arrival in the United States), unless the Department of Homeland Security has grounds to deny

his admission and places him in removal proceedings. *See* 8 C.F.R. § 223.3(d)(2)(i); 8 C.F.R.

§ 208.24.  If the asylee leaves the United States without having obtained a refugee travel

document for his re-entry, as in this case, he may be deemed inadmissible at the time he attempts

to re-enter the United States.[6]  *See* 8 U.S.C. § 1182(a)(7); *see also* INS Legal Op. No. 99-6

---

[5]  By operation of section 1512(d) of the Homeland Security Act of 2002, Pub. L. 107-296, 116 Stat. 2135, 2310, the Attorney General's authority to allow aliens to travel abroad was transferred to the Secretary of Homeland Security.

[6]  In certain limited circumstances, the Department of Homeland Security ("DHS") may exercise its discretionary authority to permit such alien's re-entry into the United States.  For example, it may decide to take the "extraordinary measure" of granting the alien parole.  INS Legal Op. No. 99-6; *see* Immigration and Nationality Act § 212(d)(5)(A); 8 C.F.R. § 212.5.  If the asylee had not been out of the country for more than one year, "[a]s a matter of discretion," DHS may grant the alien's application for a refugee travel document either at the port-of-entry or at a foreign U.S. consulate.  *See* 8 C.F.R. § 223.3(b)(2).  This exception, however, was created to account for "those cases where the alien innocently departed in ignorance of the requirement or, although aware of the requirement, departed without applying for the document due to an urgent humanitarian need, such as the impending death of a close relative . . . ."  INS Legal Op. No. 99-6 (quoting 62 Fed. Reg. 10312, 10315 (1997)).  Thus, "if it is apparent that the alien knew of the general requirement and simply chose to ignore it (e.g., if the alien had previously been issued a refugee travel document . . . and there was no emergency necessitating the more recent departure)," DHS may deny the application as a matter of discretion.  *Id.*

Moreover, the same regulation permitting this discretionary authority further requires DHS to determine whether the alien engaged in any activities while outside the United States that would be inconsistent with continued refugee or asylee status.  *See* 8 C.F.R. § 223.3(b)(ii)(C). "This requirement will typically come into question when the refugee or asylee has returned to

("Asylees and refugees who leave the United States without permission, or whose refugee travel

document has expired, are rendered inadmissible by their action. . . . These individuals may not

resume their status in the United States, unless they apply for and are granted a refugee travel

document . . . or are granted parole under section 212(d)(5) of the Act."). In sum, as an asylee

outside the United States at Guantanamo, petitioner may not avail himself of the benefits of the

asylee status, and thus has no entitlement to any constitutional rights.

Finally, petitioner is plainly wrong that his alleged ownership of property in the United

States somehow gives rise to a right to habeas relief under the Suspension Clause. In

*Boumediene*, the D.C. Circuit explained that "[t]he law of this Circuit is that a 'foreign entity

without property or presence in this country has no constitutional rights, under the due process

clause or otherwise.'" 476 F.3d at 992. *Boumediene* did not hold, however, that any property

held in the United States entitles a detainee to Suspension Clause protection. Indeed, neither of

the cases cited by *Boumediene* for the proposition at issue, *People's Mojahedin Organization of

Iran ("PMOI") v. U.S. Dep't of State*, 182 F.3d 17, 22 (D.C. Cir. 1999), and *32 County

---

his or her country of feared persecution," in which case DHS must determine whether the refugee
or asylee has voluntarily availed himself of the protection of his country of nationality, such as
using the passport from the country of alleged persecution or otherwise voluntarily re-
establishing ties to that country. INS Legal Op. No. 99-6.

Here, despite his two separate applications indicating his intention to travel to Dubai in
the United Arab Emirates, *see* Neufeld Decl. ¶¶ 8-9, according to petitioner's own allegations he
actually returned to Pakistan, once to get married and once to visit his wife, who continued to
reside in Pakistan. As for his second trip, even assuming that petitioner left the United States
before his refugee travel document expired on December 22, 2002, he remained in Pakistan
without permission, cognizant, as circumstances indicate, of the requirement that he needed a
valid refugee travel document while traveling abroad and for re-entry into the United States. *See*
Neufeld Decl. ¶¶ 8-9; Pet. ¶¶ 26-27. Indeed, it is telling that another individual should have been
convicted of trying to impersonate petitioner in the United States in order to obtain the necessary
refugee travel document for petitioner's return.

*Sovereignty Comm. v. U.S. Dep't of State*, 292 F.3d 797, 799 (D.C. Cir. 2002), held that property

in the United States entitles a foreign entity to the full panoply of constitutional rights. Both

cases involved foreign entities that had been designated as "foreign terrorist organizations" by the

State Department under the Antiterrorism and Effective Death Penalty Act ("AEDPA"), 8 U.S.C.

§ 1189. The designation means that the organization's bank accounts in the United States

become subject to seizure, and anyone who knowingly contributes financial support to the named

entity can be prosecuted criminally. *See* 8 U.S.C. §§ 1189(a)(2)(C), 2329B(a)(1). The question

in those cases was whether such foreign entities were entitled to Fifth Amendment due process

rights when they had no property or presence in this country, and the Court of Appeals held that

they did not. *See PMOI*, 182 F.3d at 22; *32 County Sovereignty Comm.*, 292 F.3d at 799. The

discussion regarding the foreign entities' property interests in the United States was necessary for

the constitutional analysis because it is the deprivation of those interests that would have

arguably triggered the protection of the Due Process Clause. *See PMOI*, 182 F.3d at 22 ("We put

to one side situations in which an organization's bank deposits were seized as a result of the

Secretary's designation. Neither [of the foreign entities in *PMOI*] suffered that fate, presumably

because no United States financial institutions held any of their property.").

Here, in contrast, petitioner's property interest (whatever that may be) has nothing to do

with his claim of constitutional protection under the Suspension Clause while outside the United

States. It is his person that was seized, not his property. To be sure, if petitioner were currently

present in the United States, then a property interest here might be relevant to determine the

extent of his connections with this country. *See PMOI*, 182 F.3d at 22 ("[A]liens receive

constitution protections [only] when they have come within the territory of the United States *and*

developed substantial connections with this country.") (quoting *Verdugo-Urquidez*, 494 U.S. at 271) (alterations in original and emphasis added). But he is not present here, and thus, it is of no moment that he may have some property here. Any other holding would permit foreign persons to claim wholesale constitutional rights simply by holding a bank account or owning some other property in the United States, even when the alleged constitutional deprivation has nothing to do with property interests in the United States. The Constitution has no such extraterritorial application, and petitioner has not shown otherwise.

> **B.**    **The Judicial Review Provided under the DTA Fully Comports With the Suspension Clause**.

Even if petitioner were entitled to the protection of the Suspension Clause, Congress has provided an alternative judicial review scheme that fully comports with that Clause. The Supreme Court has stressed that the "'the power to award the writ by any of the Courts of the United States, must be given by written law.'" *See Felker v. Turpin*, 518 U.S. 651, 664 (1996) (quoting *Ex Parte Bollman*, 8 U.S. (4 Cranch.) 75, 94 (1807)); *see also* 518 U.S. at 664 ("judgments about the proper scope of the writ [of habeas corpus] are 'normally for Congress to make'") (quoting *Lonchar v. Thomas*, 517 U.S. 314, 323 (1996)). Consistent with these principles, the Supreme Court has held that Congress may freely repeal habeas jurisdiction, if an adequate and effective substitute remedy is provided. *See Swain v. Pressley*, 430 U.S. 372, 381 (1977).[7]

---

[7]    Moreover, petitioner cannot argue that the Constitution provides a freestanding jurisdictional basis for habeas relief in *district court* independent of the jurisdiction Congress provides by statute. Under the Constitution the federal district courts exist as a creation of Congress. *See* U.S. CONST. art. III, § 1 ("The judicial power of the United States, shall be vested in one Supreme Court, and in such inferior Courts as the Congress may from time to time ordain and establish."). Logically then, because the Constitution contains no provision requiring the

Specifically, the Supreme Court has indicated that "Congress could, without raising any constitutional questions, provide an adequate substitute through the courts of appeals. *INS v. St. Cyr, 533*, U.S. 289, 314 & n.36 (2001). The Court has indicated that the fundamental factor in determining whether the writ of habeas corpus has been suspended is whether a detainee has access to judicial review of constitutional and statutory questions. *See id.* at 300 (noting that a substantial Suspension Clause question would be presented if the statute "entirely preclude[d] review of a pure question of law by any court"); *id.* at 304-305 ("[T]here is substantial evidence to support the proposition that pure questions of law like the one raised by the respondent in this case could have been answered in 1789 by a common-law judge with power to issue the writ of habeas corpus. It necessarily follows that a serious Suspension Clause issue would be presented if we were to accept the INS' submission that the 1996 statutes have withdrawn that power from federal judges and provided no adequate substitute for its exercise."); *see also Swain*, 430 U.S. at 382-384 (presuming that the habeas substitute was "neither ineffective nor inadequate simply because the judges of that court do not have life tenure" in light of the "settled view" that non-life-tenured judges are "fully competent to decide federal constitutional issues"). Judicial review of constitutional claims and questions of law is the touchstone of habeas corpus and any substitute guaranteeing such review is therefore adequate. *See Mohamed v. Gonzales*, No. 05-

---

existence of district courts, there is no extra-statutory authority, under the Constitution or otherwise, that would automatically vest district courts with *habeas* or other jurisdiction. *See*, *e.g.*, *Sheldon v. Sill*, 49 U.S. (8 How.) 441 (1850) ("Congress may withhold from any court of its creation jurisdiction of any of the enumerated controversies."); *Kokkonen v. Guardian Life Ins. Co. of America*, 511 U.S. 375, 377 (1994) ("Federal courts are courts of limited jurisdiction. They possess only that power authorized by Constitution and statute, which is not to be expanded by judicial decree.") (citation omitted). By prescribing the review available to aliens detained as enemy combatants, Congress has exercised its broad authority to define District Court jurisdiction.

3357, 2006 WL 3392088, at *3 (8ᵗʰ Cir. 2006) ("This court may review all constitutional claims and questions of law. . . .  Congress has created a remedy as broad in scope as a habeas petition. It is an adequate and effective substitute to test the legality of a person's detention."); *Alexandre v. United States Atty. Gen.*, 452 F.3d 1204, 1206 (11th Cir. 2006) (*per curiam*) ("Because Congress gave courts of appeals jurisdiction to review all legal and constitutional errors in a removal order, habeas review became unnecessary.").

The judicial review scheme provided under the DTA ensures that federal courts have jurisdiction to decide constitutional and statutory questions regarding petitioner's detention.[8] Thus, the DTA judicial review scheme is neither inadequate nor ineffective to test the legality of petitioner's detention.  Specifically, section 1005(e)(2)(C) of the DTA permits the Court of Appeals of the District of Columbia Circuit to review whether the determination of a CSRT with regard to an alien detainee was consistent with the standards and procedures specified by the Secretary of Defense for CSRTs, including the requirement that the conclusion of the CSRT be supported by a preponderance of the evidence.  DTA §1105(e)(2)(C).  In addition, the Court of Appeals may consider, "to the extent the Constitution and laws of the United States are applicable, whether the use of such standards and procedures to make the determination is consistent with the Constitution and laws of the United States."  *Id.*  Similarly, final decisions of a military commission are reviewable both as to their consistency with standards and procedures specified for a military commission and with the Constitution and laws of the United States to the extent they are applicable.  DTA § 1005(e)(3)(D).  Thus, while petitioner maintains that he is

---

[8]  While respondents' position, consistent with *Boumediene*, is that petitioner has no constitutional rights in this context, petitioner can plead his arguments to the contrary, where appropriate, to the Court of Appeals.

not an enemy combatant, Pet. ¶ 17, he can raise that argument before the Court of Appeals in an appropriate DTA proceeding. The Court of Appeals can determine the nature of petitioner's rights, if any, under "laws of the United States" and the U.S. Constitution, and can adjudicate whether the CSRT process violated any applicable rights. *See* DTA § 1005(e)(2), (3).

Importantly, the controlling (plurality) opinion in *Hamdi v. Rumsfeld*, 542 U.S. 507 (2004), made clear that constitutional requirements for detaining even citizens in this country as enemy combatants "could be met by an appropriately authorized and properly constituted military tribunal" modeled upon military procedures implementing the Geneva Conventions for determining the status of detainees potentially entitled to prisoner-of-war status. *See id*. at 538 (plurality opinion). Acknowledging "the weighty and sensitive governmental interests in ensuring that those who have in fact fought with the enemy during a war do not return to battle against the United States," *id*. at 531, as well as the need to "tailor[] [enemy combatant proceedings] to alleviate their uncommon potential to burden the Executive at a time of ongoing military conflict," *id*. at 533, the plurality noted that proceedings by which the military determined enemy combatant status could legitimately be severely limited in scope, in ways that are not characteristic of traditional judicial proceedings, including permitting hearsay from the government, establishing a presumption in favor of the government, and limiting factual disputes to the alleged combatant's acts. *Id*. at 534.

The CSRT process is modeled on this same process, with additional procedural process and protections. Consistent with *Hamdi*, the MCA and DTA were enacted to ensure that, while each detainee is afforded his day in court, the substantive decision – of whether to consider an alien captured during an armed conflict an enemy combatant – remains a military decision. *See*

152 Cong. Rec. S10266 (daily ed. Sept. 27, 2006) (Sen. Graham) ("[t]he role of the courts in a time of war is to pass muster and judgment over the processes we create -- not substituting their judgment for the military"); *id.* at S10403 (Sen. Cornyn) ("Weighing of the evidence is a function for the military when the question is whether someone is an enemy combatant.  Courts simply lack the competence -- the knowledge of the battlefield and the nature of our foreign enemies -- to judge whether particular facts show that someone is an enemy combatant").

Indeed, the review provided under the DTA is consistent with traditional habeas practice. In *INS* v. *St. Cyr*, the Supreme Court explained that under traditional habeas review in alien-specific contexts, "the courts generally did not review the factual determinations made by the Executive," other than the question whether there was some evidence to support the order.  *St. Cyr*, 533 U.S. at 305-06; *accord Jackson v. Virginia*, 443 U.S. 307, 320-24 (1979).  The DTA review is consistent with that approach; such review permits the Court of Appeals to assess whether the CSRT, in reaching its decision, complied with "the requirement that the conclusion of the Tribunal be supported by a preponderance of the evidence."  DTA § 1105(e)(2)(C)(i). Notably, at common law, habeas courts did not even engage in any sufficiency review, given the longstanding rule that the truth of the custodian's return could not be controverted.  *See, e.g.,* Opinion on the Writ of Habeas Corpus, Wilm 77, 107, 97 Eng. Rep. 29, 43 (H.L. 1758); *see also* Note, Developments in the Law – Federal Habeas Corpus, 83 HARV. L. REV. 1038, 1113-1114 (1970) ("From 1789 to 1867, the period during which, with minor exceptions, federal habeas corpus extended only to federal prisoners, the federal habeas court did not hold fact hearings. The facts asserted in the return to the writ had to be accepted despite the prisoner's attempt to controvert them.").

- 17 -

In fact, the judicial review under the DTA provides alien detainees with greater rights than are traditionally available even in the military tribunal context.  The Supreme Court has held that the habeas review traditionally afforded in the context of military tribunals does not examine the guilt or innocence of the defendant, nor does it examine the sufficiency of the evidence.  Rather, it is limited to a jurisdictional question.  *See Yamashita v. Styer*, 327 U.S. 1, 8 (1946) ("If the military tribunals have lawful authority to hear, decide and condemn, their action is not subject to judicial review merely because they have made a wrong decision on disputed facts.  Correction of their errors of decision is not for the courts but for the military authorities which are alone authorized to review their decisions"); *id.* at 17 ("We do not here appraise the evidence on which petitioner was convicted" because such a question is "within the peculiar competence of the military officers composing the commission and were for it to decide"); *Ex parte Quirin*, 317 U.S. 1, 25 (1942) ("We are not here concerned with any question of the guilt or innocence of petitioners").  *See also Eisentrager*, 339 U.S. at 786.  In contrast, the DTA provides for constitutional and other legal claims, including issues of compliance with the military's own procedures and evidentiary sufficiency standards, and thus it actually gives petitioner *greater rights* of judicial review than are traditionally afforded even to those convicted of war crimes by a military commission.

In sum, the availability of judicial review under the DTA negates any argument under the Suspension Clause, even if it were appropriate.

**II.     THIS COURT HAS NO JURISDICTION TO ENTER A STAY AND ABEY ORDER PENDING PETITIONER'S EXHAUSTION OF HIS DTA REMEDIES**

Petitioner argues that even if *Boumediene* is applicable here, this Court is required to stay

and hold in abeyance his habeas petition pending exhaustion of his DTA remedies because

*Boumediene* is not final and because his case is neither frivolous nor foreclosed by prior decision

of the Supreme Court.  Contrary to petitioner's argument, however, *Boumediene* is final and is

the law of the circuit, requiring dismissal of this case now.  *See Ayuda, Inc. v. Thornburgh*, 919

F.2d 153, 154 (D.C. Cir. 1990) (Henderson, J., concurring) ("[o]nce [an] opinion [is] released it

[becomes] the law of this circuit").  Indeed, the Court of Appeals has recognized as much by

dismissing for lack of jurisdiction other detainees' habeas cases, pursuant to *Boumediene.  See*

*Kiyemba v. Bush*, Nos. 05-5487, et al. (D.C. Cir. Order of Mar. 22, 2007) (attached as Exhibit D

to Resps' Mot. to Dismiss); *Paracha v. Bush*, Nos. 05-5194, et al. (D.C. Cir. Order of Apr. 9,

2007) (attached as Exhibit E to Resps' Mot. to Dismiss); *Zalita v. Bush*, No. 07-5129 (D.C. Cir.

Order of Apr. 25, 2007).  And the Supreme Court's refusal to review *Boumediene* underscores

the fact that that decision is final and binding.  *See* 127 S. Ct. 1478; *see also Boumediene v.*

*Bush*, 127 S.Ct. 1725 (2007) (denying petitioners' motion for extension of time in which to file a

petition for rehearing of the order denying *certiorari* and denying petitioners' motion for

suspension of the order denying *certiorari*); *Hamdan v. Gates*, No. 06-1169, ___ S. Ct. ___ 2007

WL 606477 (Apr. 30, 2007) (denying *certiorari*).

Petitioner argues that the respondents erroneously relied on Judge Henderson's

concurring opinion in *Ayuda* for the proposition that once an opinion is released it becomes the

law of this circuit.   *See* Pet. Opp. at 8 n.4.  But Judge Henderson's statement in *Ayuda* was

merely an express statement of the reasoning inherent in the majority opinion, which held that

because the Court of Appeals had issued a prior opinion deciding that the district court lacked

jurisdiction, a later order of the district court should be stayed based on that earlier Court of

Appeal opinion, even though (as here) the mandate had not yet issued from that earlier opinion.

Thus, *Ayuda* – and not just Judge Henderson's concurrence – stands for the proposition that a

decision of the Court of Appeals is binding in the Circuit regardless of whether the mandate has

issued.  As the Court of Appeals for this Circuit put the matter in another case,

> While law-of-the-case doctrine is a prudential creation of the
> courts, the law-of-the-circuit doctrine is derived from legislation
> and from the structure of the federal courts of appeals.  Courts of
> appeals sit in panels, or divisions, of "not more than three judges"
> pursuant to the authority granted in 28 U.S.C. § 46(c).  The
> "decision of a division" is "the decision of the court." Revision
> Notes to 28 U.S.C. § 46 (citing *Textile Mills Sec. Corp. v.
> Commissioner*, 314 U.S. 326 (1941)); *see Critical Mass Energy
> Project v. Nuclear Regulatory Comm'n*, 975 F.2d 871, 876 (D.C.
> Cir.1992) (in banc), *cert. denied*, 507 U.S. 984 (1993).  Were
> matters otherwise, the finality of our appellate decisions would
> yield to constant conflicts within the circuit.  *Textile Mills Sec.
> Corp.*, 314 U.S. at 335.

*LaShawn A. v. Barry*, 87 F.3d 1389, 1395 (D.C. Cir. 1996) (*en banc*).  If "[o]ne three-judge panel

. . . does not have the authority to overrule another three-judge panel of the court," *id*., then this

Court certainly lacks the authority to disregard *Boumediene*.

Citing the Supreme Court's decision in *Steel Co. v. Citizens for Better Environment*, 523

U.S. 83 (1998), petitioner argues that the decision somehow means that the presence of an

arguably nonfrivolous claim on the merits prevents dismissal of a case on jurisdictional grounds

regardless of circuit precedent.  Such a reading is simply untenable.  Indeed, *Steel Co.* strongly

supports dismissal of this case, because it requires courts to decide jurisdictional issues *before*

merits questions, and requires a court that lacks jurisdiction to dismiss a case forthwith.  If

petitioner's reading of *Steel Co.* were correct, then the myriad jurisdictional statutes found in the

United States Code and the voluminous caselaw on the subject would be meaningless; all that a plaintiff or petitioner would need to do to have a federal court exercise jurisdiction over his or her case would be to state a claim that is not frivolous on its merits.

The unanimous Court in *Ruhrgas AG v. Marathon Oil Co.*, 526 U.S. 574 (1999), explained *Steel Co.* in the following terms:

> In *Steel Co. v. Citizens for Better Environment*, 523 U.S. 83 (1998), this Court adhered to the rule that a federal court may not hypothesize subject-matter jurisdiction for the purpose of deciding the merits. *Steel Co* rejected a doctrine, once approved by several Courts of Appeals, that allowed federal tribunals to pretermit jurisdictional objections "where (1) the merits question is more readily resolved, and (2) the prevailing party on the merits would be the same as the prevailing party were jurisdiction denied." *Id.*, at 93. Recalling "a long and venerable line of our cases," *id.*, at 94, *Steel Co.* reiterated: "The requirement that jurisdiction be established as a threshold matter ... is 'inflexible and without exception,'" *id.*, at 94-95 (quoting *Mansfield, C. & L.M.R. Co. v. Swan*, 111 U.S. 379, 382 (1884)); for "[j]urisdiction is power to declare the law," and "'[w]ithout jurisdiction the court cannot proceed at all in any cause,'" 523 U.S., at 94 (quoting *Ex parte McCardle*, 7 Wall. 506, 514, 19 L.Ed. 264 (1868)).

526 U.S. at 577. Under that long-standing rule, this Court simply lacks the authority to do anything other than to consider its jurisdiction, and then, in accordance with binding circuit precedent, to dismiss this case.

Petitioner also contends that *Boumediene* does not control his case because the petitioners in *Boumediene* declined to seek DTA review, whereas he intends to promptly file a DTA appeal of any adverse CSRT decision, and because Justices Stevens' and Kennedy's statements when denying *certiorari* in *Boumediene* indicated that his petition should be fully considered only after exhaustion of his DTA remedies. Petitioner's argument is wholly without merit. The Court of Appeals' decision in *Boumediene* was in no way dependent on whether the petitioners in those

appeals had pursued DTA remedies; rather, the Court of Appeals simply held that Section 7 of the MCA eliminates federal court jurisdiction over habeas petitions filed by the detainees at Guantanamo Bay.  In denying certiorari, the Supreme Court declined to review that decision, including the Court of Appeals' conclusion that Section 7 of the MCA requires dismissal of the detainees' habeas cases.[9]   Thus, petitioner has no right to pursue his habeas case, even after he has pursued his remedies under the DTA.

Nor can this Court find a basis in *Rhines v. Weber*, 544 U.S. 269 (2005), to conclude that it has discretion to stay the habeas cases pending exhaustion of DTA remedies.  In *Rhines*, the Supreme Court held that the district court had discretion to stay a mixed habeas petition to allow the petitioner to present his unexhausted claims to the state court in the first instance, and then to return to federal court for review of his perfected petition.  The exercise of that discretion was proper in certain limited circumstances because exhaustion of state remedies for all of the petitioner's claims was a predicate to having habeas review in federal court, and yet, some prisoners with meritorious claims might be time-barred by the one-year limitation period imposed by AEDPA when they return to federal court.  Moreover, as the Court found, no statute barred the district court from staying petitioner's federal habeas action so that it could be pursued post-exhaustion.  *See id.* at 276 (noting that district courts ordinarily have authority to issue stays, and "AEDPA does not deprive district courts of that authority").

---

[9] Moreover, given that the Supreme Court declined to review the *Boumediene* decision, the statement of Justices Kennedy and Stevens accompanying the denial of certiorari cannot plausibly be read, as petitioner suggests, to mean that they would interpret dismissal of the underlying habeas actions as an "additional step[]" that "prejudice[s] the position of the petitioners." 127 S. Ct. 1478.

Here, in contrast, retention of jurisdiction by this Court is explicitly barred by the MCA. Under the MCA, petitioner cannot bring <u>any</u> claim relating to any aspect of his detention in the District Court. Thus, unlike in *Rhine*, the impediment to this Court's exercise of jurisdiction is not petitioner's mere failure to exhaust available remedies, but a statutory directive making clear that the Court has no jurisdiction whatsoever. Whether petitioner pursues a DTA petition before the Court of Appeals is simply irrelevant to the jurisdictional question here. Accordingly, there is no basis for this Court to maintain the case pending exhaustion of DTA remedies, and this Court's "only recourse" is to dismiss this present habeas petition. *Boumediene*, 476 F.3d at 994; *see also Paracha v. Bush*, No. 05-5194, et al. (D.C. Cir. Order of Apr. 9, 2007) (attached as Exhibit E to Resps' Mot. to Dismiss) (remanding to the district court with instruction to dismiss the habeas petitions for lack of jurisdiction); *Kiyemba v. Bush,* Nos. 05-5487, *et al.* (D.C. Cir. Order of March 22, 2007, attached as Exhibit D to Resps' Mot. to Dismiss, and mandate issued May 10, 2007).

## CONCLUSION

For the foregoing reasons, respondents respectfully request that the Court dismiss petitioner's habeas case for lack of jurisdiction, and deny petitioner's motion for a stay-and-abey order.

Dated:        May 21, 2007                 Respectfully submitted,

                                           PETER D. KEISLER
                                           Assistant Attorney General

                                           DOUGLAS N. LETTER
                                           Terrorism Litigation Counsel

                                           _____/s/ *Jean Lin*_____
                                           JOSEPH H. HUNT (D.C. Bar No. 431134)
                                           VINCENT M. GARVEY (D.C. Bar No. 127191)

- 23 -

JUDRY L. SUBAR (D.C. Bar 347518)
TERRY M. HENRY
JEAN LIN
Attorneys
United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave., N.W.
Washington, DC  20530
Tel:  (202) 514-4107
Fax:  (202) 616-8470

Attorneys for Respondents

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| MAJID KHAN, *et al.* | ) | |
| | ) | |
| Petitioners, | ) | |
| | ) | |
| v. | ) | Civil Action No. 06-CV-1690 (RBW) |
| | ) | |
| GEORGE W. BUSH, | ) | |
| President of the United States, | ) | |
| *et al.,* | ) | |
| | ) | |
| Respondents. | ) | |

## DECLARATION

I, Donald W. Neufeld, pursuant to 28 U.S.C. § 1746, make the following declaration:

1). I am presently Chief of Field Operations with U.S. Citizenship and Immigration Services

(USCIS), an agency within the U.S. Department of Homeland Security (DHS), in Washington,

D.C. I have been employed by USCIS, including its predecessor, the former U.S. Immigration

and Naturalization Service, since September 1983.

2). In October 2006, I was promoted to Chief of Field Operations, which is my present position.

3). My duties include managerial oversight of USCIS' domestic operations in 26- districts

throughout the United States.

4). In preparation for making this declaration, I have reviewed the USCIS record pertaining to

Majid S. Khan.

5). USCIS records reflect that Majid S. Khan is a citizen of Pakistan who was born in Saudi

Arabia.

6). According to USCIS records Majid S. Khan entered the United States illegally in July 1996 without inspection by an immigration officer as required by INA § 235(a)(3). He was granted asylum by an immigration judge pursuant to 8 U.S.C. § 1158(b)(3)(A) on July 14, 1998.

7). USCIS records show that in July 1999, Majid S. Khan filed for legal permanent resident status. That application has not been adjudicated.

8). According to USCIS records, Majid S. Khan applied for a refugee travel document in October 2001. In the application for the refugee travel document, Khan stated that he planned to travel to Dubai to get married and to Saudi Arabia to go on pilgrimage. The application was approved, and he was granted a refugee travel document valid from December 22, 2001 to December 22, 2002. The refugee travel document was produced on December 26, 2001. Per USCIS records, Majid S. Khan was admitted to the United Stated on March 21, 2002.

9). According to USCIS records, Majid S. Khan filed an application for another refugee travel document which was dated December 20, 2002. On the application, he indicated that he planned to travel to Dubai to visit his wife. This application was received on January 2, 2003, but has not been adjudicated.


    I declare, under penalty of perjury, that the foregoing is true and correct to the best of my knowledge, information, and belief. Executed on:


May 21, 2007
Date                                    DONALD W. NEUFELD
                                        Department of Homeland Security
                                        U.S. Citizenship and Immigration Services
                                        Washington, D.C.