IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____
                                                    )
MAJID KHAN, *et al.*,                               )
        *Petitioners*,                              )
                                                    )
v.                                                  )        Civil Action No. 06-cv-1690 (RBW)
                                                    )
                                                    )
GEORGE W. BUSH, et al.,                             )
        *Respondents*.                              )
_____)

### PETITIONERS' SURREPLY MEMORANDUM IN OPPOSITION TO MOTION TO DISMISS AND REPLY MEMORANDUM IN SUPPORT OF A STAY-AND-ABEY ORDER

Petitioner Majid Khan, by and through his undersigned counsel, respectfully submits this memorandum in further opposition to Respondents' motion to dismiss this case for lack of jurisdiction (*see* dkt. no. 19) and in support of his alternative motion for a stay-and-abey order. Respondents' motion to dismiss should be denied.

### Argument

### I.    RESPONDENTS' NEW ARGUMENTS AND EVIDENCE CONCERNING THE RENEWAL OF PETITIONER'S TRAVEL DOCUMENT ARE UNAVAILING

Respondents argue for the first time in their reply memorandum that "[d]espite petitioner's one-time voluntary connections to this country, he is not 'vested with constitutional rights,' because he voluntarily left the country, did not reenter the United States during a period in which he would have been permitted to do so, was captured in a foreign country, and never re-entered the United States, having been detained entirely outside the sovereign territory of the United States." Gvt. Reply at 5-6 (dkt. no. 24) (citation omitted). While Respondents concede that Petitioner had political asylum in the United States and resided here legally for several years,

they argue that any constitutional protections he may have had "ceased to exist" once he "left the country and remained outside the country." *Id.* at 2, 9. Respondents are wrong.

As an initial matter, Respondents' statement that Petitioner's "status is no different from that of any other alien outside of the United States for purposes of invoking constitutional protections under the Suspension Clause," *id.* at 2, is undercut by the many factors set forth in Petitioner's opposition brief (*see* dkt no. 21, at 4), none of which Respondents dispute. Indeed, the undisputed facts show that Petitioner's status is materially different from that of any other Guantánamo prisoner. Notably, in particular, Petitioner was granted political asylum in the United States in July 1998. Respondents do not contest that he still has political asylum status in this country notwithstanding his abduction, forced disappearance, imprisonment and torture by U.S. officials over the course of the last four years.

Moreover, undersigned counsel have recently learned from the unclassified transcript of Petitioner's Combatant Status Review Tribunal proceedings – heavily redacted to spare Respondents embarrassment and legal accountability for Petitioner's torture and abuse – that he purchased and owned a home in the Baltimore area; maintained a bank account here; paid approximately $2,400 in taxes each month to the government; and assisted the Federal Bureau of Investigation in the capture of an illegal Pakistani immigrant named "Shafeeq" in mid-2002. *See* Ex. A at 18, 20-21 (attached hereto).[1] These additional ties further establish beyond any doubt

---

[1] Counsel are in the process of gathering documentary evidence in further support of these claims, which we intend to submit to the Court for its consideration in connection with the motion to dismiss. Indeed, Respondents argue that the Court may consider extra-pleading materials, including affidavits and testimony, in ruling on the motion to dismiss. *See* Gvt. Reply at 2 & 3 n.2. Petitioner accordingly requests permission to conduct additional jurisdictional discovery. Counsel specifically request access to Petitioner in order to interview him about his property and other ties to the United States, his refugee travel documents and any intention he may have had to reenter the United States. At a minimum, Petitioner requests copies of all documents supporting or otherwise relating to the affidavit of Mr. Neufeld, which was submitted for the first time with Respondents' reply memorandum. The Court plainly has the authority to order such relief in aid of its jurisdiction under the All Writs Act, 28 U.S.C. § 1651.

Petitioner's entitlement to the fundamental common law right to habeas corpus enshrined in the Constitution and protected by its Suspension Clause.

Respondents now appear to base their argument that Petitioner is not entitled to any constitutional protections solely on his purported failure to obtain proper renewal of his refugee travel document.  Even if Respondents were correct that Petitioner failed to renew his travel papers—which we do not concede—it would be irrelevant to the question of whether he is entitled to invoke habeas rights under the Constitution.  Respondents concede that Petitioner resided in the United States legally and left with a valid travel document.  They also concede that he applied for renewal of that document before he left, which was not acted upon by immigration officials.  Respondents further concede that if Petitioner had not been out of the country for more than one year, he could have applied for and received renewal of his travel documents at a port-of-entry into the United States or at a foreign U.S. embassy or consulate.  (*See* Gvt. Reply at 10 & 11 n. 6.)  The only events which prevented him from doing so were his kidnapping, rendition and indefinite imprisonment by U.S. officials in March 2003.[2]  That Petitioner failed to reenter the United States is entirely the result of Respondents' actions, and in no way reflects his intention to remain outside the country for more than one year.

Moreover, Respondents cite no authority—and we are aware of none—holding that an aslyee who leaves the country legally but whose travel papers later expire without renewal thereby forfeits all constitutional rights to which he would otherwise indisputably be entitled.  To

---

Alternatively, the Court should strike this late-filed "evidence" as incomplete and therefore unreliable hearsay, or give it no weight.

[2] Even if Petitioner intended to travel to Dubai – and there is no evidence before the Court concerning whether he did so or not – the fact that he traveled to Pakistan is immaterial to his asylum status.  Respondents do not argue that he lost his asylum status or that his legal rights were otherwise affected by his traveling to Pakistan.  *See* Gvt. Reply at 10-11 n.6.  Nor are hearsay statements that another individual was convicted in federal court of attempting to impersonate Petitioner relevant here, particular considering Petitioner had no opportunity to appear and testify in those proceedings because he was being held by the CIA in secret detention.

the contrary, Petitioner's substantial voluntary contacts with this country—all undisputed by Respondents—plainly vest him with certain fundamental constitutional rights, including at a minimum the constitutional right to petition for habeas relief.  *See* Pet'r's Mem. at 4-5 (dkt. no. 21) (citing cases).

Respondents' reliance on *Shaughnessy v. United States ex rel. Mezei*, 345 U.S. 206 (1953), is also misplaced in several respects.  First, the case is plainly distinguishable.  Unlike Petitioner here, who indisputably has legal status in this country based on his continuing asylum, the District Court concluded in *Mezei* that "[t]here is a certain vagueness about Mezei's history.... The government alleges that he was never lawfully admitted to the United States for permanent residence."  101 F. Supp. 66, 67 (S.D.N.Y. 1951).  Mezei also was ultimately denied a hearing to challenge his exclusion from the United States not merely because he left the country and later attempted to reenter without an unexpired travel document, but because he was otherwise "unqualified for admission under existing immigration laws" at the time of his attempted reentry.  345 U.S. at 207, 213.  In particular, Mezei had been formally determined to pose a security risk by the Attorney General under the Passport Act of 1918. *See id.* at 210-11.  Petitioner here, by contrast, has never been alleged by Respondents to be excludable on any basis.

If anything, *Mezei* supports Petitioner's contention that he is vested with a constitutional right to petition for a writ of habeas corpus. There, the Supreme Court concluded that "[c]oncededly [the petitioner's] movements are restrained by authority of the United States, and *he may by habeas corpus test the validity of his exclusion*" from this country while detained indefinitely. *Id.* at 213 (emphasis added).[3]  But the Court in *Mezei* held that the habeas

---

[3] Mezei was at all relevant times subject to the "entry fiction" that held that he remained an "excludible alien" despite his presence within the United States—either on Ellis Island or, later, in Buffalo, New York while paroled into the United States pending his appeals.

proceeding was for all practical purposes an exclusion proceeding, *id*. at 213, accepting the government's argument that the question of whether due process limited Mezei's detention was indistinguishable from the question of whether due process limited his exclusion.[4] Absent a legal entitlement, initial entry to the United States is a discretionary benefit; there is no loss of a liberty or property interest implicating procedural due process in the denial of initial entry.[5] Thus the Court concluded that Mezei lacked any due process rights that could be vindicated through habeas. *Id*. at 212. However, while a decision to deny initial entry to a foreign national might not trigger procedural due process (assuming he has no independent legal right to enter), a decision to detain an alien deprives him of liberty and thus "lies at the heart of" what the Due Process Clause protects. *Zadvydas v. Davis*, 533 U.S. 678, 690 (2001). In contrast to Mezei, Petitioner Khan seeks review of his detention; nothing about the review Khan seeks carries implications by necessity for his entry into the United States, and thus the logic of *Mezei* does not apply to defeat his claims.

Moreover, modern due process jurisprudence calls for a balancing approach, whereby the amount of process due—even in the context of exclusion proceedings—is tied to the balance of individual and government interests at stake. See *Landon v. Plasencia*, 495 U.S. 21, 34 (1982) (weighing "the interest at stake for the individual, the risk of an erroneous deprivation of the interest through the procedures used as well as the probable value of additional or different

---

[4]  See Petitioner's Brief in *Shaughnessy v. United States ex rel. Mezei*, 345 U.S. 206 (1953) (No. 139), at 3 n.2, where the government argued: "Although this proceeding arises on a petition for habeas corpus, it actually involves the right of an alien to temporary entry into the United States in the face of a determination by the Attorney General that his entry would impair the public interest. The order of the district court does not merely grant the respondent his freedom; it gives him a privilege he never possessed."

[5] *Cf. Olim v. Wakinekona*, 461 U.S. 238, 248-49 (1983) (holding that procedural due process not triggered by denial of discretionary parole, because no liberty interest infringed).

procedural safeguards, and the interest of the government in using the current procedures rather than additional or different procedures" (citing *Mathews v. Eldridge*, 424 U.S. 319, 334-35 (1976))).[6] Petitioner Khan's substantial family, residence, status and property ties to the United States all would need to be taken into account in determining the amount of process he is due *even if* he were an excludible alien whose release would grant him entry, like Mezei. In any event, given that he presents a pure question of detention, "the interest at stake" for Petitioner and "the risk of an erroneous deprivation" are at their absolute zenith, and place him well over the threshold necessary to assert habeas jurisdiction (over both substantive and procedural due process claims).

Consistent with the modern approach, even the *Mezei* Court stated that "[t]o be sure, a lawful resident alien may not captiously be deprived of his constitutional rights to procedural due process." 345 U.S. at 213. Temporary absence from the United States does not automatically deprive "a returning lawfully resident alien" of his constitutional right to be heard. *Id*. At a minimum, because Petitioner was granted political asylum pursuant to a congressional statute, his status should be "'assimilat[ed]' for constitutional purposes to that of continuously present alien residents." *Id*. at 214 (quoting *Kwong Hai Chew v. Colding*, 344 U.S. 590, 601 (1953)); *see also Landon v. Plasencia*, 459 U.S. 21, 33 (1982) (affirming *Chew*); *Rosenberg v. Fleuti*, 374 U.S. 449, 460 (1963) (*Chew* "supports the general proposition that a resident alien who leaves this country is to be regarded as retaining certain basic rights.").

In addition to his asylum status and his substantial personal and family ties to the United States, Petitioner's property ties to the United States support his claims to due process rights that

---

[6] Such an approach suggests *Mezei* might be decided differently today. *Cf. Zadvydas*, 533 U.S. at 694 (*Mezei* distinguishable and thus "we need not consider the aliens' claims that subsequent developments have undermined *Mezei*'s legal authority" (citing sections of petitioners' briefs highlighting the subsequent development of due process limits to government's power to civilly commit persons indefinitely in cases such as *Foucha*, *Hendricks* and *Salerno*)).

may be vindicated in habeas. Respondents contend that "petitioner's property interest (whatever that may be) has nothing to do with his claim of constitutional protection under the Suspension Clause while outside the United States" because "[i]t is his person that was seized, not his property." (Gvt. Reply at 12.) In other words, Respondents argue that Petitioner's property ties to this country are wholly meaningless for purposes of determining whether he has a constitutional right to habeas because he is imprisoned outside the United States. That argument is meritless.

Not only is Guantánamo, where Petitioner is detained, "in every practical respect a United States territory," *see Rasul v. Bush*, 542 U.S. 466, 487 (2004) (Kennedy, J., concurring), but the Court of Appeals' recent decision in *Boumediene* belies any purported distinction between non-citizens vested with constitutional rights based on their physical presence in this country and those who are so vested because they retain substantial voluntary connections with the United States, including property ties. It is well-established law in both this circuit and the Supreme Court that an alien's substantial property ties to the United States are a relevant factor to be considered in determining the scope of an alien's rights. *Boumediene v. Bush*, 476 F.3d 981, 990 (D.C. Cir. 2007) ("[t]he short of the matter is that given the history of the writ in England prior to the founding, habeas corpus would not have been available in 1789 to aliens without *presence or property* within the United States.") (emphasis added); *id.* at 991, 992; *see also 32 County Sovereignty Comm. v. Dep't of State*, 292 F.3d 797, 799 (D.C. Cir. 2002) ("The affidavits do not aver that either organization possessed any controlling interest in property located within the United States, nor do they demonstrate any other form of presence here. The Secretary therefore did not have to provide [them] with any particular process..."). The decision in *32 County Sovereignty Committee*, as in *PMOI v. U.S. Dept. of State*, 182 F.3d 17, 22 (D.C. Cir. 1999) and *NCRI v. Department of State*, 251 F.3d 192 (D.C. Cir. 2001), turned on the fact that the organizations designated as terrorist groups had not "'developed substantial

connections'" with the United States, 292 F.3d at 799 (quoting *NCRI*, 251 F.3d at 202), not the fact that they were not being deprived of property within the United States that they already held, as the government would interpret this line of cases. (Gov't Reply at 12.) This line of cases supports Petitioner's contention that his property ties to the United States,[7] along with the rest of his substantial voluntary ties, support his claim to a due process interest that may be vindicated in habeas.

Given the totality of Petitioner's undisputed, substantial voluntary ties to the United States, the Court should in any event conclude that, at a minimum, he has a constitutional right to petition for habeas relief. *See Johnson v. Eisentrager*, 339 U.S. 763, 770 (1950) ("The alien, to whom the United States has been traditionally hospitable, has been accorded a generous and ascending scale of rights as he increases his identity with our society.... And, at least since 1886, we have extended to the person and property of resident aliens important constitutional guaranties – such as the due process of law of the Fourteenth Amendment.").

For all of these reasons, Respondents' motion to dismiss should be denied.

## II.    RESPONDENTS' NEW ARGUMENTS CONCERNING THE CONSTITUTIONAL ADEQUACY OF THE DTA ARE EQUALLY UNAVAILING

Respondents also argue for the first time in their reply memorandum that the judicial review provided for under the DTA fully comports with the Suspension Clause.  In particular, Respondents claim that the DTA is an adequate substitute for habeas because it: (1) "ensures that federal courts have jurisdiction to decide constitutional and statutory challenges regarding petitioner's detention" (Gvt. Reply at 13-16); (2) "the review provided under the DTA is

---

[7]  The government argues that Petitioner's argument would lead inexorably to the result that any alien not present inside the United States could acquire due process rights (indeed, "wholesale constitutional rights") simply by purchasing property within the United States or opening a  bank account here (Gov't Reply at 13). That misconstrues the nature of the inquiry: insubstantial or contrived property ties would not weigh in favor of a finding of "substantial connection" with the United States.

consistent with traditional habeas practice" (*id.* at 17-18); and (3) the CSRT process is modeled on Army Regulation § 190-8 (1997), which implements the Geneva Conventions' requirement for determining whether detainees are entitled to prisoner-of-war status, and provides "additional procedural process and protections" (*id.* at 16-17; *see also id.* at 2-3). Respondents are wrong.

### A.    The DTA Does Not Provide a Constitutionally Adequate Substitute for Habeas

Respondents first contend that even if Petitioner could properly invoke the Suspension Clause, the review of his "enemy combatant" determination available in the Court of Appeals is sufficient to withstand a suspension challenge to the validity of the DTA. In support of this argument, they note that the DTA permits the Court of Appeals to consider (1) whether the CSRT determination that Petitioner is properly held as an "enemy combatant" was consistent with the "standards and procedures" governing the CSRT process, including whether that determination was supported by a "preponderance of the evidence," and (2) whether the CSRT standards and procedures were "consistent with the Constitution and laws of the United States." Gvt. Reply at 15 (quoting DTA § 1005(e)(2)(C)). But such limited review is hardly adequate or effective to test the legality of Petitioner's detention as would be required in a habeas hearing. *See Swain v. Pressley*, 430 U.S. 372, 381 (1977) (any statutory substitute for habeas must provide an "adequate and effective" means to test the legality of the detention, in a process "commensurate" with habeas, to avoid a violation of the Suspension Clause).[8]

### B.    The DTA Is Constitutionally Deficient for the Reasons Set Forth in Respondents' Filings in the *Bismullah* Case

---

[8] The *Swain* Court upheld a statute providing a collateral remedy for prisoners in custody in the Superior Court of the District of Columbia against a Suspension Clause challenge for reasons that are not applicable here. In particular, the Court cited the statute's "savings clause" allowing a federal district court to hear an application for habeas if the statute's remedy was "inadequate or ineffective" to test the legality of the prisoner's detention. The DTA has no such "savings clause" allowing resort to habeas if limited review of the CSRTs under the DTA is determined to be inadequate or ineffective to test the legality of a detainee's detention.

In a recent filing in *Bismullah v. Rumsfeld*, No. 06-1197 (D.C. Cir.) – in which a Guantánamo detainee seeks review in the Court of Appeals under the DTA – Respondents have set forth their views concerning the scope of review available under the DTA (and now the MCA), making it clear that such review is not commensurate with the searching inquiry required by common law habeas.   *See* Response in Opp'n to Motion to Compel (Aug. 21, 2006) ("*Bismullah* Opp'n") (attached hereto as Ex. B).

First, according to Respondents' position in *Bismullah*, the DTA provides no opportunity for the Court of Appeals to engage in a factual inquiry into the bases for detainees' detentions or to engage in any fact-finding at all.  *Id.* at 15.  Rather, they argue, the Court of Appeals is limited to reviewing the CSRT "record," *id.* at 14, which as a practical matter consists only of the evidence that Respondents themselves chose to put before the CSRT panel.  In Respondents' view, the Court of Appeals also may only examine the CSRT record to determine "whether the CSRT followed appropriate procedure." *Id.* at 12-13.  And although the DTA instructs the Court of Appeals to determine whether a detainee's enemy combatant designation is consistent with "the requirement that the conclusion of the Tribunal be supported by a preponderance of the evidence," Respondents claim that this provision "limits review to the question of whether the CSRT followed appropriate procedure and rendered a decision supported by sufficient evidence." *Id.* at 12.  Moreover, by "sufficient evidence" Respondents mean "simply such relevant evidence as a reasonable person might accept as proof of a conclusion."  *Id.* at 13 (citation omitted).

Second, Respondents contend that the DTA prevents detainees like Petitioner from introducing, and the Court of Appeals from considering, extrinsic evidence to controvert Respondents' evidence, including evidence of "actual innocence" or evidence that statements

used against detainees were obtained through torture. *Id.* at 16-17.[9]  According to Respondents, the DTA simply "does not authorize the submission of new evidence." *Id.* at 16.  This limitation is critically important here, where Petitioner has alleged extensive torture and abuse while held in secret CIA detention and since his transfer to Guantanamo in September 2006, resulting in Petitioner's hunger strike and repeated attempts to commit suicide by chewing through arteries in his elbow.  *See* Ex. A (attached hereto).

Third, Respondents contend that, although the factual bases for a detainee's detention may be classified, neither the detainees nor their counsel are entitled under the DTA to have access to all such relevant but classified information.  Indeed, Respondents argue that detainees and their counsel are not entitled to any evidence relevant to the detainees' detentions that is outside the "record" compiled by them for the CSRTs.  *Id.* at 10-12, 17-20.  Notably, in this case Respondents have refused and continue to refuse to provide Petitioner access to his counsel – despite his repeated requests – on the ground that he might reveal the methods of torture applied to him while in secret CIA detention and at Guantanamo, as well as the locations of the secret CIA detention facilities overseas.  Nor have Respondents provided the record evidence concerning Petitioner's CSRT proceedings.[10]

Fourth, while the DTA authorizes the Court of Appeals to consider whether the CSRT standards and procedures are "consistent with the Constitution and laws of the United States" – and Respondents point to that provision in their instant motion as a basis for why the DTA is not unconstitutional, *see* Gvt. Reply at 14 – Respondents argue in *Bismullah* that there is not a single constitutional protection, including fundamental due process, which detainees may invoke.  *See*

---

[9] The CSRTs' acceptance of evidence obtained by torture – and the presumption that such evidence is genuine and accurate – is a particularly troubling departure from habeas corpus.

[10] Respondents have produced only the heavily redacted transcript of his CSRT proceedings.  *See* Ex. A (attached hereto).

*Bismullah* Opp'n at 6 n.5 & 7.    Thus, under Respondents' interpretation, DTA § 1005(e)(2)(C)(ii) is utterly meaningless.

Fifth, during oral argument in the *Al Odah/Boumediene* consolidated appeals, Respondents have made clear their view that the DTA gives the Court of Appeals no authority to order a detainee's release even if it determines that his CSRT was unfair or unlawful.  The only remedy, according to Respondents, is for the Court of Appeals to order a new CSRT.

According to a recent analysis of unclassified CSRT proceedings, there have already been several cases where detainees who were found by CSRTs not to be "enemy combatants" were sent back for new hearings rather than being released.  Respondents simply sent went back for a second or third "bite at the apple," ordering new CSRTs for each of those detainees until they eventually obtained "enemy combatant" determinations.  *See* Mark Denbeaux & Joshua Denbeaux, *No-Hearing Hearings: An Analysis of the Proceedings of the Government's Combatant Status Review Tribunals at Guantánamo* at 3, 37-39 (Nov. 17, 2006) (available at http://law.shu.edu/news/final_no_hearing_hearings_report.pdf).  Nor is there any indication that the detainees in those cases were ever informed of the initial favorable decisions, or informed of or allowed to participate in the later CSRT proceedings.  *See id.*  Perhaps nothing could offend fundamental due process more starkly than sending an innocent man back for additional pro forma hearings until Respondents are able to obtain a preferred outcome which results in potentially life-long detention without charge for the detainee.

In any event, the Court of Appeals' purported inability to order detainees released certainly belies any claim that CSRT review under the DTA is an adequate substitute for habeas corpus.  *See, e.g., Preiser v. Rodriguez*, 411 U.S. 475, 484 (1973) ("[T]he essence of habeas corpus is an attack by a person in custody upon the legality of that custody, and [ ] the traditional function of the writ is to secure release from illegal custody."); *see also Hamdi v. Rumsfeld*, 542

U.S. 507, 576 (2004) (Scalia, J., dissenting) ("The role of habeas corpus is to determine the legality of the executive detention, not to supply the omitted process necessary to make it legal. . . . It is not the habeas court's function to make illegal detention legal by supplying a process that the Government could have provided, but chose not to.").

### C.     In Cases of Executive Detention, Common Law Habeas Demands a Far More Searching and Extensive Review than the Limited DTA Review Espoused by Respondents

Petitioner has been imprisoned in secret CIA detention and at Guantánamo for several years without charge or trial. He is detained not under sentence of any court or tribunal, but by the sheer might of the Executive. In these circumstances of "pure executive detention," common law habeas would require a searching judicial inquiry into the factual and legal basis for the detention, including the opportunity to traverse Respondents' factual return – which, again, has not even been provided to Petitioner in this case – to present exculpatory evidence and to obtain a judicial determination of any disputed factual issues.

The common law distinguished between habeas petitions challenging a prior conviction pursuant to judicial process and those challenging pure executive detentions. While courts prohibited petitioners from introducing extrinsic evidence and limited their review of the underlying facts in cases where the petitioners were challenging a criminal conviction by a duly constituted court of "competent jurisdiction,"[11] that was never the case with respect to executive detentions. The Supreme Court has emphasized: "At its historical core, the writ of habeas corpus has served as a means of reviewing the legality of executive detention, and it is in that context that its protections have been strongest." *INS v. St. Cyr*, 533 U.S. 289, 301 (2001).

In cases of non-judicial detention, the common law required a searching judicial examination into the bases for detention. This examination included not only an examination of

---

[11] *See generally* R.J. Sharpe, The Law of Habeas Corpus 51 (1989).

the Executive's return, but also allowed a petitioner to dispute the return and present evidence. And the court would review all of the evidence and order the petitioner's release if it concluded that the evidence as a whole was insufficient to justify the detention. *See, e.g., Goldswain's Case*, 96 Eng. Rep. 711, 712 (C.P. 1778) (petitioner "may plead to [court] any special matter necessary to regain his liberty" and court "could not willfully shut [its] eyes against such facts as appeared on the affidavits, but which were not noticed on the return"). Early American courts also required the same searching judicial examination into the bases for detention. *See, e.g., Ex parte Milligan*, 71 U.S. (4 Wall.) 2 (1866) (court examined "facts stated in Milligan's petition, and the exhibits [he] filed" to decide ultimate questions of lawful authority); *State v. Joseph Clark*, 2 Del. Cas. 578 (Del. Chancery 1920) (releasing habeas petitioner after reviewing his affidavit traversing the return and hearing testimony from his father). Likewise, non-citizens detained by the Executive in wartime were able to submit evidence in habeas proceedings to challenge whether they were properly detained by the Executive as "enemy aliens." *See, e.g., Lockington's Case,* Bright (N.P.) 269, 298-99 (Pa. 1813); *Case of the Three Spanish Sailors*, 96 Eng. Rep. 775, 776 (C.P. 1779); *Rex v. Schiever*, 97 Eng. Rep. 551 (K.B. 1759).[12]

Nor does habeas otherwise entail a limited, highly deferential review that Respondents have suggested is the extent of judicial inquiry available under the DTA. Even if the Executive has undertaken some prior process of its own to justify the detention, a habeas court would not be bound by that process or restricted simply to reviewing whether the Executive had abided by its own rules in conducting that process. *See, e.g., Bushell's Case*, 124 Eng. Rep. 1006, 1007

---

[12] Respondents misconstrue *INS v. St. Cyr*, 533 U.S. 289, 306 (2001), in support of the proposition that under "[t]raditional habeas review in alien-specific contexts, 'the courts generally did not review the factual determinations made by the Executive,' other than the question whether there was some evidence to support the order." Gvt. Reply at 17. To the contrary, in the cases cited in *St. Cyr* on which Respondents apparently rely the factual review of habeas was limited because the petitioners had already had the opportunity to participate in full immigration removal proceedings and appeals to the Board of Immigration Appeals. Indeed, the Court emphasized that at common law "an attack on an executive order could raise *all* issues relating to the legality of the detention." *Id.* at 301 n.14 (emphasis added; citation omitted).

(C.P. 1670) ("[O]ur judgment ought to be grounded upon our own inferences and understandings, and not upon [those of an inferior tribunal]."); *Ex parte Bollman*, 8 U.S. (4 Cranch) 75, 125 (1807) (Supreme Court examined written depositions to determine if there was sufficient evidence of petitioner levying war against United States to justify detention for treason); *see also Moore v. Dempsey*, 261 U.S. 86, 92 (1923) (habeas corpus does not "allow a Judge of the United States to escape the duty of examining the facts for himself").

### D. Petitioner Has Not Been Afforded More "Procedural Process and Protections" Than Military Commission Defendants

Respondents also suggest that the DTA does not violate the Suspension Clause because the CSRT process is modeled on Army Regulation § 190-8 (1997), which implements the Geneva Conventions' requirement for determining whether detainees are entitled to prisoner-of-war status. Indeed, Respondents contend that the CSRTs provide detainees like Petitioner with "significant additional procedural process and protections" beyond what is required by Army Regulation § 190-8. Gvt. Reply at 16-17. Respondents also argue that these minimal procedures comport with the due process requirements of *Hamdi*. *See id.* Again, Respondents are wrong on all accounts.

As an initial matter, the CSRT process falls well short of the requirements of Army Regulation § 190-8. As Judge Green explained, Article 5 of the Third Geneva Convention entitles all individuals to be treated as prisoners of war "until such time as their status has been determined by a competent tribunal," even if there is doubt as to whether they are entitled to that status under Article 4 of the Convention. *See In re Guantanamo Detainee Cases*, 355 F. Supp. 2d 443, 479-80 (D.D.C. 2005), *appeal pending*. "Army Regulation 190-8 created the rules for the 'competent tribunal' referenced in Article 5 of the Third Geneva Convention." *Id.*

"Article 5 hearings, like the CSRT, involve a panel of three officers who hear information from the military and the prisoner. These hearings, the [*Hamdi*] Court said, had proven

successful in resolving doubts about the status of prisoners captured during conflicts governed by the Geneva Conventions." Joseph Margulies, Guantánamo and the Abuse of Presidential Power 160 (2006). "The streamlined proceedings of an Article 5 hearing were developed in response to the unique circumstances presented in the field. . . . Admittedly, these hearings are extremely summary, which creates a significant risk of error. But the consequences of a mistake are mitigated by the fact that prisoners will be confined under conditions that comply with the Geneva Conventions." *Id.* That is far from true with the CSRTs, which are unrestrained by the applications of the Geneva Conventions. *See id.* at 170.

Indeed, while a CSRT "bears a glancing resemblance to an Article 5 hearing, [it] actually provides fewer procedural protections." *Id.* at 161. For example, in the Guantánamo detainee cases the "inflexible and expansive definition of enemy combatant made it inevitable the CSRT would rule against a number of prisoners who should have been released. Yet this problem was exacerbated by the procedural rules governing the CSRTs. To begin with, the tribunals based their decision on secret evidence kept from the prisoner. This sometimes produced absurd spectacles, fit for Lewis Carroll . . ." *Id.* at 163.

> At the same time, the [CSRT] tribunal must presume that the evidence presented by the military, including secret evidence, is genuine and accurate. This distinguishes the CSRT from an Article 5 hearing, where the prisoner is presumed to be a POW until proven otherwise, and there is no presumption in favor of the military's evidence. In addition, the CSRT panel may rely on "any information it deems relevant and helpful," including any degree of hearsay. . . . and for the first time in U.S. military history, the tribunal may rely on evidence secured by torture, coercive interrogations, or cruel and degrading treatment. . . . Article 5 hearings, by contrast, rely on evidence secured in compliance with the Geneva Conventions, which prohibit torture and unlawful coercion and thereby minimize the risk of error caused by unreliable confessions.

*Id.* at 164.

The CSRTs are also decidedly not administered by impartial decisionmakers. *See id.* at 166. "Like an Article 5 hearing, each [CSRT] tribunal consists of three commissioned officers.

But in an Article 5 hearing, the prisoner is presumed a POW. In these tribunals, by contrast, [Respondents] have all repeatedly announced that each detainee is an enemy combatant" without determining on an individualized basis whether a particular detainee complied with the laws of war or otherwise falls within an exception denying him POW status. *Id.*; *see also* 355 F. Supp. 2d at 480. In this respect, a CSRT is exactly the opposite of an Article 5 hearing.

Accordingly, while there are other examples of how CSRTs fall short of the standards for Article 5 hearings, "the conclusion is simply inescapable that these tribunals were created for no other purpose than to validate a predetermined result." Margulies at 169. The CSRTs bear "superficial similarity to Article 5 hearings" but only serve to "create[ ] the impression that the Administration has fixed the problem identified in *Rasul*." *Id.*

Respondents are also incorrect that under *Hamdi* "proceedings by which the military determined enemy combatant status legitimately could be severely limited in scope, in ways that are not characteristic of traditional judicial proceedings." Gvt. Reply at 16. To the contrary, *Hamdi* held that an individual detained by Respondents as an "enemy combatant" must receive notice of the factual basis for that determination and a fair opportunity to rebut Respondents' factual assertions before a neutral decisionmaker. *See* 542 U.S. at 533. In reaching that conclusion, the Court "necessarily reject[ed]" Respondents' suggestions that "separation of powers principles mandate a heavily circumscribed role of the courts in such circumstances." *Id.* at 535. The Court cautioned that "a state of war is not a blank check for the President." *Id.* at 536.

The *Hamdi* plurality also suggested *in dicta* that "exigencies of the circumstances may demand that, aside from these core elements [of due process], enemy combatant proceedings may be tailored to alleviate their uncommon potential to burden the Executive at a time of ongoing military conflict." 542 U.S. at 533. "Hearsay, for example, may need to be accepted as the most reliable evidence available from the Government," and there may be a "presumption in

favor of the Government's evidence, so long as that presumption remained a rebuttable one and fair opportunity for rebuttal were provided." *Id.* at 533-34. The Court further explained that "once the Government puts forth credible evidence that the habeas petitioner meets the enemy-combatant criteria, the onus could shift to the petitioner to rebut that evidence with more persuasive evidence that he falls outside that criteria." *Id.* at 534. But in the absence of a tribunal following constitutionally mandated procedures, the district courts must provide those procedural rights to the detainee through habeas. *See id.* at 605.

Here, Respondents have not shown—and cannot show—that exigent circumstances require anything less than full habeas review.[13] And they have not demonstrated that admission of hearsay evidence is necessary, or that such evidence would be reliable. They have not put forth any evidence—let alone "credible" evidence—to show that Petitioner is properly held as an enemy combatant. Nor has Petitioner had a fair opportunity to contest that designation before a neutral decisionmaker. *See* Ex. A at 3 ("I'm not satisfied with ... the Tribunal process.... I would rather have fair trial ..."). Thus, under *Hamdi*, this Court must afford him full habeas review.

Respondents also overlook prior precedent establishing that detainees subject to military commissions have traditionally been afforded all of the rights that Petitioner has been denied

---

[13] While Respondents have often raised the specter of interference with military operations, the Supreme Court has rejected their argument that such circumstances justify the denial of due process in the detainee cases. The Court has done so in the context of tribunals to determine who is properly detained, and with respect to military commissions to try and punish violations of the laws of war. *See Hamdi*, 542 U.S. at 532, 534-35 ("It is during our most challenging and uncertain moments that our Nation's commitment to due process is most severely tested; and it is in those times that we must preserve our commitment at home to the principles for which we fight abroad. ... We think that it is unlikely that this basic [due] process will have the dire impact on the central functions of warmaking that the Government forecasts.... [I]t does not infringe on the core role of the military for the courts to exercise their own time-honored and constitutionally mandated roles of reviewing and resolving claims like those presented here."); *Hamdan*, 126 S. Ct. at 2773 ("Exigency alone, of course, will not justify the establishment and use of penal tribunals not contemplated by ... the Constitution unless some other part of that document authorizes a response to the felt need."). Here, too, any rote claims of exigency could not operate to deprive Petitioner of full habeas review because the Petition was not filed in a "zone of active military operations" and Petitioner is detained on an island thousands of miles away from any battlefield. *Cf. Johnson v. Eisentrager*, 339 U.S. 763, 780 (1950).

here.  For instance, unlike Petitioner, military commission defendants typically have the right to examine and rebut the factual evidence against them, to confront their accusers, to call witnesses and present evidence, and to be represented by counsel.  *See Ex parte Quirin*, 317 U.S. 1 (1942); *In re Yamashita*, 327 U.S. 1 (1946); *Johnson v. Eisentrager*, 339 U.S. 763 (1950).  The limited habeas review afforded in these cases is also consistent with the limited habeas review that common law courts afforded petitioners who challenged convictions resulting from prior trial-like procedures deemed fair and adequate.  Moreover, in each of these cases the Supreme Court engaged in a searching and detailed analysis of whether the military commissions complied with the laws of war, including the Geneva Conventions.  *See* 317 U.S. at 24; 327 U.S. at 5-6, 9; 339 U.S. at 780-81, 785-91.  Here, by contrast, Respondents contend that the Court of Appeals has no such power to inquire into such matters or independently assess the fairness and adequacy of the CSRT process.

Finally, it is important to remember that Petitioner has not been convicted of war crimes by military commission.  He has not even been charged with any offense.  Nor can the post-hoc CSRT process to which he was unilaterally subjected by the military in order to confirm his "enemy combatant" status be compared to duly authorized military commissions established to try war crimes.

## **Conclusion**

Respondents' motion to dismiss should be denied in its entirety and the Court should consider the merits of Petitioner's challenge to his detention.

Dated:    New York, New York
          May 28, 2007

Respectfully submitted,

/s/ Gitanjali S. Gutierrez
J. Wells Dixon (Pursuant to LCvR 83.2(g))
Gitanjali S. Gutierrez (Pursuant to LCvR 83.2(g))
Shayana Kadidal [D.C. Bar No. 454248]
CENTER FOR CONSTITUTIONAL RIGHTS
666 Broadway, 7th Floor
New York, New York 10012
Tel:  (212) 614-6485
Fax:  (212) 614-6499

*Counsel for Petitioners*

**EXHIBIT A**

Verbatim Transcript of Combatant Status Review Tribunal for ISN10020 [Majid Khan] (Unclassified)

http://www.defenselink.mil/news/transcript_ISN10020.pdf

## UNCLASSIFIED

## Verbatim Transcript of Combatant Status Review Tribunal Hearing for ISN 10020

### OPENING

| | |
|---|---|
| PRESIDENT: | This hearing shall come to order. |
| RECORDER: | This Tribunal is being conducted at 08:42 on 15 April 2007 on board U.S. Naval Base Guantanamo Bay, Cuba. The following personnel are present: Colonel [REDACTED], United States Air Force, President, Commander [REDACTED], United States Navy, Member, Lieutenant [REDACTED], United States Air Force, Member, Major [REDACTED], United States Air Force, Personal Representative, Sergeant First Class [REDACTED], United States Army, Reporter, Major [REDACTED], United States Air Force, Recorder. Lieutenant Colonel [REDACTED] is the Judge Advocate member of the Tribunal. |

### OATH SESSION 1

| | |
|---|---|
| RECORDER: | All rise. |
| PRESIDENT: | The Recorder will be sworn. Do you, Major [REDACTED], swear or affirm that you will faithfully perform the duties as Recorder assigned in this Tribunal, so help you God? |
| RECORDER: | I do. |
| PRESIDENT: | The Reporter will now be sworn. The Recorder will administer the oath. |
| RECORDER: | Do you, Sergeant First Class [REDACTED], swear that you will faithfully discharge your duties as Reporter assigned in this Tribunal, so help you God? |
| REPORTER: | I do. |
| PRESIDENT: | We'll take a brief recess while the Detainee is brought into the room. |
| RECORDER: | The time is 08:43 on 15 April 2007. This Tribunal is now in recess. All rise. [All personnel depart the room.] |

### CONVENING AUTHORITY

| | |
|---|---|
| RECORDER: | [All personnel return into the room at 08:48.] All rise. |
| PRESIDENT: | This hearing will come to order. You may be seated. Good morning. |
| DETAINEE: | Good morning. How are you guys doing? |

**UNCLASSIFIED**

PRESIDENT: Very good, fine, thank you. This Tribunal is convened by order of the Director, Combatant Status Review Tribunals under the provisions of his Order of 12 February 2007. This Tribunal will determine whether you meet the criteria to be designated as an enemy combatant against the United States or its coalition partners or otherwise meets the criteria to be designated as an enemy combatant.

## OATH SESSION 2

PRESIDENT: The members of this Tribunal shall now be sworn. All rise.

RECORDER: Do you swear that you will faithfully perform your duties as a member of this Tribunal; that you will impartially examine and inquire into the matter now before you according to your conscience, and the laws and regulations provided; that you will make such findings of fact and conclusions as are supported by the evidence presented; that in determining those facts, you will use your professional knowledge, best judgment, and common sense; and that you will make such findings as are appropriate according to the best of your understanding of the rules, regulations, and laws governing this proceeding, and guided by your concept of justice, so help you God?

MEMBERS: I do.

PRESIDENT: The Recorder will now administer the oath to the Personal Representative.

RECORDER: Do you affirm that you will faithfully perform the duties of Personal Representative in this Tribunal?

PERSONAL REP: I do.

PRESIDENT: Please be seated. The Recorder and Reporter, have previously been sworn. Mister MAJID KHAN, you are hereby advised of the following ah-- during this hearing. Excuse me; the following applies during this hearing. You may be present at all open sessions of the Tribunal; however, if you become disorderly, you will be removed from the hearing and the Tribunal will continue to hear evidence in your absence. You may not be compelled to testify at this Tribunal; however, you may testify if you wish to do so. Your testimony can be under oath or not under oath. You may have the assistance of a Personal Representative at the hearing. Your assigned Personal Representative is present. You may present evidence to this Tribunal, including the testimony of witnesses who are reasonably available and whose testimony is relevant to this hearing. You may question witnesses testifying at the Tribunal. You may examine documents or statements offered into evidence other than classified information; however, certain documents may be partially masked for security reasons. Mister MAJID KHAN, do you understand this process?

ISN # 10020
Enclosure (3)
Page 2 of 39

UNCLASSIFIED

| | |
|---|---|
| DETAINEE: | Yes, Sir. |
| PRESIDENT: | Do you have any questions concerning the Tribunal process? |
| DETAINEE: | Ah, I personally am not satisfied with the process itself. But I don't have questions. So far, from what I understood. But I'm not satisfied with the course ah--the Tribunal process. I would-- I would rather have fair trial than rather than have a Tribunal process, but I so far, what I understood, I understood how it goes. But the Personal Representative told me, ah-- but I'm not satisfied with it at all. |
| PRESIDENT: | Very well. This is an administrative process and we will continue through it, and if you have any questions about what we are doing at any time, please feel free to ask. |
| DETAINEE: | The same goes for you too. |
| PRESIDENT: | Certainly. |

## PRESENTATION OF UNCLASSIFIED INFORMATION

| | |
|---|---|
| PRESIDENT: | Personal Representative, please provide the Tribunal with the Detainee Election Form. |
| PERSONAL REP: | Sir, I am providing to the Tribunal the Detainee Election Form labeled Exhibit D-a. |
| PRESIDENT: | I have received the Detainee Election Form marked Exhibit D dash A and it does provide ah-- various administrative information, including a notation that you wish to participate in this Tribunal, you want the assistance of the Personal Representative and it summarizes a number of items regarding the witness and evidence requests and other matters related to this hearing. |
| PRESIDENT: | Recorder, please provide the Tribunal with the unclassified evidence. |
| RECORDER: | I am handing the Tribunal what has previously been marked as Exhibit R-1, the unclassified summary of the evidence that relates to this Detainee's status as an enemy combatant. A translated copy of this exhibit was provided to the Personal Representative in advance of this hearing for presentation to the Detainee. In addition, I am handing to the Tribunal the following unclassified exhibits, marked as Exhibits R-2 through R-4. Copies of these exhibits have previously been provided to the Personal Representative. |
| PRESIDENT: | The unclassified summary? [Looking for a copy.] |
| RECORDER: | Can I give it to you after, after I read it? |

UNCLASSIFIED

**UNCLASSIFIED**

| | |
|---|---|
| PRESIDENT: | Oh. Very well. |
| RECORDER: | Sorry. |
| PERSONAL REP: | Sir, I have an additional copy. |
| RECORDER: | Thank you. |
| PRESIDENT: | No, that's fine. We'll receive it here shortly. Recorder, please read the unclassified Summary of Evidence which is R-1. Read it for the record please. Recorder, before you proceed--Mister MAJID KHAN, at this time please do not comment on the evidence. There'll be an appropriate time later in the hearing for you to comment on it. I would like it to be read into the record at this time. Recorder, please proceed. |
| RECORDER: | The following facts support the determination that the Detainee is an enemy combatant: a. In March 2003, one of the Detainee's brothers stated the Detainee was involved with a group that he believed to be al Qaida, and as of December 2002, was involved in transporting people across the border of Afghanistan and Pakistan, and points elsewhere. b. On 1 May 2003, IYMAN FARIS pleaded guilty in the United States District Court in Alexandria, Virginia, to providing material support and resources to al Qaida and conspiracy for providing the terrorist organization with information about possible United States targets for attack. c. In mid-2001, IYMAN FARIS had dinner and spent the night at the Detainee's family residence in Baltimore, Maryland. FARIS stated during this visit the Detainee spoke to him about the fighting and struggle in Afghanistan. On a subsequent visit, the Detainee told FARIS he met KHALID SHAYKH MOHAMMED (KSM) in Pakistan and referred to KSM as his uncle. The Detainee told FARIS of his desire to martyr himself against President MUSHARAFF of Pakistan by detonating a vest of explosives inside a building. d. A computer harddrive seized from a residence where munitions were discovered contained linkages to media seized from the Detainee's residence. e. In March 2003, the Detainee's father stated the Detainee recently began to be influenced by anti-American thoughts and became extremely religious in his behavior. The Detainee's father believed the Detainee had come under the influence of family members in Karachi, Pakistan, who discussed anti-American feelings and could be very destructive. f. On 23 November 2005, UZAIR PARACHA was convicted in United States District Court, Southern District of New York, on charges relating to his provision of material support to the al Qaida terrorist organization. The evidence proved PARACHA agreed with two al Qaida members, including the Detainee, to provide support to al Qaida by trying to help the Detainee obtain a travel document that would have allowed the Detainee to reenter the United States to commit a terrorist act. g. In February and March 2003, UZAIR PARACHA posed as the Detainee |

**UNCLASSIFIED**

during telephone calls with the United States Immigration and Naturalization Service, called the Detainee's bank, and attempted to gather information about the Detainee's immigration paperwork via the Internet. PARACHA also agreed to use the Detainee's credit card to make it appear that the Detainee was in the United States, when in fact the Detainee was in Pakistan. h. On 29 March 2003, a search of UZAIR PARACHA's bedroom in Brooklyn, New York, revealed a Bank of America Visa card, excuse me, check card in the name of the Detainee and five different identification cards for the Detainee, including one Maryland drivers license and one social security card. i. UZAIR PARACHA stated he knew from his father the Detainee and a second individual were al Qaida. The Detainee and the individual wanted to give PARACHA and his father between 180,000 and 200,000 United States dollars to invest in their company as a loan. PARACHA stated he knew the money was al Qaida money and that al Qaida wanted to keep the money liquid so they could have it back at a moment's notice. PARACHA felt it was implied that he had to perform tasks for the Detainee and the individual on behalf of al Qaida because of the money being loaned to their business. Sir, this concludes the unclassified summary of evidence.

PRESIDENT:     Personal Representative, does the Detainee have any evidence to present to this Tribunal?

PERSONAL REP: Sir . I am handing Detainee exhibits D-b through D-l to the Tribunal Board Members. These have been provided to the Tribunal Court Reporter [Recorder] Exhibit D-b is MAJID's written statement of torture for Combatant Status Review Tribunal, taken March 2007 by PR3. It is twelve pages. Exhibit D-c is MAJID KHAN's oral Statement of Torture for Combatant Stat-- Status Review Tribunal, taken March and April 2007 by PR3. It is three pages in length. Exhibit D-d is MAJID KHAN's rebuttal statement for Combatant Status Review Tribunal taken March/April 2007 by PR3; six pages in length. Exhibit D-e is a witness statement from SAIFULLAH PARACHA for ISN 20 taken 6 April 2007; three pages. Exhibit D-f is a statement received from IYMAN FARIS for use at MAJID KHAN's Combatant Status Review Tribunal and it is three pages. Exhibit D-g is UZAIR PARACHA's court testimony at Federal Court of Southern District of New York; it's thirty-two pages in length. Exhibit D-h is a photo of MAJID KHAN's daughter, with a statement from MAJID KHAN; page-- one page. Exhibit D-i are witness questions from MAJID KHAN as to the-- he requested to be asked to his witnesses; three pages. D-j is a statement of--from ALI KHAN for presentation at the CSRT-- MAJID KHAN's CSRT; three pages. Exhibit D-k are Detainee session notes; two pages. And finally, Exhibit D-l, the witness-- ah-- a typed witness statement from IYMAN FARIS. So you guys can-- excuse me, so the Board can actually-- IYMAN FARIS's handwriting is not the best, so I interpreted it and typed it so you guys can read it here. And now I am handing them to the Board.

ISN # 10020
Enclosure (3)
Page 5 of 39

**UNCLASSIFIED**

PRESIDENT:    Thank you, Personal Representative. I appreciate the summary of all those documents. At this point, I would like to address some relevancy and rulings regarding the requests for evidence that were received. The first evidence request regarded your various documents that you believe show that you could legally enter the United States. I found this evidence request to be relevant, and I directed that efforts be made to obtain these or similar documents relating to your legal status to enter the United States. Various documents were provided by the government and also from your father's attorney to satisfy this request for evidence. Those were provided to your Personal Representative previously. The second evidence request that I received regarded your request for the transcript of UZAIR PARACHA's court case. I also found this evidence request to be relevant and directed that the document be produced. The relevant portions of that document has been provided. And this concludes my remarks regarding the relevancy and the availability of the evidence that you requested. I will address witness requests later in the hearing. Does the Recorder have any further unclassified evidence to present?

RECORDER:    Mister President, I have no further unclassified evidence for the Tribunal, but I respectfully request a closed Tribunal session at an appropriate time to present classified evidence relative to this Detainee's status as an enemy combatant.

PRESIDENT:    Recorder, your request for a closed session is granted and will be taken in due course. We now come to the point of the hearing where we'll address witness requests and the calling of witnesses.

**CALLING OF WITNESSES**

PRESIDENT:    Does the Recorder have any witnesses to present?

RECORDER:    No, Sir.

PRESIDENT:    According to the Detainee Election Form provided to the Tribunal earlier, I am reminded that, Mister KHAN, you have requested various witnesses to provide testimony at this hearing. For purposes of this process, the people are referred to as witnesses and the statements from them would be considered testimony. I will address each of your witness requests now. You requested the testimony of UZAIR PARACHA to address statements attributed to him in Exhibit R-1, which was read to us earlier, the Summary of Evidence. I determined the request was relevant. UZAIR PARACHA, through his attorney, has volunteered not to participate. Because this process cannot compel the testimony of non-U.S. military witnesses, the witness is not reasonably available. You also requested the testimony of IYMAN FARIS to address statements attributed to him, also in the unclassified Summary of Evidence, R-1. I determined the request was

**UNCLASSIFIED**

relevant and IYMAN FARIS voluntarily elected to participate by providing written testimony. Consequently, the testimony of IYMAN FARIS is reasonably available. Another witness you requested was SAIFULLAH PARACHA to address statements regarding his knowledge of you being al Qaida, as described also in the Summary of Evidence. I determined this request was also relevant. SAIFULLAH PARACHA voluntarily elected to provide a written statement; consequently, the testimony of SAIFULLAH PARACHA is reasonably available. You requested the testimony of your father, ALI KHAN to address statements attributed to him in the Summary of Evidence. I determined the request was relevant, and ALI KHAN voluntarily elected to provide testimony in the form of a written statement, and consequently, the testimony of ALI KHAN is reasonably available. The final testimony you requested is from your three brothers, MAHMOOD, MOHAMMED and AHMED KHAN, to address statements attributed to one brother in the Summary of Evidence. Initially, I determined the testimony from all three brothers to be relevant; however, because the Summary of Evidence concerns the testimony of just one brother, I determined the testimony from that specific brother to be relevant. The attorney of this brother indicated through written testimony that written testimony would be provided prior to this hearing; however, that date has passed and no testimony has been received through the attorney. Again, because this process cannot compel the testimony of non-U.S. military personnel, this witness testimony is not reasonably available. I will also make a note that the KHAN family was provided the opportunity to participate and provide their testimony by video teleconference. While video teleconference is the equivalent of in-person testimony, they elected to provide written testimony instead. So in summary, you have requested five witnesses: UZAIR PARACHA, IYMAN FARIS, SAIFULLAH PARACHA, your father ALI KHAN, and your three brothers, MAHMOOD, MOHAMMED and AHMED KHAN, who I treat as a request for just one of those brothers. Testimony from UZAIR PARACHA and one of those brothers is not reasonably available, and testimony from IYMAN FARIS, SAIFULLAH PARACHA, and your father, ALI KHAN, has been provided in writing and is available. And I do note that the Personal Representative has provided those various statements for us to consider in this matter. We'll certainly carefully review these statements and consider them as we go through the determination process of your enemy combatant status. With the witness testimony addressed at this point, we'll now receive your oral statement.

PERSONAL REP:    Sir, the Detainee has requested that the witness statements be read into the record.

PRESIDENT:    Oh. Very well. This is an appropriate time for you to do that. Please proceed Mister-- Personal Representative.

**UNCLASSIFIED**

PERSONAL REP:  The first statement is from SAIFULLAH PARACHA taken on 6 April 2007. I, SAIFULLAH PARACHA, voluntarily make the following statement regarding MAJID KHAN for presentation at his Combatant Status Review Tribunal. I am providing this statement to the person identified to me as MAJID KHAN's Personal Representative. I make this statement of my own free will without any threats or promises extended to me.

The PR asked me to provide the following information:  Your son-- your son stated he knew from you that MAJID KHAN was al Qaida.

1. Did you ever tell your son that MAJID KHAN was al Qaida?  If not, why would your son say this?  A person was introduced to me in Karachi, Pakistan who used to live in Baltimore, Maryland area.  AMMAR AL BALUCHI introduced him with a different name, which I don't remember. That person was identified by the interrogator as MAJID KHAN.  I never knew MAJID KHAN was member of al Qaida.

2. Do you think he may have been coerced, tricked or deceived into saying this?  I don't know.

How did you know MAJID KHAN was al Qaida?  Already answered as stated above.

Describe any conversation between you, your son, and MAJID KHAN about any money being loaned to your business.  I never had any conversations with MAJID KHAN regarding any financial matters whatsoever.

MAJID KHAN wanted to give your company between $180,000 and $200,000 USD as a loan.  Where do you think MAJID KHAN was getting the money to loan you?  As stated above, I never discussed any financial matters with MAJID KHAN.

Did MAJID KHAN ever give you that loan?  No, as stated above.

What was discussed regarding this loan?  I never discussed above any loan as stated above.

What was the purpose of this loan?  I never discussed any loan as discussed above.

How were you going to pay back-- excuse me, how were you going to pay the loan back?  As stated above, there was no loan transaction with MAJID KHAN.

Did you ever feel like you had to perform tasks for MAJID KHAN on

**UNCLASSIFIED**

behalf of al Qaida? As stated above, there was no financial dealing with MAJID KHAN, and I never knew his affiliation with al Qaida and I am not aware of any tasks. I was told he had an issue with U.S. Immigration and wanted to keep his bank account in the USA active, which I asked my son to assist him with as a fellow Pakistani.

Please describe your knowledge, if any, of MAJID KHAN's association with Taliban, al Qaida, or associated forces that are engaged in hostilities against the United States or its coalition partners. I am a business man and I have a large business setup in Karachi, Pakistan. All of my business details have already been provided. I have no way of judging MAJID KHAN's activities against the USA or it coalition partners at all.

Please describe your knowledge, if any, regarding MAJID KHAN's plans to commit terrorist acts. I have no knowledge about any error-- any terrorist acts by MAJID KHAN, as also stated above.

Please provide any additional information that you think may be relevant to the determination of MAJID KHAN's enemy combatant status. I have no knowledge about MAJID KHAN's enemy combatant status.

I have been provided the opportunity to make any changes or corrections that I desire to make and have placed my initials over those changes and corrections. This statement was typed by the Personal Representative and reviewed with me. I affirm these are my words and the truth as I know it. Signed and dated.

Before continuing on with, IYMAN FARIS's testimony, I'd like to point out that the questions presented to IYMAN FARIS were not presented to the Detainee prior to IYMAN FARIS's answers. Exhibit D-i includes the questions that the Detainee provided for his witnesses.

Exhibit D-f, from the Department of Defense Office for the Administrative Review of the Detention of Enemy Combatants.

To IYMAN FARIS. You are being requested as a witness by MAJID KHAN as part of his presentation to a Combatant Status Review Tribunal (CSRT) being conducted at U.S. Naval Base, Guantanamo Bay, Cuba.

The CSRT will be evaluating whether MAJID KHAN is an Enemy Combatant. That term is defined as "an individual who was part of or supporting the Taliban or al Qaida forces, or associated forces that are engaged in hostilities against the United States or its coalition partners. This includes any person who committed a belligerent act or has directly supported hostilities in aid of enemy armed forces."

UNCLASSIFIED

MAJID KHAN has asked you to provide answers to the following questions. If you decide to answer the questions, your answers will be considered by the CSRT members as they evaluate whether or not MAJID KHAN is an enemy combatant.

Your participation in this process is entirely voluntary. Your decision to participate or not participate in this process has absolutely no effect on your pending criminal case in federal court or the appeal of your conviction. The government is not asking you to provide this information. It is MAJID KHAN who has asked you to answer these questions.

If you want to participate in this process, please write your answers in the foll-- excuse me, please write your answers to the following questions in the space provided below.

Questions:
1. In mid-2001 you had dinner and spent the night at MAJID KHAN's family residence in Baltimore, Maryland. You have stated that MAJID KHAN spoke to you during this visit about the fighting and struggle in Afghanistan.

Were you coerced, tricked, or deceived into making this statement? If so, please explain.

There was no discussion other than religious duty and what he like to do in life, like work in construction and not in his father's business because his father was involved in invest dealing.

b. Please describe the discussions you had regarding the fighting and struggle in Afghanistan. There were never any discussion regarding the fight in Afghanistan--ever.

What was the purpose of this visit to the KHAN residence?

To invest in the family business of gas station.

2. You have said that during a later visit with MAJID KHAN, MAJID KHAN said he had met KHALID SHAYKH MOHAMMAD in Pakistan and MAJID KHAN called him his uncle. You have also said that MAJID KHAN spoke during this visit of his desire to martyr himself against Pakis-- President MUSHARRAF of Pakistan by detonating a vest of explosives inside a building.

That is an absolute lie.

a. Were you coerced, tricked or deceived into making this statement?

ISN # 10020
Enclosure (3)
Page 10 of 39

**UNCLASSIFIED**

All of the above.

He called uncle to my friend MAQSOOD, I did.

b.  What was the purpose of this visit to the KHAN residence?  Were you there to see MAJID KHAN?

I was there to see his father which I had a business dealing.

3.  Were you coerced, tricked or deceived into making any statements about MAJID KHAN?  If so, please explain.

Yes, by FBI.  If I don't tell them what they wanted to hear, they were going to take me to GITMO.

4.  Please provide any other information regarding MAJID KHAN's knowledge of, planning of, or participation in activities of al Qaida, the Taliban, or associated forces that may be relevant in determining his enemy combatant status.

I do not know of anything as plan that he was involved, none what-so-ever nor he ever discussed the --and then there's an illegible word--fighting or anything relating to Afghanistan or al Qaida I have no idea of his affiliation.

I, IYMAN FARIS, state that the above answers are my words and the truth as I know it.  I was coerced, excuse me, I was not coerced, tricked or deceived into providing these answers.  I answered voluntarily and of my own free will without any promises being made.  Signed and dated.

There's an additional note that reads: He, MAJID KHAN, numerous times told me he love USA and can't wait to get the U.S. citizenship.  I would also like to point out that an Interpreter, Linguist, or Translator was not made available to IYMAN FARIS when ah, when OARDEC Forward asked, excuse me, when OARDEC was questioned about IYMAN FARIS understanding.  The reply was, "He spoke perfect English."

DETAINEE:          You said invest dealing; I thought it was interest dealing.  [Speaking to Personal Representative.]

PERSONAL REP:   For the Board, question 1a; MAJID KHAN has stated that he believes it's interest dealing and not invest dealing.  You'll see from the exhibit that it's hard to read.

PRESIDENT:        We appreciate that.  Thank you.

**UNCLASSIFIED**

PERSONAL REP:    The final witness statement is from ALI KHAN.  Similar to IYMAN
FARIS, the Detainee was not presented the questions prior to the witness
answering.  Statement of ALI KHAN:

To the Tribunal.  My name is ALI KHAN and I am MAJID's father.  I am
writing this statement on behalf of my family because the military will not
let us travel to Guantanamo and participate in MAJID's hearing.  I ask the
Tribunal to consider my statement, which has been prepared with help from
my children and from our lawyers at the Center for Constitutional Rights
because I have difficulty with English.

I have not seen my son in more than four years since before he was
kidnapped from his brother's home in Karachi on March 5, 2003.  Now I am
told by the military that my son wants to know whether I said in March
2003 that he became very religious and developed anti-American feelings
and whether one of my other sons said that MAJID might be involved with
al Qaida.  Where and when did we make these statements that you claim we
made?  Who did we make these statements to, exactly?  The government has
refused to give us this information.  Anything we may have said about
MAJID KHAN was simply out of shock because we only knew that MAJID
had disappeared and was pure speculation based on what FBI agents in the
United States told us and pressured us to say.

You want to know whether my son is a terrorist.  The answer is no.  As of
I--as I have said before publicly, I cannot accept these allegations against
him.  If you think that he did something wrong, show me the evidence.
Charge him with a crime and give him a fair trial in a real court.  This
Tribunal is not a real court.  It is not a legitimate proceeding.  It is only for
show and the outcome has probably already been decided.  After several
years of detention, there are still no charges against MAJID.  He cannot see
any evidence or question any witnesses against him.  And he cannot have
access to his lawyers at the Center for Constitutional Rights, which he has
asked for in letters sent through the Red Cross.  Anything that may a-- he
may have confessed to, or that other prisoners may have said about him,
should also be considered with suspicion because these statements were
probably tortured or coerced out of them.  Under theses circumstances, how
could anyone believe what the government says about my son?

What I can tell you is that MAJID was kidnapped from my son
MOHAMMED's house in Karachi, along with MOHAMMED, his wife, and
my infant granddaughter.  They were captured by Pakistani police and
soldiers and taken to a detention center fifteen minutes from
MOHAMMED's house.  The center had walls that seemed to be eighty feet
high.  My sons were hooded, handcuffed, and interrogated.  After eight days
of interrogation by U.S. and Pakistani agents, including FBI agents,
MOHAMMED was allowed to see MAJID.  MAJID looked terrible and

**UNCLASSIFIED**

very, very tired. According to MOHAMMED, MAJID said that the Americans tortured him for eight hours at a time, tying him tightly in stressful positions in a small chair until his hands, feet, and mind went numb. They re-tied him in the chair every hour, tightening the bonds on his hands and feet each time so that it was more painful. He was often hooded and had difficulty breathing. They also beat him repeatedly, slapping him in the face, and deprived him of sleep. When he was not being interrogated, the Americans put MAJID in a small cell that was totally dark and too small for him to lie down in or sit in with his legs stretched out. He had to crouch. The room was also infested with mosquitoes. This torture only stopped when MAJID agreed to sign a statement that he was not even allowed to read. But then it continued again when MAJID was unable to identify certain streets and neighborhoods in Karachi that he did not know. MAJID almost cried when he told MOHAMMED how he was accused of lie--lying even when he was telling the truth.

According to MOHAMMED, MAJID was interrogated and abused at a separate detention center in a different neighborhood. He was taken there in the morning and brought back at night. Other unknown prisoners were transferred to and from there as well. The Pakistani guards were upset by this treatment and often let MAJID speak with MOHAMMED when he got back late at night. After about twenty days of these interrogations, MAJID told MOHAMMED that the Americans had threatened to send him to Guantanamo. He was exhausted from lack of sleep. A day or two later, MAJID was again allowed to see MOHAMMED and told him that he was being sent to Islamabad. MAJID said he was not sure he would ever see his brother again and asked him to pray for him.

After that, MAJID disappeared and my family had no idea whether he was alive or dead until President Bush announced on September 6, 2006, that he had been moved from a secret CIA prison to Guan--Guantanamo. According to MOHAMMED, the Pakistani guards promised that MAJID would never be turned over to the Americans and sent to Guantanamo because President MUSHARRAF had a special deal with the Americans to prevent this. But this was obviously not true.

Also accord--according to MOHAMMED, he and MAJID were denied in the same place--excuse me, he and MAJID were detained in the same place where two of KHALID SHEIK MOHAMMED's young children, ages about six and eight, were held. The Pakistani guards told my son that the boys were kept in a separate area upstairs and were denied food and water by other guards. They were also mentally tortured by having ants or other creatures put on their legs to scare them and get them to say where their father was hiding. The Americans also once stripped and beat two Arab boys, ages fourteen and sixteen, who were turned over by the Pakistani guards at the detention center. These guards told my son MOHAMMED

UNCLASSIFIED

that they were very upset at this and said the boys were thrown like garbage onto a plane to Guantanamo. Women prisoners were also held there, apart from their husbands, and some were pregnant and forced to give birth in their cells. According to MOHAMMED, one woman almost died in her cell because the guards could not get her to a hospital quickly enough. This was most upsetting to the Pakistani guards.

At the time MAJID was kidnapped and these events were happening in Pakistan, our family's home in Maryland was also raided by government agents. Our whole house was searched from top to bottom and our whole life was so disrupted that we eventually had to move out of our neighborhood. I was also interrogated by the FBI agents for several days, as was each of my sons and daughters. We were threatened and when we asked about lawyers, we were told they could not help us. The FBI pressured us to talk and to speculate about MAJID. They followed us everywhere we went for a long time, requiring us to tell them in advance where we were going and what we were going to do there. They followed us so closely that we even asked them for directions sometimes when we got lost driving.

Despite all that we have endured, we have always cooperated and continue to cooperate with the government. At this point, the FBI has probably questioned us for hundreds of hours. I think they have opened our mail and they seem to have placed listening devices in our house, our phones, and probably our computers. They have also tried to recruit my sons to spy on other Muslims by bribing them with money. I am also not allowed to leave the country. But the government still refuses to show us any evidence against MAJID. This is not right. We expect much more in America. Particularly because MAJID has political asylum here and grew up and went to high school here in Maryland. He has legal status in the United States.

We are also deeply saddened that President MUSHARRAF and the government of Pakistan would allow this to happen to MAJID. We cannot understand why they participated in his abduction and rendition from Pakistani soil, or why they do not call for MAJID's release and return to Pakistan now. We can only assume that they do whatever the United States tells them to do; this is not right. It is not Islamic.

We love MAJID very much and we support him. Again, if he has done something wrong, he should be charged with a crime and given a fair trial. But this Tribunal provides no justice. It is also cruel that the military refuses to allow MAJID to see his family after several years of imprisonment. We would be allowed to visit him in jail in Pakistan. Why does the United States, which is supposed to respect the law and stand up for human rights, deny us this simple request? Is the United States afraid of what MAJID would say? Someday we'll-- we will learn the truth about

**UNCLASSIFIED**

what has happened to my son. Thank you for considering my statement. [As read by the Personal Representative.]

PRESIDENT:          Personal Representative, does that conclude the statements that-- to be read into the hearing?

PERSONAL REP:    That concluded the witness statements, Sir.

PRESIDENT:          The witness statements. Very well. Mister MAJID KHAN, you may now make an oral statement to the Tribunal, and you have the assistance of your Personal Representative in doing so. I understand that you do have an oral statement that you wish the Personal Representative to read in. Is that correct?

DETAINEE:           Yes, Sir.

PRESIDENT:          Mister KHAN, if you make other statements today, would you like to make those statements under oath? We do not require an oath, but I do--would like-- I would like to offer that opportunity for you.

DETAINEE:           I am not in position to take an oath.

PRESIDENT:          Very well then. Personal Representative, when you are ready, you may proceed with the Detainee's statements to be read in.

## BEGIN DETAINEE ORAL STATEMENT

PERSONAL REP:      Exhibit D-d. MAJID KHAN's rebuttal statement for Combatant Status Review Tribunal taken March and April 2007 by PR3. Mister President and Members of the Combatant Status Review Tribunal, thank you for letting me make a rebuttal statement regarding the Summary of Evidence for Combatant Status Review Tribunal. KHAN, MAJID dated 8 February 2007.

During this entire statement, I am bringing up other points of view regarding the evidence. I am challenging and refuting the authen-- authenticity and reliability of the evidence presented to me and whether it even applies to the definition of Enemy Combatant supplied to me in both the Combatant Status Review Tribunal Notice to Detai-- to Detainees and the Summary of Evidence.

Mr. President, I am going to need to ask you to double check the sources for the information presented against me. I guarantee you will find flaws in this evidence.

I am not an Enemy Combatant. I am not an extremist.

UNCLASSIFIED

Paragraph A:
Paragraph A discusses statements made by my brother concerning my assocart-- association with al Qaida and transporting people. First of all, the paragraph states that his beliefs, excuse me, that he believes certain things, but does not provide an explanation for this belief. Additionally, Exhibit D-j clearly states that my brothers were extensively interrogated and pressured into making statements about me. In Pakistani culture, the father is the head of the household and speaks for the entire family. He states that I am not a terrorist.

[REDACTED]

Paragraph B:
Paragraph B has nothing to do with me. I have met IYMAN FARIS, but I don't have any knowledge of his business dealings. Paragraph B has nothing to do with the definition of Enemy Combatant.

Paragraph C:
First, I would like to point out that to me, it doesn't appear that there was a translator made available to IYMAN FARIS when preparing his answers to the questions that I supplied.

It is true that IYMAN FARIS had dinner at my father's house. According to IYMAN FARIS' testimony, there was "never any discussion regarding fight in Afghanistan, ever." I have never been to Afghanistan. How would I be able to talk "about the fighting and struggle in Afghanistan?"

As you can see from the testimony, I have never called KSM my uncle. KSM is not my uncle. There was never any conversation between myself and IYMAN FARIS about meeting KSM.

When IYMAN FARIS was asked to provide any information regarding "knowledge of, planning of, or participation in activities of al Qaida, the Taliban or assodi-- associated forces that may be relevant in determining his enemy combatant status" he replied, " I do not know of anything as plan."

My PR said this statement should be enough to cover the question about my desire to commit suicide bombing since the government never asked IYMAN FARIS about it. I wanted IYMAN FARIS to deny his statements about the plan without feeding him the answers.

The following is pertaining to the evidence that I told FARIS of my desire to martyr myself against President MUSHARRAF of Pakistan by detonating a vest of explosives inside a building.

UNCLASSIFIED

Why would I leave my newlywed wife who was two months pregnant behind and become a martyr? In my Pakistani culture, if a woman becomes a widow, chances are she won't ever find another husband. Why would I want to destroy my 18-year-old wife's life by widowing her and letting her raise my daughter without a father?

IYMAN FARIS' testimony also states that he was coerced, tricked, and deceived by the FBI into making statements regarding me. He said he was told "by FBI, if I don't tell them what they wanted then they were going to take me to GITMO."

Paragraph C does not contain information related to being an Enemy Combatant.

Paragraph D:
Paragraph D is not relevant and does not fit the definition of Enemy Combatant. I never owned a computer or hard drive while living in Pakistan or the United States. In Pakistani culture, many things are shared more freely than in the United States. Computers are household computers. Everyone in my family used the computer for office work, entertainment, and internet surfing. My cousins and everyone who came to visit us used the computer.

[REDACTED]

A computer hard drive seized from a residence where munitions were discovered does not fit the definition of Enemy Combatant nor does that mean that munitions were al Qaida or Taliban related. It is possible that agencies intentionally put some linkages on that drive to link it with the family's computer hard drive.

Do you have any proof that the media belonged to me at time of my arrest?

Do you have any proof that intelligence people didn't alter the family computer's hard drive after my arrest to link me with some suspicious things?

Just because media was seized when I was captured does not mean that media belongs to me. You have to give me benefit of doubt, please.

Paragraph E
Paragraph E does not fit in the definition of Enemy Combatant. Paragraph E discusses alleged statements made by my father. It is unclear from exhibit D-j, my father's testimony, that he actually said the things in paragraph E. My father said any statements provide by him were provided under the

# UNCLASSIFIED

pressure of interrogation from the FBI. My father goes on to say that I am not a terrorist.

If my ma-- if my father said that I've become extremely religious and influenced by my relatives, who have anti-American thoughts, it is just his only opinion because it depends on how extremist or moderate or liberal he is himself. He thinks I am a ex-- an extremist and I have anti-American thoughts. I know some people who, in my opinion, are extremists, and they told me that I have pro-American thoughts.

I have a religious extremist family member in Karachi, Pakistan. Excuse me, retract that. Having a religious extremist family member in Karachi, Pakistan, does not put me in same category. If this was the case, then I think my whole family should be in Guantanamo Bay prison because they are also related to them.

If I was so anti-American, why would I help the FBI catch an illegal Pakistani immigrant named "SHAFEEQ" in mid of 2002. Certainly al Qaida lovers would rather die than do what I did.

After catching SHAFEEQ, the FBI called me to thank, to say thank you for your assistance.

If I was an extremist Muslim, why would I teach computers to Muslim and non-Muslim for free in Baltimore mosque ISB in 2001?

Paragraph F:
The United States District Court of New York has made me al Qaida. I am not al Qaida. To be al Qaida, a person needs to be trained in Afghanistan and needs to take an oath in front of USAMA BIN LADEN. I have never been to Afghanistan and I have never met UBL. I cannot possibly be a member of al Qaida. I admit I can't prove that I am not al Qaida. It is very difficult to prove that someone is not al Qaida.

The paragraph states that I was re-entering the states to commit a terrorist act. The only reason they assumed I was going to commit a terrorist act is because they made me al Qaida in the first place. Their logic says I must be coming to commit a terrorist act. I am not al Qaida. I am not an Enemy Combatant, and there were not any terrorist acts.

Paragraph G and H:
While visiting my new wife and family in Pakistan, my travel documents for return to the United States expired. As a fellow Pakistani, the PARACHAs agreed to help. UZAIR PARACHA is innocent; he is not a criminal. One ordinary citizen helping another ordinary citizen does not make them terrorists. Getting help from a criminal does not make me a criminal or,

ISN # 10020
Enclosure (3)
Page 18 of 39

**UNCLASSIFIED**

more importantly, an Enemy Combatant.

Just because I wanted my travel document back, that doesn't mean I was going to travel back to the states. Could it be that I was going to get this travel document, not for me, but to help other refugees to travel on this document after manipulating a bit? This makes me a fraud, certainly not a terror-- terrorist or an Enemy Combatant. You have to give me the benefit of the doubt because usually things aren't what they same-- seem.

Paragraph I:
UZAIR PARACHA stated "he knew from his father" the Detainee was al Qaida. In this statement, UZAIR admits that I never told him that I was al Qaida.

SAIFULLAH PARACHA, UZAIR's father, admitted in his testimony he never said such things. He also said that there was never a conversation being myself-- between myself, UZAIR, and his father about any money being loaned to their business. UZAIR also states in his court case that his father never told him that I am al Qaida.

Nothing in this paragraph or in this whole evidence summary, never once did his father say himself that I am al Qaida. What was his source to know that I was al Qaida?

After watching too much FOX news, I learned that to become al Qaida, a person needs to go to Afghanistan for training, and take a oath front of USAMA BIN LADEN for their cause. I've never been to Afghanistan or met UBL; to prove it, I can take a lie detector test.

UZAIR himself admitted that I "wanted" to loan 200,000 dollars to their business and to have the money liquid for short notices. Please pay attention to word "wanted." I never loaned any money, meaning no harm done. It is clear from SAIFULLAH PARACHA's testimony and UZAIR PARACHA's court case, there was never any conversations about money being loaned and no money was loaned.

The Enemy Combatant definition clearly says "who committed a belligerent act or has directly supported hostilities in aid of enemy armed forces." Meaning everything is in past tense.

UZAIR also claims the only reason I wanted to give him money was to keep the money liquid so I could have it back at a moment's notice. If I really wanted to give him money for that particular reason, I could have sent myself money through Hawala dealers, without even trace of it. Or at least that's what I learned from FOX NEWS that you could do. If I really wanted to loan him money, I would have sent it in my family business so it would

ISN # 10020
Enclosure (3)
Page 19 of 39

**UNCLASSIFIED**

have at least benefited them, for at least some time.

UZAIR also said he "felt" it was implied that he had to perform tasks for me. Please pay attention on word "felt." It clearly shows that I never said anything to him about doing any task for me in the future regarding money. This is just his feelings. The Enemy Combatant definition does not say anything about feelings. The PARACHAs have made it clear that there were no future tasks.

I had asked for UZAIR PARACHA to be a witness for me. He has denied answering my questions. Instead of using this against me, it should go in my favor. If he was telling the truth, it would not have hurt him to confirm all of his accusations. This should tell you that there is something fishy going on.

The transcripts from UZAIR PARACHA's court case clearly states he was lying about me to the FBI. I still don't agree with everything UZAIR said about me after a quick review of the testimony he supplied at his trial. Everything is very contradicting in the transcript.

To summarize:
If you read the questions to my witnesses, they are probably the same things you want to know about me. I am also anxious to know. How can they accuse me of such things? I myself has asked, have asked them for the truth. I asked them to describe how they knew certain things. I asked them to add anything that the United States government should know about me without me feeding them any answers.

About ten white lies have been proved wrong by witnesses. These facts were against me, but now you know the truth. How the DoD lied and manipulated some evidence and witnesses and present these facts, excuse me, and present these to you as facts in the Summary of Evidence.

There is clearly something wrong with the evidence. The U.S. District Court of New York has made me al Qaida. The FBI told me here in February 2007 that the United States government hasn't charged me yet. It has been four years. Can the United States government call me a terrorist and not yet, and yet not charge me? What is stopping them?

How can a home owner in Baltimore, Maryland be an Enemy Combatant? How can a pa-- person who has passed a security clearance and worked for President Roosevelt's Company, EDS, until 2002 be an Enemy Combatant? How can a person that paid $2,400 United States dollars in tax every month to the United States be an Enemy Combatant?

Mister President and Members of the board, I am not an Enemy Combatant.

**UNCLASSIFIED**

ISN # 10020
Enclosure (3)
Page 20 of 39

UNCLASSIFIED

I would like to make a few quick comments regarding the questioning of my witnesses. The CSRT refused to show me exactly what type of questions they were going to ask my witnesses until they were answered by my witnesses. But overall, we talked in general about what kind of questions were going to be asked. I did see the exact questions that were presented to SAIFULLAH PARACHA prior to him seeing them.

I am not fully satisfied with this whole tribunal process, but my Personal Representative has done a fine job guiding me through the whole process. Special thanks to my Personal Representative.

Before the end of these proceedings, I would like to present to you "my after arrest report" and I even call it "torture report." It has some facts about how the CIA, [REDACTED], and DoD abused me.

If you don't want to hear the entire report, then at least allow me to present you the summary of this report which is very short and to the point. This report is directly related to the Summary of Evidence due to the Summary of Evidence coming from a combination of both classified and unclassified sources. [REDACTED]. These are the same people who tortured me. Please read it before believing the government sources. These are my words and truth as I know it.

PRESIDENT:          Thank you. There are a few more statements that I believe Mister McK-- Mister KHAN would like to be read in. Is that correct?

PERSONAL REP:    Yes, Sir. I just want to confer with the Detainee regarding this statement.

PRESIDENT:          Please.

PERSONAL REP:    MAJID, do you want the entire statement read or the summary statement?

DETAINEE:           Two things I ask you. The, if the President allows, the entire statement is about twelve pages and the summary is to the point. But the summary doesn't really explain what really happened. I would prefer, if you can allow it, to read the whole report. It is more Intel but it's not to the point, but I think it have to do with ah--it have to do the whole thing because it has to do with the CIA and FBI and everything. So, I would prefer the whole report. And it's up to the President if he allows it or not.

PRESIDENT:          We are certainly going to read everything that's provided to us and I will allow to have the whole thing read in. It would save us a little time as far as all three of us hearing it at one time. And again, we will also read all this material that is provided to us carefully and consider the matters regarding your determination as an enemy combatant status. So at this point, Personal

**UNCLASSIFIED**

Representative, when you are ready, you may proceed with the ah--I believe the written statement regarding his treatment.

PERSONAL REP:    Exhibit D-b.  MAJID KHAN written Statement of Torture for Combatant Status Review Tribunal taken March 2007 by PR3.  [REDACTED].

For me, things got better [REDACTED], and [REDACTED] I am brought to Guantanamo Bay, Cuba.  I swear to God this place in some sense worst than CIA jails.  I am being mentally torture here, [REDACTED].

[REDACTED].

Since I got here, I have tried to cut my artery which goes through my elbow, on January 12th, 07, and again on February 22nd, 07.  I went on hunger strike for four weeks on January 2nd, 07, and lost almost thirty pounds.  And I have already spent two and half month in disciplinary status without comfort, incentive items, and sometimes even without basic items.  On 28 November 2006, I wrote on my walls, "Stop torturing to me-- stop torturing me; I need newspaper, my lawyer and my mail, etc."  I don't cooperate with them until they would treat me as human and until they would stop mentally torturing me.

[REDACTED]

My real problem with this administration where I am staying right now, that they are corrupt and some of guards, supervisors, and manager who may be DoD contractor today, [REDACTED].

Since these guards managers hate me [REDACTED], that what caused me to do or they call it act out.  They are getten-- getting even with me here under DoD, and making me suffer by mentally torturing me.  They know my weaknesses--what drive me crazy and what doesn't.  [REDACTED].  In following paragraph, I am writing some facts about DoD and how they are abusing their powers, and there is no check and balance system.  Even the doctor, medic, and Naval people are in this together, meaning that they are manipulators and corrupt.  There is extensive torture even for the smallest of infractions.

[REDACTED].

On October 6th, 06, ICRC gave me my only daughter pictures which was born after my abduction.  I left my wife pregnant but didn't know the sex of the baby until ICRC told me about her.  So anyway, when I took this picture and came back to my camp building, the guard forcibly took it from me.  Then I went crazy and yelled for one hour and they ignored me as if they

ISN # 10020
Enclosure (3)
Page 22 of 39

**UNCLASSIFIED**

didn't know I was yelling and waited until they can send their reports; until next day, 1:00 PM they took all my incentive items comfort items, until October 16th, 06. Again, they can't do this. They should have put--they should have put me disciplinary status since each time they put me disciplinary status they have to report to camp leadership, and they didn't wanted to do that because then they had to explain why they took my baby pictures, etc.

On October 23rd, 2006, I went on thirst strike. Each time I refused to eat, they slowly took my incentive and comfort item one by one. Until I broke my strike and the same night I got my stuff back, meaning on 25-- on October 25th, 06.

On November 2nd, 06, they gave me new wrong prescription eyeglasses to wear. Also wrong frame which don't fit my nose. I took it and when I try to wear it, they made my eyes hurt and head spin. The prescription was way off. They knew I am practically blind without my glasses and knew exactly how to hurt me. Anyway, so I didn't wear it. I kept-- I kept wearing old one, the one I am wearing right now. After four days, they forcibly took my old glasses and made me wear new one, but I protested and then I got it back next day.

On November 13th, 06, I tore a disposable cup and playing card cover to throw them away as a trash, but guards again took my incentive and comfort item without explanation. Then I decided to protest on November 15th, 06. I refused to return breakfast tray and they ignored me until 1:00 PM and they didn't even give me my lunch that day. After 1:00 PM, the guard came forcibly inside my cell, never gave me a chance to be shackled down on my own. I never refused to be shackled; they just came in with eight guards and took me to main rec and forcibly shaved my beard to humiliate me and offend my religion. While they were shaving my beard, the female Navy head of Psychiatrist was watching the whole thing.

Then they put me for first time in orange clothes and three days of disciplinary two and another three days for disciplinary status one. Next day early in the morning, they moved me from cell B13 to cell A16. This cell is attach to main rec door's wall. Somehow it is easy to do cover-up on A16 because if I do anything unusual they make main rec occupied as if A16 is occupied. Since A16 and main rec both linked to same wall, it is somehow easy from them to manipulate A16 to main rec activities. The second reason they moved me to A16 is because to drive me crazy. Whenever they close main rec door or whenever they play games with main rec door, it just make big out loud noise in my cell. They have since moved me to A14 on 6 April 2007.

On November 28th, 06, I wrote on my walls stop, "torturing me, I need my

ISN # 10020
Enclosure (3)
Page 23 of 39

UNCLASSIFIED

mails, newspaper and my lawyer." Then they put me on D1 status for only two days, but took my writing pen for two weeks. They cleaned my walls the same day, but some marks are still there. This happened in cell A16.

On January 2nd, 07, I was on hunger strike way before than this date, but they officially put me on strike on January 2nd. But next day, to make me eat my own, they left me with only basic item and no sunlight and fresh air until I break my strike. I didn't break any rule; I was just simply practicing my rights by going on hunger strike. Anyway, days passed like this, but eventually I got frustrated and chewed my artery which goes through my elbow on January 11th, 07. But I never broke my hunger strike until January 29th, 07, after they tricked me or lied to me. On January 11th, 07, I also refused to get medical assistance, by giving them vital signs, because I was told by doctor that I had right to refuse to get medical assistance. But they never told me I have no right of refuse when I am on hunger strike, but by then it was too late. But anyhow, I wanted to be disciplinary status cause I had a feeling that this administration is doing cover-up on my strike. I was hoping when camp leadership steps in, they will know that I am on hunger strike and maybe they will come to talk to me what my problems were and why I was on hunger strike. The reasons I was on hunger strike is that I wanted to go back to Pakistan or charged. Until then, treat me with respect like CIA did in last ten months before my arrival. Later I found out it was camp leadership doing the cover-up. I was told by the head psychiatrist that the maximum a person can get in D status was six days. So knowing all the consequences, I decided to refuse to be shackled and refused to give my vital signs the next day. But in return, they put one IV in me and forcibly shaved my beard again, but again they still didn't put me in D status. Then again, next day, I refused to be shackled and refused to give my vital signs. But this time I finally got in D status, but three weeks in D2 status and another three weeks in D1 status. Instead of six days, I got six weeks in D status. If I had known that, if they didn't lied to me, I would not have refused to be shackled.

Note: They clearly lied to me. They could have always taken me vital signs from door's window without coming in my cell. But they wanted to make this disciplinary issue so they can put me in D2 status. Meaning I was on disciplinary status not because I refused to get medical assistance but because I refused to be shackled in my cell and the only reason I refused to be shackled in my cell because I wasn't cooperating with medic because I was on hunger strike.

Now if you check the database and the last report of disciplinary status, it doesn't say anything about me refusing medic because if it did then they had to explain why and everything about my strike. All I am saying is that they did the cover-up on my strike by making it as if I was only dieting or since they tricked me to go to D2 status for long time because they were suppose

ISN # 10020
Enclosure (3)
Page 24 of 39

UNCLASSIFIED

to give us finger food which is very low in calories and carbohydrates, etc. And because of finger food I lost more than twenty-five pounds. But in reality I was on hunger strike. When I was on hunger strike, they forcibly put IVs with potassium, glucose, sodium, etc. This left three big bruises for about two weeks.

On January 29th, 07, I broke my strike because they tricked me by saying that a team from Washington is coming to meet you specially and gave me an impression as if they are coming to talk to me about my issues and strike or even my lawyers, but actually they were FBI to whom I refuse to talk to very next day.

Before I write farther, let me tell you why they do these things to me. It's not entirely their fault; it just that I don't cooperate, volunteer, ask for things nor give my things my own.

Since I don't do anything-- to repeat, [Personal Representative starts sentence over.] since I don't do any above things I just mentioned, they have to do cover-up or make it as if I'm cooperating. Now if I am not cooperating, they got to at least make sure I don't act out or I don't do some unpleasant or unusual things. If, for example, I do unusual act, then they need to see me cooperating with medic, voluntarily giving or taking things my own. If that doesn't work, then they take my amenities, one way or other, to do cover-up on that unusual act. If that doesn't work, they would put me in disciplinary status and take my personal belongings, shave beard or take my blood test or see me in pain or give things from inside my body, like body weight, etc. Another option is to make that unusual act of mine, like yelling, not eating, my complaints, a normal act. To do that, they will make sure someone else will do the same act. For example, if I yell, they will make sure some other Detainee will also yell. The very last option they have is to take me out of the building for administrative purposes or for medical purpose, especially in reporting hours. Not only that, to make this act itself a normal act, they will take couple more Detainees with me to other building, as if it was a routine process, just like they did on January 2nd, February 14th, 07, etc.

They don't do this every day. They only do this on special reporting, hours, days, weeks, and even month. Anyway, they have a thousand ways to make sure as if Detainee is volunteering and everything is good to go up here.

February 1, 07, the dentist did some filling in my tooth, but she didn't do it right so I will be in pain and so I will get painkillers from medic. So it will seem like I am cooperating and working with medic. But when my pain got worst, instead asking for painkillers, I yelled and finally she did refilling on February 18th, 2007.

ISN # 10020
Enclosure (3)
Page 25 of 39

**UNCLASSIFIED**

February 22, 07, I chewed my artery again. Medic cleaned my wound.

February 2-- February 23rd, 2007, I got my stuff back after six weeks.

February 26th, 07, they took some of incentive and comfort items, telling me that they are afraid as if I am going to hurt myself and they returned them on March 3rd, 2007. But never put me in disciplinary status.

Some Facts How They Are Mentally Torturing Us:

They them self use the best kind of stuff but they give us cheap branded, unscented deodorant soap to wash ourselves with. Also, same goes for shampoo, toothpaste, and deodorant, etc.

This camp gives us only twelve to fourteen pages of newsletter only once week. Most of the stuff is crap; only few pages are worth of reading it.

In main rec no weight lifting machine, no toilet, no sink, no hoops, and even balls them self have little air in them; they hardly bounce.

In end of January 2007, they brought a big fan which makes noise, which makes more noise than produce air in main hall. It drives us crazy. They have since turned the fan off and I have been moved to A19 on 6 April 2007. The fan itself is still there.

They know how we feel about family members. They intentionally make our ICRC mails delay- very,very delay in so call censorship issues.

We only get one hour of communal rec and only one hour of main rec per day, 2 books per week, and that's it. No mind stimulations, no solitary games, no DVD players, no entertainment, and you know how small and cozy our cells are in size. It has been seven months like this, no improvement.

[REDACTED] So please, before making any decision on me, please read this report of torture and then think yourself if these people can go that far and how hard it is for them to make something up, [REDACTED] I affirm these are my words and the truth as I know it.

PRESIDENT:          Personal Representative, thank you.

PERSONAL REP:   There is one additional statement, Sir.

PRESIDENT:          Okay. Before we continue, I have a question. The title of this document says it was taken on March 2007. There's no specific date. And then at the end, it was certified as dated the 15th of April, which I would assume,

UNCLASSIFIED

|                |                                                                                                                                                                                                                                                                                                              |
|----------------|--------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------|
|                | correct me if I am wrong, that's the date it was finally agreed by yourself, Mister KHAN, that this was accurately what you had evidently provided in written form some time in March. Is that correct?                                                                                                          |
| DETAINEE:      | Step by step. Eventually I added a lot of things. Mostly recently I add the last part, even the summaries itself, a few days ago. All together, yes. I just signed today.                                                                                                                                       |
| PRESIDENT:     | Understand. There are some references to specific days that you were making the statement and it was unclear to me what date that was in-March or-- or April, so, I understand now, thank you very much. Personal Representative, there's another document?                                                      |
| PERSONAL REP:  | That is correct. Exhibit D-8, excuse me, Exhibit D-h, the photo of MAJID KHAN's daughter. The back of the photo reads, my daughter--                                                                                                                                                                           |
| PRESIDENT:     | Excuse me just a moment. I have that in front of me now, thank you.                                                                                                                                                                                                                                           |
| PERSONAL REP:  | To repeat, the back of the photo reads, my daughter MANAAL, she is three years and three months old in this picture. She is my only daughter, but I never even talk to her. Your decision today may not only affect my life, but also others too. So please be careful.                                         |
| PRESIDENT:     | Is there anything else?                                                                                                                                                                                                                                                                                       |
| DETAINEE:      | I would like to have that summary as well, to read it if possible.                                                                                                                                                                                                                                            |
| PRESIDENT:     | Does it contain the same information that was just provided?                                                                                                                                                                                                                                                  |
| DETAINEE:      | I think there's something, just a few lines may not be. It's just a couple of pages. [Detainee is searching for document.]                                                                                                                                                                                     |
| PRESIDENT:     | Is this a three-page document, Exhibit D-c?                                                                                                                                                                                                                                                                   |
| DETAINEE:      | Yes, Sir. D-c. It's really, it's-- it's ah-- it's right to the point and it actually, the whole report doesn't tell you for how long, for how long I was in that. I will certainly appreciate your allowance; it's only really short and it's only a couple of pages. If possible, if not--                    |
| PRESIDENT:     | I'm willing to hear it, but I'd like to ask the other Tribunal Members if they need a break at this time.                                                                                                                                                                                                     |
| MEMBERS:       | [Indicated no.]                                                                                                                                                                                                                                                                                               |
| PRESIDENT:     | Okay. We'll take the time to have it read in, please. Personal Representative, if you will.                                                                                                                                                                                                                   |

ISN # 10020
Enclosure (3)
Page 27 of 39

UNCLASSIFIED

PERSONAL REP:    Just to reiterate, there are points in the oral summary that are not contained in the written summary.  So the written report that was just read, there are additional points in the in the oral statement.  [SCI[1]].

PRESIDENT:    Yes.  I am looking forward to hearing those, yes.

PERSONAL REP:    Exhibit D-c.  MAJID KHAN Oral Statement of Torture for Combatant Status Review Tribunal taken March/April 2007 by PR3.  Mister President and Members of the Combatant Status Review Tribunal, thank you for letting me make a statement regarding the torture I received after my kidnapping [REDACTED].

[REDACTED]

After my arrest, Allah blessed me with only one beautiful daughter, but I have still been unable to talk to her.

Since my arrival at Guantanamo Bay I have been without communal recreation for eleven weeks all together.

I have had my beard forcibly shaven twice.

On two occasions I choed-- chewed my artery and three times they have made me wear the protective suicide prevention smock for days.

For three weeks, I was without basic, incentive, or comfort items.

For nine weeks, I was without incentive or comfort items.

Four weeks without sunlight and fresh air.

Four weeks straight I went on hunger strike and lost twenty-five pounds.  They put nine bags of IVs of sodium, potassium, and glucose mix forcibly in my arm.  It left big bruises on my arms for weeks.  I was threatened by the medic with nose feeding where they would strap me in a special chair that allows nose-- no movement at all-- at all for more than ten straight hours each feeding.

There are many more abuses.  Please read tort-- the report of torture that my Personal Representative has provided to the Board.  My statements are 100% true.  I can take a lie detector test and I tried to prove in my reports from the fact that these statements are 100% true.  I affirm these are my words and the truth as I know it.

---

[1] Simultaneous Communication Interruption

UNCLASSIFIED

DETAINEE:          Mister President, the questions that I wrote to my witnesses, at some point if
                   you allow that, I want that to be readed because these other questions are
                   different from what you guys asked.

PRESIDENT:         In that case I will be reading them ah-- we will be reading them in written
                   form. The matters regarding your witnesses have been previously addressed
                   by myself. Making sure that they are contacted and known of your request,
                   it's all been matters I have addressed previously. Certainly we'll consider
                   those questions as well as the responses that we have received today.
                   Anything else, Personal Representative?

PERSONAL REP:      No, Sir.

PRESIDENT:         Very well. At this point I would like to take a recess. We've been provided
                   considerable amount of written material to review. We are going to be in
                   this building for a little bit of time, I'm going to ask that the Detention
                   Authorities give you a comfort break as well, Mister KHAN.

DETAINEE:          Okay. [Spoken in a very low voice.]

PRESIDENT:         We will reconvene after we've completed this and depending on other
                   matters regarding lunch, we will let you know as soon as possible. I hope
                   that we can reconvene shortly. Recorder, please note the date and time of
                   when we will go into recess.

RECORDER:          The time is 10:49. The date is 15 April 2007. This Tribunal is now in
                   recess. [All personnel depart the room.]

RECORDER:          All rise. [All personnel return into the room at 13:38.]

PRESIDENT:         This hearing will come to order. Please be seated. Mister MAJID KHAN,
                   good afternoon.

DETAINEE:          Good afternoon, Sir.

PRESIDENT:         Excuse me. [clears throat.] We recessed to review all, excuse me, to read
                   all the unclassified documents and evidence that was provided to us earlier.
                   Thank you for allowing us time to read that carefully. We now are going to
                   resume our hearing process by addressing some questions and answers to
                   you, and then we'll be able to complete this session. Okay, Personal
                   Representative, do you have any questions for Mister KHAN?

PERSONAL REP:      No, Sir.

PRESIDENT:         Okay. Recorder, do you have any questions for the Detainee?

UNCLASSIFIED

# UNCLASSIFIED

RECORDER: No, Sir. I have a comment from the earlier proceeding. Would you like me to make that now or save it?

PRESIDENT: It would be appropriate to make that-- address that issue right now.

RECORDER: Yes, Sir. I'd just like to note for the record that during the previous proceeding a note was made regarding the earlier, an earlier version of the Unclassified Summary; references was made to it. The current version is dated 28 March 2007. The difference in the two versions is simply a wording in the definition of enemy combatant. The earlier version says an individual who is part of or supporting the Taliban or al Qaida forces and the 28 March 2007, current version says that an individual who is part of or supporting Taliban or al Qaida forces. That's all, thank you.

PRESIDENT: There's a minor wording change, the change of just deleting the word "the" in front of Taliban. Thank you for that administrative comment. [Reffering to the Detainee.] I believe the Tribunal Members, with me, have questions for you.

MEMBER: Mister KHAN, I have one question. In Mister SAIFULLAH PARACHA's statement, he said that you were introduced to him by Mister AMMAR AL BALUCHI. What did you, what was your dealing with Mister BALUCHI?

DETAINEE: I am not at-- I can't answer that in this ah-- under the circumstances. I'm not in position to tell you exactly what my association with that guy. And did you say that he call me? What was the question again? I'm sorry.

MEMBER: Mister SAIFULLAH PARACHA has stated in his, in his witness statement or his--

DETAINEE: In his testimony [SCI]

MEMBER: -documentation that you were introduced to him by AMMAR AL BALUCHI.

DETAINEE: All I can tell you that the person, whoever it is, that, that I was introduced to him, in my opinion, that he is not al Qaida, he's not Taliban, or associate forces who may be a threat to United States. And that's all I have to say about this person. Other than, I can't comment, and how do I know this person.

MEMBER: Alright.

MEMBER: Mister KHAN, I have two questions. The first is to clarify something you said in your rebuttal concerning paragraph G and H, about visiting your new wife and family in Pakistan, and your travel documents for return to the

UNCLASSIFIED

United States expired. Can you clarify the reason why you were trying to renew those documents?

DETAINEE:    Ah-- which [looking through papers.] The point I was trying to make there is that, that's for sure that I was trying to get that ah-- ah--travel document back, but the point I was trying to make is ah-- the one thing is for sure, that I was not going to travel on that-- with that specific travel document. There could be other things, other options you could do, you could do with that travel document, that might be not legal or legal. I'm not sure about that, but the point I was trying to make there is that, one thing I can promise you, that I was not going to travel, travel on that specific travel document. Ah-- since I let it, myself, expire in December 25th, I was in Pakistan and know it was going to expire and I had made my mind that ah, that I was not going to go back to States. And at that, at some point in my time, some time in-- some time in-- ah--- [Detainee appears to be getting confused or experiencing anxiety.]

PRESIDENT:    Take your time.

DETAINEE:    Some time in life, I made a decision that, there were times that I wanted to be citizen of the United States and there was times that I thought that I was done with United States. And I left it; I let it expire. And then, as you said, in the bottom it says that I was there-- there couldn't be, let me think, I don't have the correct words 'cause I wrote it this morning. Could it be that I was trying to get this document for refugee or stuff like that? I think I made the statement, there are other things that you can do too, with that travel document other than just, just traveling back to United States. So the point I was trying to make there is that, one thing is for sure, I was not going to travel with that specific travel document. And I can't talk about in-depth that-- what was my other intention for that. I think that not relevant to ah-- in my opinion, to enemy combatant definition, cause I had not intention to use it for Taliban, al Qaida, or associate forces to maybe engage against United States. So I don't be able to answer that. That's one of the reasons I can't talk in-depth about it. I can prob-- all I am saying, the point that I was trying to make there is that I was not going to travel on that specific travel document. That is for 100% sure. Ah-- Yeh, that's all I have to say about it.

MEMBER:    So if I understand what you just said, you're clarifying that you wanted to renew the travel document, but you were not going to travel back using that documentation once it had been renewed.

DETAINEE:    Yes, Ma'am. And then if it couldn't be-- I was trying to give you another option. A person can use it for other reasons, maybe legal or illegal. It has nothing to do with ah-- it could be a fraud or something like that. But it has

**UNCLASSIFIED**

nothing to do with enemy definition. Go ahead. [Member waiting to speak.]

MEMBER:    But what your true intention was would be relevant because you're giving us a hypothetical, and I was wondering what the real intent was. So if you were not going to travel back with that documentation, can you tell us the specific purpose you intended to use it for?

DETAINEE:    The specific purpose was that, as I said there, there are a lot of refugees out there, in Pakistan who are desperate, who need help. And I could use that-- I just don't want to talk a-- I can't, I can't give you specific person for some reasons. It could be, I don't want to endanger his life or it could be either a person or individual group, that I could give it to the refugees. And I was hoping they could manipulate this document and they can travel back to States and then they could apply for asylum there. Just like, like I used, my whole family used this kind of passport or travel document to go back to State first and once we in State, we can apply for asylum and for refugee status. So, since I made up my mind that I'm not going back to, I'm not going back, I'm not gonna go back to States, then I thought I might as well use this to help some desperate people who I believed, in my opinion, were refugees like my mother and so forth. And, but I can't really talk about specific names that I was going to give out to 'cause it may endanger their life.

MEMBER:    Okay, thank you. Mister KHAN, I have one other question to clarify something you stated in this case, concerning paragraph 3-i which starts on page four of your rebuttal.

DETAINEE:    Page four, paragraph i?

MEMBER:    Yes, it starts on page four paragraph i, but if you look on page five in the section where you discuss to Mister UZAIR having admitted that you wanted to loan him money but you did not loan him money, so there was no harm. The question I wanted to ask you was to clarify whether you had wanted or intended to loan him money, but the loan did not [SCI, Detainee said something inaudible.] the transaction did not take place.

DETAINEE:    Actually ah-- when I say UZAIR himself admitted that, I wanted-- what actually I'm trying to-- maybe it's some bad English, I was trying-- I was-- I was trying to point out the actual word in that, in that paragraph. He said I want it, not that I said I want it. What I'm trying to prove it that the enemy combatant definition doesn't say anything about a person want to become Taliban or a person wanted to help. It just claims that a person was associated or something like that. And I'm trying to clarify that, that I had no intention whatsoever, 'cause it just that I come bringing that statement from paragraph and--and--and challenging that, that specific word,

ISN # 10020
Enclosure (3)
Page 32 of 39

## UNCLASSIFIED

whether it fits the definition of enemy combatant. For myself, I never wanted to give any kind of money to UZAIR or any al Qaida organization or whatsoever. There's no, "I want it." [Quotes inserted due to emphasis on, I want it.] I just, I'm bringing his statements to make point.

MEMBER: I think you've then clarified what I found a little confusing near the top of page five. You said you had never loaned any money, meaning there was no harm. And I wanted to clarify whether you had conversations to intend to loan the money or try to loan the money. It's just that the transaction did not take place.

DETAINEE: Yes, I think, if you read UZAIR transcript, and I just myself was reading it, and he, himself said there was no, no conversation between me and him and his father about any money. And-

MEMBER: I did read that and I wanted to clarify what your version of the facts were since this paragraph does not specify what you say about whether there were any conversations or intent to loan money. Your rebuttal merely says you did not loan the money. So I wanted to clarify-

DETAINEE: whether there were intentions-

MEMBER: -or conversations-- your statement about that versus Mister PARACHA's statement.

DETAINEE: Let me-- I didn't make myself clear there that I want to make clear now. There were no intention or conversation at all, from my side as well.

MEMBER: Thank you.

PRESIDENT: First of all, I'd like to ask if the statements that you made to your PR during the course of preparing for this Tribunal, as well as the written documents that you have provided to us, were any of those, were all of those provided voluntarily by yourself? Were there any threats regarding submitting or not submitting something for consideration here today?

DETAINEE: The only thing I say that for-- when my PR first arrived, I--I had decide not to attend the Tribunal at all. And month passed 'cause I thought that Tribunal itself is a game. I think that it was a setup 'cause the kind of questions I had, I thought it was a trap to make me say things. Even when I was going through this process, I was uncomfortable. I was like, this is just a game. But more I talk to my PR, I realize, maybe it is important in my life. Maybe it's very important. I didn't know that. The more I talk to my PR, then I realize, you know, it will affect a lot of people or myself. So then I start giving a lot things voluntarily and ah--but only thing, I as said it my statement that I wanted write in Urdu because I can express myself much better this way. Still, I know English as a second language, as you know,

ISN # 10020
Enclosure (3)
Page 33 of 39

UNCLASSIFIED

but my PR had me translate everything in English and had me write everything in English, so I just, I didn't feel very comfortable about it. And so, all I have to say that, when I was speaking-- actually I speak very finely, but when it comes to writing, it's pretty bad. You've probably seen it. So I wasn't very comfortable expressing things in writing. So that's-- yes, I pretty much volunteered everything I wrote. There was no threat, no coerce. There's only one thing that I have to say; it the travel document. In my opinion, I never ask for travel document. I never-- there had to be some kind of misunderstanding between me and him. And next day he came, we have asked for evidence in that travel document. And I don't say, I don't see any reason for travel document in this whole thing. So I refused it next day. And that's the only one thing I can think of that was not appropriate.

PRESIDENT:     Very well. I understand on that last point that no-- none of those travel documents were submitted by yourself and certainly I believe, as we know here today, the Recorder didn't submit any of those for our consideration. So those were provided as a request that I thought came from you, but at this point, we don't have those.

DETAINEE:     The only thing I was going to add, I don't want to give you the impression that I am hiding anything. 'Cause whatever we talked about, I, even good or bad, my PR used it. I just thought maybe you had a feeling that I had a travel document hiding or something hidden about it. There's nothing hidden, nothing to hide. So, [SCI] I just wanted to make that clear.

PRESIDENT:     I understand your point. And I do understand that English is your second language, and we have reviewed carefully everything you provided and I know you've had a discourse regarding every one of those documents with your Personal Representative. And we believe that they are very complete and where we do have questions, we have an opportunity get your input on that. So thank you very much. In your Exhibit D-b, regarding the treatments that you had while you were in custody, it was rather detailed and I understand that was probably difficult for you to present to us. But the question I have has to do with anything that you did say while, enduring those times, in specifically, I think, page seven, said that you didn't cooperate. In fact, I believe it said "since I was innocent and didn't know anything" you refused to look at pictures or cooperate. That's the only real reference I can find in that your document where you talked about things that you may have said during that period. What I would like to know is, were there any statements that you made during that whole period that what you said was incorrect or incomplete or not true? And you can relate any of those cases? It does appear that there is at least only one place where you said you didn't cooperate, which means you didn't provide any statements. But if you had provided statements, can you comment on the validity of the statements made during those conditions?

UNCLASSIFIED

DETAINEE:        There was always statement, [REDACTED].

PRESIDENT:      Statements that you made.

DETAINEE:        Statement that I made, even written.

PRESIDENT:      Understood.

DETAINEE:        [REDACTED]

PRESIDENT:      Well I was just using the terminology that you had in your statement where you said you-- you [SCI] did not cooperate.

DETAINEE:        [REDACTED]

PRESIDENT:      Well, and I'd like to ask about those statements. Were those statements true or incorrect?

DETAINEE:        Definitely not true.

PRESIDENT:      That's all I am looking for and- [SCI]

DETAINEE:        Okay. [SCI]

PRESIDENT:      -first direct statement on that.

DETAINEE:        Definitely not true. Most of the stuff, yes.

PRESIDENT:      Very well. Okay, that completes the questions I had. I will make an-a statement here regarding what we've heard here today. Ah-What you have told us will be included in the record, obviously. We'll also be reported to appropriate authorities for any investigation that's necessary. As you know, we will carefully consider what you have said to us today, as we make our determination regarding your enemy combatant status. [We] consider this a very important matter. You've heard us take our oath and ah-- you know we won't ah-- consider these-- this evidence that you provided as well as we received, very carefully. [*Tribunal President's post-hearing note: The previous sentence is a direct transcript of my statement; however, it is incomplete and disjointed as I attempted to transition to receiving the Detainee's final statement. As directly stated previously, I intended to reiterate that the Tribunal would carefully consider the Detainee's statements.*] At this point in the hearing, we've received all the unclassified information [Detainee acknowledges with "ah ha."] and, ah, we're now about to complete this portion by providing you an opportunity to provide a final statement. Would you like to make a final statement at this time?

DETAINEE:        I have few questions of what we talked about today.

ISN # 10020
Enclosure (3)
Page 35 of 39

**UNCLASSIFIED**

PRESIDENT:      Okay.

DETAINEE:       Ah-

PRESIDENT:      Ask your questions. Are they-- go ahead, please.

DETAINEE:       Ah-- so you said there's one of my brother. I ask for MOHAM-, MAHMOOD, MOHAMMAD, AHMED KHAN, and ah you said that one of my brother wasn't able to make a statement. And were you talking about paragraph A or paragraph D in Summary of Evidence.

PRESIDENT:      Where are you at? [Referring to Summary of Evidence.]

DETAINEE:       Because we both, we don't know who made, what exactly-

PRESIDENT:      It is actually referring to paragraph A.

DETAINEE:       Okay. If you were referring to paragraph A, then ah-- I'd like to point that out that the question about one of my brother has ever made a statement about me being involved with al Qaida, I think my father in his statement, ALI KHAN, he made it clear that-- "because now I'm told by the military that my son wants to know whether I said in March 2003 that he became very religious and developed anti-American feelings. And whether one of my other son said MAJID might be involved with al Qaida." So basically he already answered the paragraph A in it. So even--even that brother didn't make it, and there's a statement attached to it, didn't make up here, so they should be-- I don't feel that we need his statement because my father took care of it. Another thing is D, ah-- I was wondering if-- if-- if you know that D is talking about, I think it doesn't fit the definition of enemy combatant itself because it's clear it doesn't fit the definition itself. But anyway, when it's talking about Detainee's residence, I mean my residence, now are they talking about Baltimore or-- or-- or-- or ah-- Pakistan, Karachi? 'Cause I lived in both place.

PRESIDENT:      As you can see, this is what we know; the same thing you know at this point. So, we will have to consider that question after we receive all of the information. Again, this is a unclassified Summary of Evidence and this is all we know about this at this point.

DETAINEE:       So, would it be appropriate statement to make that--that D itself, let's just say, ah I think I refuted pretty good with every single paragraph, all the witnesses. The D, I can't refute because I don't know. To me-- I just can't know. What you don't know, you can't refute. So, D itself can make me enemy combatant, if they're right; just only D itself. If I refute all successfully, let us say, and D I'm worried about because I don't know. And it's just--it's up to you. With D itself, will make me an enemy combatant?

ISN # 10020
Enclosure (3)
Page 36 of 39

## UNCLASSIFIED

PRESIDENT:       I can't answer that at this point.

DETAINEE:        Okay. [SCI]

PRESIDENT:       We have not received all information; we have not gone into deliberation. We--I certainly understand your point very well that you provided in your written statement, your oral statement as well, regarding that matter. We will consider that as we look at that information in its content. Thank you.

DETAINEE:        Last--last question is ah-- actually there was--there was some comments made in that paragraph and me and PR talk about it and it was inappropriate--un-appropriate to bring it up. In paragraph F, Exhibit D-d, page number four-

PRESIDENT:       Oh, I need to look at that, excuse me just a moment. Okay, please continue.

DETAINEE:        And ah-- when I talk about I've never been to Afghanistan and I never met UBL. I cannot possibly be member of al Qaida. I admit I can't prove I am not al Qaida. It is very difficult to prove that someone is not al Qaida. Now there was few more sentence in which me and PR decided may not be very appropriate to ask, but this is a very important question I need to ask you. Let's just say someone claims that the Board Member are themselves al Qaida. And if you were--if you were in my shoes, I would like to know that how can you prove it, that you yourself are not al Qaida? And if you can't, then I can't either. And if you can, then please let me know 'cause I will follow the same process to prove that I am not al Qaida. That was my question.

PRESIDENT:       Sorry, I may have lost the question in there.

DETAINEE:        If someone believes that you're, the Board Member, of al Qaida and you are in my shoes and you ought to prove, let us say you say I can't prove it, then I can't either. And let's say that you can prove it. Then I would like to know how can you prove it to anyone, anyone in the world 'cause there's a Board Member of this CSRT are not al Qaida. So I can follow same process.

PRESIDENT:       Well, you are following that process. In a sense that evidence is being provided to these three Members, myself and the two Members next to me. And we will look at all of the evidence provided, including testimony and information you wish to provide and comment on. We recognize this may have been the first time that you've had an opportunity to comment on--on such matters. That is our job. We will determine that, based upon the evidence provided to us. Just what's provided to us here. There's probably a lot of other things out there regarding yourself as a detained person, but only certain things are provided to us. The things, as you read from the unclassified Summary of Evidence R-1, that the government believes makes

ISN # 10020
Enclosure (3)
Page 37 of 39

**UNCLASSIFIED**

you fit the definition of an enemy combatant.  So, if the reverse happened, a Board, an independent group of officers that have not been part of your detention or your interrogation are now have been charged to do our responsibility, our duty.  We make the decision based upon the evidence provided to us, just the three officers here.  The majority vote determines your enemy combatant status.

DETAINEE:          Okay.  I don't have any comments to make.  I said whatever I wanted to say.  These are the questions and the answers.

PRESIDENT:        Very well.  Thank you.

DETAINEE:          Thank you.

PRESIDENT:        So that concludes your, your final statement?

DETAINEE:          Yes, Sir.

PRESIDENT:        I have some additional information I'd like to share with you, to conclude this hearing.

## CLOSING UNCLASSIFIED SESSION

PRESIDENT:        All unclassified evidence having been provided to this Tribunal, this Tribunal has concluded its open session.  Mister MAJID KHAN, you will be notified of the Tribunal decision upon completion of the review of these proceedings by the Combatant Status Review Tribunal convening authority in Washington, D.C.  If the Tribunal determines that you should not be classified as a ene--as an enemy combatant, you will be released to your home country as soon as arrangements can be made.  If the Tribunal determines that you are classified as an enemy combatant you may be eligible for an Administrative Review Board hearing at a future date.  The Administrative Review Board will make an assessment of whether there are continued reasons to believe that you pose a threat to the United States or its coalition partners in the ongoing armed conflict against terrorist organizations such as al Qaida and its affiliates and supporters or whether there are other factors bearing upon the need for continued detention.  You will have the opportunity to be heard and to present relevant information to the Administrative Review Board.  You can present information from your family and friends that might help you at the Board.  You are encouraged to contact them as soon as possible to begin to gather information that may help you.  A military officer will be assigned at a later date to assist you in the Administrative Review Board process.  Thank you very much for participating with us today.  I appreciate your, your understanding as this is a lengthy process, and I appreciate your continued cooperation with detention authorities while you are in detention.

UNCLASSIFIED

UNCLASSIFIED

## ADJOURN OPEN SESSION

PRESIDENT:        The open session of this Tribunal hearing is adjourned.  Good afternoon.

RECORDER:        The time is 14:10; the date is 15 April 2007.  All rise.


## AUTHENTICATION

I certify the material contained in this transcript is a true and accurate verbatim rendering of the testimony during the Combatant Status Review Tribunal of ISN 10020.


[REDACTED], Colonel, USAF
Tribunal President

**EXHIBIT B**

Response in Opposition to Motion to Compel (Aug. 21, 2006),
*Bismullah v. Rumsfeld*, No. 06-1197 (D.C. Cir.)

**[NO ORAL ARGUMENT SCHEDULED]**

IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

| | | |
|---|---|---|
| HAJI BISMULLAH, et al., | ) | |
| Petitioners, | ) | |
| v. | ) | No. 06-1197 |
| | ) | |
| DONALD H. RUMSFELD, | ) | |
| Secretary of Defense, | ) | |
| Respondent. | ) | |

## RESPONSE IN OPPOSITION TO MOTION TO COMPEL

The Government opposes petitioners' motion to compel.  Bismullah has been determined to be an enemy combatant in connection with the ongoing hostilities in Afghanistan against the Taliban and Al Qaeda and communications with him carry with them an inherent risk to the nation's wartime security.  Accordingly, counsel access to Bismullah should be controlled by the entry of a protective order by this Court, in the form proposed by the government, and counsel's execution of a memorandum of understanding acknowledging the requirements of that order and agreeing to comply with it.  The United States will move for entry of an appropriate protective order on or before August 25, 2006.  Until the entry of that order, counsel can submit the petition or any other materials to Bismullah through normal mail channels, where the material would be subject to routine security screening. [1] Any specialized "legal mail" system in these circumstances, however, is appropriately controlled by a protective order, which is not yet in effect for Guantanamo Bay detention

---

[1]  Contrary to petitioners' assertions, the Government has <u>not</u> refused to provide the petition or other legal material to Bismullah.  Rather, it has refused to provide them absent the clearance of the filings through the Defense Department screening process for material within those filings that would raise security concerns.

cases in this Court pursuant to the Detainee Treatment Act. Bismullah's counsel also has no right to access classified information in the record of the Combatant Status Review Tribunal (CSRT), and access to such information must also await entry of a protective order.[2]

The development of a protective order for entry by this Court is not a simple task, contrary to what Bismullah suggests. Mot. at 9-10. It is a complex document consisting of numerous provisions designed to balance carefully the interest of allowing counsel to participate in this proceeding with the compelling national security interests that are at stake in detaining enemy combatants during ongoing hostilities. Further, the district court protective order is not an adequate substitute. Rather, that order has led to intractable disputes over vague or ambiguous provisions, unanticipated consequences that threaten safety and security at Guantanamo, and gaps that have allowed unwarranted potential security risks and inappropriate impositions upon the military during a time of war.[3]

Bismullah's overheated rhetoric (p. 2) that these issues "must be resolved immediately" lacks merit. Bismullah has been detained as an enemy combatant since February 2003. He was expressly notified in 2004 of his right to submit a petition for habeas

---

[2] The unclassified CSRT material has now been provided to counsel. In future cases, the provision of such material will also be governed by the proposed protective order.

[3] These problems will be explained in detail in the government's motion for a protective order to be filed later this week. In brief, those problems have stemmed from counsel and detainees utilizing the legal mail system to transmit materials that are not related to the litigation challenging the detentions or in a manner that creates a security risk; the pursuit of litigation on behalf of detainees by alleged "next friends" in circumstances where the detainee refuses to participate in the suit; and communications from counsel that have encouraged risky behavior by detainees.

corpus. *See Adem v. Bush*, 425 F.Supp.2d 7, 11-13 (D.D.C. 2006). In spite of this notice, Bismullah never sought habeas corpus relief, nor has he himself sought relief under the Detainee Treatment Act. Likewise, the petitioner here, who claims to be Bismullah's "next friend," has been aware of Bismullah's detention at Guantanamo since March 2003 (Pet. 13), yet did not file any action in until over <u>three years</u> had passed. The government is working diligently to prepare a proposed protective order to govern these proceedings and will move for entry of one by August 25; in these circumstances, no immediate court-ordered access as sought by Bismullah is necessary in advance of the entry of such an order. Indeed, the government has permitted two visits by counsel with Bismullah in the past two months pursuant to a restrictive regime agreed to by counsel.

The government genuinely seeks to allow counsel to participate meaningfully in this litigation, and its proposed protective order will provide counsel with much of what they are seeking. First, it will allow counsel to communicate with the detainee through a special legal mail system designed to preserve attorney-client privilege while still ensuring that national security is protected in these unique circumstances. Second, if the detainee elects to participate in this action, counsel will be given the opportunity to visit the detainee in person. Third, counsel with the necessary clearances will be given access to the full CSRT record to the extent counsel has a need to know this information. This record formed the basis of the CSRT determination and has been certified in this Court as the "complete record upon which the final decision of the [CSRT] was entered in this case." Certified Index to Record at 1.

Counsel seeks, in addition to the record before the CSRT, to be given immediate

access to "all relevant and reasonably available information in the government's possession concerning Bismullah." Mot. at 14. Essentially, counsel seeks to engage in wide ranging discovery in search of any information that ought to have been considered by the CSRT. Such a request wholly incompatible with the scheme of limited judicial review provided by the Detainee Treatment Act. It is also inconsistent with the scope of review familiar in administrative review cases, where a strong presumption of regularity is accorded to the record, and, finally, it is unprecedented with respect to wartime detention of enemy combatants. For all these reasons, to the extent counsel seeks information other than that contained in the certified CSRT record, that request should be denied.

## STATEMENT

**A.** CSRT procedures were established by written orders of the Deputy Secretary of Defense and the Secretary of the Navy "to determine, in a fact-based proceeding, whether the individuals detained * * * [at] Guantanamo * * * are properly classified as enemy combatants and to permit each detainee the opportunity to contest such designation." Deputy Sec. England Memo. at 1 (Pet. Exh. 3). A CSRT is composed of "three neutral commissioned officers" who were not involved in the apprehension or interrogation of the detainee, CSRT Process, Encl. 1, §C(1) (Pet. Exh. 3). A recorder is charged with "obtain[ing] and present[ing] all relevant evidence to the [CSRT] and to cause a record to be made of the proceedings." *Id.* § C(2). During the CSRT hearing, the recorder "shall present to the Tribunal such evidence in the Government Information as may be sufficient to support the detainee's classification as an enemy combatant, including the circumstances of how the

detainee was taken into the custody of U.S. or allied forces." *Id.* § H(4).[4]  The recorder

provides to the CSRT any evidence which might "suggest that the detainee should not be

designated as an enemy combatant." *Ibid.*  The recorder also presents an "unclassified report

summarizing the Government Evidence and any evidence to suggest that the detainee should

not be designated as an enemy combatant."   *Id.* § H(5).   This report is provided to the

detainee and his personal representative in advance of the CSRT proceeding. *Ibid;* Enc. 3,

§ D. The recorder also "shall call witnesses, if any." Enc. 1, § H(6). The detainee's personal

representative also reviews the government information presented, and may independently

present evidence "to the CSRT on the detainee's behalf." *Id.*, Enc. 3, § C(2) & (3).

During the CSRT proceeding, the detainee may "present evidence" and testimony.

*Id.* Enc. 1, § H(7).  In addition to his own testimony, the detainee may present the relevant

"testimony of witnesses who are reasonably available," as well as relevant documents and

written statements. *Id.* § F(6), H(7). A personal representative shall "assist the detainee in

reviewing all relevant unclassified information, in preparing and presenting information, and

in questioning witnesses." *Id.* § C(3).

**B.** The Detainee Treatment Act ("DTA"), enacted in December 2005, establishes a

---

[4] Information presented to the CSRT that supports the detainee's classification as an enemy combatant is delineated as the "Government Evidence." *Ibid.*  "Government information" is defined as that information which is "reasonably available information in the possession of the U.S. Government bearing on the issue of whether the detainee meets the criteria to be designated as an enemy combatant, including information generated in connection with the initial determination to hold the detainee as an enemy combatant and in any subsequent reviews of that determination, as well as any records, determinations, or reports generated in connection with such proceedings." *Id.* § E(3).

judicial review mechanism for determinations made by a CSRT. Pub. L. No. 109-148, tit. X, § 1105(e)(2), 119 Stat. 2741-42. The statute confers on this Court "exclusive jurisdiction to determine the validity of any final decision of a [CSRT] that an alien is properly detained as an enemy combatant." *Id.* § 1105(e)(2)(A). This Court's review "shall be limited to the consideration of * * * whether the status determination of the [CSRT] with regard to such alien was consistent with the standards and procedures specified by the Secretary of Defense for [CSRTs] (including the requirement that the conclusion of the Tribunal be supported by a preponderance of the evidence and allowing a rebuttable presumption in favor of the Government's evidence)." *Id.* § 1105(e)(2)(C). This Court may also consider, "to the extent the Constitution and laws of the United States are applicable, whether the use of such standards and procedures to make the determination is consistent with the Constitution and laws of the United States." *Id.* § 1105(e)(2)(C).[5]

**C.** Bismullah, was captured in Afghanistan in February 2003 and has been detained as an enemy combatant since that time. In a hearing held on November 30, 2004, a CSRT reviewed his status and determined that he is an enemy combatant. In June 2006, Haji Mohammad Wali filed a petition for review in this Court under the DTA. Wali states that he is Bismullah's brother, and is acting as his "next friend." Pet. at 6-7. Counsel has been allowed to visit Bismullah in person twice at Guantanamo (in June and August 2006) but has

---

[5] This petition was filed after the enactment of the DTA. Accordingly, this case will remain in this Court regardless of the decision in *Al Odah v. United States*, Nos. 05-5064, 05-5095 through 05-5116, and *Boumediene v. Bush*, 05-5062 & 05-5063, relating to the applicability of the Act to pending cases and other issues that will impact this case, such as whether Guantanamo detainees have rights under the Constitution.

not submitted anything to this Court signed by Bismullah to suggest that Bismullah supports this lawsuit or would like counsel to represent him.

**ARGUMENT**

On or before August 25, 2006, the government will seek the entry of a protective order that will allow counsel access to much of what he seeks. Until such an order is entered, however, he is not entitled to the information requested in his motion. Further, even after the entry of a protective order, Bismullah is not entitled to the sort of wide-ranging discovery of any "relevant" information contained in government files. Instead, review under the DTA is on the record of the CSRT, and no additional material need be provided in order for this Court to carry out that review.

**A.      Entry of a Protective Order on Terms Appropriately Protective of the Government's Interests is Required to Govern Counsel Access to Classified Material and to Represented Detainees.**

Contrary to Bismullah's claim, counsel has no right stemming from the Constitution or the DTA to access the detainee or classified information in the record. Rather, that access requires protective measures appropriate to the circumstances of these detentions, and which will be set forth soon in a proposed protective order. As an initial matter, Bismullah, as an enemy combatant detained overseas during an ongoing armed conflict, has no right to counsel; nor does his counsel have any right to access classified information. These points were fully addressed in *Al-Odah* and *Boumediene*, and a decision on the process appropriate in this case is closely bound up in this Court's resolution of those appeals.

**1.** Historically, a captured enemy combatant was entitled to *no* process to challenge

his status. More recently, the process granted to aliens captured on a foreign battlefield was no more than the procedures reflected in Article 5 of the Geneva Convention and Army Regulation 190-8, where there is *no* provision of counsel and detainees are given *no* access to classified information. *See* Army Reg. 190-8, § 1-6.e(3) & (5).[6] The same could occur in this review proceeding.

Further, this Court can carry out its review without a requirement for counsel access to classified information. When this Court performs its familiar role of reviewing the decision of an administrative body, it has the "inherent authority to review classified material *ex parte, in camera* as part of its judicial review function." *Jifry v. FAA*, 370 F.3d 1174, 1182 (D.C. Cir. 2004). Because this Court can perform that function *ex parte*, there is no reason to allow counsel access to the classified material that is in the CSRT record. Instead, this Court has explained in regard to classified information: "[w]e anticipate that in camera review of affidavits, followed if necessary by further judicial inquiry, *will be the norm*." *Stillman v. C.I.A.*, 319 F.3d 546, 548 (D.C. Cir. 2003) (emphasis added).

**2.** The Due Process Clause does not require that counsel be provided materials that are classified. The rulings of the Supreme Court and this Court have recognized the government's compelling interest in protecting its national security and in the classified information that is vital to the nation's security. *See Haig v. Agee*, 453 U.S. 280, 307

---

[6] Common Article 3 of the Convention does not address the procedures for determining an individual's status as an enemy combatant during the relevant hostilities. Instead, it only limits the "passing of sentences and the carrying out of executions," neither of which are involved here. 6 U.S.T. 3316, 3318 (1956).

(1981). Because of this compelling interest, this Court has upheld agency action and rejected due process claims even when private parties and their counsel have been denied all access to classified information in the record. *See Jifry*, 370 F.3d at 1184; *People's Mojahedin Org. v. Dep't of State*, 327 F.3d 1238, 1242 (D.C. Cir. 2003) (citing *Nat'l Council of Resistance of Iran v. Dep't of State*, 251 F.3d 192, 207-09 (D.C. Cir. 2001)); *Holy Land Foundation v. Ashcroft*, 333 F.3d 156, 164 (D.C. Cir. 2003).

Moreover, this Court should work towards a solution that will allow resolution of this matter while avoiding the difficult constitutional and separation-of-powers questions that would arise if a court attempted to *compel* disclosure of national security information or *require* access to a detained enemy combatant. *See Stillman*, 319 F.3d at 548. Indeed, ordering the release of information or unqualified access to enemy combatants would violate core separation-of-powers principles. *See Hamdi v. Rumsfeld*, 542 U.S. 507, 531 (2004) (recognizing detention of enemy combatant as "core strategic matters of warmaking belong in the hands of those who are best positioned and most politically accountable for making them") (plurality op.); *Egan*, 484 U.S. at 527 ("authority to classify and *control access to information* bearing on national security * * * flows primarily from [Article II's] constitutional investment of power in the President and exists quite apart from any explicit congressional grant") (emphasis added); *Holy Land*, 333 F.3d at 164 (recognizing "the primacy of the Executive in controlling and exercising responsibility over access to classified information"). These considerations strongly militate in favor of awaiting the government's proposed protective order, to be filed later this week, prior to ordering access to the detainee

or to the classified materials in the CSRT record.

**B.    Counsel Is Not Entitled To The Production Of Materials Outside of the CSRT Record.**

**1.** Bismullah next argues (p. 18) that the "plain language" of the DTA authorizes him to "rely on evidence that was not part of the prior CSRT evidentiary record." This contention is without merit because the DTA's plain language clearly sets forth a familiar scheme whereby this Court reviews the decision of the CSRT based on the record before it. The Act specifies that "review" is of "the validity of any final decision of a Combatant Status Review Tribunal." *Id.* § 1105(e)(2)(A). That "review" also "shall be limited to the consideration of * * * whether the status determination * * * was consistent with the standards and procedures specified by the Secretary of Defense for Combatant Status Review Tribunals (including the requirement that the conclusion of the Tribunal be supported by a preponderance of the evidence and allowing a rebuttable presumption in favor of the Government's evidence)." *Id.* § 1105(e)(2)(C). The review may also consider, "to the extent the Constitution and laws of the United States are applicable, whether the use of such standards and procedures to make the determination is consistent with the Constitution and laws of the United States." *Id.* § 1105(e)(2)(C).

Such review is limited by the statute's terms and established precedent to the administrative record before the tribunal. Even outside the wartime context, it is established that statutes providing for review of final agency decisions authorize a "reviewing function [that] is * * * ordinarily limited to consideration of the decision of the agency or court below and of the evidence on which it was based." *United States v. Carlo Bianchi & Co.*, 373 U.S.

709, 714-15 (1963); *see Florida Power & Light Co. v. Lorion* 470 U.S. 729, 743 (1985)

(recognizing the "fundamental principle[] of judicial review of agency action" that "'[t]he

focal point for judicial review should be the administrative record already in existence, not

some new record made initially in the reviewing court.'") (quoting *Camp v. Pitts*, 411 U.S.

138, 142 (1973)); *Jifry*, 370 F.3d at 1181.

Even in cases where "Congress has simply provided for review, without setting forth

the standards to be used or the procedures to be followed, [the Supreme] Court has held that

consideration is to be confined to the administrative record and that no de novo proceeding

may be held." *Carlo Bianchi*, 373 U.S. at 715. Here, Congress specified narrow review of

the administrative decision – to determine if the decision was "consistent with" CSRT

procedures; whether the decision was "supported by a preponderance of the evidence"; and

whether the "use of such standards and procedures * * * is consistent with the Constitution

and laws of the United States," to the extent applicable. *Id.* § 1105(e)(2). Each of these

limitations calls for a review of the record before the agency upon which it based its decision.

Accordingly, this type of record review is limited to assessing the validity of the decision of

the CSRT based upon the record before it and applying the appropriate standard of review.

*See Cabinet Mountains Wilderness/Scotchman's Peak Grizzly Bears v. Peterson*, 685 F.2d

678, 685 (D.C. Cir. 1982) ("applicability of de novo review to administrative actions is

limited and is generally not presumed in the absence of statutory language or legislative

intent to the contrary"). [7]

Bismullah urges that review need not be on the record of the proceeding because the detainee may challenge the CSRT determination "on the ground that the determination is not supported by 'a preponderance of the evidence'" and the statute does "not limit" this review to "a preponderance of the evidence 'in the record.'" Mot. at 18. This argument simply fails to accord meaning to the language of the statute. The Act specifies that this Court may assess whether the "requirement *that the conclusion of the Tribunal* be supported by a preponderance of the evidence" has been met, DTA, § 1105(e)(2)(C) (emphasis added), as part of an inquiry into whether a CSRT decision is "consistent with the standards and procedures specified by the Secretary of Defense." *Ibid.* By its terms, this provision limits review to the question of whether the CSRT followed appropriate procedure and rendered a decision supported by sufficient evidence. In determining on review whether the "the tribunal (*i.e.* the CSRT) rendered a decision "consistent with" DOD CSRT procedures requiring support of a CSRT decision by a "preponderance of the evidence," it makes no sense to consider evidence not before the CSRT.

Rather, this type of review provision is consistent with this Court reviewing the CSRT

---

[7] Review on the record is, of course, particularly appropriate where Congress has lodged review of an agency determination in the court or appeals, which is not suited for factfinding. *See Bianchi*, 373 U.S. at 715; *Midwest Independent Transmission System Operator, Inc. v. FERC*, 388 F.3d 903, 910 (D.C. Cir. 2004) (court of appeals review appropriate when "'[t]he factfinding capacity of the district court is . . . unnecessary to judicial review of agency decisionmaking,' because the administrative proceedings have already generated the record necessary for appellate review"); *General Elec. Uranium Management Corp. v. U.S. Dept. of Energy*, 764 F.2d 896, 903 (D.C. Cir. 1985).

factual determination to ensure, at most, that it is supported by substantial evidence. *See Consol. Edison Co. v. N.L.R.B.*, 305 U.S. 197, 229 (1938) ("Substantial evidence * * * * means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion"); *Jifry*, 370 F.3d at 1181 ("'[s]ubstantial evidence' is simply such relevant evidence as a reasonable person might accept as proof of a conclusion"); *Charlton v. FTC*, 543 F.2d 903, 907 (D.C. Cir. 1976) (explaining that in circumstance where "agency itself is to initially ascertain the facts" under a "preponderance of the evidence" standard, "on judicial review of agency action, [those] administrative findings of fact must be sustained when supported by substantial evidence on the record considered as a whole" as the standard to be utilized by the "reviewing court").

Indeed, every administrative review proceeding must necessarily develop a standard of review for administrative resolution of factual issues, and nothing about defining that standard of review suggests that this Court should conduct its review by going outside of the record. *See Carlo Bianchi*, 373 U.S. at 715 ("the standards of review adopted * * * 'not supported by substantial evidence'-have frequently been used by Congress and have consistently been associated with a review limited to the administrative record * * * * [t]his standard goes to the reasonableness of what the agency did on the basis of the evidence before it, for a decision may be supported by substantial evidence even though it could be refuted by other evidence that was not presented to the decision-making body"). Rather, when Congress intends to allow factfinding when a court is conducting review of an agency decision, it provides expressly for such factfinding. *Cabinet Mountains*, 685 F.2d at 685;

*see, e.g.*, 28 U.S.C. § 2347(c) (Hobbs Act provision addressing "leave to adduce additional evidence"); 5 U.S.C. § 706(2)(F); *Reid ex rel. Reid v. District of Columbia*, 401 F.3d 516, 521 (D.C. Cir. 2005) (IDEA expressly authorizes district court to "'hear additional evidence at the request of a party'" and "'bas[e] its decision on the preponderance of the evidence'") (quoting 20 U.S.C. § 1415(i)(2)(B)). In sum, the DTA does not provide for evaluating evidence outside of the record reviewing a CSRT's factual conclusion of evidentiary sufficiency.

In accord with ordinary administrative review principles, the DTA is thus properly read as limiting this Court's review to the record before the CSRT. It is important to remember, however, that this is not a garden-variety administrative law case. Rather, it is the extraordinary grant of review of an enemy combatant determination during an ongoing armed conflict. To read the DTA to afford wide ranging discovery and *de novo* fact review, as petitioner suggests, is not only contrary to established administrative review principles, it is also to argue that the DTA grants greater judicial review than that has historically been granted to even a person convicted by a military commission. *See Yamashita v. Styer*, 327 U.S. 1, 8, 23 (1946). Such review is not remotely contemplated by Article 5 of the Geneva Convention or Army Regulation 190-8, and it is not even contemplated in *Hamdi* even for citizens held in this country as enemy combatants. At bottom, the DTA, which provides record review of final CSRT decisions, cannot fairly be construed as providing discovery and *de novo* review, especially where doing so both has no historical precedent and would impose of the Executive an unprecedented wartime burden.

-14-

**2.** Bismullah next argues (p. 8) that factfinding is allowed because the DTA "confers original – not appellate – jurisdiction on this Court." The fact that the DTA provides direct review of a CSRT determination in this Court lends no support to Bismullah's argument that review should extend beyond the record in this case. Rather, as we have shown, record review is the norm when original jurisdiction is conferred upon this Court. Similarly, whether or not this case involves "administrative decisions entitled to deference" (p. 19 n.11) or "claims" rather than "appeals" (*ibid.*) says nothing about whether this case involves review based on the record before the CSRT. Instead, as we have explained, the statute itself calls for record review by conferring on this Court "exclusive jurisdiction to determine the validity of any final decision of a Combatant Status Review." DTA § 1005(e)(2)(A).

Bismullah urges (p. 19 n.11) that he has "made a strong showing of inadequate fact-finding procedures" such that this Court needs to consider extra-record evidence. In a similar vein, Bismullah's counsel urges that "significant exculpatory information has been provided" to various United States officials, thereby justifying a discovery-like process to determine if the government is in possession of this evidence. But the DTA does not authorize fact-finding by this Court in these or any other circumstances. *Cf. Camp*, 411 U.S. at 142 (*de novo* hearing allowed in APA claims in limited circumstances because 5 U.S.C. § 706(2)(F) expressly so provides). Instead, Congress directed the Department to ensure that its already existing administrative review board process for periodic review of detainee status that takes into consideration any relevant new information. *See* DTA § 1005(a)(1) & (3) (directing Secretary to promulgate "procedures of the * * * Administrative Review Boards" that, among

-15-

other things, "provide an annual review to determine the need to continue to detain an alien who is a detainee" and "provide for periodic review of any new evidence that may become available relating to the enemy combatant status of a detainee"). The Department has updated its preexisting regulation to include those procedures. *See* ARB Memo. and Procedures, Enc. 13 (July 14, 2006).[8] The ARB procedures, in existence since 2004, provide for annual "consideration of all relevant and reasonably available information to determine whether the enemy combatant represents a continuing threat." ARB Mem., § 1.c. In those proceedings, the detainee is allowed to "present information relevant to his continued detention, transfer, or release." *Ibid.*; *Id.* encl. 3, § 3.a (detainee "shall be provided a meaningful opportunity to be heard and to present information to the ARB"). Under the present regulations, any new information relating to the enemy combatant status of a detainee that is presented to an ARB shall be brought to the attention of the Deputy Secretary of Defense as soon as practicable. The Deputy Secretary of Defense shall review the new evidence and decide whether to convene a new CSRT to reconsider the basis of the detainee's enemy combatant status. *See* ARB Memo. and Procedures, Enc. 13.

In sum, the DTA does not authorize the submission of new evidence to this Court relating to the detainee's status as an enemy combatant; such evidence must instead be submitted to DoD, consistent with the congressionally-authorized procedures for consideration of such evidence.

Finally, Bismullah argues that he must be able to submit evidence to this Court "akin

---

[8] Http://www.defenselink.mil/news/Aug2006/d20060809ARBProceduresMemo.pdf.

to an 'actual innocence' claim in *habeas corpus* proceedings;" if not, Bismullah argues (p. 19-20), the DTA would constitute a suspension of the writ of habeas corpus. This claim is meritless, for reasons that have been addressed in detail in the *Al Odah* briefing. First, alien combatants held overseas have no constitutional rights under the Suspension Clause. *See Johnson v. Eisentrager*, 339 U.S. 763, 777-79 (1950). Second, even if Suspension Clause rights existed, they do not require or necessitate any factual review of the CSRT determination. *See INS* v. *St. Cyr*, 533 U.S. 289, 305-06 (2001) (under traditional habeas review, "other than the question whether there was some evidence to support the order, the courts generally did not review the factual determinations made by the Executive"); *Yamashita*, 327 U.S. at 8 (military tribunals are "not subject to judicial review merely because they have made a wrong decision on disputed facts."). And third, what Bismullah calls an "actual innocence" claim is in fact a claim that Bismullah is not properly designated as an enemy combatant. A challenge to the evidentiary sufficiency of the CSRT decision, designating him as an enemy combatant, is properly rendered on the CSRT record. *Superintendent, Mass. Correctional Institution v. Hill*, 472 U.S. 445, 455-457 (1985) (the some evidence standard "does not require" a "weighing of the evidence," but rather calls for assessing "whether there is any evidence in the record that could support the conclusion")).

   **3.** Bismullah also argues that he is entitled to obtain "all information in the possession of the government that is relevant" (Mot. at 15) in order to "show that the Recorder failed to discharge his obligations consistent with the CSRT Procedures" to provide relevant information to the CSRT. Mot. at 16. Bismullah argues that such review is entailed

in determining whether the "CSRT Procedures" were followed. Mot at 16. Such a request

is essentially an effort to disguise free-ranging discovery of any relevant material possessed

by the government in the guise of a procedural challenge. But Bismullah misperceives the

scope of this Court's review as well as the nature of the recorder's task, which is routine and

entitled to a presumption of regularity.

First, Bismullah misperceives the scope of this Court's review, which is of the

"validity of any final decision of a CSRT." DTA, § 1005(e)(2)(A). That review, as we have

explained, is on the record and does not call for opening up to review the recorder's process

of identifying and gathering relevant evidence. *See Citizens to Preserve Overton Park, Inc.*

*v. Volpe*, 401 U.S. 402, 417, 420 (1971) (in evaluating "whether the Secretary's action

followed the necessary procedural requirements" under the APA, explaining that "where

there are administrative findings that were made at the same time as the decision * * * there

must be a strong showing of bad faith or improper behavior before [an] inquiry may be

made" into the "mental processes of administrative decisionmakers"); *Community for*

*Creative Non-Violence v. Lujan*, 908 F.2d 992, 998 (D.C. Cir. 1990) (no review of "agency

decisionmaking process" when there is an "adequate record in this case for effective judicial

review"). Instead, this Court's review of the process is based on the record before the

administrative decisiomaker, *i.e.*, the CSRT. *See James Madison Ltd. v. Ludwig*, 82 F.3d

1085, 1095 (D.C. Cir.1996).

Thus, this Court has rejected the notion that in conducting review of an agency

decision, it should look behind the actions of officials who are not the ultimate

decisionmaker. In *James Madison*, this Court rejected the assertion that because "the examiners were the 'real decision-makers,' * * * the district court should have reviewed whatever materials the examiners may have seen during their on-site investigation." *See James Madison*, 82 F.3d at 1095. Instead, there was no reason to look behind the actions of the examiners, just as here there is no reason to look beyond the evidence compiled by the recorder; rather, review is of the information submitted by the examiner or the recorder for use in making the ultimate administrative decision. *Id.* at 1095-96. Ultimately, a contrary view would turn the Court into the first line factfinder searching for "all information in the possession of the government that is relevant" (Mot. at 15), but in administrative review courts "do not duplicate agency fact-finding efforts." *James Madison*, 82 F.3d at 1096.

Indeed, the recorder's task is routine and subject to a strong presumption of regularity. The recorder's job, essentially, is to compile material that is both relevant and reasonably available and to present that material to the CSRT. CSRT Procedures, Enc. 1, § C(2).[9] Such a routine task is entitled to the strongest sort of presumption of regularity in reviewing the

---

[9]   Bismullah vastly overstates the recorder's role. With one small exception, the recorder simply compiles relevant material that is reasonably available in government files (*see* CSRT Procedures, Enc. 1, § E(3) (defining "Government Information"), and places that information into the CSRT record. *Id.* § H(4). The only government information that would not enter the CSRT record is material that goes *beyond* what would be sufficient to conclude that the detainee is an enemy combatant, *e.g.*, duplicative material supporting the fact that a detainee is an enemy combatant. As an additional check, the Personal Representative also reviews all of the government information, and may independently present evidence "to the CSRT on the detainee's behalf."   *Id.*, Enc. 3, § C(2) & (3). And, of course, Bismullah himself could testify and submit evidence that is reasonably available. *Id.*, Enc. 1, § F(6). Thus, Bismullah's claim (p. 15) that the "Recorder *alone* is responsible for reviewing all information * * * that is relevant" is not true.

decision of the CSRT. *See Martino v. U.S. Dept. of Agriculture*, 801 F.2d 1410, 1413 (D.C. Cir. 1986. Indeed, the original purpose of the presumption of regularity is to allow reliance upon the record upon which a decision is based. *See Dorsey v. Gill*, 148 F.2d 857, 874 (D.C. Cir. 1945).

In sum, the functions of the recorder cannot be utilized as an avenue for freewheeling discovery into "all information in the possession of the government that is relevant." Mot. at 15. Instead, the review in this Court is to be based upon the record before the CSRT, and that record will be provided to this Court and, upon entry of a protective order, to counsel.

## CONCLUSION

For the foregoing reasons, this Court should deny Bismullah's motion to compel.

Respectfully submitted,

PETER D. KEISLER
*Assistant Attorney General*

GREGORY G. KATSAS
*Deputy Associate Attorney General*

DOUGLAS N. LETTER
*Terrorism Litigation Counsel*

ROBERT M. LOEB
(202) 514-4332
AUGUST E. FLENTJE
(202) 514-1278
Attorneys, Appellate Staff
Civil Division, Room 7268
U.S. Department of Justice
950 Pennsylvania Avenue, N.W.
Washington, D.C. 20530

AUGUST 2006

-20-

## CERTIFICATE OF SERVICE

I hereby certify that on August 21, 2006, I caused copies of the foregoing "RESPONSE IN OPPOSITION TO MOTION TO COMPEL" to be served upon counsel of record by causing copies to be sent by Fed Ex overnight delivery and by e-mail transmission to:

Jeffery I. Lang
Jennifer R. Cowan
Debevoise & Plimpton
919 Third Avenue
New York, New York 10022

Robert M. Loeb