IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____
                                                                    )
MAJID KHAN, *et al.*,                                    )
       *Petitioners*,                                     )
                                                                    )
v.                                                                 )         Civil Action No. 06-cv-1690 (RBW)
                                                                    )
                                                                    )
GEORGE W. BUSH, et al.,                              )
       *Respondents*.                                   )
_____)

## PETITIONERS' EXPEDITED MOTION FOR EMERGENCY ACCESS TO COUNSEL AND ENTRY OF AMENDED PROTECTIVE ORDER

      Petitioner Khan, by and through his undersigned counsel, respectfully moves for entry of the Amended Protective Order and immediate access to his undersigned counsel. Petitioner's motion should be granted for all of the reasons set forth in the accompanying memorandum of law, as well as those set forth in his prior motions for counsel access which were denied without prejudice. Counsel access is particularly appropriate now in order to obtain further necessary discovery relating directly to this Court's jurisdiction over his pending habeas petition.

      Petitioner requests oral argument on this motion.

Dated:  New York, New York.
      June 11, 2007

                                Respectfully submitted,

                                Counsel for Petitioners:

                                By:

                                __/s/_____
                                Gitanjali S. Gutierrez
                                CENTER FOR CONSTITUTIONAL RIGHTS
                                666 Broadway
                                New York, New York 10012
                                (212) 614-6485
                                ggutierrez@ccr-ny.org

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____
                                                                    )
MAJID KHAN, *et al.*,                                     )
      *Petitioners*,                              )
v.                                                                       )          Civil Action No. 06-cv-1690 (RBW)
                                                                    )
GEORGE W. BUSH, et al.,                             )
      *Respondents.*                             )
_____)


### MEMORADNUM IN SUPPORT OF
### PETITIONER'S EXPEDITED MOTION FOR EMERGENCY ACCESS TO COUNSEL
### AND ENTRY OF AMENDED PROTECTIVE ORDER

Petitioner Majid Khan ("Khan") respectfully submits this Memorandum in support of his

Motion for Emergency Access to Counsel and Entry of Amended Protective Order.[1]

Petitioner's motion should be granted.

Since September 2006, the counsel for Petitioner have been seeking access to him. While

Respondents have raised one objection after another to Khan meeting with his counsel, Khan

has made at least two suicide attempts; military authorities have placed him in a suicide

prevention smock; he has engaged in a 27-day hunger strike; he has undergone a Combatant

Status Review Tribunal (CSRT) during which he was denied the most fundamental due process

rights; FBI agents continue to question and interrogate him in the absence of counsel; and

Petitioner Khan has specifically and directly sought the assistance of the undersigned counsel

by writing a letter to counsel through the standard mail delivery system available to

---

[1] Pursuant to Local Civil Rule 7(m), the undersigned counsel for Petitioners conferred with
Respondents' counsel regarding the relief sought in this motion.  Respondents' counsel oppose
the motion

Guantanamo detainees.[2]  Counsel have also requested that Respondents process any additional security clearances necessary to afford Petitioner Khan access to his undersigned counsel.[3] Respondents have so far refused to act on that request and still refuse to allow Petitioner Khan to meet with his attorneys.[4]

This Court should not allow Respondents to continue to frustrate and delay Petitioner Khan's access to his attorneys – access to which they concede he is entitled – so that he may proceed with his legal challenges to his detention.  It is particularly appropriate for this Court to order access now in order to address issues relating to his immigration status and property ownership in the United States, which bear directly on the Court's continuing jurisdiction over his habeas petition despite the Court of Appeals' decision in the *Boumediene* case.  *See* Petitioner's Surreply in Opposition to Motion to Dismiss (dk. no. 28).

Petitioner Khan first sought access to his counsel on October 8, 2006.  *See* Petitioners' Expedited Motion for Emergency Access to Counsel and Entry of Amended Protective Order (dkt. no. 2).  In opposing Khan's effort to meet with his counsel, the Respondents asserted that, in light of the Detainee Treatment Act of 2005[5] ("DTA") and Military Commission Act of 2006[6] ("MCA"), this Court should summarily announce its lack of authority over the case.  *See* Respondents' Opp. (dkt. no. 6).  The Respondents also boldly claimed that because Khan was exposed to "top secret//sensitive compartmented information" vis-à-vis his secret detention and

---

[2] *See* Exhibit A, Verbatim Transcript of Combatant Status Review Tribunal for ISN10020 [Majid Khan] (Unclassified), http://www.defenselink.mil/news/transcript_ISN10020.pdf, attached hereto; Exhibit B, Declaration of Gitanjali S. Gutierrez, at ¶¶ 2, 4-5, attached hereto.

[3] *See* Exhibit B, Gutierrez Declaration, Attachment 1 (Letter from J. Wells Dixon to Terry Henry, dated March 27, 2007).

[4] *See* Exhibit B, Gutierrez Declaration, Attachment 2 (Letter from Terry Henry to J. Wells Dixon, dated April 9, 2007).

[5] Detainee Treatment Act of 2005, Pub. L. No. 109-148, tit. X, 119 Stat. 2680 (10 U.S.C. §801 note).

[6] Military Commission Act of 2006, Pub. L. No. 109-___.

brutal interrogations, he cannot consult with his attorney at this time for fear he will reveal information about his secret detention and interrogations, including the methods used to torture him or information that the Respondents voluntarily provided to him.

On November 17, 2006, this Court denied without prejudice Petitioner's motion for access to his counsel because "the issue of whether this Court has jurisdiction to entertain the habeas petition filed by putative counsel is pending review by the District of Columbia Circuit." *See* Order of November 17, 2006, at 4 (dkt. no. 11). By denying without prejudice Khan's Expedited Motion for Emergency Access to Counsel and Entry of the Protective Order, the Court was not required to consider Khan's additional arguments that Respondents misrepresented the scope and provisions of the Amended Protective Order; that Respondents cannot invoke their own torture and abuse of Khan as grounds to delay his access to counsel; that Respondents were attempting to improperly use Executive classification authority to conceal illegal or embarrassing conduct; and that any delay in consulting with his lawyer is likely to have an irreparable and detrimental impact upon Khan's ability to assist in his own defense and challenge to his detention.

Petitioner Khan moved for reconsideration of the Court's November 17, 2006 Order, which was likewise denied without prejudice in an omnibus order issued on January 31, 2007 in every Guantánamo detainee case before this Court. *See* Order of January 31, 2007 (dkt. no. 18).

On February 20, 2007, the Court of Appeals for the District of Columbia held in *Boumediene v. Bush*, 476 F.3d 981 (2007), that the MCA was a permissible removal of habeas jurisdiction for non-citizens who lacked any substantial voluntary ties to the United States. Subsequently, on April 19, 2007, Respondents filed an omnibus motion to dismiss in every district court habeas case brought by men imprisoned in Guantánamo, including in this case. *See* Respondents' Motion to Dismiss, filed on April 19, 2007 (dkt. no. 19). Petitioner Khan

opposed the motion on the grounds that his legal residence and asylum status in the United States, as well as his strong family, professional and material connections to this country, place him in the category of non-citizens whose substantial voluntary ties to the United States entitle him to fundamental constitutional protections. *See* Petitioner's Opposition to Motion to Dismiss (dkt. no. 21); Petitioner's Surreply in Opposition to Motion to Dismiss (dkt. no. 28)..

With their Reply in Support of their Motion to Dismiss, Respondents submitted for the first time an affidavit making new factual allegations concerning his immigration status. Counsel for Petitioner also learned of new factual information relevant to the jurisdictional question when Respondents publicly released a transcript of Petitioner Khan's CSRT, including information concerning Petitioner Khan's purchase and ownership of real property in Maryland. As set forth in Petitioner's surreply memorandum in further opposition to the motion to dismiss, both Respondents' late-filed affidavit and the CSRT transcript plainly demonstrate the need for counsel to meet with and interview Petitioner concerning these issues which bear directly on this Court's continuing jurisdiction over his habeas petition. *See* Petitioner's Surreply in Opposition to Motion to Dismiss (dkt. no. 28)   Indeed, Respondents should not be permitted to make factual assertions in support of their Motion to Dismiss, while simultaneously denying Petitioner Khan the opportunity to share factual information with his counsel that will support his assertion of this Court's jurisdiction over his challenge.[7]  This Court should only determine its jurisdiction on the basis of a complete, undisputed record.  Accordingly, because there are factual gaps in the record relevant to the question of this Court's jurisdiction that result from

---

[7] Petitioner Khan cannot use the regular mail delivery system for Guantánamo detainees as his sole means to discuss substantial legal issues with his counsel. First, these letters undergo multiple layers of review and censorship by military authorities that will inevitably result in redaction of relevant information.  Second, the letters are subject to violations of attorney-client privilege because even if marked "attorney-client privileged communications," the letters will be logged, reviewed and censored by Respondents.  Third, the delivery of these letters may take two to four months depending upon the length of the letter.  Petitioner Khan is entitled to immediate and direct in-person and confidential communications with his security-cleared counsel.

Petitioner Khan's lack of opportunity to meet with counsel to discuss these facts, Petitioner now renews his motion for immediate counsel access.

In support of this motion for access to counsel and entry of the Amended Protective Order, Petitioner Khan hereby adopts and renews the arguments set forth in his Expedited Motion for Emergency Access to Counsel and Entry of Amended Protective Order (dkt., no. 2), Reply in Support of Expedited Motion for Emergency Access to Counsel and Entry of Amended Protective Order (dkt. no. 10), Motion for Reconsideration of the Court's Order of November 17, 2006 (dkt. no. 12), Reply in Support of Motion for Reconsideration of the Court's Order of November 17, 2006, Opposition to Motion to Dismiss (dkt. no. 21), and Surreply in Opposition to Motion to Dismiss (dkt. no. 28). Accordingly, for the reasons set forth above, and for the reasons set forth in Petitioner Khan's prior filings, this Court should exercise its authority to order Respondents to afford Khan immediate access to counsel pursuant to the Amended Protective Order.

## CONCLUSION

After three years of secret detention, torture and abuse, and after being denied access to his attorneys for over eight months, this Court should order Respondents to afford Petitioner Khan prompt access to counsel pursuant to the Amended Protective Order.

Dated: June 11, 2007

<div style="margin-left:50%">

Respectfully submitted,

Counsel for Petitioners:

  /s/ Gitanjali S. Gutierrez

Gitanjali S. Gutierrez
Shayana Kadidal
J. Wells Dixon
CENTER FOR CONSTITUTIONAL RIGHTS
666 Broadway
New York, New York 10012

</div>

5

(212) 614-6485

# EXHIBIT A

UNCLASSIFIED

## Verbatim Transcript of Combatant Status Review Tribunal Hearing for ISN 10020

### OPENING

PRESIDENT:      This hearing shall come to order.

RECORDER:      This Tribunal is being conducted at 08:42 on 15 April 2007 on board U.S. Naval Base Guantanamo Bay, Cuba. The following personnel are present: Colonel [REDACTED], United States Air Force, President, Commander [REDACTED], United States Navy, Member, Lieutenant [REDACTED], United States Air Force, Member, Major [REDACTED], United States Air Force, Personal Representative, Sergeant First Class [REDACTED], United States Army, Reporter, Major [REDACTED], United States Air Force, Recorder. Lieutenant Colonel [REDACTED] is the Judge Advocate member of the Tribunal.

### OATH SESSION 1

RECORDER:      All rise.

PRESIDENT:      The Recorder will be sworn. Do you, Major [REDACTED], swear or affirm that you will faithfully perform the duties as Recorder assigned in this Tribunal, so help you God?

RECORDER:      I do.

PRESIDENT:      The Reporter will now be sworn. The Recorder will administer the oath.

RECORDER:      Do you, Sergeant First Class [REDACTED], swear that you will faithfully discharge your duties as Reporter assigned in this Tribunal, so help you God?

REPORTER:      I do.

PRESIDENT:      We'll take a brief recess while the Detainee is brought into the room.

RECORDER:      The time is 08:43 on 15 April 2007. This Tribunal is now in recess. All rise. [All personnel depart the room.]

### CONVENING AUTHORITY

RECORDER:      [All personnel return into the room at 08:48.] All rise.

PRESIDENT:      This hearing will come to order. You may be seated. Good morning.

DETAINEE:      Good morning. How are you guys doing?

**UNCLASSIFIED**

PRESIDENT:    Very good, fine, thank you. This Tribunal is convened by order of the Director, Combatant Status Review Tribunals under the provisions of his Order of 12 February 2007. This Tribunal will determine whether you meet the criteria to be designated as an enemy combatant against the United States or its coalition partners or otherwise meets the criteria to be designated as an enemy combatant.

## OATH SESSION 2

PRESIDENT:    The members of this Tribunal shall now be sworn. All rise.

RECORDER:    Do you swear that you will faithfully perform your duties as a member of this Tribunal; that you will impartially examine and inquire into the matter now before you according to your conscience, and the laws and regulations provided; that you will make such findings of fact and conclusions as are supported by the evidence presented; that in determining those facts, you will use your professional knowledge, best judgment, and common sense; and that you will make such findings as are appropriate according to the best of your understanding of the rules, regulations, and laws governing this proceeding, and guided by your concept of justice, so help you God?

MEMBERS:    I do.

PRESIDENT:    The Recorder will now administer the oath to the Personal Representative.

RECORDER:    Do you affirm that you will faithfully perform the duties of Personal Representative in this Tribunal?

PERSONAL REP:    I do.

PRESIDENT:    Please be seated. The Recorder and Reporter, have previously been sworn. Mister MAJID KHAN, you are hereby advised of the following ah-- during this hearing. Excuse me; the following applies during this hearing. You may be present at all open sessions of the Tribunal; however, if you become disorderly, you will be removed from the hearing and the Tribunal will continue to hear evidence in your absence. You may not be compelled to testify at this Tribunal; however, you may testify if you wish to do so. Your testimony can be under oath or not under oath. You may have the assistance of a Personal Representative at the hearing. Your assigned Personal Representative is present. You may present evidence to this Tribunal, including the testimony of witnesses who are reasonably available and whose testimony is relevant to this hearing. You may question witnesses testifying at the Tribunal. You may examine documents or statements offered into evidence other than classified information; however, certain documents may be partially masked for security reasons. Mister MAJID KHAN, do you understand this process?

**UNCLASSIFIED**

**UNCLASSIFIED**

DETAINEE:        Yes, Sir.

PRESIDENT:       Do you have any questions concerning the Tribunal process?

DETAINEE:        Ah, I personally am not satisfied with the process itself. But I don't have questions. So far, from what I understood. But I'm not satisfied with the course ah--the Tribunal process. I would-- I would rather have fair trial than rather than have a Tribunal process, but I so far, what I understood, I understood how it goes. But the Personal Representative told me, ah-- but I'm not satisfied with it at all.

PRESIDENT:       Very well. This is an administrative process and we will continue through it, and if you have any questions about what we are doing at any time, please feel free to ask.

DETAINEE:        The same goes for you too.

PRESIDENT:       Certainly.

## PRESENTATION OF UNCLASSIFIED INFORMATION

PRESIDENT:       Personal Representative, please provide the Tribunal with the Detainee Election Form.

PERSONAL REP:    Sir, I am providing to the Tribunal the Detainee Election Form labeled Exhibit D-a.

PRESIDENT:       I have received the Detainee Election Form marked Exhibit D dash A and it does provide ah-- various administrative information, including a notation that you wish to participate in this Tribunal, you want the assistance of the Personal Representative and it summarizes a number of items regarding the witness and evidence requests and other matters related to this hearing.

PRESIDENT:       Recorder, please provide the Tribunal with the unclassified evidence.

RECORDER:        I am handing the Tribunal what has previously been marked as Exhibit R-1, the unclassified summary of the evidence that relates to this Detainee's status as an enemy combatant. A translated copy of this exhibit was provided to the Personal Representative in advance of this hearing for presentation to the Detainee. In addition, I am handing to the Tribunal the following unclassified exhibits, marked as Exhibits R-2 through R-4. Copies of these exhibits have previously been provided to the Personal Representative.

PRESIDENT:       The unclassified summary? [Looking for a copy.]

RECORDER:        Can I give it to you after, after I read it?

**UNCLASSIFIED**

**UNCLASSIFIED**

PRESIDENT:        Oh. Very well.

RECORDER:        Sorry.

PERSONAL REP:    Sir, I have an additional copy.

RECORDER:        Thank you.

PRESIDENT:        No, that's fine. We'll receive it here shortly. Recorder, please read the unclassified Summary of Evidence which is R-1. Read it for the record please. Recorder, before you proceed--Mister MAJID KHAN, at this time please do not comment on the evidence. There'll be an appropriate time later in the hearing for you to comment on it. I would like it to be read into the record at this time. Recorder, please proceed.

RECORDER:        The following facts support the determination that the Detainee is an enemy combatant: a. In March 2003, one of the Detainee's brothers stated the Detainee was involved with a group that he believed to be al Qaida, and as of December 2002, was involved in transporting people across the border of Afghanistan and Pakistan, and points elsewhere. b. On 1 May 2003, IYMAN FARIS pleaded guilty in the United States District Court in Alexandria, Virginia, to providing material support and resources to al Qaida and conspiracy for providing the terrorist organization with information about possible United States targets for attack. c. In mid-2001, IYMAN FARIS had dinner and spent the night at the Detainee's family residence in Baltimore, Maryland. FARIS stated during this visit the Detainee spoke to him about the fighting and struggle in Afghanistan. On a subsequent visit, the Detainee told FARIS he met KHALID SHAYKH MOHAMMED (KSM) in Pakistan and referred to KSM as his uncle. The Detainee told FARIS of his desire to martyr himself against President MUSHARAFF of Pakistan by detonating a vest of explosives inside a building. d. A computer harddrive seized from a residence where munitions were discovered contained linkages to media seized from the Detainee's residence. e. In March 2003, the Detainee's father stated the Detainee recently began to be influenced by anti-American thoughts and became extremely religious in his behavior. The Detainee's father believed the Detainee had come under the influence of family members in Karachi, Pakistan, who discussed anti-American feelings and could be very destructive. f. On 23 November 2005, UZAIR PARACHA was convicted in United States District Court, Southern District of New York, on charges relating to his provision of material support to the al Qaida terrorist organization. The evidence proved PARACHA agreed with two al Qaida members, including the Detainee, to provide support to al Qaida by trying to help the Detainee obtain a travel document that would have allowed the Detainee to reenter the United States to commit a terrorist act. g. In February and March 2003, UZAIR PARACHA posed as the Detainee

**UNCLASSIFIED**

during telephone calls with the United States Immigration and Naturalization Service, called the Detainee's bank, and attempted to gather information about the Detainee's immigration paperwork via the Internet. PARACHA also agreed to use the Detainee's credit card to make it appear that the Detainee was in the United States, when in fact the Detainee was in Pakistan. h. On 29 March 2003, a search of UZAIR PARACHA's bedroom in Brooklyn, New York, revealed a Bank of America card, excuse me, check card in the name of the Detainee and five different identification cards for the Detainee, including one Maryland drivers license and one social security card. i. UZAIR PARACHA stated he knew from his father the Detainee and a second individual were al Qaida. The Detainee and the individual wanted to give PARACHA and his father between 180,000 and 200,000 United States dollars to invest in their company as a loan. PARACHA stated he knew the money was al Qaida money and that al Qaida wanted to keep the money liquid so they could have it back at a moment's notice. PARACHA felt it was implied that he had to perform tasks for the Detainee and the individual on behalf of al Qaida because of the money being loaned to their business. Sir, this concludes the unclassified summary of evidence.

PRESIDENT:  Personal Representative, does the Detainee have any evidence to present to this Tribunal?

PERSONAL REP: Sir . I am handing Detainee exhibits D-b through D-l to the Tribunal Board Members. These have been provided to the Tribunal Court Reporter [Recorder] Exhibit D-b is MAJID's written statement of torture for Combatant Status Review Tribunal, taken March 2007 by PR3. It is twelve pages. Exhibit D-c is MAJID KHAN's oral Statement of Torture for Combatant Stat-- Status Review Tribunal, taken March and April 2007 by PR3. It is three pages in length. Exhibit D-d is MAJID KHAN's rebuttal statement for Combatant Status Review Tribunal taken March/April 2007 by PR3; six pages in length. Exhibit D-e is a witness statement from SAIFULLAH PARACHA for ISN 20 taken 6 April 2007; three pages. Exhibit D-f is a statement received from IYMAN FARIS for use at MAJID KHAN's Combatant Status Review Tribunal and it is three pages. Exhibit D-g is UZAIR PARACHA's court testimony at Federal Court of Southern District of New York; it's thirty-two pages in length. Exhibit D-h is a photo of MAJID KHAN's daughter, with a statement from MAJID KHAN; page-- one page. Exhibit D-i are witness questions from MAJID KHAN as to the-- he requested to be asked to his witnesses; three pages. D-j is a statement of- -from ALI KHAN for presentation at the CSRT-- MAJID KHAN's CSRT; three pages. Exhibit D-k are Detainee session notes; two pages. And finally, Exhibit D-l, the witness-- ah-- a typed witness statement from IYMAN FARIS. So you guys can-- excuse me, so the Board can actually-- IYMAN FARIS's handwriting is not the best, so I interpreted it and typed it so you guys can read it here. And now I am handing them to the Board.

ISN # 10020
Enclosure (3)
Page 5 of 39

**UNCLASSIFIED**

PRESIDENT:        Thank you, Personal Representative. I appreciate the summary of all those documents. At this point, I would like to address some relevancy and rulings regarding the requests for evidence that were received. The first evidence request regarded your various documents that you believe show that you could legally enter the United States. I found this evidence request to be relevant, and I directed that efforts be made to obtain these or similar documents relating to your legal status to enter the United States. Various documents were provided by the government and also from your father's attorney to satisfy this request for evidence. Those were provided to your Personal Representative previously. The second evidence request that I received regarded your request for the transcript of UZAIR PARACHA's court case. I also found this evidence request to be relevant and directed that the document be produced. The relevant portions of that document has been provided. And this concludes my remarks regarding the relevancy and the availability of the evidence that you requested. I will address witness requests later in the hearing. Does the Recorder have any further unclassified evidence to present?

RECORDER:        Mister President, I have no further unclassified evidence for the Tribunal, but I respectfully request a closed Tribunal session at an appropriate time to present classified evidence relative to this Detainee's status as an enemy combatant.

PRESIDENT:        Recorder, your request for a closed session is granted and will be taken in due course. We now come to the point of the hearing where we'll address witness requests and the calling of witnesses.

## CALLING OF WITNESSES

PRESIDENT:        Does the Recorder have any witnesses to present?

RECORDER:        No, Sir.

PRESIDENT:        According to the Detainee Election Form provided to the Tribunal earlier, I am reminded that, Mister KHAN, you have requested various witnesses to provide testimony at this hearing. For purposes of this process, the people are referred to as witnesses and the statements from them would be considered testimony. I will address each of your witness requests now. You requested the testimony of UZAIR PARACHA to address statements attributed to him in Exhibit R-1, which was read to us earlier, the Summary of Evidence. I determined the request was relevant. UZAIR PARACHA, through his attorney, has volunteered not to participate. Because this process cannot compel the testimony of non-U.S. military witnesses, the witness is not reasonably available. You also requested the testimony of IYMAN FARIS to address statements attributed to him, also in the unclassified Summary of Evidence, R-1. I determined the request was

**UNCLASSIFIED**

**UNCLASSIFIED**

relevant and IYMAN FARIS voluntarily elected to participate by providing written testimony. Consequently, the testimony of IYMAN FARIS is reasonably available. Another witness you requested was SAIFULLAH PARACHA to address statements regarding his knowledge of you being al Qaida, as described also in the Summary of Evidence. I determined this request was also relevant. SAIFULLAH PARACHA voluntarily elected to provide a written statement; consequently, the testimony of SAIFULLAH PARACHA is reasonably available. You requested the testimony of your father, ALI KHAN to address statements attributed to him in the Summary of Evidence. I determined the request was relevant, and ALI KHAN voluntarily elected to provide testimony in the form of a written statement, and consequently, the testimony of ALI KHAN is reasonably available. The final testimony you requested is from your three brothers, MAHMOOD, MOHAMMED and AHMED KHAN, to address statements attributed to one brother in the Summary of Evidence. Initially, I determined the testimony from all three brothers to be relevant; however, because the Summary of Evidence concerns the testimony of just one brother, I determined the testimony from that specific brother to be relevant. The attorney of this brother indicated through written testimony that written testimony would be provided prior to this hearing; however, that date has passed and no testimony has been received through the attorney. Again, because this process cannot compel the testimony of non-U.S. military personnel, this witness testimony is not reasonably available. I will also make a note that the KHAN family was provided the opportunity to participate and provide their testimony by video teleconference. While video teleconference is the equivalent of in-person testimony, they elected to provide written testimony instead. So in summary, you have requested five witnesses: UZAIR PARACHA, IYMAN FARIS, SAIFULLAH PARACHA, your father ALI KHAN, and your three brothers, MAHMOOD, MOHAMMED and AHMED KHAN, who I treat as a request for just one of those brothers. Testimony from UZAIR PARACHA and one of those brothers is not reasonably available, and testimony from IYMAN FARIS, SAIFULLAH PARACHA, and your father, ALI KHAN, has been provided in writing and is available. And I do note that the Personal Representative has provided those various statements for us to consider in this matter. We'll certainly carefully review these statements and consider them as we go through the determination process of your enemy combatant status. With the witness testimony addressed at this point, we'll now receive your oral statement.

PERSONAL REP:  Sir, the Detainee has requested that the witness statements be read into the record.

PRESIDENT:  Oh. Very well. This is an appropriate time for you to do that. Please proceed Mister-- Personal Representative.

**UNCLASSIFIED**

PERSONAL REP:  The first statement is from SAIFULLAH PARACHA taken on 6 April 2007. I, SAIFULLAH PARACHA, voluntarily make the following statement regarding MAJID KHAN for presentation at his Combatant Status Review Tribunal. I am providing this statement to the person identified to me as MAJID KHAN's Personal Representative. I make this statement of my own free will without any threats or promises extended to me.

The PR asked me to provide the following information: Your son-- your son stated he knew from you that MAJID KHAN was al Qaida.

1. Did you ever tell your son that MAJID KHAN was al Qaida? If not, why would your son say this? A person was introduced to me in Karachi, Pakistan who used to live in Baltimore, Maryland area. AMMAR AL BALUCHI introduced him with a different name, which I don't remember. That person was identified by the interrogator as MAJID KHAN. I never knew MAJID KHAN was member of al Qaida.

2. Do you think he may have been coerced, tricked or deceived into saying this? I don't know.

How did you know MAJID KHAN was al Qaida? Already answered as stated above.

Describe any conversation between you, your son, and MAJID KHAN about any money being loaned to your business. I never had any conversations with MAJID KHAN regarding any financial matters whatsoever.

MAJID KHAN wanted to give your company between $180,000 and $200,000 USD as a loan. Where do you think MAJID KHAN was getting the money to loan you? As stated above, I never discussed any financial matters with MAJID KHAN.

Did MAJID KHAN ever give you that loan? No, as stated above.

What was discussed regarding this loan? I never discussed above any loan as stated above.

What was the purpose of this loan? I never discussed any loan as discussed above.

How were you going to pay back-- excuse me, how were you going to pay the loan back? As stated above, there was no loan transaction with MAJID KHAN.

Did you ever feel like you had to perform tasks for MAJID KHAN on

**UNCLASSIFIED**

behalf of al Qaida?  As stated above, there was no financial dealing with
MAJID KHAN, and I never knew his affiliation with al Qaida and I am not
aware of any tasks.  I was told he had an issue with U.S. Immigration and
wanted to keep his bank account in the USA active, which I asked my son to
assist him with as a fellow Pakistani.

Please describe your knowledge, if any, of MAJID KHAN's association
with Taliban, al Qaida, or associated forces that are engaged in hostilities
against the United States or its coalition partners.  I am a business man and I
have a large business setup in Karachi, Pakistan.  All of my business details
have already been provided.  I have no way of judging MAJID KHAN's
activities against the USA or it coalition partners at all.

Please describe your knowledge, if any, regarding MAJID KHAN's plans to
commit terrorist acts.  I have no knowledge about any error-- any terrorist
acts by MAJID KHAN, as also stated above.

Please provide any additional information that you think may be relevant to
the determination of MAJID KHAN's enemy combatant status.  I have no
knowledge about MAJID KHAN's enemy combatant status.

I have been provided the opportunity to make any changes or corrections
that I desire to make and have placed my initials over those changes and
corrections.  This statement was typed by the Personal Representative and
reviewed with me.  I affirm these are my words and the truth as I know it.
Signed and dated.

Before continuing on with, IYMAN FARIS's testimony, I'd like to point out
that the questions presented to IYMAN FARIS were not presented to the
Detainee prior to IYMAN FARIS's answers.  Exhibit D-i includes the
questions that the Detainee provided for his witnesses.

Exhibit D-f, from the Department of Defense Office for the Administrative
Review of the Detention of Enemy Combatants.

To IYMAN FARIS.  You are being requested as a witness by MAJID
KHAN as part of his presentation to a Combatant Status Review Tribunal
(CSRT) being conducted at U.S. Naval Base, Guantanamo Bay, Cuba.

The CSRT will be evaluating whether MAJID KHAN is an Enemy
Combatant.  That term is defined as "an individual who was part of or
supporting the Taliban or al Qaida forces, or associated forces that are
engaged in hostilities against the United States or its coalition partners.  This
includes any person who committed a belligerent act or has directly
supported hostilities in aid of enemy armed forces."

**UNCLASSIFIED**

MAJID KHAN has asked you to provide answers to the following questions. If you decide to answer the questions, your answers will be considered by the CSRT members as they evaluate whether or not MAJID KHAN is an enemy combatant.

Your participation in this process is entirely voluntary. Your decision to participate or not participate in this process has absolutely no effect on your pending criminal case in federal court or the appeal of your conviction. The government is not asking you to provide this information. It is MAJID KHAN who has asked you to answer these questions.

If you want to participate in this process, please write your answers in the foll-- excuse me, please write your answers to the following questions in the space provided below.

Questions:
1. In mid-2001 you had dinner and spent the night at MAJID KHAN's family residence in Baltimore, Maryland. You have stated that MAJID KHAN spoke to you during this visit about the fighting and struggle in Afghanistan.

Were you coerced, tricked, or deceived into making this statement? If so, please explain.

There was no discussion other than religious duty and what he like to do in life, like work in construction and not in his father's business because his father was involved in invest dealing.

b. Please describe the discussions you had regarding the fighting and struggle in Afghanistan. There were never any discussion regarding the fight in Afghanistan--ever.

What was the purpose of this visit to the KHAN residence?

To invest in the family business of gas station.

2. You have said that during a later visit with MAJID KHAN, MAJID KHAN said he had met KHALID SHAYKH MOHAMMAD in Pakistan and MAJID KHAN called him his uncle. You have also said that MAJID KHAN spoke during this visit of his desire to martyr himself against Pakis-- President MUSHARRAF of Pakistan by detonating a vest of explosives inside a building.

That is an absolute lie.

a. Were you coerced, tricked or deceived into making this statement?

**UNCLASSIFIED**

**UNCLASSIFIED**

All of the above.

He called uncle to my friend MAQSOOD, I did.

b. What was the purpose of this visit to the KHAN residence? Were you there to see MAJID KHAN?

I was there to see his father which I had a business dealing.

3. Were you coerced, tricked or deceived into making any statements about MAJID KHAN? If so, please explain.

Yes, by FBI. If I don't tell them what they wanted to hear, they were going to take me to GITMO.

4. Please provide any other information regarding MAJID KHAN's knowledge of, planning of, or participation in activities of al Qaida, the Taliban, or associated forces that may be relevant in determining his enemy combatant status.

I do not know of anything as plan that he was involved, none what-so-ever nor he ever discussed the --and then there's an illegible word--fighting or anything relating to Afghanistan or al Qaida I have no idea of his affiliation.

I, IYMAN FARIS, state that the above answers are my words and the truth as I know it. I was coerced, excuse me, I was not coerced, tricked or deceived into providing these answers. I answered voluntarily and of my own free will without any promises being made. Signed and dated.

There's an additional note that reads: He, MAJID KHAN, numerous times told me he love USA and can't wait to get the U.S. citizenship. I would also like to point out that an Interpreter, Linguist, or Translator was not made available to IYMAN FARIS when ah, when OARDEC Forward asked, excuse me, when OARDEC was questioned about IYMAN FARIS understanding. The reply was, "He spoke perfect English."

DETAINEE:          You said invest dealing; I thought it was interest dealing. [Speaking to Personal Representative.]

PERSONAL REP:   For the Board, question 1a; MAJID KHAN has stated that he believes it's interest dealing and not invest dealing. You'll see from the exhibit that it's hard to read.

PRESIDENT:        We appreciate that. Thank you.

**UNCLASSIFIED**

PERSONAL REP:   The final witness statement is from ALI KHAN.  Similar to IYMAN
FARIS, the Detainee was not presented the questions prior to the witness
answering.  Statement of ALI KHAN:

To the Tribunal.  My name is ALI KHAN and I am MAJID's father.  I am
writing this statement on behalf of my family because the military will not
let us travel to Guantanamo and participate in MAJID's hearing.  I ask the
Tribunal to consider my statement, which has been prepared with help from
my children and from our lawyers at the Center for Constitutional Rights
because I have difficulty with English.

I have not seen my son in more than four years since before he was
kidnapped from his brother's home in Karachi on March 5, 2003.  Now I am
told by the military that my son wants to know whether I said in March
2003 that he became very religious and developed anti-American feelings
and whether one of my other sons said that MAJID might be involved with
al Qaida.  Where and when did we make these statements that you claim we
made?  Who did we make these statements to, exactly?  The government has
refused to give us this information.  Anything we may have said about
MAJID KHAN was simply out of shock because we only knew that MAJID
had disappeared and was pure speculation based on what FBI agents in the
United States told us and pressured us to say.

You want to know whether my son is a terrorist.  The answer is no.  As of
I--as I have said before publicly, I cannot accept these allegations against
him.  If you think that he did something wrong, show me the evidence.
Charge him with a crime and give him a fair trial in a real court.  This
Tribunal is not a real court.  It is not a legitimate proceeding.  It is only for
show and the outcome has probably already been decided.  After several
years of detention, there are still no charges against MAJID.  He cannot see
any evidence or question any witnesses against him.  And he cannot have
access to his lawyers at the Center for Constitutional Rights, which he has
asked for in letters sent through the Red Cross.  Anything that may a-- he
may have confessed to, or that other prisoners may have said about him,
should also be considered with suspicion because these statements were
probably tortured or coerced out of them.  Under theses circumstances, how
could anyone believe what the government says about my son?

What I can tell you is that MAJID was kidnapped from my son
MOHAMMED's house in Karachi, along with MOHAMMED, his wife, and
my infant granddaughter.  They were captured by Pakistani police and
soldiers and taken to a detention center fifteen minutes from
MOHAMMED's house.  The center had walls that seemed to be eighty feet
high.  My sons were hooded, handcuffed, and interrogated.  After eight days
of interrogation by U.S. and Pakistani agents, including FBI agents,
MOHAMMED was allowed to see MAJID.  MAJID looked terrible and

ISN # 10020
Enclosure (3)
Page 12 of 39

**UNCLASSIFIED**

very, very tired. According to MOHAMMED, MAJID said that the Americans tortured him for eight hours at a time, tying him tightly in stressful positions in a small chair until his hands, feet, and mind went numb. They re-tied him in the chair every hour, tightening the bonds on his hands and feet each time so that it was more painful. He was often hooded and had difficulty breathing. They also beat him repeatedly, slapping him in the face, and deprived him of sleep. When he was not being interrogated, the Americans put MAJID in a small cell that was totally dark and too small for him to lie down in or sit in with his legs stretched out. He had to crouch. The room was also infested with mosquitoes. This torture only stopped when MAJID agreed to sign a statement that he was not even allowed to read. But then it continued again when MAJID was unable to identify certain streets and neighborhoods in Karachi that he did not know. MAJID almost cried when he told MOHAMMED how he was accused of lie--lying even when he was telling the truth.

According to MOHAMMED, MAJID was interrogated and abused at a separate detention center in a different neighborhood. He was taken there in the morning and brought back at night. Other unknown prisoners were transferred to and from there as well. The Pakistani guards were upset by this treatment and often let MAJID speak with MOHAMMED when he got back late at night. After about twenty days of these interrogations, MAJID told MOHAMMED that the Americans had threatened to send him to Guantanamo. He was exhausted from lack of sleep. A day or two later, MAJID was again allowed to see MOHAMMED and told him that he was being sent to Islamabad. MAJID said he was not sure he would ever see his brother again and asked him to pray for him.

After that, MAJID disappeared and my family had no idea whether he was alive or dead until President Bush announced on September 6, 2006, that he had been moved from a secret CIA prison to Guan--Guantanamo. According to MOHAMMED, the Pakistani guards promised that MAJID would never be turned over to the Americans and sent to Guantanamo because President MUSHARRAF had a special deal with the Americans to prevent this. But this was obviously not true.

Also accord--according to MOHAMMED, he and MAJID were denied in the same place--excuse me, he and MAJID were detained in the same place where two of KHALID SHEIK MOHAMMED's young children, ages about six and eight, were held. The Pakistani guards told my son that the boys were kept in a separate area upstairs and were denied food and water by other guards. They were also mentally tortured by having ants or other creatures put on their legs to scare them and get them to say where their father was hiding. The Americans also once stripped and beat two Arab boys, ages fourteen and sixteen, who were turned over by the Pakistani guards at the detention center. These guards told my son MOHAMMED

**UNCLASSIFIED**

that they were very upset at this and said the boys were thrown like garbage onto a plane to Guantanamo. Women prisoners were also held there, apart from their husbands, and some were pregnant and forced to give birth in their cells. According to MOHAMMED, one woman almost died in her cell because the guards could not get her to a hospital quickly enough. This was most upsetting to the Pakistani guards.

At the time MAJID was kidnapped and these events were happening in Pakistan, our family's home in Maryland was also raided by government agents. Our whole house was searched from top to bottom and our whole life was so disrupted that we eventually had to move out of our neighborhood. I was also interrogated by the FBI agents for several days, as was each of my sons and daughters. We were threatened and when we asked about lawyers, we were told they could not help us. The FBI pressured us to talk and to speculate about MAJID. They followed us everywhere we went for a long time, requiring us to tell them in advance where we were going and what we were going to do there. They followed us so closely that we even asked them for directions sometimes when we got lost driving.

Despite all that we have endured, we have always cooperated and continue to cooperate with the government. At this point, the FBI has probably questioned us for hundreds of hours. I think they have opened our mail and they seem to have placed listening devices in our house, our phones, and probably our computers. They have also tried to recruit my sons to spy on other Muslims by bribing them with money. I am also not allowed to leave the country. But the government still refuses to show us any evidence against MAJID. This is not right. We expect much more in America. Particularly because MAJID has political asylum here and grew up and went to high school here in Maryland. He has legal status in the United States.

We are also deeply saddened that President MUSHARRAF and the government of Pakistan would allow this to happen to MAJID. We cannot understand why they participated in his abduction and rendition from Pakistani soil, or why they do not call for MAJID's release and return to Pakistan now. We can only assume that they do whatever the United States tells them to do; this is not right. It is not Islamic.

We love MAJID very much and we support him. Again, if he has done something wrong, he should be charged with a crime and given a fair trial. But this Tribunal provides no justice. It is also cruel that the military refuses to allow MAJID to see his family after several years of imprisonment. We would be allowed to visit him in jail in Pakistan. Why does the United States, which is supposed to respect the law and stand up for human rights, deny us this simple request? Is the United States afraid of what MAJID would say? Someday we'll-- we will learn the truth about

**UNCLASSIFIED**

**UNCLASSIFIED**

what has happened to my son. Thank you for considering my statement. [As read by the Personal Representative.]

PRESIDENT: Personal Representative, does that conclude the statements that-- to be read into the hearing?

PERSONAL REP: That concluded the witness statements, Sir.

PRESIDENT: The witness statements. Very well. Mister MAJID KHAN, you may now make an oral statement to the Tribunal, and you have the assistance of your Personal Representative in doing so. I understand that you do have an oral statement that you wish the Personal Representative to read in. Is that correct?

DETAINEE: Yes, Sir.

PRESIDENT: Mister KHAN, if you make other statements today, would you like to make those statements under oath? We do not require an oath, but I do--would like-- I would like to offer that opportunity for you.

DETAINEE: I am not in position to take an oath.

PRESIDENT: Very well then. Personal Representative, when you are ready, you may proceed with the Detainee's statements to be read in.

## BEGIN DETAINEE ORAL STATEMENT

PERSONAL REP:    Exhibit D-d. MAJID KHAN's rebuttal statement for Combatant Status Review Tribunal taken March and April 2007 by PR3. Mister President and Members of the Combatant Status Review Tribunal, thank you for letting me make a rebuttal statement regarding the Summary of Evidence for Combatant Status Review Tribunal. KHAN, MAJID dated 8 February 2007.

During this entire statement, I am bringing up other points of view regarding the evidence. I am challenging and refuting the authen-- authenticity and reliability of the evidence presented to me and whether it even applies to the definition of Enemy Combatant supplied to me in both the Combatant Status Review Tribunal Notice to Detai-- to Detainees and the Summary of Evidence.

Mr. President, I am going to need to ask you to double check the sources for the information presented against me. I guarantee you will find flaws in this evidence.

I am not an Enemy Combatant. I am not an extremist.

**UNCLASSIFIED**

Paragraph A:
Paragraph A discusses statements made by my brother concerning my associant-- association with al Qaida and transporting people. First of all, the paragraph states that his beliefs, excuse me, that he believes certain things, but does not provide an explanation for this belief. Additionally, Exhibit D-j clearly states that my brothers were extensively interrogated and pressured into making statements about me. In Pakistani culture, the father is the head of the household and speaks for the entire family. He states that I am not a terrorist.

[REDACTED]

Paragraph B:
Paragraph B has nothing to do with me. I have met IYMAN FARIS, but I don't have any knowledge of his business dealings. Paragraph B has nothing to do with the definition of Enemy Combatant.

Paragraph C:
First, I would like to point out that to me, it doesn't appear that there was a translator made available to IYMAN FARIS when preparing his answers to the questions that I supplied.

It is true that IYMAN FARIS had dinner at my father's house. According to IYMAN FARIS' testimony, there was "never any discussion regarding fight in Afghanistan, ever." I have never been to Afghanistan. How would I be able to talk "about the fighting and struggle in Afghanistan?"

As you can see from the testimony, I have never called KSM my uncle. KSM is not my uncle. There was never any conversation between myself and IYMAN FARIS about meeting KSM.

When IYMAN FARIS was asked to provide any information regarding "knowledge of, planning of, or participation in activities of al Qaida, the Taliban or assodi-- associated forces that may be relevant in determining his enemy combatant status" he replied, " I do not know of anything as plan."

My PR said this statement should be enough to cover the question about my desire to commit suicide bombing since the government never asked IYMAN FARIS about it. I wanted IYMAN FARIS to deny his statements about the plan without feeding him the answers.

The following is pertaining to the evidence that I told FARIS of my desire to martyr myself against President MUSHARRAF of Pakistan by detonating a vest of explosives inside a building.

**UNCLASSIFIED**

Why would I leave my newlywed wife who was two months pregnant behind and become a martyr? In my Pakistani culture, if a woman becomes a widow, chances are she won't ever find another husband. Why would I want to destroy my 18-year-old wife's life by widowing her and letting her raise my daughter without a father?

IYMAN FARIS' testimony also states that he was coerced, tricked, and deceived by the FBI into making statements regarding me. He said he was told "by FBI, if I don't tell them what they wanted then they were going to take me to GITMO."

Paragraph C does not contain information related to being an Enemy Combatant.

Paragraph D:
Paragraph D is not relevant and does not fit the definition of Enemy Combatant. I never owned a computer or hard drive while living in Pakistan or the United States. In Pakistani culture, many things are shared more freely than in the United States. Computers are household computers. Everyone in my family used the computer for office work, entertainment, and internet surfing. My cousins and everyone who came to visit us used the computer.

[REDACTED]

A computer hard drive seized from a residence where munitions were discovered does not fit the definition of Enemy Combatant nor does that mean that munitions were al Qaida or Taliban related. It is possible that agencies intentionally put some linkages on that drive to link it with the family's computer hard drive.

Do you have any proof that the media belonged to me at time of my arrest?

Do you have any proof that intelligence people didn't alter the family computer's hard drive after my arrest to link me with some suspicious things?

Just because media was seized when I was captured does not mean that media belongs to me. You have to give me benefit of doubt, please.

Paragraph E
Paragraph E does not fit in the definition of Enemy Combatant. Paragraph E discusses alleged statements made by my father. It is unclear from exhibit D-j, my father's testimony, that he actually said the things in paragraph E. My father said any statements provide by him were provided under the

**UNCLASSIFIED**

**UNCLASSIFIED**

pressure of interrogation from the FBI. My father goes on to say that I am not a terrorist.

If my ma-- if my father said that I've become extremely religious and influenced by my relatives, who have anti-American thoughts, it is just his only opinion because it depends on how extremist or moderate or liberal he is himself. He thinks I am a ex-- an extremist and I have anti-American thoughts. I know some people who, in my opinion, are extremists, and they told me that I have pro-American thoughts.

I have a religious extremist family member in Karachi, Pakistan. Excuse me, retract that. Having a religious extremist family member in Karachi, Pakistan, does not put me in same category. If this was the case, then I think my whole family should be in Guantanamo Bay prison because they are also related to them.

If I was so anti-American, why would I help the FBI catch an illegal Pakistani immigrant named "SHAFEEQ" in mid of 2002. Certainly al Qaida lovers would rather die than do what I did.

After catching SHAFEEQ, the FBI called me to thank, to say thank you for your assistance.

If I was an extremist Muslim, why would I teach computers to Muslim and non-Muslim for free in Baltimore mosque ISB in 2001?

Paragraph F:
The United States District Court of New York has made me al Qaida. I am not al Qaida. To be al Qaida, a person needs to be trained in Afghanistan and needs to take an oath in front of USAMA BIN LADEN. I have never been to Afghanistan and I have never met UBL. I cannot possibly be a member of al Qaida. I admit I can't prove that I am not al Qaida. It is very difficult to prove that someone is not al Qaida.

The paragraph states that I was re-entering the states to commit a terrorist act. The only reason they assumed I was going to commit a terrorist act is because they made me al Qaida in the first place. Their logic says I must be coming to commit a terrorist act. I am not al Qaida. I am not an Enemy Combatant, and there were not any terrorist acts.

Paragraph G and H:
While visiting my new wife and family in Pakistan, my travel documents for return to the United States expired. As a fellow Pakistani, the PARACHAs agreed to help. UZAIR PARACHA is innocent; he is not a criminal. One ordinary citizen helping another ordinary citizen does not make them terrorists. Getting help from a criminal does not make me a criminal or,

**UNCLASSIFIED**

more importantly, an Enemy Combatant.

Just because I wanted my travel document back, that doesn't mean I was going to travel back to the states. Could it be that I was going to get this travel document, not for me, but to help other refugees to travel on this document after manipulating a bit? This makes me a fraud, certainly not a terror-- terrorist or an Enemy Combatant. You have to give me the benefit of the doubt because usually things aren't what they same-- seem.

Paragraph 1:
UZAIR PARACHA stated "he knew from his father" the Detainee was al Qaida. In this statement, UZAIR admits that I never told him that I was al Qaida.

SAIFULLAH PARACHA, UZAIR's father, admitted in his testimony he never said such things. He also said that there was never a conversation being myself-- between myself, UZAIR, and his father about any money being loaned to their business. UZAIR also states in his court case that his father never told him that I am al Qaida.

Nothing in this paragraph or in this whole evidence summary, never once did his father say himself that I am al Qaida. What was his source to know that I was al Qaida?

After watching too much FOX news, I learned that to become al Qaida, a person needs to go to Afghanistan for training, and take a oath front of USAMA BIN LADEN for their cause. I've never been to Afghanistan or met UBL; to prove it, I can take a lie detector test.

UZAIR himself admitted that I "wanted" to loan 200,000 dollars to their business and to have the money liquid for short notices. Please pay attention to word "wanted." I never loaned any money, meaning no harm done. It is clear from SAIFULLAH PARACHA's testimony and UZAIR PARACHA's court case, there was never any conversations about money being loaned and no money was loaned.

The Enemy Combatant definition clearly says "who committed a belligerent act or has directly supported hostilities in aid of enemy armed forces." Meaning everything is in past tense.

UZAIR also claims the only reason I wanted to give him money was to keep the money liquid so I could have it back at a moment's notice. If I really wanted to give him money for that particular reason, I could have sent myself money through Hawala dealers, without even trace of it. Or at least that's what I learned from FOX NEWS that you could do. If I really wanted to loan him money, I would have sent it in my family business so it would

**UNCLASSIFIED**

have at least benefited them, for at least some time.

UZAIR also said he "felt" it was implied that he had to perform tasks for me. Please pay attention on word "felt." It clearly shows that I never said anything to him about doing any task for me in the future regarding money. This is just his feelings. The Enemy Combatant definition does not say anything about feelings. The PARACHAs have made it clear that there were no future tasks.

I had asked for UZAIR PARACHA to be a witness for me. He has denied answering my questions. Instead of using this against me, it should go in my favor. If he was telling the truth, it would not have hurt him to confirm all of his accusations. This should tell you that there is something fishy going on.

The transcripts from UZAIR PARACHA's court case clearly states he was lying about me to the FBI. I still don't agree with everything UZAIR said about me after a quick review of the testimony he supplied at his trial. Everything is very contradicting in the transcript.

To summarize:
If you read the questions to my witnesses, they are probably the same things you want to know about me. I am also anxious to know. How can they accuse me of such things? I myself has asked, have asked them for the truth. I asked them to describe how they knew certain things. I asked them to add anything that the United States government should know about me without me feeding them any answers.

About ten white lies have been proved wrong by witnesses. These facts were against me, but now you know the truth. How the DoD lied and manipulated some evidence and witnesses and present these facts, excuse me, and present these to you as facts in the Summary of Evidence.

There is clearly something wrong with the evidence. The U.S. District Court of New York has made me al Qaida. The FBI told me here in February 2007 that the United States government hasn't charged me yet. It has been four years. Can the United States government call me a terrorist and not yet, and yet not charge me? What is stopping them?

How can a home owner in Baltimore, Maryland be an Enemy Combatant? How can a pa-- person who has passed a security clearance and worked for President Roosevelt's Company, EDS, until 2002 be an Enemy Combatant? How can a person that paid $2,400 United States dollars in tax every month to the United States be an Enemy Combatant?

Mister President and Members of the board, I am not an Enemy Combatant.

ISN # 10020
Enclosure (3)
Page 20 of 39

**UNCLASSIFIED**

I would like to make a few quick comments regarding the questioning of my witnesses. The CSRT refused to show me exactly what type of questions they were going to ask my witnesses until they were answered by my witnesses. But overall, we talked in general about what kind of questions were going to be asked. I did see the exact questions that were presented to SAIFULLAH PARACHA prior to him seeing them.

I am not fully satisfied with this whole tribunal process, but my Personal Representative has done a fine job guiding me through the whole process. Special thanks to my Personal Representative.

Before the end of these proceedings, I would like to present to you "my after arrest report" and I even call it "torture report." It has some facts about how the CIA, [REDACTED], and DoD abused me.

If you don't want to hear the entire report, then at least allow me to present you the summary of this report which is very short and to the point. This report is directly related to the Summary of Evidence due to the Summary of Evidence coming from a combination of both classified and unclassified sources. [REDACTED]. These are the same people who tortured me. Please read it before believing the government sources. These are my words and truth as I know it.

PRESIDENT:       Thank you. There are a few more statements that I believe Mister McK-- Mister KHAN would like to be read in. Is that correct?

PERSONAL REP:    Yes, Sir. I just want to confer with the Detainee regarding this statement.

PRESIDENT:       Please.

PERSONAL REP:    MAJID, do you want the entire statement read or the summary statement?

DETAINEE:        Two things I ask you. The, if the President allows, the entire statement is about twelve pages and the summary is to the point. But the summary doesn't really explain what really happened. I would prefer, if you can allow it, to read the whole report. It is more Intel but it's not to the point, but I think it have to do with ah--it have to do the whole thing because it has to do with the CIA and FBI and everything. So, I would prefer the whole report. And it's up to the President if he allows it or not.

PRESIDENT:       We are certainly going to read everything that's provided to us and I will allow to have the whole thing read in. It would save us a little time as far as all three of us hearing it at one time. And again, we will also read all this material that is provided to us carefully and consider the matters regarding your determination as an enemy combatant status. So at this point, Personal

UNCLASSIFIED

Representative, when you are ready, you may proceed with the ah--I believe the written statement regarding his treatment.

PERSONAL REP: Exhibit D-b. MAJID KHAN written Statement of Torture for Combatant Status Review Tribunal taken March 2007 by PR3. [REDACTED].

For me, things got better [REDACTED], and [REDACTED] I am brought to Guantanamo Bay, Cuba. I swear to God this place in some sense worst than CIA jails. I am being mentally torture here, [REDACTED].

[REDACTED].

Since I got here, I have tried to cut my artery which goes through my elbow, on January 12th, 07, and again on February 22nd, 07. I went on hunger strike for four weeks on January 2nd, 07, and lost almost thirty pounds. And I have already spent two and half month in disciplinary status without comfort, incentive items, and sometimes even without basic items. On 28 November 2006, I wrote on my walls, "Stop torturing to me-- stop torturing me; I need newspaper, my lawyer and my mail, etc." I don't cooperate with them until they would treat me as human and until they would stop mentally torturing me.

[REDACTED]

My real problem with this administration where I am staying right now, that they are corrupt and some of guards, supervisors, and manager who may be DoD contractor today, [REDACTED].

Since these guards managers hate me [REDACTED], that what caused me to do or they call it act out. They are getten-- getting even with me here under DoD, and making me suffer by mentally torturing me. They know my weaknesses--what drive me crazy and what doesn't. [REDACTED]. In following paragraph, I am writing some facts about DoD and how they are abusing their powers, and there is no check and balance system. Even the doctor, medic, and Naval people are in this together, meaning that they are manipulators and corrupt. There is extensive torture even for the smallest of infractions.

[REDACTED].

On October 6th, 06, ICRC gave me my only daughter pictures which was born after my abduction. I left my wife pregnant but didn't know the sex of the baby until ICRC told me about her. So anyway, when I took this picture and came back to my camp building, the guard forcibly took it from me. Then I went crazy and yelled for one hour and they ignored me as if they

**UNCLASSIFIED**

didn't know I was yelling and waited until they can send their reports; until next day, 1:00 PM they took all my incentive items comfort items, until October 16th, 06. Again, they can't do this. They should have put--they should have put me disciplinary status since each time they put me disciplinary status they have to report to camp leadership, and they didn't wanted to do that because then they had to explain why they took my baby pictures, etc.

On October 23rd, 2006, I went on thirst strike. Each time I refused to eat, they slowly took my incentive and comfort item one by one. Until I broke my strike and the same night I got my stuff back, meaning on 25-- on October 25th, 06.

On November 2nd, 06, they gave me new wrong prescription eyeglasses to wear. Also wrong frame which don't fit my nose. I took it and when I try to wear it, they made my eyes hurt and head spin. The prescription was way off. They knew I am practically blind without my glasses and knew exactly how to hurt me. Anyway, so I didn't wear it. I kept-- I kept wearing old one, the one I am wearing right now. After four days, they forcibly took my old glasses and made me wear new one, but I protested and then I got it back next day.

On November 13th, 06, I tore a disposable cup and playing card cover to throw them away as a trash, but guards again took my incentive and comfort item without explanation. Then I decided to protest on November 15th, 06. I refused to return breakfast tray and they ignored me until 1:00 PM and they didn't even give me my lunch that day. After 1:00 PM, the guard came forcibly inside my cell, never gave me a chance to be shackled down on my own. I never refused to be shackled; they just came in with eight guards and took me to main rec and forcibly shaved my beard to humiliate me and offend my religion. While they were shaving my beard, the female Navy head of Psychiatrist was watching the whole thing.

Then they put me for first time in orange clothes and three days of disciplinary two and another three days for disciplinary status one. Next day early in the morning, they moved me from cell B13 to cell A16. This cell is attach to main rec door's wall. Somehow it is easy to do cover-up on A16 because if I do anything unusual they make main rec occupied as if A16 is occupied. Since A16 and main rec both linked to same wall, it is somehow easy from them to manipulate A16 to main rec activities. The second reason they moved me to A16 is because to drive me crazy. Whenever they close main rec door or whenever they play games with main rec door, it just make big out loud noise in my cell. They have since moved me to A14 on 6 April 2007.

On November 28th, 06, I wrote on my walls stop, "torturing me, I need my

**UNCLASSIFIED**

UNCLASSIFIED

mails, newspaper and my lawyer." Then they put me on D1 status for only two days, but took my writing pen for two weeks. They cleaned my walls the same day, but some marks are still there. This happened in cell A16.

On January 2nd, 07, I was on hunger strike way before than this date, but they officially put me on strike on January 2nd. But next day, to make me eat my own, they left me with only basic item and no sunlight and fresh air until I break my strike. I didn't break any rule; I was just simply practicing my rights by going on hunger strike. Anyway, days passed like this, but eventually I got frustrated and chewed my artery which goes through my elbow on January 11th, 07. But I never broke my hunger strike until January 29th, 07, after they tricked me or lied to me. On January 11th, 07, I also refused to get medical assistance, by giving them vital signs, because I was told by doctor that I had right to refuse to get medical assistance. But they never told me I have no right of refuse when I am on hunger strike, but by then it was too late. But anyhow, I wanted to be disciplinary status cause I had a feeling that this administration is doing cover-up on my strike. I was hoping when camp leadership steps in, they will know that I am on hunger strike and maybe they will come to talk to me what my problems were and why I was on hunger strike. The reasons I was on hunger strike is that I wanted to go back to Pakistan or charged. Until then, treat me with respect like CIA did in last ten months before my arrival. Later I found out it was camp leadership doing the cover-up. I was told by the head psychiatrist that the maximum a person can get in D status was six days. So knowing all the consequences, I decided to refuse to be shackled and refused to give my vital signs the next day. But in return, they put one IV in me and forcibly shaved my beard again, but again they still didn't put me in D status. Then again, next day, I refused to be shackled and refused to give my vital signs. But this time I finally got in D status, but three weeks in D2 status and another three weeks in D1 status. Instead of six days, I got six weeks in D status. If I had known that, if they didn't lied to me, I would not have refused to be shackled.

Note: They clearly lied to me. They could have always taken me vital signs from door's window without coming in my cell. But they wanted to make this disciplinary issue so they can put me in D2 status. Meaning I was on disciplinary status not because I refused to get medical assistance but because I refused to be shackled in my cell and the only reason I refused to be shackled in my cell because I wasn't cooperating with medic because I was on hunger strike.

Now if you check the database and the last report of disciplinary status, it doesn't say anything about me refusing medic because if it did then they had to explain why and everything about my strike. All I am saying is that they did the cover-up on my strike by making it as if I was only dieting or since they tricked me to go to D2 status for long time because they were suppose

UNCLASSIFIED

**UNCLASSIFIED**

to give us finger food which is very low in calories and carbohydrates, etc. And because of finger food I lost more than twenty-five pounds. But in reality I was on hunger strike. When I was on hunger strike, they forcibly put IVs with potassium, glucose, sodium, etc. This left three big bruises for about two weeks.

On January 29th, 07, I broke my strike because they tricked me by saying that a team from Washington is coming to meet you specially and gave me an impression as if they are coming to talk to me about my issues and strike or even my lawyers, but actually they were FBI to whom I refuse to talk to very next day.

Before I write farther, let me tell you why they do these things to me. It's not entirely their fault; it just that I don't cooperate, volunteer, ask for things nor give my things my own.

Since I don't do anything-- to repeat, [Personal Representative starts sentence over.] since I don't do any above things I just mentioned, they have to do cover-up or make it as if I'm cooperating. Now if I am not cooperating, they got to at least make sure I don't act out or I don't do some unpleasant or unusual things. If, for example, I do unusual act, then they need to see me cooperating with medic, voluntarily giving or taking things my own. If that doesn't work, then they take my amenities, one way or other, to do cover-up on that unusual act. If that doesn't work, they would put me in disciplinary status and take my personal belongings, shave beard or take my blood test or see me in pain or give things from inside my body, like body weight, etc. Another option is to make that unusual act of mine, like yelling, not eating, my complaints, a normal act. To do that, they will make sure someone else will do the same act. For example, if I yell, they will make sure some other Detainee will also yell. The very last option they have is to take me out of the building for administrative purposes or for medical purpose, especially in reporting hours. Not only that, to make this act itself a normal act, they will take couple more Detainees with me to other building, as if it was a routine process, just like they did on January 2nd, February 14th, 07, etc.

They don't do this every day. They only do this on special reporting, hours, days, weeks, and even month. Anyway, they have a thousand ways to make sure as if Detainee is volunteering and everything is good to go up here.

February 1, 07, the dentist did some filling in my tooth, but she didn't do it right so I will be in pain and so I will get painkillers from medic. So it will seem like I am cooperating and working with medic. But when my pain got worst, instead asking for painkillers, I yelled and finally she did refilling on February 18th, 2007.

**UNCLASSIFIED**

February 22, 07, I chewed my artery again. Medic cleaned my wound.

February 2-- February 23rd, 2007, I got my stuff back after six weeks.

February 26th, 07, they took some of incentive and comfort items, telling me that they are afraid as if I am going to hurt myself and they returned them on March 3rd, 2007. But never put me in disciplinary status.

Some Facts How They Are Mentally Torturing Us:

They them self use the best kind of stuff but they give us cheap branded, unscented deodorant soap to wash ourselves with. Also, same goes for shampoo, toothpaste, and deodorant, etc.

This camp gives us only twelve to fourteen pages of newsletter only once week. Most of the stuff is crap; only few pages are worth of reading it.

In main rec no weight lifting machine, no toilet, no sink, no hoops, and even balls them self have little air in them; they hardly bounce.

In end of January 2007, they brought a big fan which makes noise, which makes more noise than produce air in main hall. It drives us crazy. They have since turned the fan off and I have been moved to A19 on 6 April 2007. The fan itself is still there.

They know how we feel about family members. They intentionally make our ICRC mails delay- very, very delay in so call censorship issues.

We only get one hour of communal rec and only one hour of main rec per day, 2 books per week, and that's it. No mind stimulations, no solitary games, no DVD players, no entertainment, and you know how small and cozy our cells are in size. It has been seven months like this, no improvement.

[REDACTED] So please, before making any decision on me, please read this report of torture and then think yourself if these people can go that far and how hard it is for them to make something up, [REDACTED] I affirm these are my words and the truth as I know it.

PRESIDENT:        Personal Representative, thank you.

PERSONAL REP:  There is one additional statement, Sir.

PRESIDENT:        Okay. Before we continue, I have a question. The title of this document says it was taken on March 2007. There's no specific date. And then at the end, it was certified as dated the 15th of April, which I would assume,

ISN # 10020
Enclosure (3)
Page 26 of 39

**UNCLASSIFIED**

|  |  |
|---|---|
|  | correct me if I am wrong, that's the date it was finally agreed by yourself, Mister KHAN, that this was accurately what you had evidently provided in written form some time in March. Is that correct? |
| DETAINEE: | Step by step. Eventually I added a lot of things. Mostly recently I add the last part, even the summaries itself, a few days ago. All together, yes. I just signed today. |
| PRESIDENT: | Understand. There are some references to specific days that you were making the statement and it was unclear to me what date that was in-March or-- or April, so, I understand now, thank you very much. Personal Representative, there's another document? |
| PERSONAL REP: | That is correct. Exhibit D-8, excuse me, Exhibit D-h, the photo of MAJID KHAN's daughter. The back of the photo reads, my daughter-- |
| PRESIDENT: | Excuse me just a moment. I have that in front of me now, thank you. |
| PERSONAL REP: | To repeat, the back of the photo reads, my daughter MANAAL, she is three years and three months old in this picture. She is my only daughter, but I never even talk to her. Your decision today may not only affect my life, but also others too. So please be careful. |
| PRESIDENT: | Is there anything else? |
| DETAINEE: | I would like to have that summary as well, to read it if possible. |
| PRESIDENT: | Does it contain the same information that was just provided? |
| DETAINEE: | I think there's something, just a few lines may not be. It's just a couple of pages. [Detainee is searching for document.] |
| PRESIDENT: | Is this a three-page document, Exhibit D-c? |
| DETAINEE: | Yes, Sir. D-c. It's really, it's-- it's ah-- it's right to the point and it actually, the whole report doesn't tell you for how long, for how long I was in that. I will certainly appreciate your allowance; it's only really short and it's only a couple of pages. If possible, if not-- |
| PRESIDENT: | I'm willing to hear it, but I'd like to ask the other Tribunal Members if they need a break at this time. |
| MEMBERS: | [Indicated no.] |
| PRESIDENT: | Okay. We'll take the time to have it read in, please. Personal Representative, if you will. |

**UNCLASSIFIED**

PERSONAL REP:  Just to reiterate, there are points in the oral summary that are not contained in the written summary. So the written report that was just read, there are additional points in the in the oral statement.  [SCI[1]].

PRESIDENT:  Yes.  I am looking forward to hearing those, yes.

PERSONAL REP:  Exhibit D-c. MAJID KHAN Oral Statement of Torture for Combatant Status Review Tribunal taken March/April 2007 by PR3. Mister President and Members of the Combatant Status Review Tribunal, thank you for letting me make a statement regarding the torture I received after my kidnapping [REDACTED].

[REDACTED]

After my arrest, Allah blessed me with only one beautiful daughter, but I have still been unable to talk to her.

Since my arrival at Guantanamo Bay I have been without communal recreation for eleven weeks all together.

I have had my beard forcibly shaven twice.

On two occasions I choed-- chewed my artery and three times they have made me wear the protective suicide prevention smock for days.

For three weeks, I was without basic, incentive, or comfort items.

For nine weeks, I was without incentive or comfort items.

Four weeks without sunlight and fresh air.

Four weeks straight I went on hunger strike and lost twenty-five pounds. They put nine bags of IVs of sodium, potassium, and glucose mix forcibly in my arm.  It left big bruises on my arms for weeks.  I was threatened by the medic with nose feeding where they would strap me in a special chair that allows nose-- no movement at all-- at all for more than ten straight hours each feeding.

There are many more abuses.  Please read tort-- the report of torture that my Personal Representative has provided to the Board.  My statements are 100% true.  I can take a lie detector test and I tried to prove in my reports from the fact that these statements are 100% true.  I affirm these are my words and the truth as I know it.

---

[1] Simultaneous Communication Interruption

**UNCLASSIFIED**

DETAINEE:   Mister President, the questions that I wrote to my witnesses, at some point if you allow that, I want that to be readed because these other questions are different from what you guys asked.

PRESIDENT:   In that case I will be reading them ah-- we will be reading them in written form. The matters regarding your witnesses have been previously addressed by myself. Making sure that they are contacted and known of your request, it's all been matters I have addressed previously. Certainly we'll consider those questions as well as the responses that we have received today. Anything else, Personal Representative?

PERSONAL REP:   No, Sir.

PRESIDENT:   Very well. At this point I would like to take a recess. We've been provided considerable amount of written material to review. We are going to be in this building for a little bit of time; I'm going to ask that the Detention Authorities give you a comfort break as well, Mister KHAN.

DETAINEE:   Okay. [Spoken in a very low voice.]

PRESIDENT:   We will reconvene after we've completed this and depending on other matters regarding lunch, we will let you know as soon as possible. I hope that we can reconvene shortly. Recorder, please note the date and time of when we will go into recess.

RECORDER:   The time is 10:49. The date is 15 April 2007. This Tribunal is now in recess. [All personnel depart the room.]

RECORDER:   All rise. [All personnel return into the room at 13:38.]

PRESIDENT:   This hearing will come to order. Please be seated. Mister MAJID KHAN, good afternoon.

DETAINEE:   Good afternoon, Sir.

PRESIDENT:   Excuse me. [clears throat.] We recessed to review all, excuse me, to read all the unclassified documents and evidence that was provided to us earlier. Thank you for allowing us time to read that carefully. We now are going to resume our hearing process by addressing some questions and answers to you, and then we'll be able to complete this session. Okay, Personal Representative, do you have any questions for Mister KHAN?

PERSONAL REP:   No, Sir.

PRESIDENT:   Okay. Recorder, do you have any questions for the Detainee?

**UNCLASSIFIED**

**UNCLASSIFIED**

RECORDER: No, Sir. I have a comment from the earlier proceeding. Would you like me to make that now or save it?

PRESIDENT: It would be appropriate to make that-- address that issue right now.

RECORDER: Yes, Sir. I'd just like to note for the record that during the previous proceeding a note was made regarding the earlier, an earlier version of the Unclassified Summary; references was made to it. The current version is dated 28 March 2007. The difference in the two versions is simply a wording in the definition of enemy combatant. The earlier version says an individual who is part of or supporting the Taliban or al Qaida forces and the 28 March 2007, current version says that an individual who is part of or supporting Taliban or al Qaida forces. That's all, thank you.

PRESIDENT: There's a minor wording change, the change of just deleting the word "the" in front of Taliban. Thank you for that administrative comment. [Reffering to the Detainee.] I believe the Tribunal Members, with me, have questions for you.

MEMBER: Mister KHAN, I have one question. In Mister SAIFULLAH PARACHA's statement, he said that you were introduced to him by Mister AMMAR AL BALUCHI. What did you, what was your dealing with Mister BALUCHI?

DETAINEE: I am not at-- I can't answer that in this ah-- under the circumstances. I'm not in position to tell you exactly what my association with that guy. And did you say that he call me? What was the question again? I'm sorry.

MEMBER: Mister SAIFULLAH PARACHA has stated in his, in his witness statement or his--

DETAINEE: In his testimony [SCI]

MEMBER: -documentation that you were introduced to him by AMMAR AL BALUCHI.

DETAINEE: All I can tell you that the person, whoever it is, that, that I was introduced to him, in my opinion, that he is not al Qaida, he's not Taliban, or associate forces who may be a threat to United States. And that's all I have to say about this person. Other than, I can't comment, and how do I know this person.

MEMBER: Alright.

MEMBER: Mister KHAN, I have two questions. The first is to clarify something you said in your rebuttal concerning paragraph G and H, about visiting your new wife and family in Pakistan, and your travel documents for return to the

**UNCLASSIFIED**

**UNCLASSIFIED**

United States expired. Can you clarify the reason why you were trying to renew those documents?

DETAINEE:  Ah-- which [looking through papers.]  The point I was trying to make there is that, that's for sure that I was trying to get that ah-- ah--travel document back, but the point I was trying to make is ah-- the one thing is for sure, that I was not going to travel on that-- with that specific travel document. There could be other things, other options you could do, you could do with that travel document, that might be not legal or legal.  I'm not sure about that, but the point I was trying to make there is that, one thing I can promise you, that I was not going to travel, travel on that specific travel document. Ah-- since I let it, myself, expire in December 25th, I was in Pakistan and know it was going to expire and I had made my mind that ah, that I was not going to go back to States.  And at that, at some point in my time, some time in-- some time in-- ah--- [Detainee appears to be getting confused or experiencing anxiety.]

PRESIDENT:  Take your time.

DETAINEE:  Some time in life, I made a decision that, there were times that I wanted to be citizen of the United States and there was times that I thought that I was done with United States.  And I left it; I let it expire.  And then, as you said, in the bottom it says that I was there-- there couldn't be, let me think, I don't have the correct words 'cause I wrote it this morning.  Could it be that I was trying to get this document for refugee or stuff like that?  I think I made the statement, there are other things that you can do too, with that travel document other than just, just traveling back to United States.  So the point I was trying to make there is that, one thing is for sure, I was not going to travel with that specific travel document.  And I can't talk about in-depth that-- what was my other intention for that.  I think that not relevant to ah-- in my opinion, to enemy combatant definition, cause I had not intention to use it for Taliban, al Qaida, or associate forces to maybe engage against United States.  So I don't be able to answer that.  That's one of the reasons I can't talk in-depth about it.  I can prob-- all I am saying, the point that I was trying to make there is that I was not going to travel on that specific travel document.  That is for 100% sure.  Ah-- Yeh, that's all I have to say about it.

MEMBER:  So if I understand what you just said, you're clarifying that you wanted to renew the travel document, but you were not going to travel back using that documentation once it had been renewed.

DETAINEE:  Yes, Ma'am.  And then if it couldn't be-- I was trying to give you another option.  A person can use it for other reasons, maybe legal or illegal.  It has nothing to do with ah-- it could be a fraud or something like that.  But it has

**UNCLASSIFIED**

**UNCLASSIFIED**

nothing to do with enemy definition. Go ahead. [Member waiting to speak.]

MEMBER:        But what your true intention was would be relevant because you're giving us a hypothetical, and I was wondering what the real intent was. So if you were not going to travel back with that documentation, can you tell us the specific purpose you intended to use it for?

DETAINEE:      The specific purpose was that, as I said there, there are a lot of refugees out there, in Pakistan who are desperate, who need help. And I could use that-- I just don't want to talk a-- I can't, I can't give you specific person for some reasons. It could be, I don't want to endanger his life or it could be either a person or individual group, that I could give it to the refugees. And I was hoping they could manipulate this document and they can travel back to States and then they could apply for asylum there. Just like, like I used, my whole family used this kind of passport or travel document to go back to State first and once we in State, we can apply for asylum and for refugee status. So, since I made up my mind that I'm not going back to, I'm not going back, I'm not gonna go back to States, then I thought I might as well use this to help some desperate people who I believed, in my opinion, were refugees like my mother and so forth. And, but I can't really talk about specific names that I was going to give out to 'cause it may endanger their life.

MEMBER:        Okay, thank you. Mister KHAN, I have one other question to clarify something you stated in this case, concerning paragraph 3-i which starts on page four of your rebuttal.

DETAINEE:      Page four, paragraph i?

MEMBER:        Yes, it starts on page four paragraph i, but if you look on page five in the section where you discuss to Mister UZAIR having admitted that you wanted to loan him money but you did not loan him money, so there was no harm. The question I wanted to ask you was to clarify whether you had wanted or intended to loan him money, but the loan did not [SCI, Detainee said something inaudible.] the transaction did not take place.

DETAINEE:      Actually ah-- when I say UZAIR himself admitted that, I wanted-- what actually I'm trying to-- maybe it's some bad English, I was trying-- I was-- I was trying to point out the actual word in that, in that paragraph. He said I want it, not that I said I want it. What I'm trying to prove it that the enemy combatant definition doesn't say anything about a person want to become Taliban or a person wanted to help. It just claims that a person was associated or something like that. And I'm trying to clarify that, that I had no intention whatsoever, 'cause it just that I come bringing that statement from paragraph and--and--and--and challenging that, that specific word,

**UNCLASSIFIED**

whether it fits the definition of enemy combatant. For myself, I never wanted to give any kind of money to UZAIR or any al Qaida organization or whatsoever. There's no, "I want it." [Quotes inserted due to emphasis on, I want it.] I just, I'm bringing his statements to make point.

MEMBER:       I think you've then clarified what I found a little confusing near the top of page five. You said you had never loaned any money, meaning there was no harm. And I wanted to clarify whether you had conversations to intend to loan the money or try to loan the money. It's just that the transaction did not take place.

DETAINEE:     Yes, I think, if you read UZAIR transcript, and I just myself was reading it, and he, himself said there was no, no conversation between me and him and his father about any money. And-

MEMBER:       I did read that and I wanted to clarify what your version of the facts were since this paragraph does not specify what you say about whether there were any conversations or intent to loan money. Your rebuttal merely says you did not loan the money. So I wanted to clarify-

DETAINEE:     whether there were intentions-

MEMBER:       -or conversations-- your statement about that versus Mister PARACHA's statement.

DETAINEE:     Let me-- I didn't make myself clear there that I want to make clear now. There were no intention or conversation at all, from my side as well.

MEMBER:       Thank you.

PRESIDENT:    First of all, I'd like to ask if the statements that you made to your PR during the course of preparing for this Tribunal, as well as the written documents that you have provided to us, were any of those, were all of those provided voluntarily by yourself? Were there any threats regarding submitting or not submitting something for consideration here today?

DETAINEE:     The only thing I say that for-- when my PR first arrived, I--I had decide not to attend the Tribunal at all. And month passed 'cause I thought that Tribunal itself is a game. I think that it was a setup 'cause the kind of questions I had, I thought it was a trap to make me say things. Even when I was going through this process, I was uncomfortable. I was like, this is just a game. But more I talk to my PR, I realize, maybe it is important in my life. Maybe it's very important. I didn't know that. The more I talk to my PR, then I realize, you know, it will affect a lot of people or myself. So then I start giving a lot things voluntarily and ah--but only thing, I as said it my statement that I wanted write in Urdu because I can express myself much better this way. Still, I know English as a second language, as you know,

**UNCLASSIFIED**

but my PR had me translate everything in English and had me write everything in English, so I just, I didn't feel very comfortable about it. And so, all I have to say that, when I was speaking-- actually I speak very finely, but when it comes to writing, it's pretty bad. You've probably seen it. So I wasn't very comfortable expressing things in writing. So that's-- yes, I pretty much volunteered everything I wrote. There was no threat, no coerce. There's only one thing that I have to say; it the travel document. In my opinion, I never ask for travel document. I never-- there had to be some kind of misunderstanding between me and him. And next day he came, we have asked for evidence in that travel document. And I don't say, I don't see any reason for travel document in this whole thing. So I refused it next day. And that's the only one thing I can think of that was not appropriate.

PRESIDENT:    Very well. I understand on that last point that no-- none of those travel documents were submitted by yourself and certainly I believe, as we know here today, the Recorder didn't submit any of those for our consideration. So those were provided as a request that I thought came from you, but at this point, we don't have those.

DETAINEE:    The only thing I was going to add, I don't want to give you the impression that I am hiding anything. 'Cause whatever we talked about, I, even good or bad, my PR used it. I just thought maybe you had a feeling that I had a travel document hiding or something hidden about it. There's nothing hidden, nothing to hide. So, [SCI] I just wanted to make that clear.

PRESIDENT:    I understand your point. And I do understand that English is your second language, and we have reviewed carefully everything you provided and I know you've had a discourse regarding every one of those documents with your Personal Representative. And we believe that they are very complete and where we do have questions, we have an opportunity get your input on that. So thank you very much. In your Exhibit D-b, regarding the treatments that you had while you were in custody, it was rather detailed and I understand that was probably difficult for you to present to us. But the question I have has to do with anything that you did say while, enduring those times, in specifically, I think, page seven, said that you didn't cooperate. In fact, I believe it said "since I was innocent and didn't know anything" you refused to look at pictures or cooperate. That's the only real reference I can find in that your document where you talked about things that you may have said during that period. What I would like to know is, were there any statements that you made during that whole period that what you said was incorrect or incomplete or not true? And you can relate any of those cases? It does appear that there is at least only one place where you said you didn't cooperate, which means you didn't provide any statements. But if you had provided statements, can you comment on the validity of the statements made during those conditions?

**UNCLASSIFIED**

**UNCLASSIFIED**

| | |
|---|---|
| DETAINEE: | There was always statement, [REDACTED]. |
| PRESIDENT: | Statements that you made. |
| DETAINEE: | Statement that I made, even written. |
| PRESIDENT: | Understood. |
| DETAINEE: | [REDACTED] |
| PRESIDENT: | Well I was just using the terminology that you had in your statement where you said you-- you [SCI] did not cooperate. |
| DETAINEE: | [REDACTED] |
| PRESIDENT: | Well, and I'd like to ask about those statements. Were those statements true or incorrect? |
| DETAINEE: | Definitely not true. |
| PRESIDENT: | That's all I am looking for and- [SCI] |
| DETAINEE: | Okay. [SCI] |
| PRESIDENT: | -first direct statement on that. |
| DETAINEE: | Definitely not true. Most of the stuff, yes. |
| PRESIDENT: | Very well. Okay, that completes the questions I had. I will make an-a statement here regarding what we've heard here today. Ah-What you have told us will be included in the record, obviously. We'll also be reported to appropriate authorities for any investigation that's necessary. As you know, we will carefully consider what you have said to us today, as we make our determination regarding your enemy combatant status. [We] consider this a very important matter. You've heard us take our oath and ah-- you know we won't ah-- consider these-- this evidence that you provided as well as we received, very carefully. [*Tribunal President's post-hearing note: The previous sentence is a direct transcript of my statement; however, it is incomplete and disjointed as I attempted to transition to receiving the Detainee's final statement. As directly stated previously, I intended to reiterate that the Tribunal would carefully consider the Detainee's statements.*] At this point in the hearing, we've received all the unclassified information [Detainee acknowledges with "ah ha."] and, ah, we're now about to complete this portion by providing you an opportunity to provide a final statement. Would you like to make a final statement at this time? |
| DETAINEE: | I have few questions of what we talked about today. |

**UNCLASSIFIED**

| | |
|---|---|
| PRESIDENT: | Okay. |
| DETAINEE: | Ah- |
| PRESIDENT: | Ask your questions. Are they-- go ahead, please. |
| DETAINEE: | Ah-- so you said there's one of my brother. I ask for MOHAM-, MAHMOOD, MOHAMMAD, AHMED KHAN, and ah you said that one of my brother wasn't able to make a statement. And were you talking about paragraph A or paragraph D in Summary of Evidence. |
| PRESIDENT: | Where are you at? [Referring to Summary of Evidence.] |
| DETAINEE: | Because we both, we don't know who made, what exactly- |
| PRESIDENT: | It is actually referring to paragraph A. |
| DETAINEE: | Okay. If you were referring to paragraph A, then ah-- I'd like to point that out that the question about one of my brother has ever made a statement about me being involved with al Qaida, I think my father in his statement, ALI KHAN, he made it clear that-- "because now I'm told by the military that my son wants to know whether I said in March 2003 that he became very religious and developed anti-American feelings. And whether one of my other son said MAJID might be involved with al Qaida." So basically he already answered the paragraph A in it. So even--even that brother didn't make it, and there's a statement attached to it, didn't make up here, so they should be-- I don't feel that we need his statement because my father took care of it. Another thing is D, ah-- I was wondering if-- if-- if you know that D is talking about, I think it doesn't fit the definition of enemy combatant itself because it's clear it doesn't fit the definition itself. But anyway, when it's talking about Detainee's residence, I mean my residence, now are they talking about Baltimore or-- or-- or-- or ah-- Pakistan, Karachi? 'Cause I lived in both place. |
| PRESIDENT: | As you can see, this is what we know; the same thing you know at this point. So, we will have to consider that question after we receive all of the information. Again, this is a unclassified Summary of Evidence and this is all we know about this at this point. |
| DETAINEE: | So, would it be appropriate statement to make that--that D itself, let's just say, ah I think I refuted pretty good with every single paragraph, all the witnesses. The D, I can't refute because I don't know. To me-- I just can't know. What you don't know, you can't refute. So, D itself can make me enemy combatant, if they're right; just only D itself. If I refute all successfully, let us say, and D I'm worried about because I don't know. And it's just--it's up to you. With D itself, will make me an enemy combatant? |

**UNCLASSIFIED**

**UNCLASSIFIED**

PRESIDENT:    I can't answer that at this point.

DETAINEE:    Okay. [SCI]

PRESIDENT:    We have not received all information; we have not gone into deliberation. We--I certainly understand your point very well that you provided in your written statement, your oral statement as well, regarding that matter. We will consider that as we look at that information in its content. Thank you.

DETAINEE:    Last--last question is ah-- actually there was--there was some comments made in that paragraph and me and PR talk about it and it was inappropriate--un-appropriate to bring it up. In paragraph F, Exhibit D-d, page number four-

PRESIDENT:    Oh, I need to look at that, excuse me just a moment. Okay, please continue.

DETAINEE:    And ah-- when I talk about I've never been to Afghanistan and I never met UBL. I cannot possibly be member of al Qaida. I admit I can't prove I am not al Qaida. It is very difficult to prove that someone is not al Qaida. Now there was few more sentence in which me and PR decided may not be very appropriate to ask, but this is a very important question I need to ask you. Let's just say someone claims that the Board Member are themselves al Qaida. And if you were--if you were in my shoes, I would like to know that how can you prove it, that you yourself are not al Qaida? And if you can't, then I can't either. And if you can, then please let me know 'cause I will follow the same process to prove that I am not al Qaida. That was my question.

PRESIDENT:    Sorry, I may have lost the question in there.

DETAINEE:    If someone believes that you're, the Board Member, of al Qaida and you are in my shoes and you ought to prove, let us say you say I can't prove it, then I can't either. And let's say that you can prove it. Then I would like to know how can you prove it to anyone, anyone in the world 'cause there's a Board Member of this CSRT are not al Qaida. So I can follow same process.

PRESIDENT:    Well, you are following that process. In a sense that evidence is being provided to these three Members, myself and the two Members next to me. And we will look at all of the evidence provided, including testimony and information you wish to provide and comment on. We recognize this may have been the first time that you've had an opportunity to comment on--on such matters. That is our job. We will determine that, based upon the evidence provided to us. Just what's provided to us here. There's probably a lot of other things out there regarding yourself as a detained person, but only certain things are provided to us. The things, as you read from the unclassified Summary of Evidence R-1, that the government believes makes

**UNCLASSIFIED**

**UNCLASSIFIED**

you fit the definition of an enemy combatant. So, if the reverse happened, a Board, an independent group of officers that have not been part of your detention or your interrogation are now have been charged to do our responsibility, our duty. We make the decision based upon the evidence provided to us, just the three officers here. The majority vote determines your enemy combatant status.

DETAINEE:        Okay. I don't have any comments to make. I said whatever I wanted to say. These are the questions and the answers.

PRESIDENT:       Very well. Thank you.

DETAINEE:        Thank you.

PRESIDENT:       So that concludes your, your final statement?

DETAINEE:        Yes, Sir.

PRESIDENT:       I have some additional information I'd like to share with you, to conclude this hearing.

## CLOSING UNCLASSIFIED SESSION

PRESIDENT:       All unclassified evidence having been provided to this Tribunal, this Tribunal has concluded its open session. Mister MAJID KHAN, you will be notified of the Tribunal decision upon completion of the review of these proceedings by the Combatant Status Review Tribunal convening authority in Washington, D.C. If the Tribunal determines that you should not be classified as a ene--as an enemy combatant, you will be released to your home country as soon as arrangements can be made. If the Tribunal determines that you are classified as an enemy combatant you may be eligible for an Administrative Review Board hearing at a future date. The Administrative Review Board will make an assessment of whether there are continued reasons to believe that you pose a threat to the United States or its coalition partners in the ongoing armed conflict against terrorist organizations such as al Qaida and its affiliates and supporters or whether there are other factors bearing upon the need for continued detention. You will have the opportunity to be heard and to present relevant information to the Administrative Review Board. You can present information from your family and friends that might help you at the Board. You are encouraged to contact them as soon as possible to begin to gather information that may help you. A military officer will be assigned at a later date to assist you in the Administrative Review Board process. Thank you very much for participating with us today. I appreciate your, your understanding as this is a lengthy process, and I appreciate your continued cooperation with detention authorities while you are in detention.

**UNCLASSIFIED**

UNCLASSIFIED

## ADJOURN OPEN SESSION

PRESIDENT:     The open session of this Tribunal hearing is adjourned.  Good afternoon.

RECORDER:     The time is 14:10; the date is 15 April 2007.  All rise.

## AUTHENTICATION

I certify the material contained in this transcript is a true and accurate verbatim rendering of the testimony during the Combatant Status Review Tribunal of ISN 10020.

[REDACTED], Colonel, USAF
Tribunal President

ISN # 10020
Enclosure (3)
Page 39 of 39

# EXHIBIT B

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| **MAJID KHAN**, *et al.*,<br>     *Petitioners,*<br>v.<br><br>**GEORGE W. BUSH, et al.,**<br>     *Respondents.* | )<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

Civil Action No. 06-cv-1690 (RBW)

## DECLARATION OF GITANJALI S. GUTIERREZ

I, Gitanjali S. Gutierrez, declare that the following statements are true to the best of my knowledge, information, and belief:

1. I am an attorney with the Center for Constitutional Rights (CCR) and counsel in the above-captioned action for Petitioner Majid Khan and his next friend, his wife Rabia Khan. I offer this Declaration in support of Petitioner Khan's Motion for Emergency Access to Counsel and Entry of Amended Protective Order.

2. On March 27, 2007, CCR requested that Respondents notify Petitioner Khan of his representation and permit us access to him for attorney-client meetings. *See* Letter from J. Wells Dixon to Terry Henry, dated March 27, 2007, attached hereto as Attachment 1. Respondents instructed counsel to correspond with Petitioner Khan through the regular, nonlegal mail system, which undergoes extensive security review and redactions. Respondents have not permitted counsel to have any privileged and confidential communications with Petitioner. *See* Letter from Terry Henry to J. Wells Dixon, dated April 9, 2007, attached hereto as Attachment 2.

3. Left with no other options to communicate with our client, CCR attorneys have corresponded with Petitioner Khan through the nonlegal mail system for Guantánamo detainees.

4. We have received a letter from Petitioner Khan dated March 22, 2007, and received in our office on May 2, 2007, confirming that he is aware of CCR's representation of him, knows that we are his attorneys and seeks our legal assistance.

5. Respondents have also refused to refrain from interrogating Petitioner Khan in the absence of counsel for purposes of their investigation of him for charges triable by military commission. *See* Letter from Terry Henry to J. Wells Dixon, Attachment 2.

6. I declare, under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed this 11th day of June, 2007 in New York, New York.

/s/ Gitanjali S. Gutierrez
Gitanjali S. Gutierrez

# ATTACHMENT 1

# centerforconstitutionalrights

666 broadway new york, ny 10012
t 212 614 6464 f 212 614 6499 www.ccr-ny.org

March 27, 2007

<u>Via E-Mail and Federal Express</u>
(Terry.Henry@usdoj.gov)

Terry M. Henry, Esq.
U.S. Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Avenue, N.W.
Washington, DC 20530

      Re:    <u>Majid Khan, ISN 10020</u>

Dear Mr. Henry:

      I write concerning our client Majid Khan, who is currently detained at the U.S. Naval Station at Guantánamo Bay, Cuba.

      As you are aware, Mr. Khan was unlawfully abducted from his brother's home in Karachi, Pakistan on March 5, 2003, and was held in the custody of the Central Intelligence Agency in secret prisons overseas until his transfer to Guantánamo on September 6, 2006. At the time of his transfer to Guantánamo, President Bush stated that Mr. Khan and the other thirteen so-called "high value detainees" had been detained by the CIA overseas, where they were subjected to "enhanced interrogation techniques" likely constituting torture, and announced that they would be tried by military commission for unspecified offenses. Mr. Khan has expressly asked for legal counsel in letters received by his family from the International Committee of the Red Cross in December 2006, and most recently Mr. Khan wrote his family that information about his lawyers was redacted from their letters to him. In light of the government's stated intention to subject Mr. Khan to trial by military commission as well as his ongoing request for legal counsel, we request the following:

- That Mr. Khan be afforded immediate access to his counsel in order to prepare for his Combatant Status Review Tribunal and any future commission proceedings;

- That Mr. Khan not be interviewed, questioned or interrogated by any government official, agency or contractor without his counsel present;

- That Mr. Khan not be subjected to a CSRT without the assistance of his counsel; and

- That the government provide us with a list of names and contact information for all government officials or contractors who have spoken with Associated Press reporter Katherine Shrader concerning Mr. Khan, including without limitation all of the unnamed government sources indicated in her article *An Immigrant's Journey From Md. to Gitmo,*



dated March 22, 2007, so that we may subpoena these officials for documents and testimony.

We also request that the Defense Department promptly deliver the attached notice of filing to Mr. Khan and confirm his receipt of it. You may recall that the Defense Department General Counsel's office approved a similar request in August 2004, prior to entry of the Protective Order, with respect to our former clients Moazzam Begg and Feroz Abbasi, who were each designated for military commissions before their release to the United Kingdom without charge or trial. We see no basis for denying the same request for Mr. Khan.

We also request that the government indicate whether it will comply with Judge Walton's recommendation that the Defense Department provide the Court and counsel with a report concerning Mr. Khan's physical and mental health status.

Finally, we request that the government begin to process for Gitanjali Gutierrez and me whatever level of additional security clearance may be required for us to meet with Mr. Khan as soon as possible. Please let us know what will be required in this regard.

Very truly yours,

J. Wells Dixon

cc:     Gitanjali S. Gutierrez, Esq.

# centerforconstitutionalrights

666 broadway new york, ny 10012
t 212 614 6464 f 212 614 6499 www.ccr-ny.org

March 27, 2007

**TO: Majid Khan**
ISN 10020
Guantánamo Bay Naval Station
Guantánamo Bay, Cuba

Dear Majid:

Assalaamu' alaykum.  We are human rights lawyers in the United States working on your behalf.  We are writing to inform you that your wife, Rabia, and your family authorized us to file a legal case in the civilian courts in the United States for you.  We meet often with your family members.  We speak with them about your case and until we are able to meet with you, they are making decisions on your behalf about your case.

**Your legal case was filed on September 29, 2006 in the United States federal court in Washington, D.C.  It challenges the lawfulness of your detention and your classification as an alleged "enemy combatant."**

We are your United States lawyers working on your behalf on a voluntary basis.  Our legal organization is called the Center for Constitutional Rights and our names are Ms. Gitanjali Gutierrez and Mr. Wells Dixon.

Sincerely,

Gitanjali S. Gutierrez, Esq.
Center for Constitutional Rights

Wells Dixon, Esq.
Center for Constitutional Rights



# GIBBONS, DEL DEO, DOLAN, GRIFFINGER & VECCHIONE

### A PROFESSIONAL CORPORATION

GIBBONS FELLOWSHIP IN
PUBLIC INTEREST & CONSTITUTIONAL LAW

JOHN J. GIBBONS
SENIOR PARTNER

ATTORNEYS AT LAW

ONE RIVERFRONT PLAZA

NEWARK, N.J. 07102-5496

973-596-4500

WEB SITE
http://www.gibbonslaw.com

LAWRENCE S. LUSTBERG
DIRECTOR

PHILIP G. GALLAGHER
JENNIFER CHING
JONATHAN L. HAFETZ*
GITANJALI S. GUTIERREZ

* NOT ADMITTED IN N.J.

August 6, 2004

**TO: Moazzam Begg**
Camp Delta
Guantánamo Bay Naval Station
Guantánamo Bay, Cuba

Dear Moazzam:

We are civilian United States lawyers working on your behalf. We are writing to inform you that your wife, Sally Begg, has authorized us to file a legal case in the civilian courts in the United States for you. Your wife contacted Gareth Pierce, a U.K. solicitor, to challenge the lawfulness of your detention. We are working closely with Gareth Pierce to bring your civil case in the United States court in Washington, D.C.

**Your legal case was filed on July 2, 2004 in the United States federal court in Washington, D.C. It challenges the lawfulness of your detention and your classification as an alleged "enemy combatant."**

We are your United States lawyers working on your behalf. Our names are Lawrence Lustberg and Gitanjali Gutierrez from the law firm Gibbons, Del Deo, Dolan, Griffinger & Vecchione, P.C., and Clive Stafford Smith, from the legal organization Justice in Exile.

Sincerely,

Gitanjali S. Gutierrez
Lawrence S. Lustberg
Gibbons, Del Deo, Dolan, Griffinger &
    Vecchione, P.C.
New Jersey, United States

Clive Stafford Smith
Justice in Exile
Louisiana, United States

# ATTACHMENT 2



**U.S. Department of Justice**
Civil Division
Federal Programs Branch
P.O. Box 883
Washington, D.C. 20044

---

Terry M. Henry
Senior Trial Counsel

Tel:   (202) 514-4107
Fax:  (202) 616-8470
Email: terry.henry@usdoj.gov

April 9, 2007

<u>VIA ELECTRONIC MAIL</u>

J. Wells Dixon, Esq.
Center for Constitutional Rights
666 Broadway
New York, NY 10012
E-mail: wdixon@ccr-ny.org

     Re: <u>Majid Khan, ISN 10020</u>

Dear Wells:

     This is in response to various requests raised in your letter of March 27, 2007. You request that Mr. Khan be afforded immediate access to and assistance of counsel respecting his upcoming Combatant Status Review Tribunal ("CSRT") proceeding. As you are aware, counsel have not been and are not allowed to participate in CSRTs with respect to Guantanamo detainees. You also request that no questioning or interrogation of Mr. Khan be conducted without the presence of counsel. Mr. Khan has not been charged with any crime, and Guantanamo detainees have no right to the presence of counsel during questioning by the government.

     With respect to your request that the Department of Defense ("DoD") promptly deliver a letter from you to Mr. Khan (which is attached to your March 27, 2007 letter to me) and then confirm his receipt of it, I suggest that, if you have not already done so, you send the letter to Mr. Khan through normal, first-class mail channels at the following address:

          Majid Khan, ISN 10020
          U.S. Naval Base, Guantanamo Bay, Cuba
          Washington, DC 20355

- 2 -

Your remaining requests constitute informal requests for discovery to which the government cannot accede, matters that were the subject of prior motions practice that is now concluded, or matters that can be addressed in any jurisdictionally appropriate litigation regarding Mr. Khan that may be brought in the future.

Sincerely yours,

Terry M. Henry

cc (by e-mail):    Gitanjali Gutierrez, Esq.