# Exhibit 3

IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

|  |  |  |
|---|---|---|
| MAJID KHAN, | ) | |
| | ) | |
| Petitioner, | ) | Case No. 07-1324 |
| | ) | |
| v. | ) | |
| | ) | |
| ROBERT M. GATES, | ) | |
| | ) | |
| Respondent. | ) | |
| | ) | |

## MOTION OF THE NEW YORK TIMES COMPANY, THE ASSOCIATED PRESS AND USA TODAY TO UNSEAL

*Of Counsel*:

David E. McCraw
The New York Times Company
620 Eighth Avenue
New York, NY 10018

David H. Tomlin
Associated Press
450 West 33rd Street
New York, NY 10001

Barbara L. Wall
Gannett Co., Inc.
7950 Jones Branch Drive
McLean, Virginia 22101

LEVINE SULLIVAN KOCH
& SCHULZ, L.L.P.
    David A. Schulz
    Amanda Leith
    Chad R. Bowman
321 West 44th Street, Suite 510
New York, NY 10036
(212) 850-6100

*Counsel for The New York Times
Company, The Associated Press
and USA TODAY*

## MOTION OF THE NEW YORK TIMES COMPANY, THE ASSOCIATED PRESS AND USA TODAY TO UNSEAL

The public interest in this case could not be greater. In this appeal Majid Khan challenges the determination of a military tribunal that he is properly being held by the United States at Guantanamo Bay, Cuba as an "enemy combatant." A long-time resident of Baltimore, Khan vigorously protests this determination, asserting that it is based on unreliable evidence obtained through illegal acts of torture committed by the United States government (the "Government").

In motions and supporting declarations now before the Court, Khan makes his case that he was subjected "to an aggressive CIA detention and interrogation program notable for its elaborate planning and ruthless application of torture."[1] Khan contends that his "torture was decidedly not a mistake, an isolated occurrence, or even the work of 'rogue' CIA officials or government contractors," but rather part of a "sophisticated, refined program of torture operating with impunity outside the boundaries of any domestic or international law."[2] And, Khan asserts, U.S. intelligence officials have repeatedly lied about his "imprisonment and torture in CIA custody."[3]

---

[1]    Khan's Motion for Preservation of Torture evidence, dated November. 29, 2007 (the "Preservation Motion") at 3-4.

[2]    *Id.* at 4.

[3]    Khan's Reply Memorandum in Further Support of Torture Motions, dated January. 4, 2008 ("Khan Reply") at 6.

While these broad outlines of Khan's allegations are known to the public, every fact and detail presented by Khan in support of his accusations is under seal. The Government has removed the facts from the public record pursuant to a stipulated protective order that permits it unilaterally to redact any information it considers "classified" or otherwise "protected" out of concern for "significant government interests." As a result, it is impossible for the public to fully assess the validity of Khan's claims or to know if justice is being done.

The New York Times Company, The Associated Press and USA Today (collectively "Press Applicants") respectfully move this Court, pursuant to Rule 27 of the Federal Rules of Appellate Procedure and Rules 27 and 47.1 of the Local Rules, to unseal the withheld portions of the motions and declarations filed by Khan.[4] The public has a qualified right to inspect and copy Khan's court filings that the Government can overcome only by demonstrating a compelling interest in secrecy, and any restriction on access must be both narrow and effective. The wholesale redaction of Khan's first-hand account of his treatment is neither.

The Government claims a need to prevent the enemy from knowing about secret detention facilities and interrogation techniques used by the CIA, but its broad invocation of secrecy in this case serves no such purpose. Extensive

---

[4]    Circuit Rule 47.1(c) provides that "[a] party or any other interested person may move at any time to unseal any portion of the record in this court, including confidential briefs or appendices filed under this rule."

information about the CIA's "black sites" and "aggressive interrogation" techniques is already well known—including specific details about the facility in Afghanistan where Khan was held and the nature of interrogation techniques used at this facility. The blanket secrecy imposed on Khan's court filings appears only to prevent the public from evaluating either the credibility of Khan's claims or the fairness of this proceeding. It prohibits discussion of vital public issues and renders democratic oversight of the institutions of government impossible, without any apparent benefit to the interest advanced to justify secrecy in the first place.

In such circumstances, both the First Amendment and the common law prohibit the wholesale sealing of information submitted by Khan to support his torture accusation. "The guarding of military and diplomatic secrets at the expense of informed representative government provides no real security for our Republic." *New York Times v. United States*, 403 U.S. 713, 719 (1971) (Black, J., concurring).

## BACKGROUND

### A.    Khan's Allegations Against The Government

Khan is a United States resident and Pakistani citizen. He immigrated to the United States in 1996 as a teenager, settled in the Baltimore area with his family, and was granted asylum and residency status in 1998. Khan alleges that he was abducted by the CIA on March 5, 2003 and remains in U.S. custody to this day.

Until September 2006, Khan says he was subjected to torture and other forms of illegal coercion at a secret CIA jail overseas. (*See* Preservation Mot. at 2-4.)

In September 2006 Khan was publicly transferred to Guantanamo to await prosecution by a military tribunal. Khan was declared to be an "enemy combatant" in August 2007 by a Combatant Status Review Tribunal ("CSRT") convened to review his case. (*Id.* at 3.) In this appeal, Khan seeks review of the CSRT's determination, claiming it was improperly based upon unreliable evidence obtained through torture and other cruel, inhuman and degrading treatment.[5] The Government has withheld Khan's evidence of his alleged torture from the public record of his CSRT as well as from the record of this appeal.

The circumstances of the prisoners held at Guantanamo, including Khan's case in particular, have generated significant public concern within this country and around the world.[6] The use of "enhanced interrogation" methods—admitted by the CIA—are the subject of widespread debate concerning both their legality and their efficacy. Even military officers have questioned whether torture

---

[5]    Khan had previously filed a petition for a writ of habeas corpus in the U.S. District Court for the District of Columbia on September 29, 2006. *See Khan v. Bush*, No. 06-1690 (RBW) (D.D.C.).

[6]    *See, e.g.*, David McFadden, *US Court Grants Motion on Gitmo Suspect*, ASSOCIATED PRESS, Dec. 12, 2007; William Glaberson, *U.S. nears charging 6 in Sept. 11 case*, INT'L HERALD TRIB. (France), Feb. 10, 2008; Scott Shane, *Detainee's Lawyers Rebut C.I.A. on Tapes*, N.Y. TIMES, Jan. 19, 2008; Joan Biskupic, *Court to decide detainees' rights*, USA TODAY, Nov. 26, 2007.

4

produces accurate information and have raised concerns about what its use by the CIA would mean for our own prisoners of war.[7]

There is also ongoing controversy over the propriety of procedures being used to identify "enemy combatants" and to prosecute detainees in military tribunals.[8] Khan's challenge to these procedures has heightened public interest in knowing that this appeal is being handled properly and seeing that justice is done.[9]

**B.**     **The Government's Actions To Block Public Access**

The Government has taken extraordinary measures to keep from the public any statements from Khan about his detention and treatment. In a declaration of a CIA information officer filed in Khan's *habeas* litigation, the Government urged that "the classified national security information likely to arise in this case is different and more sensitive than any previous cases involving detainees at Guantanamo Bay."[10] The CIA emphasized that specifics of its detention program remain classified, notwithstanding public acknowledgement of the program's

---

[7]     *See, e.g.*, Dan Froomkin, *A General Demands Accountability*, WASH. POST, Oct. 15, 2007.

[8]     *E.g.*, R. Tuttle, *Rigged Trials at Gitmo*, THE NATION, Feb. 20, 2008 (available at www.thenation.com/doc/20080303/tuttle, last visited 3/3/08); P. Spiegel and D. Savage, *Stubborn doubts on 9/11 trials*, L.A. TIMES, Feb. 12, 2008.

[9]     *See, e.g.*, Carol Rosenberg, *Filing: Gitmo detainee 'tortured' Lawyers for a Guantánamo...*, MIAMI HERALD, Dec. 9, 2007; *Ex-Md. resident writes from Guantanamo about CIA torture*, BALT. SUN, Jan. 22, 2008, at 8A.

[10]    Declaration of Marilyn Dorn ("Dorn Decl."), sworn to October 26, 2006, filed in *Khan v. Bush*, No. 06-CV-1690 (D.D.C.) at ¶ 6 (annexed as Exhibit A to the Affidavit of Chad Bowman, sworn to March 5, 2008 ("Bowman Aff.")).

existence, and identified this classified information as including "where the detainees had been held, the details of their confinement, the employment of alternative interrogation methods, and other operational details." (Dorn Decl., ¶ 8.) Because Khan was detained in this classified CIA program, the Government has taken the position that Khan's knowledge of his own treatment is itself classified. (*Id.*, ¶ 10.) The Government's rationale is that permitting Khan to disclose the details of his interrogations "'would permit terrorist organizations to adapt their training to counter the tactics the C.I.A. can employ in interrogations'"[11]—an argument that presumes that Khan will never be released.

In this appeal, the parties filed and the Court entered at the outset a stipulated protective order permitting "classified information" to be sealed. The order requires Khan to submit all his court filings under seal, and then allows the Government to determine whether they contain classified information before they are made public. All classified information is redacted by the Government and remains sealed. (*See* Interim Protective Order, entered October 12, 2007, at 13-14.) The order also permits the Government, upon application to the Court, to redact unclassified information it wants to protect, and all such unclassified information "must be maintained under seal unless and until the court determines

---

[11]    David Johnston and Neil A. Lewis, *U.S. Is Quietly Preparing Evidence Against Top Qaeda Detainees*, N.Y. TIMES, Jan. 12, 2007 at A16.

6

the information should not be designated 'protected.'" (*Id.* at 12.) The Government thus has the unilateral ability to censor Khan's court filings.

## C. The Court Records Sought By The Press Applicants

Through this motion the Press Applicants seek unredacted copies of all papers supporting two motions that are now before the Court: Khan's motion to preserve "all documents and information relating to [his] tortures, cruel, inhuman, degrading treatment, and other unlawful coercion," and Khan's motion to declare that the interrogation methods used against him constitute "torture."[12] Now fully briefed, these motions have been referred to the merits panel for resolution, and remain pending. (*See* Per Curiam Order, entered February 14, 2008.)

In support of these motions, Khan submitted two declarations of counsel. One is described as setting forth "in detail" the facts of Khan's "secret detention and interrogation;[13] the other provides further details of the secret detention program" and interrogation techniques applied against other individuals.[14] On January 7, 2008 Khan also filed a reply memorandum in further support of his motions. That memorandum accuses "unnamed intelligence officials" of lying

---

[12]    On December 11, 2007 the Court entered an interim order requiring the preservation of evidence pending a resolution of Khan's motion. (Per Curiam Order, entered December 11, 2007.)

[13]    The Declaration of Gitanjali S. Guitierrez is identified as "Exhibit 1" to Khan's motion to declare interrogation methods to constitute torture.

[14]    The Declaration of J. Wells Dixon is identified as "Exhibit 2" to Khan's motion filed with the Court.

7

about Khan's "imprisonment and torture" (Kahn Reply at 6), and repeats Khan's claim that the facts submitted in his motions and declarations amount to illegal and unconstitutional torture, "so severe as to 'shock the conscience.'" (*Id.* at 18.)

Each key fact presented to the Court in support of these claims—every detail about Khan's detention and interrogation—has been sealed from the public by the Government. The public versions of Khan's motions have been heavily redacted, including pages of material that are deleted entirely, and his attorneys' declarations have been withheld in their entirety.

In opposing Khan's motions, the Government claims that his allegations of torture are false, but simultaneously asserts that his evidence must nonetheless be sealed to protect national security. (*See* Opposition to Petitioner's Motions for Preservation Order and For Declaratory Judgment at 1 n.1.) As Chief Justice Burger famously observed, however, "[p]eople in an open society do not demand infallibility from their institutions, but it is difficult for them to accept what they are prohibited from observing." *Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 572 (1980). Indeed, the public interest in observing this case is magnified by the Government's consistent public position that torture has never been used. Yet, without the sealed facts, the public has no way to evaluate the credibility or the import of Khan's allegations, to assess the fairness of his treatment by the courts, or to exercise democratic control over the institutions of government.

8

## ARGUMENT

## SEALING KHAN'S FILINGS DOES NOT SERVE A COMPELLING INTEREST AND IS NOT NARROWLY TAILORED

### A.    The Public Has A Qualified Right Of Access To Khan's Motion Papers

Both the First Amendment and the common law afford the press and public

a qualified right of access to inspect the motions and declarations filed by Khan.

As this Court observed in *Washington Post Co. v. Robinson*, 935 F.2d 282 (D.C.

Cir. 1991) ("*Robinson*"), "[t]he first amendment guarantees the press and the

public a general right to court proceedings and court documents unless there are

compelling reasons demonstrating why it cannot be observed." *Id.* at 287. *See*

*also Lugosch v. Pyramid Co.*, 435 F.3d 110, 120 (2d Cir. 2006) (recognizing first

amendment right of access to motions); *Grove Fresh Distribs., Inc. v. Everfresh*

*Juice Co.*, 24 F.3d 893, 897 (7th Cir. 1994) (same); *In re Washington Post Co.*,

807 F.2d 383, 390 (4th Cir. 1986) (First Amendment right to documents filed for

plea hearings).

The public's right to inspect court documents is equally enshrined in the

common law. *Nixon v. Warner Commc'ns, Inc.*, 435 U.S. 589, 597 (1978) ("the

courts of this country recognize a general right to inspect and copy . . . judicial

records and documents"); *In re Nat'l Broad. Co.*, 653 F.2d 609, 612 (D.C. Cir.

1981) ("existence of the common law right to inspect and copy judicial records is

9

indisputable"); *Lugosch*, 435 F.3d at 120 (same). The common law access right "is not some arcane relic of ancient English law," but rather "is fundamental to a democratic state." *United States v. Mitchell*, 551 F.2d 1252, 1258 (D.C. Cir. 1976), *rev'd on other grounds sub nom. Nixon v. Warner Commc'ns, Inc.*, 435 U.S. 589 (1978).

These rights of access to judicial records exist to ensure that courts "have a measure of accountability" and to promote "confidence in the administration of justice"—a goal that cannot be accomplished "without access to testimony and documents that are used in the performance of Article III functions." *United States v. Amodeo*, 71 F.3d 1044, 1048 (2d Cir. 1995); *accord United States v. Hubbard*, 650 F.2d 293, 314-15 (D.C. Cir. 1981). The vital role that openness plays in ensuring public respect for the results produced by an adjudicative process is perhaps best demonstrated by considering the converse:

> Public confidence cannot long be maintained where important judicial decisions are made behind closed doors and then announced in conclusive terms to the public, with the record supporting the court's decision sealed from public view.

*Gannett Co. v. DePasquale*, 443 U.S. 368, 429 (1979) (Blackmun, J., concurring in part and dissenting in part).

The right of access also protects more generally "the citizen's desire to keep a watchful eye on the workings of public agencies." *Nixon*, 435 U.S. at 597-598.

It promotes "an informed and enlightened public opinion," *Mitchell*, 551 F.2d at 1258, which is "the most potent of all restraints upon misgovernment," *Grosjean v. Am. Press Co.*, 297 U.S. 233, 250 (1936). Access to information is particularly important concerning our national defense and our international actions, where "the absence of the governmental checks and balances present in other areas of our national life" makes an informed citizenry "the only effective restraint upon executive policy and power." *New York Times*, 403 U.S. at 728 (Stewart, J., concurring).

While not every document filed with a court falls within the right of access, Kahn's motion papers seeking affirmative relief from this Court plainly do. "[W]hat makes a document a judicial record and subjects it to the common law right of access is the role it plays in the adjudicatory process." *United States v. El-Sayegh*, 131 F.3d 158, 163 (D.C. Cir. 1997). Access to substantive motions is protected because such motions are relevant and useful to the performance of the judicial function, and they often substitute for argument in open court that would itself be subject to a First Amendment right of access. *E.g. Johnson v. Greater Se. Cmty. Hosp. Corp.*, 951 F.2d 1268, 1278 (D.C. Cir. 1991) (common law right applied to summary judgment motion); *Lugosch*, 435 F.3d at 120-21 (common law and First Amendment rights of access applied to summary judgment motion); *Bank of Am. Nat'l Trust & Savs. Ass'n v. Hotel Rittenhouse Assocs.*, 800 F.2d 339, 343-

11

44 (3d Cir. 1986) (common law right of applied to motions filed with the court); *Rushford v. New Yorker Magazine, Inc.*, 846 F.2d 249, 252-53 (4th Cir. 1988) (common law right applied to summary judgment motion). *In re Continental Ill. Secs. Litig.*, 732 F.2d 1302, 1308-09 (7th Cir. 1984) (common law and First Amendment right of access applied to documents submitted in support of motions).

Khan's motions to preserve evidence and to declare his treatment to be torture ask the Court to make important legal and factual determinations that may ultimately resolve the merits of this appeal. Whether evaluated as a First Amendment or common law right, his motions are subject to a right of access.

**B.    The Government Bears A Heavy**
       **Burden To Seal Records Filed by Khan**

A party seeking to restrict access right bears the burden of justifying any limitation. Where, as here,

> the State attempts to deny the right of access in order to inhibit the disclosure of sensitive information, it must be shown that the denial is necessitated by a compelling governmental interest, and is narrowly tailored to serve that interest.

*Robinson*, 935 F.2d at 287; *see Johnson*, 951 F.2d at 1277-78 (same); *Lugosch*, 435 F.3d at 123-24 (same). Because a restriction on access must be "no broader than is necessary to protect those specific interests identified as in need of protection," *Johnson*, 951 F.2d at 1278, any order limiting access must also be effective in actually protecting the interest for which sealing is ordered. *See Press-*

*Enterprise Co. v. Superior Court*, 478 U.S. 1, 14 (1986) (party seeking secrecy must demonstrate "that closure would prevent" harm sought to be avoided); *In re The Herald Co.*, 734 F.2d 93, 101 (2d Cir. 1984) (closure impermissible if information "has already been given sufficient public exposure").

This Court has previously articulated six factors to assist in the judicial sealing determination:

> (1) the need for public access to the documents at issue; (2) the extent to which the public had access to the documents prior to the sealing order; (3) the fact that a party has objected to disclosure and the identity of that party; (4) the strength of the property and privacy interests involved; (5) the possibility of prejudice to those opposing disclosure; and (6) the purposes for which the documents were introduced.

*Johnson*, 951 F.2d at 1277 n.14 (citing *Hubbard*, 650 F.2d at 317-22).[15]  These standards are to be carefully applied because, as the Seventh Circuit has cautioned:

> Any step that withdraws an element of the judicial process from public view makes the ensuing decision look more like fiat, which requires a compelling justification.

*Union Oil Co. of Cal. v. Leavell*, 220 F.3d 562, 568 (7th Cir. 2000).  Thus, when a party seeks to restrict the right of access, it is the duty of the court to make factual

---

[15]   These factors were developed in considering the scope of the common law right of access.  Some courts have held that a higher standard is required where the First Amendment right also applies.  *See generally*, *Lugosch*, 435 F.3d at 121-125 (and cases cited therein).

findings demonstrating that any restriction of the right is necessary, narrow and effective. *E.g.*, *Robinson*, 935 F.2d at 289.

Nor are these standards vitiated when the Government seeks to seal information because it has been "classified" by the Executive Branch. Were the Government to exceed its classification authority and seek to seal statements in order to conceal unlawful behavior or prevent embarrassment, the judiciary unquestionably would have the authority to review the Government's action and determine whether it is lawful.[16] *See, e.g., Joint Anti-Fascist Refugee Comm. v. McGrath*, 341 U.S. 123, 139-140 (1951) (Attorney General exceeded authority conferred by executive order; injunctive relief granted). Indeed, the authority of the courts to review classification decisions has been recognized in a number of circumstances. *See, e.g., Krikorian v. Dep't of State*, 984 F.2d 461, 466-67 (D.C. Cir. 1993) (court has the authority in FOIA case to review *in camera* the propriety of a claimed national security exemption); *Goldberg v. U.S. Dep't of State*, 818

---

[16]     For example, the CIA Director has acknowledged the use of "waterboarding," but says it has only been used on three occasions, not including Khan. *See infra* note 22. The public sections of Khan's motions nonetheless analyze the legality of waterboarding and "other 'evolved' forms of torture," (Reply at 14), and discuss the acknowledged destruction of video tapes of waterboarding as a basis for needing a preservation order. (*Id.* at 4-5.) If sealed portions of Khan's motions assert that he too was subjected to waterboarding—and the Press Applicants have no way to know—a Government effort to conceal from the public the scope of its use of this admitted practice would not be a legitimate basis for sealing such information.

F.2d 71, 76-77 (D.C. Cir. 1987) (same); *Stillman v. CIA*, 319 F.3d 546, 548-49 (D.C. Cir. 2003) (courts have independent duty to review classification claim used to censor former CIA employee); *McGehee v. Casey*, 718 F.2d 1137, 1147-48 (D.C. Cir. 1983) (same).

While national security unquestionably can constitute a "compelling interest" sufficient to require sealing judicial records, "[t]he word security is a broad, vague generality." *New York Times*, 403 U.S. at 719 (Black, J., concurring.) This Court must make its own determination that a good faith basis exists for the Government's claim of national security risk, and that the requested limitation on access is no broader than necessary to effectively protect against the risk. Otherwise, as Judge Tatel has warned, an "uncritical deference" to "vague, poorly explained arguments for withholding broad categories of information" can quickly eviscerate "the principles of openness in government." *Center for Nat'l Sec. Studies v. U.S. Dep't of Justice*, 331 F.3d 918, 937 (D.C. Cir. 2003) (Tatel, J., dissenting).

C.     **No Proper Basis Exists For Sealing**
       **Khan's Depictions of His Own Treatment**

On the public record, there is no reason that the sealing of every detail about Khan's detention and treatment is warranted. Such sweeping closure does not satisfy the *Hubbard* factors and, given the information already known, is neither narrowly tailored nor effective in protecting against the risk of educating terrorists

15

about the CIA's detention system or interrogation techniques. The *Hubbard* factors applied to the facts of this preceding strongly support the disclosure of the sealed information:

*The need for public access.* The sealed information concerns the actions of government officials in responding to terrorist attacks on this country. The public has a compelling interest in knowing whether that response is violating international law or constitutional rights as Khan contends. Because the government has "nearly unlimited authority" concerning national defense, "the press and the public serve as perhaps the only check on abusive government practices." *Detroit Free Press v. Ashcroft*, 303 F.3d 681, 704 (6th Cir. 2002).

*The extent of prior access to the documents.* While Khan's specific motion papers have not previously been public, much of the information the Government has sealed is apparently widely known. Publicly available information discloses, for example, the location of some secret CIA detention facilities, including the facility where Khan is alleged to have been held in Afghanistan. *See generally* Bowman Aff., Ex. B at pp. 9-11 (compilation of publicly available information concerning CIA detention facilities). Khaled El-Masri, a released CIA detainee, in an unsealed declaration submitted in Khan's *habeas* proceeding, describes both the

16

facility where Khan was held and aspects of his detention.[17] Testimony from other detainees has been compiled by international organizations and provides additional public detail about the locations and facilities of the CIA prisons.[18]

Extensive information is also known about the methods used by the CIA and other U.S. interrogators. These include "slaps to the head; hours held naked in a frigid cell; days and nights without sleep while battered by thundering rock music; long periods manacled in stress positions; or the ultimate, waterboarding."[19] Descriptions of such interrogation techniques have been provided by both former prisoners and former interrogators. For example, former CIA officer John Kiriakou has described "enhanced techniques" including an "attention shake,"

---

[17]    Bowman Aff., Ex C. The declaration has been widely reported. *E.g.*, Jane Mayer, *The Black Sites*, NEW YORKER, Aug. 13, 2007 (available at www.newyorker.com, last visited 3/3/08); Carol D. Leonnig and Eric Rich, *U.S. Seeks Silence on CIA Prisons*, WASH. POST, Nov. 4, 2006 at A1.

[18]    *See, e.g.*, Center for Human Rights and Global Justice, *Surviving the Darkness: Testimony from the U.S. 'Black Sites'* (New York: NYU School of Law, 2007) (available at www.chrgj.org. (last visited 3/3/08, follow link for "Full Report" under "CHRGJ Releases Unprecedented Testimony about CIA 'Black Sites'")) ("CHRGJ Report").

[19]    Scott Shane, David Johnston and James Risen, *Secret U.S. Endorsement of Severe Interrogations*, N.Y. TIMES, Oct. 4, 2007, at A1 (reporting on Justice Department memorandum reviewing "harrowing pressure tactics" used by interrogators); *see also* Curt Anderson, *Jose Padilla Is Sentenced to 17 Years*, ASSOCIATED PRESS, Jan. 22, 2008 (reporting allegations that Padilla "was forced to stand in painful stress positions, given LSD or other drugs as 'truth serum,' deprived of sleep and even a mattress for extended periods and subjected to loud noises, extreme heat and cold and noxious odors").

"open-handed belly slap[s]," and "waterboarding."[20]  Former detainee Mohamed

Farag Ahmad Bashmilah has provided detailed testimony about his treatment by

the CIA, including severe beatings, extreme isolation, being forced to wear a

diaper for fifteen days, and being subjected to "[e]xcruciatingly loud western rap

and Arabic music . . . twenty-four hours a day, seven days a week" for a month.[21]

The director of the CIA has publicly acknowledged the use of waterboarding.[22]

Some public information even exists about the treatment Khan has received.

El-Masri has described the type of interrogation techniques used in facility where

Khan was detained.   *See* Bowman Aff., Ex. C, ¶¶ 40-50.   Khan's father has

provided testimony describing aspects of Khan's treatment reported by Khan to his

family.   *See id.*, Ex. D at 12-15.   Under these circumstances, sealing the same

information in the Court's records would appear to provide no effective protection

to any compelling national security interest.

*The identity of the party objecting to disclosure.*  Weight should be given to

the fact that the request for sealing comes from the Government.  In weighing this

---

[20]     *See* ABC News Interview with John Kiriakou at 15-16, 20-22 (transcript available at http://abcnews.go.com/Blotter/Story?id=3978231&page=5; video available at http://abcnews.go.com/Video/playerIndex?id=3980294, last visited 3/3/08).

[21]     *See,* CHRGJ Report, *supra,* note 18, at 6-31;  *see also* Bowman Aff., Ex. B at pp. 11-12 (compiling examples).

[22]     *See, e.g.,* Aamer Madhani, *U.S. confirms waterboarding use,* CHI. TRIB., Feb. 6, 2008 at 16 (CIA Director Hayden confirmed Khalid Shaikh Mohammed, Abu Zubaydah and Abd al-Rashim al-Nashiri subjected to waterboarding).

factor, however, it is important to bear in mind that the "dominant purpose of the first amendment was to prohibit the wide spread practice of governmental suppression of embarrassing information." *New York Times*, 403 U.S. 723-24 (Douglas, J. concurring). Sealing is not proper if the court determines its purpose is to avoid embarrassment rather than to protect national security.

*The strength of the interests favoring sealing.* As noted, the Press Applicants do not dispute that a legitimate national security need is a compelling state interest and, if other factors support sealing, would justify a narrowly tailored sealing of court records.

*Possibility of prejudice to those opposing sealing.* To the extent that the needs of national security are being applied in an overly broad manner to censor information that is disturbing or embarrassing to the Government, the public's legitimate interest in knowing "what the government is up to" is severely prejudiced. "Secrecy in government is fundamentally un-democratic," *New York Times*, 403 U.S. at 724, and this consideration carries special force here because the government has consistently denied that the United States uses torture.[23]

---

[23]    *See, e.g.*, Siobhan Gorman, *Guantanamo Detainee Denies Al-Qaida Link, Alleges Torture*, BALT. SUN, May 16, 2007 at 1A (Defense Dept. contends "Khan has been treated humanely while in Department . . . custody"); *Carter says U.S. tortures prisoners*, CNN.com, (available at www.cnn.com/2007/POLITICS/ 10/10/carter.torture, last visited 3/3/08) ("Bush [has] defended the techniques used, saying, 'This government does not torture people.'").

*The purposes for which the documents were filed with the court.* The final *Hubbard* factor also weighs significantly in favor of public disclosures. In this proceeding Kahn claims that the CSRT determination that he is an enemy combatant must be thrown out because it was based upon evidence obtained through torture. The pending motions were filed to preserve torture evidence and obtain a judicial determination on the central fact of this case: whether Kahn was subjected to torture by the CIA. Such substantive motions should not be sealed absent "the most compelling reasons." *Lugosch*, 435 F.3d at 121.

In short, the *Hubbard* factors compel the conclusion that the Government's wholesale sealing of the facts presented in support of Khan's motions cannot stand. The complete removal of Khan's facts from the court record is overly broad, ineffective in protecting a compelling interest, and improper.

### CONCLUSION

For each and all the foregoing reasons, the redacted and withheld portion of Khan's motion papers should be unsealed.

Dated March 6, 2008

Respectfully submitted,

LEVINE SULLIVAN KOCH & SCHULZ, L.L.P.

By: _____

David A. Schulz
Amanda Leith
Chad R. Bowman
321 West 44th Street, Suite 510
New York, NY 10036
212-850-6100

20

[NOT SCHEDULED FOR ORAL ARGUMENT]

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

|  |  |  |
|---|---|---|
| **MAJID KHAN,** | ) | |
| Petitioner | ) | |
|  | ) | |
| v. | ) | No. 07-1324 |
|  | ) | |
| **ROBERT M. GATES,** | ) | |
| Respondent. | ) | |

## OPPOSITION TO THE MOTION OF THE
## NEW YORK TIMES COMPANY, THE ASSOCIATED PRESS
## AND USA TODAY TO UNSEAL CLASSIFIED DOCUMENTS

The pending motion asks this Court to disclose to news organizations, and through them the world at large, classified information in the Court's custody whose public disclosure threatens exceptionally grave damage to the nation's security. This demand is unprecedented.  To our knowledge, no court has ever deliberately disclosed classified filings to the public.  To the contrary, courts have consistently undertaken to protect classified information through sealing orders and other protective orders – as this Court has done in this case and others arising under the Detainee Treatment Act (DTA).

Neither the First Amendment nor the common law entitles news organizations to obtain and publish classified information that has been placed under seal by a court to preserve its secrecy.  The qualified right of access to judicial proceedings created by the First Amendment is confined to criminal proceedings and does not extend to civil proceedings in general or to proceedings under the DTA in particular. Moreover, even if the news organizations enjoyed a First Amendment right of access to DTA proceedings, that right does not extend to the inspection and publication of classified filings. The common law does not provide a right of access to classified information either, for federal common law operates only in the absence of federal legislation, and Congress has repeatedly exercised its legislative authority to prohibit the disclosure of classified information to the public.

Demands for public disclosure of classified filings are unfounded in any

context, but they are particularly misconceived in the context of litigation over the detention of enemy combatants under the DTA. The information being sought by the news organizations in this case was provided by an important military prisoner in time of war, and the news organizations are seeking it because they believe that it discloses details about techniques used to gather wartime intelligence. The information has been classified at the TOP SECRET//Sensitive Compartmented Information (SCI) level because its disclosure risks exceptionally grave damage to our nation's security. The Supreme Court has specifically recognized that "discovery into military operations would * * *intrude on the sensitive secrets of national defense." *Hamdi v. Rumsfeld*, 542 U.S. 507, 532 (2004) (plurality opinion). The classified information in Khan's filings squarely implicates these concerns.

The news organizations suggest that the government bears a "heavy burden" (Mot. 12) to justify the continued sealing of the classified information in Khan's filings. To the contrary, this Court has held that it will extend great deference to the government's classification decisions and will sustain them as long as they are reasonable and legitimate. Here, the reasons provided by the CIA are not only reasonable and legitimate, they are compelling. In short, if the Court releases Khan's statements, the media will able to reveal highly classified details of key CIA programs relating to high value detainees. Accordingly, the material sought by the news organizations is properly classified, and they have no right to obtain it.

2

## STATEMENT

The news organizations seek to obtain, and presumably publish, "unredacted copies of all papers" filed in support of Khan's two pending motions. Mot. 7. In particular, they seek two declarations that they claim detail Khan's allegations about the detention and interrogation of him and others by the CIA. *Ibid.*

These declarations are currently under seal in this Court because CIA professional intelligence experts have determined that disclosure of them might reveal "the locations of CIA intelligence activities overseas, the assistance provided by certain foreign governments * * *, and the conditions of confinement and interrogation methods used by the CIA." Hilton Decl. ¶ 11 (attached). This is because Khan and "other[s] * * * formerly held in CIA custody * * * have been exposed to [these] intelligence sources and methods." *Ibid.*; see *id.* ¶¶ 14, 17, 23. The release of such "information to which [Khan] has been exposed reasonably could be expected to cause exceptionally grave damage to the national security" by damaging our "relationships with foreign intelligence and security services" and "degrad[ing] the CIA's ability to effectively question terrorist detainees and elicit information necessary to protect the American people." *Id.* ¶ 12.

The CIA is currently engaged in a paragraph-by-paragraph review to determine whether the declarations include any information that does not require classification and that can be made public. As soon as that review process is completed, the

3

government will submit redacted versions of the declarations for filing on the Court's public docket. As a result, the only issue posed by the pending motion is whether the news organizations are entitled to information in the declarations that *is classified* and whose disclosure reasonably could be expected to cause exceptionally grave damage to national security.

## REASONS FOR DENYING THE MOTION

**I.    Neither the First Amendment Nor the Common Law Provides News Organizations with Any Right of Access to Classified Materials**

**A.** The news organizations have no First Amendment right to receive and publicly disclose classified information filed in this Court under a protective order. In this Circuit, the qualified First Amendment right of access to judicial proceedings applies only to criminal proceedings and does not extend to civil proceedings like this case. See *Center For National Security Studies* v. *U.S. Dep't of Justice*, 331 F.3d 918, 935 (D.C. Cir. 2003) (*CNSS*) ("[n]either the Supreme Court nor this Court" has recognized a constitutional right of public access "outside the context of criminal judicial proceedings"). While a few other Circuits have extended a qualified First Amendment right of access to some civil cases (see Mot. 9)), this Court has continued to adhere to the Supreme Court's narrower view.  See *Flynt* v. *Rumsfeld*, 355 F.3d 697, 704 (D.C. Cir. 2004); *CNSS*, 331 F.3d at 934 (no controlling case has "ever *indicated* that it would apply [the right of access cases] to anything other than

4

criminal judicial proceedings"). The case on which the news organizations principally rely (Mot. 9, 12), *Washington Post Co.* v. *Robinson*, 935 F.2d 282 (D.C. Cir. 1991), involved access to a sealed plea agreement in a *criminal* case, and hence offers no support for a First Amendment right of access in civil litigation.

1. Even if the First Amendment right of access were not confined to criminal proceedings, it would not extend to judicial review proceedings under the DTA, much less to classified information filed under seal in these proceedings. Before a First Amendment right of access will attach to a proceeding, the entity seeking access must make two showings: first, that "the place and process" to which access is sought "have historically been open to the press and general public," and second, that "public access plays a significant positive role in the functioning of the particular process in question." *Press-Enterprise Co.* v. *Superior Court*, 478 U.S. 1, 8-9 (1986). A failure to make either showing is fatal to a First Amendment access claim. *United States* v. *El-Sayegh*, 131 F.3d 158, 161 (D.C. Cir. 1997); *In re Reporters Committee*, 773 F.2d 1325, 1332 (D.C. Cir. 1985). Here, neither showing has been made.

There is no tradition of public access to judicial proceedings for review of military determinations of enemy combatant status, much less a tradition of access to classified information in such proceedings. While the Supreme Court held in *Rasul v. Bush*, 542 U.S. 462 (2004), that the habeas statute as then written extended to aliens held at Guantanamo, there is no tradition of judicial proceedings at all in these

5

circumstances, much less open proceedings, given limitations on the territorial jurisdiction of the writ that existed until 1973. *Id.* at 478-79 (explaining that in 1973, a "decision[] of this Court" first "filled the statutory gap" and allowed persons "detained outside the territorial jurisdiction of [a] federal district court" to seek habeas review); see *El-Sayegh*, 131 F.3d at 161 ("There can hardly be a historical tradition of access to the documents accompanying a procedure that did not exist until * * * 1991."). At most, there is a tradition of *closed* proceedings that relate to aliens who are not in the United States. *North Jersey Media Group v. Ashcroft*, 308 F.3d 198, 211 (3d Cir. 2002) (recognizing that "since the 1890s, when Congress first codified deportation procedures, '[t]he governing statutes have always expressly closed *exclusion* hearings'").[1] The lack of any history of public access contrasts sharply with the history of criminal trials, which have been open to the public from "the days before the Norman Conquest." *Press-Enterprise*, 478 U.S. at 8. And while military tribunals themselves are generally open, that policy has never extended to classified information. To the contrary, the military procedures for identifying enemy combatants, which were cited with approval in *Hamdi*, 542 U.S. at 538 (plurality opinion), provide that "[p]roceedings shall be open except for * * * matters which

---

[1] In deportation cases, there is also no tradition of public access to material that may form the basis of habeas proceedings. Cf. *id.* at 211, 221 (acknowledging the right to seek habeas review of deportation proceedings, but finding an "insufficient tradition of openness to support the right" to access immigration proceedings).

6

would compromise security if held in the open." Army Reg. 190-8, § 1-6(e)(3).

Public access also does not and would not "play[] a significant positive role in the functioning of the particular process in question." *Press-Enterprise*, 478 U.S. at 8. First, there has been no determination by this Court that the information submitted by Khan is relevant or related to the civil litigation authorized by the DTA. As the government has explained, Khan's "CSRT was not presented with any statements made by petitioner, or any other detainee, while in CIA custody," making it unlikely that Khan's treatment while in custody will be relevant.    Opp. to Mot. for Preservation Order at 5 n.4.  Publicly releasing irrelevant information would contribute nothing to the DTA process. *Cf. United States v. Gonzales*, 150 F.3d 1246, 1261 (10th Cir. 1998) (even in criminal context, no right to access materials that do not "relate to the core proceeding – the determination of guilt or innocence of the defendant").

Further, "to gauge accurately whether [the] role [of public access] is positive, the calculus must perforce take account of the flip side -- the extent to which openness impairs the public good." *North Jersey Media Group*, 308 F.3d at 217. Here, the public good would be severely impaired, because public disclosure of classified information would cause severe damage to national security. The Supreme Court has recognized this potential harm in the context of enemy detainees in the war against al Qaeda, *Hamdi*, 542 U.S. at 532; this Court has likewise recognized the

7

harm in DTA cases generally by entering a detailed protective order sealing classified material; *see Bismullah v. Gates*, 531 F.3d 178, 194-204 (D.C. Cir. 2007), *petition for cert. pending*; and the potential harm to national security is particularly great in this case, which involves TOP SECRET//SCI information. Hilton Decl. ¶ 27. This Court recognized as much in the protective order entered in this case, which is more stringent than the order entered in *Bismullah*.

At the same time, the rules and procedures governing this case already provide the public with broad access to the proceeding, with public unclassified briefs, open oral arguments, and published opinions. These comprehensive procedures are sufficient to inform the public how DTA cases are decided and to satisfy the "'citizen's desire to keep a watchful eye on the workings of'" this Court. Mot. 10 (quoting *Nixon* v. *Warner Communications, Inc.*, 435 U.S. 589, 597-98 (1978)). Moreover, Khan's counsel has access to the classified information that has been placed under seal. In sum, the process is served by the procedures currently in place that seal the classified material filed in this Court.

The news organizations argue that there is a "compelling [public] interest" in knowing whether the government's intelligence-gathering efforts "violat[e] international law or constitutional rights[,] as Khan contends." Mot. 16. That argument ignores the unrelated purpose of this Court's DTA review, which is to gauge Khan's status as an enemy combatant rather than investigate the CIA's

8

detention program. It also assumes that any factual assertions by Khan about his treatment are truthful, which is hardly a safe assumption when terrorists are trained to lie about the conditions of their detention. See Gov't Exs. 158, 1677-T, introduced into evidence in *United States v. Bin Laden*, No. S(7) 98 Cr. 1023 (LBS) (S.D.N.Y.) (excerpt from al-Qaeda training manual stating that captured "brothers must insist on proving that torture was inflicted upon them by State Security" and "[c]omplain * * * of mistreatment while in prison").[2]

This Court has recognized the propriety of denying access to classified material in litigation even when access is being sought by a party to the suit rather than, as here, members of the public who are non-parties. See, *e.g., Holy Land Foundation v. Ashcroft*, 333 F.3d 156, 164 (D.C. Cir. 2003); *People's Mojahedin v. Dep't of State*, 327 F.3d 1238, 1242 (D.C. Cir. 2003); *Jifry v. FAA*, 370 F.3d 1174, 1182 (D.C. Cir. 2004). The Court has likewise declined to allow counsel for a former federal employee to access classified information from his client. *Stillman v. CIA*, 319 F.3d 546, 548 (D.C. Cir. 2003). And the Court has frequently crafted protective orders to allow the parties to litigate disputes involving classified information while ensuring that such information remains under seal. *See, e.g., Northrop v. McDonnell Douglas*,

---

[2]The Executive Branch has allowed Khan's lawyers to provide a classified briefing to Congress on Khan's claims, thereby further serving the public interest in government oversight. See http://ccrjustice.org/newsroom/press-releases/ccr-attorney-gives-unprecedented-classified-briefing-senate-intelligence-com.

751 F.2d 395, 401 (D.C. Cir. 1984). If it is permissible to limit the access of private litigants and their counsel to classified information that bears on their claims, it follows *a fortiori* that withholding access does not violate the First Amendment rights of non-party news organizations.

**B.** The news organizations are similarly mistaken in asserting a common law right of access to classified documents in civil cases. Although federal common law creates a qualified right of access to public records in general, see *Washington Legal Foundation* v. *U.S. Sentencing Comm'n*, 89 F.3d 897, 906 (D.C. Cir. 1996), the countours of the right are "largely controlled by the second of the First Amendment criteria-the utility of access as a means of assuring public monitoring of judicial or prosecutorial misconduct." *El-Sayegh*, 131 F.3d at 161. Those criteria are not satisfied here because the filings have not been determined to be relevant to this action; their public release is not essential to the functioning of the judicial process; and their release would harm national security. See *supra* pp. 7-9.

More fundamentally, neither this Court nor any other court has ever extended that common law right to classified information. The common law right of access to public records, like other federal common law rights, "is subject to the paramount authority of Congress," and "[w]hen Congress addresses a question previously governed by * * * federal common law[,] the need for such an unusual exercise of lawmaking by federal courts disappears." *City of Milwaukee* v. *Illinois*, 451 U.S. 304,

314 (1981) (internal quotation marks omitted). Here, Congress has made the policy

judgment that classified information should not be disclosed to the public and has

embodied that judgment in legislation. Thus, the Freedom of Information Act

exempts from disclosure those matters that are "specifically authorized under criteria

established by an Executive order to be kept secret in the interest of national defense

or foreign policy and * * * are in fact properly classified pursuant to such Executive

order." 5 U.S.C. 552 § (b)(1)(A)-(B); *see also* 18 U.S.C. § 793; 50 U.S.C. §§ 421,

783 (criminal provisions related to release of classified information); 18 U.S.C. App.

§ 6(e)(1) (Classified Information Procedures Act).

Taken together, these provisions embody a broad Congressional policy against

unauthorized disclosure of classified information, including disclosure to the public.

That policy precludes the creation of a conflicting common law right of access, for

the courts may not "continue to rely on federal common law by judicial[] decree[] *

* * when Congress has addressed the problem." *City of Milwaukee*, 451 U.S. at 315.

## II.    The Material Sought is Properly Classified.

**A.** For the foregoing reasons, the news organizations do not have a right to

obtain the classified material filed under seal. But even if this Court construed the

motion as seeking review of the underlying classification decision, the decision is not

properly reviewed in this litigation. Instead, the Freedom of Information Act (FOIA)

is the appropriate avenue to seek review of whether the Executive Branch has

11

improperly or erroneously classified material. *See El-Sayegh*, 131 F.3d at 163 (when a party seeks information to "evaluat[e] the performance of" the government "in [its] dealings with" an individual, the person is not evaluating "the judicial function" and the "appropriate device" for obtaining the information is not a request for "access to the records of the judiciary" but "a [FOIA] request addressed to the relevant agency").[3]

**B.**     In any event, the CIA properly classified the material.     The news organizations argue that this Court should unseal the classified filings unless the government carries the "heavy burden" of showing a "'compelling interest'" in keeping the information under seal (Mot. 12). That argument seriously misstates the standard of review.     Far from requiring the government to bear a "heavy burden," both the Supreme Court and this Court have held that the Executive Branch's classification determinations warrant great deference from the courts.

This Court has repeatedly declined to second-guess classification decisions. See, *e.g.*, *Students Against Genocide v. Dept. of State*, 257 F.3d 828, 835 (D.C. Cir. 2001). As this Court observed most recently in *Bismullah*, "consistent with our rule

---

[3]The availability of FOIA also undermines the news organizations' claim to the extent they assert a First Amendment or common law right to obtain review of the classification decision by intervening in this litigation. Cf. *Washington Legal Foundation*, 89 F.3d at 899 ("access under the common law should be denied" when there is a statutory regime governing access because "the availability of a legislatively prescribed route to documents tips the second-step balancing test against their judicially prompted release").

of deference, '[i]t is within the role of the executive to acquire and exercise the expertise of protecting national security. It is not within the role of the courts to second-guess executive judgments made in furtherance of that branch's proper role.'" 501 F.3d at 187-88. Instead, "[t]he assessment of harm to intelligence sources, methods and operations is entrusted to the Director of Central Intelligence, not to the courts." *Fitzgibbon v. C.I.A.* 911 F.2d 755, 766 (D.C. Cir. 1990).

Importantly, this case concerns *access* to classified information, rather than preventing the *release* of classified information by someone already in possession of it. Here, Khan has not sought to release classified information. Instead, the news organizations are seeking to access the classified information Khan has provided to his attorneys. If Khan sought release of classified information, this Court could address the issues that would arise at that time. When disclosure is being pursued by an entity that already possesses classified information and is predicated on recognized First Amendment interests, the government's classification decisions are still entitled to a significant measure of deference. See *McGehee v. Casey*, 718 F.2d 1137, 1147-49 (D.C. Cir. 1983). Here, were Khan to seek to release information in his possession, his status as an alien abroad who is being held as a military prisoner in wartime would preclude his reliance on the First Amendment. See *United States ex rel. Turner v. Williams*, 194 U.S. 279, 292 (1904); *Cuban-American Bar Ass'n v. Christopher*, 43 F.3d 1412, 1428-29 (11th Cir. 1995). Cf. *Thornburgh v. Abbott*, 490

13

U.S. 401 (1989) (speech of prisoners held in the United States may be restricted if there is a legitimate penological interest).[4] In sum, judicial deference is warranted *a fortiori* here, where the case concerns access, not release, of classified information and there is no First Amendment right of access in the first instance. See *McGehee*, 718 F.2d at 1147.

**C.** Under this deferential standard of review, this Court should sustain the CIA's reasonable, good faith explanation for classifying the redacted portions of Khan's filings. The information in Khan's filings is classified because the United States has confirmed that Khan "may have come into possession of the very information about the CIA program that the U.S. Government seeks to protect, including the locations of detention facilities, the identities of cooperating foreign governments, and the conditions of confinement and interrogation techniques." Hilton Decl. ¶ 23. He has also "been exposed to intelligence sources and methods" protected by the National Security Act, 50 U.S.C. § 403-1(i). *Id.* ¶ 11. While "many of the allegations" made by Khan are not true, he "is in a position to provide accurate and detailed information

---

[4]The government may "act[] to protect substantial government interests by imposing reasonable restrictions on employee activities that in other contexts might be protected by the First Amendment." *Stillman*, 319 F.3d at 548 (quoting *Snepp v. United States*, 444 U.S. 507, 510 n.3 (1980)). That "government interest[]" is obviously compelling in circumstances like these, where an enemy combatant has come into possession of classified information in conjunction with his detention. Accordingly, it is entirely appropriate to impose restrictions on Khan to protect classified information. Cf. *United States* v. *El-Hage*, 213 F.3d 74, 81-82 (2d Cir. 2000).

about the CIA's detention program." *Id.* ¶ 24.

If the Court were to release the true details of the program – including the locations of his detention, the governments that cooperated, and the details of interrogation methods – there would be "exceptionally grave damage to the national security." *Id.* ¶¶ 12, 18. With respect to cooperation with foreign governments, they "have provided critical assistance to CIA counterterrorism operations * * * under the condition that their assistance be kept secret." *Id.* ¶ 14. If the "United States demonstrates that it is * * * unable to stand by its commitments [of secrecy] to foreign governments, they will be less willing to cooperate * * * on counterterrorism activities" and could "cease cooperating with the CIA" in the detention program. *Ibid.* This risk is not "merely conjectural" – "specific assurances" were made to "protect [the] cooperation" in this program and a leak of information about the program has caused "one particular liaison partner [to] reduce[] its cooperation" causing "incalculable" damage. *Id.* ¶¶ 15-16.

With respect to classified interrogation methods, public disclosure "could be expected to cause exceptionally grave damage to national security by making it more difficult for the CIA to obtain the information it needs to help protect the American people." *Id.* ¶ 17. Disclosure of these interrogation methods "would allow al Qaeda and other terrorists to more effectively train to resist such techniques, which would result in degradation in the effectiveness of the techniques." *Id.* ¶ 21.

15

The President has confirmed the importance of the CIA detention program. See *id.* ¶ 18. It is "one of the most useful tools in combating terrorist threats" that has "led to the disruption of terrorist plots" such as the "plot to fly a plane into the tallest building in Los Angeles." *Id.* ¶ 19. It has also "provided initial leads to the locations of al Qaeda operatives that led to their capture." *Id.* ¶ 20. Accordingly, releasing information about the program would "result in exceptionally grave damage to the national security." *Id.* ¶ 18.

Moreover, because it has been publicly acknowledged that Khan has had access to classified information regarding the program, the CIA cannot adequately protect this classified information by either declining to classify any statements made by Khan about the program or by classifying only those statements he makes which are actually true. *Id.* ¶ 26. Either rule, once established, would enable Khan to easily reveal the scope and details of the classified program. Of course, because Khan has been exposed to the classified program, if the government declined to classify any of Khan's statements, he could directly reveal "the very information about the CIA program that the U.S. Government seeks to protect." *Id.* ¶ 23. If, on the other hand, the government were allowed to classify only Khan's statements concerning the program that were *true*, Khan and other former CIA detainees could nonetheless reveal "accurate, highly classified information about the program" by "making multiple allegations" that would allow others to figure out the correct information "through a

16

simple process of elimination." *Id.* ¶ 25. Khan and other detainees "with knowledge of classified facts could easily manipulate the rule to reveal those classified facts." *Ibid.* For example, to reveal the identity of a cooperating government, he could name several governments, and by process of elimination, an analyst could determine the identity of the government that was redacted. *Ibid.* In sum, protecting the classified programs "depends as much on concealing what * * * methods are *not* approved as it does on concealing what methods are approved." *Ibid.*; see *Halkin v. Helms*, 598 F.2d 1, 8 (D.C. Cir. 1978) (intelligence gathering is "akin to the construction of a mosaic" whereby "bits and pieces of seemingly innocuous information can be analyzed and fitted into place to reveal with startling clarity how the unseen whole must operate").

It is of no moment that news reports and individuals have made public statements claiming knowledge of some of the facts that are classified. *See* Mot. at 16-18 (citing news reports and statements by Khaled El-Masri and Khan's father). Rather, it is well established that news reports and other unconfirmed statements by individuals do not vitiate the classified nature of information. *Fitzgibbon*, 911 F.2d at 765 (because of the "critical difference between official and unofficial disclosures," information may be released under FOIA only if the "specific" information "has been 'officially acknowledged'"); see *Wolf v. CIA*, 473 F.3d 370, 378 (D.C. Cir. 2007); *Phillippi v. CIA*, 546 F.2d 1009, 1015 (D.C. Cir. 1976) (agency may properly protect "greater '(o)fficial acknowledgment of the involvement of specific United States

17

Government agencies'"); see also *El-Masri v. U.S.*, 479 F.3d 296, 308 (4th Cir.), *cert. denied*, 128 S. Ct. 373 (2007). In fact, the protective order entered by this Court here addressed this issue by providing that even when "classified information enters the public domain," counsel is not free to confirm that information because it remains classified. See Khan Protective Order, § 5(O).[5]

Beyond speculation, there is no reason to believe that the sources of those reports actually had access to the classified information in question. Here, on the other hand, the United States has confirmed that Khan was detained by the CIA and "may have come into possession of the very information about the CIA program that the U.S. Government seeks to protect, including locations of detention facilities" and "interrogation techniques." Hilton Decl. ¶ 23  Thus, while foreign governments can ignore allegations made by most people about CIA conduct, they would view disclosure in these circumstances as a breach of secrecy agreements. *Id.* ¶ 14. While the audience is very different, the result is similar with respect to statements concerning interrogation techniques: statements that Khan has or might make, in conjunction with the acknowledgment that he has been exposed to classified

---

[5]The government also does not waive the classified status of information relating to a subject by releasing or acknowledging other information related to the subject. See *Assassination Archives and Research Ctr. v. C.I.A.*, 334 F.3d 55, 60 (D.C. Cir. 2003) (to warrant release of material, "agency's previous disclosure [must] 'appear[] to duplicate' the material sought, *i.e.*, that the disclosure is 'as specific as' and 'match[es]' the sought material") (citations omitted).

information regarding the CIA program, will necessarily provide al Qaeda with more reliable information regarding the range of techniques employed by the CIA, thereby allowing "[t]errorists * * * [to] exploit such disclosures to improve their counter-interrogation training." *Id.* ¶ 23.

Indeed, this Court has allowed the government to prevent ex-employees from divulging classified information. See *McGehee*, 718 F.2d at 1147-49. In that context, which is much more fraught with First Amendment implications, a key basis for allowing the government to prevent disclosure is the fact that there is a degree of official confirmation that the ex-employee had access to classified information. See *Stillman*, 319 F.3d at 548. If the news organizations' theory was correct, the government would never be able to preclude former employees from disclosing potentially classified information; instead, the government would have to resort to refusing to confirm or deny the accuracy of that information once released. The gravamen in both cases is that the United States has confirmed that the individual has had access to classified information and has a "substantial government interest[]" in protecting that information. *Ibid.*

The news organizations are also incorrect in arguing that the government's determination that Khan's allegations are classified is illogical and "presumes that Khan will never be released." Mot. 6. There is nothing unusual about preventing a prisoner or detainee in custody from revealing classified materials or national security

19

information even though the person may eventually be released. For example, the government may restrain convicted terrorists, or those charged as terrorists, from communicating with the public prior to trial even though the trial may result in acquittal. See, e.g., *El-Hage*, 213 F.3d at 81-82 (sustaining Special Administrative Measures by the Attorney General, including requirements limiting communication, imposed upon a pre-trial detainee accused of plotting a terrorist bombing); *Yousef* v. *Reno*, 254 F.3d 1214, 1219 (10th Cir. 2001).

Because the news organizations have failed to establish that they have any right to classified information filed under seal in this Court, this Court need not balance the public's interest in disclosure against the government's interest in protecting classified material from disclosure. Even if balancing were appropriate, however, this Court should not unseal the classified information. There is little public interest in releasing the declarations. See *supra* pp. 7-9. The government's interest, on the other hand, is extraordinary: the protection of national security is perhaps the highest duty of the federal government. *Haig* v. *Agee*, 453 U.S. 280, 307 (1981) ("no governmental interest is more compelling than the security of the Nation").

## CONCLUSION

For the foregoing reasons, this Court should deny the news organizations' Motion To Unseal.

Respectfully submitted,

20

JEFFREY S. BUCHOLTZ
*Acting Assistant Attorney General*

JONATHAN F. COHN
*Deputy Assistant Attorney General*

DOUGLAS N. LETTER
*Terrorism Litigation Counsel*

ROBERT M. LOEB
(202) 514-4332

AUGUST FLENTJE
(202) 514-1278
ANNE MURPHY
(202) 514-3688
Attorneys, Appellate Staff
Civil Division, Room 7242
U.S. Department of Justice
950 Pennsylvania Avenue, N.W.
Washington, D.C. 20530

MARCH 28, 2008

## CERTIFICATE OF SERVICE

I hereby certify that on March 28, 2008, I served the foregoing by email and

by causing copies to be sent by regular mail to:

J. Wells Dixon
Gitanjali S. Gutierrez
Center for Constitutional Rights
666 Broadway, 7th Floor
New York, NY 10012

David A. Schulz
Amanda Leith
321 West 44th Street, Suite 510
New York, NY

August E. Flentje

[NOT SCHEDULED FOR ORAL ARGUMENT]

IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

---

|  |  |  |
|---|---|---|
| MAJID KHAN, | ) | |
| | ) | |
| Petitioner, | ) | Case No. 07-1324 |
| | ) | |
| v. | ) | |
| | ) | |
| ROBERT M. GATES, | ) | |
| | ) | |
| Respondent. | ) | |
| | ) | |

---

## REPLY BRIEF IN SUPPORT OF
## MOTION TO UNSEAL COURT RECORDS

*Of Counsel*:

David E. McCraw
The New York Times Company
620 Eighth Avenue
New York, NY 10018

David H. Tomlin
Associated Press
450 West 33rd Street
New York, NY 10001

Barbara L. Wall
Gannett Co., Inc.
7950 Jones Branch Drive
McLean, Virginia 22101

LEVINE SULLIVAN KOCH
& SCHULZ, L.L.P.
David A. Schulz
Amanda Leith
Chad R. Bowman
321 West 44th Street, Suite 510
New York, NY 10036
(212) 850-6100

*Counsel for The New York Times
Company, The Associated Press
and USA TODAY*

## PRELIMINARY STATEMENT

From its very first sentence, the Government's Opposition seeks to portray this access application by three news organizations as a shameful insistence upon the release of information that will impose "exceptionally grave damage to the nation's security." (Opp. 1.) The motion for access seeks no such relief. It expressly concedes that national security is a compelling interest that can warrant the sealing of court records. (Mot. 19.) Press Applicants seek rather a judicial determination of whether any such national security interest actually justifies sealing *every* fact advanced in this lawsuit by an alleged victim of torture, as the Government contends.

By recasting the issue presented, the Opposition fails to come to terms with the primary concern advanced by the motion to unseal: that the Government's censoring of the Court's records may do nothing to protect national security, while undeniably preventing the public from evaluating either the fairness of Khan's treatment or the actions of its government. If no legitimate need exists, secrecy is defeating democratic control over our political institutions for no proper reason.

The Opposition exaggerates the relief being sought apparently to distract attention from two rather extraordinary legal contentions that lie at the heart of the Government's position: First, that the public has no constitutional right of access whatsoever to "civil" litigation (Opp. 4), a theory that has flatly been rejected by

1

every other Court of Appeals to have addressed it. Second, that Congress has abrogated the public's common law right of access when "classified" information is involved (Opp. 10-11), so that no court has any role to play in reviewing the unilateral decision of the Executive to keep secret the judicial records upon which Article III powers are exercised. Neither contention withstands scrutiny.

## ARGUMENT

### I.  The First Amendment Access Right Extends To Khan's Motions

The Opposition asserts that, "[i]n this Circuit, the qualified First Amendment right of access to judicial proceedings applies only to criminal proceedings and does not extend to civil proceedings like this case." (Opp. 4.) This contention is incorrect on several levels.

1.  This Circuit has not rejected the right of access to civil proceedings, and the Government improperly relies on *dicta* from a Freedom of Information Act (FOIA) case in advancing this incorrect claim.[1] Nor is the Government correct to suggest that the Supreme Court holds this "narrower view" of the access right. (Opp. 4.) While the four access cases it has decided all involved criminal cases,

---

[1] The Government relies upon *Center for Nat'l Sec. Studies v. U.S. Dep't of Justice*, 331 F.3d 918 (D.C. Cir. 2003), which held that the First Amendment access right does not extend to *non-judicial* documents, noting only in *dicta* that the Supreme Court cases addressing the right of access all arose in the criminal context. *Flynt v. Rumsfeld*, 355 F.3d 697 (D.C. Cir. 2004), also cited, rejected a First Amendment right to be "embedded" with military units on the field of battle. Neither case decided the right of access to civil proceedings.

nothing in the Supreme Court's holdings or rationale limits the right to criminal proceedings. To the contrary, in addressing the right to attend a criminal trial in *Richmond Newspapers v. Virginia*, the plurality opinion by Justice Burger went out of its way to disapprove this very limitation:

> [W]hether the public has a right to attend trials of civil cases is a question not raised by this case, but we note that historically both civil and criminal trials have been presumptively open.

448 U.S. 555, 580 n. 17 (1980); *see also, id.* at 599 (constitutional right extends to trials, "civil as well as criminal") (Stewart, J. concurring).

2. To limit the access right to criminal proceedings would miss the point of the Court's First Amendment analysis altogether. The Court's "experience and logic" approach looks at whether a type of judicial proceeding or record has "historically been open to the press and general public," and whether "public access plays a significant positive role in the functioning of the particular process in question." *Press-Enterprise Co. v. Superior Court*, 478 U.S. 1, 8, 9 (1986) ("*Press-Enterprise II*"). Civil proceedings plainly satisfy this test. Civil lawsuits have a history of openness that parallels precisely that of criminal proceedings. *See Richmond Newspapers*, 448 U.S. at 580. Similarly, each of the policy reasons the Supreme Court identified for protecting access to criminal proceedings applies fully to civil cases. *See, e.g. Press-Enterprise II*, 478 U.S. at 12-14; *Richmond Newspapers*, 448 U.S. at 569-572. The contention that the same access standard

3

does not apply in civil lawsuits is so plainly incorrect that it has been rejected by every Circuit to have addressed it.[2]

3.    The Government asserts that a different analysis is required for classified information, where access would "not play[] a significant positive role in the functioning of the particular process" but rather would "severely impair" the public good. (Opp. 7.) This improperly conflates two issues—whether the right *exists* and whether it is *overcome* in a specific case. To determine the existence of the right, the proper question is whether the *type* of court record at issue is subject to the right of access, and motion papers seeking substantive judicial relief plainly are. *E.g.*, *Lugosch v. Pyramid Co.*, 435 F.3d 110, 124 (2d Cir. 2006); *Rushford*, 846 F.2d at 253; *Publicker Indus. Inc.*, 733 F.2d at 1061; *In re Cont'l Ill. Sec. Litig.*, 732 F.2d at 1308.[3] The impact of releasing specific information is relevant only to the distinct assessment of whether the right is overcome. (Mot. 15-20.)

---

[2] *See, e.g., Rushford v. New Yorker Magazine*, 846 F.2d 249, 253 (4th Cir. 1988); *Publicker Indus., Inc. v. Cohen*, 733 F.2d 1059, 1067-71 (3d Cir. 1984); *Westmoreland v. CBS*, 752 F.2d 16, 23 (2d Cir. 1984); *In re Cont'l Ill. Sec. Litig.*, 732 F.2d 1302, 1308 (7th Cir. 1984); *Brown & Williamson Tobacco Corp. v. FTC*, 710 F.2d 1165, 1178-79 (6th Cir.1983).

[3] *In re Reporters Comm. for Freedom of the Press*, 773 F.2d 1325, 1335-36 (D.C. Cir. 1985), found no First Amendment right of contemporaneous access to exhibits admitted into evidence during the course of a civil trial. Relying on "sparse" authority suggesting no historic right to "pre-judgment records in civil cases," and decided before the Supreme Court ruled in *Press-Enterprise II* that the access right extends to pre-trial proceedings, even this decision recognized an historic right of access to "appeal" records such as the records of this Court. 773 F.2d at 1333-34.

4

4.    The Government is equally misdirected in arguing the lack of any "tradition of public access" under the new Detainee Treatment Act and that access "contributes nothing to the DTA process." (Opp. 5, 7.) The DTA created no new procedures by which *this* Court is to consider Khan's appeal. The relevant focus is not on the subject matter of a specific proceeding, but whether the type of proceeding—here an appeal to a three judge court—historically has been open and benefits from public access. *See Press-Enterprise II,* 478 U.S. at 10 (analyzing the procedures used in pre-trial hearings without regard to the substance of those hearings). The true relevance of the DTA is that it authorizes a direct appeal as a substitute for habeas corpus proceedings, which are themselves subject to the right of access.[4] *E.g., Osband v. Ayers,* 2007 WL 3096113, at *2 (E.D. Cal. Oct. 22, 2007). So even if the DTA had created new procedures, a "new procedure that substituted for an older one" is judged by the "tradition of access" to the older procedure. *United States v. El-Sayegh,* 131 F.3d 158, 161 (D.C. Cir. 1997). *See also Newman v. Graddick,* 696 F.2d 796, 801 (11th Cir. 1983) (constitutional access right must extend to proceedings "which pertain to the release or incarceration of prisoners and the conditions of their confinement").

---

[4] The suggestion that anything in *North Jersey Media Group v. Ashcroft,* 308 F.3d 198 (3d Cir. 2002) supports a lack of historic openness for all "proceedings that relate to aliens who are not in the United States" is baseless. (Opp. 6.) That case addressed deportation proceedings conducted by the Executive Branch, not judicial proceedings in Article III courts, and makes no such indefensible claim.

5.    Given the DTA's purpose to substitute for habeas proceedings, it is not even accurate to characterize this appeal as a "civil" matter.   Habeas proceedings challenging the basis for confinement are not "civil actions." *Blair-Bey v. Quick*, 151 F.3d 1036, 1039 (D.C. Cir. 1998) (citing cases).

## II.    The Common Law Access Right Extends to Khan's Motions

1.    The Government argues that the common law access right has been overruled by "a broad Congressional policy against unauthorized disclosure of classified information." (Opp. 11.)   It has not.   For Congress to abrogate a common law right a statute "must 'speak directly' to the question addressed by the common law." *United States v. Texas*, 507 U.S. 529, 534 (1993).   The Freedom of Information Act ("FOIA"), 5 U.S.C. § 552 *et. seq.*, and various criminal statutes relied upon by the Government say nothing about access to court records.[5]   Far from advancing the Government's position, the provisions of FOIA undercut its premise that the common law right must be abrogated because no court can review an Executive Branch decision to classify.   FOIA expressly instructs the federal judiciary to engage in "*de novo*" review of all agency refusals to disclose

---

[5] When Congress did address the conflict between classification and court access, it made clear its opposite understanding—that the use of classified information in a courtroom does not automatically defeat public access.  The Classified Information Procedures Act, 18 U.S.C. App. 3 §§ 1-16, requires the Executive either to de-classify evidence needed in a criminal trial or to prepare alternative evidence that can be publicly disclosed, so that a court need not conduct the balancing that otherwise would be required to limit the public's access rights.

6

information, including expressly claims based on national security. 5 U.S.C. § 552 (a)(4)(B). In FOIA, Congress "insisted that judges could be trusted to approach the national security determinations with common sense, and without jeopardy to national security." *Ray v. Turner*, 587 F.2d 1187, 1194 (D.C. Cir. 1978).[6]

2.    The Government alternatively argues without elaboration that the common law right does not exist because "the filings have not been determined to be relevant" and their release "is not essential to the functioning of the judicial process." (Opp. 10.) Substantive motions "submitted to, and accepted by, a court of competent jurisdiction in the course of adjudicatory proceedings" become subject to the presumptive right of access. *See Lugosch*, 435 F.3d at 122 (citing cases). This right attaches to motion papers regardless of the significance ultimately accorded to specific facts or claims advanced in them. *See, supra*, p. 4.

## III.    The Government Fails To Justify Total Sealing of Khan's Allegations

1.    Ignoring the governing *Hubbard* standards (Mot. 15-20), the Government argues that the Court must seal "classified" information and may not second-guess the CIA's "assessment of harm to intelligence sources." (Opp. 13.)

---

[6] The alternative suggestion that FOIA provides the *only* mechanism to review classification is also incorrect. (Opp. 11-12.) FOIA was never intended to restrict access rights to court records. *Brown & Williamson*, 710 F.2d at 1177. *El-Sayegh* pointed the parties to FOIA because they sought information solely to evaluate the performance of the Department of Justice. 131 F.3d at 163. Court records are sought here to determine, *inter alia*, if justice is done *in this case*.

The Government's own authorities fail to support this broad proposition, and this Court repeatedly has made clear that courts can properly review an agency's classification decision when it is necessary to do so in exercising Article III power. For example, *Stillman v. CIA*, 319 F.3d 546, 548-49 (D.C. Cir. 2003), held that a district court had erred in reaching a constitutional issue presented by the CIA's classification of information needed by the plaintiff's lawyer without first determining whether that classification itself was proper. In *McGehee v. Casey*, 718 F.2d 1137, 1146-47 (D.C. Cir. 1983), the Court denied a constitutional challenge to a contractual obligation of a former CIA agent to seek agency review of a proposed manuscript, in part, because the CIA's decision to classify information was itself subject to judicial review. *See also* Mot. 14-15.

2.    The Government alternatively argues that its classification determinations must be given great deference. (Opp. 12.) Its own authorities describe the proper standard of review. This Court should give "substantial weight to agency statements," but only "so long as they are plausible and not called into question by contrary evidence or evidence of agency bad faith." *Students Against Genocide v. Dep't of State*, 257 F.3d 828, 837 (D.C. Cir. 2001); *see also Northrop v. McDonnell Douglas Corp.*, 751 F.2d 395, 402 (D.C. Cir. 1984) (deference "does not mean unquestioning acceptance of every claim [of harm]").

8

3.    Because the Government seeks to override public access rights by classifying judicial records, the Court must first determine if a compelling need for secrecy exists and then assure that any secrecy imposed is no broader than necessary. (Mot. 12.) The Government asserts a compelling national security need to withhold (1) the locations of secret CIA jails, (2) the identities of cooperating governments, and (3) intelligence-gathering techniques (Opp. 14), but this claim is plainly too broad if it results in sealing allegations of facts contained in Khan's motions that are already known to the public. (Mot. 16-18.)[7]

The Government counters that great harm would still occur if Khan were viewed as confirming unofficial speculation because he is "in a position to provide accurate and detailed information." (Hilton Dec. ¶ 24.) This concern might plausibly support sealing the first two categories of information the Government seeks to protect for foreign relations reasons, but has no meaningful application to Khan's allegations of torture. As to these facts the Government advances a single reason for secrecy: Khan's depiction of interrogation techniques is "likely to degrade the programs' effectiveness" because terrorists could "more effectively train to resist such techniques." (Hilton Dec. ¶¶ 18, 21.) This justification is

---

[7] Two additional reports document the CIA's actions and discuss Khan specifically. *See* Amnesty Int'l, *USA: A Case to Answer* 22-23, 29-35 (March 14, 2008), h ttp://www.amnesty.org/en/library/info/AMR51/013/2008/en; Human Rights Watch, *Ghost Prisoner, Two Years in Secret CIA Detention* 6-12 (February 2007), http://hrw.org/reports/2007/us0207).

completely untenable as a basis to withhold Khan's claims about interrogation techniques already being widely discussed, whether officially confirmed or not. What committed terrorist would not train to resist a reported technique just because its use is not officially confirmed?  Moreover, many interrogation techniques have been described publicly by former detainees, former interrogators and others with at least as much credibility as Khan, including the Director of the CIA.  (Mot. 16-18 & n. 16.)  Concealing similar descriptions presented to the Court by Khan can do nothing to prevent terrorist training, but undeniably prohibits the public from evaluating the credibility of Khan's claims, the fairness of this proceeding, and the actions of government.  Such secrecy creates unnecessary suspicion and prevents informed democratic decision-making, to no proper purpose.

## CONCLUSION

For each of the foregoing reasons, the Court should release those sealed portions of Khan's motion papers for which no compelling need for secrecy exists.

Dated April 7, 2008

Respectfully submitted,

LEVINE SULLIVAN KOCH & SCHULZ, L.L.P.

By: _David R. Bo_____

David A. Schulz
Amanda Leith
Chad R. Bowman
321 West 44th Street, Suite 510
New York, NY 10036
(212) 850-6100

10

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on April 7, 2008, I directed that a true and correct copy of the foregoing Reply Brief in Support of Motion to Unseal Court Records, pursuant to Fed. R. App. P. 25(c)(1)(C), by Federal Express, as follows:

*Counsel for Petitioner, Majid Khan:*

J. Wells Dixon, Esq.
Gitanjali S. Gutierrez, Esq.
CENTER FOR CONSTITUTIONAL RIGHTS
666 Broadway, 7th Floor
New York, NY 10012
(212) 614-6485

*Counsel for Respondent, Robert M. Gates:*

Robert M. Loeb, Esq.
August E. Flentje, Esq.
Attorneys, Appellate Staff
U.S. DEPARTMENT OF JUSTICE
Civil Division, Room 7268
950 Pennsylvania Avenue, N.W.
Washington, DC 20590-001
(202) 514-4332

Chad R. Bowman