# Exhibit 4

TOP SECRET//CODEWORD

FILED WITH THE
COURT SECURITY OFFICER
CSO: *Miguel Perer*
DATE: *5/9/08*

[ORAL ARGUMENT NOT YET SCHEDULED]

IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

————————————————— x
:
MAJID KHAN,                              :
:
Petitioner,          :
:
v.                   :    No. 07-1324
:
ROBERT M. GATES,                         :
:
Respondent.          :
:
————————————————— x

## MOTION TO UNSEAL PETITIONER'S TORTURE MOTIONS

CENTER FOR CONSTITUTIONAL RIGHTS
J. Wells Dixon
Gitanjali S. Gutierrez
Shayana D. Kadidal
666 Broadway, 7th Floor
New York, New York 10012
Tel: (212) 614-6423
Fax: (212) 614-6499

Counsel for Petitioner

TOP SECRET//CODEWORD

Petitioner Majid Khan, by and through his undersigned counsel, respectfully submits this motion to unseal (1) his motion to preserve evidence relating to his torture, (2) his motion to declare that the interrogation methods inflicted on him constitute torture, (3) his combined reply memorandum of law in support of the torture motions, and (4) all supporting exhibits.[1] Khan's motion should be granted.

### Preliminary Statement

Majid Khan, a former Baltimore-area resident with legal status in this country, was forcibly disappeared by the United States in March 2003. There is no serious dispute that he was abducted, imprisoned and tortured by U.S. officials at secret overseas "black sites" operated by the Central Intelligence Agency before he was transferred to Guantánamo Bay in September 2006. Nor is there any serious dispute that Khan's detention and interrogation violated U.S. and international law.

In a transparent attempt to avoid criminal indictments of U.S. officials and the national embarrassment that would unquestionably follow from public disclosure of Khan's ordeal, the government has improperly classified *every detail* of his experience in the CIA Torture Program. The government has essentially sought to maintain complete secrecy concerning Khan by holding him indefinitely in military custody at Guantánamo, and by withholding from public scrutiny any

---

[1] The government did not respond to undersigned counsel's letter of February 7, 2008, requesting disclosure of these "torture papers." *See* Ex. 1 (attached hereto).

TOP SECRET//CODEWORD

description of his torture or its impact on him and the conduct of his Combatant Status Review Tribunal ("CSRT") at Guantánamo. The government has classified Majid Khan almost in his entirety, as if he never existed to the outside world after his abduction except through government descriptions of him as an Al Qaeda terrorist – a claim he rejects. As Khan has correctly observed, "They had no choice but to make me Top Secret because of what they did to me."

The government's lawful classification authority does not permit this unprecedented, wholesale public censoring of a prisoner detained without charge or trial – or guarantee of either – who has properly invoked the Court's jurisdiction to challenge his "enemy combatant" designation. Pursuant to Executive Order 13,292, 68 Fed. Reg. 15,315 (Mar. 25, 2003) (amending Exec. Order 12,958), the government is prohibited from classifying information that it does not own, produce or control; that could not reasonably be expected to result in damage to national security; and that does not constitute an intelligence "source or method." *See id.* §§ 1.1(a), 1.4(c). Nor may the government classify information to conceal violations of the law, prevent embarrassment, or prevent or delay the release of information that does not require protection. *See id.* § 1.7(a). Finally, Khan is entitled to fundamental constitutional rights, including a First Amendment right to declare publicly how U.S. officials tortured him. His motion should be granted.

TOP SECRET//~~CODEWORD~~

## Background

On September 29, 2006, Khan filed a habeas petition in the D.C. District Court, challenging his detention in military custody. *See Khan v. Bush*, No. 06-1690 (RBW) (D.D.C.). He repeatedly sought access to his counsel in that case, which the government denied because he might possess and transmit to his counsel classified information. The District Court took no action on the merits of Khan's counsel access motions, and the case is effectively stayed.

Khan appeared before a CSRT in April 2007 and was subsequently found to be an "enemy combatant." On August 14, 2007, a few days after the final CSRT determination was announced, Khan filed this action under the Detainee Treatment Act of 2005 ("DTA"), challenging his detention as an "enemy combatant" and preserving all other legal claims including his right to habeas relief. But the government continued to deny him access to his existing counsel for two months.

On October 12, 2007, the Court entered an interim Guantánamo SCI Protective Order ("SCI PO"), which sets forth procedures that must be followed by Khan, his counsel and all other individuals who may receive classified or protected information in connection with this case. *See* SCI PO § 1.B. Among other things, the interim order provides that counsel shall treat all information learned from Khan as presumptively classified, *see id.* § 5.L, but that the government shall

3

TOP SECRET//CODEWORD

unseal court filings or portions of filings that do not actually contain classified or protected information. *See id.* §§ 8.A-C.

A few days after entry of the interim order, and more than a year after his habeas case was filed, Khan met with his counsel for the first time at Guantánamo.

On November 30, 2007, Khan filed a motion to preserve evidence of his torture. He filed a motion on December 6, 2007, to declare that the interrogation methods inflicted on him constitute torture. The motions (the "torture papers"), which are pending before a merits panel, are supported by counsel declarations describing Khan's experience in the CIA Torture Program (Declaration of Gitanjali S. Gutierrez) and the imprisonment and torture of other CIA "ghost prisoners" (Declaration of J. Wells Dixon), as well as several statements written directly by Khan. The government has since filed on the public record heavily redacted versions of the motions and Khan's personal statements; but the declarations of his counsel have not been disclosed in any form.

Khan now moves to unseal his torture papers on the ground that they are not properly classified under Executive Order 13,292, and may not be redacted or withheld entirely from the public record under the terms of the interim protective order.[2] The First Amendment also requires disclosure here.

---

[2] On March 6, 2008, the New York Times Company and other news organizations filed a motion to unseal Khan's torture papers, including the counsel declarations, on First Amendment and common law grounds. The motion is pending.

TOP SECRET//~~CODEWORD~~

Khan's need for disclosure is not academic; it goes to the very heart of his
right to challenge his detention, with meaningful legal assistance, under the DTA.
In view of the serious claims made against him at his CSRT, he cannot adequately
challenge his "enemy combatant" status without independently investigating the
facts and circumstances leading to his abduction, imprisonment and torture. In
particular, he must be able to retain investigators to locate and interview witnesses
to corroborate his CSRT testimony and ensure that all readily available exculpatory
evidence was presented to the CSRT panel. *See* CSRT Regulations § H(4). This
need is compounded by the government's refusal to produce the full record on
review, including, at a minimum, the complete CSRT Record. *See infra* pp. 6-7
and note 4. In addition, Khan must retain independent experts to assist with his
case, including psychologists to evaluate the effects of his torture and the likely
impact on his CSRT.

That is not possible as a practical matter unless Khan's torture papers are
disclosed, for the government has already refused to process additional security
clearances in this case which might permit investigation without public disclosure.
*See* Ex. 2. Moreover, absent Khan's ability to present a vigorous challenge to his
"enemy combatant" status, the Court may not be able to fulfill its statutory
mandate to determine whether that status is supported by a preponderance of the
evidence. *See Bismullah v. Gates*, 501 F.3d 178 (D.C. Cir. 2007).

5

TOP SECRET//~~CODEWORD~~

### Argument

The information that Khan seeks to unseal is limited to information within his personal knowledge, which the government lacks legal authority to classify under the provisions of Executive Order 13,292.[3]  The government deliberately disclosed information about the CIA Torture Program to Khan when U.S. officials abducted, imprisoned and tortured him.  Khan also holds no security clearance, and has no employment or contractual relationship with the government, which would require him to keep the information confidential.  Nothing prohibits disclosure of his personal knowledge except his physical custody at Guantánamo, which appears to be unending.

Indeed, it is important to note that neither Khan nor his counsel has access to government documents or other information, such as interrogation manuals or written communications with foreign governments.  The government has not provided us, or apparently the Court, with any classified documents in this case, including documents directly relevant to the Court's determination of Khan's

---

[3] ███████████████████████████████████████████
████████ That information was disclosed by the military to undersigned counsel, but has not been provided to Khan.  Accordingly, because it falls outside of his personal knowledge, Khan does not seek to unseal that particular piece of information at this time.  Nonetheless, this is literally the *only* fact included in Khan's torture papers that was not derived from his personal knowledge or from public sources.

TOP SECRET//CODEWORD

torture motions and the resolution of this case.[4]    Nor does Khan move for production of classified documents.[5]    Here, only his personal knowledge is at issue.

The government's purported classification of Khan's personal knowledge of the CIA Torture Program is also wildly overbroad, if at all proper.    There is no reasonable or legitimate basis for the government categorically to declare that *every detail* of his ordeal would threaten national security.    Both general information about the CIA Torture Program



Many former prisoners who were held with Khan

---

[4] The government also continues to withhold several *unclassified* documents from Khan's CSRT proceedings. *See* Reply Mem. in Support of Torture Motions at 16.

[5] As Khan does not seek production of government documents, this motion is notably distinct from an action under the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552. *See also* Gvt. Opp'n to N.Y. Times Motion to Unseal at 13 (recognizing that obtaining access to information is different from disclosing information). FOIA cases also plainly do not involve challenges to deprivations of liberty, where, as here, the prisoner has a substantially greater interest in obtaining information for his defense than a litigant seeking to ensure good governance. *See Afshar v. Dep't of State*, 702 F.2d 1125, 1137 (D.C. Cir. 1983) ("FOIA is not the kind of statute that is primarily concerned with individual rights.").

TOP SECRET//CODEWORD

have also provided detailed accounts of their experiences in the CIA Torture Program. *See infra* pp. 14-15. Moreover, much of the information that Khan seeks to unseal has already been officially acknowledged and verified by U.S. intelligence agents and other government officials. ███████████████ ██████████████████████████████████ No palpable harm to national security has ensued from these disclosures; and none would if this motion were granted.

The Executive further lacks legal authority to classify information in order to conceal violations of the law, prevent embarrassment, or prevent or delay the release of information that does not require protection. Because that is plainly the intended purpose of withholding Khan's torture papers, the Court should reject the government's blanket classification determinations here.

Finally, because Khan has legal status in the United States, and other substantial and voluntary ties to this country, he has a fundamental right under the First Amendment to declare publicly how U.S. officials tortured him.

TOP SECRET//CODEWORD

## I.    THE EXECUTIVE LACKS AUTHORITY UNDER EXECUTIVE ORDER 13,292 TO CLASSIFY INFORMATION WITHIN KHAN'S PERSONAL KNOWLEDGE

Although courts ordinarily defer to classification determinations made by the Executive, criminal defendants and civil litigants have an indisputable right to challenge whether information is properly classified. *See Stillman v. CIA*, 319 F.3d 546, 548 (D.C. Cir. 2003) (court improperly assumed information classified). That right is essential here because Khan raises substantial questions about the government's adherence to law, accountability for past crimes, and confidence in the administration of justice, all necessary components of a democratic state.

Although this is a civil case, Khan's liberty is as much at stake as if he were charged and held criminally. *See infra* note 9. He challenges the power of the Executive to detain him as an "enemy combatant," without charge or trial, and without any assurance that he will be released if he is cleared of any wrongdoing. Indeed, the premise of the government's purported authority to classify Khan's torture papers is the assumption that he will *never* be released from custody. If judicial review under the DTA is to have any meaning, that premise must fail.

### A.    The Government's Blanket Classification of Every Detail Concerning Khan's Experience in the CIA Torture Program Violates the Limitations of Executive Order 13,292 § 1.1(a)

The Executive's authority to classify information derives specifically from the National Security Act, 50 U.S.C. § 401 *et seq.*, and generally from the limited

9

TOP SECRET//CODEWORD

powers vested in the President by the Constitution and laws of the United States. The Executive's classification authority is currently governed by Executive Order 13,292, 68 Fed. Reg. 15,315 (Mar. 25, 2003) (amending Exec. Order 12,958).

Section 1.1(a) of Executive Order 13,292 provides that information may be classified only under the following conditions:

> (1) an original classification authority is classifying the information[7];
>
> (2) the information is owned by, produced by or for, or is under the control of the United States Government;
>
> (3) the information falls within one or more of the categories of information listed in section 1.4 of this order; and
>
> (4) the original classification authority determines that the unauthorized disclosure of the information reasonably could be expected to result in damage to the national security, which includes defense against transnational terrorism, and the original classification authority is able to identify or describe the damage.

Section 1.4 further provides, in relevant part, that the government may classify "intelligence sources or methods." Exec. Order 13,292 § 1.4(c).

Here, as indicated above, Khan moves to unseal his torture papers, which, with one exception, *see supra* note 3, only contain information that is within his personal knowledge. He has not been given access to any official classified information relating to the CIA Torture Program, including with respect to his own

---

[7] Khan does not dispute that the CIA Director and his delegates may classify information originally as "Top Secret." *See* Exec. Order 13,292 § 1.3(a), (c).

TOP SECRET//CODEWORD

abduction, imprisonment and torture. The information he has thus falls squarely outside the requirements of Executive Order 13,292 because it is not "owned by, produced by or for, or [ ] under the control of the United States Government," and could not "reasonably be expected to result in damage to the national security." Exec. Order 13,292 §§ 1.1(a)(2), (4). Nor would disclosure of Khan's personal knowledge implicate any "intelligence source or method." *Id.* §§ 1.1(a)(3), 1.4(c).

### 1.   Information Within Khan's Personal Knowledge Is Not Owned, Produced or Controlled by the Government (§ 1.1(a)(2))

The information within Khan's personal knowledge is plainly not "owned by, produced by or for, or [ ] under the control of the United States Government." Exec. Order 13,292 § 1.1(a)(2). What Khan thinks, feels, observes and recollects is owned, produced and controlled only by him. Undersigned counsel is not aware of any statute, regulation or court decision instructing otherwise. Nor is counsel aware of any authority sanctioning the blanket public censoring of an individual's personal knowledge of a classified program where: (1) the individual holds no security clearance, and has no employment or contractual relationship with the government, which would require that he keep the information confidential; (2) the government has deliberately and officially disclosed to the individual information that it sought to protect; and (3) where the public censoring is potentially

TOP SECRET//CODEWORD

permanent.[8] We are certainly not aware of any cases where a prisoner has been barred from disclosing information about his capture and imprisonment where it is necessary to challenge his detention. *See also infra* note 9.

To the contrary, information is not properly classified where it is officially disclosed by the government to private individuals without security clearances or official duties requiring access to classified information. *See Halperin v. Dep't of State*, 565 F.2d 699, 704 (D.C. Cir. 1977) (rejecting classification where State Department officials disclosed information to reporters without security clearances and with no official duties requiring access to classified information). There are also numerous cases in which private individuals have filed civil actions against the government for torture and abuse by the CIA, and, in their pleadings, have publicly described their observations and recollections of the classified government programs in which they were brutalized. *See, e.g., Orlikow v. United States*, 682 F.

---

[8] *See Doe v. ACLU*, 500 F. Supp. 2d 379, 391-94 (S.D.N.Y. 2007) (rejecting permanent bar to disclosures concerning National Security Letters, and noting administrative subpoenas, wiretaps and grand jury secrecy are subject to judicial review and limited in duration); *see also id.* at 420 ("[I]t is hard to conceive of any circumstances that would justify a permanent bar on disclosure. . . . International terrorism investigations might generally last longer than run-of-the-mill domestic criminal investigations, but they do not last forever."). The only cases we are aware of that permit the classification of information generated by private individuals involve patent secrecy issues, which plainly have no relevance here, and in which constitutional challenges to the classifications have never been raised. *See, e.g.*, Sabing H. Lee, *Protecting the Private Inventor Under the Peacetime Provisions of the Invention Secrecy Act*, 12 Berkeley Tech. L.J. 345 (1997).

TOP SECRET//CODEWORD

Supp. 77 (D.D.C. 1988) (involving allegations about CIA covert research project

involving LSD); *Kronisch v. United States*, 150 F.3d 112 (2d Cir. 1998) (same).

Even in cases dismissed based on the government's invocation of the state

secrets doctrine, plaintiffs are permitted to make public allegations about classified

government programs at the core of their complaints.[9]  *See El-Masri v. United

States*, 479 F.3d 296 (4th Cir. 2007) (former prisoner describing CIA Torture

Program); *Al-Haramain Islamic Foundation v. Bush*, 507 F.3d 1190 (9th Cir.

2007) (attorneys not permitted to discuss classified document concerning

warrantless wiretapping, but freely able to discuss telephone call that was subject

of surveillance); *see also* Patrick Radden Keefe, *State Secrets*, The New Yorker,

Apr. 28, 2008 (reporting ability to discuss substance of phone call at issue in *Al-

Haramain*, but not classified document concerning that call).  They are permitted

---

[9] Although the government has not invoked the state secrets doctrine in this case, it
has essentially tried to impose a similar blanket restriction on Khan's disclosure of
information relating to his experience in the CIA Torture Program. That attempt
should be rejected. It is improper because Khan does not request information from
the government, and because he challenges an unending deprivation of his liberty.
As the Supreme Court explained in *United States v. Reynolds*, 345 U.S. 1, 12
(1953), "the Government can invoke its evidentiary privileges only at the price of
letting the [prisoner] go free." That reasoning applies with equal force to cases of
military custody. Although Khan is not held under judgment of conviction and
sentence of imprisonment, the government is very much the "moving party" in the
overall matter of Khan's detention, and is plainly situated "on terms to which it has
consented." *Id.* On the other hand, because Khan was found to be an "enemy
combatant," his detention could be tantamount to a life sentence. *See Bismullah v.
Gates*, 514 F.3d 1291, 1297 (D.C. Cir. 2008) (Ginsburg, C.J., concurring).

TOP SECRET//CODEWORD

to make these allegations precisely because the government does not own, produce or control the information within their personal knowledge. *See Afshar v. Dep't of State*, 702 F.2d 1125, 1134 (D.C. Cir. 1983) (memoirs of covert CIA activities "are received as the private product of their authors, like any other memoirs").

Here, Khan seeks no greater right than the right of other former ghost prisoners to discuss publicly their experiences in the CIA Torture Program. Indeed, it is an unclassified fact that Khan was abducted ████████████ in Karachi, Pakistan, ████████████████████████████████ ████████████████████████████████████████ ████████████████████████ and disappeared into the secret CIA prisons. ████████████████████████████████ ████████████████████████████████████████ ████████████████████████████████████████ ████████████████████████████ It is equally nonsensical that Khaled El-Masri or other prisoners who encountered Khan in the CIA Torture Program may publicly describe his experience, but, again, he may not do so himself. *See, e.g.*, Declaration of Khaled El-Masri (Nov. 3, 2006) (attached to Dixon Declaration as Ex. F) (former ghost prisoner discussing Khan); Human Rights Watch, *Ghost Prisoner: Two Years in Secret CIA Detention* (Feb. 2007) (attached to Dixon Declaration as Ex. C) (former ghost prisoner discussing Khan,

TOP SECRET//~~CODEWORD~~

at pp. 12, 21-22, 29 & n.37); Amnesty International, *USA: A Case to Answer From*

*Abu Ghraib to Secret CIA custody: The Case of Khaled al-Maqtari* (Mar. 2008)

(attached hereto as Ex. 4) (former ghost prisoner discussion Khan, at pp. 22-23, 29,

33-34, 35); Center for Human Rights and Global Justice, *Surviving the Darkness:*

*Testimony from the U.S. "Black Sites"* (2007) ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ *see also* Craig S. Smith &

Souad Mekhennet, *Algerian Tells of Dark Term in U.S. Hands*, N.Y. Times, July 7,

2006, at A1 (describing imprisonment of men held with Khan).[10]

The only way the government could argue that Khan's personal knowledge

of the CIA Torture Program is somehow distinguishable from disclosures made by

other former prisoners would be to assume that Khan will never be released from

custody. For if he is freed, as a practical matter and as a legal matter he would be

able to disclose what the CIA did to him. But any presumption that Khan will

---

[10] The government has not confirmed or denied allegations by former prisoners concerning their experiences in the secret CIA prisons. Nor has the government confirmed or denied any particular allegations by Khan. It claims only that he is "in a position to provide accurate and detailed information about the CIA's detention program," and that some of his unspecified allegations are untrue. *See infra* p. 17 and Ex. 7 (Hilton Decl. ¶24). Accordingly, the government could simply refuse to comment on any public allegations by Khan, as it routinely does with media reports about the CIA Torture Program, without compromising the information. Any public statements by Khan would remain unacknowledged by the government regardless of their veracity. *Cf. Public Citizen v. Dep't of State*, 11 F.3d 198, 203 (D.C. Cir. 1993) (rejecting attempt under FOIA to force government to confirm or deny truth of information other sources have already made public).

TOP SECRET//CODEWORD

never be released and permitted to communicate with the outside world would render the DTA unconstitutional. If the government may continue to hold Khan without charge or trial regardless of whether the Court concludes that he is properly detained as an "enemy combatant," then the Court's Article III power to decide cases and controversies would be illusory. The DTA would not be constitutional if the only relief the Court could order were a referral of Khan's case back to the Defense Department for a new CSRT hearing. *See Hayburn's Case*, 2 U.S. (2 Dall.) 409 (1792) (rejecting request for advisory opinion concerning agency compliance with act of Congress). Accordingly, with respect to its classification authority, the government cannot distinguish Khan's case from that of other prisoners based on a purported right to retain physical custody of him possibly forever.[11]

---

[11] The government has suggested that Khan's detention *incommunicado* is no different than restrictions placed on convicted terrorists, or those charged as terrorists, from communicating with the public. *See* Gvt. Opp'n to N.Y. Times Motion to Unseal at 20. That assertion is incorrect. Defendants subject to Special Administrative Measures in criminal cases are routinely permitted access to the outside world, including regular telephone calls and visits with their families. *See, e.g., United States v. Abu Ali*, 396 F. Supp. 2d 703, 710 (E.D. Va. 2005) (pretrial defendant accused of terrorism "retains the ability to meet with and talk to his attorneys and family members," and is permitted regular family telephone calls); *United States v. El-Hage*, 213 F.3d 74, 78 (2d Cir. 2000) (pretrial defendant accused of embassy bombing permitted regular family telephone calls); *see also Yousef v. Reno*, 254 F.3d 1214, 1219 (10th Cir. 2001) (regarding first World Trade Center bomber confined in ADX "supermax" facility in Colorado: "the Bureau of Prisons could not assign a prisoner directly . . . . to spend the rest of his life in the control unit without the possibility of reconsideration") (quotation marks omitted).

TOP SECRET//~~CODEWORD~~

2.    **Information Within Khan's Personal Knowledge**
      **Cannot Reasonably or Legitimately Be Expected**
      **to Result in Damage to National Security (§1.1(a)(4))**

Public disclosure of Khan's personal knowledge could not reasonably or legitimately be expected to result in damage to national security. *See* Exec. Order 13,292 § 1.1(a)(4). The government cannot show harm as a matter of law concerning matters that have already been officially acknowledged; and the single government declaration alleging possible harm from the disclosure of information known by Khan is facially insufficient to warrant judicial deference.

Here, Khan seeks to disclose specific information that has indisputably been officially acknowledged and verified by U.S. intelligence agents and other government officials. For instance, the government has acknowledged the existence of the CIA Torture Program and Khan's disappearance into secret CIA detention. *See* Decl. of Wendy M. Hilton (Mar. 28, 2008) ("Hilton Decl.") (attached hereto as Ex. 7). The government has also acknowledged the complicity

---

Khan neither stands accused of any crime, nor does he have any meaningful right to communicate with the outside world. That he is detained as an "enemy combatant" in military custody is also irrelevant to whether he may communicate with the outside world. *Compare Omar v. Harvey*, 514 F. Supp. 2d 74, 78 (D.D.C. 2007) (prisoner held by U.S. military in Iraq permitted telephone call with counsel); Certificate of Andrew J. Savage, III, at ¶55 (Mar. 10, 2008) (alleged Al Qaeda agent permitted telephone calls with counsel), Exhibit A to Memorandum in Support of Motion for Interim Relief from Prolonged Isolation and Other Unlawful Conditions of Confinement, *Al Marri v. Gates*, C/A No. 2:05-cv-2259-HFF-RSC (D.S.C.) (attached hereto as Ex. 6).

TOP SECRET//~~CODEWORD~~

of at least one foreign government in the CIA Torture Program, the United

Kingdom, regarding extraordinary rendition flights. *See* John F. Burns, *C.I.A.*

*Used a British Island to Transport Terrorism Suspects*, N.Y. Times, Feb. 22, 2008

(CIA confirms use of Diego Garcia).



18

TOP SECRET//CODEWORD





TOP SECRET//CODEWORD



Moreover, U.S. intelligence agents who carried out the CIA Torture Program have publicly verified many details of the program that Khan seeks to disclose, including the use of other torture techniques [REDACTED] and the medieval torture of Abu Zubaydah. [REDACTED]

According to one former CIA agent:

> I suppose I can say that – that my understanding is that what's been reported in the press – has been correct in that these enhanced interrogation techniques included everything from – what was called an attention shake where you grab the person by their lapels and shape [sic] them. All the way up to the other end, which was water boarding. . . . Water boarding was one of the techniques, yes. . . . To me it's almost like being shocked. . . . None of us [CIA agents] were able to withstand more than ten seconds worth, ten or 12 seconds. . . . [Sleep deprivation was one of the enhanced interrogation techniques. . . . after a while some people just can't take it



TOP SECRET//CODEWORD

anymore. . . . I recall the handful of times it was used on people it was usually 40 hours plus [while standing the whole time]. . . [a]nd you do things like you play music.

*Id.* (transcript of video interview at pp. 16, 37, 38, 43-46 (attached hereto as Ex. 10)); *see also* Ron Suskind, *The One Percent Doctrine: Deep Inside America's Pursuit of Its Enemies Since 9/11*, at 100 (Simon & Schuster 2006) (quoting former FBI agent Dan Coleman concerning Abu Zubaydah). This information is not mere speculation; it is sufficiently specific, credible and "official" to waive any claim of classification. *See Wolf*, 473 F.3d at 378 (quoting *Fitzgibbon v. CIA*, 911 F.2d 755, 765 (D.C. Cir. 1990)). At a minimum, these disclosures and the non-harm that has resulted from them undermine any claim by the government that disclosure of Khan's personal knowledge would cause harm to national security. *See Bonner v. U.S. Dep't of State*, 724 F. Supp. 1028, 1032 n.14 (D.D.C. 1989) (claim of damage to national security overcome by production of prima facie evidence of non-damage); *see also supra* pp. 14-15 (former ghost prisoners describing personal knowledge of the CIA Torture Program).

The government's inability to show harm is further evidenced by the inadequacy of the Hilton Declaration. The government has presented the Hilton Declaration in support of its claim that harm would result from the disclosure of information concerning Khan's experience in the CIA Torture Program. The

TOP SECRET//CODEWORD

declaration is facially insufficient to warrant judicial deference to the wholesale classification of this information.

The Court unquestionably has jurisdiction to review the adequacy of a government declaration filed in support of a classification determination, and to reject that declaration where it lacks reasonable detail and specificity, fails to account for contrary record evidence, or is filed in bad faith. *See Campbell v. Dep't of Justice*, 164 F.3d 20, 30 (D.C. Cir. 1998) (rejecting declaration). In addition, while courts frequently defer to government declarations concerning likely harm, "deference is not equivalent to acquiescence." *Id.*; *see also Gavin v. DIA*, 330 F. Supp. 2d 592, 601 (E.D. Va. 2004) (quoting *Coldiron v. Dep't of Justice*, 310 F. Supp. 2d 44, 53 (D.D.C. 2004) ("No matter how much a court defers to an agency, its review is not vacuous. An agency cannot meet its burden of justifying non-disclosure simply by invoking the phrase national security.")). Here, the government cannot carry its burden to show that the Hilton Declaration satisfies the requirements to uphold the purported blanket classifications.

The Hilton Declaration states in conclusory fashion that Khan was "exposed to intelligence sources and methods," which included the locations of the secret prisons, the involvement of foreign governments, and the conditions of confinement and methods of interrogation used by the CIA. Hilton Decl. ¶11. The Declaration then states that disclosing the locations of the secret prisons and the

TOP SECRET//CODEWORD

involvement of foreign governments "would damage the CIA's relations with these foreign governments and could cause them to cease cooperating with the CIA on such matters." *Id.* ¶14. It further states that this harm would arise from the fact that "the CIA provided certain foreign partners with specific assurances that the CIA would protect their cooperation." *Id.* ¶15.

But the Hilton declaration does not explain whether the particular foreign governments involved in Khan's abduction, imprisonment and torture were promised confidentiality or otherwise expected it from the CIA. Nor does the declaration attempt to draw any connection between the proffered harm to foreign relations and the classification of *every detail* concerning Khan's experience in the CIA Torture Program. *See Campbell*, 164 F.3d at 3031 (rejecting declaration containing no specific reference to person seeking disclosure or any language narrowly tailored to specific set of documents). Moreover, merely showing that an intelligence source was confidential and would be revealed by a disclosure is not sufficient to sustain a classification determination. *See Wiener v. FBI*, 943 F.2d 972, 980 (9th Cir. 1991) (rejecting affidavits).[14]

---

[14] The Hilton Declaration cites an unspecified instance in which a foreign government apparently reduced its cooperation in the CIA Torture Program when its role was leaked to a third country whose national had been detained within the program. *See* Hilton Decl. ¶16. Apart from the conclusory nature of that claim, it says nothing about who actually leaked the information or whether it had anything to do with Khan. Indeed, it appears that the leak may have involved an official

TOP SECRET#CODEWORD

The Hilton Declaration likewise fails to show why disclosure of Khan's personal knowledge concerning the conditions of confinement and interrogation techniques used by the CIA would compromise CIA intelligence activities. The Declaration states that Khan has "been exposed to classified intelligence methods," which, if disclosed, would make it more difficult for the CIA to obtain the information it requires. Hilton Decl. ¶17. The only explanation offered for this vague and sweeping statement is that "terrorists train in counter-interrogation methods," and if the methods were disclosed it would allow them to train more effectively to resist such techniques. *Id.* at ¶21. This argument is fatally flawed.

First, there is again no mention or discussion of the specific interrogation techniques that were used on Khan, or any explanation as to how or why it is necessary to classify *every detail* concerning Khan's experience in the CIA Torture Program in order to protect those techniques. There is also no explanation as to how or why the unqualified statement  would somehow permit alleged terrorists to train more

---

acknowledgement by the government, which the Hilton Declaration itself recognizes is distinct from a prisoner's unconfirmed allegations. *See id.* ¶22 & n.4.

24

TOP SECRET//CODEWORD

effectively to resist that technique than they might with the mere knowledge that it

was inflicted 

The notion that anyone could train to resist the methods of torture inflicted

on Khan is also pure fantasy.

[15]

---

[15] *See, e.g.*, Brian Ross & Richard Esposito, *CIA's Harsh Interrogation Techniques Described*, ABC News, Nov. 18, 2005 (CIA officer caused the death by hypothermia of one detainee at the secret "Salt Pit" prison in Afghanistan; a second

TOP SECRET//CODEWORD

Even if there were some way to train to resist the torture methods described by Khan, and even if those techniques were not publicly known or officially recognized, there is more than enough public information available concerning the torture methods used by the CIA for any alleged terrorist to assume what might happen to him if he were captured. The techniques have been widely reported in the news media for several years.[16] The Army Field Manual and the CIA's own KUBARK manual are also publicly available and discuss in great detail many of the methods inflicted on Khan.[17] And the military SERE techniques from which the CIA torture methods were adapted are now the subject of great public debate.[18]

---

CIA detainee died in Iraq and a third died after interrogation by the Defense Department officials and contractors in Iraq).

[16] *See* Dana Priest, *CIA Puts Harsh Tactics on Hold*, Wash. Post, June 27, 2004, at A1 ("The 'enhanced interrogation techniques' as the CIA calls them, include feigned drowning and refusal of pain medication for injuries. The tactics have been used to elicit intelligence from al Qaeda leaders such as Abu Zubaydah and Khalid Sheik Mohammed."); Brian Ross & Richard Esposito, *CIA's Harsh Interrogation Techniques Described*, ABC News, Nov. 18, 2005 (listing six techniques: attention grab, attention slap, belly slap, long time standing, cold cell, and water boarding).

[17] *See* U.S. Army Field Manual FM 2-22.3, Human Intelligence Collector Operations (6 Sept. 2006) (excerpts attached hereto as Ex. 11); CIA, KUBARK Counterintelligence Interrogation (July 1963), *available at* http://www.gwu.edu/~nsarchiv/NSAEBB/NSAEBB122/index.htm#kubark.

[18] *See* Jane Mayer, *The Experiment*, The New Yorker, July 11, 2005; Mark Benjamin, *The CIA's Torture Teachers*, Salon.com, June 21, 2007, *available at* http://salon.com/news/feature/2007/06/21/cia_sere/print.html; Katherine Eban, *Rorschach and Awe*, Vanity Fair, July 17, 2007; Jane Mayer, *The Black Sites*, The New Yorker, Aug. 13, 2007.

TOP SECRET//CODEWORD

In sum, none of the techniques inflicted on Khan is unknown. Nor is there any dispute that information concerning the impact of these techniques is widely available; alleged terrorist suspects already know exactly what to expect from U.S. interrogators.[19] Nothing could be learned about the CIA's methods from Khan's torture papers that has not already been debated publicly, except that Khan experienced the torture himself.

Moreover, the notion that the techniques must be kept secret from alleged terrorists makes no sense considering that the information is revealed to those individuals as soon as the techniques are used on them. The government's argument in this regard thus rests once again on the explicit assumption that individuals like Khan will never be released or otherwise permitted to communicate with the outside world, under any circumstance, regardless of whether a court rules their detention unlawful.

---

[19] *See* Physicians for Human Rights et al., *Leave No Marks, Enhanced Interrogation Techniques and the Risk of Criminality* (August 2007) (attached as Ex. 2 to Reply Mem. in Support of Torture Motions);

TOP SECRET//CODEWORD

The Hilton Declaration's further claim that Khan has made unspecified false allegations about the CIA Torture Program, and thus that it would not be possible to redact only his truthful statements because that would allow Khan and other prisoners to reveal truthful information by process of elimination, proves too much. *See* Hilton Decl. ¶¶24-26. Khan does not ask for a rule allowing only the redaction of his truthful statements. He simply asks to reveal information within his personal knowledge. The Hilton Declaration fails to explain why the government could not simply refuse to confirm or deny any specific allegations by Khan, thereby avoiding altogether *any* official acknowledgment concerning his experience in the CIA Torture Program. *See supra* note 10.

Finally, the Hilton Declaration offers no explanation as to why the continued success of the CIA Torture Program "depends as much on concealing what interrogation methods are <u>not</u> approved as it does on concealing what methods are approved." Hilton Decl. ¶25 (emphasis in original). The necessary implication of this argument is that the CIA wants to preserve the ability to threaten prisoners that if they do not cooperate they might be subject to unauthorized or illegal tactics, or, in other words, that there might not be any limits to their torture. Any such method of interrogation, of course, would be illegal in its own right and would plainly have no place in a functioning democracy.

TOP SECRET//CODEWORD

it is

unclear what CIA techniques, if any, are actually still considered to be unlawful.

> 3. **Information Within Khan's Personal Knowledge Does Not Constitute an Intelligence Source or Method Because the Information Has Not Been Confirmed or Denied and Because the CIA's Actions Were Illegal and _Ultra Vires_ (§§1.1(a)(3), 1.4(c))**

The government is also wrong to claim that Khan's personal knowledge concerning the locations of the secret prisons, the complicity of foreign governments, and the torture methods inflicted on him constitute intelligence "sources and methods" within the meaning of Executive Order 13,292 § 1.4(c). "An intelligence source provides, or is engaged to provide, information the [CIA] needs to fulfill its statutory obligations." _CIA v. Sims_, 471 U.S. 159, 177 (1985).[20] While unquestionably broad, that definition is not met here for two reasons.

First, as discussed above, when a private party makes allegations about a classified program, those allegations do not result in the disclosure of intelligence sources or methods absent government confirmation or denial of the information. _See El-Masri v. United States_, 479 F.3d 296, 310, 311 (4th Cir. 2007) ("The general subject matter of [ ] allegations [concerning prisoner's experience in CIA Torture Program] could be discussed without revealing state secrets"; only actual

---

[20] _Sims_ was notably a FOIA case that did not involve a withholding of information because it was classified. _See_ 471 U.S. at 184 & n.3 (Marshall, J., concurring).

TOP SECRET//CODEWORD

evidence necessary to defense against allegations are "CIA means and methods"). At a minimum, the Hilton Declaration again fails to establish why *every detail* of Khan's experience in the CIA Torture Program is properly classified as an intelligence source or method. *Cf. Campbell v. Dep't of Justice*, 164 F.3d 20, 31 (D.C. Cir. 1998) (while "FBI surveillance and monitoring techniques" may be classified under FOIA, "it is implausible to baldly assert that such material is so sensitive that the FBI is incapable of providing any descriptive information.").

Second, the purported sources and methods at issue here – *i.e.*, the CIA's use of forced disappearance and torture – fall outside the CIA's statutory authority. Because these actions are *ultra vires*, they are not properly classified under Executive Order 13,292 §§ 1.1(a)(3) and 1.4(c). *Cf. Orlikow v. United States*, 682 F. Supp. 77, 82 (D.D.C. 1988) (if plaintiffs' allegations concerning CIA abuse were resolved in their favor, "the [CIA] would have acted so far beyond its authority that in any proper construction the action could not be termed discretionary.").

There is no serious dispute that the interrogation methods inflicted on Khan constituted torture or other unlawful coercion. *See* Motion to Declare Interrogation Methods Constitute Torture. Khan's forced disappearance was also indisputably illegal under U.S. and international law, including treaties signed by the United States. *See* Convention Against Torture and Other Cruel, Inhuman or Degrading

TOP SECRET//CODEWORD

Treatment or Punishment, G.A. res. 39/46, Annex, 39 U.N. GAOR Supp. No. 51,

U.N. Doc. A/39/51 (1984), *entered into force* June 26, 1987 (Art. 3 prohibits

transfers to torture); International Covenant on Civil and Political Rights, G.A. res.

22000A (XXI), 21 U.N. GOAR Supp. (No. 16), U.N. Doc. A/6316 (1966), 999

U.N.T.S. 171, *entered into force* Mar. 23, 1976 (Arts. 7 and 9 prohibit transfers to

torture).

   The law is also well-settled that the CIA must comply with the Constitution

and law of the United States. *See* 50 U.S.C. § 403-1(f)(4) (Director of National

Intelligence "shall ensure compliance with the Constitution and laws of the United

States by the Central Intelligence Agency and shall ensure compliance by other

elements of the intelligence community"). "The permissible scope of CIA activity

is subject to oversight by Congress and by the Courts in appropriate

circumstances." *Agee v. CIA*, 524 F. Supp. 1290, 1293 (D.D.C. 1981). Nor does

the President have constitutional authority as Commander-in-Chief to expand the

CIA's statutory mandate or to disregard the law in his own right. *See* U.S. Const.

art. II, § 3 (Take Care Clause); *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S.

579, 587 (1952) ("In the framework of our Constitution, the President's power to

see that the laws are faithfully executed refutes the idea that he is to be a

lawmaker."); *id.* at 646, 655 (Jackson, J., concurring) ("The claim of inherent and

unrestricted presidential powers has long been a persuasive dialectical weapon in

TOP SECRET//CODEWORD

political controversy. . . [But] men have discovered no technique for long preserving free government except that the Executive be under the law, and that the law be made by parliamentary deliberations.").[21]

> **B.    The Government's Blanket Classification of Khan's Personal Knowledge Violates Executive Order 13,292 § 1.7(a) Because Its Purpose Is Plainly to Conceal Violations of the Law, Prevent Embarrassment, and Prevent or Delay the Release of Information Not Requiring Protection**

The government further lacks legal authority to classify Khan's personal knowledge of the CIA Torture Program because its intended purpose is plainly to conceal violations of the law, prevent embarrassment, and prevent or delay the release of information that does not require protection. *See* Exec. Order § 1.7(a). Regrettably, the CIA's wholesale classification of every detail concerning Khan's experience in the CIA Torture Program appears to reflect bad faith.[22]

Evidence of intent to conceal criminal conduct and prevent embarrassment exists in several respects. That the CIA would seek to classify every detail about

---

[21] *Youngstown* stands in sharp contrast to a recently disclosed Justice Department memorandum – since revoked – concluding that the President is free to ignore domestic criminal statutes, as well as the Fourth Amendment. *See* Memorandum for William J. Haynes II, General Counsel of the Department of Defense, from Deputy Assistant Attorney General John C. Yoo, U.S. Department of Justice, Office of Legal Counsel, at 8 n.10 (March 14, 2003) (stating Fourth Amendment has no application to domestic military operations), *available at* http://www.dod.mil/pubs/foi/detainees/OLCmemo14mar2003.pdf. That document may have authorized certain aspects of the CIA Torture Program.

[22] Khan does not suggest bad faith by government counsel in this case.

32

Khan's experience in the CIA Torture Program in the face of repeated, consistent disclosures concerning the program, whether official or otherwise, shows their improper intentions. *See ACLU v. DOD*, 389 F. Supp. 2d 547, 564-65 (S.D.N.Y. 2005) ("The discussions of [information] in the public press, undoubtedly arising from numerous leaks . . . raise concern [ ] that the purpose of the CIA's [classification] responses is less to protect intelligence activities, sources or methods than to conceal possible 'violations of law' in the treatment of prisoners, or 'inefficiency' or 'embarrassment' of the CIA."). As discussed above and in prior filings, the CIA's creation and execution of a secret detention and interrogation program have had as their very object the avoidance of anti-torture statutes as well as the most fundamental due process rights guaranteed by the Constitution. *See supra* note 21 (citing DOJ memorandum concluding that Executive not bound by anti-torture statutes or Fourth Amendment). The program was also structured to avoid every major international anti-torture treaty, agreement or declaration to which civilized nations are party, including the United States. This leads to no other conclusion than that U.S. officials further undertook efforts to conceal those crimes by misusing their classification authority.

Intent to conceal misconduct is further shown by the demonstrably false statements of the CIA Director and other government officials to the public and to Congress concerning (1) the videotaping of interrogations, (2) the destruction of

TOP SECRET//CODEWORD

interrogation tapes, and (3) the use of waterboarding as an interrogation technique.[23]    Why senior public officials would continue to make such misstatements in the face of undisputed contrary evidence is unclear, if not for some improper purpose. Indeed, if such statements were knowingly or recklessly false – and it remains unclear whether they were – then they could constitute obstruction of justice or other offenses. At a minimum, disclosure of additional evidence to contradict these public statements would cause embarrassment to a government that routinely recites the mantra "we don't torture." In any case, blanket over-classification for the purpose of avoiding such embarrassment is consistent with the government's repeated attempts to immunize CIA officials from accountability for their unlawful conduct. *See* Jan Crawford Greenburg et al., *Bush Aware of Advisers' Interrogation Talks*, ABC News, Apr. 11, 2008 (DOJ legal opinions intended as "golden shields" to protect CIA agents from liability).

That the classification of Khan's torture papers was intended to prevent or delay the release of information not harmful to national security is likewise demonstrated by the government's conduct regarding Khan. It has repeatedly

---

[23] *See, e.g.*, Redacted Letter from Justice Department to U.S. Court of Appeals for the Fourth Circuit and U.S. District Court for the Eastern District of Virginia, dated Oct. 25, 2007, at 3 of 5 ("The fact that the audio/video recording of enemy combatant interrogations occurred, and that the United States was in possession of three of those recordings is, as noted, inconsistent with factual assertions in CIA declarations dated May 9, 2003 . . . and November 14, 2005.") (attached as Ex. 9 to Motion for Preservation of Torture Evidence).

TOP SECRET//CODEWORD

invoked vague and sweeping national security concerns as a basis for denying Khan a meaningful opportunity to challenge his detention. For instance, after Khan filed his habeas case, the government denied him access to his counsel for a year on the ground that "he may have come into possession of information" – *i.e.*, information about his torture – which could not be communicated safely to his counsel. ·Decl. of Marilyn A. Dorn, Information Review Officer, Central Intelligence Agency, at ¶10 (Oct. 26, 2006) (Dkt. No. 6-2), *Khan v. Bush*, No. 06-CV-1690 (RBW) (D.D.C.). Even after Khan filed this DTA action, the government inexplicably refused to permit him access to counsel for two months.

Now, the government refuses without justification to produce the record on review, or, at a minimum, the CSRT Record, including various *unclassified* documents critical to the resolution of this case. Nor has the CIA released any public versions – redacted or otherwise – of the Gutierrez and Dixon Declarations, more than five months after they were filed, as they were required to do by the interim protective order. Every detail concerning Khan's experience in the CIA Torture Program simply remains "classified." These actions can only reflect an attempt to prevent and delay the disclosure of information that is criminal or embarrassing, but, ultimately, for the reasons set forth above, not harmful to national security. *Cf. Military Audit Project v. Casey*, 656 F.2d 724, 754 (D.C. Cir. 1981) ("The release of . . . documents after a thorough review suggests to us a

TOP SECRET//CODEWORD

stronger, rather than a weaker, basis for the classification of those documents still withheld.").

Accordingly, for these reasons and for the reasons set forth in Khan's prior papers, the government is not entitled to any presumption of good faith in the exercise of its classification authority.

## II.    KHAN HAS A FIRST AMENDMENT RIGHT TO DISCLOSE PUBLICLY HIS TORTURE BY THE CIA

Whatever the Supreme Court may soon decide concerning the rights of other Guantánamo prisoners, Khan is uniquely vested with fundamental constitutional rights, including the right to petition for habeas corpus and First Amendment free speech rights. At the time of his capture in March 2003, Khan had legal status in the United States and possessed strong family, work, material and personal ties to this country. He grew up in the suburbs of Baltimore, and graduated from Owings Mills High School in 1999. He purchased a home near Baltimore, opened a bank account, and worked for the State of Maryland and Electronic Data Systems. He paid thousands of dollars in taxes to the Internal Revenue Service. His family still resides legally near Baltimore; and some of his family members are U.S. citizens. There can be little doubt that he still retains those basic constitutional rights to which he was entitled at the time of his abduction by the CIA. *See United States v. Verdugo-Urquidez*, 494 U.S. 259, 271 (1990) ("[O]nce a [non-citizen] lawfully enters and resides in this country he becomes invested with the rights guaranteed

36

by the Constitution to all people within our borders.") (citation omitted). This
Court appeared to recognize this distinction in its *Boumediene* decision. *See
Boumediene v. Bush*, 476 F.3d 981, 990 (D.C. Cir. 2007) ("habeas corpus would
not have been available in 1789 to aliens without *presence or property* within the
United States") (emphasis added), *cert. granted*, 127 S. Ct. 3078.

Because Khan has basic constitutional rights, he has a First Amendment free
speech right to declare and debate publicly what happened to him in the CIA
Torture Program. That right may not be conditioned on an affirmative government
act or obligation. *See Lamont v. Postmaster General*, 381 U.S. 301, 307 (1965);
*Thomas v. Collins*, 323 U.S. 516, 545 (1945) (Jackson, J., concurring) ("The very
purpose of the First Amendment is to foreclose public authority from assuming
guardianship of the public mind through regulating [ ] speech."). The government
may not legally condition his free speech rights on its willingness to release, or
allow his counsel to release, information concerning his experience in the CIA
Torture Program merely because he is physically located in Guantánamo.
Moreover, even if the government had a compelling interest in limiting Khan's
speech, the wholesale restrictions that the government has attempted to impose on
his communications with the outside world are not narrowly tailored to serve the
government's interest and therefore fail strict scrutiny. *See Doe v. ACLU*, 500 F.

TOP SECRET//CODEWORD

Supp. 2d 379, 417 (S.D.N.Y. 2007) (blanket prohibition on disclosures concerning National Security Letters is unconstitutional).[24]

Moreover, the First Amendment is a structural limitation on the federal government's powers. As such, application of the First Amendment is not contingent on Khan's citizenship, his legal status, or the peculiar legal status of the military base where he is held. This result is reflective of the fact that the public's interest in enforcement of structural limitations on government power to restrict the flow of information is on par with Khan's interest in the same. Indeed, the liberal standing rules for facial First Amendment challenges to government action in certain circumstances are an acknowledgment that in those circumstances it is a *public* interest that is vindicated through the private litigant's actions.

Such structural limitations would apply to this proceeding regardless of where Khan is physically held. *See Downes v. Bidwell*, 182 U.S. 244 (1901) (describing "prohibitions as go to the very root of the power of Congress to act at all, irrespective of time or place"). They do so because structural limitations on

---

[24] As set forth in the news organizations' motion to unseal, Khan's audience – the American public – also has a First Amendment right to learn what happened to him in the CIA Torture Program. The public's interest is particularly weighty because this case is for all practical purposes like a criminal case, and public access enhances the fairness of the proceedings and the appearance of fairness that is critical to public confidence in the system. *See Washington Post v. Robinson*, 935 F.2d 282, 288 (D.C. Cir. 1991).

TOP SECRET//~~CODEWORD~~

government power apply everywhere[25]; but, in any event, they clearly apply to this

action, a domestic proceeding under the DTA.

This motion should be granted for these reasons as well.

### Conclusion

For all of the foregoing reasons, Khan's motion should be granted.

Dated:    Washington, DC
          May 9, 2008

Respectfully submitted,

Counsel for Petitioner:

J. Wells Dixon [Bar No. 51138]
Gitanjali S. Gutierrez
Shayana D. Kadidal
CENTER FOR CONSTITUTIONAL RIGHTS
666 Broadway, 7th Floor
New York, New York 10012
Tel: (212) 614-6423
Fax: (212) 614-6499

---

[25] Accordingly, federal courts have held that the Establishment Clause of the First Amendment applies to limit government action which has effect overseas. *See Lamont v. Woods*, 948 F.2d 825 (2d Cir. 1991).

39

TOP SECRET//CODEWORD

## CERTIFICATE OF SERVICE

I hereby certify that on May 9, 2008, I caused the foregoing Motion to Unseal Petitioner's Torture Motions, with exhibits, to be filed and served on counsel listed below by causing an original and seven copies to be personally delivered to the Court Security Office.

Robert M. Loeb, Esq.
U.S. Department of Justice
Civil Division, Room 7268
950 Pennsylvania Ave., N.W.
Washington, DC 20530-0001

Counsel for Respondent

_____
J. Wells Dixon

40

UNCLASSIFIED 

FILED WITH THE
COURT SECURITY OFFICER
CSO: *Miguel Ferrer*
DATE: *5/6/08*

[ORAL ARGUMENT NOT YET SCHEDULED]

IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

```
———————————————————— x
                              :
MAJID KHAN,                   :
                              :
              Petitioner,     :
                              :
       v.                     :   No. 07-1324
                              :
ROBERT M. GATES,              :
                              :
              Respondent.     :
                              :
———————————————————— x
```

## MOTION TO EXCEED PAGE LIMIT

Petitioner Majid Khan, by and through his undersigned counsel, respectfully moves for permission, pursuant to Federal Rule of Appellate Procedure 27 and D.C. Circuit Rule 27(h)(3), to exceed the page limit for his presumptively classified Motion to Unseal Petitioner's Torture Motions, filed herewith. The extraordinary interests of Khan and the public in the matters at stake in the Motion to Unseal, and the complexity of the legal issues of first impression raised by the Motion, constitute extraordinary compelling reasons for the Court to grant this motion.

Counsel for Respondent has indicated that the government reserves its right to consent or object to this motion.

UNCLASSIFIED

TOP SECRET//CODEWORD

Dated:     Washington, DC
           May 9, 2008

Respectfully submitted,

Counsel for Petitioner:

J. Wells Dixon [Bar No. 51138]
Gitanjali S. Gutierrez
Shayana D. Kadidal
CENTER FOR CONSTITUTIONAL RIGHTS
666 Broadway, 7th Floor
New York, New York 10012
Tel:  (212) 614-6423
Fax:  (212) 614-6499

2

TOP SECRET//CODEWORD

## CERTIFICATE OF SERVICE

I hereby certify that on May 9, 2008, I caused the foregoing Motion to

Exceed Page Limit to be filed and served on counsel listed below by causing an

original and seven copies to be personally delivered to the Court Security Office.

Robert M. Loeb, Esq.
U.S. Department of Justice
Civil Division, Room 7268
950 Pennsylvania Ave., N.W.
Washington, DC  20530-0001

Counsel for Respondent

_____
J. Wells Dixon

3

[ORAL ARGUMENT NOT SCHEDULED]

IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

|  |  |  |
|---|---|---|
| MAJID KHAN and RABIA KHAN, as Next Friend, | ) ) ) ) | |
| Petitioners, | ) ) | |
| v. | ) ) | No. 07-1324 |
| ROBERT M. GATES, Secretary of Defense, Respondent. | ) ) ) ) ) | |

## OPPOSITION TO MOTION TO FILE MOTION IN EXCESS OF PAGE LIMIT AND CROSS-MOTION TO HOLD MOTION IN ABEYANCE

The respondent, Secretary of Defense Robert M. Gates, respectfully opposes petitioners' request to file a motion in excess of the page limits. Respondent also requests that this Court hold petitioners' motion in abeyance until it has resolved the motion filed by various news organizations that seeks the exact same relief sought by petitioners' motion. Finally, if this Court declines to hold petitioners' motion in abeyance, and given the length of petitioners' motion - which is nearly two times the length allowable under this Court's rules - the respondent seeks twenty-one days in which to prepare a response from the date the Court files petitioners' motion.

1. Petitioners' over-length motion, if filed, should be held in abeyance pending resolution of the motion filed by various news organizations to unseal the exact same

material that petitioners seek to unseal in their motion. In the over-length motion, petitioners seek to unseal material petitioners submitted to this Court in two motions filed in this Court in November and December 2007, and which this Court has sealed pursuant to a protective order entered in this matter. Petitioners' legal arguments are largely identical to those presented by the news organizations[1] and the relief sought by petitioners - unsealing of material filed by petitioners in the two motions - is *exactly identical* to the relief sought by various news organizations. *See* Mot. of the N.Y. Times at 2 (moving to "unseal the withheld portions of the motions and declarations filed by Khan"). That motion by the news organizations was filed over two months ago, has been fully briefed, and is awaiting disposition by this Court.

Because petitioners seek the same relief already sought in motions pending before this Court, addressing petitioners' motion now will waste the resources of the parties and the Court. Rather, this Court's resolution of the motion filed by the news organizations may address legal issues presented by petitioners that are identical to the issues presented by the news organizations; and it may grant some or all of the relief sought by petitioners, which is the same relief being sought by the news organizations. Thus, to the extent petitioners raise legal issues that duplicate the

---

[1] Petitioners primarily argue, as the news organizations already argued, that the material was not properly classified. *See* News Organizations' Motion at 14-15. Petitioners' only unique legal argument is based on the First Amendment.

issues raised by the news organizations, further briefing on those issues is unnecessary. And because the relief sought in each motion is identical, this Court's resolution of the news organizations' motion may render petitioners' motion moot.

Further, petitioners were entitled to file a response to the news organizations' motion. Fed. R. App. P. 27(a)(3)(A) ("[a]ny party may file a response to a motion"). But petitioners took no part in that briefing. Thus, the relief now being sought by petitioners has already been the subject of full pleadings on a motion filed in this very case, yet petitioners failed to present any legal arguments at that time. Because petitioners did not seek to participate at that time in the motions briefing, they should not be heard now requesting the same relief until the news organizations' motion is resolved by this Court.

2. Petitioners' motion to file an overlength motion should in any event be denied. As we have explained, there has already been a full set of pleadings filed on a motion to seek the identical relief now sought by petitioners. Accordingly, petitioners had ample opportunity to present their position at the time that motion was briefed but declined to do so, and the legal issues presented by the news organizations have been fully aired before this Court. An over-length motion addressing the same relief sought by the prior pleading is not now warranted.

3. Given that petitioners' lodged pleading is nearly two times the page limit mandated by this Court's rules, if this Court accepts petitioners' over-length motion

for filing and does not hold it in abeyance, the government should be given twenty-one days in which to file a response from the date the Court files petitioners' motion.

Respectfully submitted,

GREGORY G. KATSAS
*Acting Assistant Attorney General*

DOUGLAS N. LETTER
*Terrorism Litigation Counsel*

ROBERT M. LOEB
(202) 514-4332

AUGUST E. FLENTJE
(202) 514-4212
*Attorneys, Appellate Staff
Civil Division, Room 7212
U.S. Department of Justice
950 Pennsylvania Avenue, N.W.
Washington, D.C. 20530*

-4-

## CERTIFICATE OF SERVICE

I hereby certify that on May 16, 2008, I served the foregoing "OPPOSITION TO MOTION TO FILE MOTION IN EXCESS OF PAGE LIMIT AND CROSS-MOTION TO HOLD MOTION IN ABEYANCE" upon counsel of record by e-mail and by causing copies to be sent by regular mail to:

J. Wells Dixon
Gitanjali S. Gutierrez
Center for Constitutional Rights
666 Broadway, 7th Floor
New York, NY 10012

_____
August E. Flentje

TOP SECRET//~~CODEWORD~~

FILED WITH
COURT SECURITY OFFICER
5|20|08  _[signature]_
DATE

[ORAL ARGUMENT NOT YET SCHEDULED]

IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

——————————————————— x
                         :

MAJID KHAN,                  :

          Petitioner,      :

         v.          :   No. 07-1324

ROBERT M. GATES,     :

          Respondent.   :

                          :
——————————————————— x

### PETITIONER'S REPLY MEMORANDUM IN FURTHER SUPPORT OF MOTION TO EXCEED PAGE LIMIT, AND IN OPPOSITION TO RESPONDENT'S CROSS-MOTION TO HOLD IN ABEYANCE

Petitioner Majid Khan, by and through his undersigned counsel, respectfully submits this reply memorandum in further support of his motion for permission to exceed the page limit for his presumptively classified motion to unseal his torture motions, and in opposition to the government's cross-motion to hold his motion to unseal in abeyance. Khan's motion should be granted, and the government's motion should be denied, for the following reasons.

### Preliminary Statement

The government's opposition and cross-motion ("the government's brief") has little to do with the length of Khan's motion to unseal or the legal arguments

TOP SECRET//CODEWORD

set forth in that motion. The government's brief is intended to achieve one thing –
delay. It is the latest chapter in the government's long-running effort to avoid
judicial scrutiny of Khan's unlawful abduction, imprisonment and torture by U.S.
officials. This transparent strategy has already included the government's denial of
counsel access to Khan for more than a year; its refusal to disclose public versions
of the Gutierrez and Dixon Declarations filed in support of Khan's torture motions
(which, after nearly six months, is an indisputable violation of the SCI protective
order)[1]; the government's refusal to produce the record on review, or, at a
minimum, the CSRT Record; and its refusal to process security clearance
applications for Khan's counsel at Jenner & Block. No further delay is warranted.[2]

Accordingly, because Khan has met the legal requirement in this Circuit for
permission to file an over-length brief, and because he has a substantial interest in
litigating this challenge to his indefinite detention expeditiously, the Court should

---

[1] The government's attempt to prevent or delay the release of information in the
declarations establishes, in part, the basis for Khan's motion to unseal pursuant to
Executive Order 13,292 § 1.7(a).

[2] Regardless of whether the Court grants Khan's motion to exceed the page limit or
the government's motion to hold Khan's motion to unseal in abeyance, the
government is already obligated to prepare and disclose a public version of Khan's
motion to unseal because that document was filed with the Court, under the terms
of the SCI protective order, when it was physically submitted to the Court Security
Office on May 9, 2008. *See* SCI PO § 8.A.

2

TOP SECRET//CODEWORD

grant his motion to exceed the page limit and deny the government's motion to hold his motion to unseal in abeyance.

### Argument

## I.  KHAN'S MOTION TO EXCEED THE PAGE LIMIT SHOULD BE GRANTED BECAUSE THERE ARE EXTRAORDINARY COMPELLING REASONS TO GRANT THE REQUESTED RELIEF

A motion to exceed the page limit may be granted where there are "extraordinary compelling reasons" for the requested relief.   D.C. Cir. Rule 27(h)(3).  That standard is plainly satisfied here.

In his motion to exceed the page limit, Khan argues that his extraordinary interests and those of the public in the matters at stake in his motion to unseal, and the complexity of the legal issues of first impression raised by the motion to unseal, constitute extraordinary compelling reasons to grant his request to file an over-length brief.   In particular, Khan's motion to unseal alleges that the government's classification of *every detail* concerning his experience in the CIA Torture Program violates Executive Order 13,292, as well as the First Amendment, and that the government's attempt to maintain complete secrecy concerning him effectively deprives him of his right to challenge his detention, with meaningful legal assistance, under the Detainee Treatment Act of 2005 ("DTA").

Although the government opposes Khan's motion to exceed the page limit, it does not address D.C. Circuit Rule 27(h)(3), or dispute either the compelling

TOP SECRET//CODEWORD

interests of Khan and the public in the matters at stake in Khan's motion to unseal, or the complexity of the issues involved. Khan's motion to exceed the page limit should be granted on that basis alone.

The government's opposition to Khan's request to exceed the page limit appears to be directed almost entirely to Khan's contention that his motion to unseal involves "legal issues of first impression." The government claims that Khan's request for permission to file an over-length brief should be denied because "[p]etitioners' legal arguments are largely identical to those presented by the news organizations [in their prior motion to unseal]," and "this Court's resolution of the motion filed by the news organizations may address legal issues presented by petitioners that are identical to the issues presented by the new organizations." Gvt. Opp'n at 2. That argument is meritless and should be rejected.

The government's claim that the legal issues involved in Khan's motion to unseal are "identical" or "largely identical" to those involved in the news organizations' motion to unseal is a gross mischaracterization of each filing. While the government correctly notes that Khan's motion to unseal is based on the government's improper classification of his torture motions, it is flatly wrong in its assertion that the only unique claim Khan asserts is based on the First Amendment. *See id.* at 2 n.1. As indicated above, Khan's argues that his torture motions are not properly classified under Executive Order 13,292. Khan also contends that based

4

on his legal status in the United States and his substantial, voluntary ties to this country, he has a First Amendment free speech right to declare and debate publicly what happened to him in the CIA Torture Program, which is unlawfully infringed by the government's refusal to disclose his torture motions. Khan further argues that the First Amendment is a structural limitation on the power of the Executive to classify the information in his torture motions.

By contrast, the news organizations do not contend that the information in Khan's torture motions is improperly classified under Executive Order 13,292. Nor do they argue that Khan has First Amendment free speech rights or that the First Amendment is a structural limitation on the government's classification authority. They contend that under the First Amendment and the common law, the public has a qualified right to inspect and copy the sealed materials, which may only be overcome by a compelling state interest that is narrowly-tailored. The news organizations concede that national security is a compelling state interest that can warrant sealing of court records, and they seek a judicial determination of whether any such interest justifies sealing every detail concerning Khan's torture. *See* N.Y. Times Reply Mem. at 1. The news organizations simply do not know

what the sealed information includes, and therefore cannot assert, as Khan does, that it is improperly classified.[3]

Not only are the legal issues different, but the government has already acknowledged *and relied on* the material distinction between the news organizations' situation and Khan's situation in its opposition to the news organizations' motion to unseal:

> Importantly, [the news organizations' motion] concerns *access* to classified information, rather than preventing the *release* of classified information by someone already in possession of it. Here, Khan has not sought to release classified information. Instead, the news organizations are seeking to access the classified information Khan has provided to his attorneys.

Gvt. Opp'n to N.Y. Times Motion at 13 (emphasis in original). The government further represented in opposition to the news organizations' motion that "*[i]f Khan sought release of classified information, this Court could address the issues that would arise at that time.*" *Id.* (emphasis added). Now, however, the government apparently seeks to retract that statement and deny Khan the right to seek disclosure of information that he already knows.

---

3 

6

TOP SECRET//CODEWORD

The government is also wrong to suggest that Khan's motion to exceed the page limit should be denied because his motion to unseal seeks the same relief as the news organizations' motion. The government's argument in this regard is essentially that consideration of Khan's motion is unnecessary or wasteful because the Court may at some point in the future grant the news organizations' motion to unseal, thereby mooting Khan's motion. That is not correct.

If anything, permitting Khan to file an over-length motion to unseal would *conserve* judicial resources. That would be particularly so if the Court were to deny the news organizations' motion; in that case, the Court would otherwise have to conduct a separate inquiry to consider Khan's unique claims under Executive Order 13,292 and the First Amendment. Full briefing and consideration of Khan's motion to unseal alongside the news organizations' motion would allow the Court to consider at one time all issues for or against disclosure. It would also prevent piecemeal litigation. For if Khan's motion to exceed the page limit were denied, he would have to file two separate motions to unseal on different bases (one based on Executive Order 13,292, and one based on the First Amendment). That, of course, would require multiple opposition briefs and reply briefs, and possibly multiple oral arguments and/or rulings by the Court. It would likely generate further stay requests by the government, which would have to be addressed.

7

TOP SECRET//CODEWORD

The government's further suggestion that Khan should be precluded from filing a motion to unseal because he did not join the news organizations' motion is specious. As indicated above, the legal issues presented by the motions to unseal are not the same, and the government itself has acknowledged Khan's right to move separately for disclosure of information within his personal knowledge. The news organizations' motion also was not directed to Khan and did not involve his personal interests in obtaining disclosure. While the news organizations' motion seeks access to sealed information in order to ensure good governance, Khan's motion seeks disclosure of information that he already knows in order to pursue a vigorous challenge to his indefinite detention under the DTA. Indeed, in a contest of competing interests, Khan's individual interest in challenging a deprivation of his liberty would likely trump the news organizations' more generalized interests. Moreover, the full extent of the government's improper classification of Khan's torture motions was unclear until the government filed the Hilton Declaration in opposition to the news organizations' motion. As discussed at length in Khan's motion to unseal, that Declaration is facially insufficient to support the government's classification determinations under Executive Order 13,292, and is ripe for challenge by Khan.[4]

---

[4] The government's citation to Fed. R. App. P. 27(a)(3)(A) is inapposite. While Khan may have been permitted to file a pleading in response to the news

8

TOP SECRET//CODEWORD

## II.    THE GOVERNMENT'S CROSS-MOTION TO HOLD IN ABEYANCE SHOULD BE DENIED BECAUSE FURTHER DELAY WOULD CAUSE KHAN SUBSTANTIAL PREJUDICE

For all of the preceding reasons, the government's cross-motion to hold Khan's motion to unseal in abeyance should be denied. The government's cross-motion should also be denied because further delay will substantially prejudice Khan's right to challenge his indefinite detention, with meaningful legal assistance, under the DTA.

As set forth in his motion to unseal (at p. 5), Khan's need for disclosure is not academic. He cannot adequately challenge his "enemy combatant" designation without independently investigating the facts and circumstances surrounding his abduction, imprisonment and torture, none of which is possible as a practical matter absent disclosure. Khan's inability to present a vigorous defense also might prevent the Court from fulfilling its statutory mandate to determine whether his "enemy combatant" status is supported by a preponderance of the evidence. At a minimum, delaying briefing of Khan's motion to unseal would delay the Court's resolution of this case.

In addition, in the context of a DTA proceeding, where, again, Khan challenges a deprivation of liberty, an indefinite delay would be substantive, not

---

organizations' motion, he was not required to do so. The government cites no authority – and we are not aware of any – instructing otherwise.

9

TOP SECRET//CODEWORD

procedural. Delay means more indefinite detention, and that is the harm *itself* that Khan filed this action to remedy. Such harm is so grievous that even an adjudicated criminal alien who has never made an entry into the United States, and has no right to be here – unlike Khan – must be released into the United States when faced with the prospect of indefinite detention. *See Clark v. Martinez*, 543 U.S. 371, 386 (2005); *cf. also Braden v. 30th Jud. Ct. of Ky.*, 410 U.S. 484, 490 (1973) (noting interest of society and prisoner in preserving habeas as a swift and imperative remedy to indefinite confinement); *Yong v. INS*, 208 F.3d 1116, 1120 (9th Cir. 2000) (rejecting indefinite stay in habeas case). Indeed, the need for prompt judicial review is never greater than where, as here, a petitioner was abducted, imprisoned and tortured, and has been afforded no judicial review. *Cf. Jones v. Shell*, 572 F.2d 1278, 1280 (8th Cir. 1978) (habeas is reduced to sham if trial courts do not act promptly).

Finally, the Court should deny the government's alternate request for permission to file their opposition to Khan's motion to unseal 21 days after the Court resolves Khan's motion to exceed the page limit. The government does not allege that it cannot file its brief within the required time limit. Nor have they offered any reason why an additional 21 days would be necessary to prepare their filing. In sum, their request is arbitrary and should be denied as such.

10

TOP SECRET//CODEWORD

## Conclusion

For these reasons, Khan's motion to exceed the page limit should be granted

and the government's motion to hold in abeyance should be denied.

Dated:    Washington, DC
          May 20, 2008

Respectfully submitted,

Counsel for Petitioner:

J. Wells Dixon [Bar No. 51138]
Gitanjali S. Gutierrez
Shayana D. Kadidal
CENTER FOR CONSTITUTIONAL RIGHTS
666 Broadway, 7th Floor
New York, New York 10012
Tel:  (212) 614-6423
Fax:  (212) 614-6499

11

TOP SECRET//CODEWORD

## CERTIFICATE OF SERVICE

I hereby certify that on May 20, 2008, I caused the foregoing memorandum

to be filed and served on counsel listed below by causing an original and seven

copies to be personally delivered to the Court Security Office.

Robert M. Loeb, Esq.
U.S. Department of Justice
Civil Division, Room 7268
950 Pennsylvania Ave., N.W.
Washington, DC 20530-0001

Counsel for Respondent

_____
J. Wells Dixon

12

# United States Court of Appeals
### FOR THE DISTRICT OF COLUMBIA CIRCUIT

No. 07-1324

September Term 2007

**CSRT ISN #10020**

**Filed On:** June 3, 2008

Majid Khan and Rabia Khan, as Next Friend,

    Petitioners

    v.

Robert M. Gates, U.S. Secretary of Defense,

    Respondent

    **BEFORE:**    Garland, Brown, and Griffith, Circuit Judges

### O R D E R

Upon consideration of the motion to unseal filed by The New York Times Company, The Associated Press and USA Today, the supplement thereto, the opposition to the motion to unseal, and the reply; and the motion to unseal filed by petitioner Majid Khan, the motion to exceed page limits, and the opposition to the motion to exceed page limits and cross-motion to hold in abeyance, it is

**ORDERED** that the motion to hold the motion to unseal in abeyance be denied. It is

**FURTHER ORDERED** that the motions to unseal be referred to the merits panel that will consider the merits of petitioner Majid Khan's challenge to his designation as an enemy combatant. It is

**FURTHER ORDERED** that the motion to exceed the page limits be dismissed as moot because the parties will be directed to include in their briefs on the merits the issues presented by petitioner Majid Khan's motion to unseal.

The court's interim order filed December 11, 2007, remains in effect.

### Per Curiam

           **FOR THE COURT:**
           Mark J. Langer, Clerk

    BY:

           /s/
           Lynda M. Flippin
           Deputy Clerk/LD